UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHELE BAKER; CHARLES CARR; ANGELA CORBETT; PAMELA FORREST; MICHAEL HICKEY, individually and as parent and natural guardian of O.H., infant; KATHLEEN MAIN-LINGENER; KRISTIN MILLER, as parent and natural guardian of K.M., infant; JAMES MORIER; JENNIFER PLOUFFE; SILVIA POTTER, individually and as parent and natural guardian of K.P, infant; and DANIEL SCHUTTIG, individually and on behalf of all others similarly situated, | Civ. No. 1:16-CV-917 (LEK/DJS) **MASTER CONSOLIDATED CLASS ACTION COMPLAINT** **DEMAND FOR JURY TRIAL** |
| Plaintiffs, | |
| v. | |
| SAINT-GOBAIN PERFORMANCE PLASTICS CORP., and HONEYWELL INTERNATIONAL INC. f/k/a ALLIED-SIGNAL INC. and/or ALLIEDSIGNAL LAMINATE SYSTEMS, INC., | |
| Defendants. | |

Plaintiffs, individually and on behalf of the putative classes of similarly situated persons defined herein, file this Master Consolidated Complaint pursuant to the Court's Decision and Order dated July 27, 2016.  Dkt. No. 1 at 16.  Plaintiffs file suit against Defendants Saint-Gobain Performance Plastics Corp. and Honeywell International Inc. f/k/a Allied-Signal Inc. and/or AlliedSignal Laminate Systems, Inc. (collectively, "Defendants"), and allege as follows:

## INTRODUCTION

1.      Residents of Hoosick Falls, New York receive their drinking water from groundwater from either the Hoosick Falls municipal water supply or from private wells.  Although unknown to them, for years residents have been drinking water laced with a dangerous chemical

called perfluorooctanoic acid, commonly referred to as PFOA.  When consumed, PFOA can cause numerous and serious negative health outcomes.

2.     The United States Environmental Protection Agency (EPA) recently issued a health advisory for PFOA (and a related chemical, perfluorooctanesulfonic acid, or PFOS), advising against ingesting water with PFOA and PFOS in excess of 70 parts per trillion (ppt).  Separately, a panel of scientists studying the health impacts from PFOA-contaminated drinking water in and around Parkersburg, West Virginia found negative health outcomes associated with exposure to drinking water containing PFOA at 50 ppt.  Certain states have also promulgated advisory exposure levels lower than the EPA's advisory level, including the State of New Jersey at 40 ppt and the State of Vermont at 20 ppt.

3.     The level of PFOA in Hoosick Falls' municipal water supply exceeded 600 ppt when it was tested in 2014 and 2015.  Upon information and belief, the concentration of PFOA in the municipal water supply had been this high or higher for years, if not decades.  In addition, as of January 2016, numerous private wells in and around Hoosick Falls contained dangerous concentrations of PFOA in excess of any safe drinking standard.

4.     The State of New York has identified Defendants Saint-Gobain Performance Plastics Corp. (Saint-Gobain) and Allied Signal Inc. and/or AlliedSignal Laminate Systems, Inc., now doing business as Honeywell International Inc. (Honeywell), as two of the parties, if not the only parties, potentially responsible for the contamination of the groundwater in Hoosick Falls with PFOA.

5.     Defendants, in whole or in part, contaminated the aquifer beneath Hoosick Falls with PFOA.

6.     On January 27, 2016, New York Governor Andrew Cuomo declared the primary Saint-Gobain facility in Hoosick Falls a state Superfund site and directed New York state agencies to use Superfund money to address PFOA in the municipal water system and in private wells.  The State has since described this Saint-Gobain facility, located at 14 McCaffrey Street, as a "significant threat to public health or the environment."  Officials have also initiated the process to have the area declared a federal Superfund site.

7.     The presence of PFOA in the municipal water supply and the local aquifer immediately stigmatized the community and has adversely impacted and continues to adversely impact property values in the Village and the Town.

8.     The PFOA contamination has also adversely impacted, and continues to adversely impact, individuals' ability to use and enjoy their properties, negatively impacted and continues to negatively impact businesses, caused significant annoyance, inconvenience, and hardship, and caused and continues to cause fear and uncertainty among Hoosick Falls residents regarding the safety of their water even after temporary filtration systems were installed.  For each of these reasons, as well as those described in more detail below, residents of Hoosick Falls are entitled compensation under the law.

9.     Furthermore, the people living in and around Hoosick Falls have been exposed for years, if not decades, to PFOA at concentrations well above a safe drinking level.  These residents had no way to know they were consuming water contaminated with PFOA until the contamination was disclosed by state and federal officials.  What is more, blood testing has now demonstrated that individuals in the community have concentrations of PFOA in their blood that is, on average, over 30 times higher than the typical American.  While PFOA is found in individuals nationwide at an average concentration of 2.08 ug/L (and only 5 percent of the population has PFOA in their

in a concentration of 5.68 ug/L), the median blood level among Hoosick Falls residents who have been tested to date is 64.2 ug/L.  Virtually all residents who have lived in and around the Village for several years have PFOA in their blood at alarming concentrations.  PFOA has thus placed the people of Hoosick Falls at significant risk of developing health conditions linked to PFOA exposure, and they are entitled to biomonitoring to safeguard against such outcomes.

## PARTIES

### *Plaintiffs*

10.    Plaintiff Michele Baker is a citizen and resident of Hoosick Falls, New York, with a mailing zip code of 12090.  Ms. Baker is a homeowner who obtains her water from a private well.  In late January 2016, Ms. Baker commenced refinancing her mortgage with a bank in Hoosick Falls.  Over the course of the next several months, Ms. Baker received multiple home appraisals, each of which appraised her home at a lower value than the previous appraisal.  A bank representative informed Ms. Baker that the bank was no longer providing financing to residents of Hoosick Falls.  Another bank representative told Ms. Baker that the bank could not provide financing to individuals who lacked potable water.  The New York State Department of Environmental Conservation (DEC) tested water from Ms. Baker's well and determined that PFOA was present at 67 ppt.  In the spring of 2016, DEC installed a Point-of-Entry Treatment (POET) system on Ms. Baker's private well, which reduced, but did not eliminate, the concentration of PFOA in her drinking water.  Ms. Baker will require use of the POET indefinitely to filter PFOA from her water.  After several months, and only after installation of her POET system, Ms. Baker was ultimately able to secure financing on terms that were much less favorable than they had been prior to disclosure of the PFOA contamination.  Upon information and belief,

4

Ms. Baker's residential property has lost value since PFOA contamination in Hoosick Falls was disclosed.

