UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

**************************************************

MICHELE BAKER, ANGELA CORBETT, et al.,          *

                            Plaintiffs,         *

                    -v-    16-cv-917             *

SAINT-GOBAIN PERFORMANCE PLASTICS CORPORATION and *

HONEYWELL INTERNATIONAL, INCORPORATED,          *

                            Defendants.         *

**************************************************


                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE LAWRENCE E. KAHN
                    December 7, 2016
              445 Broadway, Albany, New York

**A P P E A R A N C E S**

ATTORNEYS FOR PLAINTIFFS:

        WEITZ, LUXENBERG LAW FIRM
        700 Broadway
        New York, New York   10003
        By:  Robin Greenwald, Esq.

        FARACI, LANG LAW FIRM
        28 East Main Street
        Rochester, New York  14614
        By:  Stephen Schwarz, Esq.

ATTORNEYS FOR DEFENDANT SAINT-GOBAIN

        QUINN, EMANUEL LAW FIRM
        51 Madison Avenue
        New York, New York  10010
        By:  Sheila Birnbaum, Esq.
            Patrick Curran, Esq.

ATTORNEYS FOR DEFENDANT HONEYWELL

        ARNOLD, PORTER LAW FIRM
        601 Massachusetts Avenue N.W.
        Washington, D.C.  20001
        By:  Elissa J. Preheim, Esq.

BAKER, et al. v SAINT-GOBAIN - 16-cv-917

1          COURT CLERK:  Wednesday, December 7th, 2016,

2   the case is Michele Baker, Angela Corbett, Daniel

3   Schuttig, Michael Hickey, Charles Carr, Pamela Forrest,

4   Kathleen Main-Lingener, Kristin Miller, James Morier,

5   Jennifer Plouffe and Silvia Potter versus Saint-Gobain

6   Performance Plastics Corporation and Honeywell

7   International, Incorporated, case number 1:16-cv-917.

8          We are here for a motion hearing.  May we have

9   appearances for the record, please.

10          MS. GREENWALD:  Good morning, your Honor.

11   Robin Greenwald for the plaintiffs.

12          MR. SCHWARZ:  Stephen Schwarz for the

13   plaintiffs.

14          THE COURT:  Mr. Schwarz.

15          MS. BIRNBAUM:  Your Honor, Sheila Birnbaum for

16   the defendant Saint-Gobain.

17          THE COURT:  Ms. Birnbaum.

18          MS. PREHEIM:  Good morning, your Honor.  Elissa

19   Preheim for defendant Honeywell.

20          THE COURT:  Ms. Preheim.

21          MR. CURRAN:  Good morning, your Honor.  Patrick

22   Curran, Saint-Gobain.

23          THE COURT:  Very good.  So, apparently, as I

24   understand it, there's going to be two attorneys arguing

25   on each side.  Am I correct about that?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

BAKER, et al. v SAINT-GOBAIN - 16-cv-917

1        MS. BIRNBAUM:  Yes, your Honor.

2        THE COURT:  And we should be done a little

3   before noon, in that area.  So, I say each of you should

4   go about ten minutes and then reply, you will have a

5   little time to reply to each other if that sounds

6   workable.

7        MS. BIRNBAUM:  Yes, your Honor.

8        MS. GREENWALD:  Yes, your Honor.

9        THE COURT:  No bell or lights here.  Use our

10  heads and I guess we will begin.  Obviously we have Ms.

11  Birnbaum.

12       MS. BIRNBAUM:  Yes.  Thank you, your Honor.

13       THE COURT:  Proceed.

14       MS. BIRNBAUM:  Your Honor, I'm going to address

15  the medical monitoring causes of action and Ms. Preheim

16  will discuss the property causes of action, just to give

17  you a road map of where we are headed.

18       As Your Honor knows, there also was a motion to

19  dismiss the injunctive relief here, remedial relief, and

20  parties have stipulated and Your Honor has ordered that

21  that be stayed until April because many of the issues

22  raised by those motions may go away because a lot of the

23  remedial work is being done.

24       There is a permanent filter being put into the

25  municipal systems, paid for by the defendants, and POETS

BAKER, et al. v SAINT-GOBAIN - 16-cv-917

1  have been put on the private wells.  So that's off the
2  table.

3          THE COURT:  I'm aware of that, yes.

4          MS. BIRNBAUM:  Thank you.  And so we go on to
5  the medical monitoring claim.  Your Honor, the
6  plaintiffs' claim should be dismissed for medical
7  monitoring because it fails to state a cause of action
8  under New York law.

9          We are not writing on a clean slate here
10  because the New York Court of Appeals has clearly stated
11  what gives rise to damages from medical monitoring or
12  cause of action for medical monitoring, and the Caronia
13  case, which was decided recently by the New York Court of
14  Appeals, governs here under Geary.  I think Your Honor
15  needs to follow Caronia.  It is the existing law in
16  New York.

17          And what does Caronia tell us?  Caronia tells
18  us, first of all, that New York does not recognize a
19  cause of action for medical monitoring, an equitable
20  medical monitoring, and in reaching that decision, the
21  New York Court of Appeals clearly weighed and balanced
22  the public policy issues of whether there should be a
23  cause of action or recovery for asymptomatic plaintiffs
24  in New York.  That is, plaintiffs that do not have a
25  present physical injury.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1          The plaintiffs in this case, in fact, the

2   plaintiffs have excluded from their class anyone who

3   files a personal injury case.  So, they understand that

4   they are seeking medical monitoring damages and I'd like

5   to get back to that because they're really not seeking

6   damages.  They're really seeking injunctive relief here.

7          What they have asked in their complaint is not

8   for damages for medical monitoring, that goes to

9   individual plaintiffs.  What they're talking about is

10   setting up a program of medical monitoring, an injunctive

11   relief, and that would then lead to a fund to be created

12   that would be paid for by the defendants.  That is

13   exactly what the plaintiff was requesting in Caronia.  In

14   Caronia the plaintiff -- does Your Honor have a question?

15          THE COURT:  Well, I'm thinking you do cite

16   Caronia, the case of Askey, but in that case didn't they

17   cite a case called Abusio, which seems to support that

18   the fear of contracting a disease is a physical injury,

19   which was implied in Abusio and that was cited by Caronia

20   favorably?

21          MS. BIRNBAUM:  This is not a fear case.  This

22   is not a fear case.  This is really, when you get down to

23   it, a case of plaintiffs -- they have a fear for PFOA in

24   their blood and accumulation for PFOA is what the injury

25   is.  They call that a physical injury.  Well, that was

1    before the Court in Caronia.  Caronia could not find that

2    it was a physical injury.  In fact, in Caronia, the

3    plaintiffs there were arguing exactly like the plaintiffs

4    here, that they had cellular damage, that the cigarette

5    smoke caused cellular damage and that was physical

6    injury.

