UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MICHELE BAKER, *et al.*,

                Plaintiffs,

     -against-                        1:16-CV-0917 (LEK/DJS)

SAINT-GOBAIN PERFORMANCE
PLASTICS CORP., *et al.*,

                Defendants.

---

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

This case stems from the contamination of groundwater in the Village of Hoosick Falls with perfluorooctanoic acid, or PFOA. E.g., Dkt. No. 9 ("Complaint") ¶ 1. While many suits concerning this contamination have been filed in this district, this case is a consolidated class action whose putative classes include all individual owners or renters of real property within the Village, as well as anyone who consumed water from Hoosick Falls and exhibits a heightened blood-serum level of PFOA. Id. ¶ 135.[1]

In the Complaint, Plaintiffs allege that Defendants—Saint-Gobain Performance Plastics Corp and Honeywell International Inc.—were responsible for this contamination, which came from one or more manufacturing facilities they operated at various times within the Village. Id. ¶¶ 60–86. Because of this groundwater contamination, Plaintiffs claim that the drinking water of

---

[1]  Because class certification is not at issue in this Memorandum-Decision and Order, the Court has summarized these classes for brevity. The full proposed class definitions, and other class-related allegations, can be found in the Complaint. Compl. ¶¶ 134–53.

Hoosick Falls became nonpotable,[2] causing loss of property value and other damages. E.g., id. ¶¶ 163–66. Additionally, the past consumption of contaminated water has caused PFOA to accumulate in Plaintiffs' blood serum and bodies. E.g., id. ¶¶ 9, 127, 165–66.

Currently before the Court is Defendants' motion to dismiss for failure to state a claim, which raises several complex and relatively novel questions of state law concerning private claims for water contamination and for ingesting potentially harmful substances. Dkt. No. 13 ("Motion"); see also Dkt. Nos. 13-1 ("Memorandum"), 17 ("Opposition"), 23 ("Reply").[3] For the following reasons, Defendants' Motion is granted in part and denied in part.

## II. BACKGROUND

The following facts are taken from the allegations in the Complaint, which are assumed to be true when deciding a motion to dismiss for failure to state a claim. E.g., Bryant v. N.Y. State Dept. of Educ., 692 F.3d 202, 210 (2d Cir. 2012).

### A. PFOA

"PFOA is a fluorinated organic chemical" originally manufactured by the 3M Company. Compl. ¶¶ 33, 35. Among other things, PFOA is used "to achieve water, oil, and grease repellency," and thus has been used to manufacture "carpets, clothing, fabric for furniture, paper packaging for food and other materials such as cookware that are resistant to water, grease or

---

[2] As discussed further below, Defendants, the Village, and state and federal agencies have been working to address the contamination. These efforts include the installation of filtration systems on both the municipal water supply and on private wells. Compl. ¶¶ 121, 123.

[3] While Defendants also moved to dismiss or to stay Plaintiffs' claims for injunctive relief pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act and the primary jurisdiction doctrine, Mem. at 14–30, these claims were stayed until April 28, 2017, by a stipulation and order, Dkt. No. 18.

stains." Id. ¶¶ 37–38. Perhaps most notably, "PFOA was also a key component in the manufacturing of Teflon"—or PTFE—a material used as a nonstick coating and in several other applications. Id. ¶ 39; What Is Teflon?, Chemours, https://www.chemours.com/Teflon/en_US/products/safety/what_is_it.html (last accessed Jan. 19, 2017).

"PFOA is biologically and chemically stable in the environment," and can remain in soil and water for extended periods of time. Compl. ¶ 41. This is problematic, Plaintiffs allege, because of the toxic effects of exposure to PFOA. E.g., id. ¶ 43. "PFOA is readily absorbed after ingestion," has a human biological half life of two to nine years, and causes health risks even at low levels of ingestion (less than one part per billion, or ppb). Id. ¶¶ 43–44. PFOA binds to serum albumin in the blood, id. ¶ 44, and nationwide blood concentrations average at 2.08 μg/L, id. ¶ 9.

Plaintiffs claim that "PFOA is associated with increased risk in humans" of various cancers, along with several other conditions. Id. ¶ 45. "[T]he EPA Science Advisory Board stated that PFOA cancer data are consistent with guidelines suggesting exposure to the chemical is 'likely to be carcinogenic to humans,'" id. ¶ 46, and the Complaint also points to animal studies showing a connection with other cancers "not yet associated with human exposure," id. ¶ 45.

Plaintiffs cite no studies and make no allegations concerning the dose dependency of these conditions or the threshold levels of exposure associated with them, but do note that the U.S. Environmental Protection Agency ("EPA") recently issued both a health advisory for drinking water of seventy parts per trillion (or ppt)[4] and a reference dose of 0.000002 mg/kg/day.

_____

[4] This may also be expressed as approximately 70 ng/L.

Id. ¶¶ 49, 53. The health advisory level (70 ppt) suggests that drinking-water sources with greater levels of PFOA should undergo remediation efforts, while the reference dose represents a conservative estimate of the maximum continuous daily exposure likely to be without "an appreciable risk" of negative health effects. Id.[5] Following the EPA's actions concerning PFOA, several states have established similar health advisories and guidelines. Id. ¶¶ 50–52.

**B. The Contamination of Hoosick Falls**

The Village of Hoosick Falls is located in upstate New York near the Vermont border and has a population of approximately 3,500. Id. ¶ 55. Since as early as the late 1950s, PFOA has been used in manufacturing facilities in and around Hoosick Falls. Id. ¶ 60. One of these facilities—a small factory at 14 McCaffrey Street—appears to be the main source of the Village's PFOA contamination. Id. ¶ 61. Through various acquisitions, the McCaffrey Street site came to be owned by AlliedSignal in 1986, which later adopted Honeywell's name after a merger. Id. ¶¶ 62–64. In 1996, Honeywell sold the site to another company called Furon, but Saint-Gobain acquired Furon in 1999 and continues to own the facility to this day. Id. ¶¶ 65–67.

At the McCaffrey Street site, Saint-Gobain and Honeywell manufactured stain- and water-resistant fabric, applying a PFOA solution to the fabric in large trays. Id. ¶¶ 68–70. As the fabrics dried, some of the PFOA would vaporize and leave the site by air as particulate matter. Id.

---

[5] The reference dose, or RfD, is calculated by taking the estimated "no observed adverse effect level" or NOAEL of the substance—"the 'highest tested dose at which no statistically significant elevation over background in the incidence of the adverse effect was observed'"—and dividing it by one or several factors of ten to account for uncertainty. Matthew D. Adler, Against "Individual Risk": A Sympathetic Critique of Risk Assessment, 153 U. Pa. L. Rev. 1121, 1161–62 (2005) (quoting Lorenz R. Rhomberg, A Survey of Methods for Chemical Health Risk Assessment Among Federal Regulatory Agencies, 3 Hum. & Ecological Risk Assessment 1029, 1105 (1997)). This means that doses equal to and lower than the reference dose "do not (it can be said with great confidence) produce an incremental risk of death." Id. at 1162.

¶ 71. Employees would also wash the trays and pour the resulting discharge down floor drains in the facility. Id. ¶ 72. This in turn would cause PFOA to flow into the soil and ultimately the aquifer. Id.

Saint-Gobain and Honeywell also used solid PFOA to manufacture Teflon-coated materials and other products in large ovens at the McCaffrey Street site. Id. ¶¶ 76–77. As part of the coating process, a sticky residue containing PFOA would adhere to internal tubing or "stacks" within the ovens, which would be cleaned on a rotating schedule. Id. ¶¶ 78–79. These stacks were cleaned in a large sink, the waste water from which was discharged down a drain, ultimately migrating into the soil and then the aquifer. Id. ¶ 80.

The Complaint identifies other sites in Hoosick Falls operated by one or both defendants at various times that may also have contributed to the PFOA contamination. Id. ¶¶ 81–84. Additionally, PFOA has been found in leachate emanating from the former municipal landfill, where Defendants allegedly sent waste containing PFOA. Id. ¶¶ 85, 108.

Approximately 95% of Hoosick Falls residents receive drinking water from the municipal water system, which in turn gathers its water from a well. Id. ¶¶ 57, 87. In 2007, a new well for the municipal system was constructed about five hundred yards from the McCaffrey Street site. Id. ¶¶ 87–88. Additionally, some residents of Hoosick Falls and the surrounding Town of Hoosick receive drinking water from private wells instead of the municipal supply. Id. ¶¶ 58–59.

