UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHELE BAKER; CHARLES CARR; ANGELA CORBETT; PAMELA FORREST; MICHAEL HICKEY, individually and as parent and natural guardian of O.H., infant; KATHLEEN MAIN-LINGENER; KRISTIN MILLER, as parent and natural guardian of K.M., infant; JENNIFER PLOUFFE; SILVIA POTTER, individually and as parent and natural guardian of C.P, infant; and DANIEL SCHUTTIG, individually and on behalf of all others similarly situated, | Civ. No. 1:16-CV-917 (LEK/DJS) **FIRST AMENDED MASTER CONSOLIDATED CLASS ACTION COMPLAINT** **DEMAND FOR JURY TRIAL** |
| Plaintiffs, | |
| v. | |
| SAINT-GOBAIN PERFORMANCE PLASTICS CORP., HONEYWELL INTERNATIONAL INC. f/k/a ALLIED-SIGNAL INC. and/or ALLIEDSIGNAL LAMINATE SYSTEMS, INC., E.I. DUPONT DE NEMOURS AND COMPANY and 3M CO., | |

Plaintiffs, individually and on behalf of the putative classes of similarly situated persons defined herein, file this First Amended Master Consolidated Complaint. Plaintiffs, having previously filed suit against Defendants Saint-Gobain Performance Plastics Corp. ("Saint-Gobain") and Honeywell International Inc. f/k/a Allied-Signal Inc. and/or AlliedSignal Laminate Systems, Inc. ("Honeywell"), now amend their Master Consolidated Class Action Complaint as permitted pursuant to the Uniform Pretrial Scheduling Order of this Court filed on February 21, 2018 (Dkt. 48), as amended by subsequent Stipulations and Orders (Dkts. 68, 69 and 77), to add E.I. DuPont De Nemours and Company and 3M Co. as defendants, to modify this pleading to conform with rulings of the Court, and to provide additional allegations based upon information obtained since filing the previous pleading, and hereby allege as follows:

**INTRODUCTION**

1.      Residents of Hoosick Falls, New York receive their drinking water from groundwater from either the Hoosick Falls municipal water supply or from private wells.  Although unknown to them, for years residents have been drinking water laced with a dangerous chemical called perfluorooctanoic acid, commonly referred to as PFOA. When consumed, PFOA can cause numerous and serious negative health outcomes.

2.      The United States Environmental Protection Agency (EPA) issued a health advisory for PFOA (and a related chemical, perfluorooctane sulfonic acid, or PFOS) in 2016, advising against ingesting water with PFOA and PFOS in excess of 70 parts per trillion (ppt). Separately, a panel of scientists studying the health impacts from PFOA-contaminated drinking water in and around Parkersburg, West Virginia found negative health outcomes associated with exposure to drinking water containing PFOA at 50 ppt. Certain states have also promulgated advisory exposure levels lower than the EPA's advisory level, including the State of New Jersey at 14 ppt and the State of Vermont at 20 ppt.

3.      The level of PFOA in Hoosick Falls' municipal water supply exceeded 600 ppt when it was tested in 2014 and 2015. Upon information and belief, the concentration of PFOA in the municipal water supply had been this high or higher for years, if not decades. In addition, as of January 2016, numerous private wells in and around Hoosick Falls contained dangerous concentrations of PFOA in excess of any safe drinking standard.

4.      The State of New York has identified Defendants Saint-Gobain Performance Plastics Corp. (Saint-Gobain) and Allied Signal Inc. and/or AlliedSignal Laminate Systems, Inc., now doing business as Honeywell International Inc. (Honeywell), as two of the parties potentially responsible for the contamination of the groundwater in Hoosick Falls with PFOA.

5.      Defendants Saint-Gobain and Honeywell, in whole or in part, contaminated the

aquifer beneath Hoosick Falls with PFOA by releasing PFOA into the environment.

6.      On January 27, 2016, New York Governor Andrew Cuomo declared the primary Saint-Gobain facility in Hoosick Falls a state Superfund site and directed New York state agencies to use Superfund money to address PFOA in the municipal water system and in private wells.  The State has since described this Saint-Gobain facility, located at 14 McCaffrey Street, as a "significant threat to public health or the environment." This site has subsequently been listed as a federal Superfund site.

7.      The presence of PFOA in the municipal water supply and the local aquifer immediately stigmatized the community and has adversely impacted and continues to adversely impact property values in the Village and the Town.

8.      The PFOA contamination has also adversely impacted, and continues to adversely impact, individuals' ability to use and enjoy their properties, negatively impacted and continues to negatively impact businesses, caused significant annoyance, inconvenience, and hardship, and caused and continues to cause fear and uncertainty among Hoosick Falls residents regarding the safety of their water supply, even after filtration systems were installed. For each of these reasons, as well as those described in more detail below, residents of Hoosick Falls are entitled compensation under the law.

9.      Furthermore, the people living in and around Hoosick Falls have been exposed for years, if not decades, to PFOA at concentrations well above a safe drinking level. These residents had no way to know they were consuming water contaminated with PFOA until the contamination was disclosed by state and federal officials. What is more, blood testing has now demonstrated that individuals in the community have concentrations of PFOA in their blood that is, on average, over 30 times higher than the typical American. While PFOA was found in individuals nationwide at a geometric mean concentration of 1.86 ug/L in 2013-14, the median blood level among Hoosick

Falls residents who have been tested to date is 64.2 ug/L. Virtually all residents who have lived in and around the Village for several years have PFOA in their blood at alarming concentrations. PFOA has thus infiltrated the blood of Hoosick Falls residents and placed them at significant risk of developing health conditions linked to PFOA exposure, and they are entitled to biomonitoring to safeguard against such outcomes.

## PARTIES

### *Plaintiffs*

10.     Plaintiff Michele Baker is a citizen and resident of Hoosick Falls, New York, with a mailing zip code of 12090. Ms. Baker is a homeowner who obtains her water from a private well. In late January 2016, Ms. Baker commenced refinancing her mortgage with a bank in Hoosick Falls. Over the course of the next several months, Ms. Baker received multiple home appraisals, each of which appraised her home at a lower value than the previous appraisal.  A bank representative informed Ms. Baker that the bank was no longer providing financing to residents of Hoosick Falls. Another bank representative told Ms. Baker that the bank could not provide financing to individuals who lacked potable water. The New York State Department of Environmental Conservation (DEC) tested water from Ms. Baker's well and determined that PFOA was present at 67 ppt. In the spring of 2016, DEC installed a Point-of-Entry Treatment (POET) system on Ms. Baker's private well, which reduced, but did not eliminate, the concentration of PFOA in her drinking water.  Ms. Baker will require use of the POET indefinitely to filter PFOA from her water. After several months, and only after installation of her POET system, Ms. Baker was ultimately able to secure financing on terms that were much less favorable than they had been prior to disclosure of the PFOA contamination. Upon information and belief,

Ms. Baker's residential property has lost value since PFOA contamination in Hoosick Falls was disclosed.

11.     Plaintiff Charles Carr is a citizen and resident of Hoosick Falls, New York, with a mailing zip code of 12090. Mr. Carr is a homeowner who obtains his water from a private well. He has lived at his current residence since 1993. In 2016, Mr. Carr's private well was tested for the presence of PFOA. He later learned that PFOA was present in his private well at a concentration of at least 390 ppt. Following this discovery, DEC installed a POET system on Mr. Carr's private well that has reduced the concentration of PFOA in his home's drinking water. Mr. Carr will require use of the POET indefinitely to filter PFOA from his water. In the spring of 2016, Mr. Carr had his blood tested at the Hoosick Falls Armory by representatives from the New York State Department of Health (DOH). In June 2016, he was informed that PFOA was present in his blood at a level of 186 ug/L. Mr. Carr routinely drank water from the tap at his residence until he learned that PFOA was contaminating the groundwater in and around Hoosick Falls. To this day, he continues to use bottled water for drinking purposes despite the presence of the POET system.

12.     Plaintiff Angela Corbett is a citizen and resident of Hoosick Falls, New York, with a mailing zip code of 12090. Ms. Corbett is a homeowner who obtains her water from a private well. She has lived at her current residence and owned her home since approximately 1992. In 2016, Ms. Corbett's private well was tested for the presence of PFOA.  She later learned that PFOA was present in her private well at a concentration of 160 ppt. Following this discovery, DEC installed a POET system on Ms. Corbett's private well that has reduced the concentration of PFOA in her home's drinking water.  Ms. Corbett will require use of the POET indefinitely to filter PFOA from her water. Until she was informed in late 2015 that PFOA was contaminating the

groundwater in and around Hoosick Falls, Ms. Corbett routinely drank water from the tap at her residence.

13.     Plaintiff Pamela Forrest is a citizen and resident of Hoosick Falls, New York, with a mailing zip code of 12090. Ms. Forrest is a homeowner who obtains her water from the Village of Hoosick Falls municipal water system. She has lived in her current residence since 1996. In the years prior to 2016, Ms. Forrest's home was appraised on multiple occasions. In June 2016, following disclosure of the widespread PFOA contamination in and around Hoosick Falls, Ms. Forrest's home was appraised again, this time showing substantial loss of value compared to multiple prior appraisals. Upon information and belief, this substantial loss of property value is due in whole or in significant part to the disclosure of PFOA contamination and its impact on property values Village-wide.

14.     Plaintiff Michael Hickey, individually and as parent and natural guardian of O.H., infant, is a citizen and resident of Hoosick Falls, New York, with a mailing zip code of 12090. Since 2011, Mr. Hickey has lived at a home in the Village of Hoosick Falls along with his son. They obtain their water from the Village of Hoosick Falls municipal water system. Prior to that, and since 2003, Mr. Hickey has lived at various properties in the Village of Hoosick Falls. At each of these locations, Mr. Hickey obtained his water from the Village of Hoosick Falls municipal water system.  In the spring of 2016, Mr. Hickey had his blood tested at the Hoosick Falls Armory by representatives from the DOH. In June 2016, he was informed that PFOA was present in his blood at a level of 24.6 ug/L. Mr. Hickey and O.H. routinely drank water from the tap at each of their residences until they learned that the municipal water system was contaminated with PFOA.  O.H. had his blood tested and was found to have PFOA present at a level of 27.7 ug/L.

15.     Plaintiff Kathleen Main-Lingener was a citizen and resident of Hoosick Falls, New York, with a mailing zip code of 12090. Ms. Main-Lingener was a homeowner who obtained

her water from the Village of Hoosick Falls municipal water system. She had lived at her residence for nine years and made substantial improvements to it over the course of her ownership.  Prior to that, she rented a home in Hoosick Falls for ten years that received its drinking water from the Village of Hoosick Falls municipal water system. Ms. Main-Lingener placed her home on the market for sale and had interested potential buyers at the time the contamination was made public and the potential buyers withdrew.  All subsequent efforts to sell the property failed, despite repeated reductions of asking price, due to the adverse effect on its value caused by the contamination. Her inability to sell the property even at prices below her purchase price and its tax-assessed value ultimately led to her loss of the property in foreclosure.  In the spring of 2016, Ms. Main-Lingener had her blood tested at the Hoosick Falls Armory by representatives from the DOH.  In June 2016, she was informed that PFOA was present in her blood at a level of 95.4 ug/L. Ms. Main-Lingener routinely consumed water from the tap at both of her residences in Hoosick Falls until she learned that the municipal water system was contaminated with PFOA.

16.     Plaintiff Kristin Miller, as parent and natural guardian of K.M., infant, is a citizen and resident of Hoosick Falls, New York, with a mailing zip code of 12090. Ms. Miller is a homeowner who lives with her minor son, K.M., at a residence that obtains its water from the municipal water system.  Ms. Miller has resided at this property since 2008 and K.M. has lived there for his entire life.  In the spring of 2016, K.M.'s blood was tested at the Hoosick Falls Armory by representatives from the DOH. In June 2016, Ms. Miller was informed that PFOA was present in her son's blood at a level of 108 ug/L. Until she learned in late 2015 that PFOA was contaminating the municipal water system of Hoosick Falls, Ms. Miller and K.M. routinely drank water from the tap at their residence, and K.M. has been exposed to the contamination his entire life.

