UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHELE BAKER; CHARLES CARR; ANGELA CORBETT; PAMELA FORREST; MICHAEL HICKEY, individually and as parent and natural guardian of O.H., infant; KATHLEEN MAIN-LINGENER; KRISTIN MILLER, as parent and natural guardian of K.M., infant; JENNIFER PLOUFFE; SILVIA POTTER, individually and as parent and natural guardian of C.P., infant; and DANIEL SCHUTTIG, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>  v.<br><br>SAINT-GOBAIN PERFORMANCE PLASTICS CORP., HONEYWELL INTERNATIONAL INC. f/k/a ALLIED-SIGNAL INC. and/or ALLIEDSIGNAL LAMINATE SYSTEMS, INC., E.I. DUPONT DE NEMOURS AND COMPANY and 3M CO.,<br><br>          Defendants. | Civ. No. 1:16-CV-917 (LEK/DJS) |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

I.    STATEMENT OF FACTS ........................................................................................ 6

    A.  Chemical Characteristics of PFOA. ............................................................... 6

    B.  3M and DuPont's Historical Use and Knowledge of PFOA. .................... 7

    C.  Use of PFOA in Hoosick Falls. ..................................................................... 18

        1.  The Hoosick Falls Processor Defendants and Their Dealings with the Manufacturer Defendants .................................................................... 19

        2.  The Coating Operations in Hoosick Falls. .......................................... 21

        3.  Wastewater Discharge and Other Improper Practices in Hoosick Falls. ............ 26

        4.  Processor Defendants' Knowledge of PFOA Toxicity. ..................... 28

    D.  Discovery of PFOA in Hoosick Falls and Its Impact. ............................... 32

        1.  Diminution in Property Value ............................................................... 33

        2.  Human Exposure and Health Impacts .................................................. 34

II.    THE PROPOSED CLASSES ................................................................................ 36

III.    PROCEDURAL HISTORY .................................................................................... 43

IV.    ARGUMENT .......................................................................................................... 44

    A.  Legal Standard .................................................................................................. 44

    B.  The Proposed Classes Satisfy the Requirements of Rule 23(a) ............... 47

        1.  The Numerosity Requirement is Satisfied. ......................................... 47

        2.  The Commonality Requirement is Satisfied. ...................................... 48

        3.  The Typicality Requirement is Satisfied. ............................................. 57

       4.   The Adequacy Requirement is Satisfied. ............................................................ 59

       5.   The Proposed Classes Are Ascertainable. ........................................................ 60

   C.  The PFOA Invasion Injury Class Should Be Certified Under Rule 23(b)(2). .......... 61

   D.  The Classes Should Be Certified Under Rule 23(b)(3). .......................................... 65

   E.  The Court Should Certify the Issue of Defendants' Liability
       Under Rule 23(c)(4) ............................................................................................... 76

CONCLUSION ................................................................................................................................ 79

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Abusio v. Consolidated Edison Co. of New York*,
    238 A.D.2d 454 (N.Y. App. Div. 1997) ...............................................................41, 43, 73

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    No. 06-MD-1175 (JG)(VVP), 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ...................74

*Allison v. Citgo Petroleum Corp.*,
    151 F.3d 402 (5th Cir. 1998) ............................................................................................62

*Amara v. CIGNA Corp.*,
    775 F.3d 510 (2d Cir. 2014)........................................................................................61, 62

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)..........................................................................................................75

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    568 U.S. 455 (2013)..........................................................................................................65

*Ansoumana v. Gristede's Operating Corp.*,
    201 F.R.D. 81 (S.D.N.Y. 2001) .......................................................................................58

*In re Aqua Dots Prods. Liab. Litig.*,
    654 F.3d 748 (7th Cir. 2011) ............................................................................................74

*Baker v. Miller*,
    No. 1:16-cv-260-JEJ (M.D. Pa. Oct. 23, 2017) .........................................................47, 63

*Baker v. Saint-Gobain Performance Plastics Corp.*,
    232 F. Supp. 3d 233 (N.D.N.Y. 2017)......................................................................passim

*Baker v. Saint-Gobain Performance Plastics Corp.*,
    No. 17-3942 (2d Cir.)........................................................................................................44

*Bentley v. Honeywell Int'l, Inc.*,
    223 F.R.D. 171 (S.D. Ohio 2004) ....................................................................................67

*Bitzko v. Weltman, Weinberg & Reis Co., LPA*,
    2019 WL 4602329 (N.D.N.Y. Sept. 23, 2019) ................................................................57

*Bower v. Westinghouse Elec. Corp.*,
    522 S.E.2d 424 (W. Va. 1999)..........................................................................................70

*Burdick v. Tonoga, Inc.*,
   110 N.Y.S.3d 219 (Sup. Ct. Rensselaer Cnty. 2018)....................................................passim

*Burdick v. Tonoga, Inc.*,
   179 A.D.3d 53 (App. Div. 3d Dep't 2019) ......................................................5, 43, 54, 70

*Caridad v. Metro-N. Commuter R.R.*,
   191 F.3d 283 (2d Cir. 1999)..........................................................................................57

*Caronia v. Philip Morris USA, Inc.*,
   5 N.E.3d 11 (N.Y. 2013).................................................................................................41

*Catholic Healthcare W. v. U.S. Foodservice Inc. (In re Foodservice Inc.*
   *Pricing Litig.*,
   729 F.3d 108 (2d Cir. 2013)......................................................................................65, 66

*Collins v. Olin Corp.*,
   248 F.R.D. 95 (D. Conn. 2008)......................................................................................46

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)....................................................................................................45, 46

*Consol. Rail Corp. v. Hyde Park*,
   47 F.3d 473 (2d Cir. 1995)............................................................................................48

*Cook v. Rockwell Int'l Corp.*,
   151 F.R.D. 378 (D. Colo. 1993) ....................................................................................55

*D'Alauro v. GC Servs. Ltd. P'ship*,
   168 F.R.D. 451 (E.D.N.Y. 1996) ...................................................................................74

*DeLuca v. Tonawanda Coke Corp.*,
   134 A.D.3d 1534 (N.Y. App. Div. 4th Dep't 2015) ........................................................67

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006)..........................................................................................59

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*,
   No. CIV. A. 98-20626, 1999 WL 673066 (E.D. Pa. Aug. 26, 1999) ................................63

*Donovan v. Philip Morris USA, Inc.*,
   268 F.R.D. 1 (D. Mass. 2010)...................................................................................passim

*Duprey v. Conn. Dep't of Motor Vehicles*,
   191 F.R.D. 329 (D. Conn. 2000)....................................................................................58

*In re Fosamax Prods. Liab. Litig.*,
  248 F.R.D. 389 (S.D.N.Y. 2008) ................................................................76

*Gates v. Rohm & Haas Co.*,
  655 F.3d 255 (3d Cir. 2011)..............................................................68, 72

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982)......................................................................................49

*Gibbs v. E.I. DuPont De Nemours & Co.*,
  876 F. Supp. 475 (W.D.N.Y. 1995) ......................................................63

*Giovanni v. United States Dep't of Navy*,
  906 F.3d 94 (3d Cir. 2018)........................................................................63

*Hecht v. United Collection Bureau, Inc.*,
  691 F.3d 218 (2d Cir. 2012).....................................................................63

*In re Hoosick Falls PFOA Cases*,
  No. 1:19-mc-00018-LEK-DJS (N.D.N.Y.)................................41, 75

*In re Initial Public Offerings Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006).......................................................................46

*Johnson v. Nextel Communications Inc.*,
  780 F.3d 128 (2d Cir. 2015).....................................................................45

*Katz v. Warner-Lambert Co.*,
  9 F. Supp. 2d 363 (S.D.N.Y. 1998) ......................................................63

*LaFlamme v. Carpenters Local No. 370 Pension Plan*,
  212 F.R.D. 448 (N.D.N.Y. 2003) ..........................................................45

*Lucey v. Saint-Gobain Performance Plastics Corp.*,
  No. 1:17-cv-01054-LEK-DJS (N.D.N.Y.)..........................................44

*Madden v. Midland Funding, LLC*,
  237 F. Supp. 3d 130 (S.D.N.Y. 2017)..................................................58

*Marisol A. v. Guiliani*,
  126 F.3d 373 (2d Cir. 1997)......................................................................45

*Martin v. Behr Dayton Thermal Prods. LLC*,
  896 F.3d 405 (6th Cir. 2018) .......................................................77, 79

*Mejdrech v. Met-Coil Sys. Corp.*,

v

319 F.3d 910 (7th Cir. 2003) ............................................................................46

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
   241 F.R.D. 185 (S.D.N.Y. 2007) ........................................................46, 47, 53, 54

*Meyer ex rel. Coplin v. Fluor*,
   220 S.W.3d 712 (Mo. 2007) ...........................................................................70

*In re Nassau Cnty. Strip Search Cases*,
   461 F.3d 219 (2d Cir. 2006)....................................................................46, 66, 77

*In re Nat'l Football League Players Concussion Injury Litig.*,
   821 F.3d 410 (3d Cir. 2016)....................................................................47, 58, 69

*In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico on Apr. 20, 2010*,
   910 F. Supp. 2d 891 (E.D. La. 2012), *aff'd*, *In re Deepwater Horizon*, 739 F.3d
   790 (5th Cir. 2014)......................................................................................46

*In re Oil Spill by the Oil Rig Deepwater Horizon*,
   295 F.R.D. 112 (E.D. La. 2013)...............................................................47, 69, 70

*Parko v. Shell Oil Co.*,
   739 F.3d 1083 (7th Cir. 2014) .........................................................................69

*In re Petrobas Securities*,
   862 F.3d 250 (2d Cir. 2017)....................................................................60, 65, 74

*Petrovic v. Amoco*,
   200 F.3d 1140 (8th Cir. 1999) .........................................................................46

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
   148 F.3d 283 (3d Cir. 1998)............................................................................58

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015).......................................................................passim

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir. 1993)............................................................................48

*Robinson v. Metro-North Commuter R.R. Co.*,
   267 F.3d 147 (2d Cir. 2001)........................................................................62, 63

*Rowe v. E.I. DuPont de Nemours & Co.*,
   262 F.R.D. 451 (D.N.J. 2009)......................................................................53, 71

*In re Scott EZ Seed Litig.*,

304 F.R.D. 397 (S.D.N.Y. 2015) .........................................................................55, 74, 76

*Saint-Gobain Performance Plastics Corp. v. Sullivan*,
    No. 19-2851 (2d Cir. Jan. 17, 2020) ............................................................................5

*Seekamp v. It's Huge, Inc.*,
    No. 1:09-CV-00018 (LEK/DRH), 2012 WL 860364
    (N.D.N.Y. Mar. 13, 2012).....................................................................................44, 45, 57

*Seijas v. Rep. of Argentina*,
    606 F.3d 53 (2d Cir. 2010)...........................................................................................75

*Sterling v. Veliscol Chem. Corp.*,
    855 F.2d 1188 (6th Cir. 1988) .....................................................................................46

*Sullivan v. Saint-Gobain Performance Plastics Corp.*,
    No. 5:16-cv-125, 2019 WL 8272995 (D. Vt. Aug. 23, 2019) ....................................passim

*Sykes v. Mel S. Harris & Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015)...........................................................................................passim

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008)........................................................................................45

*In re Teletronics Pacing Sys.*,
    172 F.R.D. 271 (S.D. Ohio 1997) ...............................................................................56

*Turner v. Murphy Oil USA*,
    234 F.R.D. 597 (E.D. La. 2006)...................................................................................67

*Tyson Foods, Inc. v. Bouphakeo*,
    --- U.S. ---, 136 S. Ct. 1036 (2016)............................................................................56

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017)...........................................................................................68

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)...................................................................................................passim

## Rules and Statutes

Fed. R. Civ. P. 23(a) ..............................................................................................passim

Fed. R. Civ. P. 23(a)(1).................................................................................................48

Fed. R. Civ. P. 23(a)(2).................................................................................................49

Fed. R. Civ. P. 23(a)(4) ..................................................................................59, 60

Fed. R. Civ. P. 23(b) ....................................................................................3, 6, 44

Fed. R. Civ. P. 23(b)(2) ....................................................................................passim

Fed. R. Civ. P. 23(b)(3) ....................................................................................passim

Fed. R. Civ. P. 23(c)(4) ..........................................................................76, 77, 79

15 U.S.C. § 2607(e) ..............................................................................................10

**Other**

https://www.epa.gov/enforcement/ei-dupont-de-nemours-and-company-pfoa-settlements ....18

https://www.rensco.com/wp-content/uploads/2016/02/Hoosick-RPS150P1.pdf. ...................61

https://www.villageofhoosickfalls.com/Media/PDF/WaterQualityReport2015.pdf. ........48, 61

## INTRODUCTION

In December 2015, residents of the Village of Hoosick Falls, New York ("the Village") learned that their drinking water was contaminated with a dangerous, man-made carcinogenic chemical called perfluorooctanoic acid (PFOA). Over the next several months, residents in the Town of Hoosick ("the Town"), who obtained their water from a privately owned well, received the same distressing news.[1] For decades, this chemical was improperly discharged from a manufacturing facility in the heart of the Village, at 14 McCaffrey Street and, to a lesser extent, from another facility in the Village on John Street. Residents learned to their dismay that they unknowingly drank, cooked with, and showered in water contaminated with this carcinogen. And soon they learned at least one of the consequences: these exposures caused PFOA to accumulate in residents' blood in quantities far above anything observed in the general population. Indeed, in 2016, the median PFOA blood serum concentration in Hoosick Falls was 23 times higher than levels seen nationwide. United States Senators and other elected officials called it a "public health crisis." (Exs. S1 at 2/3; S2.[2]) The Environmental Protection Agency (EPA) warned the community not to drink or cook with the water and told parents to limit their children's' exposure. (Ex. S3.)

New York State soon announced that the current owner of the McCaffrey Street facility, Defendant Saint-Gobain Performance Plastics Corporation ("Saint-Gobain"), and the previous owner, Honeywell International Inc. ("Honeywell"), were responsible for the contamination. From at least 1967 until 2003, operators at McCaffrey Street used an aqueous solution containing PFOA to coat fiberglass fabric. During the coating process, the fabric and aqueous solution were heated,

---

[1] The Village comprises approximately 1.6 square miles within the larger Town.

[2] All parenthetical references to "Ex. S##" are to exhibits to the Declaration of Stephen G. Schwarz, filed herewith. For specific references in multi-paged exhibits, references are to the page number of the PDF, e.g. "9/34," instead of the pagination in the original document.

causing PFOA to vaporize and exhaust from the facility's stacks. The vast majority of these emissions were completely uncontrolled, meaning PFOA was exhausted to the outside air where it carried across the community before settling on the ground and migrating through the soil to the groundwater. For years, McCaffrey Street operators also discarded wastewater containing PFOA to the ground at the facility, contaminating the groundwater beneath the facility, where it then traveled toward the Village wells that sat only 500 yards away.

For many months after disclosure of the contamination, residents were reliant on bottled water to drink and cook. Ultimately, Saint-Gobain installed a carbon filter on the municipal wells to remove PFOA from the Village drinking water. Similarly, after testing hundreds of households with private wells, the New York State Department of Environmental Conservation (NYDEC) installed over 400 point-of-entry treatment (POET) filters on contaminated private wells throughout the Town. Although the community was able to use its water again, the damage was done. The State designated the McCaffrey facility a Superfund site. A federal Superfund designation followed. Property values cratered in 2016 and have been depressed ever since. Those who received POETs in 2016 will need them for decades.

Saint-Gobain and Honeywell are directly responsible for the environmental contamination in Hoosick Falls, but there is more to the story. The aqueous solutions used in the fabric coating process, which were known by the trade name Teflon®, were manufactured by Defendant E.I. DuPont de Nemours & Company ("DuPont") with PFOA purchased from Defendant 3M Company ("3M"). Indeed, 3M invented PFOA in the 1940s and supplied DuPont with the chemical for decades. And, as these companies used this synthetic chemical and related fluorosurfactants to manufacture other products, like Teflon® and Scotchguard®, they acquired extensive information about the toxicity of these compounds and their effect on workers and the environment—

information that 3M and DuPont shared with each other but not the public, the government, or users of their products until it was far too late to prevent the contamination of places like Hoosick Falls. Both companies were ultimately fined in the mid-2000s by the EPA for failing to report information indicating that perfluorinated compounds like PFOA presented a substantial risk to health and the environment. In other words, 3M and DuPont failed to warn of the dangers related to the chemical that has now polluted the environment in Hoosick Falls.