11.     Plaintiff Charles Carr is a citizen and resident of Hoosick Falls, New York, with a mailing zip code of 12090.  Mr. Carr is a homeowner who obtains his water from a private well. He has lived at his current residence since 1993.  In 2016, Mr. Carr's private well was tested for the presence of PFOA.  He later learned that PFOA was present in his private well at a concentration of at least 390 ppt.  Following this discovery, DEC installed a POET system on Mr. Carr's private well that has reduced the concentration of PFOA in his home's drinking water.  Mr. Carr will require use of the POET indefinitely to filter PFOA from his water.  In the spring of 2016, Mr. Carr had his blood tested at the Hoosick Falls Armory by representatives from the New York State Department of Health (DOH).  In June 2016, he was informed that PFOA was present in his blood at a level of 186 ug/L.  Mr. Carr routinely drank water from the tap at his residence until he learned that PFOA was contaminating the groundwater in and around Hoosick Falls.  To this day, he continues to use bottled water for drinking purposes despite the presence of the POET system.

12.     Plaintiff Angela Corbett is a citizen and resident of Hoosick Falls, New York, with a mailing zip code of 12090.  Ms. Corbett is a homeowner who obtains her water from a private well.  She has lived at her current residence and owned her home since approximately 1992.  In 2016, Ms. Corbett's private well was tested for the presence of PFOA.  She later learned that PFOA was present in her private well at a concentration of 160 ppt.  Following this discovery, DEC installed a POET system on Ms. Corbett's private well that has reduced the concentration of PFOA in her home's drinking water.  Ms. Corbett will require use of the POET indefinitely to filter PFOA from her water.   Until she was informed in late 2015 that PFOA was contaminating the

groundwater in and around Hoosick Falls, Ms. Corbett routinely drank water from the tap at her residence.

13.     Plaintiff Pamela Forrest is a citizen and resident of Hoosick Falls, New York, with a mailing zip code of 12090.  Ms. Forrest is a homeowner who obtains her water from the Village of Hoosick Falls municipal water system.  She has lived in her current residence since 1996.  In the years prior to 2016, Ms. Forrest's home was appraised on multiple occasions.  In June 2016, following disclosure of the widespread PFOA contamination in and around Hoosick Falls, Ms. Forrest's home was appraised again, this time showing substantial loss of value compared to multiple prior appraisals.  Upon information and belief, this substantial loss of property value is due in whole or in significant part to the disclosure of PFOA contamination and its impact on property values Village-wide.

14.     Plaintiff Michael Hickey, individually and as parent and natural guardian of O.H., infant, is a citizen and resident of Hoosick Falls, New York, with a mailing zip code of 12090. Since 2011, Mr. Hickey has lived at a home in the Village of Hoosick Falls along with his son. They obtain their water from the Village of Hoosick Falls municipal water system.  Prior to that, and since 2003, Mr. Hickey has lived at various properties in the Village of Hoosick Falls.  At each of these locations, Mr. Hickey obtained his water from the Village of Hoosick Falls municipal water system.  In the spring of 2016, Mr. Hickey had his blood tested at the Hoosick Falls Armory by representatives from the DOH.  In June 2016, he was informed that PFOA was present in his blood at a level of 24.6 ug/L.  Mr. Hickey routinely drank water from the tap at each of his residences until he learned that the municipal water system was contaminated with PFOA.

15.     Plaintiff Kathleen Main-Lingener is a citizen and resident of Hoosick Falls, New York, with a mailing zip code of 12090.  Ms. Main-Lingener is a homeowner who obtains her

water from the Village of Hoosick Falls municipal water system.  She has lived at her residence for nine years.  Prior to that, she rented a home in Hoosick Falls for ten years that received its drinking water from the Village of Hoosick Falls municipal water system.  In the spring of 2016, Ms. Main-Lingener had her blood tested at the Hoosick Falls Armory by representatives from the DOH.  In June 2016, she was informed that PFOA was present in her blood at a level of 95.4 ug/L.  Ms. Main-Lingener routinely drank water from the tap at both of her residences in Hoosick Falls until she learned that the municipal water system was contaminated with PFOA.

16.    Plaintiff Kristin Miller, as parent and natural guardian of K.M., infant, is a citizen and resident of Hoosick Falls, New York, with a mailing zip code of 12090.  Ms. Miller is a homeowner who lives with her seven-year-old son, K.M., at a residence that obtains its water from the municipal water system.  Ms. Miller has resided at this property since 2008 and K.M. has lived there for his entire life.  In the spring of 2016, K.M.'s blood was tested at the Hoosick Falls Armory by representatives from the DOH.  In June 2016, Ms. Miller was informed that PFOA was present in her son's blood at a level of 108 ug/L.   Until she learned in late 2015 that PFOA was contaminating the municipal water system of Hoosick Falls, Ms. Miller and K.M. routinely drank water from the tap at their residence, and K.M. has been exposed to the contamination his entire life.

17.    Plaintiff James Morier is a citizen and resident of Hoosick Falls, New York, with a mailing zip code of 12090.  Mr. Morier is a homeowner who obtains his water from the Village of Hoosick Falls municipal water system.  He has lived at his current residence since 1995.  In the spring of 2016, Mr. Morier had his blood tested at the Hoosick Falls Armory by representatives from the DOH.  In June 2016, he was informed that PFOA was present in his blood at a level of

79.1 ug/L.  Mr. Morier routinely drank water from the tap at both of his residences in Hoosick Falls until he learned that the municipal water system was contaminated with PFOA.

18.     Plaintiff Jennifer Plouffe is a citizen and resident of Hoosick Falls, New York, with a mailing zip code of 12090.  Ms. Plouffe is a homeowner who obtains her water from the Village of Hoosick Falls municipal water system.  In October 2015, Ms. Plouffe moved to Hoosick Falls from out of state.  At this time, she did not know that the municipal water system was dangerously contaminated with PFOA.  The following month, she purchased her current home.  At this time, she remained unaware of the PFOA contamination in and around Hoosick Falls.  Within a month of her closing date, however, the state and federal government disclosed the extent of PFOA contamination in the Village and Town.  Ms. Plouffe immediately found herself owner of a home worth less than she paid for it with no means of obtaining financing to move elsewhere because lending institutions had ceased providing financing to homeowners on municipal water.

19.     Plaintiff Silvia Potter, individually and as parent and natural guardian of K.P., infant, is a citizen and resident of Hoosick Falls, New York, with a mailing zip code of 12090. Ms. Potter is a homeowner who obtains her water from the Village of Hoosick Falls municipal water system.  Although Ms. Potter would like to refinance her home, she is skeptical that she could do so on reasonable terms now that state officials have disclosed the presence of PFOA in the municipal water supply.  In the spring of 2016, Ms. Potter had her blood tested at the Hoosick Falls Armory by representatives from the DOH.  In June 2016, she was informed that her PFOA level is 120 ug/L.  Ms. Potter routinely drank water from the tap at her residence prior to learning that the municipal water was contaminated with PFOA.  Ms. Potter's minor daughter, K.P., also had her blood tested in the spring of 2016.  Ms. Potter was informed in June 2016 that her daughter's blood level is 28.6 ug/L.

8

20.     Plaintiff Daniel Schuttig is a citizen and resident of Hoosick Falls, New York, with a mailing zip code of 12090.  Mr. Schuttig owns his home in Hoosick Falls and lives there with his wife and two young children.  He has owned the home since 2006, refinancing it in 2011, and the home is on municipal water.  Neither Mr. Schuttig nor his children have yet had their blood tested for the presence of PFOA.  Until he learned in late 2015 that PFOA was contaminating the groundwater in and around Hoosick Falls, Mr. Schuttig and his family routinely drank water from the tap at their residence.