7            The Court did not agree with them.  The Court

8    treated it as an exposure case that did not have a

9    physical injury and the Court found that there was no

10   cause of action for medical monitoring but the Court also

11   found, and stated very strongly, that not only was there

12   no cause of action, but you had to sustain a physical

13   injury, a physical injury before you could recover tort.

14           So it's -- it was basic tort law that the Court

15   was looking at.  If you had a negligence cause of action,

16   you have to plead and prove duty, breach of duty and

17   actual injury.  Actual injury.  A physical injury.  If

18   you had kidney cancer, then you have a physical injury.

19   But the fact that you have -- that was why it was being

20   argued in Caronia, too.  The fact that you had an

21   accumulation of a chemical in your bloodstream, that does

22   not give rise to a physical injury under New York law and

23   that New York Court of Appeals told everybody why that

24   was.  They went through the rationale.  And, by the way,

25   plaintiffs never talk about the rationale of the decision

1   and what was the rationale of the decision?  The New York

2   Court of Appeals cites to the U.S. Supreme Court case in

3   Buckley against Metro-North, which also denied common law

4   right to medical monitoring and the -- the --

5           THE COURT:  I was going to say, also a case,

6   which I don't know if you cited it, the World Trade

7   Center Lower Manhattan Disaster Site case, that was a

8   Second Circuit, which also seemed to imply what was said

9   in Abusio was saying this kind of case there was, there

10  is a physical injury.  Did you see that case?

11          MS. BIRNBAUM:  Your Honor, I'm familiar with

12  that case.  I was a special master in those cases but

13  that also was quite different than what we have here.

14  There they were alleging physical injury.

15          THE COURT:  Right.

16          MS. BIRNBAUM:  The fact was that they were

17  injured.  Here they're not alleging physical injury, they

18  are alleging only accumulation of PFOA in their blood,

19  risk of injury, which clearly, under New York, does not

20  give rise to physical injury, and that there was

21  subcellular or cellular or genetic changes.  That's

22  exactly what was before the Court in Caronia.

23          The Court said that's really not a present

24  injury and there are a number of Courts that have said so

25  since that time.  There are two PFOA cases we cited, your

BAKER, et al. v SAINT-GOBAIN - 16-cv-917

1    Honor.  One from the Fourth Circuit and one from the

2    District Court in Alabama in which the exact same

3    arguments were made but the law in those states were not

4    any different than the law of New York, that had to

5    establish a present physical injury in order to recover

6    medical monitoring damages.  The Court said accumulation

7    or changes in cells are not a present physical injury.

8         And, your Honor, reason for that is cells can

9    change.  That's not an injury.  The Supreme Court noted

10   that in Metro-North as well and the reason for that is if

11   that is an injury, then millions, tens of millions of

12   people would have a cause of action.  All the people that

13   have been exposed to asbestos has accumulation of

14   asbestos in their body and cellular changes.  That

15   doesn't mean they have a present injury, and almost every

16   Court that has looked at this says that is not a present

17   injury that would give rise to medical monitoring damages

18   and that is why the plaintiffs here do not have a cause

19   of action.  They can call it a physical injury but it

20   just isn't, and that was before the Court in Caronia.  It

21   is not dicta in Caronia when the Court says you have to

22   have a physical harm before you can recover in tort.

23        And if that was the case, and the Court says

24   this in no uncertain terms, we would have limited

25   liability.  There would be no way to serve this

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    liability.  The courts would be overwhelmed with cases in

2    which people say I have been exposed to a harmful

3    chemical and, therefore, I have cellular changes and I'm

4    entitled to medical monitoring cases.

5              The public policy reasons -- and by the way,

6    in -- in -- in Caronia, the Court carefully weighed the

7    fact, isn't there some positives by having a medical

8    monitoring?  Wouldn't it be a good idea from -- from a

9    policy point of view to have medical monitoring to see if

10   you can determine if there is injury.  And the Court

11   weighed that against the Court's determination, following

12   the U.S. Supreme Court, saying it would -- it would lead

13   to liability that was limitless.  There would be no way

14   for the courts to limit the liability.

15             There would be no way to take out the

16   speculative nature of these claims and, therefore, the

17   Court, weighing the pros and cons, tell that you have to

18   have a present injury and they do not have a present

19   injury, no matter how they try and, your Honor, I -- in

20   Caronia, if you look at that case, and we looked at the

21   briefs very carefully, there were clearly argument in

22   Caronia.  There was clearly arguments made that there was

23   a present injury and that was the accumulation of smoke

24   and cellular changes and that was rejected by the

25   New York Court of Appeals as it has been rejected by the

1    Seventh District of Alabama in PFOA cases and it has been

2    rejected by the Fourth Circuit in another PFOA case.

3              If we allow this case in this instance, not

4    only will the federal court be making new law that is

5    contrary to New York law, but it would be opening the

6    floodgates that thousands and thousands and thousands,

7    millions of plaintiffs who have been exposed, who have no

8    present injury.

9              New York law is clear.  If you look at the

10   Ivory case, what the Court did in Ivory is said, if you

11   had kidney cancer, you then can have a medical monitoring

12   damages arising from your kidney cancer.  But if you only

13   have exposure and accumulation, you have no cause of

14   action for medical monitoring.

15             THE COURT:  In Ivory -- you mentioned Ivory.

16   Did that involve a claim for contamination of drinking

17   water?  I don't think it did.

18             MS. BIRNBAUM:  It was.  It was a -- my

19   recollection, it was contamination case.

20             THE COURT:  Source -- of a source --

21             MS. BIRNBAUM:  Of the Fourth Department.  The

22   Fourth Department reviewed the Supreme Court and came to

23   the conclusion that the dismissal of the medical

24   monitoring cases for asymptomatic plaintiffs, that we

25   have here, was proper.  The case should be dismissed.

1   The only case that was allowed to go forward for personal

2   injury was the person who had kidney cancer, his case

3   could go forward because he had a present injury.

4           THE COURT:  So you're suggesting, you're saying

5   or alleging or contending that a water source of a home

6   that's contaminated and causes a homeowner to lose his

7   investment in the house, there's no legal -- no legal

8   remedy for him basically?

9           MS. BIRNBAUM:  I think what Your Honor is

10  suggesting, if you could show that you had a property

11  damage, does that give you the right to medical

12  monitoring and I think here the answer would be --

13          THE COURT:  There's no property.

14          MS. BIRNBAUM:  There's -- they're not alleging

15  property damage.  They're alleging other things that my

16  co-counsel will discuss but I think also, if you look at

17  the cases very carefully, I think Ivory would be wrong on

18  that case and you could have to have -- Caronia Court was

19  so clear that you have to have a present physical injury

20  and it cannot be that you have a physical injury if you

21  have no symptoms, if you have no manifest injury.