From late 2014 to the middle of 2015, the Village conducted testing and received results showing high levels of PFOA in the municipal water system. Id. ¶¶ 89–92. These tests showed PFOA concentrations ranging from 151 to 662 ppt (as noted above, the EPA ultimately advised against using water supplies with concentrations greater than 70 ppt). Id. ¶¶ 53, 93. The Village

also oversaw testing of certain private wells, and received results showing PFOA concentrations "significantly above any safe level." Id. ¶ 94.

Despite these test results, Village officials maintained that the water was safe to drink. Id. ¶ 95. In October 2015, the EPA Regional Administrator for New York learned of the test results, and in November, the EPA contacted the village and recommended the use of an alternative water source. Id. ¶¶ 96–97. Even then, the New York State Department of Health released a fact sheet the following month stating that "[h]eath effects are not expected to occur from normal use of the water," and "Village officials further minimized the potential risk of PFOA." Id. ¶¶ 98–99.

After learning of the Village's laissez-faire response, the EPA repeated its recommendation on December 17, 2015. Id. ¶ 100. Shortly thereafter, Saint-Gobain began to provide free bottled water to Village residents on the municipal water system, and agreed to fund the installation of a filter system on the municipal supply. Id. ¶ 102. After some debate with Town and Village residents, the state agreed to provide testing of private wells. Id. ¶¶ 105–07.

On January 27, 2016, Governor Cuomo and other state officials announced that the McCaffrey Street facility would be classified as a state superfund site, and that PFOA would be classified as a hazardous substance. Id. ¶¶ 110–11. The following day, the EPA advised homeowners with private wells to use bottled water if their wells showed PFOA at concentrations greater than 100 ppt, or if their wells had not yet been tested. Id. ¶ 112.[6] In late February, results from private wells showed that 42 out of 145 wells tested had PFOA concentrations above this 100 ppt threshold, and in early March, tests from the Hoosick Falls Water Treatment Plant included a peak result of 983 ppt. Id. ¶¶ 122, 124.

_____

[6] This warning came before the 70 ppt advisory was issued in May 2016. Compl. ¶ 53.

Around this time, municipal and state officials began remediation efforts both for municipal and private well users. Id. ¶¶ 121, 123. A temporary carbon filter system was installed at the municipal water treatment plant, and a permanent filter was scheduled for later installation. Id. ¶ 121.[7] Additionally, the New York State Department of Environmental Conservation ("DEC") announced that it would install point-of-entry treatment ("POET") systems at homes with private wells. Id. ¶ 123. Plaintiffs allege that Hoosick Falls residents were forced "to deal with frustrations relating to installation and upkeep of POET systems" and that they "must remain installed for the foreseeable future and will require regular maintenance." Id.

In February 2016, the Department of Health also began to offer blood testing to Hoosick Falls residents, and over 3,000 individuals have used this program to date. Id. ¶ 120. The median blood level of those tested is 64.2 μg/L, over thirty times higher than the national average of 2.08 μg/L. Id. ¶ 127. According to Plaintiffs, "the vast majority of residents and former residents of Hoosick Falls have been exposed to PFOA at a level that meets or exceeds some health-based comparison value," though again, Plaintiffs do not specify the precise characteristics of these values or the expected consequences thereof. Id. ¶ 130.

In addition to heightened blood levels of PFOA, the contamination has had collateral effects on homeowners in Hoosick Falls. As alleged in the Complaint, "[t]he presence of PFOA in the municipal water supply and the local aquifer immediately stigmatized the community and has adversely impacted . . . property values." Id. ¶ 7. These property values "experienced a

_____

[7] Plaintiffs claim that despite the installation of this filter system, "residents continue to rely on bottled water for drinking." Compl. ¶ 121. But cf. New York State Announces Water from Village of Hoosick Falls Municipal Water System Is Safe to Drink, Village Hoosick Falls (Mar. 30, 2016), http://www.villageofhoosickfalls.com/Water/news.html (noting that water "show[ed] non-detectable levels of PFOA" after passing through the temporary filtration system).

significant decline since the presence of PFOA was disclosed," which "persists to this day and is expected to continue." Id. ¶ 115. Hoosick Falls residents have also faced difficulty obtaining financing for their homes, as banks would not write mortgages for homes on the municipal water supply, and would not do so for homes with private wells unless testing revealed low levels of PFOA. Id. ¶¶ 113–14.[8] While the Complaint admits that financing has since "resumed," the interest rates subsequently offered to borrowers "were much less favorable . . . than the rates offered in late 2015." Id. ¶ 114.

### C. Plaintiffs' Injuries

There are two main sources of harm to the named plaintiffs alleged in the Complaint: damage to the Plaintiffs' property and personal injury from their ingestion of PFOA.[9] These are discussed in turn below.

#### 1. Property Damage

As a part of the injury alleged for Plaintiffs' negligence and strict liability claims, id. ¶¶ 164, 166, 184, and as the sole source of injury for their nuisance and trespass claims, id. ¶¶ 170, 172, 178, Plaintiffs claim that the PFOA pollution caused harm to real property they

---

[8] According to the Complaint, an employee of Trustco Bank "indicated that lenders typically require that homes have access to potable water before financing is approved." Compl. ¶ 113.

[9] As noted in Defendants' brief, Mem. at 14, "[t]he fact that the Plaintiff has asserted a putative class action does not affect the Court's analysis of the validity of the named Plaintiff's claims," DiGangi v. Gov't Emp'rs. Ins. Co., No. 13-CV-5627, 2014 WL 3644004, at *2 (E.D.N.Y. July 22, 2014); accord Garcia v. Does, 779 F.3d 84, 87 n.1 (2d Cir. 2014); Patchen v. Gov't Emp'rs Ins. Co., 759 F. Supp. 2d 241, 244 (E.D.N.Y. 2011); see also Lewis v. Casey, 518 U.S. 343, 357 (1996) ("[E]ven named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 40 n.20 (1976))).

either own or rent. Throughout the Complaint, the uniform source of this harm is the contamination of the drinking water in Hoosick Falls, either through the municipal water supply or through private wells on their land. E.g., id. ¶¶ 163–64, 169–70, 178, 182. Plaintiffs' alleged damages include the cost to remediate the contamination of their property, the loss of their use and enjoyment of the property, and a loss in their quality of life. Id. ¶ 186; see also id. ¶ 166 (alleging "damages associated with the investigation, treatment, remediation, and monitoring of drinking water and the contamination of [Plaintiffs'] property," among other sources of injury).

Most significant for the Motion, however, is Plaintiffs' perhaps largest source of damages: a loss in their property values. E.g., id. ¶ 115. As noted before, Plaintiffs allege a precipitious drop in "property values in and around Hoosick Falls," a "decline [that] persists to this day." Id. The Complaint seeks "monetary damages for the diminution of the value of the plaintiffs' property," and also lists these damages as an alternative to the cost of remediation mentioned above. Id. ¶ 186. Of course, these damages are applicable only to the plaintiffs who own real property in Hoosick Falls, and the interaction between this theory of injury and Plaintiffs' ability to state their claims is discussed later in this opinion.

Also relevant in deciding the Motion is the distinction between plaintiffs who use the municipal water supply from the Village and those who own private wells. For example, the Complaint asserts trespass claims only on behalf of those with private wells. See id. ¶ 174 ("This Claim is brought . . . on behalf of the Private Well Water Property Damage Class."). For ease of reference, the named plaintiffs on the municipal water supply are Pamela Forrest, Michael Hickey (individually and on behalf of his child, O.H.), Kathleen Main-Lingener, Kristin Miller (on behalf of her child, K.M.), James Morier, Jennifer Plouffe, Silvia Potter (individually and on

behal of her child, K.P.), and Daniel Schuttig (collectively, the "Municipal Water Plaintiffs"),

and the named plaintiffs with private wells are Michele Baker, Charles Carr, and Angela Corbett

(collectively, the "Private Well Plaintiffs"). Id. ¶¶ 10–20.