17.     Plaintiff Jennifer Plouffe is a citizen and resident of Hoosick Falls, New York, with a mailing zip code of 12090. Ms. Plouffe is a homeowner who obtains her water from the Village

of Hoosick Falls municipal water system. In October 2015, Ms. Plouffe moved to Hoosick Falls from out of state.  At this time, she did not know that the municipal water system was dangerously contaminated with PFOA. The following month, she purchased her current home. At this time, she remained unaware of the PFOA contamination in and around Hoosick Falls. Within days of her closing date, however, she learned that the municipal water supply was contaminated with PFOA and soon thereafter, the state and federal government disclosed the extent of PFOA contamination in the Village and Town. Ms. Plouffe immediately found herself owner of a home worth less than she paid for it with no means of obtaining financing to move elsewhere because lending institutions had ceased providing financing to homeowners on municipal water.

18.     Plaintiff Silvia Potter, individually and as parent and natural guardian of C.P., infant, is a citizen and resident of Hoosick Falls, New York, with a mailing zip code of 12090. Ms. Potter is a homeowner who obtains her water from the Village of Hoosick Falls municipal water system. Although Ms. Potter would like to refinance her home, she is skeptical that she could do so on reasonable terms now that state officials have disclosed the presence of PFOA in the municipal water supply and property values throughout the Village have diminished. In the spring of 2016, Ms. Potter had her blood tested at the Hoosick Falls Armory by representatives from the DOH. In June 2016, she was informed that her PFOA level is 120 ug/L. Ms. Potter routinely drank water from the tap at her residence prior to learning that the municipal water was contaminated with PFOA. Ms. Potter's minor daughter, C.P., also had her blood tested in the spring of 2016. Ms. Potter was informed in June 2016 that her daughter's blood level is 28.6 ug/L.

19.     Plaintiff Daniel Schuttig is a citizen and resident of Hoosick Falls, New York, with a mailing zip code of 12090. Mr. Schuttig owns his home in Hoosick Falls and lives there with his wife and two young children. He has owned the home since 2006, refinancing it in 2011, and the home is on municipal water. Until he learned in late 2015 that PFOA was contaminating the

groundwater in and around Hoosick Falls, Mr. Schuttig and his family routinely drank water from the tap at their residence.

20.     Collectively, Plaintiffs Michele Baker, Charles Carr, Angela Corbett, Pamela Forrest, Michael Hickey, individually and as parent and natural guardian of O.H., infant, Kathleen Main-Lingener, Kristin Miller, as parent and natural guardian of K.M., infant, Jennifer Plouffe, Silvia Potter, individually and as parent and natural guardian of C.P., infant, and Daniel Schuttig are referred to as "Plaintiffs."

### Defendants

21.     Defendant Saint-Gobain Performance Plastics Corporation is and was at all times relevant hereto a corporation organized under the laws of California with its principal executive office located at 750 East Swedesford Road, Valley Forge, Pennsylvania. Saint-Gobain is registered to do business as a foreign corporation in the State of New York.

22.     Saint-Gobain's global headquarters are located in Curbevoie, France, and it is a multinational corporation with more than 350 years of engineered materials expertise. It is one of the 100 largest industrial companies in the world with € 43.2 billion in sales and 193,000 employees in 64 countries.

23.     Saint-Gobain is the world's leading producer of engineered, high-performance polymer products, serving virtually every major industry across the globe.

24.     Defendant Honeywell International, formerly known as Allied-Signal Inc. and/or AlliedSignal Laminate Systems, Inc., is a Delaware corporation with its principal executive office located at 115 Tabor Road, Morris Plains, New Jersey. Honeywell is registered to do business as a foreign corporation in the State of New York.

25.     Honeywell is a Fortune 100 company with a global workforce of approximately 130,000. It serves a variety of industries, including the specialty chemicals industry.

26.     In 1999, Allied-Signal Inc. (Allied-Signal) acquired Honeywell. The combined company adopted Honeywell's name because of superior name recognition.

27.     Allied-Signal was an aerospace, automotive, and engineering company that was created through the 1985 merger of Allied Corp. and Signal Companies. Together, these companies had operated in the United States since at least the early 1920s. Prior to the merger, a significant portion of Allied Corp.'s business was concerned with the chemical industry.

28.     At all relevant times, AlliedSignal Laminate Systems, Inc. was a unit of Allied-Signal.

29.     Defendants Saint-Gobain and Honeywell (through its predecessor Allied-Signal and/or AlliedSignal Laminates), at various times relevant herein, and as described more fully below, operated a manufacturing facility at or around 14 McCaffrey Street, Hoosick Falls, New York, and 1 Liberty Street, Hoosick Falls, New York. Defendant Honeywell also operated facilities on John Street/3 Lyman Street in Hoosick Falls, New York, Liberty Street in Hoosick Falls, New York and on River Road in Hoosick Falls, New York.

30.     Defendant E.I. DuPont De Nemours and Company ("DuPont"), is and was at all times relevant hereto a corporation organized under the laws of Delaware with its principal executive office located at 974 Centre Rd., Wilmington, DE.  DuPont is registered to do business as a foreign corporation in the State of New York.   At all times relevant hereto, DuPont manufactured and sold ammonium perfluorooctanoate (APFO) and/or polytetrafluoroethylene (PTFE) dispersions containing APFO to defendants Saint-Gobain and Honeywell that were used at these defendants' facilities in their manufacturing processes as described herein.

31.     Defendant 3M Co. ("3M") is and was at all times relevant hereto a corporation organized under the laws of Minnesota with its principal executive office located at 3M Center Building 220-11W-02, Saint Paul, Minnesota.  Defendant 3M manufactured and sold APFO to

defendants Saint-Gobain and Honeywell that was used at these defendants' facilities in their manufacturing processes as described herein.

32.     Defendant 3M manufactured and sold APFO to DuPont and other manufacturers for inclusion in polytetrafluoroethylene (PTFE) and fluorinated ethylene propylene (FEP)[1] dispersion products at least through 2000, and some of these PTFE and FEP dispersions were sold to defendants Saint-Gobain and Honeywell and used at these defendants' facilities in their manufacturing processes as described herein.

33.     Defendant DuPont manufactured and sold APFO after 2000 to other manufacturers for inclusion in PTFE dispersion products up through 2015 and these PTFE dispersion products were sold to defendants Saint-Gobain and Honeywell and used at these defendants' facilities in their manufacturing processes as described herein. Defendant DuPont also sold APFO directly to defendant Saint-Gobain between 2000-2015.

## JURISDICTION AND VENUE

34.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff classes are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

35.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because Defendant Saint-Gobain conducts substantial business in this District, and all Defendants have caused harm to class members residing in this District. Plaintiffs also reside in this District.

## GENERAL FACTUAL ALLEGATIONS

**Background Regarding PFOA**

---

[1] References to PTFE dispersions are intended to also include FEP dispersions and other PFOA-containing products manufactured by defendants DuPont and 3M.

36.     Ammonium Perfluorooctonoate (APFO) dissociates in water to form perfluorooctanoate (PFO⁻) and under acidic conditions is protonated to form perfluorooctanoic acid (PFOA).[2]

37.     PFOA is a fluorinated organic chemical that is part of a larger group of chemicals referred to as perfluoroalkyl substances (PFASs) or perfluorochemical compounds (PFCs) that include perfluorooctane sulfonic acid (PFOS).

38.     PFOA and all PFCs are human-made chemicals that are not found in nature.

39.     Defendant 3M is the inventor and original manufacturer of PFOA having begun manufacturing the chemical in approximately 1947 at its Cottage Grove plant in Minnesota.  It ceased manufacturing PFOA in or about the year 2000.

40.     Defendant DuPont began using PFOA (also referred to as C-8) in dispersion polymerization in the manufacture of fluoropolymers at its Washington Works plant in West Virginia in the 1950s.

41.     Defendant DuPont began manufacturing PFOA after defendant 3M chose to stop making the chemical in 2000 and DuPont then continued to manufacture PFOA and use it in its manufacturing processes after 2000.  Defendant DuPont also sold PFOA to other manufacturers of PTFE and FEP dispersions once it took over manufacturing the chemical from 3M after 2000.

42.     Historically, PFOA was used as a polymerization aid and as a dispersion and wetting agent in the manufacturing of fluoropolymers.   PFOA was also used in manufacturing a variety of consumer products to achieve water, oil, and grease repellency.

43.     Prior to 2015, companies utilized PFOA to make, among other things, carpets, clothing, fabrics for furniture, paper packaging for food and other materials such as cookware that

---

[2] For purposes of this complaint, APFO, PFO⁻ and PFOA will all be generically referred to as "PFOA".

are resistant to water, grease or stains.

44.     PFOA was also a key component in the manufacturing of PTFE (Teflon®) and other similar coatings.  In this process, PFOA was used as a surfactant, dispersing and wetting agent.  PFOA was not intended to be incorporated into the final product, although trace amounts remain.

45.     PFOA is a white solid at ambient temperature, but exists as a vapor when heated during the process of PTFE (Teflon®) manufacturing and coating.  When PTFE coatings are heated PFOA vaporizes out of the PTFE dispersion and exits through stacks in manufacturing facilities.  When hot PFOA vapor exits through the stacks and cools, it condenses back into solid form and, within minutes, it coagulates and forms micro-sized particulates ranging from 0.1 um to 1 um in diameter that are then carried by the wind until they settle to the ground (dry deposition) or are washed from the atmosphere by precipitation (wet deposition).  PFOA is highly water soluble and its particulate matter is carried by the wind and settles into soil where it dissolves into rainwater and other precipitation and then readily percolates down to contaminate groundwater.

46.     Due to its chemical structure, PFOA is biologically and chemically stable in the environment and is resistant to environmental degradation processes.  It is particularly persistent in water and soil and, because PFOA is water-soluble, it can migrate readily from soil to groundwater.  PFOA remains present in the environment long after it is initially released.

47.     In 2006, EPA implemented a global stewardship program that included eight major perfluoroalkyl manufacturing companies, including defendants DuPont and 3M.  The stewardship program's goal was (i) to achieve a 95% reduction of global facility emissions of PFOA and chemicals that degrade to PFOA by 2010, and (ii) to eliminate PFOA from emissions and products by 2015.  According to EPA, all eight companies that participated in the program have attested that they phased out PFOA, and chemicals that degrade to PFOA, from emissions and products by

the end of 2015.

**PFOA-Associated Health Risks**

48.     There are a number of health risks associated with exposure to PFOA, and these risks are present even when PFOA is ingested at, seemingly, very low levels (less than 1.0 part per billion (ppb)).

49.     Defendant DuPont had received inquiries regarding the toxicity of PFOA as early as 1954 and began to be concerned about its toxicity.

50.     In or about 1961 toxicologists working for defendant DuPont concluded that PFOA was toxic.  Its toxicology section chief stated it should be "handled with extreme care."  DuPont researchers also found that exposure to PFOA causes an increase in the size of the livers in rats and rabbits.  In 1962 the same effect was discovered by DuPont scientists when PFOA was ingested by dogs.  Internal documents from defendant 3M show that company scientists had been aware of the health risks of PFOA as early as the 1960s.

51.     In 1970, defendant DuPont became aware that a large group of company foremen and salesmen at its Washington Works facility in West Virginia where Teflon® manufacturing took place, had higher incidence rates of myocardial infarction, cerebrovascular disease, diabetes mellitus and cancer than its high level executives at the facility who were not involved directly in manufacturing operations.

52.     In 1976 researchers from the University of Rochester, New York published a report that showed widespread contamination of human tissues with organofluorine compounds (organic compounds that contain the carbon-fluorine bond) which likely derived from commercial sources such as PFOA.  The authors contacted defendant 3M questioning whether its consumer products containing these compounds could be the source.  J.D. LaZerte of 3M advised W.S. Guy, one of the researchers on the project, "not to speculate" on the source of the organofluorine compounds

found in human tissues and, upon information and belief, 3M took no further action to investigate this issue.