Plaintiffs bring this motion to certify four narrowly defined classes of current and former residents of Hoosick Falls harmed by Defendants' collective misconduct: (i) a class of property owners who obtain water from the municipal water supply, which was contaminated with PFOA levels as high as 600 parts per trillion (ppt); (ii) a class of property owners within a defined zone of contamination who receive water from a privately owned well that was tested and found to be contaminated with PFOA; (iii) a class of owners and lessees of properties within a defined zone of contamination who receive water from a privately owned well that was tested and found to be contaminated with PFOA, resulting in the installation of a POET filtration device; and (iv) a class of individuals who consumed PFOA-contaminated water at their residence for at least a six-month period between 1996 and 2016, and who received a blood serum test demonstrating that PFOA has accumulated in their blood in excess of the 2013-2014 national background level of 1.86 ug/L.

The proposed classes meet the requirements for class certification set forth in Federal Rule of Civil Procedure 23(a) and (b). Through no fault of their own, Plaintiffs' properties have been contaminated, they have been forced to install permanent water filtration in their homes, and their bodies have been invaded by a carcinogenic chemical with known, cancer-causing health effects. The classes share common questions of law and fact, including Defendants' ultimate liability for causing community-wide contamination and failure to warn of hazards posed by PFOA. Moreover,

because of the NYDEC's widespread community testing, the universe of contaminated properties is well known and easily ascertainable. And unlike some less cohesive environmental class actions, each of these class definitions requires proof of exposure, either through water testing or blood tests. Through air modeling conducted by Plaintiffs' expert, the evidence shows that each class members' exposure was predominantly caused by PFOA emissions from the McCaffrey Street facility. The damages sought by these classes are also common and shared. Property owners seek to recoup the diminution in market value caused by the community-wide contamination of their small, rural village. Those with PFOA blood accumulation seek a classwide medical monitoring program to provide diagnostic testing and early diagnosis of PFOA-related health conditions.

The classes proposed here are comparable to classes recently certified in factually similar cases brought in the nearby communities of Petersburgh, New York, and North Bennington, Vermont. In Petersburgh, Taconic Plastics ("Taconic") has, like the operators in Hoosick Falls, coated fiberglass fabric for decades using aqueous solutions containing PFOA. *Burdick v. Tonoga, Inc.*, 110 N.Y.S.3d 219, at *1 (Sup. Ct. Rensselaer Cnty. 2018). During the coating process, Taconic emitted PFOA from its stacks, where it then spread to the neighboring community, contaminating the municipal water supply and over 200 private wells in the area. *Id.* at *1-2. The plaintiffs sought to certify four classes akin to those proposed here: property owners seeking diminution in value, private well owners raising claims for nuisance, and individuals who consumed contaminated water who have blood test results demonstrating PFOA accumulated in their blood above background levels. *Id.* at *3. The Rensselaer County Supreme Court certified

the four classes,[3] *id.* at \*13-14, a ruling affirmed by the Appellate Division, *Burdick v. Tonoga, Inc.*, 179 A.D.3d 53 (App. Div. 3d Dep't 2019).

Similarly, for years a company called Chemfab operated its own fabric coating facility in North Bennington, Vermont. In approximately 2000, Chemfab was purchased by Saint-Gobain and the facility was closed. *Sullivan v. Saint-Gobain Performance Plastics Corp.*, No. 5:16-cv-125, 2019 WL 8272995, at \*1 (D. Vt. Aug. 23, 2019). In 2016, PFOA contamination was found in private wells around the former Chemfab fabric coating facility. *Id.* at \*2. Like here, PFOA was exhausted from Chemfab's stacks during the fabric coating process and spread by wind to the surrounding community. *Id.* at \*2. Plaintiffs sought to certify a class of residents who consumed contaminated water and whose blood now contained PFOA above background levels (as evidenced by a blood test). *Id.* at \*3. The district court certified the class for injunctive relief under Federal Rule of Civil Procedure 23(b)(2), *id.* at \*13-15, and the Second Circuit Court of Appeals denied interlocutory review, *Saint-Gobain Performance Plastics Corp. v. Sullivan*, No. 19-2851 (2d Cir. Jan. 17, 2020).[4] The district court also certified an issue class for liability of property owners seeking loss of property value.[5] *Sullivan*, 2019 WL 8272995, at \*10-12.

_____

[3] In certifying the four classes, the *Burdick* court relied on federal case law under Rule 23, as well as New York state law. *Burdick*, 110 N.Y.S.3d at \*5 ("State courts often rely upon Federal case law applying [Rule 23] in determining whether a class action may be certified under CPLR article 9.").

[4] The Second Circuit's order is provided at Ex. S4.

[5] Several of the experts who testified in support of the proposed classes in Petersburgh and North Bennington have also provided supportive testimony here. Dr. Alan Ducatman testified in support of the classwide medical monitoring program in both proceedings. Dr. Donald Siegel has provided testimony in both cases regarding the movement of PFOA through soil to the groundwater and through groundwater. Dr. Jeffrey Zabel provided testimony on the market-wide diminution in value of contaminated properties in Petersburgh. Dr. David Savitz testified to the causal link between PFOA exposure and a number of human health conditions and Dr. Hyeong-Moo Shin testified to the fate and transport of PFOA in the environment once it is released. Defendants moved to disqualify all of these experts in one or both the Petersburgh and North Bennington cases; both courts rejected these motions and found each expert's testimony to be

This Court should reach similar results, certify the proposed classes, and permit Plaintiffs to utilize the efficiencies of the class action device to seek to right the wrongs done to the classes. The classes are tightly-knit groups of homeowners and renters whose properties have been contaminated, whose property values have fallen, and who have been exposed to and consumed PFOA in their homes and, unfortunately, have blood serum tests to prove it. They seek to establish their claims through common proof, which is far superior to hundreds of individual trials. The proposed classes meet the requirements of Rule 23(a) and (b) to proceed as a class and Plaintiffs respectfully move the court for an order permitting them to do so.

## I.   STATEMENT OF FACTS

### A.   Chemical Characteristics of PFOA.



. (Report of N. Cheremisinoff at 15-17 ("Cheremisinoff").[6]) For decades, APFO was a "potent synthetic surfactant used in industrial applications." (S7 at 10/35.) Because of its eight-carbon chain structure, APFO was also frequently referred to as C-8. APFO is a white powdery substance that converts from a solid directly to a vapor form (sublimates) when heated to approximately 130º C. When released into the environment, APFO transforms and becomes PFOA. (*Id.* at 9/34; Report of H. Shin (hereafter, "Shin" at 4.)

---

reliable and suitable for presentation to the trier of fact. (*Sullivan* Decision, Ex. S5; *Burdick* Decision, Ex. S6.)

[6] In support of this motion, Plaintiffs have submitted various expert reports with a one-page Declaration preceding each report. For simplicity, when referencing to these experts' reports, Plaintiffs refer to the expert's name and the page number of the report where the referenced information can be located.

██PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 32)██ (Shin at 4.) APFO, PFOA, and C-8 will be used interchangeably below as they all refer to essentially the same substance.

**B.    3M and DuPont's Historical Use and Knowledge of PFOA.**

3M and DuPont (the "Manufacturer Defendants") had knowledge of the possible health and environmental hazards posed by PFOA for many years and failed to warn users, the government, and the public who might be exposed to these hazards.[7] ██PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)██

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ (Cheremisinoff at 16-18.) ██PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)██

████████████████████████████████████████████████████████████

████████████████████ (*Id.*)

In the early 1950s, DuPont began manufacturing products called polytetrafluoroethylene (PTFE) and fluorinated ethylene propylene (FEP), both of which were used in the fabric coating processes historically performed at facilities in Hoosick Falls. DuPont produced what were referred to as aqueous dispersions by disbursing PTFE or FEP particles in water. ██████████████

██PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)██

████████████████████████████████████████ (Ex. S8 at 4/8; Ex. S9 at 59-60.) ██PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)██

███████████████████████████████████████████████████.[8] (*See, e.g.*, Ex. S10 at 14,

---

[7] Because the Manufacturer Defendants are in the process of responding to Plaintiffs' requests for production, and only one deposition has been taken of a witness from the Manufacturer Defendants, the evidence set forth herein will be supplemented as discovery proceeds.

[8] ██████PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)██████. (Ex. S12 at 218:20-24.)

24/28; Ex. S11 at 3/3.) DuPont sold its aqueous PTFE dispersions to companies like Allied-Signal (predecessor to Honeywell) and Saint-Gobain under the trade name Teflon®.

3M and DuPont studied the environmental properties and toxicity of PFOA throughout the 1960s, but beginning in the mid-1970s both companies began to consistently observe that organic fluorocarbons like PFOA were accumulating in human blood.[9] █████████████████████

████████████PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████ (Ex. S13 at 2/11.) ████████PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)████████

█████████████ (*Id.* at 2-3/11.)

In May 1978, 3M shared with DuPont that it had observed the accumulation of organic fluorocarbons in its employees' blood in quantities of 1 to 71 parts per million (ppm), with higher levels associated with workers who were exposed to airborne mists and dusts at its fluoropolymer manufacturing facilities. (Ex. S14 at 2/11.) In response, DuPont resolved to advise employees handling APFO-containing material to avoid inhalation; conduct more animal toxicity testing; conduct an industrial hygiene review; and perform blood testing on its workforce. (*Id.*) ████████

████████████PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)████████████

██████████████████████████████████ (Ex. S15 at 4/4.) ████

████████████PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[9] During this period there was no specific test for PFOA in blood, so organic fluorocarbons were used as a surrogate. Organic fluorocarbons are compounds that contain the carbon-fluorine bond.

[REDACTED] [10] (Ex. S16 at 2/15.) 3M understood early on that it was not only its employees who were at risk.



(Ex. S17 at 7/7.)

(*Id.*) Another consultant, J.R. Mitchell commented on an animal study 3M completed the previous year: "Some of the symptoms in animals from these 90 day studies are similar to those observed with carcinogens."[11] (Ex. S20 at 4/7.)

(Ex. S21 at 2-3/3.)

In 1979, DuPont also began testing its employees' blood for fluorochemicals. (Ex. S22.) Shortly after commencement of these studies, DuPont found significantly elevated fluorine blood levels in workers exposed to APFO. DuPont shared these results with 3M. The companies decided not to report these findings under the Section 8(e) reporting provisions of the Toxic Substances Control Act (TSCA), reasoning: "[I]t was concluded that the information did not reasonably

---



[10] [REDACTED] (Ex. S16 at 15/15.)

[11] [REDACTED] (Ex. S18 at 4-5/44.) (Ex. S19 at 49/305.)

support a conclusion that a substantial risk was presented, primarily based upon the absence of known adverse health effects related to fluorine in blood."[12] (Ex. S23; Ex. S24.)

Since APFO was a synthetic chemical, only companies manufacturing and using the product had the ability to research whether exposure posed potential adverse human health risks and to raise any such concerns with appropriate governmental agencies. Both 3M and DuPont chose instead to remain silent, justifying their conduct by citing a lack of definitive evidence. By October 1979, however, DuPont's own blood testing of its employees demonstrated that organic fluoride blood levels were elevated in occupations likely to be exposed to APFO. (Ex. S25.)

The following year, and in seeming contradiction to its justification for not reporting under TSCA, a DuPont memo concluded, "C-8 is toxic, but can be handled safely"; "although this has caused no health effects continued exposure is not tolerable." (Ex. S26 at 4/14.) In an employee presentation attached to this memo, which was part of a program to reduce occupational exposure, DuPont provided a prescient explanation of mistakes made in the past (and which DuPont would repeat):

> Some of the old timers remember when C-8 was treated with less respect and wonder "Why is it suddenly harmful now?" Throughout the chemical industries over the last 50 years this story has been repeated with the same disbelief but often with more dramatic consequences. For example, carbon tetrachloride was used to clean auto parts and as a fire extinguisher for years and now it is known to cause damage in some people and is used with care. The same story has been repeated several times for things like chloroform (which was used in cough suryp [sic]), methyl alcohol and other chemicals. The difference between the ending of the C-8 story and the other is Du Pont is reacting while C-8 levels in the blood are low and before any damage is done to the body.

---

[12] TSCA Section 8(e) requires a manufacturer that distributes a chemical substance in commerce, and that obtains information that reasonably supports the conclusion that the chemical substance presents a substantial risk of injury to health or the environment, must immediately report such information to the EPA. 15 U.S.C. § 2607(e).

(*Id.* at 4, 6-7/14.)

In 1980 and 1981, 3M performed three animal teratology studies, all of them finding eye lens birth defects in the exposed subjects. (Ex. S27.) Between 1979 and 1981, two of seven children born to female workers at a DuPont perfluorocarbon (PFC) facility also had birth defects. ███

██████████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132) ██████████

██████████████████████████████████

██████████████████████████████████

(Ex. S12 at 234:11-235:3.) ███ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132) ███

(Ex. S28.) DuPont thereafter began testing the blood of pregnant employees at its Washington Works facility in West Virginia where it manufactured PTFE and FEP products. (Ex. S29.) This testing revealed that PFOA in maternal blood crossed the placental barrier and was detected in similar levels in fetal blood. (Ex. S30 at 2/6.)

Around this time, 3M finally reported to the EPA the results of the animal teratology studies it performed, as well as occupational blood surveillance performed on employees at its Decatur, Alabama facility. (Ex. S31 at 2/4.) In its letter to the EPA, 3M stated, "We plan to inform, by mid-December [1980], all those customers and 3M employees who have a potential, through certain uses and/or processing, of significant exposure to the subject chemicals" of the findings of its occupational surveillance studies. (*Id.* at 4/4.) There is no evidence 3M provided any such information to its customers, including the company operating facilities in Hoosick Falls at this time. Despite this particular disclosure to the EPA, ███ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132) ███

██████████████████████████████████

██████████████████████████████████

███ (Ex. S32.)

The Manufacturer Defendants continued to track their employees' blood accumulation and studied the effects of PFCs on animals. In 1982, a cross-sectional study of 3M workers showed a prevalence of high blood pressure and high cholesterol. 3M dismissed the results as lifestyle related. (Ex. S33 at 3/5.) █████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132) █████

████████████████████████████████████████████████

██████████ (Ex. S34.) █████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132) █████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████ (Ex. S35.)

By 1984, DuPont was aware that C-8 released from its Washington Works facility was detected in nearby communities' water systems. (Ex. S36.) DuPont surreptitiously obtained tap water samples from commercial businesses in these nearby communities to confirm that the tap water was contaminated. It did not share this information either with the affected communities or any governmental agency. (Ex. S37.) █████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132) █████

████████████████████████████████████████████████

██████████ (Ex. S38 at 11/27.) █████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132) █████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████.[13] (*Id.* at 10/27, 13/27.)

---

[13] There is substantial similarity between the discharge of APFO during DuPont's drying process in creating fine powders and the fabric coating process performed in Hoosick Falls. (Ex. S39 at 30; Ex. S9 at 42-43, 58-60.) Both processes involved heating a liquid dispersion of PTFE particles and APFO, such that the water evaporated and the APFO sublimated and was released as

PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

(Ex. S40.) PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

(Ex. S41 at 2/3.)

PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

(*Id.*)

PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132). (*Id.*)

The following year, DuPont established through toxicological testing that PFOA caused testicular tumors in rats and this effect was hormonally mediated, foreshadowing the findings of the C-8 Health Study more than 15 years later.[14] (Ex. S42 at 3/3.) PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

(Ex. S19.) PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

(*Id.*)

---

a vapor. Had DuPont's scrubber technology been used in Hoosick Falls, APFO air emissions to the Town of Hoosick would have been substantially reduced.

[14] As described more fully below, the C-8 Health Study was a comprehensive effort, led by an independent panel of epidemiologists in the mid-2000s, to study the impacts of PFOA exposure on communities in West Virginia that were exposed to PFOA emitted and discharged from DuPont's Washington Works facility. (Report of D. Savitz at 4-8 ("Savitz").)

███████████████████████████████████████████████████████
PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)

████████████████████████████████ (*Id.*) The following year, 3M conducted a mortality

study that showed a three-fold excess occurrence of prostate cancer in workers employed more

than ten years. (Ex. S43 at 2/3.) An internal DuPont memo described the study the following year

and noted that "PFOA was on a fast-track as a potential carcinogen." (Ex. S44.)