21.     Collectively, Plaintiffs Michele Baker, Charles Carr, Angela Corbett, Pamela Forrest, Michael Hickey, individually and as parent and natural guardian of O.H., infant, Kathleen Main-Lingener, Kristin Miller, as parent and natural guardian of K.M., infant, James Morier, Jennifer Plouffe, Silvia Potter, individually and as parent and natural guardian of K.P., infant, and Daniel Schuttig are referred to as "Plaintiffs."

### Defendants

22.     Defendant Saint-Gobain Performance Plastics Corporation is and was at all times relevant hereto a corporation organized under the laws of California with its principal executive office located at 750 East Swedesford Road, Valley Forge, Pennsylvania.  Saint-Gobain is registered to do business as a foreign corporation in the State of New York.

23.     Saint-Gobain's global headquarters are located in Curbevoie, France, and it is a multinational corporation with more than 350 years of engineered materials expertise.  It is one of the 100 largest industrial companies in the world with € 43.2 billion in sales and 193,000 employees in 64 countries.

24.     Saint-Gobain is the world's leading producer of engineered, high-performance polymer products, serving virtually every major industry across the globe.

25.    Defendant Honeywell International, formerly known as Allied-Signal Inc. and/or AlliedSignal Laminate Systems, Inc., is a Delaware corporation with its principal executive office located at 115 Tabor Road, Morris Plains, New Jersey.  Honeywell is registered to do business as a foreign corporation in the State of New York.

26.    Honeywell is a Fortune 100 company with a global workforce of approximately 130,000.  It serves a variety of industries, including the specialty chemicals industry.

27.    In 1999, Allied-Signal Inc. (Allied-Signal) acquired Honeywell.  The combined company adopted Honeywell's name because of superior name recognition.

28.    Allied-Signal was an aerospace, automotive, and engineering company that was created through the 1985 merger of Allied Corp. and Signal Companies.  Together, these companies had operated in the United States since at least the early 1920s.  Prior to the merger, a significant portion of Allied Corp.'s business was concerned with the chemical industry.

29.    At all relevant times, AlliedSignal Laminate Systems, Inc. was a unit of Allied-Signal.

30.    Defendants, at various times relevant herein, and as described more fully below, operated a manufacturing facility at or around 14 McCaffrey Street, Hoosick Falls, New York, and 1 Liberty Street, Hoosick Falls, New York.  Defendant Honeywell also operated facilities on John Street/3 Lyman Street in Hoosick Falls, New York, and on River Road in Hoosick Falls, New York.

## JURISDICTION AND VENUE

31.    Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff classes are citizens of states different

from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

32.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because Defendant Saint-Gobain conducts substantial business in this District, and both Defendants have caused harm to class members residing in this District.  Plaintiffs also reside in this District.

## GENERAL FACTUAL ALLEGATIONS

**Background Regarding PFOA**

33.     PFOA is a fluorinated organic chemical that is part of a larger group of chemicals referred to as perfluoroalkyl substances (PFASs).

34.     PFOA is a derivative of a man-made chemical Ammonium perfluroctoanoate (APFO), which is not found in nature.  For purposes of this complaint, PFOA and APFO will be referred to as "PFOA."

35.     Minnesota Mining and Manufacturing Company (3M) is the original manufacturer of PFOA.

36.     A number of other companies have manufactured PFOA within the United States.  Those companies include Arkema, Asahi, BASF Corp., Clariant, Daikin, DuPont and Solvay Solexis.

37.     Historically, PFOA was used as a polymerization aid and as a dispersion and wetting agent in the manufacturing of fluoropolymers.   PFOA is also used in a variety of consumer products to achieve water, oil, and grease repellency.

38.     Companies utilized PFOA to make, among other things, carpets, clothing, fabrics for furniture, paper packaging for food and other materials such as cookware that are resistant to water, grease or stains.

11

39.     PFOA was also a key component in the manufacturing of Teflon®.  In this process, PFOA was used as a surfactant, dispersing and wetting agent.

40.     PFOA is a white solid at ambient temperature, but exists as a vapor when heated during the process of coating and Teflon® manufacturing.  The vapor exits through stacks in manufacturing facilities.  When hot PFOA vapor exits through the stacks, it tends to condense and, within minutes, it coagulates and forms micro-sized particulates ranging from 0.1 um to 1 um in diameter.

41.     Due to its chemical structure, PFOA is biologically and chemically stable in the environment and resistant to environmental degradation processes.  It is particularly persistent in water and soil and, because PFOA is water-soluble, it can migrate readily from soil to groundwater. PFOA, in short, remains present in the environment long after it is initially discharged.

42.     In 2006, EPA implemented a global stewardship program that included eight major perfluoroalkyl manufacturing companies.  The stewardship program's goal was (i) to achieve a 95% reduction of global facility emissions of PFOAs and chemicals that degrade to PFOA by 2010, and (ii) to eliminate PFOAs from emissions and products by 2015.  According to EPA, all eight companies that participated in the program have attested that they phased out PFOAs, and chemicals that degrade to PFOAs, from emissions and products by the end of 2015.

43.     There are a number of health risks associated with exposure to PFOA, and these risks are present even when PFOA is ingested at seemingly low levels (less than 1.0 parts per billion (ppb)).

44.     Toxicology studies show that PFOA is readily absorbed after ingestion or inhalation exposure.  PFOA has a half-life in the human body of 2 to 9 years.  PFOA binds to albumen in the serum and is concentrated in the liver and kidneys.  Indeed, PFOA is especially

concerning from a human health standpoint precisely because it can stay in the environment and in the human body for long periods of time.

45.     PFOA is associated with increased risk in humans of testicular cancer, kidney cancer, prostate cancer, non-Hodgkin's lymphoma, pancreatic cancer and ovarian cancer, as well as thyroid disease, high cholesterol, high uric acid levels, elevated liver enzymes, ulcerative colitis, and pregnancy-induced hypertension, as well as other conditions.  Epidemiological studies of PFOA exposure in animals has shown the ability to cause other cancers not yet associated with human exposure.  EPA has also advised that exposure to PFOA may result in developmental effects to fetuses during pregnancy or to breastfed infants, liver damage, and various immunological effects.

46.     In May 2006, the EPA Science Advisory Board stated that PFOA cancer data are consistent with guidelines suggesting exposure to the chemical is "likely to be carcinogenic to humans."

47.     The health conditions set forth above can arise months or years after exposure to PFOA.

48.     In 2009, the EPA identified PFOA as an emerging contaminant of concern and issued a provisional health advisory stating that lifetime exposure to PFOA at a concentration of 400 ppt can cause human health effects.  The provisional health advisory stated that the discovery of PFOA in water above the advisory level should result in the discontinued use of the water for drinking or cooking.