22          This is just a exposure case.  It is increased

23  risk case and the New York Courts have clearly said those

24  cases are not able to recover medical monitoring.

25          THE COURT:  Okay.


                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

BAKER, et al. v SAINT-GOBAIN - 16-cv-917

1          MS. BIRNBAUM:  Thank you.

2          THE COURT:  I appreciate the argument and --

3          MS. BIRNBAUM:  Thank you, your Honor.  I hope I

4     stayed within my time.

5          THE COURT:  Well, you did.  You did okay.

6          MS. BIRNBAUM:  Thank you.

7          THE COURT:  I think maybe we should hear the

8     other side as to -- since we are doing issue by issue,

9     maybe right now I'd like to hear the plaintiffs' response

10    to that one issue and then I'll hear the other side and

11    then back here.

12         MR. SCHWARZ:  Thank you, your Honor.  Stephen

13    Schwarz for the plaintiffs.

14         THE COURT:  Right.

15         MR. SCHWARZ:  Your Honor, I think on any motion

16    to dismiss case, Rule 12, the place to start is the

17    pleadings and one of the things that we disagree with

18    vehemently is the defendants' interpretation of our

19    pleadings.

20         The defendants have argued in their brief that

21    our claim for injury is increased risk of future disease.

22    That is a consequence of the injury we're claiming but

23    not the injury we're claiming.

24         Ms. Birnbaum started out by taking about a

25    cause of action for medical monitoring.  We didn't allege

                Lisa L. Tennyson, CSR, RMR, FCRR
              UNITED STATES DISTRICT COURT - NDNY

1   a cause of action for medical monitoring.  We allege

2   consequential damages of medical monitoring attaching to

3   the other common law tort claims of negligence and

4   trespass.  So right from the outset, and if you look at

5   our brief, it is unambiguous in that we say that -- at

6   paragraph 165, plaintiffs in the biomonitoring class

7   suffer injury and damage at the cellular and genetic

8   level by accumulation of PFOA in their body.

9           Page 166 -- excuse me -- paragraph 166 we state

10  plaintiffs in the class have suffered and continue to

11  suffer damages, including personal injury, due to the

12  accumulation of PFOA in their bodies.

13          So, again, the Court of Appeals recognized in

14  the Snyder case that disease was a consequence of injury,

15  not the injury itself.  The injury was complete upon

16  toxic invasion.  What we're alleging is that the toxic

17  invasion, the injury, these people are indeed at

18  increased risk of future illness.  That's what the remedy

19  of medical monitoring is intended to do, to provide them

20  with screening and early diagnosis and treatment.  But

21  the injury is the toxic invasion.

22          So, under Rule 12 basically we have alleged an

23  injury.  Now, the Court clearly understands under Rule 12

24  that our allegations are deemed true at this stage

25  unless -- unless the defendants can point to case law

1    that says that our allegations of injury are insufficient

2    as a matter of law.

3             Your Honor, as it turns out, not only is that

4    not true but there are nine Court of Appeals cases

5    spanning 80 years saying that the allegations we made are

6    an injury as a matter of law.  Those cases started with

7    the Schmidt case and most recent -- not most recently but

8    in 1995, for instance, the Consorti case and it's

9    interesting.  Again, Ms. Birnbaum, in their briefs, spent

10   very little time talking about nine Court of Appeal cases

11   that say exactly this, Judge.  They say, in a right mind

12   readily verifiable rule was adopted in which, as a matter

13   of law, the tortious injury is deemed to have occurred

14   upon the introduction of the toxic substance into the

15   body.  That was in Consorti in 1995.

16            It was followed in that same year by Rothstein,

17   which says an unbroken string of this Court's decisions

18   from Schmidt in 1936 to Consorti this year has upheld

19   this benchmarks that injury occurs upon the invasion of

20   the body.

21            So, the law in New York State has been, for 80

22   years, that an injury sufficient to support a cause of

23   action for negligence occurs when the toxic invasion is

24   in the body.  So --

25            THE COURT:  Everyone is citing, you're citing

1    to the Caronia case and does that case seem to expressly

2    rule out claims for increased risk of developing cancer

3    or other diseases?

4             MR. SCHWARZ:  Your Honor, that -- let me get to

5    that.  If I could answer your question saying that -- the

6    only way that that line of 80 years of precedence in New

7    York State could be overruled is if it's overruled by the

8    Court of Appeals and here in the Caronia case or if it

9    was overruled by statute.

10             So let's look at the Caronia case.  What did

11   the Caronia case hold?  The Caronia case, of course, was

12   a case where the Second Circuit certified a question to

13   the New York Court of Appeals and that question

14   specifically was, Does New York recognize an independent

15   equitable cause of action for medical monitoring or will

16   it create one basically because none had ever been

17   recognized before.

18             What the Caronia Court held in answer to that

19   question was no.  They refused to -- to adopt an

20   independent equitable cause of action for medical

21   monitoring for plaintiffs who had no alleged present

22   injury.  That's the first hold.  The second part was, in

23   New York medical monitoring damages are available to

24   plaintiffs who can otherwise state a cause of action for

25   negligence as a result of alleged damage to person or

1    property.

2            So what the Court of Appeals said is, we have

3    common law torts in New York.  They require either injury

4    of property or injury to person.  If you can meet those

5    standards, then you can -- then you can recover

6    consequential medical monitoring damages, assuming that

7    you prove the elements that are required for doing that.

8    But without any present injury or without any injury to

9    property, there is no claim for equitable claim, the

10   Court would not go that far and, of course, there was a

11   vehement dissent on that.

12           But what I'm saying, your Honor, is, those are

13   the two points that are made in Caronia and neither of

14   them overturns or refute the 80 years of precedence in

15   New York State that injury happens at toxic invasion and

16   the important part of Caronia, which was not mentioned on

17   the argument by my learned counsel, was that the

18   plaintiffs in Caronia did not claim a present personal

19   injury.  In fact, they chose not to claim that because

20   the statute of limitation argument would be -- they would

21   lose the cases on statute of limitations.  All these

22   people were smokers for years and years and years and

23   their only hope of having any recovery was for the Court

24   to recognize a new cause of action for medical

25   monitoring, and to set the accrual of that upon the

1    invention of a test that would allow people to be

2    screened safely for lung cancer, which they allege

3    happened within three years of when they sued.

4             So they never made -- they certainly made the

5    argument that -- that cigarette smoke is toxic but they

6    never made the argument that the plaintiffs had suffered

7    a present injury and that's clear in the -- in the

8    decision at Page 446 of the decision.  Right at the

9    beginning, the Court says, plaintiffs do not claim to

10   have suffered physical injury or damage to property and

11   later on in that same page they say, having alleged no

12   physical injury or damage to property in their complaint,

13   plaintiffs' only potential pathway to relief is for this

14   Court to recognize a new tort, namely, an equitable

15   medical monitoring cause of action.