### 2. Personal Injury

Plaintiffs also seek relief stemming from their consumption of the PFOA-contaminated

water. According to the Complaint, the residents of Hoosick Falls "have been exposed for years,

if not decades, to PFOA at concentrations well above a safe drinking level," an exposure that

resulted in "concentrations of PFOA in their blood that is, on average, over 30 times higher than

the typical American." Id. ¶ 9. Plaintiffs combine this allegation with claims that PFOA is

associated with increased risk of several cancers and other diseases, noting advised limits on

PFOA exposure established by regulators. Id. ¶¶ 45–53. They also claim that this exposure

causes them "to suffer injury and damage at the cellular and genetic level by the accumulation of

PFOA in their bodies." Id. ¶ 165. In response to this risk, Plaintiffs seek consequential damages

and injunctive relief to either fund or provide "a biomonitoring program that is reasonably

tailored to the exposure risks posed by PFOA." Id. ¶¶ 187, 189.[10]

---

[10] Medical monitoring or biomonitoring is the provision of "regular medical testing . . . intended to detect the onset of latent injuries or diseases and to facilitate early diagnosis and treatment." Abbatiello v. Monsanto Co., 522 F. Supp. 2d 524, 536 (S.D.N.Y. 2007), abrogated in part by Caronia v. Philip Morris USA, Inc., 5 N.E.3d 11 (N.Y. 2013); see also Chistopher P. Guzelian et al., A Quantitative Methodology for Determining the Need for Exposure-Prompted Medical Monitoring, 79 Ind. L.J. 57, 58 (2004) (defining medical monitoring as "periodic diagnostic medical examinations and medical tests intended to diagnose illness or medical conditions before they would be diagnosed in the course of ordinary medical care"). "The object of [medical] monitoring is to find a disease before symptoms arise that would prompt the patient to seek medical care resulting in a typical clinical diagnosis," allowing earlier treatment when swift intervention would allow for better outcomes. Guzelian et al., supra, at 64, 76–77; see also ATSDR's Final Criteria for Determining the Appropriateness of a Medical Monitoring Program Under CERCLA, 60 Fed. Reg. 38,840, 38,841–42 (July 28, 1995) ("[Medical] monitoring should

Not every Plaintiff claims an increased level of PFOA in their blood. Plaintiffs Charles Carr, Michael Hickey (individually), Kathleen Main-Lingener, K.M. (the son of Kristin Miller), James Morier, Silvia Potter, and K.P. (the daughter of Silvia Potter) (collectively, the "Accumulation Plaintiffs") all allege heightened blood-serum levels of PFOA. Id. ¶¶ 10–20. On the other hand, Michele Baker, Angela Corbett, Pamela Forrest, O.H. (the son of Michael Hickey), Jennifer Plouffe, and Daniel Schuttig (collectively, the "Nonaccumulation Plaintiffs") do not personally allege any heightened blood concentration of PFOA. Id. Importantly, Plaintiffs do not allege any current manifestation of disease or symptoms related to PFOA exposure. Id.; cf. id. ¶ 137 (excluding "any individual . . . who has filed a lawsuit for personal injury for a PFOA-related illness related to exposure to municipal or private well water" from the proposed class definitions).

### D. Defendants' Motion

After the consolidated complaint was filed in this action, Saint-Gobain and Honeywell moved to dismiss the Complaint for failure to state a claim. Mot.[11] The core of Defendants' argument is that Plaintiffs have not suffered a legally cognizable injury—either to their property or to their bodies—sufficient to allege a tort under New York law. Mem. at 30–40.

---

be directed at detecting adverse health effects that are . . . amenable to prevention or intervention measures. . . . [T]he adverse health effects . . . should be such that early detection and treatment or intervention interrupts the progress to symptomatic disease, improves the prognosis of the disease, improves the quality of life of the individual, or is amenable to primary prevention.").

[11] Again, Plaintiffs' claims for injunctive relief have been stayed under a stipulation and order. Dkt. No. 18. The Court accordingly delays decision on the propriety of and its jurisdiction over those claims in light of the ongoing regulatory and remediation efforts in Hoosick Falls. See id. at 1 (noting the "ongoing efforts by state and federal agencies in cooperation with Defendants").

First, Defendants argue that all of Plaintiffs' property damage claims are based on injury to groundwater, but because groundwater in New York is "a public resource held by the State for the benefit of the public," Plaintiffs lack standing to sue and cannot claim a cognizable injury to their own property. Id. at 31–32. Additionally, Defendants argue that claims for economic injury alone—here, a loss in property value—are not allowed under New York law. Id. at 32–35. Finally, Defendants argue that Plaintiffs' nuisance claims fail as a matter of law because the injury alleged is common across thousands of people, yet a private nuisance must "threaten[] one person or a relatively few." Id. at 35–36 (emphasis omitted) (quoting Caldarola v. Town of Smithtown, No. 09-CV-272, 2010 WL 6442698, at *15 (E.D.N.Y. July 14, 2010), adopted, 2010 WL 1336574 (E.D.N.Y. Apr. 4, 2011)).

Next, Defendants argue that Plaintiffs' personal injury claims essentially assert a separate cause of action for medical monitoring, a claim that has been expressly forbidden by the New York Court of Appeals. Id. at 36–38 (citing Caronia, 5 N.E.3d at 18–19). Instead, under New York law, the availability of medical monitoring damages depends on the existence of an independent tort, which in turn requires a present physical injury. Id. Because, under Defendants' view, the Complaint alleges only "the possibility of future injury," Plaintiffs cannot state a claim for personal injury under either a negligence or strict liability theory, and thus cannot recover damages for medical monitoring. Id. at 38–40 (quoting Remson v. Verizon Commc'ns, Inc., No. 07-CV-5296, 2009 WL 723872, at *3 (E.D.N.Y. Mar. 13, 2009)).

III.    LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a "complaint must contain sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of the plaintiff. <u>Allaire Corp. v. Okumus</u>, 433 F.3d 248, 249–50 (2d Cir. 2006). Plausibility, however, requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." <u>Twombly</u>, 550 U.S. at 556.

The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Iqbal</u>, 556 U.S. at 678 (citing <u>Twombly</u>, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 555). Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleaded facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. <u>Id.</u> at 678–79.

## IV.    DISCUSSION

### A.   Negligence and Strict Liability

Plaintiffs' first enumerated claim is negligence. In support of this claim, they argue that Honeywell and Saint-Gobain knew or should have known that PFOA "was potentially hazardous to human health," that Defendants' method of disposal caused it to enter the environment and ultimately Plaintiffs' water supply, and that such actions together were unreasonable and negligent. Compl. ¶¶ 154–63. As an alternative theory, Plaintiffs argue that Defendants' manufacture and handling of PFOA constituted an abnormally dangerous activity, and thus that

Honeywell and Saint-Gobain may instead be held strictly liable. Id. ¶¶ 179–84.[12] While discussed more extensively above, the property-related damages claimed by Plaintiffs include the loss in their property value, the expense of remediation, the loss of their use and enjoyment of the property, and a decline in their quality of life. Id. ¶ 186.[13] These property damage claims are brought only on behalf of plaintiffs who own real property. See id. ¶¶ 135, 155 (noting that the claims are brought "on behalf of the Municipal Water Property Damage Class [and] the Private Well Water Property Damage Class," which are in turn limited to "owners of real property").

The familiar elements of negligence under New York law are duty, breach, causation, and damages. E.g., Aegis Ins. Servs., Inc. v. 7 World Trade Co., 737 F.3d 166, 177 (2d Cir. 2013); Pasternack v. Lab. Corp. of Am. Holdings, 59 N.E.3d 485, 490 (N.Y. 2016); Luina v. Katharine Gibbs Sch. N.Y., Inc., 830 N.Y.S.2d 263, 264 (App. Div. 2007). In their Motion, Defendants focus on the last of these elements. Mem. at 31–35. Specifically, they argue that the Complaint fails to allege a cognizable injury to property, and thus, Plaintiffs' negligence and strict liability claims must be dismissed. Id.

Under Defendants' view, the only substantive allegations in the Complaint concerning contamination refer to the pollution of the Village's groundwater. Id. at 31. While this groundwater constituted the source of Plaintiffs' drinking water (either through the municipal water supply or private wells), Plaintiffs themselves cannot be said to own this groundwater. Id.

---

[12] Defendants do not argue in the Motion that their alleged activities were not abnormally dangerous, Mem., a question left for later resolution in this case. Accordingly, while the discussion here is primarily phrased in terms of negligence, these issues are applicable to both theories of liability.