53.     By 1978, defendant 3M had found elevated organic fluorine levels in the blood of its workers exposed to fluorinated surfactants such as PFOA.

54.     When defendant DuPont learned of these elevated levels in 3M workers, it too began an internal review to determine its workers' C-8 (PFOA) concentrations and documented high concentrations of PFOA in the blood of its factory workers at its Washington Works plant in West Virginia, showing that PFOA bioaccumulates and is not easily removed from the body.

55.     In 1978, Bruce Karrh, M.D., defendant DuPont's Corporate Medical Director, published an article in a professional journal stating: "It is the duty of every company's management to discover and reveal the unvarnished facts about health hazards. . . [A] company should disclose health-hazard information.  It should be candid, and lay all the facts on the table. This is the only responsible and ethical way to go. This approach is the correct one, of course and it is the way we try to proceed at DuPont."

56.     By September of 1978 Defendant DuPont had reviewed medical records of 11 operators and 18 laboratory workers with long-term exposure to PFOA and found that more of them than anticipated had abnormal liver function tests (elevated liver enzymes in their blood serum).

57.     In the late 1970s defendant 3M consulted with Dr. Harold C. Hodge of the University of Rochester.  At a meeting in 1978, Dr. Hodge told 3M's Medical Director, Dr. F.A. Ubel, that physical examination results of employees should be compared with controls.  "There appears to be indications of liver change from the physical examination results.  In terms of indicators of liver disorder, there are [sic] a higher percentage of Chemolite [one 3M facility] than at Decatur [another 3M facility] and the organically bound fluorine level at Chemolite is

15

correspondingly higher."  Dr. Hodge indicated to 3M at this time that a potential hazard was present regarding organofluorine chemical exposure to its workers.

58.    A joint meeting was held in 1979 between defendant 3M's fluorochemical exposure committee and defendant DuPont's Eugene Berman and several of his DuPont colleagues.  Both companies' representatives agreed that since there were no *established* adverse health effects associated with the findings of accumulated fluorochemicals in the blood of workers at the two companies there was no reason to provide an 8E notification under TSCA to the Environmental Protection Agency regarding these findings.  Minutes from the meeting indicate that a discussion transpired between the two companies as to whether they would make any efforts to seek evidence of a possible association between worker blood levels and illness: "DuPont was asked if they had carried out any chronic studies on fluorochemicals in the past and if they planned any in the future. In both cases the answer was negative.  Fluorochemicals have a low priority in their chronic testing program.  They would not carry out such studies unless they were forced to by regulations."

59.    In 1979, Defendant DuPont learned that PFOA caused metabolic abnormalities, including uncoupling of oxidative phosphorylation in rat liver mitochondria that were oxidizing succinate.  It also learned that PFOA seemed to alter the immunochemical reaction of bovine (cow) serum albumin.  It also was aware at that time that: 1) PFOA caused liver enlargement in rats and death at high doses; 2) increases in plasma enzyme levels indicative of cellular damage in dogs and death at high doses; and; 3) inhaled doses in rats for only four hours could cause liver enlargement and corneal opacity.

60.    Based upon the adverse health effects of PFOA on laboratory animals, in 1979 defendant DuPont established a provisional PFOA acceptable exposure level for its employees of 0.01 mg/m$^3$ in air based upon an 8-hour time-weighted average exposure.

61.    In 1979 Defendant DuPont found increased PFOA levels in the blood of eight

workers who worked in the FEP polymerization and TFE dispersion polymerization processes, with the average blood level for PFOA among the eight workers being 8.2 ppm (8,200 ppb).

62.     In 1979 Defendant DuPont was aware that blood test results of its Washington Works employees from 1978 showed that organic fluoride levels were associated with increases in SGOT levels in blood serum.  SGOT (now more commonly referred to as AST) is a liver enzyme which when found at increased levels in blood serum is a sign of possible liver damage.

63.     In 1979, Defendant DuPont was aware "compound-related effects" (effects related to PFOA) were observed in both Rhesus monkeys and Charles River CD rats, but that "monkeys were more severely affected of the two."  It learned that "the data on monkeys suggested increased incidences of chronic interstitial nephritis [kidney damage], hyperkeratosis in the skin and a slight increase in skeletal muscle atrophy …  Similarly, the data on rats suggest hepatocellular necrosis [liver damage], sinusoidal liver congestion and the presence of yellow-brown pigment in the epithelium of the convoluted tubules of the kidney."

64.     By 1979 Defendant DuPont was aware that a 90-day oral study in Rhesus monkeys had been administered at dosage levels of 0, 3, 10, 30 and 100 mg/kg/day of PFOA, with the monkeys receiving the highest dose dying during weeks 2-5 of the study, three of the monkeys receiving the 30 mg/kg/day dose also died during weeks 7-12 of the study while all monkeys exposed at this dose showed signs of toxicity in the gastrointestinal tract and other adverse changes. Monkeys dosed at the two highest levels also showed weight loss from the first week of the study.

65.     Early PFOA toxicology studies commissioned by defendant 3M were summarized in 1980 and the liver was highlighted as a target organ, while effects on the immune system were also reported.  The study reports were not submitted to the EPA until 2000, the year defendant 3M decided to stop manufacturing PFOA.

66.     In 1980 PFOA animal toxicity studies were published by Griffith and Long in the

JAIHA.

67.     By 1980, defendant DuPont had internally confirmed that PFOA "is toxic," "people accumulate" the chemical in their bodies after exposure and "continued exposure is not tolerable." At this same time defendant DuPont documented that sixteen of its workers had PFOA blood serum levels of between 4.97 ppm and 21.69 ppm (4,970 ppb and 21,690 ppb).

68.     In 1980 DuPont was aware that the rate of first time myocardial infarctions (heart attacks) in company foreman at its Washington Works facility was almost double what would have been expected.

69.     In materials from a C-8 Communications meeting, dated July 31, 1980, D.E. Steiner, an employee of defendant DuPont, stated: "After 25 years of handling C-8, we see no damage among workers.  However the potential is there – C-8 has accumulated in the blood. Because of this accumulation we have decided to undertake programs to minimize accumulation of C-8 in the blood in the workers."

70.     By 1981, defendant DuPont was aware that PFOA in the blood serum of a pregnant woman could cross the placenta to the fetus.  PFOA was found to be present in the umbilical cord blood of an infant born to an employee and in the blood of an infant born to another employee.

71.     By 1981 defendant 3M was aware that PFOA ingestion caused birth defects in rats. Acting on this information defendant DuPont surveyed children born to workers of its Teflon Division and found birth defects in two of seven children born to PFOA exposed workers, both of whom had eye defects.

72.     An experimental study conducted by defendant 3M in 1981 showed birth defects in the eye lens of rats exposed to PFOA.  A total of three teratology studies were carried out, all of them finding lens abnormalities in exposed animals.  In March of 1981, defendant 3M informed defendant DuPont of the rat study.  DuPont then removed all female employees from PFOA

exposed jobs, but did not inform them of the reason for their transfer.

73.     By the early 1980's Defendants DuPont and 3M were sharing their internal studies concerning health and environmental effects associated with exposure to PFOA that Defendants were not sharing publicly.

74.     In 1982, Defendant DuPont calculated that approximately 40 percent of the PFOA vapor inhaled was retained in the blood of human males.

75.     A cross-sectional study of worker health at 3M's Chemolite plant in Cottage Grove, Minnesota was summarized by a 3M medical officer in 1982 as showing a high prevalence of high blood pressure and elevation of cholesterol.  No apparent effort was made to compare the incidence of these conditions to PFOA or PFOS blood levels and the authors concluded that this observation was caused by worker lifestyle, not occupational exposures.

76.     On November 23, 1982, Defendant DuPont's Medical Director, Bruce Karrh, MD, wrote in an internal memorandum: a) "Our knowledge of the product health effects of long-term exposure to low levels of C-8 is quite limited"; b) "C-8 is retained in the blood for a long time, creating concern in other areas such as blood donations, etc."; and c) "All employees, not just Teflon area workers, are exposed."

77.     By September of 1984 defendant 3M's medical service team noticed an increasing trend in worker organic fluorine concentrations in blood testing that had begun eight years earlier. The team advised "we must view this present trend with serious concern . . . exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."

78.     Thereafter, defendant 3M decided to search to see if it could find any blood samples among its workers that were free of organofluorine compounds.  When this was unsuccessful, an internal 3M document proposed: "It is in the interest of 3M to strengthen the evidence of non-

industrial sources of organic fluorine in normal human blood."  3M initiated efforts beginning in 1993 to show that organic fluorine in blood could be from entirely natural sources, but was unable to find any data to support this hypothesis.

79.    By June 14, 1984 defendant DuPont was aware from analysis of blood testing of former Teflon Division employees that the average biological half-life of PFOA in human blood was approximately 2.4 years, but with considerable variability between individuals.

80.    In 1984 defendant DuPont was aware that male operators in the Teflon division that had worked there for many years had complained about difficulty in achieving pregnancy with their wives.

81.    By 1986 defendant DuPont was aware of a cancer morbidity study among its Washington Works employees that showed male hourly wage workers had an incidence of bladder cancer deaths at more than double what would have been expected.

82.    By 1987 defendant DuPont was aware through a study conducted of its Chamber Works plant in Deepwater, New Jersey, where fluorochemicals were used, that there were increases above expected rates of death from female breast cancer, bladder cancer, Hodgkin's disease, lung cancer, urinary cancers in men and cirrhosis of the liver in women.

83.    On June 12, 1987, H.A. Smith, of the Safety, Energy & Environmental Affairs office of defendant DuPont's Manufacturing Division made a request to DuPont's Haskell Laboratory that they establish an acceptable level of PFOA in the blood and an acceptable level of PFOA in drinking water.

84.    By 1988 defendant DuPont was aware that PFOA was associated with increased rates of carcinogenicity in rats, including testicular cancer.

85.    On March 9, 1988 defendant DuPont first recommended a drinking water limit for PFOA of 1 ug/L (ppb).  This guideline was adopted by DuPont in June of 1991.

86.     In 1989 a study by defendant DuPont of cancer incidence among its Washington Works employees detected an increased incidence of leukemia, buccal cavity and pharynx cancer, kidney and other urinary cancers, including bladder cancer and multiple myeloma.

87.     By 1989, defendant DuPont was aware that there were increases in other cancers at its Chamber Works facility as well, including pancreatic, lung, kidney and bladder cancers and Hodgkin's disease.

88.     An internal DuPont memo dated December 14, 1989, entitled "Washington Works: Cancer Incidence and Overall Mortality Rates" indicates that among Washington Works employees there was an increased incidence over expected of testicular cancer, kidney cancer and other urinary cancers.

89.     By 1990 defendant DuPont was aware that among its Chamber Works employees there was a statistically significant excess of deaths due to urinary cancers, a statistically significant increased incidence of bladder cancer in male employees, a statistically significant increase in mortality from cancer of the digestive organs among female employees and female employees continued to have a statistically significant elevation in the incidence of cirrhosis of the liver.

90.     A 1990 DuPont internal industrial hygiene data review demonstrated a correlation between PFOA levels in the air and PFOA blood levels in workers who inhaled contaminated air. It was found that levels in blood were an order of magnitude or more higher than the levels in the air, which demonstrated that PFOA bioaccumulated inside the human body.

91.     In a DuPont report dated April 12, 1990 entitled "Investigation of Hormonal Mechanisms for C-8 Induced Leydig Cell Adenoma" by Mark Hurtt and Jon Cook of DuPont's Haskell Laboratory, which reviewed data derived from a 3M animal study, the authors concluded that the induction of Leydig cell adenoma (testicular tumors) related to PFOA exposure was likely to be hormonally mediated.

92.     By October of 1990 defendant DuPont learned that PFOA induced a dose-related decrease in serum testosterone, which appeared to document a direct effect of PFOA on the testes.