███████████████████████████████████████████████████████
PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)

███████████████████████████████████████████████████████

█████████████████████████████████████████████████ (Ex. S45.)

███████████████████████████████████████████████████████
PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████ [15] (*Id.* at 3/4.) ██████████████████████████████
PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)

████████████████████████████████ (*Id.*)

███████████████████████████████████████████████████████
PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)

██████████████████████████████████████████ (Ex. S46.) █

███████████████████████████████████████████████████████
PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████ (*Id.* at 2/3.) ████
PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)

███████████████████████████████████████████████████████
PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)

(*Id.*) █████████████████████████████████████████████████
PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)

---

[15] ███████████████████████████████████████████████████████
PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)

██████ (Ex. S45 at 3/4.)

PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

.[16]

PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

(Ex. S48 at 16/20.)

PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

. (*Id.* at 6/20.)

PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

(*Id.*)

PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

(Ex. S49.)

PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

(Ex. S11 at 3/3.)

[16] PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

(Ex. S47.)

PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)
(*Id.*)

███████████████████████████████████████████
PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)
███████████████████████████████████████████

███████████████████████████████████ (Exs. S51 at 4/13; S52 at 12/13; S53 at

4/15.) ████████████████████████████████████████
PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████ (Exs. S52 at 12/13; S56 at 4/6.)

███████████████████████████████████████████
PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

█████████████████████████ (Ex. S57.) ████████████████████
PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████ (*Id.*) ████████████████████
PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

███████████████████████████████████████████

███████████████████████████████████████████ [17]

(Ex. S48 at 6/20.)

███████████████████████████████████████████
PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

███████████████████████████████████████████

███████████████████████ (Ex. S61 at 2/6.) Similarly, 3M's internal studies in the late

---

[17] ████████████████████████████████████████
PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)
█████████████████ (Exs. S58; S59 at 20/37.)

1990s confirmed that PFOS was present in marine food chains and had been detected in bald eagle populations from Minnesota and Michigan. (Ex. S62.) ██████████████████████ ██████████████████████████████████████[18] (Ex. S63.) At this time, 3M environmental scientist Richard Purdy wrote to his 3M colleague, Georjean Adams, and suggested that these food chain findings demonstrated a significant risk that should not be kept confidential. (Ex. S64.)

Purdy was apparently ignored because in 1999 he submitted his resignation letter, in which he expressed his "profound disappointment in 3M's handling of the environmental risks associated with the manufacture and use of PFOS." (Ex. S65.) Purdy called PFOS the most "insidious pollutant since PCB," because unlike PCB, PFOS (and PFOA) "do[] not degrade." (*Id.*) Purdy continued, "At almost every step, I have been assured that action will be taken – yet I see no or slow results." (*Id.*) "3M told those of us working on the fluorochemical project not to write down our thoughts or have email discussions on issues because of how our speculations could be viewed in a legal discovery process. This has stymied intellectual development on the issue, and stifled discussion on the serious ethical implications of decisions." (*Id.*)

The following year, EPA notified 3M it intended to pursue more rigorous regulation of perfluorinated chemicals. Shortly thereafter, 3M publicly announced that it was voluntarily withdrawing from the perfluorinated chemicals market and that it would no longer manufacture PFOA and PFOS. At the time it decided to exit the market, 3M was still the primary global supplier of perfluorinated chemicals, which were being found in human and animal blood and in the environment all over the world. ██████████████████████████████████████

---

[18] ██████████████████████████████████████ (Ex. S63 at 11/15.)



(Ex. S66 at 2/7; *see also* Ex. S67 at 11-12 .)

(Ex. S68.)

(Ex. S71 at 2/6; S72 at 9/43, 15/43; S73 at 73-74.)

.[19] (Ex. S74.)

Ultimately, both 3M and DuPont were penalized for reporting violations under TSCA Section 8(e). In 2005, DuPont agreed to pay $10.25 million in civil penalties and perform Supplemental Environmental Projects worth $6.25 million to resolve reporting violations related to PFOA.[20] The following year, 3M agreed to pay a penalty in excess of $1.5 million to resolve 244 alleged TSCA reporting violations of its own. (Ex. S79.)

## C.    Use of PFOA in Hoosick Falls.

---

[19] DuPont also provided misleading or blatantly inaccurate information to EPA. In a June 23, 2000 letter, DuPont's Gerry Kennedy represented that the processing of aqueous dispersions (as was performed in fabric coating operations by the Processor Defendants, discussed below) "destroyed 97%" of the APFO in the dispersions. (Ex. S75 at 3/14.)

(Exs. S77; S71 at 3/6; S78 at 2/3.)

[20] *See* https://www.epa.gov/enforcement/ei-dupont-de-nemours-and-company-pfoa-settlements (last visited Mar. 30, 2020).

1.     **The Hoosick Falls Processor Defendants and Their Dealings with the Manufacturer Defendants.**

PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

(Ex. S81.)

PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

(Ex. S82 at 1/8.) PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

(*Id.*) PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

(Ex. S83.) By the time of this acquisition, Oak Materials Group was operating a number of facilities in Hoosick Falls in addition to those at McCaffrey and John Street. (Ex. S84 at 2-3/8.)

PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

(Ex. S85 at 75:18-24; *see also id.* at 70:17-71:8.) In December 1992, one of Allied-Signal Inc.'s wholly-owned subsidiaries, AlliedSignal Laminate Systems, Inc. assumed control of the Fluorglas Division. (*See* Ex. S86.)

AlliedSignal Laminate Systems, Inc. operated the Fluorglas Division properties until November 1995, when the Fluorglas Division, including the McCaffrey Street facility and a facility at 1 Liberty Street, was sold to Furon Company. (Ex. S87.) In this sale, AlliedSignal Laminate Systems, Inc. retained certain environmental liabilities relating to the McCaffrey and Liberty Street facilities, as well as other Hoosick Falls facilities that were not part of the sale, such as the John Street facility. (*Id.*) PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

(Ex. S85 at 28:23-29:9.)

19

Furon Company ("Furon") operated the McCaffrey and Liberty Street facilities until November 1999, when Saint-Gobain Performance Plastics Corporation merged into Furon, which was then acquired by Norton Company, a Saint-Gobain affiliate. (Ex. S88 at 20/21.) The surviving entity, called Furon, then changed its name to Saint-Gobain Performance Plastics Corporation, which assumed operation of the McCaffrey and Liberty Street facilities. (*Id.*) Saint-Gobain Performance Plastics Corporation is responsible for environmental liabilities relating to the McCaffrey and Liberty Street facilities from 1996 to the present. Throughout this memorandum, Plaintiffs refer to the companies with responsibility for environmental liabilities relating to the Hoosick Falls facilities—AlliedSignal Laminate Systems, Inc. and its predecessors (hereafter, "Allied Signal") and Saint-Gobain and its predecessor, Furon—as the Hoosick Falls "Processor Defendants."

Between 1967 and approximately 2012, several of the facilities in Hoosick Falls manufactured products using materials containing APFO, including the aqueous PTFE and FEP dispersions manufactured by DuPont and described above. ▮▮ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132) ▮▮ (*See, e.g.*, Exs. S89; S90; S91; S92 at 40:2-42:1; S93 at 106:19-107:19.) ▮▮ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132) ▮▮ (Ex. S94.) ▮▮ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132) ▮▮ (*See, e.g.*, Exs. S67 at 14; S96; S97.)

APFO-containing dispersions and FC-143 were historically used at four of the Hoosick Falls Processors' facilities, though only two of those facilities contributed significantly to the community-wide PFOA contamination. (*See* Ex. S84 at 5-6/8.) As described in more detail below,



(Shin at 2, 11, 14; Report of D. Siegel at 1-1 (hereafter, "Siegel").) For decades, this operation utilized large quantities of aqueous PTFE dispersion. ████████████████████████████████████████████ ████████████████████████████████████████████ (Ex. S9 at 27.)

### 2.    The Coating Operations in Hoosick Falls.

APFO was used at the McCaffrey Street facility to coat fiberglass fabric from at least 1967 through 2003. (Ex. S84 at 3/8; S98.) Although the operators in control of McCaffrey Street changed over the years, the mechanics of the fabric coating process did not. It is this process that is primarily responsible for the PFOA contamination throughout Hoosick Falls.

████████████████████████████████████████████
████████████████████████████████████ (Ex. S9 at 45, 47; Ex. S99.)
████████████████████████████████████████████
████████████████████████████████████████[21]
(Ex. S9 at 47.) ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████ (Ex. S9
at 42-43, 47, 58-59-62; Ex. S99.) ████████████████
████████████████████████████████████████████
███████ (Ex. S100; S101; Ex. S85 at 169:23-170:20.)

---

[21] On average, aqueous dispersions used by the Hoosick Falls Processors contained approximately 0.28% APFO. (Ex. S76 at 24/76.)

The coating towers were heated by one of two heat sources. Radiant heating (analogous to the process used in a toaster) was used in some towers, which were called IR towers. Other towers used hot air heated in a gas furnace before being pumped into the tower. **[PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)]** (Exs. S9 at 28-29; S102 at 33.) **[PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)]**

**[PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)]** (Ex. S9 at 84-85.) **[REDACTED]**

**[PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)]**

**[REDACTED]** (Exs. S103; S104.) **[PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)]**

**[REDACTED]**

**[REDACTED]** (*Id.*) In the early 2000s, an industry mass balance study of fabric coating processes performed at facilities like McCaffrey Street found that IR towers released 39-54% of the APFO contained in aqueous dispersions as air emissions and the hot air heated towers released 9-19%.[22] (Ex. S76 at 63/76.)

**[PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)]**

**[REDACTED]**

**[REDACTED]**

**[REDACTED]** (Shin at 4.) **[PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)]**

**[REDACTED]** (*Id.*) Using dispersion usage data obtained through discovery as well as the industry's mass balance analysis referenced above, Plaintiffs' expert, Dr. Hyeong-Moo Shin,

---

[22] A "mass balance" study or material balance answers questions about the rate at which pollutants accumulate in a system and are discharged into the environment. **[PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)]** **[REDACTED]** (Ex. S125.)

calculated ███████████████████████████████████████████

████████████████████████████.[23]

(Shin at 2-3.)

Dr. Shin and air modeling expert, Mark Huncik, then utilized the air modeling program AERMOD to produce an analysis of the likely dispersion pattern of the ▮▮▮▮▮▮▮▮ released into the air to the Village and Town of Hoosick.[24] This dispersion pattern, taken from Mr. Huncik's report, is displayed in Figure 1 above. ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮. (Shin at 2; Siegel at 1-1.)

The facility at John Street also housed a coating operation until approximately 1996. ▮▮▮

▮▮▮▮▮▮▮▮.[26] (Ex. S85 at 128:19-129:24; Ex. S9 at 20:16-22.) ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ (Ex. S9 at 27:1-6l Ex. S85 at 142:18-143:11.) APFO was thus exhausted from the John Street stacks. Although there is insufficient data to quantify APFO emissions from John Street, they surely contributed to the overall contamination in Hoosick Falls. Allied Signal is responsible for the APFO emitted from the John Street facility from 1967 until it was closed.

---

[24] ▮▮▮▮▮▮▮▮. (Report of M. Huncik at 1-2 ("Huncik").) It is generally accepted and relied upon in the field of air modeling. (Ex. S5 at 18/49.)

[25] The Contamination Zone is defined in Plaintiffs' Second Amended Master Consolidated Class Action Complaint, as well as Plaintiffs' Notice of Motion in Support of Class Certification. (*See* S133 (Plaintiffs' Second Amended Master Consolidated Class Action Complaint, to be filed).) The Contamination Zone is also described in Dr. Shin's report. The Contamination Zone refers to properties that were impacted by APFO air emissions from the McCaffrey Street facility.

[26] ▮▮▮▮▮▮▮▮ (Shin at 11.)

As set forth above, ████████████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

████████████████████████████████████████

████████████████. (Ex. S38 at 10, 13/27.) ████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

████████████████████████████████████████

████████(Exs. S103; S105 at 74:2-76:20; 225:5-226:19); ██ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

████████████████████████████████████████

████████████████████████████████████████

████████████████████████(See Ex. S93 at 92:4-93:12.) ██ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

████████████████████████████████████████

████████(Ex. S85 at 192:8-13.)

Stack emissions from McCaffrey Street became a regulatory focus shortly after Furon acquired the facility from Allied Signal. ████████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

████████████████████████(Ex. S106.) ████████

████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

████████████████████████████████████████

████████[27] (Id..)

████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

████████████████████████████████████████(Ex. S108.) ████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

████████████████████████████████(Ex. S109.)

████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

---

[27] ████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)

████████████████████████(Ex. S107.)

PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132) (Shin at 2, 4; Ex. S104.)

PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)

(Ex. S104.) PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)

(Ex. S38 at 10, 13/27.) Saint-Gobain was also aware that one of its competitors, W.L. Gore, had been testing its APFO stack emissions for years and utilized available technologies, including thermal oxidation, to control APFO emissions. (Ex. S72 at 21-23/43.) PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)

(Ex. S105 at 74:2-76:20; 225:5-226:19.) PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)

(Ex. S110.) In May 2003, Saint-Gobain did just that.

### 3.    Wastewater Discharge and Other Improper Practices in Hoosick Falls.

PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)

(Ex. S102 at 65:5-67:14, 94:12-96:10.) PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)

PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132) (*Id.*) PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)

(*Id.* at 75.) PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)

(*Id.* at 107-08, 114.) PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)

*Id.* at 75-78.)

(*Id.* at 108-11.)

(S:111; Siegel at 1-1, 5-5.)

(Ex. S112 at 12-13, 40, 44/49.)

(Ex. S113 at 10, 39-40/89.)

(Siegel at 1-1.)

(*Id.*)

(Ex. S102 at 37.)

██████████████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132) ██████████████

████████████████████████████████████████████████████

(*Id.* at 35-36; Ex. S114; S9 at 93-94.) ████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132) ████

████████████████████ (Ex. 114); ████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132) ████

████████████████████ (Shin at 14.)

### 4.    Processor Defendants' Knowledge of PFOA's Toxicity.

As set forth above, for years the Manufacturer Defendants, 3M and DuPont, closely studied the toxicity of PFOA but shared very little of their findings. Certain information was conveyed, however, in the Material Safety Data Sheets (MSDS) for PTFE and FEP dispersions, as well as 3M's FC-143 products. ██████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132) ██████

██████████████ (*See* Ex. S85 at 260:1-8.) ████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132) ████

████████████████████ (Ex. S92 at 345.) Accordingly, the Processors were on notice of the information set forth in MSDS for PFOA-containing products.

In 1986, the year Allied Signal commenced operations in Hoosick Falls, MSDS for 3M's FC-143 product advised users to dispose of the product by "incinerat[ing] in an industrial or commercial facility" or disposing "of waste product in a facility permitted to accept chemical wastes." (Ex. S115.) The 1991 MSDS for FC-143 advised users to incinerate waste or discharge to a wastewater treatment system. (Ex. S116.) ████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132) ████

████████████████ (Ex. S100.) ████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132) ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ (Cheremisinoff at 18-20.)

Even without understanding the specific toxic properties of PFOA, Allied Signal knew or should have known it should not discharge wastewater containing FC-143 to the ground.

Similarly, in the early 1990s, DuPont and other PTFE and FEP dispersion manufacturers began providing some limited information in their MSDS regarding the potential toxicity of APFO found in the dispersion.



(Ex. S117.)

(*Id.* at 6/10.)

(*Id.* at 6/10.)

(*Id.* at 8-9/10.) Allied Signal ignored these disposal warnings by discharging wastewater from its fabric coating operation to the ground and to the Hoosick Falls sanitary sewer system, which had no capacity to treat PTFE or APFO.

(Ex. S118 at 3/5.)

.[28] (Exs. S28; S52 at 12/13; S56 at 4/6; DUP-BAKER-0085308.)

---

[28] The full scope of information conveyed by DuPont in the mid-1990s to processors like Allied Signal or Furon is not fully known, as discovery with DuPont is ongoing.