49.     Moreover, EPA also established a Reference Dose (RfD) of 0.000002 mg/kg/day.  The Reference Dose is defined by EPA as an "estimate[] (with uncertainties spanning perhaps an order of magnitude) of the daily exposure to the human population (including sensitive subgroups)

that is likely to be without an appreciable risk of deleterious effects during a lifetime." United States EPA, *Draft Health Effects Document for Perfluorooctanoic Acid (PFOA)*, p. 5-1 (Feb. 2014).

50.     Following EPA's action in 2009, the State of Minnesota established a chronic health risk limit for PFOA in drinking water of 0.3 ppb (300 ppt).

51.     In 2013, the State of New Jersey established a preliminary health-based guidance level of 0.04 ppb (40 ppt) in drinking water.

52.     In 2016, the State of Vermont established a drinking water advisory of 0.02 ppb (20 ppt).

53.     In May 2016, EPA replaced its 2009 provisional health advisory with a new lifetime advisory.  The 2016 lifetime health advisory established that the presence of PFOA in drinking water at a concentration greater than 70 ppt should require water systems to undertake remediation and public health officials to promptly notify consumers about the health risks associated with exposure to PFOA.  EPA health advisories are non-enforceable on the states.

54.     Prior to January 2016, PFOA was an unregulated contaminant within the State of New York.

**The Village of Hoosick Falls and the Town of Hoosick**

55.     The Village of Hoosick Falls has a population of approximately 3,500 individuals and is located approximately 30 miles northeast of Albany, New York.

56.     The Village of Hoosick Falls operates and maintains the municipal water system.

57.     The Village's municipal water system has approximately 1,300 service connections.  The Village estimates that its system provides water to nearly 95 percent of the Village's residents.

58.     The Village is near the center of the Town of Hoosick, located along Route 22 in Rensselaer County.  The Town of Hoosick has a population of approximately 6,900 individuals.

59.     There are over 800 private wells that provide drinking water to those living in the Town of Hoosick.

**PFOA Use in and around Hoosick Falls**

60.     For several decades beginning as early as the late 1950s, PFOA was used in manufacturing processes at facilities in and around Hoosick Falls.

61.     One of these facilities is a small factory located at 14 McCaffrey Street ("McCaffrey Street Site").  New York State has identified the McCaffrey Street Site as a probable source for the presence of PFOA in the Village municipal water supply and local aquifer.  Indeed, the State has characterized the McCaffrey Street Site as a "significant threat to public health or the environment."

62.     The McCaffrey Street Site began operation in or about 1955.  A company called Dodge Fibers Corporation owned and operated the factory at that time.

63.     Upon information and belief, in or about 1967 Oak Materials Group, Inc. purchased the assets and liabilities of Dodge Fibers, including the McCaffrey Street Site.

64.     Upon information and belief, in or about 1986, Defendant Honeywell, f/k/a Allied-Signal purchased Oak Materials Group, Inc., which included the assets and liabilities of the McCaffrey Street Site.  Allied-Signal operated the McCaffrey Street Site until 1996.

65.     Upon information and belief, in or about 1996, Defendant Honeywell (f/k/a Allied-Signal) sold the assets and liabilities of the McCaffrey Street Site to Furon Company (Furon).

66.     Upon information and belief, in or about 1999, Defendant Saint-Gobain purchased the assets and liabilities of Furon, including the McCaffrey Street Site.

67.     Defendant Saint-Gobain has continuously owned and operated the McCaffrey Street Site from the time it purchased the Furon Company to the present.

68.     Throughout the operation of the McCaffrey Street Site, each company manufactured stain and water resistant fabric and/or Teflon® at the factory.

69.     In manufacturing stain-resistant fabric, each company coated the fabric with a liquid solution containing PFOA (the "PFOA Solution").

70.     Saint-Gobain, Furon, Allied-Signal, and Oak Materials utilized trays for the application of the PFOA Solution to the fabric.  Employees added the solution to the trays during production runs and recovered a portion of the solution at the end of the run each shift.

71.     During the drying process, heat would vaporize a portion of the PFOA, which was discharged from the facility as fine particulate matter that was then transported by wind to the community.

72.     Defendants' employees, at the direction of corporate officers, washed out and discharged the remaining PFOA Solution from the trays into drains on a daily basis during each shift.  Those floor drains resulted in the discharge of PFOA into the soil and, in turn, into the aquifer.

73.     On average, Saint-Gobain ran three shifts, five days a week at the McCaffrey facility.

74.     Saint-Gobain also utilized PFOA in other processes at the McCaffrey Street Site between 1999 and approximately 2004.  Among other things, Saint-Gobain produced PTFE (polytetrafluoroethylene) film, adhesive tapes and silicone rubber for aeronautical, automotive, food processing and energy applications.

75.     Saint-Gobain claims that it halted the use of PFOA in its fabric coating operations at the McCaffrey plant around 2004, and began using another fluorinated carbon chemical as a surfactant in manufacturing.  Saint-Gobain continued to use PFOA in its silicone rubber operations at the plant until approximately 2014.

76.     Throughout the period during which Oak Materials, Allied-Signal, Furon, and Saint-Gobain owned the McCaffrey facility, each company also used PFOA in a solid form as a part of a separate process to manufacture, *inter alia*, pressure-sensitive tapes, Teflon®-coated fabrics, and Teflon® sheet, tape and laminates.

77.     Oak Materials, Allied-Signal, Furon and Saint-Gobain utilized six large, approximately three-story ovens as a part of their manufacturing process.

78.     The use of the ovens produced a sticky residue that would adhere to the internal tubing or "stacks" within the oven, and PFOA comprised a part of that residue.

79.     Each company established a rotation by which each oven and its stacks were cleaned once every six weeks, with a different oven cleaned every Monday.

80.     Defendants' employees removed the residue in the stacks by washing the stacks in a large sink that measured approximately 3 feet by 3 feet by 20 feet in size.  At the end of each cleaning, the waste water from the cleaning was discharged down a drain and may have been released into a septic system or catch basin near the McCaffrey plant.  Those floor drains and other discharge points resulted in the discharge of PFOA into the soil and, in turn, into the aquifer.

81.     New York State has identified at least three additional sites in and around Hoosick Falls that are potential sources of PFOA contamination.

82.     One of those sites is located at 1 Liberty Street ("Liberty Street Site").  Saint-Gobain currently owns this site and Allied-Signal (Honeywell) previously owned and operated

17

this facility.  The New York DEC has classified the Liberty Street Site as a "p-site," meaning that preliminary information suggests the site and surrounding areas may be contaminated but further investigation is required.

83.     Saint-Gobain claims that from 1999 through 2014, its extruded tape department at the Liberty Street Site used raw materials that contained PFOA.

84.     DEC has identified two additional sites, both formerly operated by Oak Materials and Allied-Signal, located on John Street/3 Lyman Street and River Road.  DEC has classified both of these sites as p-sites and further investigation is ongoing.

85.     DEC has also stated that its preliminary investigation has identified PFOA within the leachate coming from the former municipal landfill, and it has stated that it anticipates classifying the former landfill as a p-site in the near future.  DEC has measured PFOA levels of 21,000 ppt within the leachate.  The landfill is adjacent to the Hoosic River and leachate from the landfill continues to migrate towards and into the river.