16             Therefore, the plaintiffs in Caronia did not,

17   as defendants argue, present the argument we're

18   presenting.  They never alleged that these smokers had

19   toxic invasion of the body and that being an injury.

20   They only alleged that smoking caused them to suffer an

21   increased risk and, therefore, they should have medical

22   monitoring but they needed this new devised cause of

23   action to get there because the statute of limitations

24   issues were shot.

25             From our standpoint, Judge, nothing in the

1    Caronia decision specifically overturned 80 years of

2    precedence in New York.  There's nothing -- there's not

3    one quote from the Caronia decision that the defendants

4    can point to that says that the Court explicitly said

5    that that line of cases that we have -- we

6    have reinforced time and time again for 80 years is no

7    longer to be followed.

8           In fact, what the Caronia Court did say was

9    that they cited to Schmidt and -- Schmidt and Askey and

10   they cited to them favorably and said, in those cases,

11   there was a physical injury.  The Courts found physical

12   injury.  Even though it was a slight physical injury, it

13   was a physical injury and that distinguished what was

14   being argued in Caronia from those cases because, in

15   Caronia, the plaintiffs explicitly said we're not

16   claiming a present personal injury.

17          And in Askey's holding, what Askey said is the

18   defendant is liable for reasonable, anticipated,

19   consequential damages which may flow later from a toxic

20   invasion although the invasion itself is an injury too

21   slight to be noticed at the time of inflicted.  The Court

22   also brought out Abusio case.  The Abusio case not

23   only -- which was cited by the Court of Appeals and not

24   only did the Court say the fear of cancer was an injury

25   but also the accumulation of a toxic substance in the

1    body was an injury and that was recited in the -- in the

2    Allen case as well.  That -- that accumulation of the

3    toxic in the body was considered an injury and, of

4    course, that -- that went in line with Schmidt and 80

5    years of precedence to say that.

6             Now, the defendants tried to argue that, well,

7    those cases, which they didn't mention on -- on oral

8    argument, they say that they have statute of limitations

9    cases because Judge Pigott in his majority decision said

10   that was for accrual purposes.

11            Well, what does "accrual" mean?  Accrual --

12   according to the Court of Appeals in the Connecticut

13   case, means that all of the elements of the cause of

14   action necessary for relief in Court are present and

15   accrual then requires injury to be present.  So the

16   Courts have held that -- in other words, it would be --

17   it would be anomalous, in fact, it would be illogical to

18   say that you have a cause of action accrues for purposes

19   of statute of limitations purposes but then it should be

20   dismissed immediately because there's no present injury.

21            Those two concepts cannot fit together.  So,

22   what the Court of Appeals has long held and not change,

23   and Caronia doesn't change, is that invasion of the body

24   by a toxic substance is an injury which was sufficient to

25   support a cause of action and have that cause of action

1    accrue.

2            So Caronia doesn't overturn that line of cases

3    and, again, one would think if a Court wanted to overturn

4    80 years' worth of precedence that they spent their time

5    to describe as a right line readily verifiable rule would

6    do so explicitly and they didn't.  They didn't mention it

7    because that issue really wasn't presented to them in

8    that case because the plaintiffs didn't want to present

9    the issues of physical injury.

10           So the next argument that the defendants make

11   in their brief is, well, the legislature passed 214(c) in

12   1985 that changed the rule.  They, again, don't mention

13   that in their oral argument but that is not true, either,

14   your Honor.  I quote Judge Wesley, in the MRI Broadway

15   case, where he says -- and this was in 1998 which was --

16   this would be 13 years after the statute was passed -- he

17   said for over 60 years this Court has held that a cause

18   of action in toxic exposure cases accrues upon initial

19   exposure to the toxic substance.  While the legislature

20   has chosen to temper the effects of this rule through the

21   adoption of discovery inspection for certain toxic

22   sources, the statute does not change this Court's basic

23   definition of injury, which is at the time of the

24   invasion of the body and the Germantown and the MRI case

25   and the Jensen case also make clear that 214(c) was not a

1    statute that was passed to re-define injury in New York.

2    It was a statute that was passed to toll the statute of

3    limitations from the date of injury until the date of

4    discovery of the injury and that is what that section

5    did.

6              So 214(c) in no way -- according to Judge

7    Wesley's own statement, in no way changed the rule that

8    New York has followed for 80 years.

9              The defendants then fall to the policy

10   arguments and try to say that the floodgates would open

11   to allow people who have been exposed to toxic substances

12   and accumulations in their bodies to recover in New York,

13   and basically what they're saying is that the law of

14   New York, 80 years has opened the floodgates because

15   that's been the law in New York for 80 years.

16             But the premise behind the policy statements in

17   Caronia was clear.  At the outset, as I just read to the

18   Court, the Court says the plaintiffs do not claim present

19   physical injury.  So the concept behind those statements

20   by the Court with regard to policy were without a

21   physical injury, we do not think it's appropriate to

22   allow anyone to bring a cause of action.  There has to be

23   a physical injury or an injury to property.

24             But remember this too, your Honor.  The

25   defendants' argument appears to be, well, unless there is

1    physical illness, which, again, the Snyder case made

2    clear the illness is a consequence of injury, it's not

3    the injury.  But unless there's physical illness, the

4    Court of Appeals made clear they don't want asymptomatic

5    plaintiffs to be able to recover medical monitoring

6    damages.  The Court of Appeals could have done that in

7    Caronia.  They chose not to.

8         The Court of Appeals made it very clear that

9    consequential medical monitoring damages are recoverable

10   by people who have damaged property.

11        People who have damaged property don't have

12   physical personal injuries.  They have an injury

13   sufficient to bring a negligence claim and what the Court

14   of Appeals said, as long as there's an injury sufficient

15   to bring a negligence claim, consequential medical

16   monitoring damages can be recovered.

17        Your Honor, the real policy issue here is the

18   defendants' argument that the children of Hoosick Falls

19   should not be covered by a medical monitoring class

20   because that is exactly what they are.  In other words,

21   we can have -- some of the plaintiffs are here today that

22   have property damage.  They would be able to bring a

23   cause of action.  They would be able to recover medical

24   monitoring damages.  Those property owners whose property

25   has been damaged but their children, who were exposed to

1  exactly the same water and in fact have a higher risk of

2  illness because of their small body mass, would not be

3  because they're not property owners and they don't have

4  property damage.  The Court of Appeals never intended

5  that to be the outcome of this type of interpretation

6  and Caronia didn't even address this particular scenario

7  because Caronia plaintiffs admitted they didn't have a

8  personal injury.  They didn't have any present injury.