[13] Plaintiffs' claimed personal injury damages—namely, the cost of medical monitoring, Compl. ¶¶ 187, 189—are discussed later in this opinion.

at 31–32. Thus, because what was injured—the aquifer—is not owned by the Plaintiffs, they did not suffer an injury sufficient to raise a negligence claim, which Defendants argue requires a physical injury to their property. Id. at 31–35.

In support of this view, Defendants point to Ivory v. International Business Machines Corp., 983 N.Y.S.2d 110, 117 (App. Div. 2014), in which the Third Department discussed the availability of trespass claims based on groundwater contamination. While the court ultimately allowed the trespass claims because the groundwater "apparently flowed through [and contaminated] the soil under the [plaintiffs'] homes," it noted that contamination of groundwater alone cannot support a trespass claim. Id. This was because "groundwater does not belong to the owners of real property, but is a natural resource entrusted to the state by and for its citizens." Id.

There are two important differences between Ivory and this case. First, the quote from Ivory relied on by Defendants concerned a trespass claim, and not a negligence claim. Id.[14] Second, while Ivory seemed to reject claims based on groundwater contamination alone, it did not consider the contamination of the plaintiffs' drinking water supply (an issue discussed later in connection with the Private Well Plaintiffs' trespass claims). Id. Additionally, the cases cited by Ivory all in turn relied on the definitions section of New York's oil spill statute to settle insurance disputes, and none of these (save for Ivory) held that a private party could not state a claim for negligence when its injuries are rooted in the contamination of groundwater. See Castle Vill. Owners Corp. v. Greater N.Y. Mut. Ins. Co., 878 N.Y.S.2d 311, 315 (App. Div. 2009) (discussing exceptions to an "owned property" exclusion in an insurance policy when a cleanup

---

[14] Ivory in fact upheld the plaintiffs' negligence claims, but it is unclear what role—if any—the groundwater issue had in this. 983 N.Y.S.2d at 114–16.

of oil from the insured's property was necessary to remedy groundwater contamination); State v. N.Y. Cent. Mut. Fire Ins. Co., 542 N.Y.S.2d 402, 403–04 (App. Div. 1989) (citing N.Y. Nav. Law §§ 170, 172(12), (18)) (same). For purposes of the Motion, however, the Court assumes that Plaintiffs cannot state a claim for relief if the only injury alleged is harm to the groundwater. Thus, the question is whether Plaintiffs have alleged any other property-based injury sufficient to maintain a negligence claim.

Arguing that Plaintiffs do not present such an injury, Defendants point to the Court of Appeals' decision in 532 Madison Avenue Gourmet Foods, Inc v. Finlandia Center, Inc., 750 N.E.2d 1097 (N.Y. 2001). In that case, a consolidation of two lawsuits concerning separate but similar incidents, several shopkeepers and business owners in midtown Manhattan sued after construction collapses blocked access to their buildings. Id. at 1099–100. The issue was whether the plaintiffs, whose property was not itself damaged by the collapses, could state a claim for negligence in an attempt to recover for lost business and other economic damages. Id. at 1100–01. The Court of Appeals found that they could not, and limited recovery to those plaintiffs who "suffered personal injury or property damage" as opposed to those who suffered only a reduction in profits. Id. at 1103.

532 Madison did not, however, announce a talismanic requirement for plaintiffs to allege physical injury to their property (with courts left to determine what constitutes a physical injury). Instead, the decision concerned the existence of a legal duty between the plaintiffs and defendants. Id. at 1101. While recognizing that "[a] landowner who engages in activities that may cause injury to persons on adjoining premises surely owes those persons a duty to take reasonable precautions to avoid injuring them," the court found that the expansion of this duty to

protect additional shopkeepers who lost profits due to road closures—shopkeepers whose

properties were not themselves reached by the collapse—would unreasonably expand the scope

of negligence. Id. at 1102–03; see also id. at 1103 (noting that the limitation imposed "affords a

principled basis for reasonably apportioning liability").

The Court of Appeals has repeatedly described how courts should determine the extent of

this duty:

> The existence and scope of a tortfeasor's duty is, of course, a legal
> question for the courts, which "fix the duty point by balancing factors,
> including the reasonable expectations of parties and society generally,
> the proliferation of claims, the likelihood of unlimited or insurer-like
> liability, disproportionate risk and reparation allocation, and public
> policies affecting the expansion or limitation of new channels of
> liability."

Id. at 1101 (quoting Hamilton v. Beretta U.S.A. Corp., 750 N.E.2d 1055, 1060 (N.Y. 2001));

accord In re September 11 Litig., 280 F. Supp. 2d 279, 290 (S.D.N.Y. 2003). Such a duty "do[es]

*not* rise from mere foreseeability of the harm," Hamilton, 750 N.E.2d at 1062 (citing Pulka v.

Edelman, 358 N.E.2d 1019, 1022–23 (N.Y. 1976)), but instead comes from an analysis "of the

wrongfulness of a defendant's action or inaction" combined with "an examination of an injured

person's reasonable expectation of the care owed," Palka v. Servicemaster Mgmt. Servs. Corp.,

634 N.E.2d 189, 192 (N.Y. 1994).

However a party's duty is ultimately defined in pollution cases, this policy determination

must include a duty not to pollute a plaintiff's drinking water. Society has a reasonable

expectation that manufacturers avoid contaminating the surrounding environment, an expectation

that extends to the pollution of an area's water supply. See, e.g., In re Methyl Tertiary Butyl

Ether (MTBE) Prods. Liab. Litig., 725 F.3d 65, 80–83, 87, 117–19 (2d Cir. 2013) (noting a duty

of care to avoid chemical leaks and water contamination under New York law); <u>Leone v. Leewood Serv. Station, Inc.</u>, 624 N.Y.S.2d 610, 612 (App. Div. 1995) (per curiam) (finding "a duty to use reasonable care to maintain . . . underground tanks in a reasonably safe condition"). It is sensible public policy to require that manufacturers avoid polluting the drinking water of the surrounding community, and nothing in <u>532 Madison</u> prevents a person whose water supply was contaminated by such conduct from recovering in tort, even if she seeks economic damages. Plaintiffs' Complaint sufficiently states a claim for negligence.

In fact, several courts applying New York law have found that loss-of-value damages constitute a sufficient injury in contamination suits when the plaintiff's property is directly affected by the defendant's conduct. As noted by the Southern District of New York, "'stigma damages' have been recognized as a valid category of damages by the New York courts in environmental cases." <u>87th Street Owners Corp. v. Carnegie Hill–87th Street Corp.</u>, 251 F. Supp. 2d 1215, 1223 (S.D.N.Y. 2002); <u>see also</u> <u>Cottonaro v. Southtowns Indus., Inc.</u>, 625 N.Y.S.2d 773, 774 (App. Div. 1995) ("Damages from the diminished market value of real property as a result of public fear of exposure to a potential health hazard constitute consequential damages."); <u>cf.</u> <u>Criscuola v. Power Auth. of the State of N.Y.</u>, 621 N.E.2d 1195, 1197 (N.Y. 1993) (allowing stigma-based damages in takings cases when plaintiffs "establish some prevalent perception of a danger emanating from the objectionable condition"). Such a fear or stigma, however, must be traceable to the conduct of the defendant, and that conduct must in turn be connected with the property in question. <u>See</u> <u>Halliday v. Norton Co.</u>, 696 N.Y.S.2d 549, 551 (App. Div. 1999) (affirming the dismissal of claims for diminished property values when the alleged stigma was from "adverse publicity associated with [a contaminated] landfill," but there had not been actual

18

contamination of the plaintiffs' property or water supply); <u>Nalley v. Gen. Elec. Co.</u>, 630

N.Y.S.2d 452, 457 (Sup. Ct. 1995) (noting that "the land or water of the plaintiffs" must have

actually been "contaminated by toxic substances" in order for their property damage claims to

survive).

Here, where Plaintiffs allege that the water supply for their property has been

contaminated by the acts of Defendants and that the contaminant in question causes negative

health consequences, the stigma causing a decline in Plaintiffs' property values is directly

traceable to Defendants' conduct. Furthermore, <u>532 Madison</u> was not a contamination or toxic

tort case, and reading it—as Defendants' do—as foreclosing such recovery in contamination suits

would upend the New York courts' past holdings in those cases.