93.     On March 15, 1991, Wayne H. Martin of defendant DuPont's regulatory affairs department sent a memo that reported on a meeting at which he and other DuPont employees decided that "A warning of potential C-8 hazards (especially from condensate) should be included in MSDSs for all products in which C-8 concentration is 0.1% or more."  It also indicated that all other "product literature which contains safety or health warnings should be revised to be consistent with MSDS."

94.     In October of 1991 an internal proposal to conduct a cross-sectional study of liver enzyme levels among Washington Works employees with potential exposure to PFOA was rejected by defendant DuPont's management.  In notes from a meeting when this proposed study was considered, a DuPont employee wrote: "Do the study after we are sued."

95.     In the unpublished 1992 thesis of Frank Gilliland, MD who studied the clinical pathology parameters of 111 male workers at defendant 3M's Chemolite plant in Cottage Grove, MN, Dr. Gilliland found a positive correlation between PFOA exposure measured as serum total organic fluorine and estradiol (an adverse effect) and a negative correlation with free testosterone (also an adverse effect) with this association being stronger in older men.  Dr. Gilliland concluded that PFOA may affect male reproductive hormones.

96.     Dr. Gilliland's 1992 unpublished thesis from his 3M worker study also showed thyroid effects in 3M production workers that were associated with organofluorine concentrations in worker blood serum.  A positive correlation was seen between organic fluorine and the thyroid stimulating hormone in serum, a sign of thyroid deficiency.

97.     An internal document from defendant DuPont acknowledged that at doses of 300 ppm PFOA caused statistically significant increases in adenomas and carcinoma of the liver,

pancreas and Leydig cell adenomas in the testis. Thus, by 1993, DuPont was aware of two animal studies that found that PFOA caused testicular cancer and DuPont knew that PFOA caused cancer at three different anatomical sites among laboratory animals exposed to PFOA.

98.     By 1993 defendant 3M began to monitor PFOA levels in the blood serum of its production workers and conducted a mortality study of such workers showing a 3-fold excess occurrence of prostate cancer in workers employed more than ten years.

99.     When defendant 3M discussed DuPont's results on cancer in male rats with colleagues from the UK company ICI in 1995, the latter strongly espoused that APFO should be considered an animal carcinogen, as the benign tumors observed are simply early lesions that ultimately lead to malignant tumors, but 3M representatives disagreed.

100.    By 1996 defendant DuPont was informed that testing linked PFOA to damage to DNA.

101.    In or about 1996 defendants DuPont and 3M jointly commissioned studies to assess the effects of PFOA on humans by exposing monkeys to the chemical. By November of 1998 defendants DuPont and 3M were aware that monkeys in this study were suffering from severe health effects. By 1999 even the monkeys receiving the lowest dose of PFOA were suffering adverse health effects, including liver toxicity, and it was determined that there was no exposure level at which no observable effects could be found (NOEL) in non-human primates.

102.    As of January of 1997, researchers at defendant DuPont were aware of a hormonally-mediated mechanism for the Leydig cell tumors in rat testes. In a document entitled "Hazard Characterization for Human Health in C8 Exposures, CAS Registry No. 3825-26-1," Lisa B. Biegel, Ph.D., Senior Research toxicologist at the DuPont Haskell Laboratory wrote: "The studies summarized below support a hormonally-mediated mechanism for the Leydig cell tumorigenesis: C8 produces an increase in hepatic aromatase activity, which elevates serum

estradiol concentrations, which in turn modulates growth factors in the testes, which results in tumor formation…. The mechanism of tumorigenesis is not completely understood, and therefore relevance to humans cannot be completely ruled out.  However, it is known that non-genotoxic compounds (such as C8) produce Leydig cell tumors by altering the endocrine system."

103.    A paper published in 1997 by John C. Cook of defendant DuPont together with Eric D. Clegg, concluded: "Occurrence of Leydig cell adenomas in test species is of potential concern as both a carcinogenic and reproductive effect if this mode of induction and potential exposure cannot be ruled out as relevant for humans [and]… it should be assumed that humans are potentially susceptible."

104.    In 1999 Dr. Richard Purdy of defendant 3M wrote to his 3M colleagues, Drs. John Buttenhoff and Andrew Seacat that his calculations showed that a "general population member with [PFOA levels of] 70 ppb (in one's blood) could have 36 times more in his liver" due to life-time accumulation.

105.    In April of 2000 defendant DuPont rejected its occupational health official's recommendation for a comprehensive medical surveillance program for employees exposed to PFOA, noting that establishing such a program "could have significant repercussions at any of our other sites that handle . . . similar products."

106.    In or about 2000 the United States Environmental Protection Agency notified defendant 3M that it intended to pursue more rigorous regulation of the perfluorinated chemicals manufactured by this defendant. Shortly thereafter defendant 3M publicly announced that it was voluntarily withdrawing from the perfluorinated chemical market, including its manufacturing of PFOA.  Two of the reasons for defendant 3M's decision were PFOA's bio-persistence and toxicity.

107.    In October of 2001 Paul M. Hinderliter, Ph.D. and Gary W. Jepson, Ph.D. of the DuPont Haskell Laboratory, drafted a paper entitled: A Simple, Conservative Compartmental

Model to Relate Ammonium Perfluorooctanoate (APFO) Exposure to Estimates of Perfluorooctonoate (PFO) Blood Levels in Humans."  The paper described calculations which showed that ingestion of 1 part per billion of PFOA in drinking water corresponded to human PFOA blood levels 300 times higher.

108.    In March of 2002 a defendant DuPont website titled "C-8 INFORM" continued to state that PFOA had no adverse health effects: "In more than 50 years of C-8 use by DuPont and others, there have been no known adverse human health effects associated with the chemical.  3M and DuPont studies, as well as extensive other scientific data, support the position of no known adverse human health effects associated with C-8."

109.    Before 2003, only one commercial laboratory in the United States had the capacity to detect perfluorocarbons such as PFOA in blood. DuPont's contract with that laboratory prohibited it from testing PFCs for other entities without the consent of DuPont.

110.    In 2003 defendant 3M conducted a mortality study of its workers exposed to PFOS, a chemical closely related to PFOA, and reported excess bladder cancer incidence with high exposure jobs.

111.    A mortality registry kept by defendant DuPont demonstrated an excess of kidney cancer deaths over expected levels for workers at the Washington Works plant.

112.    In 2006, the U.S. EPA reached a settlement agreement with defendant 3M to resolve 3M's alleged reporting violations under the Toxic Substances Control Act regarding its fluorochemicals.  The agreement did not require 3M to admit the violations, but the company agreed to pay a penalty in excess of $1.5 Million Dollars for 244 separate alleged violations.

113.    In 2009 defendant 3M performed a follow-up study of its workers exposed to PFOA which showed an increase in prostate cancer incidence in workers with moderate to high exposures.

114.     Toxicology studies show that PFOA is readily absorbed after ingestion or inhalation exposure.  PFOA has a half-life in the human body of 2 to 9 years.  PFOA binds to albumen in the blood serum and is concentrated in the liver and kidneys.  Indeed, PFOA is especially concerning from a human health standpoint precisely because it can stay in the environment and in the human body for long periods of time.

115.     PFOA is associated in the medical literature with increased risk in humans of testicular cancer, kidney cancer, prostate cancer, non-Hodgkin's lymphoma, pancreatic cancer and ovarian cancer, as well as thyroid disease, high cholesterol, high uric acid levels, elevated liver enzymes, ulcerative colitis, and pregnancy-induced hypertension, as well as other conditions. Studies of PFOA exposure in animals have shown the ability to cause other cancers not yet associated with human exposure.  The EPA has also advised that exposure to PFOA may result in developmental effects to fetuses during pregnancy or to breastfed infants, liver damage, and various immunological effects.

116.     In May 2006, the EPA Science Advisory Board stated that PFOA cancer data are consistent with guidelines suggesting exposure to the chemical is "likely to be carcinogenic to humans."  These health conditions can arise months or years after exposure to PFOA.

**Knowledge of PFOA Environmental Contamination**

117.     In 1966 defendant DuPont became aware that perfluorochemicals including PFOA move rapidly in groundwater and migrate into nearby bodies of water.

118.     By August 31, 1966 defendant DuPont became aware that, without pretreatment, a small amount of perfluorocarboxylic acid (the class of pefluorochemicals to which PFOA belongs) dispersing agent, deposited in a landfill would be leached into the groundwater.

119.     By May 13, 1975, defendant DuPont employees in a memo entitled "Investigation of Current Telflon® Waste Disposal" stated: "The problems with disposing of 'Teflon' waste are

fear of toxicity, either from 'Teflon' itself or additives in some products.  Although fears of contamination of underground water supplies by 'Teflon' scrap may be exaggerated, the possibility of small amounts of undesirable materials such as 'Triton'® and C-8 being present does exist.  For this reason, we have elected to <u>not</u> landfill 'Teflon' waste at the local landfill, where large quantities of underground water serving both the Plant and the surrounding area are present."

120.     In 1982, defendant DuPont knew that PFOA was contaminating the Ohio River and could be present in drinking water that came from the Ohio River.  An internal DuPont memo dated October 19, 1982 cited analysis and projections of estimated human PFOA exposure from drinking contaminated Ohio River water.

121.     On November 23, 1982, defendant DuPont's then Medical Director, Bruce Karrh, MD, wrote in an internal memorandum that "[t]here is obviously great potential for current or future exposure of members of the local community from emissions leaving the Plant perimeter."

122.     By 1984 defendant DuPont became aware that PFOA in particulate form exhausted from stacks at its Washington Works plant was carried by the wind well beyond the Washington Works plant property line and deposited in the soil throughout the community.  Defendant DuPont also learned that the drinking water supplies in communities around the Washington Works plant were contaminated with PFOA, presumably from air discharges from the plant of particulate matter that dissolved in rainwater and percolated into the groundwater and from direct discharges of liquids containing PFOA into the Ohio River.

123.     By 1984 Defendant DuPont began a program of secretly collecting samples of tap water reported to be from public drinking water supplies near the Washington Works plant and determining their PFOA levels.  DuPont found that PFOA was present in drinking water samples collected from locations in both Ohio and West Virginia in the vicinity of its Washington Works facility.

124.     By June of 1984 Defendant DuPont was aware that water supplied by the town of Little Hocking, Ohio, which was located "up-river" from the Washington Works plant contained PFOA levels of at least 500 ppt.  Because of the location of the contaminated wells in Little Hocking in regards to the Washington Works facility and the direction of flow of the Ohio River, Defendant DuPont knew that this contamination was caused by PFOA released into the air from its manufacturing facility.  Although Defendant DuPont knew that PFOA was persistent in the environment and that it was continuing to release PFOA into the air meaning that such releases would likely increase the PFOA contamination in Little Hocking's drinking water, Defendant DuPont chose not to alert local, state or federal officials or the public.

125.     By 1985, Defendant DuPont was aware that PFOA was leaching into groundwater beneath ponds that DuPont had previously used to dispose of PFOA contaminated sludge and was migrating through the groundwater under the plant into the public drinking water supply of Lubeck, WV, where DuPont found PFOA levels as high as 1,500 ppt.  These PFOA levels increased to 1,900 ppt in 1987 and 2,200 ppt in 1988.

126.     By 1987 Defendant DuPont had conducted air modeling at its Washington Works facility that documented PFOA in the ambient air beyond the fence line of the property and drifting with the wind into nearby communities.

127.     On June 11, 1987 Dr. Karrh, Defendant DuPont's Medical Director, told DuPont officials that the Washington Works plant needed to give "highest priority" to issues associated with the presence of PFOA outside the boundaries of the plant.

128.     In January of 1992 defendant DuPont completed its purchase of the Lubeck wellfield it had previously found to be contaminated with PFOA.  It then tested the new wells that were being used by the Lubeck community for drinking water and found that these wells had even higher levels of PFOA than the old wells, even though the new wells were two miles further away

from the Washington Works plant.  DuPont chose not to disclose its findings regarding the PFOA

levels in the new Lubeck wells.  The contamination of these wells was not made public until 2001

when the West Virginia Division of Environmental Protection tested the drinking water in Lubeck.