**[REDACTED — PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)]**

**[REDACTED]** (Ex. S119 at 12-13/13.) Saint-Gobain acquired Chemfab shortly thereafter.

**[REDACTED — PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)]**

**[REDACTED — PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)]**

**[REDACTED]** (Ex. S120 at 4, 7/11.) A presentation given by Saint-Gobain employees Rich Hoeck and Ruth Jamke in April 2003 demonstrated that Saint-Gobain was fully aware of the health and regulatory issues related to APFO use by this time, including the quantity of APFO in dispersions, the presence of PFOA in the blood of workers at 3M, and that DuPont, one of its primary suppliers, had contaminated drinking water in communities surrounding its Washington Works facility with air and wastewater emissions containing APFO. (Ex. S72 at 3, 13, 16-17/43.)

**[REDACTED — PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)]**

**[REDACTED]** (Exs. S121; S122.) **[REDACTED — PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)]**

**[REDACTED]**

(Ex. S123.) **[REDACTED — PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)]**

**[REDACTED]**

**[REDACTED]**

**[REDACTED]**

**[REDACTED]** (Ex. S124.)

Saint-Gobain ceased coating fabric in Hoosick Falls in May 2003 and moved its coating operation to Merrimack, New Hampshire. **[REDACTED — PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)]**

**[REDACTED]**

**[REDACTED]**



█████████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132) █████████ (Exs. S125; S126.)

█████████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132) █████████

████████████████████████████████████████████████

████████████████████. (Ex. S127.)   █████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132) █████

█████████████████████(Ex. S128.)

Despite almost certain knowledge that large quantities of PFOA had been emitted from McCaffrey Street and spread to the Hoosick Falls community, Saint-Gobain never tested the drinking water or soil in that community to ensure residents were not at risk until it was essentially forced to do so in 2015. Indeed, unlike its facilities in Merrimack and Kilrush, the McCaffrey Street facility is not isolated from nearby residences, but is centrally located in the Village and some 500 yards from the Village water supply. (See Figure 2 below, Siegel at 2-2.) ██████████

█████████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132) █████████

████████████████████████████████████████████████

█████████████████████[29] (Ex. S129.) And Saint-Gobain continued to pay close attention (from afar) as the C-8 Science Panel conducted its work, the EPA Science Advisory Board issued a draft report characterizing PFOA as likely human carcinogen, and the C-8 Science Panel ultimately linked a number of human health conditions to PFOA exposure. (Report of D. Savitz at 11-17 ("Savitz").)

---

[29] █████████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132) █████████
████████████████████████ (Ex. S.129; S105 at 274-280.)



Figure 2 –   Map of the Village of Hoosick Falls showing the location of McCaffrey Street
and Hoosick Falls Municipal Wells

Yet with all this information, between 2003 and 2015, Saint-Gobain never took any action

to investigate whether PFOA had contaminated the Hoosick Falls water supply. It never once

during this time tested the Village drinking water, let alone the groundwater on its own site.



PURSUANT TO PROTECTIVE ORDER (ECF Nos. 131 & 132)

(Ex. S130.)

Because Saint-Gobain opted not to act on its near-certain knowledge of contamination in 2003,

Hoosick Falls residents were needlessly exposed to PFOA for more than a decade.

### D.   Discovery of PFOA in Hoosick Falls and Its Impact.

In 2014, Plaintiff Michael Hickey learned that the Village drinking water was contaminated with PFOA after he tested a water sample. (Ex. S131 at 51-53.) Nearly a year later, EPA warned the community that the Village drinking water contained levels of PFOA so high that residents should not drink or cook with the water. (S132.) Saint-Gobain immediately began providing bottled water to the community after this public disclosure. (Report of J. Zabel at 2 ("Zabel").) Testing performed by NYDEC on the Village water supply showed PFOA levels ranging from 150 ppt to 662 ppt. (Ex. S55; Siegel at 2-4.) In early 2016, NYSDEC began systematically testing private drinking water wells belonging to homes in the Town of Hoosick. **PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132)**

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*See* Ducatman at 10 & Ex. B.) A temporary carbon filtration system was installed on the municipal water supply in May 2016. NYDEC also installed hundreds of POET systems on private wells that were contaminated. Ultimately, a permanent carbon filtration system was installed on the Village water supply in December 2016, but this was too late to prevent the significant damage inflicted to person and property in Hoosick Falls.

### 1.    Diminution in Property Value.

The widespread contamination of Hoosick Falls had a devastating impact on the community's property values. Dr. Jeffrey Zabel evaluated the effect of this contamination on home sales before and after the contamination was disclosed. As Dr. Zabel explains, environmental contamination on or adjacent to a property may reduce the market value of that property due to, among other things, actual or perceived health risks. Dr. Zabel's peer-reviewed research has demonstrated that groundwater contamination may reduce the market value residential property values of 10 percent or more. (Zabel at 8-9.)

The standard economic approach to measuring the impact of environmental contamination on property values is the hedonic property value method. This method involves the development of an econometric model of house prices, their structural features, and relevant neighborhood characteristics, including any disamenities such as environmental contamination, to estimate the specific value (positive or negative) of those attributes. The hedonic method is routinely applied by assessors and other real estate data authorities and is formally recognized within federal regulations for natural resource damage assessments and guidelines for economic analyses of environmental policy. (*Id.* at 2.)

Perhaps unsurprisingly, Dr. Zabel's analysis demonstrates that in 2016, the year after the contamination was disclosed, average sales prices dropped by approximately 24.15% in Hoosick Falls. (*Id.* at 7-9.) From 2016-2019, sales prices in Hoosick Falls were approximately 21.02% of those in a control group of similar areas unaffected by the contamination in Jackson, Easton, Schaghticoke, Brunswick, and Postenkill. (*Id.* at 5-6.) When comparing the eight years from 2012-2019, the difference between sales prices in Hoosick Falls and the control group is 8.75%. (*Id.*) These results are statistically significant. (*Id.* at 7-9.) As the evidence shows, widespread PFOA contamination in Hoosick Falls devastated local property values.

### 2.   Human Exposure and Health Impacts.

Residents of Hoosick Falls likely consumed contaminated drinking water for decades. In 2016, the New York State Department of Health (NYDOH) offered free blood testing for any current or former resident of Hoosick Falls. PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)

[30] (Ducatman at 11.) ██████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ (*Id.*) ██████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████ (Shin at 15.) Exposure is widespread in Hoosick Falls, as one would

expect after decades of uncontrolled APFO emissions from a facility centrally located in the

Village. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ (Shin

at 5 (internal citation omitted).) Hoosick Falls is one such community.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ (Ex.

S60.) This was, of course, consistent with studies performed decades ago by 3M and DuPont. It is

also consistent with the conclusion of the C8 Science Panel, a group of independent

epidemiologists appointed by DuPont and attorneys representing communities contaminated by

DuPont's Washington Works facility in West Virginia. That panel, which included Plaintiffs'

expert, Dr. David Savitz, studied the potential health effects of PFOA, particularly on impacted

communities along the Ohio River, and ultimately concluded that there was a causal link between

PFOA and several human health conditions, including kidney cancer, testicular cancer, ulcerative

colitis, and thyroid disease, among others. (Savitz at 5-7.) The C8 Science Panel was and is the

---

[30] Because PFOA is no longer used to manufacture consumer products, the geometric mean background blood serum has been steadily decreasing each year. The geometric mean background level for 2015-2016 was 1.56 ug/L. (Report of A. Ducatman at 11 n.3 ("Ducatman").)

preeminent independent scientific body to study the human health impacts of PFOA; continuing research performed since the Panel issued its initial findings has largely only strengthened those conclusions.[31] Dr. Savitz explains that to a reasonable degree of scientific certainty, exposure to PFOA more likely than not is capable of causing kidney cancer, testicular cancer, ulcerative colitis, increased uric acid levels, high cholesterol, elevated liver enzymes, and immune system effects. (Savitz at 9-17.) Further, Dr. Savitz explains that "for exposures above background levels, elevated risks are likely to be present," and "evidence does not exist for establishing a level of PFOA exposure below which no negative effects can be assured." (*Id.* at 19.)

Current and former residents of Hoosick Falls with PFOA blood serum levels above the 2013-2014 background average are thus at an increased risk of developing the human health conditions identified by Dr. Savitz. Accordingly, Plaintiffs propose the implementation of a medical monitoring program to provide diagnostic testing and early identification of PFOA-linked diseases. Dr. Alan Ducatman, who designed such a program for exposed residents of North Bennington and Petersburgh, proposes a similar course here. As Dr. Ducatman explains, continued monitoring of exposed Hoosick Falls residents is important because PFOA will continue to contaminate class members' blood for years. (Report of A. Ducatman at 13-14 ("Ducatman").) Thus, the "existence of shared risk of exposure is certain." (*Id.* at 24.) Dr. Ducatman thus proposes a medical monitoring program of recurrent diagnostic testing and surveillance in an effort to provide an early diagnosis and, ultimately, more successful treatment for those for whom PFOA exposure will cause a more serious disease.

## II.    THE PROPOSED CLASSES

---

[31] In addition to Dr. Savitz, Plaintiffs' experts Dr. Ducatman and Dr. Shin were also involved in the C8 Health Project and have published multiple articles in the scientific literature regarding the fate and transport of APFO and associations between PFOA exposure and human illness. (Shin Ex. A; Ducatman Ex. A & D.)

Plaintiffs propose to certify four narrowly-defined classes that seek legal and equitable relief for injury to person, property, and nuisance. The proposed classes,[32] and the Plaintiffs who seek to represent those classes, are as follows:

### Municipal Water Property Damage Class

> All individuals who are or were owners of real property that was supplied with drinking water from the Village of Hoosick Falls municipal water supply, and who purchased that property on or before December 16, 2015.

Plaintiffs Pamela Forrest, Kathleen Main-Lingener, Jennifer Plouffe, Silvia Potter, and Daniel Schuttig are named as the Municipal Water Property Damage Class representatives. Each of these Plaintiffs owned property prior to December 16, 2015 that obtained its drinking water from the municipal water supply. (Decl. of Pamela Forrest ¶¶ 2-3; Decl. of Kathleen Main-Lingener ¶¶ 2-3; Decl. of Jennifer Plouffe ¶¶ 2-3; Decl. of Silvia Potter ¶¶ 2-3; Decl. of Daniel Schuttig ¶¶ 2-3.[33])

The Municipal Water Property Damage Class seeks damages as a result of Defendants' negligent contamination of their properties and for causing contaminated water to enter class members' homes through their taps, pipes, and showers. This Court has ruled that Plaintiffs plausibly alleged a claim for negligence and strict liability related to the contamination of their drinking water and held that Plaintiffs may seek diminution-in-value damages because their property was "directly affected by the defendant's conduct." *Baker v. Saint-Gobain Performance*

---

[32] The class definitions set forth in this memorandum and in Plaintiffs' Notice of Motion comport with the proposed class definitions pled in Plaintiffs' proposed Second Amended Master Consolidated Class Action Complaint. The parties filed a Stipulation and Proposed Order on April 6, 2020, wherein Defendants do not object to Plaintiffs' amendment of their operative pleading. The Second Amended Master Consolidated Class Action Complaint is attached hereto as Ex. S133.

[33] Plaintiffs' declarations in support of the motion for class certification are submitted herewith.

*Plastics Corp.*, 232 F. Supp. 3d 233, 246 (N.D.N.Y. 2017). All Municipal Water Property Damage

Class members are similarly situated and will prove their claims by common proof. Defendants'

negligence caused the municipal water supply to be contaminated with PFOA and that water

entered each class member's home and diminished each class member's property value.

### Private Well Water Property Damage Class

> All individuals who are or were owners of real property located in
> the Contamination Zone that was supplied with drinking water from
> a private well contaminated with PFOA and who owned that
> property at the time the contamination of the property's private well
> was discovered through a water test on or after December 16, 2015.

Plaintiffs Michele Baker, Charles Carr, and Angela Corbett are named as the Private Well

Water Property Damage Class representatives. Each of these Plaintiffs owned their property prior

to December 16, 2015, that property was supplied water from a well owned by each Plaintiff, and

the well was contaminated with PFOA, as confirmed by a water test. (Decl. of Michele Baker ¶¶

2-4; Decl. of Charles Carr ¶¶ 2-4; Decl. of Angela Corbett ¶¶ 2-4.) Each of Plaintiffs' properties

lies within the Contamination Zone in the Town of Hoosick, described more fully below.

The Private Well Water Property Damage Class, like those property owners on municipal

water, has plausibly alleged that Defendants' contaminated their drinking water and caused their

property values to decrease. *Baker*, 232 F. Supp. 3d at 246. The Private Well class also alleges

plausible claims of trespass against the Processor Defendants. *Id.* at 247. Like those on municipal

water, Private Well plaintiffs share proof of exposure. Because NYDEC tested hundreds of

properties with private wells, it is known which properties were contaminated and which were not.

Those properties with contaminated wells that fall within the Contamination Zone are members of

the class. Defendants' liability for contaminating these wells is subject to common proof.

The Contamination Zone referred to in these class definitions is a defined geographical area comprised of properties in the Town of Hoosick that lie within zip codes 12028, 12057, 12090, and 12089 (with certain exceptions). As explained above, the Contamination Zone represents the area in which PFOA emitted from the McCaffrey Street facility between 1980 and 2003 dispersed and settled onto properties. The Contamination Zone is based on the air modeling performed by Plaintiffs' expert, Mark Huncik, as well as the analysis of that modeling performed by Dr. Hyeong-Moo Shin. A map depicting the Contamination Zone is set forth in Dr. Shin's report (Figure 1 at 14.) ██████████████ PURSUANT TO PROTECTIVE ORDER (ECF NOs. 131 & 132) ██████████████

██████████████████████ (Shin at 2.)

### Nuisance Damage Class

> All individuals who are or were owners or lessors of real property located in the Contamination Zone that was supplied with drinking water from a privately owned well contaminated with PFOA, had a point-of-entry treatment (POET) system installed to filter water from that well, and who occupied that property at the time the contamination of the property's private well was discovered through a water test on or after December 16, 2015.

Plaintiffs Michele Baker, Charles Carr, and Angela Corbett are named as the Nuisance Damage Class representatives. Each of Plaintiffs' private wells was contaminated by PFOA and NYDEC installed a POET system to filter this contaminant from their drinking water. (Decl. of Michele Baker ¶ 6; Decl. of Charles Carr ¶ 6; Decl. of Angela Corbett ¶ 6.) These POET systems remain on each of Plaintiffs' private wells to this day.

The Nuisance Damage Class has plausibly alleged that the Processor Defendants interfered with the use and enjoyment of their properties by contaminating their private wells and causing a "special loss," namely the installation of a POET system that must be maintained for the foreseeable future. *Baker*, 232 F. Supp. 3d at 247. Like the Private Well Water Property Damage

Class, each Nuisance Damage class member will share common proof of exposure attributable to a predominant, single source—the McCaffrey Street facility. Class members' damages—the installation of a POET—will also be shared and similar among the class.

### PFOA Invasion Injury Class

> All individuals who, for a period of at least six months between 1996 and 2016, have (a) ingested PFOA-contaminated water at their residence, which was supplied with drinking water from the Village of Hoosick Falls municipal water supply or from a PFOA-contaminated private well in the Contamination Zone and (b) suffered invasion and accumulation of PFOA in their bodies as demonstrated by blood serum tests disclosing a PFOA level in their blood above the average background level of 1.86 ug/L; or any natural child born to a female who meets and/or met this criteria at the time of the child's birth and whose blood serum was tested after birth disclosing a PFOA level above the average background level of 1.86 ug/L.

Plaintiffs Charles Carr, Angela Corbett, Michael Hickey, individually and as parent and natural guardian of O.H., infant, Kathleen Main-Lingener, Kristin Miller, as parent and natural guardian of K.M., infant, and Silvia Potter, individually and as parent and natural guardian of C.P., infant, are named as the PFOA Invasion Injury Class representatives. Each of the Plaintiffs satisfy the class criteria set forth above and several Plaintiffs have alarming quantities of PFOA in their blood. Plaintiff Charles Carr's PFOA blood serum was 186 ug/L—100 times the 2013-2014 background level. (Decl. of Charles Carr ¶ 7.) Plaintiff Silvia Potter's blood serum was 120 ug/L— 65 times the 2013-2014 background level. (Decl. of Silvia Potter ¶ 7.) Mr. Carr consumed water from his private well; Ms. Potter consumed water from the municipal water supply. (Decl. of Charles Carr ¶ 3; Decl. of Silvia Potter ¶ 3.) The PFOA blood serum levels of the Infant Plaintiffs are equally concerning; Plaintiff K.M.'s PFOA blood serum was 108 ug/L—58 times the 2013-2014 background level. (Decl. of Kristin Miller ¶ 7.) K.M. was eight years old at the time his blood was tested. (Ex. S80 at 21:3-7.)