86.     Upon information and belief, Defendants discharged PFOA into the environment through other means and at other sites that will be revealed through the discovery process.

**Disclosure of PFOA Contamination**

87.     In or around 2007, the Village completed the construction of a new production well to supply municipal water to many of the residents of Hoosick Falls.

88.     The production well lies approximately 500 yards away from the McCaffrey Street Site.

89.     The Village conducted testing in fall 2014 that confirmed high levels of PFOA in the municipal water.

90.     In June 2015, the Hoosick Falls Water Department conducted tests on the effluent from its production well(s) in order to discern whether PFOA existed within the water supply.

91.     Shortly thereafter, the Village received the results from its production well(s) tests.

92.     Those tests again confirmed the presence of high concentrations of PFOA within the municipal water system.

93.     Testing of municipal water produced detections of 612 ppt, 618 ppt, 620 ppt, 151 ppt and 662 ppt for PFOA.

94.     Similarly, the Village oversaw the testing of certain private wells within the Village in the summer of 2015, and received results that included detections that were significantly above any safe level.

95.     The Village's response to these test results was to reassure individuals within the community that the water was safe to drink.

96.     In October 2015, EPA Region 2 administrator Judith Enck learned of the PFOA test results taken in and around Hoosick Falls.

97.     On November 25, 2015, the EPA contacted the Village and recommended the use of an alternative drinking water source.  EPA further recommended that residents not use the municipal water for drinking and cooking.

98.     In early December 2015, the DOH released a fact sheet for the Village.  That fact sheet stated, in part, "Health effects are not expected to occur from normal use of the water."

99.     Village officials further minimized the potential risk of PFOA in the municipal water.

100.    The EPA repeated its recommendation to the Village on December 17, 2015, after learning that Village officials were downplaying the first EPA notice and suggesting that whether or not an individual used municipal water was a matter of personal choice.

101.    Unbeknownst to the community at the time, Saint-Gobain was privately negotiating with Village elected officials in an effort to minimize its liability.

102.    Shortly after the EPA's December 17 warning, Saint-Gobain began providing free bottled water to Village residents dependent on municipal water.  Saint-Gobain also agreed to fund the installation of a granulated activated carbon filter system on the municipal water system to reduce the level of and/or remove PFOA from drinking water.

103.    On January 14, 2016, Healthy Hoosick Water, a local community group, sponsored a public meeting with personnel from the EPA, the DOH and the DEC.

104.    At that meeting, New York officials announced that New York State had submitted a letter that day seeking the designation of the McCaffrey Street Site as a state Superfund site.

105.    During the mid-January meeting, residents dependent on private wells questioned state officials about whether their wells may also be contaminated.  State officials indicated that the DOH would test the private wells of any individual upon request.

106.    In fact, DOH put off testing most of the private wells in and around the Town of Hoosick and instead focused its resources on the wells nearest the McCaffrey Street Site.

107.    The DOH avoided providing private well testing for several more weeks.   In response to growing public outcry, however, the state finally reversed course and began testing the private well of anyone requesting it.

108.    In mid-January, a consultant hired by the state sent an email to DOH employees stating that "all of the manufacturing in the village went to the 'dump.'  Although the landfill was

decommissioned and capped several years ago all of the potential PFOA rich leachate goes to the treatment plant and eventually out to the Hoosic River.  It may be alarmingly high and we need to get at least a baseline level."  Testing later confirmed that wells and soil in close proximity to the Hoosick landfill were contaminated with PFOA.  Indeed, one water sample taken from the landfill showed PFOA at a concentration above 21,000 ppt.  Upon information and belief, Defendants discarded PFOA-laden waste at the landfill for years before it was decommissioned.

109.    The Hoosick Falls school district announced on January 22, 2016, that testing identified PFOA within the well water at its transportation center.

110.    On January 27, 2016, Governor Cuomo directed state agencies to use state Superfund money to address PFOA in the Hoosick Falls municipal water system.  The State Health Commissioner said that the Saint-Gobain plant would be deemed a state Superfund site and designated it a Class 2 site.

111.    That same day, the governor announced an emergency regulation to classify PFOA as a hazardous substance.  This designation is temporary pending promulgation of a final agency rule.

112.    On January 28, 2016, the EPA advised that home owners with private wells should use bottled water if testing had uncovered PFOA level in their water at 0.1 ppb (100 ppt) or higher.  The EPA further recommended that home owners with private wells should use bottled water if no one has yet tested their well water.

113.    At that time, one or more local banks indicated that they would not advance funds for the purchase or refinancing of a home in Hoosick Falls.  Indeed, the Treasurer of Trustco Bank, Kevin Timmons, publicly confirmed that the bank was not writing new mortgages for any home

on the Village's municipal water supply.  Timmons indicated that lenders typically require that homes have access to potable water before financing is approved.

114.    Timmons further stated that financing would not be approved for homes on private wells until the water supply was tested for the presence of PFOAs and showed the absence (or a very low level) of PFOAs.  Homeowners with private wells would later be required to prove that their water was not contaminated as a prerequisite to acquiring financing.  Even when financing resumed, lenders offered interest rates that were much less favorable to borrowers than the rates offered in late 2015, prior to disclosure of PFOA contamination.

115.    As a result of the presence of PFOA within the aquifer, the municipal water system and private wells, the property values in and around Hoosick Falls have experienced a significant decline since the presence of PFOA was disclosed in December 2015.  That decline persists to this day and is expected to continue.

116.    On or around February 1, 2016, United States Senator Charles Schumer called on Saint-Gobain to disclose immediately the full extent of the pollution it caused.  Senator Schumer stated, "Saint-Gobain did this.  They've got to first come clean as to what happened, where they put the stuff, and then work on a plan to quickly clean it up."

117.    On February 5, 2016, news outlets reported that some Village residents were bathing by sponge because they were afraid of inadvertently ingesting water during a shower.

118.    On February 11, 2016, DEC identified Saint-Gobain and Honeywell as the parties potentially responsible for PFOA contamination at one or more properties in Hoosick Falls, including the McCaffrey Street Site.

119.    The DEC demanded at that time that each company enter into an enforceable Consent Order to characterize and investigate the extent of the contamination, to provide interim

remedial measures to protect public health and drinking water supplies, to analyze alternatives for providing clean and safe drinking water and, ultimately, to design and implement a comprehensive clean-up and remediation protocol.

120.    On February 13, 2016, DOH began offering blood testing to any Hoosick Falls residents who wished to have their blood tested for the presence of PFOA.  Over 3,000 individuals have participated in this program to date.

121.    By February 24, 2016, a newly installed carbon filtration system at the municipal water treatment plant became fully operational.  This carbon filtration system is temporary, with a permanent filter to be installed by December 2016.  Although the temporary filter has been in place since February 2016, residents continue to rely on bottled water for drinking.

122.    On February 26, 2016, state officials disclosed results from tests performed at private wells.  Of 145 wells tested, 42 showed PFOA contamination above 100 ppt.