9          So, your Honor, our argument is basically that

10  without those nine Court of Appeals cases clearly stating

11  the rule being overturned, our allegations are not only

12  sufficient to go forward in this case, they're actually,

13  as a matter of law, proof that we have had sufficient

14  injury and the cases that the -- that --

15          The final thing I'll mention, your Honor, is

16  that there are several cases the defendants cite to,

17  federal cases from other jurisdictions.  Two of those

18  cases interpret a federal statute, not New York law.

19  They -- they -- the Price-Anderson Act, which was the

20  exclusive nuclear accident legislation, has specific

21  definitions in that Act.  Those two cases only interpret

22  that specific definition, has nothing to do with this

23  case.  The other two cases, Rhodes and most recent case

24  from Alabama, both interpret laws from other states,

25  and if you look at the -- at the West Morgan case, one

1    they most recently cited --

2         THE COURT:  You don't have much time if we want

3    to let our other --

4         MR. SCHWARZ:  Sorry, your Honor.

5         THE COURT:  I'm not -- I got just, I wanted to,

6    instead of doing the reply right now, let me get to the

7    other issues and then we will do replies at the end.

8         MS. BIRNBAUM:  Thank you, your Honor.

9         THE COURT:  Hopefully there will be.  Right now

10   I guess it's Ms. Preheim?

11        MS. PREHEIM:  Yes.  Thank you, your Honor.  My

12   name is Elissa Preheim, I'm on behalf of Honeywell.

13   Plaintiffs' remaining claims at issue today are tort

14   claims for property damages, which I will address.

15   Plaintiffs' claims must be dismissed because plaintiffs

16   lack standing to sue for contamination of groundwater

17   which they do not own and they do not allege physical

18   harm to their property, unnecessary predicate to recover

19   in tort for economic harm.

20        Here, none of the named plaintiffs alleged any

21   such physical harm.  Plaintiffs' claims are premised on

22   alleged injury to groundwater but groundwater is a public

23   resource held by the state, indeed the state is already

24   addressing the groundwater in Hoosick Falls through

25   remediation under enforceable consent decrees.

1          Plaintiffs do not contest that groundwater is

2   not their property under New York law.  Instead, their

3   opposition brief now asserts a purported injury that is

4   nowhere alleged in their complaint.

5          The brief asserts that plaintiffs sustained

6   physical harm to their property -- properties because

7   PFOA is in their soil but the complaint conspicuously

8   does not allege that PFOA is in the soil of any of the 11

9   plaintiffs' properties.  Plaintiffs' brief also argues

10   that they sustained physical harm to property because

11   PFOA was inside their wells, pipes or taps at some point

12   but the complaint does not allege that any physical

13   damage or invasion to these items.

14          Finally, plaintiffs' claims do not sound

15   private nuisance under New York law which limits private

16   nuisance to something that impacts one or relatively few.

17   So I want to start by discussing standing to sue for

18   groundwater contamination.

19          THE COURT:  Let me ask you one quick question.

20          MS. PREHEIM:  Sure.

21          THE COURT:  We view this as a negligence claim

22   instead of a trespass claim.  Isn't this just a question

23   of the scope of the defendants' duty as was put in a case

24   you cite a lot, which is 532 Madison Avenue?  In other

25   words, why isn't a home whose supply of water is

1    contaminated by pollution in groundwater within the

2    zoning of danger if we take that approach?

3            MS. PREHEIM:  Your Honor, because under

4    New York law, both negligence and strict liability

5    require a physical injury to plaintiffs' property.

6    That's in the 55 Motor case; Rebecca Moss case that we

7    cite, which affirms dismissal of the negligence claim and

8    cites the 532 Madison.  In other words, New York law

9    imposes no duty to protect against purely economic

10   losses, such as alleged diminution of the property value

11   here.

12           In the 532 Madison case, the businesses located

13   near a collapse, brought negligence claims for alleged

14   loss of income due to the street closures, but the Court

15   of Appeals of New York held that those negligence claims

16   had to be dismissed because there was no accompanying

17   allegation and physical injury.  In fact, plaintiffs

18   concede in their opposition brief that New York law

19   prohibits recovery of purely economic losses where the

20   plaintiffs have sustained neither personal injury or

21   property damage; that is at Page 24 and 25.

22           Here, none of the plaintiffs allege any

23   physical injury and, in fact, plaintiffs appear to

24   recognize that the alleged groundwater contamination is

25   not a physical injury to property that can support their

1    tort claims, including negligence.

2         Although their complaint refers to water more

3    than 170 times, plaintiffs' opposition brief now argues

4    that this case is really about soil contamination but the

5    soil in the names plaintiffs' properties is not mentioned

6    anywhere in the complaint.

7         The complaints only references to PFOA in the

8    soil relates to the Hoosick Falls landfill and the

9    McCaffrey Street facility.  But even then, those

10   allegations state PFOA can migrate from the soil to the

11   groundwater.  So, really, those allegations simply

12   reinforce that plaintiffs' claims are about alleged

13   groundwater contamination and, tellingly, while the

14   complaint alleges whether PFOA was detected in municipal

15   water supply or in private wells and at well levels, the

16   complaint never alleges that PFOA was detected in a soil

17   of any of the named plaintiffs' properties.

18        Now, plaintiffs' opposition brief also asserts

19   that PFOA physically injured their properties through

20   contamination of wells, private wells and traveled

21   through their pipes and flowed out of their taps and

22   showerheads but while the wells, pipes, taps and

23   showerheads are alleged to be conduits for allegedly

24   contaminated groundwater, the complaint does not allege

25   that the PFOA caused any damage to any of these items.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1            There are no allegations that the wells, pipes,

2    taps were damaged by contact of PFOA.  There are no

3    allegations these items stopped functioning.  That is

4    fatal to their negligence claim but it also -- New York

5    law rejects that notion that trespass claims can be --

6    can be based on an invisible invasion without tangible

7    damage.

8            THE COURT:  Now, this same argument you apply

9    to the wells that are owned -- private wells as opposed

10   to the house?

11           MS. PREHEIM:  Yes.  For negligence, correct,

12   for municipal and for private wells.

13           THE COURT:  Okay.

14           MS. PREHEIM:  The plaintiffs only assert

15   trespass as to the private well owners.  But as we cited

16   in our brief and Celebrity Studios and the Ivory case,

17   New York does not recognize trespass based on invisible

18   invasion without tangible damage and, notably, under

19   federal court case we apply this principle to reject

20   nearly identical claims in another PFOA groundwater case

21   and that was the West Morgan case describing our brief.

22           In addition, the Ivory case dismissed trespass

23   claims based on alleged vapor invasion and air emissions

24   which included were only tangible -- intangible, excuse

25   me, your Honor.