Finally, the nonstigmatic injuries claimed by Plaintiffs provide an independent reason

why Plaintiffs' negligence claims survive even under Defendants' interpretations of <u>Ivory</u> and

<u>532 Madison</u>. The root injury complained of by Plaintiffs is the loss of their potable water

supply, <u>see, e.g.</u>, Compl. ¶ 164 ("These unsafe levels of PFOA have deprived and continue to

deprive Plaintiffs and the classes of potable water . . . ."), an injury that is not fairly categorized

as purely economic in nature. Plaintiffs allege a reduction in property values due to this injury,

<u>id.</u>, but they also seek compensatory damages for the cost of remediating the contamination to

their property and restoring a long-term potable water supply, <u>e.g.</u>, <u>id.</u> ¶ 186. While some or all of

these damages might later be mitigated by Defendants' outside remediation efforts, <u>see id.</u> ¶ 125

(discussing Defendants' consent decree with the DEC), Plaintiffs certainly have not pleaded

themselves out of court with respect to this issue. Accordingly, Plaintiffs' claims for negligence

and strict liability based on property damage survive Defendants' Motion.

## B. Trespass

In addition to Plaintiffs' negligence and strict liability claims, the Complaint also alleges a cause of action for trespass on behalf of the Private Well Plaintiffs. Compl. ¶¶ 173–78. Defendants' argument in regard to the trespass claims is fundamentally the same as their argument on the negligence and strict liability front: Plaintiffs' property was not injured by the PFOA contamination. Mem. at 33. Defendants rely on Ivory, which again held that "groundwater does not belong to the owners of real property, but is a natural resource entrusted to the state by and for its citizens," and thus cannot form the basis of a private trespass claim. 983 N.Y.S.2d at 117.

Defendants are correct that "[p]ossession is an essential element of a trespass action." Mem. at 33 (quoting Niagara Falls Redevelopment, LLC v. Cerrone, 814 N.Y.S.2d 427, 428 (App. Div. 2006) (per curiam)). But New York courts have indicated the availability of a trespass action to remedy the contamination of a plaintiff's private well, demonstrating that it is the possessory interest in the well itself that is invaded. See Kiley v. State, 426 N.Y.S.2d 78, 78 (App. Div. 1980) (per curiam) (sustaining a claim of trespass based on the contamination of a private well from salt stored on a neighboring property); see also Phillips v. Sun Oil Co., 121 N.E.2d 249, 250–51 (N.Y. 1954) (contemplating the availability of a trespass action provided that the defendant knew or should have known that the plaintiff's well would be affected), pattern); Meehan v. State, 408 N.Y.S.2d 652, 653–54 (Ct. Cl. 1978) ("[E]ven absent negligence there may be liability for pollution of subterranean waters under trespass or nuisance theories.").

Defendants' reference to Ivory and the theory that groundwater is not private property sufficient to sustain a trespass claim does not undo this conclusion, since the groundwater in this

case was simply the medium through which the Private Well Plaintiffs' property was invaded; the property in question is in fact the well. See Phillips, 121 N.E.2d at 251 (describing the claim as based upon "the underground movement[] of noxious fluids" into the plaintiff's well). The contamination of private wells was not discussed in the Ivory case, and the quote relied on by Defendants concerned only a claim based solely on the contamination of groundwater beneath a home. 983 N.Y.S.2d at 117. In fact, Ivory ultimately sustained the plaintiffs' trespass claims because the groundwater there was the medium through which the contaminant entered the homeowners' soil (similar to the contamination of the Private Well Plaintiffs' wells here). Id. Accordingly, Defendants' motion to dismiss the Private Well Plaintiffs' trespass claims is denied.

### C. Nuisance

Defendants' argument fares better when it comes to private nuisance. Instead of suggesting that Plaintiffs did not suffer an injury, they argue that the injury alleged was too widespread to constitute a private nuisance. Mem. at 35–36. This is because private nuisance is limited to "that which 'threatens one person or a relatively few.'" Id. at 36 (emphasis omitted) (quoting Caldarola, 2010 WL 6442698, at *15). Thus, since Plaintiffs here claim a harm suffered by "all renters and owners in Hoosick Falls," id., these allegations fail to state a claim for private nuisance and instead constitute a public nuisance, for which only the state or one of its subdivisions has standing to bring suit.

Under New York law, a private nuisance—"actionable by the individual person or persons whose rights have been disturbed"—must affect a relatively small number of people. Copart Indus., Inc. v. Consol. Edison Co. of N.Y., 362 N.E.2d 968, 971 (N.Y. 1977); accord

Scribner v. Summers, 84 F.3d 554, 559 (2d Cir. 1996); see also 81 N.Y. Jur. 2d Nuisances § 6 (2013) ("A private nuisance has been defined as one which violates only private rights and produces damages to but one or a few persons."). If not, the wrong becomes a public nuisance. E.g., New York v. Shore Realty Corp., 759 F.2d 1032, 1050 (2d Cir. 1985). While the former gives rise to a private right of action, the latter is remedied through governmental action or litigation. Shore Realty, 759 F.2d at 1050; 532 Madison, 750 N.E.2d at 1104; see also 81 N.Y. Jur. 2d, supra, § 4 ("The difference between a public and a private nuisance is significant, primarily because . . . only the public, through the proper officer, may sue to enjoin or abate a public nuisance whereas only a private individual may sue to abate a private nuisance.").

When the injury in question "is 'so general and widespread as to affect a whole community, or a very wide area within it, the line is drawn'" and a private nuisance is precluded. 532 Madison, 750 N.E.2d at 1105 (quoting William L. Prosser, Private Action for Public Nuisance, 52 Va. L. Rev. 997, 1015 (1966)). Indeed, as stated by then-Chief Judge Cardozo, the number affected need not be "very great"; an injury is sufficiently widespread to constitute a public nuisance whenever it may "[]reasonably be classified as a wrong to the community." People v. Rubenfeld, 172 N.E. 485, 486 (N.Y. 1930).

But there is an exception to this private-public divide. Even a public nuisance can permit a private suit for damages when an individual or smaller group "sustains a special loss" that is different in kind from the harm suffered by the rest of the community. 532 Madison, 750 N.E.2d at 1104–05. In this way, a private wrong may be distinguished from a common injury to the public, and a private right of action is restored. See Kavanagh v. Barber, 30 N.E. 235, 235 (N.Y. 1892) ("The public nuisance as to the person who is specially injured thereby in the enjoyment or

22

value of his lands becomes a private nuisance also."); 81 N.Y. Jur. 2d, supra, § 6 ("[A] public nuisance becomes also a private nuisance as to any person who is specially injured by it to any extent beyond the injury to the public.").

In this case, the Municipal Water Plaintiffs cannot state a claim for private nuisance, and they have not suffered a unique wrong compared to the rest of the community sufficient to sustain a private action for an otherwise public nuisance. As the Complaint alleges, "[t]he Village's municipal water system has approximately 1,300 service connections" and "provides water to nearly 95 percent of the Village's residents." Compl. ¶ 57. This widespread injury clearly fits the definition of public nuisance, and the kind of harm suffered is common among the thousands of residents connected to the municipal water supply.

On the other hand, the Private Well Plaintiffs have suffered "a special loss" sufficient to maintain a nuisance action. 532 Madison, 750 N.E.2d at 1104. Their use of private wells required the installation of POET systems on their property, Compl. ¶¶ 10–12, 123, which in turn necessitates upkeep and maintenance "for the foreseeable future," id. ¶ 123. While the number of private wells in the broader Town of Hoosick is quite high, id. ¶ 59, this does not itself eliminate a private right of action. The harm in question—the contamination of a personal well and the need for remediation on the plaintiff's property—lacks the public character of the contamination of a municipal water supply. Furthermore, even if a certain number of wells would foreclose a claim for private nuisance (or special harm from a public nuisance), the level of contamination among wells described in the Complaint varies so significantly as to prevent such a determination on a motion to dismiss, since only some of these well users may have suffered this special injury. See Compl. ¶¶ 10–12 (discussing well contamination ranging from 67 to 390 ppt).

The Appellate Division's decision in <u>Baity v. General Electric Co.</u>, 927 N.Y.S.2d 492

(App. Div. 2011), squarely confirms this outcome:

> [I]t is well settled that the seepage of chemical wastes into a public
> water supply constitutes a public nuisance. Nevertheless, "[a] public
> nuisance is actionable by a private person only if it is shown that the
> person suffered special injury beyond that suffered by the community
> at large." We conclude that defendant failed to meet its burden of
> establishing that the contamination of plaintiffs' private water wells
> did not constitute a special injury beyond that suffered by the public
> at large.