129.    In late 1998 defendant 3M environmental scientist Richard Purdy wrote to his 3M

colleague Georjean Adams and suggested that his food chain risk assessment of fluorochemicals

produced by 3M once they entered the environment demonstrated a risk that could not be kept

confidential.  In another email, Purdy stated "For 20 years the division has been stalling in the

collection of data needed for evaluating the environmental impact of fluorochemicals.  PFOS is

the most onerous pollutant since PCB and you want to avoid collecting data that indicates it is

probably worse."

130.    In 1999 Purdy drafted a resignation letter which stated: "3M told those of us

working on the fluorochemical project not to write down our thoughts or have email discussions

on issues because of how our speculations could be viewed in a legal discovery process.  This has

stymied  intellectual  development  on  the  issue  and  stifled  discussion  of  the  serious  ethical

implications of decisions."

131.    Shortly after defendant 3M decided to terminate its production of PFOA in 2000,

groundwater  near  the  3M  Cottage  Grove  facility  in  Minnesota  was  discovered  to  be  highly

contaminated  with  PFOA.    Subsequently,  perfluorinated  compound  (PFC)  contamination

including  PFOA  and  PFOS  was  found  in  groundwater  further  away  from  the  facility,  in

Washington  and  Dakota  Counties.    In  Oakdale,  MN  the  average  PFOA  concentration  in  the

municipal  water  was  570  ppt.    Closer  to  the  Cottage  Grove  facility  groundwater  levels  were

measured as high as 619 ppb (619,000 ppt).

132.    The State of Minnesota has determined that over 100 square miles of groundwater

have been contaminated by defendant 3M's disposal of PFCs and the source of residential drinking

water for over 125,000 Minnesotans has been affected by PFC waste disposal.

133.    Upon information and belief, defendants 3M and DuPont shared information about the environmental contamination potential of fluorochemicals such as PFOA and PFOS from as far back as the 1980s and the information alleged to be known by one defendant was made known to the other.

**PFOA Drinking Water Limits**

134.    In 2009, the EPA identified PFOA as an emerging contaminant of concern and issued a provisional health advisory stating that short term (weeks to months) exposure to PFOA at a concentration of 400 ppt can cause human health effects.  The provisional health advisory stated that the discovery of PFOA in water above the advisory level should result in the discontinued use of the water for drinking or cooking.

135.    Following EPA's action, in 2013, New Jersey established a preliminary health-based guidance level of 0.04 ppb (40 ppt) in drinking water.

136.    In 2016, Vermont established a drinking water advisory of 0.02 ppb (20 ppt).

137.    In May 2016, EPA replaced its 2009 provisional health advisory with a new lifetime advisory.  The 2016 lifetime health advisory established that the presence of PFOA in drinking water at a concentration greater than 70 ppt should require water systems to undertake remediation and public health officials to promptly notify consumers about the health risks associated with exposure to PFOA.  EPA health advisories are non-enforceable on the states. EPA also established a Reference Dose (RfD) of 0.000002 mg/kg/day. The Reference Dose is defined by EPA as an "estimate[] (with uncertainties spanning perhaps an order of magnitude) of the daily exposure to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime." United States EPA, Health Effects Support Document for Perfluorooctanoic Acid (PFOA), p. 4-1 (May 2016).

138.     In May 2017, Minnesota established a health guidance value for PFOA in drinking water of 0.035 ppb (35 ppt).

139.     In November of 2017 the State of New Jersey announced it will adopt a new health-based Maximum Contaminant Level (MCL) for PFOA in drinking water to 14 ppt from its previously set level of 40 ppt based upon the recommendation of the New Jersey Drinking Water Quality Institute, which was based upon the latest research on the adverse health effects of PFOA.

140.     At the time of this filing, numerous states are considering imposing limitations for the presence of PFOA in drinking water.

**The Village of Hoosick Falls and the Town of Hoosick**

141.     The Village of Hoosick Falls has a population of approximately 3,500 individuals and is located approximately 30 miles northeast of Albany, New York.

142.     The Village of Hoosick Falls operates and maintains the municipal water system.

143.     The Village's municipal water system has approximately 1,300 service connections. The Village estimates that its system provides water to nearly 95 percent of the Village's residents.

144.     The Village is near the center of the Town of Hoosick, located along Route 22 in Rensselaer County. The Town of Hoosick has a population of approximately 6,900 individuals.

145.     There are over 800 private wells that provide drinking water to those living in the Town of Hoosick.

**PFOA Use in and around Hoosick Falls**

146.     For several decades beginning as early as the late 1950s, PFOA was used in manufacturing processes at facilities in and around Hoosick Falls.

147.     One of these facilities is a small factory located at 14 McCaffrey Street ("McCaffrey Street Site"). New York State has identified the McCaffrey Street Site as a probable

source for the presence of PFOA in the Village municipal water supply and local aquifer. Indeed, the State has characterized the McCaffrey Street Site as a "significant threat to public health or the environment."

148.    The McCaffrey Street Site began operation in or about 1955. A company called Dodge Fibers Corporation owned and operated the factory at that time.

149.    Upon information and belief, in or about 1967 Oak Materials Group, Inc. purchased the assets and liabilities of Dodge Fibers, including the McCaffrey Street Site.

150.    Upon information and belief, in or about 1986, Allied-Signal Inc. purchased Oak Materials Group, Inc., which included the assets and liabilities of the McCaffrey Street Site. Allied-Signal operated the McCaffrey Street Site until 1996.

151.    In addition, at or around the time that it purchased Oak Material Group, Allied-Signal merged Oak Materials Group with another acquisition, Norplex, to form Norplex-Oak.

152.    Shortly thereafter, the Norplex-Oak business unit took over operations of the Hoosick Falls facilities, which included the McCaffrey Street Site, as well as 1 Liberty Street, a facility at John St./Lyman St., and at least four buildings on River Road.

153.    The Hoosick Falls facilities were known within Allied-Signal as Fluorglas or the Fluorglas division.

154.    Fluorglas used PFOA in its operations at the facilities at McCaffrey Street, 1 Liberty Street, John Street, and in at least one of the buildings on River Road.

155.    Fluorglas purchased PTFE dispersions containing PFOA from DuPont and other manufacturers, who in turn purchased PFOA from 3M.

156.    Fluorglas also purchased PFOA from 3M.

157.    Upon information and belief, in or about 1996, Allied-Signal sold some of the assets and liabilities of its Hoosick Falls facilities, including the McCaffrey Street Site, to Furon Company

(Furon).

158.     Upon information and belief, Allied-Signal did not sell all of the assets and liabilities in the Hoosick Falls facilities at this time.  For example, Allied-Signal retained ownership of the facilities at John Street and River Road, both of which used PFOA in manufacturing processes both during and prior to Allied-Signal's ownership of those facilities.

159.     Upon information and belief, in or about 1999, Defendant Saint-Gobain purchased the assets and liabilities of Furon, including the McCaffrey Street Site and the site at 1 Liberty Street.

160.     Defendant Saint-Gobain has continuously owned and operated the McCaffrey Street Site from the time it purchased the Furon Company to the present.

161.     Throughout the operation of the McCaffrey Street Site, defendants Saint-Gobain and Honeywell (through its predecessors) manufactured stain and water resistant fabric coated with PTFE dispersion at the factory.

162.     In manufacturing stain-resistant fabric, each company coated the fabric with a liquid solution containing PFOA (the "PFOA Solution") manufactured by either defendant DuPont or defendant 3M.

163.     Saint-Gobain, Furon, Allied-Signal, and Oak Materials utilized trays for the application of the PFOA dispersion to the fabric. Employees added the dispersion to the trays during production runs and recovered a portion of the dispersion at the end of the run each shift.

164.     During the drying process, heat would vaporize a portion of the PFOA, which was discharged from the facility as fine particulate matter that was then transported by wind where it settled to the ground and contaminated the soil throughout to the community.  Ultimately, PFOA traveled through the soil to the groundwater.

165.     Defendants' employees, at the direction of corporate officers, washed out and

discharged the remaining PFOA Solution from the trays into drains on a daily basis during each shift. Those floor drains resulted in the discharge of PFOA into the soil and, in turn, into the aquifer.

166.    On average, the McCaffrey Street Site ran three shifts, five days a week.

167.    Saint-Gobain also utilized PFOA in other processes at the McCaffrey Street Site between 1999 and approximately 2004. Among other things, Saint-Gobain produced PTFE (polytetrafluoroethylene) film and silicone rubber for aeronautical, automotive, food processing and energy applications.

168.    Saint-Gobain states that it discontinued  its fabric coating operations at the McCaffrey plant in 2003, and thereafter created its rubber department in the same location at the plant.  Saint-Gobain continued to use PFOA in its silicone rubber operations at the plant from 2003 until approximately 2014.

169.    Throughout the period during which Oak Materials, Allied-Signal, Furon, and Saint-Gobain owned the McCaffrey facility and the facility on Liberty Street in Hoosick Falls, each company also used PFOA in a solid form as a part of a separate process to manufacture, *inter alia*, pressure-sensitive tapes, Teflon®-coated fabrics, and Teflon® sheet, tape and laminates.  This PFOA was also manufactured by defendants 3M or DuPont.

170.    Oak Materials, Allied-Signal, Furon and Saint-Gobain utilized six large, approximately three-story ovens as a part of their PTFE and FEP coating manufacturing processes.

171.    The use of the ovens produced a sticky residue that would adhere to the internal tubing or "stacks" within the oven, and PFOA comprised a part of that residue.

172.    Each company established a rotation by which each oven and its stacks were cleaned once every six weeks, with a different oven cleaned every Monday.

173.    Defendants' employees removed the residue in the stacks by washing the stacks in

a large sink that measured approximately 3 feet by 3 feet by 20 feet in size. At the end of each cleaning, the waste water from the cleaning was discharged down a drain and may have been released into a septic system or catch basin near the McCaffrey plant. Those floor drains and other discharge points resulted in the discharge of PFOA into the soil and, in turn, into the aquifer.

174.     In addition to the McCaffrey Street Site, New York State has identified the facilities at Liberty Street, John Street, and River Road as potential sources of PFOA contamination. The New York DEC has classified the Liberty Street and John Street Sites as a "Class 2," site, meaning that the sites present a significant threat to public health and/or the environment. The River Road Site is classified as a "p-site" meaning that further investigation is required.

175.     Saint-Gobain admits that from 1999 through 2014, its extruded tape department at the Liberty Street Site used raw materials that contained PFOA. This PFOA was also manufactured by either DuPont or 3M.

176.     DEC has also stated that its preliminary investigation has identified PFOA within the leachate coming from the former municipal landfill, and it has stated that it anticipates classifying the former landfill as a p-site in the near future. DEC has measured PFOA levels of 21,000 ppt within the leachate. The landfill is adjacent to the Hoosic River and leachate from the landfill continues to migrate towards and into the river.

177.     Upon information and belief, Defendants Saint-Gobain and Honeywell discharged PFOA into the environment through other means and at other sites that will be revealed through the discovery process.

**Disclosure of PFOA Contamination**

178.     In or around 2007, the Village completed the construction of a new production well to supply municipal water to many of the residents of Hoosick Falls.

179.     The production well lies approximately 500 yards away from the McCaffrey Street

Site.

180.    The Village conducted testing in fall 2014 that confirmed high levels of PFOA in the municipal water.

181.    In June 2015, the Hoosick Falls Water Department conducted tests on the effluent from its production well(s) in order to discern whether PFOA existed within the water supply.

182.    Shortly thereafter, the Village received the results from its production well(s) tests.

183.    Those tests again confirmed the presence of high concentrations of PFOA within the municipal water system.

184.    Testing of municipal water produced detections of 612 ppt, 618 ppt, 620 ppt, 151 ppt and 662 ppt for PFOA.

185.    Similarly, the Village oversaw the testing of certain private wells within the Village in the summer of 2015, and received results that included detections that were significantly above any safe level.

186.    The Village's response to these test results was to reassure individuals within the community that the water was safe to drink.