The PFOA Invasion Injury Class is comprised of individuals who have raised common law claims plausibly alleging injury to person and property. *See Baker*, 232 F. Supp. 3d at 253 (explaining that "Plaintiffs have sufficiently alleged claims for negligence and other torts concerning property," which "constitutes 'an already existing tort cause of action'" (quoting *Caronia v. Philip Morris USA, Inc.*, 5 N.E.3d 11, 18-19 (N.Y. 2013)). Under New York law, members of this class are entitled to medical monitoring relief if they can show they were "in fact exposed to a disease-causing agent and that there is a 'rational basis' for [their] fear of contracting [a particular] disease." *Abusio v. Consol. Edison Co. of N.Y., Inc.*, 238 A.D.2d 454, 454 (N.Y. App. Div. 1997); *see also Caronia*, 5 N.E.3d at 16 (favorably citing *Abusio*).

Plaintiffs and all class members allege that because of Defendants' tortious conduct, PFOA was emitted or negligently discharged from the McCaffrey Street and John Street facilities, ultimately contaminating each class member's source of drinking water. Class members thereby consumed PFOA in their homes, where it invaded each class member's body and accumulated in his or her blood. The toxic invasion and accumulation that each class member has experienced constitutes an injury under New York law. *See Baker*, 232 F. Supp. 3d at 252 (ruling that the blood accumulation of PFOA constitutes an injury under New York law). Accordingly, each class member has plausibly alleged a common law injury for which Defendants bear responsibility. No member of the class alleges any personal injury other than the toxic invasion and accumulation of PFOA.[34]

---

[34] The class definition excludes any individual who has filed a separate lawsuit for personal injury alleging PFOA-related illness caused by exposure to PFOA from a Hoosick Falls water source. A number of individual personal injury suits have been filed alleging kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, and others. *See In re Hoosick Falls PFOA Cases*, No. 1:19-mc-00018-LEK-DJS (N.D.N.Y.).

To be a member of the class, an individual must make two showings. First, each member must show that he or she consumed water during a certain time frame at a residence whose water source was contaminated. Class members must have consumed contaminated water during a six-month period from 1996 to 2016. By 1996, Allied Signal and its predecessors had emitted uncontrolled PFOA to the environment for years. In November 1995, Furon purchased the McCaffrey Street facility and commenced fabric coating operations shortly thereafter. Class members' whose exposure occurred in 1996 or later were exposed to PFOA contaminant for which the Processor Defendants are jointly responsible. Further, because of the widespread testing performed by NYDEC, the universe of contaminated properties is known and easily determinable. Second, a class member must establish proof of exposure through a blood test showing an accumulation of PFOA in excess of the background average. According to the testing performed thus far by the DOH, over 2000 individuals in Hoosick Falls meet this criteria.

The PFOA Invasion Injury Class is a personal injury class that is highly cohesive. By definition, proof of causation is established, as all class members were injured by ingesting water contaminated by Defendants. By definition, proof of injury (and exposure) is established, as all class members must present proof of a blood test to be members of the class. Finally, as explained more fully below, medical monitoring damages are provable on a classwide basis. Plaintiffs have presented the expert report of Dr. Alan Ducatman, who describes the monitoring program warranted here and explains that such a program is necessary for any Hoosick Falls resident with PFOA blood accumulation above background levels. Dr. Ducatman has proposed similar programs for the exposed populations of Petersburgh and North Bennington. In both cases, courts have ruled that Dr. Ducatman's testimony is based on sound methodology, is reliable, and should be presented to the trier of fact. (*See* Exs. S5; S6.)

The class definition thus closely tracks the requirements set forth by *Abusio*. By requiring proof of PFOA accumulation above background levels, Plaintiffs will present proof that each class member was in fact exposed to a disease-causing agent. *See Abusio*, 238 A.D.2d at 454 (plaintiffs must show they were "in fact exposed to a disease-causing agent"). Further, through the testimony of Drs. Ducatman and Savitz, Plaintiffs present evidence that any individual who has PFOA present in his or her blood above background levels has a "rational basis" to fear contracting one of a number of human health conditions, including kidney and testicular cancer. *See id.* (plaintiffs must show there is "a 'rational basis' for [their] fear of contracting [a particular] disease"). The requirements of the class definition therefore comport with New York law and ensure that the class is cohesive and meets the requirements of Rule 23. In this manner, the PFOA Invasion Injury Class is similar to the class certified to seek medical monitoring relief by the Rensselaer County Supreme Court and affirmed by the Third Department in *Burdick*, as well as the class certified to seek such relief by the United States District Court for the District of Vermont in *Sullivan*. This Court should similarly certify the PFOA Invasion Injury Class proposed here.

## III.   PROCEDURAL HISTORY

Plaintiffs Baker, Corbett, and Schuttig filed suit against Saint-Gobain and Honeywell on February 24, 2016. (*See* Dkt. 1 at 4.) Three other proposed class action suits were thereafter filed, alleging claims similar to those pled in the first-filed suit. (*See id.* at 4-7 (explaining procedural history).) The Court consolidated these suits and appointed the undersigned law firms as Co-Lead Interim Class Counsel and Liaison Counsel. (*Id.* at 7-8, 12.) Plaintiffs then filed a Consolidated Complaint, which the Processor Defendants moved to dismiss. (Dkt. 9, 13.) The Court granted this motion in part and denied it in part, ruling that Plaintiffs' nuisance claims on behalf of owners and lessees of property served by the municipal water system must be dismissed, but denying the

motion with respect to all other claims. *See Baker*, 232 F. Supp. 3d 256-57. The Court granted the Processor Defendants permission to seek interlocutory review of the order, an invitation they pursued. *Id.* The Second Circuit heard oral argument on the appeal on April 17, 2019 and a decision is pending. *See Baker v. Saint-Gobain Performance Plastics Corp.*, No. 17-3942 (2d Cir.).

On December 10, 2018, Plaintiffs filed an amended complaint, pleading failure to warn claims against the Manufacturer Defendants. (Dkt. 79.) Prior to this amendment, an individual plaintiff filed suit against Saint-Gobain, Honeywell, DuPont, and 3M for causing her to be exposed to PFOA and develop ulcerative colitis. *See Lucey v. Saint-Gobain Performance Plastics Corp.*, No. 1:17-cv-01054-LEK-DJS (N.D.N.Y.). DuPont and 3M moved to dismiss those claims, a motion the Court denied, holding the plaintiff plausibly alleged that 3M and DuPont had a duty to warn regarding the environmental and health toxicities of PFOA and that breach of this duty plausibly caused the plaintiff's injuries. (*Lucey*, Dkt. 76.) Neither DuPont nor 3M moved to dismiss the *Baker* Plaintiffs' amended complaint and the parties proceeded in discovery. Discovery remains ongoing.

## IV.   ARGUMENT

### A.   Legal Standard

"Rule 23 class actions are designed to promote efficiency and economy of litigation, and to preserve small claims through aggregation without sacrificing procedural fairness or unfairness." *Seekamp v. It's Huge, Inc.*, No. 1:09-CV-00018 (LEK/DRH), 2012 WL 860364, at *1 (N.D.N.Y. Mar. 13, 2012) (Kahn, J.). Plaintiffs seeking to certify classes for both monetary and injunctive relief must satisfy the prerequisites set forth in Federal Rule of Civil Procedure 23(a) and (b). *See Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 79-80 (2d Cir. 2015).

Rule 23(a) requires the plaintiff to show "(1) the class is so numerous that joinder of all parties is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Where plaintiffs seek injunctive relief, they must demonstrate that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). For a class requesting monetary relief, plaintiffs must show that there are "questions of law or fact common to class member [that] predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). As this Court has explained, "courts are implored to construe liberally the Rule 23 requirements." *Seekamp*, 2012 WL 860364, at *2 (quoting *LaFlamme v. Carpenters Local No. 370 Pension Plan*, 212 F.R.D. 448, 452 (N.D.N.Y. 2003)); *see also Marisol A. v. Guiliani*, 126 F.3d 373, 377 (2d Cir. 1997) (courts in the Second Circuit are to give a "liberal rather than restrictive construction" to Rule 23 and to "adopt a standard of flexibility" (internal quotation omitted)).

"Rule 23 does not set forth a mere pleading standard," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011), and the plaintiffs bear the burden to demonstrate by a preponderance of the evidence that the prerequisites of Rule 23 have been satisfied, *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008). This may require the court to "'probe behind the pleadings before coming to rest on the certification question,' satisfying itself that Rule 23 compliance may be demonstrated through 'evidentiary proof.'" *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015) (quoting *Comcast Corp. v. Behrend*, 569 U.S.

27, 33 (2013)). In determining whether a proposed class should be certified, the court "should not assess any aspect of the merits unrelated to a Rule 23 requirement." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006).

In the Second Circuit, a district court's class certification ruling will not be disrupted absent an abuse of discretion. *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). When the district court has denied class certification, however, the appellate court will apply a "noticeably less deferential standard." *Id.* (quoting *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 224-25 (2d Cir. 2006)).

In the instant matter, Plaintiffs seek to certify classes for property damage, nuisance, and medical monitoring. Federal district courts have regularly certified property damage and nuisance classes. *See, e.g.*, *Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910 (7th Cir. 2003) (affirming certification of class of property owners claiming defendant's storage tank leaked and contaminated soil and groundwater beneath class members' homes); *Petrovic v. Amoco*, 200 F.3d 1140, 1144 (8th Cir. 1999) (affirming certification of class seeking "monetary relief for pollution to their property that occurred as a result of underground oil seepage originating from an Amoco petroleum refinery"); *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir. 1988) (affirming property damage class claiming defendant's landfill leaked and contaminated water supply); *In re Oil Spill by the Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 910 F. Supp. 2d 891, 907 (E.D. La. 2012) (affirming class seeking damage to coastal real property and class who sold homes for loss following oil spill), *aff'd*, *In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014); *Collins v. Olin Corp.*, 248 F.R.D. 95 (D. Conn. 2008) (certifying property damage and nuisance classes where plaintiffs alleged their properties were contaminated by nearby landfill); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 241 F.R.D. 185 (S.D.N.Y. 2007)

(certifying property damage and nuisance class of properties contaminated with MTBE from defendant's leaking underground storage tank).

Federal courts have likewise certified medical monitoring classes under Rule 23(b)(2) and (b)(3). *See, e.g.*, *In re Nat'l Football League Players Concussion Injury Litig. ("In re NFL")*, 821 F.3d 410 (3d Cir. 2016) (certifying (b)(3) personal injury class providing all class members, including asymptomatic class members, with present and future neurological testing); *Sullivan*, 2019 WL 8272995 (certifying PFOA exposure class with blood tests above national background average); *Baker v. Miller*, No. 1:16-cv-260-JEJ (M.D. Pa. Oct. 23, 2017) (certifying (b)(2) class of asymptomatic individuals who underwent open heart surgery at certain medical facilities and were exposed to nontuberculous mycobacterium through a medical device used to regulate their blood temperature);[35] *In re Oil Spill by the Oil Rig Deepwater Horizon*, 295 F.R.D. 112 (E.D. La. 2013) (certifying (b)(3) class of clean-up workers and coastal residents exposed to hydrocarbons from oil spill and providing access to monitoring program that provided visits with a qualified physician every three years); *Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1 (D. Mass. 2010) (certifying (b)(2) class of twenty pack-year smokers and providing for periodic monitoring via low-dose CT scans).

### B.     The Proposed Classes Satisfy the Requirements of Rule 23(a).

The proposed classes meet the four requirements set forth in Rule 23(a): numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a).

### 1.     The Numerosity Requirement is Satisfied.

---

[35] The *Baker* decision is unpublished and is attached as Exhibit S50 to the Declaration of Stephen G. Schwarz.

Rule 23(a)(1) requires the proposed class to be "so numerous that joinder of all members is impracticable." In the Second Circuit, there is a presumption that a putative class of 40 or more members satisfies the numerosity requirement. *Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). At the class certification stage, Plaintiffs need not present evidence of the exact class size, but must provide a reasonable estimate of the number of class members. *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993).

Each of the proposed classes exceed several hundred individuals with some, like the PFOA Invasion Injury Class, likely exceeding 2,000 members. In 2015, the Village of Hoosick Falls public water system provided water through approximately 1,300 connections, the vast majority of which are residential.[36] The individuals who own residential properties served by the Village public water system comprise the Municipal Water Property Damage Class. With regard to the Private Well Water Property Damage Class, NYDEC tested and oversaw installation of POET systems to treat the wells contaminated with PFOA at over 400 residences in the Contamination Zone. (Ducatman at 10 & Ex. B.) The individuals who own these residences comprise the Private Well Water Property Damage Class; the individuals who resided at these properties and owned or leased them at the time POET systems were installed comprise the Nuisance Damage Class. Finally, in two rounds of testing conducted thus far by NYDOH, over 2,000 current or former Hoosick Falls residents were found to have quantities of PFOA accumulation in excess of background levels. Most of these individuals will meet the criteria of the PFOA Invasion Injury Class. Each of the classes meets the numerosity requirement.

## 2.   The Commonality Requirement is Satisfied.

---

[36]   *See*   https://www.villageofhoosickfalls.com/Media/PDF/WaterQualityReport2015.pdf (last visited March 24, 2020).

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Rule 23(a)'s commonality prerequisite is satisfied if there is a common issue that 'drive[s] the resolution of the litigation' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Sykes*, 780 F.3d at 84 (quoting *Dukes*, 564 U.S. at 350). As the Supreme Court explained in *Dukes*, "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 349-50 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)).

Here, there are a number of common questions that are apt to drive the resolution of this litigation. Class members will raise numerous common questions regarding the liability of the Hoosick Falls Processor defendants for contaminating the community with PFOA, including: (1) whether PFOA used in the Processors' manufacturing processes was negligently and/or improperly emitted from the Hoosick Falls Facilities; (2) whether PFOA used in the Processors' manufacturing processes was negligently and/or improperly discharged to the groundwater beneath the Hoosick Falls Facilities; (3) whether the Processors handled and disposed of process waste appropriately; (4) whether the Processors utilized appropriate pollution controls at the Hoosick Falls Facilities; (5) whether the Processors were negligent, grossly negligent, reckless and/or acted in a willful or wanton manner with respect to their manufacturing operations and pollution controls used at the Hoosick Falls Facilities; (6) whether the Processors were negligent, grossly negligent, reckless and/or acted in a willful or wanton manner with respect to their handling of wastewater generated at the Hoosick Falls Facilities; (7) whether the Processors are liable for trespass for causing PFOA to contaminate the private wells belonging to members of the Private Well Water Damage Class; and (8) whether the Processors are liable for interfering with the use

and enjoyment of the Nuisance Damage Class members' properties by contaminating their private wells with PFOA.

In addition, the proposed classes share the common question whether Saint-Gobain was negligent, grossly negligent, reckless and/or acted in a willful or wanton manner by failing at any time between 1999 and 2015 to test for PFOA in the groundwater or soil in Hoosick Falls, or urge any such testing be performed, or for failing to test stack or fence line emissions for PFOA from 1999 to 2003.

Class members raise common questions against the PFOA Manufacturer defendants for failing to provide adequate warnings to users of PFOA, relevant government agencies, and the public. Question of law or fact common to the classes include (1) whether the Manufacturer Defendants knew or should have known that their PFOA and PFOA-containing products posed a risk to the environment and the health of people living in communities where those products were used, like Hoosick Falls; (2) whether the warnings provided by the Manufacturers were adequate; (3) whether the Manufacturer Defendants failed to provide adequate instructions regarding technologies that could reduce or eliminate PFOA emissions for fabric coating operations; (4) whether the Manufacturer Defendants breached their continuing duty to warn of dangers associated with their PFOA-containing products that they discovered after manufacture and sale; and (5) whether the failure to provide adequate warnings was a proximate cause of class members' injuries.