123.    The DEC also announced at this time that it had commenced installation of POET systems for homes with private wells.  DEC stated at that time that it had received 281 requests for POETs.  Throughout the spring, residents in and around Hoosick Falls would continue to deal with frustrations relating to installation and upkeep of POET systems.  Requests for POET systems continued to mount, and as of the date of this Complaint the state has installed over 800 POET systems on private wells in and around Hoosick Falls.  These POET systems must remain installed for the foreseeable future and will require regular maintenance.

124.    In early March 2016, the state disclosed results from water samples taken from the Hoosick Falls Water Treatment Plant in or around February 2016.  The highest sample showed PFOA at a concentration of 983 ppt.

125.    On June 3, 2016, DEC announced that it had reached agreement on two Consent Orders with Saint-Gobain and Honeywell.  These Consent Orders require Defendants to, *inter alia*, conduct further study of the Liberty Street Site and the sites at John Street and River Road—each of which was classified as a p-site under New York law.

126.    Around the same time as DEC's announcement, state officials began releasing the results of blood testing performed in February and March of 2016.  Over the course of the following two months, DOH officials would release data gathered from testing over 3,000 individuals.

127.    Numerous residents, including several Plaintiffs, received blood tests indicating that PFOA was present in their blood at alarming levels.  According to the DOH, the median blood level among those tested is 64.2 ug/L, a level that is 30 times higher than the national average level of 2.08 ug/L.  The median for men 60 and over was 91 ug/L.

128.    The 95th percentile of Americans has 5.68 ug/L of PFOA in their blood.

129.    Virtually all of the long-time residents of Hoosick Falls had blood levels an order of magnitude or more above background levels of PFOA in their blood serum.  Almost all of these long-time residents also had blood levels significantly above the 95th percentile of Americans.

130.    Moreover, the vast majority of residents and former residents of Hoosick Falls have been exposed to PFOA at a level that meets or exceeds some health-based comparison value.

131.    The results of the state's blood testing led to shock and fear among the residents of Hoosick Falls.  Since the results were mailed, the State has been unable to provide any reasonable health guidance to those with elevated blood levels.

132.    On July 8, 2016, United States Senator Kirsten Gillibrand echoed these concerns at a town hall meeting in Hoosick Falls.  Senator Gillibrand emphasized the need for and creation of

a biomonitoring program similar to the protocol implemented for first responders following the 9/11 World Trade Center attacks.  To date, neither the Defendants nor the State has taken any action to implement such a program.

## CLASS ACTION ALLEGATIONS

133.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

134.    Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed classes pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and (b)(3).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

135.    Plaintiffs bring this class action on behalf of the following classes, as set forth below:

**Municipal Water Property Damage Class**
All individuals who, as of December 1, 2015, are or were owners of real property located in the Village of Hoosick Falls, New York and/or are or were owners of real property with a mailing zip code of 12090 or 12089, and who receive or received their drinking water from the municipal water system.

**Private Well Water Property Damage Class**
All individuals who, as of December 1, 2015, are or were owners of real property located in the Village of Hoosick Falls, New York and/or are or were owners of real property with a mailing zip code of 12090 or 12089, and who obtain or obtained their drinking water from a privately owned well.

**Municipal Water Nuisance Class**
All individuals who, as of the time a class is certified in this case, are owners or lessors of real property located in the Village of Hoosick Falls, New York and/or are owners or lessors of real property with a mailing zip code of 12090 or 12089, and who receive their drinking water from the municipal water system.

**Private Well Water Nuisance Class**

All individuals who, as of the time a class is certified in this case, are owners or lessors of real property located in the Village of Hoosick Falls, New York and/or are owners or lessors of real property with a mailing zip code of 12090 or 12089, and who receive their drinking water from a privately owned well.

**Biomonitoring Class**

All individuals who, as of the time a class is certified in this case, have ingested PFOA-contaminated water from the Village water supply or from a contaminated private well in or around Hoosick Falls and who have suffered accumulation of PFOA in their bodies as demonstrated by (i) blood serum tests disclosing a PFOA level in their blood above the recognized background levels, or (ii) documentation of an increased opportunity for exposure, as defined in ATSDR's Final Criteria for Determining the Appropriateness of a Medical Monitoring Program Under CERCLA.[1]

136.    For purposes of the classes set forth above, the phrase "municipal water system" refers to the water system operated by the Village of Hoosick Falls.

137.    Excluded from the classes set forth above are: (a) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (b) the Judge to whom this case is assigned and the Judge's staff; (c) any class counsel or their immediate family members; (d) any State or any of its agencies; (e) the Village of Hoosick Falls and the Town of Hoosick; and (f) any individual who otherwise would be included under one or more of the class descriptions above but who has filed a lawsuit for personal injury for a PFOA-related illness related to exposure to municipal or private well water.

138.    Plaintiffs reserve the right to amend the class definitions set forth above if discovery and/or further investigation reveals that any class should be expanded, divided into subclasses or modified in any way.

---

[1] *See* ATSDR's Final Criteria for Determining the Appropriateness of a Medical Monitoring Program Under CERCLA, https://www.gpo.gov/fdsys/pkg/FR-1995-07-28/pdf/95-18578.pdf.

**Numerosity**

139.     Although the exact number of class members is uncertain and can be ascertained only through appropriate discovery, the number is great enough such that joinder is impracticable. Indeed, there are approximately 3500 individuals who live in the Village of Hoosick Falls and over 6000 that live in the Town of Hoosick.  Nearly all of the Village residents are dependent on the municipal water system.  In the Town, there are over 800 private wells.  Each of the classes set forth above is sufficiently numerous to warrant class treatment, and the disposition of the claims of these class members in a single action will provide substantial benefits to all parties and to the Court.

140.     Further, class members are readily identifiable from publically available information regarding property ownership and/or residential history.

**Typicality**

141.     Plaintiffs' claims are typical of the claims of the classes in that Plaintiffs, like all class members, are owners or lessors of real property that have experienced a diminution in value and/or nuisance due to the actions of the Defendants.  Further, Plaintiffs, like the Biomonitoring Class, have been exposed to drinking water contaminated with PFOA, as evidenced by blood serum tests and/or documentation of an increased opportunity for exposure.  Plaintiffs and the Biomonitoring class are at significant risk of developing medical conditions associated with exposure to PFOA.

142.     Moreover, the factual bases of Defendants' misconduct are common to all class members and represent a common thread of misconduct resulting in injury to all members of the classes.

**Adequate Representation**

143.    Plaintiffs will fairly and adequately represent and protect the interests of the classes. Plaintiffs have retained counsel with substantial experience litigating both environmental torts and class actions, including actions, like this one, representing putative classes whose property has been devalued by the actions of a polluter and/or who have been exposed to dangerous chemicals and are in need of biomonitoring.  This Court has also determined that undersigned counsel have the skill and experience necessary to litigate this action on behalf of the classes.

144.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the classes and have the financial resources to do so.  Neither Plaintiffs nor their counsel has interests adverse to the classes.