                    Lisa L. Tennyson, CSR, RMR, FCRR
                 UNITED STATES DISTRICT COURT - NDNY

1           Again, here, too, plaintiffs don't allege that

2    PFOA caused any physical or structural damage to their

3    wells, pipes, taps or showerheads and because they failed

4    to plead any physical injury to their property, they

5    cannot state a claim under New York law for diminution of

6    property values.

7           The widely accepted, if not universal, view

8    under New York U.S. Court is causing the value of

9    another's property to diminish is not, in and of itself,

10   a basis for tort liability.  Something more, such as

11   physical injury, is required.  Here, plaintiffs failed to

12   allege that something more.

13          As I've discussed briefly previously and as in

14   the Ivory case, groundwater doesn't belong to the owners

15   of real property.  Therefore, allegations of groundwater

16   contamination do not plead injury to property.

17   Consistent with this injury requirement under New York

18   law, Courts applying the laws of other jurisdictions have

19   dismissed negligence claims based on alleged groundwater

20   contamination.  For example, we cite in our briefs the

21   Rhodes case where the plaintiffs alleged PFOA

22   contamination in the public water supply but the Fourth

23   Circuit held that such allegation of contamination alone

24   does not constitute injury to support negligence claim.

25          The District of New Jersey reached the same

1    conclusion in the <u>Player</u> case, which was affirmed by the

2    Third Circuit.  There, residential property owners, MTBE

3    contamination of their aquifer, the source of their

4    drinking water, wells, but the Court there found

5    negligence requires injury and a release of contamination

6    into the groundwater aquifer does not itself establish

7    injury.

8         So, plaintiffs cannot state a tort claim for

9    property damages here because they alleged groundwater

10    contamination is not a physical injury to plaintiffs'

11    property and they have not alleged any other physical

12    invasion or damage to their property.

13         I briefly want to turn to plaintiffs' private

14    nuisance claims.  A private nuisance under New York law

15    is that which threatens one person or relatively few.

16    Here, however, plaintiffs' claims are based on

17    allegations there has been a widespread harm affecting

18    the use of groundwater, a public resource.  Plaintiffs

19    preface their private nuisance claims on the allegation

20    that defendants have contaminated the drinking water in

21    Hoosick Falls and the surrounding area and that the

22    impact of that contamination has had on the Hoosick Falls

23    community.

24         These claims are inconsistent with the claim of

25    private nuisance which the New York Courts of Appeals

1    have held impacts one person or relatively few.  Because

2    of that limitation, the Courts have held that where

3    private plaintiffs bring a suit to remedy allegation of

4    contamination of a drinking water supply, the claim is

5    not one for private nuisance.  The Southern District of

6    New York dismissed private nuisance claim on alleged

7    contamination of the Town of New Windsor water supply.

8    It held that the options of large-scale impact of a

9    contaminated water supply were not consistent with the

10   sustainable --

11          THE COURT:  Did you refer yet to the Baity case

12   at all?  Did that foreclose your private nuisance public

13   distinction argument?  That wouldn't apply to wells?

14   Baity case, which denies summary judgment on the ground

15   that the contamination of plaintiffs' private well, could

16   constitute a special injury?  Did you hold that or

17   distinguish that?

18          MS. PREHEIM:  I'm not sure the Baity case that

19   you are referring to, your Honor, but here this -- the

20   allegations here are the allegations of contamination to

21   both the municipal supply and the private well which had

22   large-scale -- as plaintiffs are alleging, have

23   large-scale impact to the community at large.

24          THE COURT:  Okay.

25          MS. PREHEIM:  Likewise, the Alabama Federal

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    Court recently dismissed private nuisance claims brought

2    by the property owners alleging PFOA contamination of the

3    town drinking water supply and under Alabama law, like

4    New York law, private nuisance is limited to its

5    jurisdiction effect on one or few individuals.

6            So here, because named plaintiffs alleged

7    contamination of town water supply and brought impact to

8    the Hoosick Falls community, their claims do not sound

9    improper nuisance.

10           So, in short, your Honor, based on the

11   complaint as pleaded, plaintiffs do not state cognizable

12   tort claims.  They concede that they don't own the

13   groundwater, which is a public resource held by the state

14   and, indeed, the state is already working in cooperation

15   with both defendants to investigate, remediate

16   groundwater of Hoosick Falls.

17           The plaintiffs don't allege that they own the

18   drinking water.  They don't allege that they installed

19   and paid for any treatment system.  They don't allege any

20   contamination of soil on their property.  They don't

21   allege that they are physically sick and, in fact,

22   expressly claim that physical injury.

23           There are some things that plaintiffs can't

24   allege.  There are some things that plaintiffs perhaps

25   have chosen not to allege.  But on the complaint as

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1   pleaded, whether they can state a cognizable claim is,

2   they have not done so in this complaint.

3         THE COURT:  Very good.  Thank you.  I guess we

4   are -- Ms. Greenwald.

5         MS. GREENWALD:  Thank you, your Honor.  Robin

6   Greenwald for the plaintiffs.  Your Honor, I'd like to

7   spend a few minutes putting this case in context, what

8   happened to the people of Hoosick Falls because I think

9   it goes to the heart of our complaint, which is, that

10  people's property was invaded by the PFOA that was

11  discharged by the defendants, traveled through

12  groundwater and then into the drinking water taps of our

13  plaintiffs.  That's what our complaint alleges in every

14  single aspect.

15        So about a year ago the residents of Hoosick

16  Falls learned the first time that their water they had

17  been drinking in their homes for decades was contaminated

18  by PFOA from the activities of their defendants.

19  Although health official advisory for PFOA drinking water

20  is currently 70 parts per trillion, people learned that

21  the drinking water they had been drinking was this high

22  as 600 parts per trillion and even higher.

23        EPA told residents on the municipal water to

24  stop drinking the water in their homes and to stop

25  cooking with the water in their homes.  The residents on

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    private wells were told by EPA not to use their water in

2    their homes if the water tested at 100 parts per trillion

3    or higher, and if their private well owners had yet had

4    their water tested, EPA told them don't drink the water

5    in your home.  This is water that invaded their homes.

6            So the residents in Hoosick Falls had to stop

7    using their water.  Enduring the inconvenience of bottled

8    water use in their homes for all uses and, more acutely,

9    they have had to endure the uncertainty of whether they

10   are still consuming PFOA in their drinking water, whether

11   the properties that they own had any remaining value and

12   whether they and their families suffered illnesses in the

13   future as a result of having consumed PFOA in their

14   drinking water in their homes for decades.

15           THE COURT:  Defendants, in fact just now,

16   stated it, seemed to allege that they don't disagree

17   with, at this point, anything you're saying but they seem

18   to say they're not liable because you -- you plaintiffs

19   don't own the groundwater and there was no soil

20   contamination.  How would you get around that?