<u>Id.</u> at 495–96 (second alteration in original) (citations omitted) (quoting <u>532 Madison</u>, 750

N.E.2d at 1104). The Court finds the <u>Baity</u> decision controlling. <u>See Blue Cross & Blue Shield of

N.J., Inc. v. Philip Morris USA, Inc.</u>, 344 F.3d 211, 221 (2d Cir. 2003) (holding that federal

courts must generally follow decisions of the Appellate Divisions).

While the Municipal Water Plaintiffs' injuries are common to the community (or a

substantial portion of it) so as to preclude private recovery under a nuisance theory, the Private

Well Plaintiffs allege a special harm that sufficiently differs from that suffered by the rest of the

area's population. Thus, the nuisance claims of the Municipal Water Plaintiffs are dismissed, but

the Private Well Plaintiffs' nuisance claims survive Defendants' Motion.

### D. Medical Monitoring

The last argument in Defendants' Motion concerns the availability of medical monitoring

damages. Plaintiffs claim that they ingested PFOA-laced water as a result of the contamination,

and several of them (the Accumulation Plaintiffs) have elevated levels of PFOA in their blood.

Compl. ¶¶ 10–20. Because PFOA is associated with an increased risk of cancer and other

diseases, <u>e.g.</u>, <u>id.</u> ¶ 45, Plaintiffs seek funding for "a biomonitoring program that is reasonably

tailored to the exposure risks posed by PFOA," id. ¶ 187; see also id. ¶ 189 (outlining Plaintiffs'

demand for injunctive relief mandating the creation of a medical monitoring program to

"diagnose at an early stage any ailments associated with exposure, inhalation or ingestion of

PFOA").

Importantly, Defendants do not argue in their Motion that sufficient exposure to and

accumulation of PFOA do not cause adverse health effects (or, more accurately, that Plaintiffs

did not plausibly allege such effects). See, e.g., Hill v. City of New York, 45 F.3d 653, 663 (2d

Cir. 1995) ("We decline to address this argument because defendants did not raise this defense in

their motion to dismiss . . . ."); Universal Entm't Events, Inc. v. Classic Air Charter, Inc., No.

15-CV-1104, 2016 WL 951534, at *4 n.2 (E.D.N.Y. Mar. 8, 2016) ("The Moving Defendants

failed to raise the argument in their Memorandum of Law in Support of their Motion to Dismiss,

and therefore the argument is not considered at this stage of the judicial proceedings."). Nor do

they argue that Plaintiffs' allegations fail to show how medical monitoring could successfully

improve their health outcomes following the ingestion of PFOA.

Instead, Defendants assert that Plaintiffs are not entitled to medical monitoring damages

as a matter of law, pointing to the New York Court of Appeals' 2013 decision in Caronia v.

Philip Morris USA, Inc., 5 N.E.3d 11. In Caronia, the Second Circuit asked the Court of Appeals

whether New York would recognize an independent equitable cause of action for medical

monitoring for plaintiffs who cannot establish all of the elements of a separate, more traditional

tort. Id. at 13–14. The court answered no, holding that plaintiffs may receive medical monitoring

as consequential damages only for an "already existing tort." Id. at 18–19. This case represents

one of the first seeking medical monitoring since <u>Caronia</u> was decided, requiring the Court to determine what constitutes such a preexisting tort under New York law.

Defendants interpret <u>Caronia</u> as foreclosing medical monitoring damages absent a present physical injury, and they define physical injury as the manifestation of symptoms or disease. Mem. at 38. Thus, because Plaintiffs do not allege any present symptoms, they cannot state an independent tort—a requirement for medical monitoring damages under New York law.

Defendants' view is incorrect for two reasons. First, under case law cited favorably by <u>Caronia</u>, a plaintiff may show an injury sufficient to seek medical monitoring damages through the accumulation of a toxic substance within her body. Second, <u>Caronia</u> appears to allow medical monitoring damages even if the only tort with a present "injury" involves harm to property, which, as discussed above, Plaintiffs have sufficiently alleged. Defendants' request to dismiss the claims for medical monitoring damages must therefore be denied.

### 1. *Availability of Medical Monitoring Damages*

As used in this opinion, medical monitoring refers to a remedy granted after exposure to a toxic substance that provides testing used for early detection of the signs of disease, which in turn allows for earlier and more effective treatment. <u>E.g.</u>, <u>Abbatiello</u>, 522 F. Supp. 2d at 536. While the cost of medical testing that is necessary for treatment of a present disease is obviously recoverable as consequential damages, <u>see, e.g.</u>, <u>Pilgrim v. Wilson Flat, Inc.</u>, 973 N.Y.S.2d 738, 739 (App. Div. 2013) (noting that medical expenses are permitted damages if they are "supported by competent evidence which establishes the need for, and the cost of, [the] medical care"), the availability of an award for medical testing before a disease manifests is a far more challenging question.

The history of medical monitoring cases in New York is discussed more extensively in Abbatiello v. Monsanto Co., 522 F. Supp. 2d at 536–39, but two early Appellate Division cases are especially important. The first is Askey v. Occidental Chemical Corp., 477 N.Y.S.2d 242, 244 (App. Div. 1984), in which plaintiffs sought to certify a class of plaintiffs who resided near a sister landfill of the infamous Love Canal site in the Town of Niagara. Even though the plaintiffs in question did not allege present illnesses caused by exposure, the Appellate Division directed the certification of a class seeking medical monitoring. Id. at 246. The Askey court found that "there is a basis in law to sustain a claim for medical monitoring as an element of consequential damage," provided that the plaintiff "establish[es] with a degree of reasonable medical certainty through expert testimony" that medical monitoring expenses must be incurred as a result of the exposure. Id. at 246–47.

Following Askey was Abusio v. Consolidated Edison Co. of New York, 656 N.Y.S.2d 371 (App. Div. 1997) (per curiam), in which the Second Department reviewed the requirements for medical monitoring damages. In affirming the trial court's decision, the court noted that medical monitoring costs are available when the plaintiff has shown "that he or she was in fact exposed to [a] disease-causing agent and that there is a 'rational basis' for his or her fear of contracting the disease," the same formulation used in New York cases generally allowing suits for fear of future disease. Id. at 372 (quoting Wolff v. A-One Oil, Inc., 627 N.Y.S.2d 788, 789 (App. Div. 1995). The Fourth Department later concurred in this view, reinstating claims seeking medical monitoring damages on summary judgment. Allen v. Gen. Elec. Co., 821 N.Y.S.2d 692, 694–95 (App. Div. 2006) (per curiam).

All this sets the stage for <u>Caronia v. Philip Morris USA, Inc.</u>, a cigarette case first filed in 2006. No. 06-CV-224, 2011 WL 338425 (E.D.N.Y. Jan. 13, 2011), <u>aff'd on other grounds</u>, 748 F.3d 454 (2d Cir. 2014). In <u>Caronia</u>, the plaintiffs sought medical monitoring after smoking Marlboro cigarettes "that delivered an excessive and dangerous level of . . . 'tar.'" <u>Id.</u> at *1. While the district court ultimately dismissed the plaintiff's claims, <u>id.</u> at *10–12, it did so only after first finding that there is an independent cause of action for medical monitoring in New York, <u>id.</u> at *4–7.

Through an appeal and subsequent certification, the case found its way to the New York Court of Appeals, which was tasked with determining whether New York law recognizes "an independent equitable cause of action for medical monitoring." 5 N.E.3d at 14. The court answered this question in the negative, finding that in order to obtain medical monitoring damages, a plaintiff must allege "an already existing tort cause of action," which in turn requires an allegation of existing "physical injury or damage to property." <u>Id.</u> at 14, 16, 18–19.

In arriving at this conclusion, <u>Caronia</u> embraced the Appellate Division cases discussed above, noting that they "consistently found that medical monitoring is an element of damages that may be recovered only after a physical injury has been proven, i.e., that it is a form of remedy for an *existing* tort." <u>Id.</u> at 16. Thus, in adopting the Appellate Divisions' view, the Court of Appeals rejected the district court's independent cause of action, which it viewed as permitting recovery even "where the plaintiff alleges absolutely no injury at all." <u>Id.</u> (citing <u>Beckley v. United States</u>, No. 92-CV-8137, 1995 WL 590658, at *4 (S.D.N.Y. Oct. 5, 1995), and <u>Gibbs v. E.I. DuPont de Nemours & Co.</u>, 876 F. Supp. 475, 478–79 (W.D.N.Y. 1995), two other cases in which federal district courts found an independent cause of action under New York law).