187.    In October 2015, EPA Region 2 administrator Judith Enck learned of the PFOA test results taken in and around Hoosick Falls.

188.    On November 25, 2015, the EPA contacted the Village and recommended the use of an alternative drinking water source. EPA further recommended that residents not use the municipal water for drinking and cooking.

189.    In early December 2015, the DOH released a fact sheet for the Village. That fact sheet stated, in part, "Health effects are not expected to occur from normal use of the water."

190.    Village officials further minimized the potential risk of PFOA in the municipal

water.

191.     The EPA repeated its recommendation to the Village on December 17, 2015, after learning that Village officials were downplaying the first EPA notice and suggesting that whether or not an individual used municipal water was a matter of personal choice.

192.     Unbeknownst to the community at the time, Saint-Gobain was privately negotiating with Village elected officials in an effort to minimize its liability.

193.     Shortly after the EPA's December 17 warning, Saint-Gobain began providing free bottled water to Village residents dependent on municipal water.  Saint-Gobain also agreed to fund the installation of a granulated activated carbon filter system on the municipal water system to reduce the level of and/or remove PFOA from drinking water.

194.     On January 14, 2016, Healthy Hoosick Water, a local community group, sponsored a public meeting with personnel from the EPA, the DOH and the DEC.

195.     At that meeting, New York officials announced that New York State had submitted a letter that day seeking the designation of the McCaffrey Street Site as a state Superfund site.

196.     During the mid-January meeting, residents dependent on private wells questioned state officials about whether their wells may also be contaminated. State officials indicated that the DOH would test the private wells of any individual upon request.

197.     In fact, DOH put off testing most of the private wells in and around the Town of Hoosick and instead focused its resources on the wells nearest the McCaffrey Street Site.

198.     The DOH avoided providing private well testing for several more weeks. In response to growing public outcry, however, the state finally reversed course and began testing the private well of anyone requesting it.

199.     In mid-January, a consultant hired by the state sent an email to DOH employees stating that "all of the manufacturing in the village went to the 'dump.' Although the landfill was

decommissioned and capped several years ago all of the potential PFOA rich leachate goes to the treatment plant and eventually out to the Hoosic River. It may be alarmingly high and we need to get at least a baseline level." Testing later confirmed that wells and soil in close proximity to the Hoosick landfill were contaminated with PFOA. Indeed, one water sample taken from the landfill showed PFOA at a concentration above 21,000 ppt. Upon information and belief, Defendants discarded PFOA-laden waste at the landfill for years before it was decommissioned.

200.    The Hoosick Falls school district announced on January 22, 2016, that testing identified PFOA within the well water at its transportation center.

201.    On January 27, 2016, Governor Cuomo directed state agencies to use state Superfund money to address PFOA in the Hoosick Falls municipal water system.  The State Health Commissioner said that the Saint-Gobain plant would be deemed a state Superfund site and designated it a Class 2 site.

202.    That same day, the governor announced an emergency regulation to classify PFOA as a hazardous substance.

203.    On January 28, 2016, the EPA advised that home owners with private wells should use bottled water if testing had uncovered PFOA level in their water at 0.1 ppb (100 ppt) or higher. The EPA further recommended that home owners with private wells should use bottled water if no one has yet tested their well water.

204.    At that time, one or more local banks indicated that they would not advance funds for the purchase or refinancing of a home in Hoosick Falls.  Indeed, the Treasurer of Trustco Bank, Kevin Timmons, publicly confirmed that the bank was not writing new mortgages for any home on the Village's municipal water supply. Timmons indicated that lenders typically require that homes have access to potable water before financing is approved.

205.    Timmons further stated that financing would not be approved for homes on private

wells until the water supply was tested for the presence of PFOAs and showed the absence (or a very low level) of PFOAs. Homeowners with private wells would later be required to prove that their water was not contaminated as a prerequisite to acquiring financing. Even when financing resumed, lenders offered interest rates that were much less favorable to borrowers than the rates offered in late 2015, prior to disclosure of PFOA contamination.

206.     As a result of the presence of PFOA within the aquifer, the municipal water system, private wells, and on residential properties throughout Hoosick Falls, the property values in and around Hoosick Falls have experienced a significant decline since the presence of PFOA was disclosed in December 2015.  That decline persists to this day and is expected to continue.

207.     On or around February 1, 2016, United States Senator Charles Schumer called on Saint-Gobain to disclose immediately the full extent of the pollution it caused. Senator Schumer stated, "Saint-Gobain did this. They've got to first come clean as to what happened, where they put the stuff, and then work on a plan to quickly clean it up."

208.     On February 5, 2016, news outlets reported that some Village residents were bathing by sponge because they were afraid of inadvertently ingesting water during a shower.

209.     On February 11, 2016, DEC identified Saint-Gobain and Honeywell as the parties potentially responsible for PFOA contamination at one or more properties in Hoosick Falls, including the McCaffrey Street Site.

210.     The DEC demanded at that time that each company enter into an enforceable Consent Order to characterize and investigate the extent of the contamination, to provide interim remedial measures to protect public health and drinking water supplies, to analyze alternatives for providing clean and safe drinking water and, ultimately, to design and implement a comprehensive clean-up and remediation protocol.

211.     On February 13, 2016, DOH began offering blood testing to any Hoosick Falls

residents who wished to have their blood tested for the presence of PFOA. Over 3,000 individuals have participated in this program to date.

212.    By February 24, 2016, a newly installed carbon filtration system at the municipal water treatment plant became fully operational. This carbon filtration system was temporary, with a permanent filter to be installed by December 2016. In spite of the presence of the temporary filter, residents continued to rely on bottled water for drinking.

213.    On February 26, 2016, state officials disclosed results from tests performed at private wells. Of 145 wells tested, 42 showed PFOA contamination above 100 ppt.

214.    The DEC also announced at this time that it had commenced installation of POET systems for homes with private wells. DEC stated at that time that it had received 281 requests for POETs. Throughout the spring, residents in and around Hoosick Falls would continue to deal with frustrations relating to installation and upkeep of POET systems. Requests for POET systems continued to mount, and as of the date of this Complaint the state has installed over 800 POET systems on private wells in and around Hoosick Falls. These POET systems must remain installed for the foreseeable future and require regular maintenance.

215.    In early March 2016, the state disclosed results from water samples taken from the Hoosick Falls Water Treatment Plant in or around February 2016. The highest sample showed PFOA at a concentration of 983 ppt.

216.    On June 3, 2016, DEC announced that it had reached agreement on two Consent Orders with Saint-Gobain and Honeywell. These Consent Orders require Defendants to, *inter alia*, conduct further study of the Liberty Street Site and the sites at John Street and River Road—each of which was classified as a p-site under New York law.

217.    Around the same time as DEC's announcement, state officials began releasing the results of blood testing performed in February and March of 2016. Over the course of the following

two months, DOH officials would release data gathered from testing over 3,000 individuals.

218.     Numerous residents, including several Plaintiffs, received blood tests indicating that PFOA was present in their blood at alarming levels.  According to the DOH, the median blood level among those tested is 64.2 ug/L, a level that is 30 times higher than the national average level of 1.86 ug/L. The median for men 60 and over was 91 ug/L.

219.     Virtually all of the long-time residents of Hoosick Falls had blood levels an order of magnitude or more above background levels of PFOA in their blood serum.  Almost all of these long-time residents also had blood levels significantly above the 95th percentile of Americans.

220.     Moreover, the vast majority of residents and former residents of Hoosick Falls have been exposed to PFOA at a level that meets or exceeds some health-based comparison value.

221.     The results of the state's blood testing led to shock and fear among the residents of Hoosick Falls. Since the results were mailed, the State has been unable to provide any reasonable health guidance to those with elevated blood levels.

222.     On July 8, 2016, United States Senator Kirsten Gillibrand echoed these concerns at a town hall meeting in Hoosick Falls. Senator Gillibrand emphasized the need for and creation of a biomonitoring program similar to the protocol implemented for first responders following the 9/11 World Trade Center attacks. To date, neither the Defendants nor the State has taken any action to implement such a program.

223.     In November 2016, New York State formally named PFOA and PFOS as hazardous substances.

## CLASS ACTION ALLEGATIONS

224.     Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

225.     Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of

all other persons similarly situated as members of the proposed classes pursuant to Federal Rules

of Civil Procedure 23(a), 23(b)(2), and (b)(3). This action satisfies the numerosity, commonality,

typicality, adequacy, predominance, and superiority requirements of those provisions.

226.    Plaintiffs bring this class action on behalf of the following classes, as set forth

below:

### Municipal Water Property Damage Class
All individuals who, as of December 1, 2015, are or were owners of real property located in the Village of Hoosick Falls, New York and/or are or were owners of real property with a mailing zip code of 12090 or 12089, and who receive or received their drinking water from the municipal water system.

### Private Well Water Property Damage Class
All individuals who, as of December 1, 2015, are or were owners of real property located in the Village of Hoosick Falls, New York and/or are or were owners of real property with a mailing zip code of 12090 or 12089, and who obtain or obtained their drinking water from a privately owned well.

### Private Well Water Nuisance Class

All individuals who, as of the time a class is certified in this case, are owners or lessors of real property located in the Village of Hoosick Falls, New York and/or are owners or lessors of real property with a mailing zip code of 12090 or 12089, and who receive their drinking water from a privately owned well.

### Biomonitoring Class
All individuals who, as of the time a class is certified in this case, have ingested PFOA-contaminated water from the Village water supply or from a contaminated private well in or around Hoosick Falls and who have suffered accumulation of PFOA in their bodies as demonstrated by (i) blood serum tests disclosing a PFOA level in their blood above the recognized background levels, or (ii) documentation of an increased opportunity for exposure, as defined in ATSDR's Final Criteria for Determining the Appropriateness of a Medical Monitoring Program Under CERCLA.[3]

---

[3] *See* ATSDR's Final Criteria for Determining the Appropriateness of a Medical Monitoring Program Under CERCLA, https://www.gpo.gov/fdsys/pkg/FR-1995-07-28/pdf/95-18578.pdf.

227.     For purposes of the classes set forth above, the phrase "municipal water system" refers to the water system operated by the Village of Hoosick Falls.

228.     Excluded from the classes set forth above are: (a) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (b) the Judge to whom this case is assigned and the Judge's staff; (c) any class counsel or their immediate family members; (d) any State or any of its agencies; (e) the Village of Hoosick Falls and the Town of Hoosick; and (f) any individual who otherwise would be included under one or more of the class descriptions above but who has filed a lawsuit for personal injury for a PFOA-related illness related to exposure to municipal or private well water.

229.     Plaintiffs reserve the right to amend the class definitions set forth above if discovery and/or further investigation reveals that any class should be expanded, divided into subclasses or modified in any way.

### Numerosity

230.     Although the exact number of class members is uncertain and can be ascertained only through appropriate discovery, the number is great enough such that joinder is impracticable. Indeed, there are approximately 3500 individuals who live in the Village of Hoosick Falls and over 6000 that live in the Town of Hoosick. Nearly all of the Village residents are dependent on the municipal water system. In the Town, there are over 800 private wells. Each of the classes set forth above is sufficiently numerous to warrant class treatment, and the disposition of the claims of these class members in a single action will provide substantial benefits to all parties and to the Court.

231.     Further, class members are readily identifiable from publically available information regarding property ownership and/or residential history.

### Typicality

232.     Plaintiffs' claims are typical of the claims of the classes in that Plaintiffs, like all

class members, are owners or lessors of real property that have experienced a diminution in value and/or nuisance due to the actions of the Defendants. Further, Plaintiffs, like the Biomonitoring Class, have been exposed to drinking water contaminated with PFOA, as evidenced by blood serum tests and/or documentation of an increased opportunity for exposure. Plaintiffs and the Biomonitoring class are at significant risk of developing medical conditions associated with exposure to PFOA.

233.    Moreover, the factual bases of Defendants' misconduct are common to all class members and represent a common thread of misconduct resulting in injury to all members of the classes.