Finally, class members will raise common questions against all Defendants, including (1) whether Defendants caused PFOA to enter, invade upon, intrude upon or injure the property rights of Plaintiffs and the classes; (2) whether the Defendants' contamination of the groundwater and Plaintiffs' properties with PFOA has caused Plaintiffs' property values to diminish; (3) whether

Defendants caused members of the PFOA Invasion Injury Class to be exposed in their homes to drinking water contaminated with PFOA; (4) whether Plaintiffs are at an increased risk of disease and harm as a result of the PFOA accumulation they have sustained in their bodies from drinking contaminated water; and (5) whether New York law entitles Plaintiffs to medical monitoring relief as a result of PFOA blood accumulation in excess of 1.86 ug/L.

As discussed in more detail below, the evidence presented in this case will produce answers to these common questions that will drive the resolution of the litigation.

**The Property Damage and Nuisance Damage Classes.** PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)

(Shin at 2; Siegel at 1-1.) There are no members of the property damage or nuisance classes whose properties were not contaminated because evidence of contamination is a requirement of the class definition. In other words, the fact of actual exposure is common and shared by the property classes and the legal issue of causation for the classwide exposure is also common and linked to Defendants' tortious conduct.

The Processor Defendants are directly responsible for these discharges. PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)

(Shin at 2-4.) PURSUANT TO PROTECTIVE ORDER (ECF NOS. 131 & 132)

(Cheremisinoff at 18-21.) What is more, whether the Manufacturer Defendants failed to warn the Processor Defendants to take due care, and for that reason the Processor Defendants allowed uncontrolled PFOA emissions to spew from McCaffrey Street for decades, is a question common to the class.

A class proceeding will generate a common answer with regard to whether Defendants are liable for contaminating the municipal water supply and private wells in the Contamination Zone via PFOA air emissions and improper wastewater discharges. This answer will be the same for every member of the property damage and nuisance classes. In short, the answers regarding Defendants' liability will drive resolution of this litigation.

Common questions with common answers will also drive resolution of the litigation with respect to damages. Diminution in value of class members' properties can be and is best determined on a classwide basis utilizing a standard economic approach to measuring the impact of environmental conditions on property values known as the hedonic method. (Zabel at 2.) This method measures the classwide impact of the contamination while controlling for other factors that affect price. (*Id.*) Plaintiffs' expert, Dr. Zabel, applied this method in the Petersburgh litigation to measure classwide diminution in value caused by PFOA contamination in that community. *See Burdick*, 110 N.Y.S.2d at *7; (*see also* Ex. S6.) The *Burdick* court ruled that Dr. Zabel's approach was reliable and should be presented to the trier of fact.

Dr. Zabel applied the hedonic method here. In 2016, following disclosure of community-wide PFOA contamination, the average home sale price in Hoosick Falls fell 24.15%. (Zabel at 9.) When comparing sales from the 2016-2019 period, the statistically significant difference between a control group and Hoosick Falls sales was 21.02%. (*Id.*) Even using a more conservative approach, and analyzing the eight years from 2012-2019, the statistically significant difference home sales in Hoosick Falls and a control group is 8.75%. (*Id.* at 8.) And this only makes common sense; one would expect that given the choice between purchasing a home in a small community with soil and water that is contaminated by a toxic chemical and is home to a state and federal Superfund site and purchasing in a community without these characteristics, a rational home buyer

would choose the latter. Dr. Zabel's evidence demonstrates that property classes can prove damages classwide.

Members of the Nuisance Damage class also share common issues with respect to damages. All class members were uniformly instructed not to drink or cook with water from their contaminated well and to procure bottled water instead. (*See* Ex. S3.) These individuals used an alternate drinking water source for weeks or months while they awaited installation of a POET, which was ultimately installed on the private well of every member of the class. Class members are now responsible for maintenance and upkeep these semi-permanent treatment systems. (Decl. of Michele Baker ¶ 6; Decl. of Charles Carr ¶ 6; Decl. of Angela Corbett ¶ 6.) Even if some Plaintiffs waited longer for a POET than others, or there is some variation in the interference with each Plaintiffs' use and enjoyment of his or her property, these small variations will not overcome commonality where Defendants' contamination of the groundwater contamination impacted the entire class. *See Rowe v. E.I. DuPont de Nemours & Co.*, 262 F.R.D. 451, 457 (D.N.J. 2009) (commonality satisfied in nuisance class alleging PFOA groundwater contamination).

Courts in the Second Circuit have made clear that in environmental contamination cases, questions of law or fact that relate to the defendant's negligent conduct will typically satisfy the commonality requirement. In *In re MTBE*, the court explained that "[c]ommon questions of law or fact almost always exist if the claims of the class arise from the same wrongful acts or underlying set of acts or circumstances." 241 F.R.D. at 197. In that case, plaintiffs sought to certify a property damage class of homeowners seeking loss of property value after the defendants contaminated those properties with MTBE and other gasoline constituents that escaped from nearby leaking underground storage tanks over time. *Id.* at 189. The court determined that commonality was met and listed specific common questions of law and fact arising from the defendants' wrongful acts,

including whether the defendants' release of MTBE into the environment was negligent and whether the release constituted an unreasonable interference with the plaintiffs' quiet use and enjoyment of their property. *Id.* at 198. Similarly, the property damage and nuisance classes here share common questions regarding Defendants' negligence for the release of PFOA into the environment and answers to those questions will drive resolution of the case.

The *Burdick* court, faced with factual circumstances similar to those presented here, found that the central questions in the case were common ones:

> In this case, the central factual basis for all Plaintiffs' claims is defendant's course of conduct and its knowledge of the potential hazards. All class members allegedly suffered a common injury— soil and water contamination emanating from Taconic's facility that interfered with their use and enjoyment of the property. The common contaminant is PFOA. The method of contamination is uniform. It is defendant's common course of conduct which caused injury to all of the proposed members of the property damage/nuisance classes.

*Burdick*, 110 N.Y.S.3d at *7; *see also Burdick*, 179 A.D.3d at 57 (citing *Dukes* and finding commonality satisfied where all class members were exposed by PFOA emitted from defendant's facility); *Sullivan*, 2019 WL 8272995, at *5 (explaining that answering the question whether Chemfab is responsible for PFOA contamination in North Bennington "may involve complex issues of chemistry, air modeling, and hydrogeology, but the answers are common to all property owners and residents within the contamination zone").[37] The *Burdick* court's description is equally applicable here; Plaintiffs suffered common injuries to their property, they present common proof

---

[37] Plaintiffs in *Sullivan* did not move to certify a property damage class seeking diminution in value, but instead sought to certify a class seeking damages associated with being forced to abandon contaminated private wells and hook up to public water. *Sullivan*, 2019 WL 8272995, at *5. The court certified the class for liability purposes, but required individual trials regarding damages because whether any owner was harmed by connecting to public water turned on individual factors like depth and expense of well water supply, cost of metered water and each class member's annual water usage. *Id.*

of exposure to a uniform contaminant that predominantly emanated from a single facility in Hoosick Falls. Although it was operated by more than one entity over time, this is a distinction without a difference. For decades, the Processor Defendants performed the same fabric coating operation in the same manner all the while allowing uncontrolled PFOA emissions to exhaust to the air. The fact that multiple entities acted negligently rather than just one does not defeat commonality. *See Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 385 (D. Colo. 1993).

The common issues of law or fact with regard to the Manufacturer Defendants' liability is an even easier case. There is ample evidence that the Manufacturer Defendants failed to warn users regarding the toxicities of fluorochemicals like PFOA. But whether they failed to warn will either be answered in the affirmative or negative; the answer will be the same for the class and will drive the resolution of the litigation. *See In re Scott EZ Seed Litig.*, 304 F.R.D. 397, 405 (S.D.N.Y. 2015) (explaining that commonality requires common answers "apt to drive the resolution of the litigation"). With all the common issues of law and fact presented in this case—liability, classwide exposure, causation, damages—it should not be difficult for the Court to conclude that commonality is satisfied for the property damage and nuisance classes.

**PFOA Invasion Injury Class.** The PFOA Invasion Injury Class satisfies the commonality requirement. By definition, all class members were exposed to PFOA-contaminated drinking water in their homes. Plaintiffs' evidence demonstrates that the Hoosick Falls Processors were the direct source of this contamination. PFOA also has, by definition, accumulated in every class member's blood serum in a quantity that exceeds background levels. Thus, members of the class have, by definition, all suffered the same injury—the toxic invasion and accumulation of PFOA, which was caused by Defendants' tortious conduct. Furthermore, the testimony of Drs. Savitz and Ducatman establishes that Plaintiffs and class members with exposure levels above background are at risk of

55

developing a number of PFOA-related health conditions. Common proof will therefore be presented to satisfy the elements of duty, breach, causation, and damages. In short, Plaintiffs will present evidence that "will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouphakeo*, ---U.S.---, 136 S. Ct. 1036, 1045 (2016).

These common issues raise common questions that will have common answers applicable to the entire class. For example, either PFOA exposure satisfies *Abusio*'s requirement that class members be exposed to a "disease-causing agent" or it does not; either class members exposed to PFOA with accumulation of PFOA in their blood are at an increased risk of harm due to this exposure or they are not; either individuals with PFOA blood accumulation above background levels are entitled to medical monitoring or they are not. The answers to these questions will be the same for all class members.

In addition, Plaintiffs' requested medical monitoring relief raises additional common questions of law or fact. Dr. Ducatman testifies that classwide medical monitoring is necessary for the exposed population of Hoosick Falls; this issue is common and will drive resolution of Plaintiffs' toxic invasion claims. *See Donovan*, 268 F.R.D. at 28-29 (explaining that class of twenty pack-year smokers shared common questions related to medical monitoring relief, including "the efficacy of [low-dose CT] testing, standard of care, and the cost of the monitoring program"); *In re Teletronics Pacing Sys.*, 172 F.R.D. 271, 280 (S.D. Ohio 1997). In its decision affirming the trial court's certification of the PFOA accumulation class in *Burdick*, the Appellate Division identified several common questions that are equally applicable here:

> (1) whether medical monitoring is an available remedy; (2) the extent of the health hazard presented by exposure to PFOA; and (3) whether the members of the class are at significant increased risk for disease based on the excess accumulation of PFOA in their bodies.

*Burdick*, 179 A.D.3d at 59. These common questions are also shared by the PFOA Invasion Injury

Class here. Commonality is satisfied.

### 3. The Typicality Requirement is Satisfied.

*Typicality*. "The typicality requirement, . . . is satisfied when each class member's claim

arises from the same course of events, and each class member will make similar arguments to

prove a defendant's liability." *Seekamp*, 2012 WL 860364, at *3. Typicality "requires that the

disputed issue of law or fact occupy essentially the same degree of centrality to the named

plaintiff's claim as to that of other members of the proposed class." *Bitzko v. Weltman, Weinberg*

*& Reis Co., LPA*, 2019 WL 4602329, at *17 (N.D.N.Y. Sept. 23, 2019) (quoting *Caridad v. Metro-*

*N. Commuter R.R.*, 191 F.3d 283, 293 (2d Cir. 1999)). As this Court has explained, the typicality

requirement "is not demanding." *Seekamp*, 2012 WL 860364, at *3.

The typicality requirement is easily met here. The claims of Plaintiffs and all class members

derive from the Processor Defendants' contamination of the municipal water supply and wells in

the Contamination Zone with PFOA, and from the Manufacturer Defendants' failure to warn of

the environmental dangers and health hazards associated with PFOA. Plaintiffs and the property

classes seek diminution in value for the contamination of their properties and drinking water

source. Plaintiffs and the nuisance class members seek damages relating to the annoyance and

inconvenience of having POETs installed in their homes, maintaining those POETs, and being

dependent on bottled water while awaiting installation of the POETs. Plaintiffs' claims are typical

of those raised by the class members; indeed, Plaintiffs and the property and nuisance class

members raised the same claims.

The fact that class members' properties are each unique, or that each property may have

experienced different levels of contamination, or that property owners may have suffered different

losses in overall value does not defeat the typicality analysis. Plaintiffs and class members are bringing the same claims seeking the same relief, which is all that the typicality requirement is concerned with. Differences in "damages arising from a disparity in injuries among the plaintiff class does not preclude typicality." *Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 87 (S.D.N.Y. 2001) (quoting *Duprey v. Conn. Dep't of Motor Vehicles*, 191 F.R.D. 329, 337 (D. Conn. 2000)); *see also Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 156 (S.D.N.Y.) (explaining that "typicality does not require identical facts, and also does not require that damages be identical among class members" (internal quotations and citations omitted)). Indeed, "[e]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." *In re NFL*, 821 F.3d at 428 (quoting *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 311 (3d Cir. 1998)).

Similarly, Plaintiffs representing the PFOA Invasion Injury Class are typical of class members and are pursuing the same claims. Plaintiffs and the class members allege that they have suffered injury to person and property resulting in the accumulation of PFOA in their blood above background levels. All consumed PFOA-contaminated water in a residence in either the Village of Hoosick Falls or the Contamination Zone. All are seeking medical monitoring relief. Again, Plaintiffs' claims are typical of those of the class they seek to represent.

Defendants may contend that Plaintiffs are not typical because they experienced more significant exposure or levels of PFOA accumulation, or because they have different medical histories that may make them more or less susceptible to a PFOA-related condition. Again, these purported differences do not alter the fact that Plaintiffs and class members are pursuing the same claim seeking the same relief. In his report, Dr. Ducatman explains that every class member with

PFOA blood accumulation in excess of background levels should requires the same medical monitoring relief, largely consisting of surveillance and testing. (Ducatman at 18-19.) Thus, it is immaterial, for purposes of the relief sought by Plaintiffs and the class members, whether a class members has a PFOA blood accumulation level of 1.86 ug/L, 18.6 ug/L, or 186 ug/L—all seek a similar medical monitoring protocol and access to the same protocols. As Dr. Ducatman explains, "Individual . . . medical histories are irrelevant to whether a medical monitoring program . . . is clinically necessary for exposed class members in a demonstrably contaminated geography." (*Id.* at 23.) In dispatching a similar argument, the *Sullivan* court observed,

> [i]t is undeniably true that every person's health profile, including his or her risk of developing cancer or high blood pressure during pregnancy or any of the other conditions associated with PFOA varies. But the *answer* for which Plaintiffs advocate does not vary from one Plaintiff to the next. Plaintiffs seek only testing and monitoring, which varies little between individuals.

*Sullivan*, 2019 WL 8272995, at *9. Because Plaintiffs bring the same claims seeking the same relief as PFOA Invasion Injury Class members, typicality is satisfied.

### 4.    The Adequacy Requirement is Satisfied.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." "Adequacy is twofold: the proposed class representatives must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of the other class members." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006). Here, the interests of the class members are aligned with those of the representative Plaintiffs. Plaintiffs and class members assert claims for present injury to person or property caused by widespread PFOA contamination in their community. Plaintiffs and class members suffered the same injuries. Further, Plaintiffs have engaged in discovery, produced documents, completed interrogatories, and sat for lengthy depositions. The Plaintiffs are adequate class representatives.

Rule 23(a)(4) also requires the Court to assess the adequacy of class counsel. The adequacy of class counsel depends on whether class counsel (1) has investigated the class claims, (2) is experienced in handling class actions and complex litigation, (3) is knowledgeable regarding the applicable law, and (4) will commit adequate resources to representing the class. Fed. R. Civ. P. 23(a)(4). Proposed class counsel have experience in class action litigation and are qualified and have the resources to prosecute this case. Indeed, they have done so since this action was filed in 2016 and will continue to do so as the litigation proceeds. (*See* Decl. of S. Schwarz; Decl. of J. Bilsborrow.)

### 5. The Proposed Classes Are Ascertainable.

The Second Circuit has recognized "an implied requirement of ascertainability in Rule 23, which demands that a class be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *In re Petrobas Securities*, 862 F.3d 250, 257 (2d Cir. 2017) (internal quotation and quotation marks omitted). This is a "modest threshold requirement [that] will only preclude certification if a proposed class definition is indeterminate in some fundamental way." *Id.* at 269. Here, the class is defined using objective criteria; class membership is based on property ownership or a leasehold with well-defined geographic areas, water tests demonstrating PFOA contamination, or blood tests demonstrating blood serum levels. These objective criteria allow class members to easily know whether they are in or out of the classes.