### Predominance of Common Questions

145.    Plaintiffs bring this action under Rule 23(b)(3) because there are numerous questions of law and fact common to Plaintiffs and the class members that predominate over any question affecting only individual class members.  The answers to these common questions will advance resolution of the litigation as to all class members.  These common legal and factual issues include:

a.    Whether Defendants owed a duty to Plaintiffs and members of the classes to refrain from conduct reasonably likely to cause contamination of class members' drinking water;

b.    Whether Defendants knew or should have known that it was unreasonably dangerous to dispose of PFOA into the environment;

c.    Whether Defendants knew or should have known that disposing of PFOA in the manner alleged herein was reasonably likely to cause contamination of class members' drinking water;

28

d.      Whether Defendants breached a legal duty to Plaintiffs and the classes by disposing of PFOA in the manner described herein;

e.      Whether Defendants' breach of a legal duty caused class members' drinking water to become contaminated with PFOA;

f.      Whether it was foreseeable that Defendants' use of PFOA would cause class members' drinking water to become contaminated and/or unreasonably dangerous for normal and foreseeable human consumption or use;

g.      Whether the PFOA contamination described herein substantially interfered with Plaintiffs' and class members' use and enjoyment of their property;

h.      Whether the PFOA contamination described herein caused, and continues to cause, a continuous invasion of the property rights of Plaintiffs and the classes;

i.      Whether Defendants caused the devaluation of Plaintiffs' and class members' property;

j.      Whether Defendants caused PFOA to enter, invade, intrude upon or injure the property rights of Plaintiffs and the classes.

k.      Whether Plaintiffs, Infant Plaintiffs, and the classes are at increased risk of illness and harm as a result of the PFOA accumulation they have sustained in their bodies from drinking municipal or private well water;

l.      Whether biomonitoring and surveillance is reasonable and necessary to assure early diagnosis and treatment of PFOA-related illnesses and conditions;

m.     Whether early diagnosis and treatment of the conditions caused by PFOA will be beneficial to Plaintiffs, Infant Plaintiffs, and the Biomonitoring Class; and

n.      Whether Defendants' conduct warrants the imposition of punitive damages.

**Superiority**

146.    Plaintiffs and members of the classes have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

147.    Absent a class action, most class members would likely find the cost of litigating their claims to be prohibitively high and, therefore, would have no effective remedy at law. Further, without class litigation, class members will continue to incur damages.

148.    Class treatment of common questions of law and fact will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

**Rule 23(b)(2) Injunctive or Declaratory Relief**

149.    In addition to the above, Plaintiffs bring this class action under Rule 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the classes, such that final injunctive relief or declaratory relief is appropriate with respect to each class as a whole.   Such injunctive relief includes, but is not limited to, an injunction to require a biomonitoring program sufficient to monitor class members' health to ensure they are adequately protected from the deleterious effects of PFOA on the human body, and an order requiring Defendants to institute remedial measures sufficient to permanently prevent PFOAs from contaminating class members' drinking water and/or properties.

150.    Accordingly, Plaintiffs seek an injunction requiring Defendants to implement a biomonitoring program to aid the Biomonitoring Class and to institute remedial measures to prevent further PFOA contamination of class members' drinking water and properties.

151.    Finally, Plaintiffs and the classes seek a declaration that Defendants acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health, safety, and property of Plaintiffs and members of the classes.

### Rule 23(c)(4) Certification of Particular Issues

152.    In the alternative to certification under Rule 23(b)(2) or 23(b)(3), Plaintiffs and the classes seek to maintain a class action with respect to particular issues under Rule 23(c)(4).

153.    Specifically, the liability of each Defendant, or the Defendants jointly, is suitable for issue certification under Rule 23(c)(4).

### CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### Negligence

154.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

155.    This Claim is brought under New York law on behalf of the Municipal Water Property Damage Class, the Private Well Water Property Damage Class, and the Biomonitoring Class.

156.    Defendants knew or should have known that use of PFOA Solution and/or PFOA and/or the discharge of PFOA into the air, ground and sewer system was potentially hazardous to human health and the environment and required Defendants to take adequate safety precautions to ensure that PFOA was not released into the surrounding environment.

157.    Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to wash out and/or discharge filters or trays containing PFOA Solution

and/or PFOA onto the ground within floor drains in, and in close proximity to, the McCaffrey Street Site and/or the p-sites identified herein.

158.    Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to wash out and/or discharge into the environment the residue from the manufacturing ovens and their stacks.

159.    Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to permit PFOA vapors to exit from stacks at the McCaffrey Street Site and/or the p-sites identified herein without adequate control measures.

160.    Defendants had a duty to take all reasonable measures to ensure that PFOA Solution and/or PFOA would be effectively contained and not discharged into the surrounding environment.

161.    Defendants further had a duty to ensure that the manufacturing processes they chose to employ did not unreasonably endanger the drinking water relied upon by residents of Hoosick Falls and the surrounding area.

162.    Defendants breached the above-stated duties by unreasonably disposing of PFOA Solution and/or PFOA in a manner that guaranteed PFOA would enter the environment, including the groundwater.

163.    As a result of Defendants' breach, the drinking water in and around Hoosick Falls, New York has become contaminated with unsafe levels of PFOA.  Indeed, Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have contaminated both the municipal drinking water system and the drinking water of private wells in Hoosick Falls and the surrounding area.

164.    These unsafe levels of PFOA have deprived and continue to deprive Plaintiffs and the classes of potable water and have reduced class members' property values.

165.    Further, by exposing Plaintiffs, Infant Plaintiffs, and the Biomonitoring Class to unsafe levels of PFOA, Defendants have caused and continue to cause Plaintiffs, Infant Plaintiffs, and the Biomonitoring Class to suffer injury and damage at the cellular and genetic level by the accumulation of PFOA in their bodies.

166.    As a direct and proximate result of Defendants' actions and omissions described herein, Plaintiffs and the classes have suffered and continue to suffer damages, including personal injury due to the accumulation of PFOA in their bodies; the loss of property value; monetary damages associated with the investigation, treatment, remediation, and monitoring of drinking water and the contamination of their respective property; as well as compensatory and consequential damages set forth below.

## SECOND CLAIM FOR RELIEF

### Private Nuisance

167.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

168.    This Claim is brought under New York law on behalf of Plaintiffs and the Municipal Water Nuisance Class and Private Well Water Nuisance Class.

169.    Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have contaminated both the municipal drinking water system and drinking water of private wells in Hoosick Falls and the surrounding area.

170.    The contamination of class members' drinking water has interfered with the rights of Plaintiffs and the classes to use and enjoy their property. Indeed, this interference is substantial in nature.  It has caused and is causing Plaintiffs and the classes to, *inter alia*, refrain from using water to drink, cook, or bathe, which has, in turn, caused significant inconvenience and expense.

33

Defendants' conduct has also substantially interfered with class members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each class member so chooses.

171.     Defendants' negligent, reckless and/or intentional acts and omissions were unreasonable and constitute a continuous invasion of the property rights of Plaintiffs and the classes.