21           MS. GREENWALD:  So, your Honor, we don't own

22   the groundwater.  That is correct.  But once you extract

23   the water, once one extracts the water from the aquifer

24   for drinking water use, there is an ownership interest

25   that attached to that and New York law has recognized

1    that in every single solitary case it has addressed.

2              And I'm actually -- so the defendants have

3    really made a great effort to try to rewrite our

4    complaint.  But the only fair reading of our complaint,

5    your Honor -- and I wanted to go through just through in

6    summaries and because of time, the only fair reading of

7    our complaint --

8              THE COURT:  I'm going to read all the papers.

9              MS. GREENWALD:  But I want to summarize so you

10   don't have --

11             THE COURT:  I want you to highlight.

12             MS. GREENWALD:  Highlight some paragraphs for

13   you.

14             THE COURT:  Sure.

15             MS. GREENWALD:  There was a physical, tangible

16   invasion of PFOA and contaminated water into every

17   plaintiff's home.  Now, as to soil, the soil allegations,

18   your Honor, is that in addition to the dumping the PFOA

19   in floor drains and other landfills and whatever else

20   that was discharged, the process of using PFOA causes

21   vapors to go out of the stacks and when the vapors

22   are contaminated with air, they turn into particulate

23   matter and the wind carries those particulate matter

24   throughout the community.  That's what happens.  But the

25   particulate matter drops, and so that is alleged in our

1    complaint, in paragraph 41 and paragraph 70.  We alleged

2    that the particulate matter from these vapors are -- are

3    discharged among the community.

4          So let me go through a little bit of summary

5    for you, your Honor, about what we do allege in our

6    complaint that shows that this case is about and only

7    about people's contaminated drinking water in their home.

8          So, in Paragraphs 1 and 9, we allege that

9    residents of Hoosick Falls had been drinking water --

10   drinking in their homes water laced with PFOA for years.

11   In Paragraph 10 through 20 we go through each and every

12   one of our class representatives and we allege that for

13   each and every class representative, that each person

14   drank contaminated water from his or her tap in his or

15   her home until learning the water was contaminated with

16   PFOA, at which time they stopped at the direction of the

17   EPA.

18         In Paragraph 97, 100 and 112 we alleged that

19   EPA informed residents of Hoosick Falls not to drink

20   their water and I just -- Paragraph 92, 100 and 112, EPA

21   told people not to drink their water in their homes, and

22   I just went through that so I won't go into any more

23   details.  Again, assuming they had contamination at a

24   certain level.

25         In paragraph 117, we allege that due to the

1    PFOA contamination in residents' homes, including our

2    class representatives and class members, some of the

3    Hoosick Falls residents bathed with sponges so as to

4    avoid inadvertent ingesting water during their showers in

5    their home and paragraph 40 and 71, as I just mentioned,

6    that is where we have the allegations about the vapors

7    that are coming from -- from this -- the manufacturing

8    facilities.

9            So, your Honor, on -- the defense made a -- a

10   lot of arguments about the fact that we don't allege any

11   damage to the property but rusted pipes or whatever type

12   of damage they're talking about.  But even defendants in

13   their brief, their opening brief on Page 33 and in their

14   reply brief on Page -- I believe it's 5, I will correct

15   that if I'm wrong -- they say that to show property

16   damage, you have to show physical harm or an invasion

17   and just gloss over invasion entirely.

18           There is nothing more relevant to an invasion

19   than drinking water entering into your home, into your

20   pipes and coming out of the taps that you drink to

21   sustain your life.

22           So, to our knowledge, there is no New York case

23   and New York Court that has ever found that a person

24   cannot assert a property damage claim when the source of

25   their contamination comes from groundwater that is relied

1   on for the plaintiffs' drinking water source.

2           Now, Your Honor asked earlier about Ivory.

3   Ivory was not a drinking water case.  Ivory was

4   contaminated groundwater but as Your Honor notes, it was

5   not drinking water, that was not the source of the

6   groundwater drinking water of the people in that case.

7   They got their water from somewhere else.  The Ivory

8   case --

9           THE COURT:  Have you got a case that supports

10  your contention that if it's drinking water that's

11  contaminated?

12          MS. GREENWALD:  Absolutely, your Honor.  We

13  have a whole lot of -- on Page 14 of our brief I actually

14  have written that out so that it will be a -- some

15  assistance here.  On Page 14 of our brief we cite a

16  number of cases, on Page 19 and 20, on Pages 21 through

17  23, and on Pages 25 through 26, and I can go through

18  those cases, your Honor, but I don't think time permits.

19  But we have so many cases and perhaps what's most

20  relevant here is the MTBE case.  Most recent -- it is not

21  really more relevant than others, but that's the deal

22  that went on for well over ten years in the Southern

23  District of New York.  Groundwater contamination

24  throughout the country.  Many, many states in the country

25  and that allegation there was that there were underground

1    leakage storage tanks that leaked gasoline and other --

2    including MTBE up into the soil, rain then took that

3    contamination into the groundwater, groundwater moved and

4    then either municipal water providers or people on

5    private wells pulled that water up for drinking water.

6    That's what they do, that's the only source of water we

7    have.

8              About half the country relies on groundwater

9    for its drinking water and in those cases, in every

10   single solitary case, nobody raised lack of standing.

11   Nobody raised that.  It was assumed that when you pull

12   the water out of an aquifer, that it's contaminated, that

13   either illness or makes water unpotable, that -- that

14   there is a property damage.  Why?  Because there's an

15   invasion of your property with a chemical that is not

16   yours.  It's the property of somebody else that invades

17   your property and, tellingly, in the reply brief there's

18   a mention of Exxon Mobil having MTBE case.

19             We address or brought up in a subsequent

20   answer, I think the eighth amended answer or something,

21   that Exxon Mobil raised this for the first time.  It may

22   have -- I don't really know but it is notable that Exxon

23   Mobil did go to trial against the City of New York, City

24   of New York sued Exxon Mobil and that case did go to

25   trial and that case went to the Second Circuit, and the

1    Second Circuit -- Exxon Mobil did raise standing but it

2    did not raise this issue and so the standing argument

3    there was whether there was injury because the level of

4    contamination was below the maximum contamination level,

5    MCL.  It was not that you can't assert property damage

6    even though the chemical invades your property because it

7    originally was in the groundwater.

8              And, your Honor, let me just spend a moment on

9    a nuisance.  I know I probably used up more time than I

10   should but really -- as to property, there really is no

11   case that I'm aware of that would hold otherwise and I

12   should also add that most of the cases, in fact, I think

13   almost every case but one that has addressed this has

14   addressed it either in summary judgment or after trial.