But Caronia did not upend the definition of injury espoused by Abusio and seemingly championed in its own text. See Stephen J. Riccardulli et al., A Need for Additional Clarity in Medical Monitoring, N.Y. L.J., May 23, 2016, at S2 ("The [Caronia] court, however, did not define what constitutes such a 'present physical injury' in toxic exposure cases . . . ."). Instead, the Caronia court quoted Abusio's language that accumulation coupled with a rational fear of contracting disease was an injury sufficient to receive medical monitoring damages, and noted the Appellate Divisions' use of "the test enunciated in Abusio" as further support for its decision. 5 N.E.3d at 16. Thus, while Caronia does not expressly define physical injury, its adoption of Abusio's reasoning strongly indicates that this definition at least includes the accumulation-based injury described in that case.

Indeed, the Second Circuit, albeit in dictum, endorsed the continued viability of Abusio's standard for medical monitoring damages before the manifestation of symptoms. Under the circuit's interpretation of Caronia, while "[m]edical monitoring is not an independent cause of action under New York law," a plaintiff may still "establish entitlement to damages for fear of cancer" by "show[ing] a '"rational basis" for [the] fear[,] . . . i.e., . . . a "clinically demonstrable presence of toxins in the plaintiff's body, or some indication of toxin-induced disease, i.e., some physical manifestation of toxin contamination.""" In re World Trade Ctr. Lower Manhattan Disaster Site Litig., 758 F.3d 202, 213 (2d Cir. 2014) (last four alterations in original) (quoting Caronia, 5 N.E.3d at 16). Following the Second Circuit's lead, the Court finds that the blood accumulation of PFOA—as alleged by the Accumulation Plaintiffs in this case—is sufficient to permit a claim for negligence seeking medical monitoring damages.

While Defendants categorize this accumulation as exposure without injury, e.g., Reply at 15, this view of the law promotes an absurdity: requiring plaintiffs to manifest physical symptoms before receiving medical monitoring would defeat the purpose of that remedy. The entire point of medical monitoring is to provide testing that would detect a patient's disease *before* she manifests an obvious symptomatic illness, thus allowing earlier treatment that carries a better chance of success. Abbatiello, 522 F. Supp. 2d at 536; Guzelian et al., supra, at 64, 76–77. "Medical monitoring" provides small comfort to someone already suffering outwardly apparent symptoms if the only benefit is to track the continued advance of the disease. Further, the cost of testing necessary to provide treatment would already be recoverable as a component of damages arising from the illness itself.

Finally, even if the accumulation of PFOA in the blood were not enough to constitute an injury within a preexisting tort, Caronia also allows plaintiffs to seek medical monitoring as consequential damages for a tort alleging injury to property. In that case, the Court of Appeals repeatedly said medical monitoring damages require either "physical injury *or damage to property*" that amounts to some "already existing tort cause of action." Caronia, 5 N.E.3d at 14–19 (emphasis added); see also id. at 16 n.2 (emphasizing the requirement for plaintiffs to allege some "physical injury or property damage" to state a claim seeking medical monitoring); Riccardulli et al., supra ("Caronia acknowledged that a plaintiff may seek medical monitoring relief for property damage . . . ."). The Third Department's decision in Ivory expressly recognized this principle, since it permitted the plaintiffs who alleged trespass claims to seek medical monitoring damages at trial on that basis. See 983 N.Y.S.2d at 118 ("Caronia also indicates that medical monitoring can be recovered as consequential damages associated with a

30

separate tort alleging property damage. . . . Accordingly, . . . plaintiffs could pursue medical monitoring damages consequential to the trespass cause of action." (citation omitted)).[15]

As discussed earlier in this opinion, Plaintiffs have sufficiently alleged claims for negligence and other torts concerning property. This constitutes "an already existing tort cause of action," Caronia, 5 N.E.3d at 18–19, and so Plaintiffs cannot be denied medical monitoring damages on this motion to dismiss. It is also for this reason that the Nonaccumulation Plantiffs' medical monitoring claims survive Defendants' Motion, though Plaintiffs may have intended to exclude them from their "Biomonitoring Class," Compl. ¶ 135, and it is unclear what they must prove to ultimately receive medical monitoring as consequential damages.

### 2. *Clarifying* Caronia

While the Court's reading of Caronia in light of Abusio may open the door to recovery in this case, it is worth noting the potential difficulties of applying Caronia in other settings. This stems from Caronia's apparent holding that the need for medical monitoring alone is not a legally cognizable injury,[16] and thus that there must be some other injury in order to state a tort claim. Caronia, 5 N.E.3d at 14 (noting that "[t]he physical harm requirement . . . defines the class of persons who actually possess a cause of action," and that because the complaint "alleged no

---

[15] Insofar as Ivory turns on whether the injury to property constitutes *damage*, see 983 N.Y.S.2d at 118 ("As private nuisance does not require any 'present . . . damage to property,' . . . no plaintiff here has a claim for medical monitoring damages consequential to a nuisance cause of action." (first alteration in original) (quoting Caronia, 5 N.E.3d at 18)), this distinction is at odds with Caronia. Caronia expressly allowed plaintiffs to seek medical monitoring damages "so long as the remedy is premised on the plaintiff establishing entitlement to damages on an already existing tort cause of action." 5 N.E.3d at 18–19. Any complete tort cause of action, regardless of the legal theory involved, would seem to meet this requirement.

[16] By "need," the Court means that the requested monitoring is medically indicated.

physical injury or damage to property," only a new cause of action could permit legal recovery). The requirement for "an already existing tort cause of action," id. at 18–19, independent of the need for medical monitoring, divorces the damages sought from the nature of the injury incurred, possibly allowing recovery in cases where it is unwarranted and almost certainly denying recovery in some cases where medical monitoring is justified.

As discussed above, Caronia allows a plaintiff to seek medical monitoring damages even when the only present tort alleged involves damage to property. 5 N.E.3d at 14–19, 16 n.2; Ivory, 983 N.Y.S.2d at 118. While the Court of Appeals did not specify what a plaintiff must prove at trial to receive medical monitoring damages (as opposed to some other relief), the decision could nevertheless allow a request for medical monitoring based on property damage alone to survive a motion to dismiss, despite the absence of allegations concerning its medical and scientific appropriateness. See Riccardulli et al., supra ("One can imagine various scenarios where, although a property is impacted by a contaminant, the impact to the property does not result in human exposure—particularly in the case of a subsurface intrusion. Under Caronia and Ivory, however, plaintiffs can still seek medical monitoring costs for this alleged injury." (footnote omitted)).

More significantly, among plaintiffs who have suffered exposure and for whom medical monitoring could improve their prognoses, Caronia bases the availability of medical monitoring on whether they suffered some separate injury to property. If instead of the water supply of her home, a plaintiff consumed a toxic chemical through the water source of a third-party (such as a restaurant), she would lack the damage to property seemingly required by Caronia. Thus, unless this plaintiff also could show bodily accumulation of the offending compound, her suit would be

dismissed for failure to state a claim, despite an absence of difference between the two cases in terms of the defendant's duty, its breach, and the cause of the plaintiff's injury.

Even the accumulation-nonaccumulation dichotomy adds potential complication (though certainly less so than basing the availability of medical testing on whether there was an injury to property). Consider two substances, both of which, through exposure, cause the same increased risk of a disease that can be successfully treated if detected before symptoms become outwardly apparent. One of these has a lengthy biological half-life and accumulates in the blood. The other is rapidly excreted, though its ingestion causes the same exact damage as the accumulating compound. Under Caronia (and in the absence of property damage), it seems that only exposure to the first substance would permit recovery of medical monitoring costs, even though both the harm incurred and the benefits of the remedy are the same in both examples.

The potential for arbitrary outcomes and the denial of medically indicated testing invites further clarification of Caronia. The foundation of that decision's holding is that the award of medical monitoring damages requires "an already existing tort cause of action." 5 N.E.3d at 18–19. In the contamination context (and in this case as well), this most likely means the tort of negligence. Cf., e.g., Aegis, 737 F.3d at 177 (listing the elements of negligence under New York law). If a plaintiff can show duty, breach, and causation, it seems incredible that there would not be a legal injury when the defendant has forced her into a lose-lose situation: she must choose to either bear the cost of medical testing herself, which could end up saving her life, or wait to recover from the defendant until she is already sick, which could be too late to provide effective treatment.