### Adequate Representation

234.    Plaintiffs will fairly and adequately represent and protect the interests of the classes. Plaintiffs have retained counsel with substantial experience litigating both environmental torts and class actions, including actions, like this one, representing putative classes whose property has been devalued by the actions of a polluter and/or who have been exposed to dangerous chemicals and are in need of biomonitoring. This Court has also determined that undersigned counsel have the skill and experience necessary to litigate this action on behalf of the classes.

235.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the classes and have the financial resources to do so. Neither Plaintiffs nor their counsel has interests adverse to the classes.

### Predominance of Common Questions

236.    Plaintiffs bring this action under Rule 23(b)(3) because there are numerous questions of law and fact common to Plaintiffs and the class members that predominate over any question affecting only individual class members. The answers to these common questions will advance resolution of the litigation as to all class members.  These common legal and factual issues

include:

a.     Whether Defendants Saint-Gobain and Honeywell owed a duty to Plaintiffs and members of the classes to refrain from conduct reasonably likely to cause contamination of class members' drinking water;

b.     Whether Defendants Saint-Gobain and Honeywell knew or should have known that it was unreasonably dangerous to dispose of PFOA into the environment;

c.     Whether Defendants Saint-Gobain and Honeywell knew or should have known that disposing of PFOA in the manner alleged herein was reasonably likely to cause contamination of class members' drinking water;

d.     Whether Defendants Saint-Gobain and Honeywell breached a legal duty to Plaintiffs and the classes by disposing of PFOA in the manner described herein;

e.     Whether Defendants Saint-Gobain and Honeywell's breach of a legal duty caused class members' drinking water to become contaminated with PFOA;

f.     Whether it was foreseeable that Defendants Saint-Gobain and Honeywell's use of PFOA would cause class members' drinking water to become contaminated and/or unreasonably dangerous for normal and foreseeable human consumption or use;

g.     Whether Defendants DuPont and 3M, knew or should have known that their PFOA and PFOA-containing products posed a risk to the environment and the health of people living in the communities where these products were used, such as the community of Hoosick Falls;

h.     Whether Defendants DuPont and 3M failed to adequately warn of the health and environmental hazards potentially caused by their products containing PFOA;

i.     Whether Defendants DuPont and 3M failed to provide adequate instructions regarding technologies that could reduce or eliminate the PFOA emissions for

PTFE coating manufacturing facilities and/or that PFOA could be replaced in PTFE dispersions with another surfactant.

j.     Whether Defendants DuPont and 3M breached their continuing duty to warn of dangers of their products discovered after manufacture and sale;

k.     Whether the PFOA contamination described herein substantially interfered with Plaintiffs' and class members' use and enjoyment of their property;

l.     Whether the PFOA contamination described herein caused, and continues to cause, a continuous invasion of the property rights of Plaintiffs and the classes;

m.    Whether Defendants caused the devaluation of Plaintiffs' and class members' property;

n.     Whether Defendants caused PFOA to enter, invade, intrude upon or injure the property rights of Plaintiffs and the classes.

o.     Whether Plaintiffs, Infant Plaintiffs, and the classes are at increased risk of illness and harm as a result of the PFOA accumulation they have sustained in their bodies from drinking municipal or private well water;

p.     Whether biomonitoring and surveillance is reasonable and necessary to assure early diagnosis and treatment of PFOA-related illnesses and conditions;

q.     Whether early diagnosis and treatment of the conditions caused by PFOA will be beneficial to Plaintiffs, Infant Plaintiffs, and the Biomonitoring Class; and

r.     Whether Defendants' conduct warrants the imposition of punitive damages.

## **Superiority**

237.   Plaintiffs and members of the classes have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is

superior to other available methods for the fair and efficient adjudication of this controversy.

238.     Absent a class action, most class members would likely find the cost of litigating their claims to be prohibitively high and, therefore, would have no effective remedy at law. Further, without class litigation, class members will continue to incur damages.

239.     Class treatment of common questions of law and fact will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

### Rule 23(b)(2) Injunctive or Declaratory Relief

240.     In addition to the above, Plaintiffs bring this class action under Rule 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the classes, such that final injunctive relief or declaratory relief is appropriate with respect to each class as a whole. Such injunctive relief includes, but is not limited to, an injunction to require a biomonitoring program sufficient to monitor class members' health to ensure they are adequately protected from the deleterious effects of PFOA on the human body, and an order requiring Defendants to institute remedial measures sufficient to permanently prevent PFOAs from contaminating class members' drinking water and/or properties.

241.     Accordingly, Plaintiffs seek an injunction requiring Defendants to implement a biomonitoring program to aid the Biomonitoring Class and to institute remedial measures to prevent further PFOA contamination of class members' drinking water and properties.

242.     Finally, Plaintiffs and the classes seek a declaration that Defendants acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health, safety, and property of Plaintiffs and members of the classes.

### Rule 23(c)(4) Certification of Particular Issues

243.     In the alternative to certification under Rule 23(b)(2) or 23(b)(3), Plaintiffs and the classes seek to maintain a class action with respect to particular issues under Rule 23(c)(4).

244.     Specifically, the liability of each Defendant, or the Defendants jointly, is suitable for issue certification under Rule 23(c)(4).

## CAUSES OF ACTION

## CLAIM I

## STRICT PRODUCT'S LIABILITY – FAILURE TO WARN AGAINST DEFENDANTS DUPONT AND 3M

245.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

246.     This Claim is brought under New York law.

247.     From the 1950's through approximately 2000 Defendant 3M developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed and/or supplied for sale and sold PFOA to defendant DuPont and to other manufacturers of PTFE dispersions, and to Defendants Honeywell and Saint-Gobain in the ordinary course of their business.

248.     From the 1950s through approximately 2015 Defendant DuPont developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed and/or supplied PFOA-containing PTFE dispersion products for sale and sold such products to defendants Honeywell and Saint-Gobain in the ordinary course of their business.

249.     From approximately 2000 through approximately 2015 Defendant DuPont developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed and/or supplied for sale PFOA and PFOA-containing PTFE dispersion products and sold such products to other manufacturers of PTFE dispersions, and to Defendant Saint-Gobain in the ordinary course of its business.

250.     By at least 1984 Defendants DuPont and 3M were aware of the health hazards associated with PFOA exposure as well as the potential for PFOA to contaminate soil and drinking

water.  Both defendants were also aware that there were technologies that could reduce or eliminate the PFOA emissions for PTFE coating manufacturing facilities and/or that PFOA could be replaced in PTFE dispersions with another surfactant.  Both Defendants chose to continue to sell PFOA and PFOA-containing PTFE dispersions and not to advise purchasers of the true hazards of PFOA or instruct them about and recommend emission reducing technologies because of concerns for loss of profits to these Defendants.

251.    Upon information and belief, Defendants Honeywell and Saint-Gobain utilized the PFOA and PFOA-containing PTFE dispersion products supplied by defendants DuPont and 3M in a reasonably foreseeable and intended manner and for such products' intended uses.

252.    The PFOA products sold by defendants DuPont and 3M to defendants Honeywell and Saint-Gobain were unreasonably dangerous to manufacturing workers and to residents of Hoosick Falls, including plaintiffs, without adequate warnings and instructions to prevent discharge of PFOA into the environment, contamination of the soil and groundwater, and toxic accumulation inside of the bodies of residents, including plaintiffs.

253.    Defendants DuPont and 3M knew or should have known that the PFOA products that they sold to defendants Honeywell and Saint-Gobain would be discharged into the environment and cause contamination of the soil and water supply of and toxic accumulation in the blood serum of residents living in the communities where their products were used, including Plaintiffs.

254.    Defendants DuPont and 3M had actual knowledge of the health hazards associated with PFOA ingestion through both animal studies conducted by researchers employed or contracted by such defendants and through experience with each defendant's own workers, but, upon information and belief, failed to communicate such information to relevant governmental agencies, or to foreseeable users of the materials, including employees handling and disposing of

them at the Hoosick Falls facilities.

255.    Defendants DuPont and 3M also failed to warn and alert purchasers and users or the public of their discoveries of extensive soil and groundwater contamination in communities located near their Washington Works (DuPont) and Cottage Grove (3M) facilities once these water supplies were determined to be contaminated with PFOA or other similar fluorochemicals produced by defendant 3M.

256.    Defendants DuPont and 3M failed provide adequate instructions and warnings when their PFOA and PFOA-containing products were sold and accordingly sold products that were unreasonably dangerous for their intended use and defective, making them strictly liable for the injuries and damages sustained by plaintiffs.

257.    Defendants DuPont and 3M breached their continuing duty to warn of defects in their products after learning of the extensive environmental contamination caused by PFOA in or near their own facilities and failing to pass this information on to purchasers, users and others in the communities where these products were utilized who could be adversely affected.

258.    Had defendants DuPont and 3M provided adequate warnings and instructions of the known health hazards and risk of environmental contamination of PFOA and their PFOA-containing products to purchasers, users, governmental agencies and the public, it is more likely than not that Plaintiffs' injuries and damages would not have occurred or would have been lessened as actions would have been taken to reduce or eliminate Plaintiffs' exposures to PFOA and contamination of the environment in and around Hoosick Falls with PFOA.

259.    Defendants 3M and DuPont acted with reckless indifference to the health and safety of workers using their PFOA products and residents in communities where their PFOA products were used, including Plaintiffs, by failing to provide adequate warnings of the known dangers of PFOA when discharged into the environment and inhaled and ingested by nearby residents, such

as Plaintiffs.

260.     As a direct and proximate result of the sale of their defective PFOA product lacking proper warnings and instructions, Plaintiffs have suffered toxic invasions of their bodies, contamination of their properties, and contamination of their drinking water and other damages, both economic and non-economic.

261.     As a direct and proximate result of the sale of PFOA products lacking proper warnings and instructions, Plaintiffs are entitled to consequential damages covering the cost of medical monitoring and surveillance for other illnesses that may develop as a result of their exposure to and accumulation of PFOA in their bodies.

## CLAIM II

## NEGLIGENCE AGAINST ALL DEFENDANTS

262.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

263.     This Claim is brought under New York law.

264.     Defendants 3M and DuPont knew or should have known that PFOA and PTFE dispersions containing PFOA that were used in the manufacturing processes at defendants Honeywell's and Saint-Gobain's facilities would result in the release into the environment of PFOA, the contamination of the soil and groundwater, ingestion of that groundwater by the community of Hoosick Falls, accumulation of PFOA in the bodies of members of that community, including Plaintiffs, and adverse health effects to those people, including Plaintiffs.

265.     All defendants knew or should have known that use of PFOA, PFOA-containing PTFE dispersions and/or the discharge of PFOA into the air, ground and sewer system was potentially hazardous to human health and the environment and required Defendants to take adequate safety precautions to ensure that PFOA was not released into the surrounding

environment.

266.    All defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to wash out and/or discharge filters or trays containing PFOA-containing PTFE dispersions onto the ground within floor drains in, and in close proximity to, the McCaffrey Street, Liberty Street and other facilities operated by defendants Saint-Gobain and Honeywell in Hoosick Falls.

267.    Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to wash out and/or discharge into the environment the residue from the manufacturing ovens and their stacks where PFOA-containing PTFE dispersions were used.

268.    Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to permit PFOA vapors and particulate matter to exit from stacks at the facility without adequate control measures.

269.    During some of the years of the operation of PTFE coating manufacturing facilities in Hoosick Falls defendants 3M and DuPont failed to share information and knowledge that these companies had and to provide adequate warnings and instructions to defendants Honeywell and Saint-Gobain about the hazards of PFOA to the environment and to the safety of the community.

270.    At some point in time after use of PFOA at the Hoosick Falls facilities began, either based upon information provided by defendants 3M and/or DuPont, or through published and available literature,  defendants Saint-Gobain and Honeywell, knew or should have known of the environmental risks and health hazards associated with exposure of human beings to PFOA.

271.    Defendants 3M and DuPont had a continuing duty to warn purchasers of their PFOA and PFOA-containing products of risks and hazards learned by such defendants after sale of these products.