The Municipal Water Property Damage Class can be ascertained by cross referencing the addresses that were served by the municipal water supply in 2015 with final tax assessment roll,

which are either publicly available or accessible with an appropriate court order.[38] The Private Well Water Property Damage Class may be ascertained by cross referencing a spreadsheet produced by NYDEC containing all private well sampling results in the Town of Hoosick with the final tax assessment roll for 2015 (*See* Ducatman Ex. B). To ascertain the Nuisance Damage Class, the same NYDEC spreadsheet provides the addresses where POET systems were installed in the Contamination Zone. Finally, members of the PFOA Invasion Injury Class may be ascertained by requiring each class member to (i) demonstrate residence at a property that falls within the property damage class definitions, and (ii) produce proof of a blood serum test showing PFOA blood accumulation above background levels. Compiling this information is administratively feasible. The ascertainability requirement is satisfied.

### C.     The PFOA Invasion Injury Class Should Be Certified Under Rule 23(b)(2).

Plaintiffs move to certify the PFOA Invasion Injury Class pursuant to Rule 23(b)(2) so that they may seek implementation of a court-ordered medical monitoring program. Classwide injunctive relief may be obtained where "the party opposing the class has acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2). Certification of a class for injunctive relief is appropriate only where "a single injunction . . . would provide relief to each member of the class." *Dukes*, 564 U.S. at 360; *see also Amara v. CIGNA Corp.*, 775 F.3d 510, 519 (2d Cir. 2014) ("Certification of a class under Rule 23(b)(2) is appropriate where the remedy sought is 'an indivisible injunction' that applies to all class members 'at once.'" (quoting *Dukes*,

---

[38] *See e.g.* Village of Hoosick Falls Annual Drinking Water Quality Report for 2015, https://www.villageofhoosickfalls.com/Media/PDF/WaterQualityReport2015.pdf (last visited March 24, 2020); 2015 Final Assessment Roll for the Town of Hoosick at https://www.rensco.com/wp-content/uploads/2016/02/Hoosick-RPS150P1.pdf (last visited March 24, 2020).

564 U.S. at 362)). This "does not require that the relief to each member of the class be identical, only that it be beneficial." *Sykes*, 780 F.3d at 97.

As the Fifth Circuit has explained, "Actions for class-wide injunctive relief or declaratory relief are intended for (b)(2) certification precisely because they involve uniform group remedies." *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 414 (5th Cir. 1998). "Such relief may often be awarded without requiring a specific or time-consuming inquiry into the varying circumstances and merits of each class member's individual case." *Id.* The focus in Rule 23(b)(2) actions, as the *Allison* court rightly observes, is on the uniform nature of the remedy available to the class rather than on individual differences, real or perceived, that may exist among class members. "[T]he actual requirements of the Rule are meant to ensure there is a *group* harm that a *group* injunctive remedy will correct." *Donovan*, 268 F.R.D. at 12.

The Second Circuit has recognized that "[c]lass actions based on claims for individualized monetary relief—implicating the due process rights of absent class members, who need not be given notice and opt-out rights pursuant to Rule 23(b)(2)—are impermissible under this provision." *Amara*, 775 F.3d at 519. A (b)(2) class may be appropriate, however, "where an award of monetary relief . . . is incidental to a final injunctive or declarative remedy." *Id.* at 520; *see also Allison*, 151 F.3d at 415 (explaining that a (b)(2) class may be certified if monetary claims are incidental to the claims for injunctive relief). Accordingly, where plaintiffs seek certification under Rule 23(b)(2), the court must engage in an "ad hoc balancing" and ask whether "(1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits." *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 164 (2d Cir. 2001), *abrogated on other grounds*,

*Dukes*, 564 U.S. 338. The court may certify the injunctive relief class where class treatment would be efficient and manageable and so long as monetary claims are incidental to the form of relief sought. *Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218, 223 (2d Cir. 2012) (explaining that under *Dukes*, monetary relief must be "non-incidental" to the relief sought).

Courts often characterize requests for the implementation of a court-ordered medical monitoring program as injunctive relief. *See, e.g.*, *Giovanni v. United States Dep't of Navy*, 906 F.3d 94, 102 (3d Cir. 2018) (medical monitoring program "is best characterized as injunctive relief"); *Baker*, No. 1:16-cv-260-JEJ, slip op. at 21-22 (explaining that a program of future periodic medical examinations to promote early detection of latent disease seeks equitable relief) (Ex. S50); *Donovan*, 268 F.R.D. at 12-13; *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, No. CIV. A. 98-20626, 1999 WL 673066, at *6 (E.D. Pa. Aug. 26, 1999) (request for court-ordered creation of a medical monitoring program "is equitable in nature"); *Katz v. Warner-Lambert Co.*, 9 F. Supp. 2d 363, 364 (S.D.N.Y. 1998) ("A claim for a medical monitoring and research fund is injunctive in nature."); *Gibbs v. E.I. DuPont De Nemours & Co.*, 876 F. Supp. 475, 481 (W.D.N.Y. 1995) (a monitoring program that extended "beyond individual monitoring to data compilation and analysis and other pooling of resources which might aid in the early detection of the disease" was injunctive).

In *Sullivan*, the court construed the plaintiffs' request for medical monitoring as one for injunctive relief under (b)(2) and certified the class. It explained that "[a]irborne pollution is inherently general or 'class-wide.' It settles on everyone." *Sullivan*, 2019 WL 8272995, at *11. Chemfab's conduct in that case was generally applicable to the medical monitoring class because the class uniformly alleged negligent releases of PFOA over many years. *Id.* at *14. So too here. The PFOA Invasion Injury Class alleges that the Processor Defendants negligently discharged

PFOA both from their stacks and through improper wastewater disposal at the McCaffrey Street site. Through Dr. Shin and Siegel's analysis, it is clear that those discharges affected the entire class by contaminating the municipal wells as well as every private well in the Contamination Zone. Accordingly, the Processor Defendants have acted or refused to act in a manner that affects all class members. Similarly, the Manufacturer Defendants' failure to warn of the toxicities associated with PFOA and PFOA-containing products uniformly harmed the proposed class, allowing users to pollute communities like Hoosick Falls without taking the precautions necessary to protect the public.

The remedy sought here is also a group one. It applies equally to all class members, regardless of individual differences in medical histories or quantity of exposure. As Dr. Ducatman explains, the medical monitoring program should include "periodic serial clinical laboratory testing of biomarkers pertinent to PFOA exposure." (Ducatman at 16.) These tests relate "to PFOA serum concentrations, as well as early detection of specific cancers to the degree feasible, liver function, uric acid status, and disease such as ulcerative colitis, kidney function, endocrine function, lipid status, and participant concerns about pregnancy and transfer of toxins to infants and young children in utero or by breast feeding." (*Id.*) The program would consist of medical screening procedures as well as medical surveillance and data gathering, (*Id.* at 19-21.) Dr. Ducatman explains that implementing and providing the medical monitoring program to the entire exposed community "is far superior in multiple ways" to monitoring individuals outside the scope of a uniform program. (*Id.* at 19.) In addition, Edgar Gentile, who administers settlements involving medical testing and in some cases serves as a Third Party Administrator for court-ordered medical monitoring programs, explains that it is especially advantageous from an administrative and cost perspective to administer a group monitoring program because it allows

for "economies of scale, uniformity of testing results and optimum availability of testing facilities." (Report of E. Gentile ("Gentile").) In other words, Plaintiffs seek a group remedy to vindicate a group harm—precisely the form of relief envisioned by Rule 23(b)(2). *See Donovan*, 268 F.R.D. at 12 (explaining that the Rule is "meant to ensure there is a *group* harm that a *group* injunctive remedy will correct" (emphasis in original)). The court should accordingly certify the PFOA Invasion Injury Class under Rule 23(b)(2).

### D.      The Classes Should Be Certified Under Rule 23(b)(3).

Rule 23(b)(3) permits a class to seek monetary relief where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Each of the proposed classes satisfies both the predominance and superiority requirement.

***Predominance.*** "[P]redominance is a comparative standard; 'Rule 23(b)(3) [] does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof. What the rule does require is that common questions *predominate* over any questions affecting only individual [class] members." *In re Petrobas Sec.*, 862 F.3d at 268 (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 469 (2013)) (emphasis in original). As the Second Circuit has explained, "[p]redominance is satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *Roach*, 778 F.3d at 405 (quoting *Catholic Healthcare W. v. U.S. Foodservice Inc. (In re U.S. Foodservice Inc. Pricing Litig.)*, 729 F.3d 108, 118 (2d Cir.

2013)). "[A]n issue is common to the class when it is susceptible to generalized, class-wide proof." *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006).

**The Property Damage and Nuisance Classes.** This case involves a single contaminant (PFOA) that was predominantly emitted from a single source (McCaffrey Street) that contaminated the drinking water and a set of clearly demarcated properties within a defined geographic area (the Village and Contamination Zone). Every home on municipal water received contaminated water into their home; because of the NYDEC's widespread well testing, every contaminated private well in the Contamination Zone is also known (as are the private well properties where POETs were installed). This is not a class where exposure is uncertain or must be proven by resorting to probabilities or conjecture; every contaminated property is known, clearly defined, and shares a common, predominant source of contamination—the McCaffrey Street facility. The property damage and nuisance classes are remarkably cohesive, tightly defined, and will commonly prove the central, predominant issues that will be dispositive in the case.

As discussed above, Defendants' liability will be subject to classwide proof that will drive resolution of Plaintiffs' claims. For decades, the Processor Defendants performed the same fabric coating operation at the same facility and allowed uncontrolled PFOA exhaust to exit the stacks and settle across the Hoosick Falls community. Classwide proof will focus on appropriate pollution controls, or lack thereof, the fate and transport of PFOA to the environment, and the appropriate precautions, if any, taken to prevent this widespread contamination. Common proof will likewise focus on the knowledge that the Manufacturer Defendants had but did not share and the warnings they could have but did not provide. Resolution of these central liability issues, which are by far the most important issues in the case, will be achieved by generalized proof, thus achieving important efficiencies in moving this litigation forward. *See Roach*, 778 F.3d at 405 (explaining

that predominance is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof" (internal quotation omitted)).

Again, the *Burdick* decision is instructive. There, in a case involving the same manufacturing operation, same chemical, same manner of pollution, and substantially similar facts relating to exposure, the court ruled that common issues predominate, explaining, "[T]he central factual basis for all of Plaintiffs' claims is defendant's course of conduct and its knowledge of the potential hazards." 110 N.Y.S.2d at *7. The court noted that all class members suffered "a common injury—soil and water contamination emanating from Taconic's facility." *Id.* The same is true here. "The common contaminant is PFOA. The method of contamination is uniform." *Id.* The Hoosick Falls classes present similar commonalities. In short, "[i]t is the defendant's common course of conduct which caused injury to all of the proposed members of the property damage/nuisance classes." *Id.* So it is here. *Burdick*'s reasoning is consistent with the rulings of other courts certifying property damage and nuisance classes under Rule 23(b)(3).[39] *See, e.g.*, *Turner v. Murphy Oil USA*, 234 F.R.D. 597, 606 (E.D. La. 2006) (predominance was satisfied in case alleging property damage caused by oil spill where the the defendant's liability for how the spill occurred and whether it could have been prevented would be central to the class claims); *Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 171, 181 (S.D. Ohio 2004) (stating that the key to certifying an environmental tort class "is the alleged conduct engaged in by Defendants").

---

[39] In another property damage case applying New York common law, the Appellate Division affirmed a motion certifying a class of individuals whose properties were contaminated and lost value as a result of the Tonawanda Coke facility's discharge of chemicals into the surrounding environment. *DeLuca v. Tonawanda Coke Corp.*, 134 A.D.3d 1534, 1535 (4th Dep't 2015). *DeLuca* found that the plaintiffs "established that there are common questions of law or fact whether defendants negligently discharged chemicals into the atmosphere and whether such negligent conduct caused decreases in property values or quality of life in the affected area."

Moreover, Plaintiffs have put forth a methodology by which the diminution in value of properties in both the Municipal Water and Private Well Water property damage classes may be measured on a classwide basis. *See Sykes*, 780 F.3d at 82 (explaining that at class certification, plaintiffs must be able to show that common evidence will establish all class members suffered some injury and a way to measure that injury, though they need not demonstrate the precise amount of the injuries suffered). As discussed above, Plaintiffs' property damage expert, Dr. Jeffrey Zabel, has applied the hedonic property value method here. It is a standard, generally accepted methodology for determining diminution in property value in communities impacted by toxic pollution. (Zabel at 2.) The use of such models to establish classwide damages is widely accepted so long as the model "actually measures damages that result from the class's asserted theory of injury.'"[40] *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017) (quoting *Roach*, 778 F.3d at 407).

Decisions denying certification of property damage classes are based on facts readily distinguishable from those before this Court. In *Gates v. Rohm & Haas Co.*, the Third Circuit affirmed denial of a proposed property damage class seeking damages due to contamination caused by the chemical vinyl chloride. 655 F.3d 255 (3d Cir. 2011). *Gates* held that certification of the property classes was inappropriate because the plaintiffs had presented no evidence to show that all the properties in the class were actually exposed to the toxin, and it was not detected in several of the residential wells in the class area. *Id.* at 258-59. In other words, proof of exposure would require individualized determinations rather than common proof. All of the properties here, in

---

[40] Similarly, the fact that there may be some variation in nuisance damages that will require individualized proof (*e.g.*, length of time each class member was reliant on bottled water, date of each class member's POET installation), but these are damages that can easily be dealt with through a claims process. *See Sykes*, 780 F.3d at 81 (explaining that individualized damages do not defeat predominance unless they "outweigh common issues").

contrast, were exposed and contaminated with PFOA as a matter of class definition. Every home on municipal water was exposed when PFOA contaminated the municipal water supply. Every property in the Private Well Water class was contaminated, as confirmed by a water test administered by NYDEC. The problems identified in *Gates* are simply not present here.

*Parko v. Shell Oil Co.*, a case in which the plaintiffs claimed defendant's refinery leaked benzene and other contaminants into the groundwater under their homes, is also factually inapposite. 739 F.3d 1083 (7th Cir. 2014). Again, the plaintiffs presented no evidence at class certification that any of the plaintiffs' properties were actually contaminated or that any contaminant was actually found on any class member's property, and the plaintiffs did not even obtain their drinking water from the contaminated underground aquifer but rather some other, uncontaminated source. *Id.* at 1087. Like the *Gates* plaintiffs, the *Parko* plaintiffs failed to show proof of classwide exposure, a fact in sharp contrast to the classwide proof offered by Plaintiffs here.

**PFOA Invasion Injury Class.** The Court should also certify the PFOA Invasion Injury Class under Rule 23(b)(3). At this stage of the proceedings, the Court may certify this class under both Rule 23(b)(2) and (b)(3). *See, e.g.*, *Donovan*, 268 F.R.D. at 25 (certifying medical monitoring class under (b)(2) and (b)(3) and explaining that "[a] cause of action in tort does not preclude an injunctive remedy"). The PFOA Invasion Injury Class is a personal injury class seeking medical monitoring relief due to the toxic invasion and accumulation of PFOA in class members' blood— a present injury under New York law. *See Baker*, 232 F. Supp. 3d at 252. Courts have certified personal injury classes seeking medical monitoring relief under Rule 23(b)(3). *See, e.g.*, *In re NFL*, 821 F.3d 410 (establishing program of neurological testing); *In re Oil Spill by the Oil Rig Deepwater Horizon*, 295 F.R.D. at 120-23 (establishing periodic consultation program allowing

class members to see a physician every three years); *Meyer ex rel. Coplin v. Fluor*, 220 S.W.3d 712 (Mo. 2007) (certifying medical monitoring class of children exposed to smelter toxins). As recognized by the West Virginia Supreme Court, the trial court "should have discretion to fashion a remedy in medical monitoring cases." *Bower v. Westinghouse Elec. Corp.*, 522 S.E.2d 424, 434 (W. Va. 1999).