172.     As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiffs and the classes have incurred, and will continue to incur, costs and expenses related to the investigation, treatment, remediation, and monitoring of drinking water and the contamination of their respective properties, as well as the damages set forth below.

## THIRD CLAIM FOR RELIEF

### Trespass

173.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

174.     This Claim is brought under New York law on behalf of the Private Well Water Property Damage Class.

175.     Plaintiffs and the Private Well Water Property Damage Class members are owners of real property with the right of possession.

176.     Defendants negligently, recklessly, and/or intentionally failed to properly control, apply, use and/or dispose of PFOA Solution and/or PFOA or other waste containing PFOA, such that Defendants proximately caused PFOA contaminants to enter, invade, intrude upon and injure the right of Plaintiffs and the Private Well Water Property Damage Class to possess their property.

177.    Plaintiffs and the Private Well Water Class have not consented, and do not consent, to the contamination alleged herein.  Defendants knew or reasonably should have known that Plaintiffs and the Private Well Water Class would not consent to this trespass.

178.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, the drinking water of Plaintiffs and the Private Well Water Property Damage Class has been contaminated with PFOA, causing significant property damage, including actual, consequential, and nominal damages, as well as those set forth in more detail below.

## FOURTH CLAIM FOR RELIEF

### Strict Liability for Abnormally Dangerous Activity

179.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

180.    In the alternative to the First Claim for Relief, set forth above, Plaintiffs bring this Claim under New York law.

181.    Defendants' manufacturing processes and negligent, reckless, and/or intentional handling of PFOA Solution and/or PFOA constituted an abnormally dangerous activity for which Defendants are strictly liable.

182.    Defendants' use and disposal of PFOA Solution, PFOA or other waste containing PFOA, as described herein, was inappropriate to the place where it was carried out, especially given the close proximity of the McCaffrey Street Site and the p-sites identified herein  to sources of drinking water relied upon by residents of Hoosick Falls.

183.    Furthermore, Defendants' use and disposal of PFOA, and reckless disregard for the consequences of those actions, carried a high degree of risk of harm to others and a likelihood that any such harm would be great.  Indeed, the result of Defendants' conduct is all too clear. The State

of New York has, *inter alia*, declared the McCaffrey Street Site a Superfund site, it may designate other facilities in the Village as Superfund sites, and it has activated emergency funds to remediate the situation.

184.    As a result of Defendants' abnormally dangerous activities, Plaintiffs and the class members have suffered and continue to suffer harm to their property and injuries to their bodies and have been forced to mitigate damages as set forth herein, as well as below.

## DAMAGES SOUGHT BY THE CLASS

185.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

186.    Plaintiffs and the classes have sustained and will continue to sustain damages to their property and health as a result of Defendants' actions.  As a result, Plaintiffs and the classes seek monetary damages for each violation of the First through Fourth Claims for Relief.   In particular, Plaintiffs and the classes seek (i) monetary damages reflecting the cost to remediate class members' property of the contamination caused by Defendants' conduct or, in the alternative, to compensate class members for the diminution in value of their property caused by Defendants' conduct; (ii) monetary damages to compensate class members for the loss of the use and enjoyment of their properties caused by Defendant's conduct; (iii) monetary damages for the diminution of the value of the plaintiffs' property, and (iv) monetary damages to compensate class members for the loss of quality of life caused by Defendants' conduct.

187.    Plaintiffs and the classes also seek consequential damages sufficient to fund a biomonitoring program that is reasonably tailored to the exposure risks posed by PFOA.

188.    Further, because Defendants' acts were done maliciously, oppressively, deliberately, and in reckless disregard of Plaintiffs and the classes, Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

189.    In addition to the above, Plaintiffs and the classes seek injunctive relief including, but not limited to, implementation of a mandatory testing protocol requiring Defendants to regularly test the wells of all Private Well Water Property Damage Class members for the presence of PFOA and to continue that testing until it is determined that the risk of PFOA contamination in private wells has ceased; to install permanent filtration devices on any private well testing positive for the presence of PFOA, and to maintain those filtration devices pursuant to industry best practices; to establish a biomonitoring protocol for Biomonitoring Class Members to monitor their health and diagnose at an early stage any ailments associated with exposure, inhalation or ingestion of PFOA; and to take additional steps, to be proven at trial, that are determined necessary to remediate all class members' properties and/or residences to eliminate the presence of PFOA.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against the Defendants, as follows:

A.    an order certifying the proposed Municipal Water Property Damage Class, Private Well Water Property Damage Class, Municipal Water Nuisance Class, Private Well Water Nuisance Class, and Biomonitoring Class, designating Plaintiffs as the named representatives of the respective classes, and designating the undersigned as Class Counsel;

B.    a declaration that Defendants acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health, safety, and property of Plaintiffs and members of the classes;

C.      an order requiring Defendants (i) to implement a testing protocol to test the wells belonging to each member of the Private Well Water Property Damage Class; (ii) to install permanent filtration devices on any private well testing positive for the presence of PFOA and to maintain those filtration devices until the risk of PFOA contamination in the groundwater has ceased; (iii) to establish a biomonitoring protocol for Plaintiffs and Biomonitoring Class Members to monitor their health and diagnose at an early stage any ailments associated with exposure, inhalation or ingestion of PFOA, and (iv) to take all necessary steps to remediate the property and/or residences of Plaintiffs and the classes to eliminate the presence of PFOA;

D.      an award to Plaintiffs and class members of compensatory, exemplary, and consequential damages, including interest, in an amount to be proven at trial;

E.      an award of attorneys' fees and costs, as permitted by law;

F.      an award of pre-judgment and post-judgment interest, as provided by law;

G.      leave to amend this Complaint to conform to the evidence produced at trial; and

H.      such other relief as may be appropriate under the circumstances and/or permitted by law or as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated: August 26, 2016
       Albany, New York

Respectfully submitted,

_John K. Powers_

_____

John K. Powers
USDC NDNY Bar Roll #102384
**POWERS & SANTOLA, LLP**

*Plaintiffs' Liaison Counsel*
39 North Pearl Street
Albany, New York 12207
Telephone: (518) 465-5995
Facsimile: (518) 426-4012
E-mail: jpowers@powers-santola.com

Robin L. Greenwald (admitted *pro hac vice*)
James J. Bilsborrow (Bar Roll #519903)
William Walsh (Bar Roll #519925)
**WEITZ & LUXENBERG, P.C.**
*Plaintiffs' Co-Lead Interim Class Counsel*
700 Broadway
New York, New York 10003
Telephone: (212) 558-5500
Facsimile: (212) 344-5461
E-mail:rgreenwald@weitzlux.com
        jbilsborrow@weitzlux.com
        wwalsh@weitzlux.com

Stephen G. Schwarz (Bar Roll #103484)
Hadley Matarazzo (Bar Roll #437785)
**FARACI LANGE, LLP**
*Plaintiffs' Co-Lead Interim Class Counsel*
28 East Main Street, Suite 1100
Rochester, New York 14614
Telephone: (585) 325-5150
Facsimile: (585) 325-3285
E-mail:sschwarz@faraci.com
        hmatarazzo@faraci.com