15   It is not addressed on a motion to dismiss because it is

16   just common sense that when a contaminate enters the

17   pipes in your home for your drinking water, that is the

18   quintessential invasion of property.

19             So as to nuisance, I'm just going to address

20   one issue and that is that the defendants' argument sort

21   of boils down to its core, is that if you have more than

22   a few people, you can't have a private nuisance but

23   that's not the law in New York.  The law in New York is a

24   private nuisance threatens individuals, not the state.

25   These essential elements being interference with the use

1    of or enjoyment of land actually by an individual or

2    persons whose right has been disturbed.

3              In fact, the Court of Appeals held that the

4    number of people impacted is not relevant to a

5    determination of public rights, private nuisance and that

6    was also in People versus Cooper which was a Second

7    Department case.

8              So, here, the argument is sort of perversant

9    with, if you are going to pollute, pollute a lot of

10   people.  Make it a lot of people whose homes are invaded,

11   who can't use or enjoy their property because then you

12   can avoid private nuisance.  If you just do a few, then

13   you can avoid private nuisance.  That is not the law in

14   New York and there really is no case that holds that

15   where the holding is -- is dictated by the number of

16   people impacted it is referenced -- your Honor, I don't

17   want to misstate anything.  It's referenced in cases but

18   it is not the genesis of the whole case.

19             So I wish, unless Your Honor has any questions,

20   I think that probably used up too much time.

21             THE COURT:  Well, you all did well.  I know you

22   have a lot more to say but, number one, I expect you all

23   said it in your papers, and which were extensive and we

24   are going to be going over that, my three clerks and

25   myself.  If you wanted a minute to respond, I know --

1          MS. BIRNBAUM:  That's all I want, your Honor,

2     is a minute.

3          THE COURT:  We will give you a minute.

4          MS. BIRNBAUM:  Thank you, your Honor.  I would

5     like to just respond to the argument that the Schmidt

6     line of cases somehow -- that wasn't any way affected by

7     the Court's decision in Caronia.  First of all, I would

8     like to start from the Caronia case.  By the way, the

9     plaintiffs in Caronia relied on Schmidt as an exposure

10    case and that they argued the same thing as plaintiffs

11    are arguing here and it's not that decided.

12          It was clearly decided by the Court in Caronia.

13    It was argued and it was reviewed and it was decided, and

14    if you look at page and -- the discussion on Schmidt in

15    this whole line of cases that is -- the plaintiffs are

16    relying on, Schmidt, is discussed on 447 and Page 448 of

17    the Court's decision and I'd just like to point out, the

18    Court makes it very clear -- Court of Appeals -- that

19    neither Schmidt or Askey question this state's long-held

20    physical harm requirement, rather, they really -- they

21    merely accept for accrual purpose, for statute of

22    limitations accrual purposes that the injury accrued at

23    the time of exposure.

24          And then the Court explains that 214(c) has

25    overruled those cases because it now says that statute of

1    limitations runs from the time you have an injury and,

2    therefore, those cases are overruled and if there was any

3    doubt that these accruals of statute of limitations cases

4    are different than whether you meet a present injury.

5    The New York case of Penny, Eastern District Court of

6    Penny against United Fruit, which was cited, says that

7    these two concepts, the concept of accrual and the

8    concept of individual, are factually and legally

9    distinct.  They are factually a -- so that whole line of

10   cases has no bearing on whether there is a physical

11   injury.

12           So, we now get to what plaintiffs say.  That in

13   Caronia they never argue that they had a physical injury.

14   Well, they understood, they argued pretty much exactly

15   what the plaintiffs are arguing here.  They argued it in

16   their briefs, they argued it in oral argument.  What did

17   they say?  I quote:  Plaintiffs were not merely exposed

18   to cigarette smoke.  Uncontroverted that they also

19   suffered by harm to the tissues and cells of their lungs.

20   That's what they argued to the Court and the Court said

21   that, in effect, is not a physical injury.  It's

22   exposure.  It's increased risk.  It is not a physical

23   injury.

24           So, all of the things that have been argued

25   here were argued extensively and rejected by the New York

1    State Court of Appeals.

2            THE COURT:  I understand.  I understand that

3    you disagree and I'm not going to keep going back and

4    forth.  I give a chance to revise --

5            MS. BIRNBAUM:  Thank you.

6            THE COURT:  Same one minute that Ms. Birnbaum

7    took.

8            MS. PREHEIM:  Thank you, your Honor.  I have

9    two very quick points.  First of all, counsel talked

10   about invasion of the home but if you look at the _Ivory_

11   case, it was a groundwater contamination case that also

12   alleged invasion from vapor invasion and air emissions

13   from a contaminated groundwater and the Third Department

14   in _Ivory_ dismissed the trespass claims based on those

15   allegations because they found that vapor invasions and

16   air emissions were only intangible invasion and they

17   distinguished soil contamination.

18           And then finally, your Honor, with respect to

19   the standing drinking water cases that Ms. Greenwald

20   cited, we -- we went through those cases in our brief

21   and as she acknowledged, none of them addressed the issue

22   of whether the plaintiffs in those cases owned the

23   groundwater or had a standing to sue and, in fact, she

24   acknowledged here today standing was assumed there.

25           _Ivory_ is directly on point, directly -- in 2014

1    rejected tort claims based on alleged groundwater

2    contamination because, and I'm quoting, groundwater does

3    not belong to the owners of real property but is a

4    natural resource entrusted in states by and for its

5    citizens.  So under New York law, the plaintiffs here do

6    not have standing to assert groundwater contamination.

7    Thank you, your Honor.

8            THE COURT:  Thank you.  Thank you, all.  And I

9    appreciate each of -- all of your arguments, and I'll

10   consider everything and we will work on it and we will

11   try to get a decision out expeditiously.  I know it's

12   important to all of you so we will take it that way.

13   Thank you for coming up.

14           MR. SCHWARZ:  Thank you.

15           MS. GREENWALD:  Thank you, your Honor.

16           MS. BIRNBAUM:  Thank you, your Honor.

17           (Whereupon, proceeding concluded)

18               * * * * * * * * * * *

19

20

21

22

23

24

25

                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

—BAKER, et al. v SAINT-GOBAIN - 16-cv-917—

1

2

3

4                    C E R T I F I C A T I O N

5

6      I, Lisa L. Tennyson, RMR, CSR, CRR, Official Court

7    Reporter in and for the United States District Court for

8    the Northern District of New York, hereby certify that

9    the foregoing pages taken by me to be a true and complete

10   computer-aided transcript to the best of my ability.

11

12    _____                                    _____

13              Lisa L. Tennyson, R.M.R., C.S.R., C.R.R.

14

15

16

17

18

19

20

21

22

23

24

25

                    Lisa L. Tennyson, CSR, RMR, FCRR
               UNITED STATES DISTRICT COURT - NDNY