This understanding of injury hinges upon the existence of a dilemma like the one discussed above, but it is hard to see the benefit of medical monitoring outside of such a context. In contrast, damage to property alone—though certainly a tort, and apparently enough to satisfy Caronia's requirements—cannot be enough to warrant this remedy. Thus, a better view of the present injury requirement is one that is independent of accumulation or property damage, instead turning on whether, because of the defendant's actions, the monitoring requested is medically indicated in the plaintiff's situation. See Allen T. Slagel, Note, Medical Surveillance Damages: A Solution to the Inadequate Compensation of Toxic Tort Victims, 63 Ind. L.J. 849, 872 (1987) ("In order to recover medical surveillance damages, the plaintiff must prove . . . exposure to a hazardous substance[,] . . . [a]s a proximate result of exposure an increased risk of manifesting a serious latent disease requiring her to undergo medical surveillance examinations[,] . . . [and] [t]he existence of a medical test which [makes] early detection of the latent diseases possible and a treatment which can alter the natural history of the disease."); id. at 863 ("The test for the compensability of medical surveillance expenses is whether future testing is necessary to detect the early warning signs of latent ailments.").

Later in this decision, the Court permits the parties to take an interlocutory appeal from the questions of law decided today. The Second Circuit may in turn choose to certify these issues of state law to the New York Court of Appeals. If this comes to pass, either now or on a later appeal, the Court of Appeals could assist the lower courts by clarifying Caronia and rooting its present-injury requirement in the potential effects on the plaintiff's health (such as the quantum of exposure and the dose-dependency of the resultant disease) and the resulting need for medical testing, as opposed to potentially arbitrary distinctions in damage to property or accumulation in

the blood. While the Court recognizes the concern about a deluge of frivolous litigation, <u>Caronia</u>, 5 N.E.3d at 18 & n.3, the judiciary should not retreat from a flood of litigation when the claims it carries have merit.

### 3. Proof of Damages

Finally, it is worth noting that this decision does not determine what Plaintiffs must prove at trial to receive consequential medical monitoring damages. The Court of Appeals' decision in <u>Caronia</u> did not address this question, but the district court—in articulating the elements of its proposed but ultimately reversed medical monitoring claim—found that an award of these damages requires the availability of a monitoring procedure "that makes early detection possible" and is different from the normal preventive care prescribed in the absence of exposure, and that this monitoring program be "reasonably necessary according to contemporary scientific principles." 2011 WL 338425, at *7; <u>accord</u> <u>Abbatiello</u>, 522 F. Supp. 2d at 539; <u>Redland Soccer Club, Inc. v. Dep't of the Army</u>, 696 A.2d 137, 145–46 (Pa. 1997); <u>see also</u> <u>In re Paoli R.R. Yard PCB Litig.</u>, 916 F.2d 829, 852 (3d Cir. 1990) (requiring that the "increased risk [of disease] make[] periodic diagnostic medical examinations reasonably necessary" and that "[m]onitoring and testing procedures exist which make the early detection and treatment of the disease possible and beneficial"); <u>Acevedo v. Consol. Edison Co. of N.Y.</u>, 572 N.Y.S.2d 1015, 1018 (Sup. Ct. 1991) ("[M]edical monitoring allowing for early detection and treatment . . . may be sought . . . provided proper proof is adduced at trial supporting the need for such recovery."), <u>abrogated in part by</u> <u>Caronia</u>, 5 N.E.3d 11. Indeed, <u>Askey</u> suggests a similar requirement, finding that "[t]he future expense of medical monitoring[] could be a recoverable consequential damage provided that plaintiffs can establish with a reasonable degree of medical certainty that such expenditures

are 'reasonably anticipated' to be incurred by reason of their exposure," and that this medical monitoring "would permit the early detection and treatment of maladies." 477 N.Y.S.2d at 247, quoted in Abbatiello, 522 F. Supp. 2d at 539; see also Slagel, supra, at 875–76 ("Unless a sufficiently sensitive and specific medical tests exists to detect the future ailment, no future medical surveillance testing should be performed and no damages awarded. . . . A damage award is appropriate only if early detection allows for a treatment that can ultimately alleviate the ailment.").

The costs of medical monitoring may not be imposed on a defendant at the expense of good medicine, but there is no doubt that medical monitoring damages can be obtained in some cases—this was expressly stated in Caronia. 5 N.E.3d at 18–19. It follows that there must be some way for Plaintiffs to prove their entitlement to them. While the Court need not decide now what must be shown to establish prospective medical monitoring damages, it is worth mentioning this issue to help shape an important component of discovery and future motion practice. Cf., e.g., Redland, 696 A.2d at 146 (noting the necessity of expert testimony in determining the suitability of medical monitoring).

### E. Interlocutory Appeal

While not raised by either party, 28 U.S.C. § 1292 allows the district court, when issuing an otherwise unappealable order, to permit an interlocutory appeal to the appropriate circuit court. Specifically, § 1292(b) states that, when a district judge is "of the opinion that [an interlocutory] order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order."

The requirements of § 1292 are met in this case. As discussed above, Defendants' Motion raises several complex and novel issues of New York law as to which the existing case law is significantly muddled. When a denial of a motion to dismiss (or, as in this case, a grant in part and denial in part) "'involves a new legal question or is of special consequence,' then the district court 'should not hesitate to certify an interlocutory appeal.'" Balintulo v. Daimler AG, 727 F.3d 174, 186 (2d Cir. 2013) (quoting Mohawk Indus., Inc. v. Carpenter, 558 U.S. 100, 111 (2009)). This is especially true given the Second Circuit's power to certify questions of state law to the New York Court of Appeals. See Joseph v. Athanasopoulos, 648 F.3d 58, 61, 67–68 (2d Cir. 2011) (certifying question to the New York Court of Appeals after an interlocutory appeal from the district court); cf. 10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co., 634 F.3d 112, 125–26 (2d Cir. 2010) (listing factors favoring certification to the New York Court of Appeals, including when "decisions by New York courts are insufficient to predict how the Court of Appeals would resolve" a dispute and when the question involves "value judgments and important public policy choices" (quoting Penguin Grp. (USA) Inc. v. Am. Buddha, 609 F.3d 30, 42 (2d Cir. 2010))).

In this case, where the question of which claims are viable under New York law could significantly impact the classes to be certified, the scope and focus of discovery, any subsequent motion for summary judgment, and the issues to be presented at trial, an early resolution of the applicable law could significantly improve the efficiency of this litigation and reduce its cost for both Defendants and the putative classes. Furthermore, an interlocutory appeal could benefit either or both parties, since both sides incurred a partially adverse decision through this Memorandum-Decision and Order.

Therefore, the Court certifies this order for interlocutory appeal pursuant to 28 U.S.C.

§ 1292(b). Any party seeking to appeal pursuant to this certification must apply to the Second

Circuit for leave to appeal within ten (10) days of the filing date of this Memorandum-Decision

and Order, and any such appeal will not delay proceedings in this Court absent a stay granted by

the circuit. § 1292(b).

## V.     CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion (Dkt. No. 13) is **GRANTED IN PART and

DENIED IN PART**; and it is further

**ORDERED**, that the Municipal Water Plaintiffs' nuisance claims are **DISMISSED**; and

it is further

**ORDERED**, that Plaintiffs' negligence and strict liability claims related to property, the

Private Well Plaintiffs' trespass and nuisance claims, and Plaintiffs' negligence and strict liability

claims related to PFOA ingestion survive Defendants' Motion; and it is further

**ORDERED**, that the questions of law decided in this Memorandum-Decision and Order

are certified for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), and any party may apply

for leave to appeal with the United States Court of Appeals for the Second Circuit within **ten

(10) days** of the filing date of this Memorandum-Decision and Order;[17] and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum-Decision

and Order on all parties pursuant to the Local Rules.

---

[17] See also Fed. R. App. P. 5 (providing rules governing petitions for permission to appeal).

**IT IS SO ORDERED.**

DATED:      February 06, 2017
             Albany, New York

Lawrence E. Kahn
U.S. District Judge