272.    Defendants Saint-Gobain and Honeywell had a duty to take all reasonable measures

to ensure that PFOA-containing PTFE dispersions and/or PFOA would be effectively contained and not discharged into the surrounding environment.

273.    Defendants Saint-Gobain and Honeywell further had a duty to ensure that the manufacturing processes they chose to employ did not unreasonably endanger the soil and drinking water relied upon by residents of Hoosick Falls and the surrounding area.

274.    Defendants Saint-Gobain and Honeywell breached the above-stated duties by unreasonably disposing of PFOA Solution and/or releasing PFOA in a manner that guaranteed PFOA would enter the environment, including the soil and groundwater and be ingested by residents, including Plaintiffs.

275.    Defendants 3M and DuPont had a duty to warn users of their PFOA products of the dangers of releasing PFOA into the environment and breached that duty by failing to disclose information they possessed about the health hazards associated with PFOA exposure, the propensity of PFOA to cause environmental contamination of soil and drinking water and the bioaccumulation of PFOA in people ingesting such contaminated drinking water.

276.    Defendants 3M and DuPont further breached their continuing duties to warn about the dangers of PFOA learned after the manufacture and sale of their PFOA and PFOA-containing products to defendants Saint-Gobain and Honeywell.

277.    Defendants 3M and DuPont breached the above-stated duties by failing to adequately warn and provide sufficient instructions to foreseeable users of the products including employees handling and disposing of the products at the Hoosick Falls facilities, and to avoid discharging PFOA into the environment where it was likely to enter the soil and ground water and be ingested by residents such as plaintiffs.

278.    Had defendants DuPont and 3M provided adequate warnings and instructions of the known health hazards and risk of environmental contamination of PFOA and their PFOA-

containing products to purchasers, users, governmental agencies and the public, it is more likely than not that Plaintiffs' injuries and damages would not have occurred or would have been lessened as actions would have been taken to reduce or eliminate Plaintiffs' exposure to PFOA before toxic accumulation in the body and environment occurred.

279.    As a result of Defendants' breaches of the various duties set forth above, the soil and drinking water in and around Hoosick Falls, New York became contaminated with unsafe levels of PFOA, which was ingested by Plaintiffs.

280.    Upon information and belief, defendants 3M and DuPont were grossly negligent, acted with reckless indifference to the health and safety of the public and/or intentionally failed to make public or provide to purchasers of their products information these defendants possessed about the potential danger and harm that accumulation of PFOA in the human beings resulting from discharge of PFOA into the environment could cause.

281.    Upon information and belief, defendants Saint-Gobain and Honeywell were grossly negligent, acted with reckless indifference to the health and safety of the public, and/or intentionally failed to prevent PFOA from being discharged into the environment and in failing to inform the Village of Hoosick Falls or the public in general of the potential that PFOA was contaminating its municipal and private water supply.

282.    As a direct and proximate result of Defendants' actions and omissions described herein, Plaintiffs have suffered injuries to person and property caused release of PFOA into the environment, contamination of soil and groundwater, and accumulation of PFOA in their bodies entitling them to compensatory and consequential damages, including the cost of future medical monitoring.

## CLAIM III

## PRIVATE NUISANCE AGAINST DEFENDANTS SAINT-GOBAIN AND HONEYWELL

283.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

284.    This Claim is brought under New York law on behalf of plaintiffs and the Private Well Water Nuisance Class.

285.    Defendants Saint-Gobain and Honeywell, through the negligent, reckless and/or intentional acts and omissions alleged herein, have contaminated the soil and drinking water of private wells in Hoosick Falls and the surrounding area.  The contamination of class members' soil and drinking water has interfered with the rights of Plaintiffs and the class to use and enjoy their property. Indeed, this interference is substantial in nature. It has caused and is causing Plaintiffs and the class to, *inter alia*, refrain from using soil to grow fruits and vegetables and water to drink, cook, or bathe, which has, in turn, caused significant inconvenience and expense.  Further, the contamination of the Private Well Water Nuisance Class Plaintiffs' private wells has required the installation of POET filters, which require regular maintenance and upkeep, and which have become permanent fixtures that are required for class members to consume or cook with water from their taps.

286.    Defendants' conduct has also substantially interfered with class members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each class member so chooses.

287.    Defendants' negligent, reckless and/or intentional acts and omissions were unreasonable and constitute a continuous invasion of the property rights of plaintiffs and the class.

288.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, plaintiffs and the class have incurred, and will continue to incur, costs and expenses related

to the investigation, treatment, remediation, and monitoring of the soil and drinking water and the contamination of their respective properties, as well as the damages set forth below.

## CLAIM IV

## TRESPASS AGAINST DEFENDANTS SAINT-GOBAIN AND HONEYWELL

289.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

290.    This Claim is brought under New York law on behalf of the Private Well Water Property Damage Class.

291.    Plaintiffs and the Private Well Water Property Damage Class members are owners of real property with the right of possession.

292.    Defendants Saint-Gobain and Honeywell negligently, recklessly, and/or intentionally failed to properly control, apply, use and/or dispose of PFOA Solution and/or PFOA or other waste containing PFOA, such that Defendants proximately caused PFOA contaminants to enter, invade, intrude upon and injure the right of Plaintiffs and the Private Well Water Property Damage Class to possess their property.

293.    Plaintiffs and the Private Well Water Class have not consented, and do not consent, to the contamination alleged herein. Defendants Saint-Gobain and Honeywell knew or reasonably should have known that Plaintiffs and the Private Well Water Class would not consent to this trespass.

294.    As a direct and proximate result of Defendants Saint-Gobain's and Honeywell's acts and omissions as alleged herein, the soil and drinking water of Plaintiffs and the Private Well Water Property Damage Class has been contaminated with PFOA, causing significant property damage, including actual, consequential, and nominal damages, as well as those set forth in more detail below.

## CLAIM V

## STRICT LIABILITY FOR ABNORMALLY DANGEROUS ACTIVITY AGAINST DEFENDANTS SAINT-GOBAIN AND HONEYWELL

295.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

296.     In the alternative to the Second Claim for Relief against Defendants Saint-Gobain and Honeywell, set forth above, Plaintiffs bring this Claim under New York law.

297.     Defendants Saint-Gobain's and Honeywell's manufacturing processes and negligent, reckless, and/or intentional handling of PFOA Solution and/or PFOA constituted an abnormally dangerous activity for which Defendants are strictly liable.

298.     Defendants Saint-Gobain's and Honeywell's use and disposal of PFOA Solution, PFOA or other waste containing PFOA, as described herein, was inappropriate to the place where it was carried out, especially given the close proximity of the McCaffrey Street Site and the p-sites identified herein to sources of drinking water relied upon by residents of Hoosick Falls.

299.     Furthermore, Defendants Saint-Gobain's and Honeywell's use and disposal of PFOA, and reckless disregard for the consequences of those actions, carried a high degree of risk of harm to others and a likelihood that any such harm would be great.  Indeed, the result of Defendants' conduct is all too clear. The State of New York has, *inter alia*, declared the McCaffrey Street Site a Superfund site, it may designate other facilities in the Village as Superfund sites, and it has activated emergency funds to remediate the situation.

300.     As a result of Defendants Saint-Gobain's and Honeywell's abnormally dangerous activities, Plaintiffs and the class members have suffered and continue to suffer harm to their property and injuries to their bodies and have been forced to mitigate damages as set forth herein, as well as below.

## DAMAGES SOUGHT BY THE CLASS

301.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

302.    Plaintiffs and the classes have sustained and will continue to sustain damages to their property and health as a result of Defendants' actions. As a result, Plaintiffs and the classes seek monetary damages for each violation of the First through Fifth Claims for Relief. In particular, Plaintiffs and the classes seek (i) monetary damages reflecting the cost to remediate class members' property of the contamination caused by Defendants' conduct or, in the alternative, to compensate class members for the diminution in value of their property caused by Defendants' conduct; (ii) monetary damages to compensate class members for the loss of the use and enjoyment of their properties caused by Defendant's conduct; (iii) monetary damages for the diminution of the value of the plaintiffs' property, and (iv) monetary damages to compensate class members for the loss of quality of life caused by Defendants' conduct.

303.    Plaintiffs and the classes also seek consequential damages sufficient to fund a biomonitoring program that is reasonably tailored to the exposure risks posed by PFOA.

304.    Further, because Defendants' acts were done maliciously, oppressively, deliberately, and in reckless disregard of Plaintiffs and the classes, Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

305.    In addition to the above, Plaintiffs and the classes seek injunctive relief including, but not limited to, implementation of a mandatory testing protocol requiring Defendants to regularly test the soil and wells of all Private Well Water Property Damage Class members for the presence of PFOA and to continue that testing until it is determined that the risk of PFOA contamination in private wells has ceased; to install permanent filtration devices on any private well testing positive for the presence of PFOA, and to maintain those filtration devices pursuant to

industry best practices; to establish a biomonitoring protocol for Biomonitoring Class Members to monitor their health and diagnose at an early stage any ailments associated with exposure, inhalation or ingestion of PFOA; and to take additional steps, to be proven at trial, that are determined necessary to remediate all class members' properties and/or residences to eliminate the presence of PFOA.

<b><u>PRAYER FOR RELIEF</u></b>

Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against the Defendants, as follows:

A.      an order certifying the proposed Municipal Water Property Damage Class, Private Well Water Property Damage Class, Private Well Water Nuisance Class, and Biomonitoring Class, designating Plaintiffs as the named representatives of the respective classes, and designating the undersigned as Class Counsel;

B.      a declaration that Defendants acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health, safety, and property of Plaintiffs and members of the classes;

C.      an order requiring Defendants (i) to implement a testing protocol to test the wells belonging to each member of the Private Well Water Property Damage Class; (ii) to install permanent filtration devices on any private well testing positive for the presence of PFOA and to maintain those filtration devices until the risk of PFOA contamination in the groundwater has ceased; (iii) to establish a biomonitoring protocol for Plaintiffs and Biomonitoring Class Members to monitor their health and diagnose at an early stage any ailments associated with exposure, inhalation or ingestion of PFOA, and (iv) to take all necessary steps to remediate the property and/or residences of Plaintiffs and the classes to eliminate the presence of PFOA;

D.      an award to Plaintiffs and class members of compensatory, exemplary, and

consequential damages, including interest, in an amount to be proven at trial;

      E.      an award of attorneys' fees and costs, as permitted by law;

      F.      an award of pre-judgment and post-judgment interest, as provided by law;

      G.      leave to amend this Complaint to conform to the evidence produced at trial; and

      H.      such other relief as may be appropriate under the circumstances and/or permitted

by law or as the Court deems just and proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated: December 10, 2018
      Albany, New York

            Respectfully submitted,

            /s/ Robin L. Greenwald

            _____
            Robin L. Greenwald (admitted *pro hac vice*)
            James J. Bilsborrow (Bar Roll #519903)
            William Walsh (Bar Roll #519925)
            **WEITZ & LUXENBERG, P.C.**
            700 Broadway
            New York, New York 10003
            Telephone: (212) 558-5500
            Facsimile: (212) 344-5461
            E-mail: rgreenwald@weitzlux.com
                   jbilsborrow@weitzlux.com
                   wwalsh@weitzlux.com

            Stephen G. Schwarz (Bar Roll #103484)
            Hadley Matarazzo (Bar Roll #437785)
            **FARACI LANGE, LLP**
            *Plaintiffs' Co-Lead Interim Class Counsel*
            28 East Main Street, Suite 1100
            Rochester, New York 14614
            Telephone: (585) 325-5150
            Facsimile: (585) 325-3285
            E-mail: sschwarz@faraci.com
                   hmatarazzo@faraci.com

*Plaintiffs' Co-Lead Interim Class Counsel*

John K. Powers
USDC NDNY Bar Roll #102384
**POWERS & SANTOLA, LLP**

100 Great Oaks Boulevard
Albany, New York 12203
Telephone: (518) 465-5995
Facsimile: (518) 426-4012
E-mail: jpowers@powers-santola.com

*Plaintiffs' Liaison Counsel*