A common nucleus of fact and law predominate among the PFOA Invasion Injury Class. Indeed, this proposed personal injury class is unique in that most, if not all, of the pertinent core issues are susceptible to classwide proof. The proposed class is similar to certified classes seeking medical monitoring relief for PFOA blood accumulation in the nearby communities of Petersburgh and North Bennington.[41] *Burdick*, 179 A.D. at 59-60; *Sullivan*, 2019 WL 8272995 at *13-15. In both of these cases, courts found that classwide proof of PFOA exposure was a predominant issue that cohesively bound the classes, outweighing individual issues. *See Burdick*, 179 A.D.3d at 60 (finding that common issues were predominant and explaining "this is not a case where there is an issue of fact regarding exposure—rather, each class member must establish exposure and accumulation through blood work"); *Sullivan*, No. 5:16-cv-125 at 27 (observing that "the exposure class includes only people who have PFOA tests above background levels. In a very concrete sense, the members of the proposed class are similarly situated by virtue of their lab results"). So too here. Each member of the PFOA Invasion Injury Class must have been exposed to

---

[41] In *Burdick*, the court certified a class comprised of individuals who consumed PFOA-contaminated water from the Petersburgh municipal water supply or a source within a defined area contaminated by Taconic and who obtained a blood serum test demonstrating a PFOA blood level above 1.86 ug/L. *See Burdick*, 60 Misc.3d 1212(A), at *14. In *Sullivan*, the court certified a class of individuals who resided in a defined area contaminated by Saint-Gobain's predecessor, who consumed PFOA-contaminated water in that defined area and who obtained a blood serum test demonstrating PFOA blood accumulation above recognized background levels. *See Sullivan*, No. 5:16-cv-125, at 5 n.1.

contaminated water in the class zone and has proof of that exposure in the form of a blood test. The class definition therefore requires that exposure be established class wide and there is no member of the class who was not exposed to PFOA as a result of Defendants' tortious conduct.

Classwide proof of exposure distinguishes the PFOA Invasion Injury Class from proposed medical monitoring classes for which certification has been denied. For example, in *Rowe v. E.I. DuPont de Nemours & Co.*, No. 06-1810 (RMB), 06-3080 (RMB), 2008 WL 5412912 (D.N.J. Dec. 23, 2008), the plaintiffs sued DuPont for discharging PFOA into the local drinking water source and sought medical monitoring under New Jersey law. *Rowe* denied class certification because the plaintiffs presented no evidence that any class member actually was exposed to PFOA. Instead, the plaintiffs submitted a "risk assessment," which was a method that purported to determine "what level of chemical in the community's water presents an unreasonable risk of harm to all members of the community." *Id.* at *13. To perform the analysis, the plaintiffs' expert gathered population data about the community, generated average values from this data, and used these averages to calculate average community exposures. *See id. Rowe* described the "risk assessment" method as "nothing more than an assumption of common exposure," and found the evidence insufficient to show that any class member was actually exposed to PFOA. *Id.*

The *Rowe* decision is useful, however, because the court contrasted the plaintiffs' risk assessment evidence with evidence of actual exposure that would have been useful in proving their case. Namely, and of particular importance here, the *Rowe* court observed that the plaintiffs may have achieved class certification by "***conduct[ing] blood serum tests of the proposed class members*** to determine whether they indeed have elevated levels of PFOA above the general population, which is useful in determining historical exposure." *Id.* at *14 (emphasis added). In

other words, the *Rowe* court was looking for precisely the evidence that is required to prove membership in the PFOA Invasion Injury Class.

Classwide proof of exposure was also absent in *Gates v. Rohm & Haas Co.*, discussed above. 655 F.3d 255. In *Gates*, the plaintiffs sought monitoring for four decades of exposure to airborne vinyl chloride. *Id.* at 258. Again, the plaintiffs presented no evidence of actual individual exposures, instead relying on modeling that reflected the average exposure of an average community resident over time. *Id.* at 265. The court explained, "Plaintiffs cannot substitute evidence of exposure of actual class members with evidence of hypothetical composite persons in order to gain class certification." *Id.* at 266. Here, in contrast, Plaintiffs and all members of the class will submit evidence of their actual exposure in the form of PFOA blood serum tests. Classwide proof of actual, substantial PFOA exposure is a predominant issue that binds the class closely together.

The PFOA Invasion Injury Class is thus far more cohesive than the typical class seeking medical monitoring relief. Not only will the class rely on the same common liability issues set forth above, but the class also shares other predominant issues subject to generalized proof that overwhelm any individual differences among class members. Causation of legal injury is another predominant issue shared by the class. All class members must have consumed contaminated water either from the municipal supply or a private well in the Contamination Zone; Defendants' liability for contaminating this water (and thus exposing each member of the class) is subject to classwide proof. Each class member who consumed contaminated water from one of these sources, and can demonstrate sufficient PFOA blood accumulation, has experienced a present legal injury for which medical monitoring relief is recoverable. *Baker*, 232 F. Supp. 3d at 252. By meeting the requirements of the class definition, each class member has established a legal injury caused by

Defendants. Accordingly, the elements of duty, breach, and causation are subject to classwide proof.

Finally, class members' entitlement to medical monitoring relief is also subject to classwide proof. Under *Abusio*, such relief is available when the plaintiff has shown "that he or she was in fact exposed to [a] disease-causing agent and that there is a 'rational basis for his or her fear of contracting the disease." *Abusio*, 238 A.D.2d at 454. The class definition requires class members to submit proof of exposure to the disease-causing agent, PFOA, through drinking water. Furthermore, Plaintiffs' evidence demonstrates that this disease-causing agent poses significant risks of specific serious diseases. (Savitz at 8-18.) The class definition and proffered evidence thus easily meet the requirements of *Abusio*—elements that will be proven on a classwide basis.

Finally, the fact that Plaintiffs and class members may have different medical histories does not defeat predominance. Indeed, as Dr. Ducatman explains,

> That people have varying medical histories, including medical co-morbidities, is well understood by experts and by the general public. These unique individual characteristics include but are not limited to our individually inherited genetics, personal health habits, and varying historical environmental experiences. Our individual uniqueness means that we are aware of excess risks to the exposed population, but generally are unable to predict in advance who in the population with demonstrable excess risk will get which disease known or suspected to be associated with exposure, or when. In addition, we cannot predict the severity of health effects for any particular individual. There are no known medical comorbidities that mitigate the risks from PFOA exposure (i.e. no trait or pre-existing condition has been identified that reliably protects an individual against the adverse health effects of PFOA). . . . This necessitates monitoring all of the exposed population . . . . In the Class Area, based on blood testing data from NYSDOH more than 2,000 individuals have tested above PFOA background, clearly demonstrating that the class requires attention. ***Individual medical records and histories are irrelevant to whether a medical monitoring program . . . is clinically necessary for exposed class members in a demonstrably contaminated geography***.

(Ducatman at 22-23 (emphasis added).) All members of the PFOA Invasion Injury Class warrant monitoring because they are part of the "demonstrably contaminated geography" and are at significant increased risk to develop a PFOA-related health condition. Individual medical histories do not change this fact and do not present a justification to exclude any of the exposed—and legally injured—population from the medical monitoring protocol.

   *Superiority.* Rule 23(b)(3) requires that a class action proceeding "is superior to other available means for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Second Circuit has explained that the superiority analysis "is explicitly comparative in nature," *In re Petrobas*, 862 F.3d at 268, and directs the court to compare the efficiencies of the class action device to "other available methods of *adjudication*." *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 415 (emphasis in original); *see also In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 752 (7th Cir. 2011) (holding that it was improper for district court to compare class action litigation to a refund program and stating that Rule 23 does not use "the word 'adjudication' loosely to mean all ways to redress injuries"). "[C]lass actions are superior to individual trials 'when the main objectives of Rule 23 are served,' including 'the efficient resolution of the claims or liabilities of many individuals in a single action, as well as the elimination of repetitious litigation and possibly inconsistent adjudications.'" *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 (JG)(VVP), 2014 WL 7882100, at *64 (E.D.N.Y. Oct. 15, 2014) (quoting *D'Alauro v. GC Servs. Ltd. P'ship*, 168 F.R.D. 451, 458 (E.D.N.Y. 1996)).

   Rule 23(b)(3) lists four factors the court should consider in making the superiority determination: class members' interests in individually controlling the litigation, prior actions involving the parties, the desirability of the forum, and difficulties in managing the case. *Sykes*, 780 F.3d at 82. Where each class member's potential recovery would not be sufficient to

incentivize an individual action, a class action is superior to individual suits. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (explaining that the "policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights" (internal quotation omitted)). Further, although the court must analyze manageability concerns, the Second Circuit has offered "the admonition that failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." *In re Petrobas*, 862 F.3d at 268 (internal quotation and quotation marks omitted)). "[M]anageability is an issue peculiarly within a district court's discretion." *Seijas v. Rep. of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010).

A class action is clearly superior to other means of adjudication in this case. Class members' claims—for diminution in property value, nuisance, and medical monitoring relief—while not insignificant are unlikely to incentivize individual suits. This matter, like all complex environmental tort lawsuits, has been expensive. Few plaintiffs would incur the expense necessary to pursue individual claims absent aggregation.[42] Further, while a plaintiff in an individual suit could seek consequential medical monitoring damages, Dr. Ducatman explains why a class remedy is superior: objective criteria (from the Agency for Toxic Substances and Disease Registry (ATSDR), for example) anticipate group, rather than individual monitoring protocols; group

---

[42] Although it is true that there are a number of individual suits filed and coordinated under a common docket number in *In re Hoosick Falls PFOA Cases*, No. 1:19-mc-18 (LEK/DJS), this fact does not alter the superiority analysis. Counsel for all parties, including individual plaintiffs, have preferred to allow the *Baker* Plaintiffs to take the lead in all discovery matters and have benefitted from the efficiencies of allowing the class case to serve discovery requests, review and code important documents, identify and depose key fact witnesses, etc. Moreover, most of the individual suits filed seek claims related to the manifestation of a PFOA-related disease of health ailment. The PFOA Invasion Injury Class does not seek relief for the development of such ailments.

programs are more feasible, more efficient; apply testing protocols more consistently; and ensure better access to relevant clinicians.[43] (Ducatman at 19.)

The instant suit also will not pose overly difficult management problems. All Plaintiffs' claims will be decided under New York law and will present no difficult choice of law analyses. The proposed classes do not include subclasses or the potential for numerous mini-trials. Instead, trial will primarily focus on Defendants' liability for contaminating the Town and Village of Hoosick Falls. Plaintiffs' case will feature common evidence, applicable to multiple classes and inquiries into whether Defendants met their duties of care. Because there are so many dispositive, common issues shared by the classes that will be litigated in a single proceeding, the manageability inquiry favors class adjudication. *See Scotts EZ Seed Litig.*, 304 F.R.D. at 415 (explaining that once the court concludes that common issues predominate, any remaining individual issues are unlikely to prove unmanageable). Here, a class action is superior to other means of adjudication.

### E. The Court Should Certify the Issue of Defendants' Liability Under Rule 23(c)(4).

In the event the Court concludes that it cannot certify one or more of the proposed classes under Rule 23(b)(3), Plaintiffs move for certification of particular common issues under Rule 23(c)(4). That provision of Rule 23 states, "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). The Second

---

[43] This case is unlike the proposed class rejected in *In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389 (S.D.N.Y. 2008). There, the court found that a medical monitoring class seeking dental monitoring was not superior to individual suits because the proposed monitoring was experimental, the monitoring procedures had not been recommended by the FDA or any other medical association, and many plaintiffs had manifested other injuries, suggesting most plaintiffs would not limit their claims to dental monitoring. *Id.* at 402-03. Here, although all PFOA Invasion Injury Class members have suffered PFOA blood accumulation, none have developed an actionable PFOA-related ailment warranting an individual suit. Further, the program proposed by Dr. Ducatman is not experimental; indeed, his proposals have been deemed reliable by the courts overseeing PFOA lawsuits in Petersburgh and North Bennington. (*See* Exs. S5; S6.)

Circuit has explained that a court may "employ Rule 23(c)(4) to certify a class on a particular issue event if the action as a whole does not satisfy Rule 23(b)(3)'s predominance requirement." *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006). An issue class may be particularly appropriate where common issues predominate with respect to the defendants' liability. *See id.* at 226 (explaining that a court "may properly employ this technique to separate the issue of liability from damages").

Should the Court determine that any of the four classes cannot be certified because common issues do not predominate over individual issues, Plaintiffs respectfully move to certify an issue class on liability against the Processor Defendants and an issue class on liability against the Manufacturer Defendants. As has been discussed throughout this memorandum, Plaintiffs will prove the Processor Defendants' liability through generalized, classwide proof. The evidence necessary to determine whether the Processor Defendants negligently and/or improperly emitted PFOA from the McCaffrey Street facility, discharged wastewater into the ground around the McCaffrey Street facility, and should have taken measures to avoid polluting Hoosick Falls with PFOA is common and raises questions that need only be answered once. *See Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 414 (6th Cir. 2018) (explaining issues that "need only be answered once because the answers apply in the same way" to each class member are subject to classwide proof). Similarly, Plaintiffs' claim that the Manufacturer Defendants failed to warn is also subject to generalized proof that will provide an answer for each class member's failure to warn claim. Under these circumstances, an issue class on liability is appropriate if the Court does not certify one or more of the proposed classes pursuant to Rule 23(b)(3).

In the alternative, and if the Court determines certifying issue classes on liability is not warranted, Plaintiffs move the Court to certify the following issues against Defendant Honeywell:

(1) whether Honeywell negligently and/or improperly emitted PFOA from the facilities it operated in Hoosick Falls; (2) whether Honeywell negligently and/or improperly discharged PFOA to the groundwater beneath the facilities it operated in Hoosick Falls; (3) whether Honeywell handled and disposed of PFOA waste properly; and (4) whether Honeywell utilized appropriate pollution controls at the facilities it operated in Hoosick Falls. Plaintiffs move to certify the following issues against Defendant Saint-Gobain: (1) whether Saint-Gobain negligently and/or improperly emitted PFOA from the facilities it operated in Hoosick Falls; (2) whether Saint-Gobain negligently and/or improperly discharged PFOA to the groundwater beneath the facilities it operated in Hoosick Falls; (3) whether Saint-Gobain handled and disposed of PFOA waste properly; (4) whether Saint-Gobain utilized appropriate pollution controls at the facilities it operated in Hoosick Falls; and (5) whether Saint-Gobain was negligent, grossly negligent, reckless and/or acted in a willful or wanton manner by failing at any time between 1999 and 2015 to test for PFOA in the groundwater or soil in Hoosick Falls, or urge any such testing be performed, or for failing to test stack or fence line emissions for PFOA from 1999 to 2003.

In addition, and in the event the Court determines certifying issue classes on liability is not warranted, Plaintiffs move to certify the following issue classes against 3M: (1) whether 3M knew or should have known that PFOA and PFOA-containing products posed a risk to the environment and the health of people living where those products were used, such as the community of Hoosick Falls; (2) whether 3M failed to adequately warn of the health and environmental hazards potentially caused by its products containing PFOA; and (3) whether 3M breached its continuing duty to warn of dangers posed by its products discovered after manufacture and sale. Plaintiffs also move to certify the following issues against DuPont: (1) whether DuPont knew or should have known that PFOA and PFOA-containing products posed a risk to the environment and the health

of people living where those products were used, such as the community of Hoosick Falls; (2) whether DuPont failed to adequately warn of the health and environmental hazards potentially caused by its products containing PFOA; (3) whether DuPont breached its continuing duty to warn of dangers posed by its products discovered after manufacture and sale; and (4) whether DuPont failed to provide adequate instruction regarding technology that could reduce or eliminate the PFOA emissions for PTFE coating manufacturing facilities.

Certification of such discrete issues is appropriate under Rule 23(c)(4). *See Martin*, 896 F.3d at 410 (certifying seven discrete factual issues in groundwater contamination case).

## CONCLUSION

For the reasons set forth herein, Plaintiffs respectfully move for certification of the proposed classes.

Dated:  April 6, 2020
New York, New York

/s/ James J. Bilsborrow
James J. Bilsborrow (Bar Roll #519903)
Robin L. Greenwald (admitted *pro hac vice*)
Weitz & Luxenberg, P.C.
700 Broadway
New York, New York 10003
jbilsborrow@weitzlux.com
rgreenwald@weitzlux.com

Stephen G. Schwarz (Bar Roll #103484)
Hadley L. Matarazzo (Bar Roll #437785)
Faraci Lange, LLP
28 E. Main St., Suite 1100
Rochester, New York 14614
sschwarz@faraci.com
hmatarazzo@faraci.com

*Plaintiffs' Co-Lead Interim Class Counsel*

John K. Powers (Bar Roll #102384)
Powers & Santola, LLP
100 Great Oaks Boulevard

Albany, New York 12203
*jpowers@powers-santola.com*

*Plaintiffs' Liaison Counsel*