# EXHIBIT S87 TO DECLARATION OF STEPHEN G. SCHWARZ IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION



PLAINTIFF'S
EXHIBIT
11
11-6-18

ASSET PURCHASE AGREEMENT

by and among

FURON COMPANY, as Purchaser,

ALLIEDSIGNAL LAMINATE SYSTEMS, INC., as Seller, and

ALLIEDSIGNAL INC., as Parent

dated as of November 9, 1995

TABLE OF CONTENTS

Page

ARTICLE 1.   PURCHASE AND SALE . . . . . . . . . . . . .   1
     1.1     Purchase and Sale . . . . . . . . . . . .   1
     1.2     Non-Assignable Assets . . . . . . . . . .   3
     1.3     Excluded Assets . . . . . . . . . . . . .   3
     1.4     Transfer of Title to the Assets . . . . .   4
     1.5     Lease Agreement . . . . . . . . . . . . .   5

ARTICLE 2.   PURCHASE PRICE . . . . . . . . . . . . . .   5
     2.1     Purchase Price . . . . . . . . . . . . .   5
     2.2     Post-Closing Adjustment . . . . . . . . .   5
     2.3     Payments . . . . . . . . . . . . . . . .   7
     2.4     Allocation of Purchase Price . . . . . .   7

ARTICLE 3.   ASSUMPTION OF LIABILITIES AND OBLIGATIONS . . . .   8
     3.1     Assumed Liabilities . . . . . . . . . . .   8
     3.2     Excluded Liabilities . . . . . . . . . .   9

ARTICLE 4.   REPRESENTATIONS AND WARRANTIES OF SELLER . . . .   10
     4.1     Corporate Status . . . . . . . . . . . .   10
     4.2     Authorization . . . . . . . . . . . . . .   10
     4.3     Compliance . . . . . . . . . . . . . . .   11
     4.4     Financial Statements; Changes . . . . . .   11
     4.5     Condition of Property; Sufficiency of Assets . .   12
     4.6     Intellectual Property . . . . . . . . . .   12
     4.7     Contracts . . . . . . . . . . . . . . . .   13
     4.8     Title to Assets . . . . . . . . . . . . .   14
     4.9     Litigation . . . . . . . . . . . . . . .   14
     4.10    Environmental Matters . . . . . . . . . .   14
     4.11    Employee Benefit Plans and Policies . . . . .   15
     4.12    Employees . . . . . . . . . . . . . . . .   15
     4.13    Undisclosed Liabilities . . . . . . . . .   16
     4.14    Compliance with Law . . . . . . . . . . .   16
     4.15    Consents . . . . . . . . . . . . . . . .   16
     4.16    Taxes . . . . . . . . . . . . . . . . . .   16
     4.17    Permits and Licenses . . . . . . . . . .   17
     4.18    Real Property . . . . . . . . . . . . . .   17
     4.19    No Brokers or Finders . . . . . . . . . .   18
     4.20    Product Warranty . . . . . . . . . . . .   18
     4.21    Intercompany Payables . . . . . . . . . .   18
     4.22    Construction of Certain Provisions . . . .   18
     4.23    No Additional Representations . . . . . .   19

ARTICLE 5.   REPRESENTATIONS AND WARRANTIES OF PURCHASER . . .   19
     5.1     Corporate Status . . . . . . . . . . . .   19
     5.2     Authorization . . . . . . . . . . . . . .   19
     5.3     Compliance . . . . . . . . . . . . . . .   19
     5.4     Financing . . . . . . . . . . . . . . . .   20
     5.5     No Brokers or Finders . . . . . . . . . .   20
     5.6     Consents . . . . . . . . . . . . . . . .   20

HONDECHOOSICK-0000199
HON-DONAVAN0000208

                                                                    Page

ARTICLE 6.    COVENANTS . . . . . . . . . . . . . . . . . .    20
      6.1     Employment  . . . . . . . . . . . . . . . . .    20
      6.2     Non-Solicitation  . . . . . . . . . . . . . .    21
      6.3     COBRA Coverage  . . . . . . . . . . . . . . .    22
      6.4     WARN Act  . . . . . . . . . . . . . . . . . .    22
      6.5     Welfare and Pension Benefit Plans . . . . . .    22
      6.6     Title Insurance . . . . . . . . . . . . . . .    22
      6.7     Seller's Covenant Not to Compete  . . . . . .    23
      6.8     Tax Returns; Taxes  . . . . . . . . . . . . .    24
      6.9     Preservation of Confidentiality . . . . . . .    25
      6.10    Removal of Underground Storage Tanks  . . . .    26
      6.11    Removal of Certain Assets . . . . . . . . . .    26
      6.12    Environmental Reports . . . . . . . . . . . .    26
      6.13    Intercompany Receivables and Payables . . . .    27
      6.14    Health and Safety Operational Issues  . . . .    27

ARTICLE 7.    TOLL AGREEMENT . . . . . . . . . . . . . . . .   28

ARTICLE 8.    PRE-CLOSING COVENANTS  . . . . . . . . . . . .   28
      8.1     Conduct of Business . . . . . . . . . . . . .   28
      8.2     Access to Records and Properties  . . . . . .   29
      8.3     Consents  . . . . . . . . . . . . . . . . . .   29
      8.4     Public Announcements  . . . . . . . . . . . .   30

ARTICLE 9.    CLOSING . . . . . . . . . . . . . . . . . . .    30
      9.1     Closing Date and Place  . . . . . . . . . . .   30

ARTICLE 10.   CONDITIONS TO CLOSING  . . . . . . . . . . . .   30
      10.1    Conditions to the Obligations of Purchaser  .   30
      10.2    Conditions to the Obligations of Seller . . .   31

ARTICLE 11.   TERMINATION AND SURVIVAL . . . . . . . . . . .   32
      11.1    Termination . . . . . . . . . . . . . . . . .   32
      11.2    Effect of Termination . . . . . . . . . . . .   32

ARTICLE 12.   CLOSING DOCUMENTS  . . . . . . . . . . . . . .   32
      12.1    Documents to be Delivered by Seller . . . . .   32
      12.2    Documents to be Delivered by Purchaser  . . .   33

ARTICLE 13.   POST CLOSING OBLIGATIONS . . . . . . . . . . .   34
      13.1    Further Assurances  . . . . . . . . . . . . .   34
      13.2    Access to Books and Records . . . . . . . . .   34
      13.3    Cooperation in Litigation . . . . . . . . . .   35
      13.4    Proprietary Information  . . . . . . . . . . .  35

ARTICLE 14.   INDEMNIFICATION  . . . . . . . . . . . . . . .   35
      14.1    Indemnification by Seller and Parent  . . . .   35
      14.1.1  Limitation on Environmental Indemnification .   36
      14.2    Indemnification by Purchaser  . . . . . . . .   37
      14.2.1  Limitation on Environmental Indemnification .   38
      14.3    Indemnification Procedure . . . . . . . . . .   38

HONDECHOOSICK-0000200
HON-DONAVAN0000209

                                                                    Page

        14.4    Limitation on Certain Claims . . . . . . . . .   41
        14.5    Term . . . . . . . . . . . . . . . . . . . . .   41

ARTICLE 15.     MISCELLANEOUS  . . . . . . . . . . . . . . . .   41
        15.1    Expenses . . . . . . . . . . . . . . . . . . .   41
        15.2    Notices  . . . . . . . . . . . . . . . . . . .   42
        15.3    Confidentiality  . . . . . . . . . . . . . . .   42
        15.4    Post Closing Services  . . . . . . . . . . . .   42
        15.5    Counterparts . . . . . . . . . . . . . . . . .   42
        15.6    Entire Agreement . . . . . . . . . . . . . . .   43
        15.7    Construction . . . . . . . . . . . . . . . . .   43
        15.8    Assignment . . . . . . . . . . . . . . . . . .   43
        15.9    Amendment  . . . . . . . . . . . . . . . . . .   43
        15.10   Applicable Law . . . . . . . . . . . . . . . .   43
        15.11   Failure to Close . . . . . . . . . . . . . . .   43
        15.12   No Third Party Rights  . . . . . . . . . . . .   43
        15.13   Schedules  . . . . . . . . . . . . . . . . . .   43
        15.14   Waivers  . . . . . . . . . . . . . . . . . . .   44
        15.15   Severability . . . . . . . . . . . . . . . . .   44
        15.16   Remedies Cumulative  . . . . . . . . . . . . .   44
        15.17   Specific Performance . . . . . . . . . . . . .   44

HONDECHOOSICK-0000201
HON-DONAVAN0000210

SCHEDULES

Schedule A                      Products
Schedule 1.1(b)                 Fluorglas Microwave Business
                                  Accounts Receivable
Schedule 1.1(h)                 Excluded Prepaid Expenses
Schedule 1.3(f)                 License Agreement
Schedule 1.3(h)                 Certain Excluded Assets
Schedule 1.4.1                  Forms of Assignment Documents
Schedule 1.4.2                  Form of Deed
Schedule 1.5.1                  Form of River Road Lease Agreement
Schedule 1.5.2                  Form of John Street Lease Agreement
Schedule 2.2(a)                 Exclusions from the Reference
                                  Statement of Assets and
                                  Liabilities
Schedule 2.2(b)                 Closing Statement of Assets and
                                  Liabilities Preparation Method
Schedule 4.4(a)(1)              Financial Statements
Schedule 4.4(a)(2)              Exceptions in Financial Statements
Schedule 4.4(b)                 Material Changes
Schedule 4.5(a)                 Personal Property
Schedule 4.5(b)                 Excluded Necessary Assets
Schedule 4.6(a)                 Intellectual Property Exclusively
                                  Used in Business
Schedule 4.6(b)                 Dual Use Intellectual Property
Schedule 4.6(c)                 Intellectual Property Claims
Schedule 4.7                    Contracts
Schedule 4.8                    Liens and Encumbrances
Schedule 4.9                    Litigation and Proceedings
Schedule 4.10                   Environmental Information
Schedule 4.11                   Benefit Plans
Schedule 4.12                   Employee Information & Claims
Schedule 4.13                   Undisclosed Liabilities
Schedule 4.14                   Compliance with Law
Schedule 4.15                   Consents
Schedule 4.17                   Permits and Licenses
Schedule 4.18(a)(i)             Facilities
Schedule 4.18(a)(ii)            Leased Property
Schedule 4.18(b)                Exceptions to Use of Transferred
                                  Facilities
Schedule 4.18(c)                Title Commitment; Title Exceptions
Schedule 4.22                   Direct Reports
Schedule 5.6                    Purchaser Consents
Schedule 6.1(a)(1)              Non-Transferring Employees
Schedule 6.1(d)                 Retention Bonus Agreements
Schedule 6.2                    High-level Salaried Employees
Schedule 6.10                   Location of Tanks
Schedule 6.14                   Health and Safety Memorandum
Schedule 7                      Form of Toll Agreement
Schedule 14.1(e)(A)             Continuing Violation Procedures
Schedule 15.4                   Post-Closing Services

HONDECHOOSICK-0000202
HON-DONAVAN0000211

# ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT dated as of November 9, 1995 by and among AlliedSignal Laminate Systems, Inc., a Delaware corporation ("**Seller**"), Furon Company, a California corporation ("**Purchaser**"), and AlliedSignal Inc., a Delaware corporation and the indirect parent of Seller ("**Parent**").

## WITNESSETH:

WHEREAS, Seller, through its Fluorglas division, is engaged in the business (the "**Business**") of developing, manufacturing and selling the products (the "**Products**") listed in Schedule A hereto, including (i) pressure-sensitive adhesive tapes, PTFE flexible composites and fabrications and PTFE films (the "**Fluorglas Core Business**") and (ii) metal-clad PTFE/glass laminates (the "**Fluorglas Microwave Business**"); and

WHEREAS, Seller desires to sell and Purchaser desires to purchase certain assets of Seller used primarily in the Business;

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations and warranties contained herein, the parties agree as follows:

## ARTICLE 1.   PURCHASE AND SALE

1.1   <u>Purchase and Sale</u>.  Subject to the terms and conditions of this Agreement and except as otherwise provided herein, at the Closing, Seller and Parent shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase and accept from Seller and Parent, all of Seller's and Parent's right, title and interest in and to (i) all of the assets of Seller and Parent primarily used in or primarily related to the Fluorglas Core Business and all assets of Seller and Parent which are exclusively used in the Fluorglas Microwave Business, in each case, together with such changes, deletions or additions occurring between the respective dates of the Schedules hereto and the Closing Date in the ordinary course of business, and (ii) such other assets as are identified in the schedules to this Agreement (the "**Assets**"), including without limitation all of Seller's and Parent's right, title and interest in and to the following:

(a)   "**Personal Property**" of Seller, which term includes (i) the machinery and equipment, fixtures, furniture, office equipment, vehicles, tools and other tangible personal property which is located at the Facilities (as defined in Section 4.18) and is used in or related to the Business, including but not limited to those items listed in Schedule 4.5(a) hereto; and (ii) the machinery and equipment listed in Schedule 4.5(a) hereto located at Seller's plant in La Crosse, Wisconsin,

HONDECHOOSICK-0000203
HON-DONAVAN0000212

utilized exclusively to manufacture metal-clad PTFE/glass laminates for the Fluorglas Microwave Business;

(b)    accounts receivable of the Business as of the Closing Date, whether recorded or unrecorded, provided that the accounts receivable of the Fluorglas Microwave Business will be handled in accordance with the provisions of Schedule 1.1(b) attached hereto (the "**Accounts Receivable**");

(c)    inventory of the Business as of the Closing Date, wherever located, including raw materials, work-in-process and finished goods (the "**Inventory**");

(d)    the patents and patent applications, trademarks, trade names, copyrights and licenses specified in Schedule 4.6(a) hereto, and other intellectual property exclusively used in the Business, including, without limitation, processes, products, apparatus, formulae, drawings, trade secrets, know-how, discoveries, inventions (including conceptions of inventions), software, and design, manufacturing, engineering and other technical information, except as otherwise expressly excluded pursuant to Section 1.3 (the "**Intellectual Property**"); provided, however, that with respect to such other intellectual property, except for the provisions of Section 6.7(a), nothing in this Agreement shall prevent Seller from using such other intellectual property which (1) is now or hereafter becomes through no fault of Seller or its Affiliates part of the public domain, (2) is independently developed by Seller without reference to Confidential Information (as defined in Section 6.9) which Seller is obligated to maintain in confidence under Section 6.9, or (3) is made available to Seller by a third party not in violation of any confidential obligation to Purchaser;

(e)    all contracts, agreements, arrangements, leases, purchase orders and commitments of the Business, including those listed on Schedule 4.7 hereto (the "Contracts") provided that Purchaser assumes the obligations under such Contracts;

(f)    all sales data and information, customer lists, supplier lists, engineering and production records, mailing lists, catalogues, brochures, sales literature, promotional material, advertising material and other selling material of the Business;

(g)    transferable governmental and other permits, licenses (other than licenses encompassed within Intellectual Property), approvals, certificates of inspection, filings, franchises and other authorizations relating to the Assets including, but not limited to those listed in Schedule 4.17 hereto (the "**Permits and Licenses**");

HONDECHOOSICK-0000204
HON-DONAVAN0000213

(h)  all prepaid expenses of the Business except as set forth on Schedule 1.1(h) hereto;

(i)  rights of Seller pursuant to any express or implied warranties, representations or guarantees made by suppliers furnishing goods or services to the Business;

(j)  the land identified in Schedule 1.4.2, including all buildings, fixtures and improvements attached thereto, and all rights appurtenant thereto (the "Real Property");

(k)  all books and records and all files, documents and papers (including, but not limited to, those contained in computerized storage media) pertaining to the Assets, the Assumed Liabilities (as defined below) or otherwise relating to the Business and customarily located at the Facilities prior to the Closing Date (excluding the corporate minute book, stock transfer ledger and other corporate records of Seller, copies of which will be available to Purchaser upon reasonable request); and

(l)  the goodwill incident to the Business.

1.2  <u>Non-Assignable Assets</u>.  Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Asset if the attempted assignment thereof, without the consent of a third party thereto, would constitute a breach of any obligation of Seller or would in any way adversely affect the rights of Purchaser or Seller thereunder.  If such consent is not obtained, or if an attempted assignment thereof would be ineffective or would affect the rights of Seller thereunder so that Purchaser would not in fact receive all such rights, Seller will, to the extent not prohibited by or not in violation of any such agreement, (a) cooperate with Purchaser in any commercially-reasonable arrangement designed to provide for Purchaser the benefits (including the exercise of Seller's rights) under any such Asset, including enforcement for the benefit of Purchaser of any and all rights of Seller against a third party thereto arising out of the breach or cancellation by such third party or otherwise, (b) hold all funds paid to Seller thereunder on and after the Closing Date in trust for the account of Purchaser, and (c) remit such money to Purchaser as promptly as possible.  Any transfer or assignment to Purchaser by Seller of any property or property rights or any agreement which shall require the consent or approval of any third party shall be made subject to such consent or approval being obtained.

1.3  <u>Excluded Assets</u>.  Notwithstanding anything to the contrary contained in this Agreement, the following are not intended to be sold, assigned, transferred or conveyed to Purchaser hereunder (the "Excluded Assets"):

HONDECHOOSICK-0000205
HON-DONAVAN0000214

(a)   all cash, cash equivalents and overdrafts of the Business;

(b)   the basic books and records of account and all supporting vouchers, invoices and other records and materials relating to any or all income taxes of Seller with respect to the Business;

(c)   any books or records relating to the Assets or the Business, which were not customarily located at the Facilities on or before the Closing Date; provided, however, that Seller shall permit Purchaser to have reasonable access to such books and records and permit Purchaser to copy the same to the extent reasonably required for the operation of the Business after the Closing;

(d)   except for any name or logo listed in Schedule 4.6(a), any right to use any name or logo of Seller or its Affiliates (as defined in Section 4.7 hereof) or any variant or derivative thereof, including but not limited to "Allied-Signal," "AlliedSignal," "Allied," "Allied Chemical," "Signal," "Oak Materials" or "Oak" whether or not such logo, name, variant or derivative was used by the Business, other than in connection with the Inventory being purchased hereunder;

(e)   the insurance policies of Seller pertaining to the Business and/or the Facilities, and the rights of Seller thereunder;

(f)   all intellectual property not exclusively used in the Business; provided, however, that with respect to any such intellectual property which is used in the Business as of the Closing Date, Seller and Parent will grant to Purchaser a non-exclusive, paid up, worldwide, royalty free, freely assignable (without Seller's or Parent's consent) license to use such intellectual property in the Business in the form attached as Schedule 1.3(f) hereto (the "License");

(g)   all prepaid corporate insurance and taxes related to the Business as set forth on Schedule 1.1(h);

(h)   the real property and any other assets identified in Schedule 1.3(h) hereto; and

(i)   any and all assets at Seller's LaCrosse, Wisconsin plant not exclusively used in the Business.

1.4   _Transfer of Title to the Assets_.  Seller shall sell, assign, convey, transfer and deliver the Assets to Purchaser at the Closing by means of bills of sale and assignments in the forms attached as Schedule 1.4.1 hereto and such other endorsements, certificates and instruments of transfer

HONDECHOOSICK-0000206
HON-DONAVAN0000215

as shall be necessary or appropriate to vest good and marketable title to the Assets in Purchaser, free and clear of any liens, charges and encumbrances, except as otherwise set forth in this Agreement or in the Schedules hereto, provided that title to the Real Property shall be transferred by deed in the form of Schedule 1.4.2 attached hereto.

1.5  Lease Agreement.  At the Closing, Seller and Purchaser will enter into lease agreements (the "**Lease Agreements**") in the forms of Schedules 1.5.1 and 1.5.2 attached hereto, pursuant to which Seller will lease to Purchaser the real property identified therein.  The real property being leased pursuant to the Lease Agreements together with the Real Property being sold pursuant to this Agreement are sometimes collectively referred to herein as the "**Transferred Facilities.**"

### ARTICLE 2.   PURCHASE PRICE

2.1  Purchase Price.  The purchase price to be paid by Purchaser for the Assets shall be Nineteen Million Dollars ($19,000,000) (the "**Purchase Price**") and shall be adjusted in accordance with Section 2.2.  The Purchase Price shall be paid by Purchaser in full at Closing.

2.2  Post-Closing Adjustment.

(a)  The Purchase Price shall be adjusted dollar-for-dollar following the Closing Date to the extent that the Final Net Assets (as defined below) of the Business as of the Closing Date do not equal the Reference Net Assets (as defined below).  The "**Final Net Assets**" means the aggregate amount of the Assets, <u>minus</u> the aggregate amount of the Assumed Liabilities (as defined below), recorded on the statement of assets and liabilities of the Business as of the Closing Date prepared and audited in accordance with the procedures set forth herein (the "**Closing Statement of Assets and Liabilities**").  The "**Reference Net Assets**" means the amount identified as "Assets in Excess of Liabilities" recorded on the audited statement of assets and liabilities of the Business as of March 25, 1995 which is set forth in Schedule 4.4(a)(1) (the "**Reference Statement of Assets and Liabilities**").  It is agreed that the Reference Statement of Assets and Liabilities does not reflect the items set forth on Schedule 2.2(a) which are recorded on the audited balance sheet dated December 24, 1994 set forth in Schedule 4.4(a)(1).  The Purchase Price as adjusted pursuant to this Section 2.2 is hereinafter referred to as the "**Adjusted Purchase Price.**"

(b)  Seller shall prepare and furnish to Price Waterhouse LLP, Seller's independent public accountants ("**Price Waterhouse**"), a proposed Closing Statement of Assets and Liabilities no later than 90 days following the Closing

HONDECHOOSICK-0000207
HON-DONAVAN0000216

Date.  The proposed Closing Statement of Assets and
Liabilities shall be audited by Price Waterhouse to
establish that it has been prepared in accordance with the
accounting principles used in the Reference Statement of
Assets and Liabilities applied on a consistent basis, using
the same accounting principles, methods, practices,
procedures and policies used in preparing the Reference
Statement of Assets and Liabilities except as otherwise
provided in Schedule 2.2(b) attached hereto and except for
the purchase accounting relating to Seller's purchase of Oak
Materials Group.  Seller will retain Price Waterhouse to
perform the audit of the Closing Statement of Assets and
Liabilities for such fees and expenses reasonably acceptable
to Purchaser.  Purchaser shall be responsible for such fees
and expenses and will reimburse Seller for such fees and
expenses within ten (10) days after receipt from Seller of
an invoice therefor.  Price Waterhouse will deliver the
audited Closing Statement of Assets and Liabilities to
Purchaser and Seller within thirty (30) days of its receipt
of the proposed Closing Statement of Assets and Liabilities
from Seller.  Purchaser shall give representatives of Seller
access to the books and records of the Business for purposes
of preparing the Closing Statement of Assets and Liabilities
and will cause appropriate Purchaser personnel to assist
Seller, at no cost to Seller, in the preparation of such
Closing Statement of Assets and Liabilities.  In connection
with the preparation of the Closing Statement of Assets and
Liabilities, Seller and Purchaser will rely upon a roll
forward of the physical inventory observed by Price
Waterhouse during the period of August 17-19, 1995.  The
audited Closing Statement of Assets and Liabilities shall be
conclusive and binding upon Purchaser and Seller, unless
Purchaser or Seller notifies the other, in writing, within
30 days of its receipt of the audited Closing Statement of
Assets and Liabilities from Price Waterhouse, of such
party's disagreement with the audited Closing Statement of
Assets and Liabilities, setting forth all of such party's
disagreements and an explanation therefor including but not
limited to the dollar amount of each item in dispute.
Purchaser and Seller shall promptly attempt to resolve their
differences with respect thereto within 30 days after
receipt of written notice of disagreement.  If any such
difference is not resolved within such 30 day period, either
party may refer the difference for resolution to an
accounting firm mutually acceptable to both Seller and
Purchaser or, in the absence of agreement, within 15 days,
to a "national" accounting firm selected by lot after
eliminating Purchaser's and Seller's principal outside
accountants and one additional firm designated as
objectionable by each of Purchaser and Seller (hereinafter,
the "Firm").  The Firm shall make a determination on the
disputes so submitted and shall make such modifications, if
any, to the Closing Statement of Assets and Liabilities and

HONDECHOOSICK-0000208
HON-DONAVAN0000217

the Final Net Assets to reflect such determination, and the same shall be conclusive and binding upon the parties, provided that the Firm may not award an amount exceeding the amount in dispute.  The fees and expenses of the Firm shall be shared equally by Seller and Purchaser.

(c)  Not later than 30 days after the engagement of the Firm (as evidenced by the date of its written acceptance by facsimile or as otherwise designated by the Firm to both parties), the parties shall submit simultaneous briefs to the Firm (with a copy to the other party) setting forth their respective positions regarding the issues in dispute, and not later than 15 days after the submittal of such briefs the parties shall submit simultaneous reply briefs (with a copy to the other party).  The Firm shall issue its decision within 30 days after the due date for the reply briefs.  If additional briefing, a hearing, or other information is required by the Firm, the Firm shall give notice thereof to the parties as soon as practicable before the expiration of such 30 day period, and the parties shall promptly respond to all requests of the Firm with a view to minimizing any delay in the decision date.

(d)  If the Reference Net Assets are greater than the Final Net Assets, then Seller shall pay to Purchaser an amount equal to the difference.  If the Final Net Assets are greater than the Reference Net Assets, Purchaser shall pay Seller an amount equal to the difference.  Any amount not in dispute under this Section 2.2 shall be due and payable immediately.  Any amount in dispute under this Section 2.2 shall be due and payable within five days of the resolution of the dispute as set forth in this Section 2.2, and shall include any interest required by Section 2.3.

2.3  Payments.  All payments required to be made pursuant to this Article 2 and any other provisions of this Agreement shall be made in United States dollars in immediately available funds by wire transfer to an account designated, in writing, by the recipient.  Interest shall accrue on any payment required to be paid pursuant to Article 2, beginning on the Closing Date, at a rate equal to the prime rate, as quoted by The Wall Street Journal, in effect from time-to-time, until the time of payment.

2.4  Allocation of Purchase Price.

(a) Seller and Purchaser agree that the Purchase Price shall be allocated to the Assets pursuant to an allocation schedule to be agreed upon by Seller and Purchaser after the Closing (the "Allocation").  The parties agree that the Allocation will be in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended (the "Code"), and will be reasonably determined in good faith pursuant to

HONDECHOOSICK-0000209
HON-DONAVAN0000218

arm's-length bargaining between the parties regarding the fair market value of the Assets.  Seller and Purchaser shall make any adjustments to the Allocation with respect to the Purchase Price that are necessary to reflect any adjustments to the Purchase Price made pursuant to Section 2.2 (the "Adjustments").  In the event the parties cannot agree on the Allocation or the Adjustments to the Allocation, such dispute shall be resolved in accordance with the procedures set forth in Section 2.2.

(b)  Seller and Purchaser shall prepare and file their respective income tax returns and Internal Revenue Service ("IRS") Form 8594, or such other form or statement as may be required of the respective parties by law, and any comparable state or local income tax form, in a manner consistent with the Allocation and will not, in connection with the filing of such returns, make any allocation of the Purchase Price, as the same may be adjusted herein, which is contrary to the Allocation.

ARTICLE 3.  ASSUMPTION OF LIABILITIES AND OBLIGATIONS

3.1  Assumed Liabilities.  Upon the terms and subject to the conditions contained herein, on the Closing Date Purchaser shall assume the following liabilities and obligations of Seller (the "Assumed Liabilities"):

(1)  all liabilities of the Business as of the Closing Date of the type recorded in the Reference Statement of Assets and Liabilities as "Accounts Payable - Trade", "Other Accrued Liabilities" and "Intercompany - Trade Related", but only to the extent of the amount recorded on the Closing Statement of Assets and Liabilities;

(2)  all obligations of Seller to perform each of the Contracts in accordance with their terms after the Closing Date to the extent (a) either (x) such Contract is listed in Schedule 4.7 (as updated through the Closing Date and which is reasonably acceptable to Purchaser) and a true and complete copy has been provided to Purchaser or Purchaser's counsel on or before the Closing Date or (y) such Contract is not required to be listed in Schedule 4.7 pursuant to the terms of Section 4.7, provided that Purchaser shall not be obligated to assume payment obligations under such undisclosed Contracts (excluding any orders for the sale of Products or purchase of goods or services entered into in the ordinary course of the Business and consistent with past practices) to the extent that such obligations in the aggregate exceed $50,000, and further provided that if Purchaser elects not to assume any such obligation Purchaser shall not be entitled to any of the rights or benefits under such Contract and Seller may take all steps to minimize its obligations under any such Contract notwithstanding any

HONDECHOOSICK-0000210
HON-DONAVAN0000219

other provision of this Agreement, and (b) such obligations arise out of or otherwise apply to the conduct of the Business subsequent to the Closing and are not the result of a breach of any such Contract occurring on or prior to the Closing Date;

(3)  all obligations to repair or replace any defective Product which is returned following the Closing and was sold within 360 days prior to the Closing, provided that the maximum aggregate liability assumed by Purchaser pursuant to this Section 3.1(3) shall not exceed $164,000;

(4)  any obligation or liability for any claim in which damages are sought for defective Product and/or for bodily injury or death to any person or for injury to or destruction of property or the like in respect of any Product with respect to which the book value has been written down to zero or scrap value on or before the Closing Date, which was manufactured by Seller prior to the Closing Date and sold by Purchaser after the Closing Date; and

(5)  all sums payable pursuant to the retention bonus agreements specified on Schedule 6.1(d) in respect of the period commencing on the Closing Date, provided that in no event will Purchaser's obligations therefor exceed $35,000 in the aggregate.

3.2  Excluded Liabilities.  Except for the Assumed Liabilities, Purchaser shall not assume, or otherwise be responsible for, any liabilities or obligations (whether actual or contingent, matured or unmatured, liquidated or unliquidated, or known or unknown) of Parent, Seller, any other owner or operator of the Business or any Facility prior to the Closing Date, or any Affiliate of any of the foregoing (collectively, the "Excluded Liabilities"), including but not limited to any liability or obligation as a result of, or based upon or arising out of the conduct of the Business on or prior to the Closing Date, including but not limited to the following:

(a)  except as described in Section 3.1(4), any and all product liability claims with respect to products manufactured by the Business (or, in the case of Extruded PTFE Film-Unsintered, -Sintered, or -Low Density, shipped by the Business) on or prior to the Closing Date, provided that no act or omission by Purchaser after Closing is the primary cause of the defect in such products;

(b)  the alleged or actual violation of any law, rule or regulation (other than any Environmental Law (as hereinafter defined)), prior to the Closing, by the Business;

HONDECHOOSICK-0000211
HON-DONAVAN0000220

(c)  all claims, liabilities, or obligations, known or unknown (other than those that constitute Assumed Liabilities), to the extent arising out of the employment relationship existing prior to the Closing between the Business and any and all current or former employees of the Business, including but not limited to (i) work-related accidents or injuries, age and sex discrimination, sexual harassment, violation of employment or safety laws and wrongful discharge, where the act, omission, event, or occurrence giving rise to the claim, obligation, or liability shall have taken place on or prior to the Closing Date, (ii) medical or health care claims, obligations and liabilities, under any plan, policy or program of the Business or applicable law, and (iii) state workers' compensation claims made against the Business by employees or former employees of the Business arising from occurrences which took place on or prior to the Closing Date but only to the extent caused by occurrences on or prior to the Closing Date; and

(d)  any liability or obligation under any Environmental Law as a result of, or based upon or arising out of the operation of the Business or any Facility prior to the Closing ("**Environmental Excluded Liabilities**").

ARTICLE 4.  <u>REPRESENTATIONS AND WARRANTIES OF SELLER</u>

        Seller and Parent represent and warrant to Purchaser as follows:

        4.1  <u>Corporate Status</u>.  Seller is a corporation duly organized and validly existing under the laws of the State of Delaware, the jurisdiction in which it is incorporated, and has full power and authority to carry on the Business as now conducted.  Seller has all requisite corporate power and authority to enter into this Agreement and to perform its obligations and consummate the transactions contemplated hereby in accordance with the terms of this Agreement.  Seller is duly qualified to do business in each jurisdiction in which the failure to be so qualified would have a material adverse effect on the Seller's conduct of the Business.

        4.2  <u>Authorization</u>.  All corporate and other proceedings required to be taken by or on the part of Seller, including, without limitation, all action required to be taken by the directors or stockholder of Seller to authorize Seller to enter into and carry out this Agreement and the related documents contemplated herein, have been, or prior to the Closing will be, duly and properly taken.  This Agreement has been, and each of the related documents will be at Closing, duly executed and delivered by Seller and constitute, or will, when delivered, constitute the valid and binding obligations of Seller, enforceable against Seller in accordance with their respective

HONDECHOOSICK-0000212
HON-DONAVAN0000221

terms, subject to laws of general application relating to
bankruptcy, insolvency and the relief of debtors and the rules of
law governing specific performance, injunctive relief and other
equitable remedies.

4.3  Compliance.  The execution and delivery of this
Agreement and the related documents by Seller do not, and the
consummation of the transactions contemplated hereby and thereby
will not, (a) violate any provision of the charter documents or
bylaws of Seller, (b) result in a material breach (or an event
which, with the giving of notice or lapse of time or both, would
constitute a material breach) of any term or provision of, or
constitute a default under, or give rise to a right to terminate,
any indenture, mortgage, deed of trust or other material
agreement or arrangement to which Seller is a party or by which
any of the Assets are bound or affected, (c) result in the
creation of any lien, charge or encumbrance on the Assets, or
(d) violate any statute or law or any judgment, decree, order,
regulation or rule of any court or governmental authority to
which Seller is subject or by which any of the Assets are bound
or affected.

4.4  Financial Statements; Changes.

(a)  Schedule 4.4(a)(1) contains the balance sheet of
the Business as of December 24, 1994, the Reference
Statement of Assets and Liabilities and the related
statements of income for the Business for the year ended
December 24, 1994 and the three-month period ended March 25,
1995, including the footnotes thereto (collectively, the
"Financial Statements").  The Financial Statements other
than the statement of income for the three-month period
ended March 25, 1995 have been audited by Price Waterhouse
and include the report of Price Waterhouse therein.  Except
as set forth in Schedule 4.4(a)(2), the Financial
Statements: (i) have been prepared based upon the books and
records of Seller, (ii) have been prepared in accordance
with United States generally accepted accounting principles
("GAAP") consistently applied, and (iii) fairly present in
all material respects the financial position of the Business
and the results of operations as of their respective dates.

(b)  Except as set forth in Schedule 4.4(b), since the
date of the Reference Statement of Assets and Liabilities,
there has not been, occurred or arisen:

(i)  any change in or event affecting Seller or
the Business that has had or to Seller's Knowledge may
reasonably be expected to have a material adverse
effect on the Business (including its results of
operations, financial condition and the Assets) other
than as a result of general economic conditions or

HONDECHOOSICK-0000213
HON-DONAVAN0000222

industry-wide developments affecting other companies engaged in similar businesses; or

(ii)  any transaction entered into or carried out other than in the usual and ordinary course of the Business.

4.5  Condition of Property; Sufficiency of Assets. Schedule 4.5(a) attached hereto lists (i) all material items of Seller's Personal Property located at the Facilities, and (ii) the machinery and equipment located at Seller's plant in La Crosse, Wisconsin, utilized exclusively to produce metal-clad PTFE/glass laminates for the Fluorglas Microwave Business. Except as set forth in Schedule 4.5(a), the Personal Property, in the aggregate, has been maintained in accordance with standard industry practices and is in reasonable operating condition and repair (normal wear and tear excepted).  Except as set forth in Schedule 4.5(a), the improvements constructed on the Facilities located at McCaffrey Street and Liberty Street are (i) to Seller's Knowledge structurally sound in all material ways, with no known material defects, (ii) have been maintained in the aggregate in accordance with standard industry practices, (iii) are in reasonable operating condition and repair, and (iv) to Seller's Knowledge are not in need of any material maintenance or repair except for ordinary routine maintenance and repair, the cost of which would not be material taking into account the operation of the Business as a whole.  Except as set forth in Schedule 4.5(b), the Assets are sufficient for the operation of the Business as presently conducted.

4.6  Intellectual Property.

(a)  Schedule 4.6(a) lists all material

(i)  patents and patent applications (including those granted to or applied for or owned by Seller),

(ii)  intellectual property agreements (other than secrecy or confidentiality agreements), and

(iii)  trademark registrations and applications, registered copyrights and applications therefor and currently used trade names,

exclusively used in or exclusively relating to the Business.

(b)  Schedule 4.6(b) lists all material

(i)  patents and patent applications (including those granted to or applied for or owned by Seller),

(ii)  intellectual property agreements (other than secrecy or confidentiality agreements), and

NBl-235174.V4                                    12                                    10/30/95

HONDECHOOSICK-0000214
HON-DONAVAN0000223

      (iii)  trademark registrations and applications, registered copyrights and applications therefor and currently used trade names,

used in, but not exclusively used in, the Business.

      (c)  Except as set forth on Schedule 4.6(c), Seller has not received written notice alleging, and Seller has no Knowledge concerning existing claims of, any current infringement of any material patent, trademark, trade name, copyright or other intellectual property right relating to the Business.

      4.7  <u>Contracts</u>.  Schedule 4.7 lists each Contract of the Business (other than intellectual property agreements) or relating to any of the Assets or to which the Business or any of the Assets is subject or bound that individually, or together as a series of related Contracts involving the same party or parties, or the successors to such party or parties: (a) obligates Seller or its Affiliates to pay an amount of $25,000 or more, (b) has an unexpired term as of the date of this Agreement in excess of six (6) months, (c) provides for an extension of credit to any customer or client of the Business for any amount over $25,000 (other than for sales in the ordinary course of business where terms of such credit extension for domestic sales are for 30 days or less and for foreign sales are for 60 days or less), (d) provides for the borrowing of money by the Business other than credit agreements with banks having normal credit terms, (e) was not made in the ordinary course of the Business, or (f) is in any way otherwise material to the Business taken as a whole.  To Seller's Knowledge, each Contract is valid and existing.  Seller has duly performed all its obligations under the Contracts listed in Schedule 4.7 in all material respects to the extent that such obligations to perform have accrued.  Seller has not received written notice of any alleged breach or default, and to Seller's Knowledge, no event which would (with the passage of time, notice or both) constitute a material breach or default by Seller or any other party or obligor with respect thereto, has occurred.  True and correct copies of the Contracts listed in Schedule 4.7, including all amendments and supplements thereto, have been delivered to Purchaser or Purchaser's counsel or are attached to Schedule 4.7. It is understood that inclusion of a Contract on Schedule 4.7 shall not be considered to be an admission that or evidence that a contract is material to the operation of the Business taken as a whole.  For purposes of this Agreement, the term "Affiliate" of any person or entity means any corporation, partnership or other entity of which more than 50% of the securities or other ownership interests having by the terms thereof ordinary voting power to elect more than 50% of the board of directors or others performing similar functions with respect to such corporation, partnership or other entity directly or indirectly controls, is

HONDECHOOSICK-0000215
HON-DONAVAN0000224

controlled by, or is under common control with such person or entity.

4.8 <u>Title to Assets</u>. Excluding the Real Property, and except as disclosed in Schedule 4.8, Seller has good and marketable title to all of the Assets free and clear of all liens, mortgages, pledges and encumbrances other than liens for taxes not yet due and payable or being contested in good faith.

4.9 <u>Litigation</u>. Except as disclosed in Schedule 4.9, there is no action, suit, proceeding, arbitration, litigation, or, to Seller's Knowledge, product warranty claim, pending, or to Seller's Knowledge, Threatened against Seller that relates to the Business or arises out of the ownership, use or possession or condition of the Assets, or the operation or conduct of the Business.

4.10 <u>Environmental Matters</u>.

(a) <u>Definitions</u>. For purposes of this Agreement, the following terms shall have the meanings set forth below:

(i) "**Hazardous Substance**" shall mean substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws as "hazardous substances," "hazardous materials," "hazardous wastes" or "toxic substances," or any other substance whose presence in the ecosystem is regulated by any applicable Environmental Law, including, without limitation, petroleum and petroleum products.

(ii) "**Environmental Laws**" shall mean all applicable laws relating to the protection of the environment including: (A) all applicable requirements for reporting, licensing, permitting, controlling, investigating or remediating emissions, discharges, releases or threatened releases of Hazardous Substances into the air, surface water, groundwater or land; and (B) all applicable requirements for the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Substances.

(iii) "**Environmental Condition**" shall mean the presence in, on or under the specified real property of any Hazardous Substance which requires investigation or remediation pursuant to any Environmental Law.

(b) <u>Environmental Information</u>. To Seller's Knowledge, Schedule 4.10, which has been delivered previously to Purchaser by Seller, contains all material information with respect to (i) the use of Hazardous Substances upon the Transferred Facilities, or in the operation of the Business,

HONDECHOOSICK-0000216
HON-DONAVAN0000225

(ii) any Environmental Condition existing upon the Transferred Facilities, or (iii) the compliance of the Business or the Transferred Facilities with any Environmental Laws, except for information that discloses a use of Hazardous Substances, the existence of an Environmental Condition or a noncompliance with Environmental Laws which would not have a material adverse effect on the Assets or on the Business taken as a whole.

(c) <u>Compliance with Environmental Laws</u>. Except as disclosed in Schedule 4.10, to Seller's Knowledge the Business is, and since January 1, 1993 has been, operated in all material respects in compliance with all Environmental Laws.

(d) <u>Environmental Conditions; Action by Governmental Agency</u>. Except as disclosed in Schedule 4.10, to Seller's Knowledge no investigation, inquiry or other proceeding is pending or, to the Knowledge of Seller, Threatened by any governmental entity with respect to the Transferred Facilities or the Business and relating to any actual or alleged Environmental Condition or failure to comply with any applicable Environmental Law that could reasonably be expected to have a material adverse effect on the Business.

4.11 <u>Employee Benefit Plans and Policies</u>. All of the employee benefit plans and policies maintained or contributed to by Seller for the Business, or in which employees of the Business, including employees on disability, medical, sick or other leave of absence (the "**Employees**"), are entitled to participate, are listed on Schedule 4.11 (collectively, the "**Benefit Plans**") and copies of all such written Benefit Plans have been made available to Purchaser. Except as listed on Schedule 4.11 (a) such Benefit Plans comply in all material respects, to the extent applicable, with the requirements of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), and the "Code"; (b) none of the Benefit Plans subject to Part 3, Subtitle B of Title I of ERISA has incurred any "accumulated funding deficiency" within the meaning of Section 302 of ERISA or Section 412 of the Code; (c) no material liability, other than required premium payments, to the Pension Benefit Guaranty Corporation has been incurred with respect to any of the Benefit Plans subject to Title IV of ERISA; (d) Seller has not incurred any material liability for any tax imposed under Section 4975 of the Code or Part 4, Subtitle B of Title I of ERISA with respect to any of the Benefit Plans; and (e) none of the Benefit Plans is a multiemployer plan within the meaning of Section 3(37)(A) of ERISA.

4.12 <u>Employees</u>. Schedule 4.12 sets forth a list of the names and current salary or wage rates of the employees of the Business employed as of five (5) days prior to the date hereof, and the names and compensation arrangements with any consultants

HONDECHOOSICK-0000217
HON-DONAVAN0000226

or agents of the Business. Seller is not under any obligation to recognize or bargain with any labor union with respect to such employees. Upon termination of the employment of any such employees by Seller, Purchaser will not, by reason of anything done by Seller prior to or at the Closing, be liable to any of said employees for so-called "severance pay" or other similar payments, except as expressly set forth in Section 6.1(d). Except as set forth in Schedule 4.12, there are no pending or threatened employment claims or suits under applicable federal or state fair employment laws (including claims arising under workers' compensation laws) relating to or arising out of the conduct of the Business.

4.13 <u>Undisclosed Liabilities</u>. Except as set forth in Schedule 4.13, there are no liabilities or obligations of Seller, either direct or indirect, matured or unmatured, absolute, contingent or otherwise, which are material to the Business taken as a whole, except (a) those liabilities or obligations set forth on the Reference Statement of Assets and Liabilities (including the footnotes thereto) and not heretofore paid or discharged, (b) those liabilities set forth in this Agreement or the Schedules attached hereto, (c) those liabilities not required to be set forth in the Schedules attached hereto because of an exception provided for in this Agreement, and (d) those liabilities arising since the date of the Reference Statement of Assets and Liabilities in the ordinary course of Business.

4.14 <u>Compliance with Law</u>. Except as set forth in Schedule 4.14, since January 1, 1993 Seller has conducted the Business and operated and used the Assets in accordance with all federal, state and local laws and regulations (excluding Environmental Laws) applicable to the conduct of the Business, and is not in violation of any such laws other than violations which would not have a material adverse effect on the Assets taken as a whole, or on the Business taken as a whole.

4.15 <u>Consents</u>. Except as otherwise provided in this Agreement or set forth in Schedule 4.15, no action, approval, consent or authorization, including but not limited to any action, approval, consent or authorization by any third party, financial institution, governmental or quasi-governmental agency, commission, board, bureau or instrumentality (i) material to the Business taken as a whole is required for the transfer or assignment of any of the Assets or (ii) is necessary to make this Agreement or any of the agreements or instruments to be executed and delivered pursuant hereto a legal, valid and binding obligation of Seller or to consummate the transactions contemplated hereunder.

4.16 <u>Taxes</u>. All Taxes (as hereinafter defined) with respect to the Business which are due and payable prior to the Closing Date have been or will be duly and properly computed, reported, fully paid and discharged or otherwise adequately

HONDECHOOSICK-0000218
HON-DONAVAN0000227

reserved in accordance with GAAP.  There are no unpaid Taxes with
respect to any period ending on or before the Closing Date which
are or would become a lien on the Assets, except for current
Taxes not yet due and payable.  As used herein, the term "Taxes"
shall include all federal, state, local and foreign taxes,
assessments or other governmental charges (including, without
limitation, net income, gross income, excise, franchise, sales
and value added taxes, taxes withheld from employees' salaries
and other withholding taxes and obligations and all deposits
required to be made with respect thereto), levies, assessments,
deficiencies, import duties, licenses and registration fees and
charges of any nature whatsoever, including any interest,
penalties, additions to tax or additional amounts with respect
thereto, imposed by any government or taxing authority which are
levied upon the Assets.

    4.17 <u>Permits and Licenses</u>.  Schedule 4.17 attached
hereto lists all material Permits and Licenses, or any waiver
thereof, obtained by Seller in connection with the conduct of the
Business (other than Permits and Licenses the failure to obtain
which could not reasonably be expected to have a material adverse
effect on the Business) together with the name of the
governmental entity issuing such Permit and License.  Seller has
all Permits and Licenses required for the conduct of the Business
as presently conducted.  Except as set forth in Schedule 4.17,
such Permits and Licenses are valid and in full force and effect.
To the extent any of such Permits and Licenses are not
transferable from Seller to Purchaser, Seller has no Knowledge of
any reason or condition which is likely to prevent Purchaser from
obtaining such Permits and Licenses upon application therefor to
the appropriate governmental entity.  To Seller's Knowledge, no
suspension, cancellation or termination of any Permits and
Licenses required by any governmental entity to permit the
Business to be conducted is threatened that could reasonably be
expected to have a material adverse effect on the Business.

    4.18 <u>Real Property</u>.

    (a)   Schedule 4.18(a)(i) identifies all real property
owned by Seller that is currently used by Seller primarily
for the conduct of the Business (the "Facilities").  It is
expressly understood and agreed that Seller's real property
in La Crosse, Wisconsin is not primarily used in the
Business and is not being sold to Purchaser under this
Agreement.  Schedule 4.18(a)(ii) lists all real property
leased for use in the conduct of the Business.

    (b)   Seller has not received written notice of any
violation of any applicable zoning or building regulation or
ordinance relating to the Transferred Facilities (as defined
in Section 1.5) and, to the Knowledge of Seller, there is no
such violation.  Except as otherwise indicated in Schedule
4.18(b), to the Knowledge of Seller, no fact or condition

HONDECHOOSICK-0000219
HON-DONAVAN0000228

exists which is reasonably likely to result in
discontinuation of presently available water, sewer, gas,
electricity, telephone, drainage facilities and other
utilities or services for the Transferred Facilities.
Seller has not received written notice of any proposed
material special assessments, or any proposed material
changes in property tax or land use laws, or condemnation
proceedings affecting any portion of the Transferred
Facilities and, to the Knowledge of Seller, there are no
such proposals or proceedings.

(c)  Seller has good and marketable fee simple title to
all Real Property subject to the state of facts set forth in
Schedule 4.18(c), including the title commitment attached as
a part of Schedule 4.18(c).

(d)  Except as otherwise set forth in Schedule 4.18(c),
there are no leases, subleases, licenses, occupancy
agreements, options, rights, concessions or other agreements
or arrangements, written or oral, granting to any person the
right to purchase, use or occupy any of the Transferred
Facilities or any portion thereof or interest in any such
Transferred Facilities.

4.19 <u>No Brokers or Finders</u>.  No agent, broker, finder,
or investment or commercial banker, or other person or firm
engaged by or acting on behalf of Seller or any of its Affiliates
in connection with the negotiation, execution or performance of
this Agreement or the related documents, is or will be entitled
to any brokerage or finder's or similar fee or other commission
as a result of this Agreement or the transactions contemplated
herein.  Any fees or expenses resulting from such engagement
shall be the sole responsibility of Seller.

4.20 <u>Product Warranty</u>.  The aggregate amounts of valid
Product Warranty claims of the Business in the years ended
December 31, 1993 and 1994 were $177,600 and $150,100,
respectively.

4.21 <u>Intercompany Payables</u>.  All intercompany trade
payable balances reflected on the Reference Statement of Assets
and Liabilities have been incurred for goods and services
provided to the Business in the ordinary course of business at
reasonable prices and fees.

4.22 <u>Construction of Certain Provisions</u>.

(a)  As used in this Article 4, the term "Knowledge"
means the knowledge of the executive officers of Parent's
Engineered Materials Sector, and the knowledge of the
General Manager of the Business and his direct reports and
other key employees of the Business identified in Schedule
4.22.

HONDECHOOSICK-0000220
HON-DONAVAN0000229

(b)  An action, suit, proceeding, arbitration or litigation shall be considered "Threatened" if a written notice or communication has been received, within two years prior to the date of the applicable disclosure schedule, reasonably indicating that an action, suit or proceeding may be commenced.

4.23  No Additional Representations.  Notwithstanding anything to the contrary contained in this Agreement, Seller makes no representation or warranty whatsoever, express or implied, beyond those expressly given in this Agreement, including but not limited to any implied warranty or representation as to condition, merchantability or suitability as to any of the properties or assets of Seller.

ARTICLE 5.   REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows:

5.1  Corporate Status.  Purchaser is a corporation duly organized and validly existing under the laws of the State of California, the jurisdiction in which it is incorporated and has full power and authority to carry on its business and to own all of ts properties and assets.  Purchaser has all requisite corporate power and authority to enter into, execute and deliver this Agreement and to perform its obligations and consummate the transactions contemplated hereby in accordance with the terms of this Agreement.

5.2  Authorization.  All corporate and other proceedings required to be taken by or on the part of Purchaser, including, without limitation, all action required to be taken by the directors or shareholders of Purchaser to authorize Purchaser to enter into and carry out this Agreement and the related documents contemplated herein, have been, or prior to the Closing will be, duly and properly taken.  This Agreement has been, and each of the related documents will be at Closing, duly executed and delivered by Purchaser and constitute, or will, when delivered, constitute the valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to laws of general application relating to bankruptcy, insolvency and the relief of debtors and the rules of law governing specific performance, injunctive relief and other equitable remedies.

5.3  Compliance.  The execution and delivery of this Agreement and the related documents by Purchaser do not, and the consummation of the transactions contemplated hereby and thereby will not (a) violate any provision of the Restated Articles of Incorporation or Bylaws of Purchaser, (b) result in the breach (or an event which, with the giving of notice or lapse of time or both, would constitute a breach) of any term or provision of, or constitute a default under, or give rise to a right to terminate,

HONDECHOOSICK-0000221
HON-DONAVAN0000230

any material indenture, mortgage, deed of trust or other agreement or arrangement to which Purchaser is a party, or (c) violate any statute or law or any judgment, decree, order, regulation or rule of any court or governmental authority to which Purchaser is subject.

    5.4   Financing.   Purchaser has funds of its own, or has binding commitments from responsible banks or other financial institutions to provide funds, which will be sufficient and available to pay the Purchase Price.

    5.5   No Brokers or Finders.   No agent, broker, finder or investment or commercial banker, or other person or firm engaged by or acting on behalf of Purchaser or any of its Affiliates in connection with the negotiation, execution or performance of this Agreement and the related documents, is or will be entitled to any broker's or finder's or similar fees or other commission as a result of this Agreement or the transactions contemplated herein.   Any fees or expenses resulting from such engagement shall be the sole responsibility of Purchaser.

    5.6   Consents.   Except as otherwise provided in this Agreement or set forth in Schedule 5.6, no action, approval, consent or authorization, including but not limited to any action, approval, consent or authorization by any third party, financial institution, governmental or quasi-governmental agency, commission, board, bureau or instrumentality, is necessary to make this Agreement or any of the agreements or instruments to be executed and delivered pursuant hereto a legal, valid and binding obligation of Purchaser or to consummate the transactions contemplated hereunder.

### ARTICLE 6.   COVENANTS

    6.1   Employment.

    (a)   Purchaser agrees to offer employment, effective immediately following the Closing, to all employees of the Business who are then employed by Seller, except for the employees listed in Schedule 6.1(a)(1).   Seller agrees in this regard to cooperate with Purchaser by permitting Purchaser throughout the period prior to the Closing to meet with the employees of the Business at reasonable times and to distribute to them such forms and other documents relating to employment by Purchaser after the Closing as Purchaser deems appropriate.

    (b)   To assist Purchaser during the post-Closing transition period, Seller and Purchaser have agreed that Purchaser will be entitled to utilize the services of Phil Guy on a full-time basis from the Closing Date through December 31, 1995, provided that Purchaser reimburses Seller for the cost to Seller of his salary and benefits incurred by Seller during such

HONDECHOOSICK-0000222
HON-DONAVAN0000231

period, and further provided that Phil Guy remains in the employ
of Seller or one of its Affiliates during such period.

(c)   Purchaser agrees to make available to each
employee of the Business who accepts employment with Purchaser as
of the Closing Date and who is not listed on Schedule 6.1(a)(1)
(collectively, "Transferred Employees"), Purchaser's standard
benefits package, including health benefits substantially
equivalent to the benefits currently provided by Seller to such
employees, such benefits to become effective without a waiting
period and without regard to pre-existing conditions, except with
respect to long term disability benefits and supplemental life
insurance to the extent such benefits are made available through
third-party insurance carriers and will not cover pre-existing
conditions.  Nothing herein shall be deemed to require Purchaser
to retain any of the employees it hires for any specific period
of time or to maintain compensation rates or fringe benefit
programs for any specific period of time, however, Purchaser
shall be responsible for all actions taken or omitted to be taken
with respect to such employees following their hiring by
Purchaser.  Seller shall amend, effective on the Closing Date,
each Benefit Plan which is an "employee pension benefit plan" (as
defined in Section 3(2) of ERISA) to fully vest all employees of
the Business in their accrued benefits as of the Closing Date.

(d)   Purchaser agrees to be responsible for the payment
of all sums payable in respect of the period following the
Closing pursuant to those certain Retention Bonus Agreements
specified on Schedule 6.1(d) attached hereto; provided, however,
Purchaser's payment obligations pursuant to this sentence shall
not exceed $35,000.  Except as expressly provided in this
Agreement, Purchaser does not assume, and shall not be deemed to
have assumed, any liability or obligation of Seller relating to
employment matters involving current or former employees of
Seller, including, without limitation, any matters arising under
any employee benefit plan of Seller or its Affiliates.  The term
"Contract" as used in this Agreement does not include any Benefit
Plan.

6.2   Non-Solicitation.  Seller covenants that for a
period of two years after the Closing, neither Seller nor any of
its Affiliates will directly or indirectly solicit, raid, entice,
induce or in any other manner encourage any Transferred Employee
to discontinue his or her employment with Purchaser or to seek
employment with Seller or any of its Affiliates.  The parties
expressly agree that advertisements addressed to the general
public made in newspapers or other periodicals of general
circulation shall not constitute direct or indirect solicitation
for purposes of this Agreement.  Seller agrees that for a period
of two years after the Closing, neither Seller nor any of its
Affiliates without the prior written consent of Purchaser which
consent shall not unreasonably be withheld will enter into any
employment or consultant relationship with any Transferred

HONDECHOOSICK-0000223
HON-DONAVAN0000232

Employee listed on Schedule 6.2, unless Purchaser has previously
terminated the employment of such Transferred Employee.

     6.3  COBRA Coverage.  Seller shall timely provide all
notices required to be provided to any of Seller's employees,
former employees, or the beneficiaries or dependents of such
employees or former employees, under Part 6 of Subtitle B of
Title I of ERISA or Section 4980B(f) of the Code (herein
collectively referred to as "COBRA"), to the extent such notices
are required to be provided by Seller by reason of events
occurring prior to or on the Closing Date or by reason of the
transactions contemplated by this Agreement.  For the purposes of
the foregoing, Seller shall treat any Transferred Employee and
such employee's beneficiaries and dependents, as of the Closing
Date as having incurred a "qualifying event" (within the meaning
of ERISA Section 603 and Code Section 4980B(f)(3)) as of the
Closing Date.

     6.4  WARN Act.  Purchaser agrees to pay and be
responsible for all liability, cost, expense and sanctions
resulting from the failure to comply with the Worker Adjustment
and Retraining Notification Act ("WARN Act"), and the regulations
thereunder, in connection with the consummation of the
transactions described in or contemplated by this Agreement.

     6.5  Welfare and Pension Benefit Plans.

     (a)  For purposes of vesting and determining
eligibility to participate and benefits payable under
Purchaser's "employee welfare benefit plans," as defined in
Section 3(1) of ERISA, Purchaser shall credit each
Transferred Employee with his or her service with Seller
before the Closing Date.

     (b)  For purposes of vesting and determining
eligibility to participate and benefits payable under
Purchaser's "employee pension benefit plans," as defined in
Section 3(2) of ERISA, Purchaser shall credit each
Transferred Employee with his or her service with Seller
before the Closing Date.

     (c)  Purchaser agrees to make payroll deductions as
requested by each Transferred Employee for timely payment of
loans outstanding at the Closing Date under Seller's savings
plans, and to remit such amounts withheld each calendar
month to the trustee of Seller's 401(k) Plan.

     6.6  Title Insurance.  Prior to the Closing, Seller
shall deliver to Purchaser a copy of the survey of the Liberty
Street Site and a copy of the survey of the McCaffrey Street
Site, each prepared by David Barrass ("Barrass") in April 1995
(each, a "Survey"), certified to Purchaser by Barrass and
containing the embossed seal of Barrass.  At the Closing and at

HONDECHOOSICK-0000224
HON-DONAVAN0000233

Purchaser's expense, Seller shall cause Lawyers Title Insurance Company (the "Title Company") to issue, or to be unconditionally committed to issue, to Purchaser an ALTA Owner's Policy of Title Insurance (10-17-92) with a liability amount of $4,000,000 insuring Purchaser as the owner of fee title to the Real Property.  Such policy (the "Title Policy") shall contain only the conditions and exceptions set forth in the form of the title commitment attached hereto as Schedule 4.18(c).

> 6.7  <u>Seller's Covenant Not to Compete</u>.

> (a)  <u>Restrictions</u>.  Parent and Seller each agrees that for a period of three (3) years after the Closing Date, neither they nor their Affiliates will engage in the business of manufacturing and selling pressure sensitive adhesive tapes, PTFE flexible composites and fabrications, and PTFE films.  Parent and Seller further agree that during the term of the Toll Agreement, neither they nor their Affiliates will engage in the business of manufacturing and selling metal-clad PTFE/glass laminates for the microwave laminates market, except as required for the performance of the Toll Agreement.  Nothing in this Agreement shall restrict Parent, Seller or any of their Affiliates from engaging in the business of manufacturing and selling metal-clad PTFE/glass laminates after the expiration or termination of the Toll Agreement.  Additionally, nothing in this Agreement is intended to prevent Parent, Seller and/or their Affiliates from:  (i) acquiring shares of capital stock, partnership or other equity interests in any entity that is engaged in the Business, provided that (a) the primary purposes of such acquisition is not to acquire an interest in any entity engaged in the Business and (b) the annual revenues of such entity from the Business are not more than 30% of such entity's aggregate revenues; or (ii) acquiring shares of capital stock, partnership, or other equity interests in any entity as investments in Seller's pension funds or funds of any other employee benefit plan whether or not such entity is engaged in the Business, provided that such interests are acquired and held for investment purposes only.

> (b)  <u>Special Remedies and Enforcement</u>.  Parent and Seller agree with Purchaser that a breach by Parent, Seller or any of their Affiliates of any of the covenants set forth in this Section 6.7 could cause irreparable harm to Purchaser, that Purchaser's remedies at law in the event of such breach would be inadequate, and that, accordingly, in the event of such breach, a restraining order or injunction or both may be issued against Parent, Seller and any of their Affiliates, in addition to any other rights and remedies that are available to Purchaser.  In connection with any such action or proceeding for injunctive relief, Parent and Seller each hereby waives the claim or defense

HONDECHOOSICK-0000225
HON-DONAVAN0000234

that a remedy at law alone is adequate and agrees, to the
maximum extent permitted by law, to have each provision of
this Section 6.7 specifically enforced against Parent and
Seller.

(c)  Severability.  If this Section 6.7 is more
restrictive than permitted by the laws of any jurisdiction
in which Purchaser seeks enforcement hereof, this
Section 6.7 shall be limited to the extent required to
permit enforcement under such laws.  In particular, the
parties intend that the covenants contained in
Section 6.7(a) shall be construed as a series of separate
covenants, one for each county and city in which the
Business has been carried on or in which Purchaser may
conduct a similar business after the Closing Date.  Except
for geographic coverage, each such separate covenant shall
be deemed identical in terms.  If, in any proceeding, a
court or arbitrator shall refuse to enforce any of the
separate covenants, then such unenforceable covenant shall
be deemed eliminated from this Section 6.7 for the purpose
of those proceedings to the extent necessary to permit the
remaining separate covenants to be enforced.  If the
provisions of this Section 6.7 shall ever be deemed to
exceed the duration or geographic limitations or scope
permitted by applicable law, then such provisions shall be
reformed to the maximum time or geographic limitations in
scope, as the case may be, permitted by applicable law.

6.8  Tax Returns; Taxes.

(a)  Purchaser and Seller shall cooperate in preparing
and filing tax returns relating to all sales, excise, real
estate, use, transfer or license tax due with regard to the
transactions contemplated by this Agreement.  Purchaser and
Seller shall each be responsible for and pay for one-half
(½) of all of such sales, excise, use, transfer or license
taxes resulting from the purchase, sale or transfer of the
Assets and transactions contemplated hereby.

(b)  All of the other fees and charges which are
payable by Seller or attributable to the conduct of the
Business or the ownership, possession or use of the Assets,
including rents, general and special assessments, street
surfacing and other municipal charges, fuel, water, sewer,
electrical and other utility charges and documentation,
license and registration fees (collectively, the "Other
Charges") shall be prorated (as described below) as of the
Closing Date.  After the Closing, Purchaser shall make or
cause to be made all necessary filings with respect to Taxes
and the Other Charges.

(c)  All Taxes related to the Transferred Facilities or
to the Business accrued or accruable with respect to events

HONDECHOOSICK-0000226
HON-DONAVAN0000235

occurring prior to the close of business on the Closing Date
shall be borne by Seller.  For this purpose, the Closing
Date shall be treated as the last day of a taxable period,
whether or not the taxable period in fact ends on such
period.  All Taxes related to the Real Property, the real
property subject to the Lease Agreements so long as such
Lease Agreements are in effect, or to the Business accrued
or accruable with respect to events occurring after the
close of business on the Closing Date will be borne by
Purchaser.

(d)   Real and personal property taxes with respect to
any Assets sold pursuant to this Agreement shall be prorated
based on the ratio of number of days in the pre-closing
period to the number of days in the actual taxable period
with respect to which tax is assessed, irrespective of when
such taxes are due, become a lien or are assessed; provided,
however, nothing in this Section 6.8(d) shall cause a
duplication in the payment of real or personal property
taxes.

(e)   Purchaser shall at its own cost and expense fully
and accurately complete and submit any tax data packages
with respect to taxable years ending on or prior to the
Closing Date or for the 1995 taxable year reasonably
required by Seller by the earlier of March 15, 1996 or 180
days after the Closing Date; provided, however, that if
compliance with this Section requires more than eighty (80)
hours of service from Purchaser's personnel, Seller shall
reimburse Purchaser for the prorated wages, salaries and
fringe benefits of such personnel for each hour of service
in excess of such amount.

6.9   Preservation of Confidentiality.   For a period of
five (5) years from the date of this Agreement, Seller agrees to
treat all Confidential Information (as defined below) of the
Business, as confidential, to preserve the confidentiality
thereof and to not disclose any Confidential Information, except
(i) disclosures made to customers and vendors in the ordinary
course of the Business through the Closing Date, (ii) disclosure
to its representatives who need to know such confidential
information in connection with the transactions contemplated
herein at any time before or after the Closing, (iii) disclosures
required by law or government authority, and (iv) with respect to
any Confidential Information used, but not exclusively used in
the Fluorglas Microwave Business, disclosures by Seller in the
ordinary course of conducting its laminates business after the
Closing, which are consistent with the standard of care Seller
applies to its own confidential information.  As used in this
Agreement, "Confidential Information" means any and all
technical, manufacturing or marketing information, ideas,
methods, developments, inventions, improvements, business plans,
trade secrets, scientific or statistical data, diagrams,

HONDECHOOSICK-0000227
HON-DONAVAN0000236

drawings, specifications or other proprietary information
relating to the Business normally treated as confidential and
proprietary by Seller in the ordinary course of the Business
consistent with past practice, together with all analyses,
compilations, studies or other documents, records or data
prepared by Seller or Purchaser or their respective
representatives, as the case may be, which contain or otherwise
reflect or are generated from such information, or which are
generated in connection with the transactions contemplated herein
at any time before or after the Closing. Seller shall have no
obligations with respect to any portion of the Confidential
Information (i) which is now in the public domain or hereafter
comes into the public domain through no fault of Seller, (ii)
which is hereafter disclosed to Seller by a third party not in
violation of any confidentiality obligation to Purchaser, or
(iii) which is hereafter independently developed by Seller's
employees without reference to the Confidential Information
Seller is obligated to maintain in confidence under this Section.

    6.10 <u>Removal of Underground Storage Tanks</u>.   At
Seller's sole cost and expense, Seller shall diligently proceed
to remove and close in accordance with all applicable
Environmental Laws the underground storage tanks described in
Schedule 6.10 hereto (the "**Tanks**"), and shall provide Purchaser
with written evidence of its performance of this obligation.   If
Seller fails to diligently perform the obligations set forth in
this Section, Purchaser may, at Seller's sole cost and expense,
cause the removal and closure of the Tanks in accordance with all
applicable Environmental Laws.

    6.11 <u>Removal of Certain Assets</u>.   All assets which are
located at the Transferred Facilities but which are not being
transferred by Seller to Purchaser pursuant to this Agreement
will be removed from the Transferred Facilities by Seller on or
before the Closing Date.

    6.12 <u>Environmental Reports</u>.   Purchaser shall deliver
to Seller a true and complete copy of the Phase I and Phase II
environmental reports prepared by Parsons Engineering Science
("**Parsons**") in connection with Purchaser's acquisition of the
Real Property when and as such reports become available.
Purchaser shall, to the extent it has the power and authority to
do so, make available or cause Parsons to make available to
Seller the field notes, laboratory reports, sampling and test
results and other relevant documentation relating to such reports
to the extent such information is not included in the reports.

    Purchaser also agrees to grant to Seller the right to
conduct sampling at the Transferred Facilities (to the extent
Purchaser retains control of such Transferred Facilities) to
confirm the results or conclusions presented in any of the
environmental reports delivered to Seller by Purchaser, provided
that:

HONDECHOOSICK-0000228
HON-DONAVAN0000237

(i)   Purchaser shall have the right to approve the scope and method of sampling and testing, which approval shall not be unreasonably withheld or delayed;

(ii)   Seller shall use reasonable efforts to minimize any interference with the business operations of Purchaser and shall not materially interfere with such operations unless (y) no reasonable alternative action is available that would cause less interference and (z) the proposed action or alternative action must be taken to satisfy a requirement of a governmental entity to investigate or remediate an Environmental Condition;

(iii)   Seller shall maintain or cause to be maintained insurance coverage relating to the sampling to be performed as reasonably required by Purchaser (provided such coverage is available at reasonable cost) and to name Purchaser an additional insured with respect to such coverage; and

(iv)   Seller shall provide to Purchaser a copy of all reports obtained by Seller when and as received by Seller and shall, to the extent it has the power and authority to do so, make available, or cause its consultant to make available, to Purchaser the field notes, laboratory reports, sampling and test results and other relevant documentation relating to such reports to the extent such information is not included in the reports.

6.13   <u>Intercompany Receivables and Payables</u>.   Each of Seller and Purchaser agrees to pay any and all intercompany trade receivables and payables, respectively, of the Business outstanding as of the Closing Date within the time period for payment in the ordinary course of business but no later than thirty (30) days after the Closing; provided, however, to the extent any such intercompany receivable or payable is not recorded on the Closing Statement of Assets and Liabilities (as finally agreed upon pursuant to Section 2.2) or the amount recorded differs from the amount paid in respect thereof by Seller or Purchaser, as the case may be, such party shall refund to the other party any overpayment received, or shall pay any additional amount owing to the other party, as the case may be, in each case together with interest at the rate specified in Section 2.3 from the date payment was originally made or due.

6.14   <u>Health and Safety Operational Issues</u>.   At Seller's sole cost and expense, Seller shall diligently proceed to take reasonable action to correct the items identified in Schedule 6.14 attached hereto.   Purchaser acknowledges that Seller may be able to provide Purchaser additional information concerning the issues set forth in the referenced memorandum that reasonably establish that one or more of such issues do not constitute a

HONDECHOOSICK-0000229
HON-DONAVAN0000238

current violation or noncompliance, in which case Seller shall have no obligation under this Section 6.14 with respect thereto.

### ARTICLE 7.   TOLL AGREEMENT

At the Closing, Purchaser and Seller shall execute the Toll Agreement attached hereto as Schedule 7, pursuant to which Seller will toll produce for Purchaser metal clad PTFE/glass laminates utilizing the Personal Property located at Seller's La Crosse, Wisconsin Laminated Products plant, for a period of up to two years from the Closing Date.

### ARTICLE 8.   PRE-CLOSING COVENANTS

8.1  Conduct of Business.  During the period from the date hereof through the Closing Date, and except as otherwise provided in this Agreement, Seller:

(i)  Shall conduct the Business in the ordinary course, consistent with past practice;

(ii)  Shall refrain from disclosing or entering into any license or agreement with respect to the Intellectual Property;

(iii)  Shall use reasonable efforts to maintain the good relations of its suppliers, customers and others with whom it has business relations;

(iv)  Shall notify Purchaser of any material adverse change with respect to the condition of the Assets or the Assumed Liabilities or the Business;

(v)  Shall not grant any compensation increase or bonus, except in the ordinary course of business, consistent with past practices;

(vi)  Shall use reasonable efforts to preserve the business organization of the Business intact, and to preserve for Seller the present relationship between the Business and its employees, suppliers, clients and others having business relations with them;

(vii)  Shall comply with all laws, ordinances, rules, regulations and orders applicable to the Business, or Seller's operations, assets or properties in respect thereof, the noncompliance with which might materially affect the Business or the Assets;

(viii)  Shall not sell, assign, transfer, convey, lease, mortgage, pledge or otherwise dispose of or encumber any of the Assets, or any interests therein, except in the ordinary course of the Business; and

HONDECHOOSICK-0000230
HON-DONAVAN0000239

(ix)  Shall not acquire by merger or consolidation with, or merge or consolidate with, or purchase substantially all of the assets of, or otherwise acquire any material assets or business of any corporation, partnership, association or other business organization or division thereof if any such transaction could materially affect the Assets, the Business or the consummation of the transactions contemplated hereby.

8.2  <u>Access to Records and Properties</u>.  (a) From the date hereof until the Closing Date or earlier termination of this Agreement, Seller will:

(i)  provide Purchaser, its officers, counsel and other representatives with reasonable access to the Assets, the principal personnel and representatives of Seller, and such books and records pertaining to the Business as Purchaser may reasonably request, during Seller's regular business hours, provided that Purchaser has provided Seller with reasonable prior written notice, and provided further that Purchase agrees that such access will be requested and exercised with due regard to minimizing interference with the operations of the Business;

(ii)  furnish to Purchaser or its representatives such additional financial and operating data and other information relating to the business as may be reasonably requested, to the extent that such access and disclosure would not violate the terms of any agreement to which Seller is bound or any applicable law or regulation; and

(iii)  make available to Purchaser for inspection and review all documents, or copies thereof, listed in the Schedules hereto, and all files, records and papers of any and all proceedings and matters listed in the Schedules hereto, except to the extent prohibited or restricted by law, regulation, contract with a third party or where the documents are subject to the attorney client or work product privilege.

8.3  <u>Consents</u>.  Seller and Purchaser each has made required filings with the Federal Trade Commission ("FTC") and U.S. Department of Justice ("DOJ") pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act") (including, without limitation, responses to requests for additional information).  The parties shall not consummate the transactions contemplated by this Agreement unless and until all applicable waiting periods under the HSR Act have expired or are otherwise terminated and shall use good faith efforts to demonstrate that such transactions should not be opposed by the FTC or DOJ.  All HSR Act filing fees are the responsibility of Purchaser.

HONDECHOOSICK-0000231
HON-DONAVAN0000240

8.4  <u>Public Announcements</u>.  On and after the date
hereof and through the Closing Date, neither of the parties shall
issue any press release or make any public statement prior to
obtaining the other party's approval, which approval shall not be
unreasonably withheld, except that no such approval shall be
necessary to the extent that, in the opinion of counsel to the
party proposing to make such disclosure, disclosure is required
by law or by any listing agreement of either party hereto.  Such
opinion of counsel shall be confirmed in writing and promptly
delivered to the other party.  The parties may disclose
information with respect to the transactions contemplated hereby
to their employees, agents and consultants only to the extent
such persons have a need to know and agree to be bound by the
terms hereof relative to the disclosure of such information.

ARTICLE 9.   <u>CLOSING</u>

9.1  <u>Closing Date and Place</u>.  The consummation of the
purchase and sale contemplated hereby (the "**Closing**") will take
place at the offices of Seller in Morristown, NJ at 10:00 a.m. on
the third business day following the later of the execution of
this Agreement or the date on which the conditions to the Closing
set forth in Sections 10.1(a) and (e) and Sections 10.2(a) and
(e) have been satisfied, or on such other date and time as may be
mutually agreed upon by the parties in writing.  Either party may
elect to effect the Closing via the exchange of executed
documents and certificates by telecopier or overnight mail.  The
date upon which the Closing occurs is referred to herein as the
"**Closing Date**".

ARTICLE 10.   <u>CONDITIONS TO CLOSING</u>

10.1 <u>Conditions to the Obligations of Purchaser</u>.  The
obligations of Purchaser under this Agreement are subject to the
fulfillment prior to or at the Closing of each of the following
conditions, any one or more of which may be waived in writing by
Purchaser in its sole discretion:

(a)   No law or order shall have been enacted, entered,
issued, promulgated or enforced by any governmental entity,
nor shall any action have been instituted and remain pending
or have been threatened and remain so at what would
otherwise be the Closing Date, which prohibits or restricts
or would (if successful) prohibit or restrict the
transactions contemplated herein.

(b)   The representations and warranties of Seller
contained in this Agreement or in any certificate or
document delivered to Purchaser pursuant hereto shall be
complete, true and correct in all material respects on the
Closing Date, with the same force and effect as though such
representations and warranties had been made on and as of
the Closing Date.

HONDECHOOSICK-0000232
HON-DONAVAN0000241

(c)   Seller shall have performed all of its covenants, obligations and agreements contained in this Agreement to the extent required to be performed and complied with by it prior to the Closing Date.

(d)   Purchaser shall have received all certificates, instruments, agreements, deeds, title policies and other documents to be delivered by Seller on or before the Closing Date pursuant to this Agreement.

(e)   The waiting periods under the HSR Act applicable to the purchase of the Business shall have expired without the initiation of legal action by the FTC or the DOJ.

10.2 <u>Conditions to the Obligations of Seller</u>.  The obligations of Seller under this Agreement are subject to the fulfillment, prior to the Closing, of each of the following conditions, any one or more of which may be waived in writing by Seller in its sole discretion:

(a)   No law or order shall have been enacted, entered, issued, promulgated or enforced by any governmental entity, nor shall any action have been instituted and remain pending or have been threatened and remain so at what would otherwise be the Closing Date, which prohibits or restricts or would (if successful) prohibit or restrict the transactions contemplated herein.

(b)   The representations and warranties of Purchaser contained in this Agreement or in any certificates or documents delivered to Seller pursuant hereto shall in all material respects be complete, true and correct on the Closing Date, with the same force and effect as though such representations and warranties, had been made on and as of the Closing Date.

(c)   Purchaser shall have performed all of its covenants, obligations and agreements contained in this Agreement to the extent required to be performed and complied with by the Closing Date.

(d)   Seller shall have received all certificates, instruments, agreements and other documents to be delivered on or before the Closing Date pursuant to this Agreement.

(e)   The waiting periods under the HSR Act applicable to the purchase of the Business shall have expired without the initiation of legal action by the FTC or the DOJ.

HONDECHOOSICK-0000233
HON-DONAVAN0000242

ARTICLE 11.   TERMINATION AND SURVIVAL

11.1 Termination.  Both of the parties hereto shall use good faith efforts to bring about the satisfaction of the conditions hereunder prior to and at Closing.  Notwithstanding anything to the contrary set forth herein, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a)  by mutual written consent of Purchaser and Seller; or

(b)  by Purchaser or Seller, upon written notice to the other, if such party or its Affiliate has breached any material representation, warranty or covenant contained in this Agreement in any material respect, if the non-breaching party has notified the breaching party of the breach in writing and the breach has continued without cure for a period of thirty (30) days after notice of the breach; or

(c)  by Purchaser or Seller, upon the earlier of three (3) months from the date hereof or the issuance of a preliminary injunction enjoining the Closing of the transactions contemplated herein.

11.2 Effect of Termination.

(a)  If this Agreement is terminated pursuant to Section 11.1(a) or Section 11.1(c), this Agreement shall become void and of no further force and effect, and neither of the parties hereto (nor their respective Affiliates, directors, shareholders, officers, employees, agents, consultants, attorneys-in-fact or other representatives) shall have any liability in respect of such termination.

(b)  If this Agreement is terminated pursuant to Section 11.1(b), then subject to Section 15.17, the non-breaching party shall be entitled to receive reimbursement from the breaching party for all reasonable fees, costs and expenses (including legal and accounting) incurred by the non-breaching party in connection with this Agreement and the transactions contemplated hereby.

ARTICLE 12.   CLOSING DOCUMENTS

12.1 Documents to be Delivered by Seller.  At the Closing, Seller shall deliver to Purchaser the following documents:

(i)  Copies of resolutions of Seller certified by a Secretary, Assistant Secretary or other appropriate officer of Seller, authorizing the execution, delivery and

HONDECHOOSICK-0000234
HON-DONAVAN0000243

performance of this Agreement and the transactions contemplated hereby;

(ii)  Duly executed bills of sale and assignments in the forms attached as Schedule 1.4.1 and such other appropriate instruments of transfer with respect to all of the Assets not transferred or assigned by any other documents or instruments described in this Section;

(iii)  Duly executed and acknowledged deed in the form attached as Schedule 1.4.2 and such other appropriate instruments of transfer with respect to the Real Property;

(iv)  Duly executed and acknowledged assignments sufficient to transfer title to the Intellectual Property;

(v)  Duly executed License in the form attached as Schedule 1.3(f);

(vi)  Duly executed assignment and assumption agreement with respect to the Assumed Liabilities in the form attached as Schedule 1.4.1;

(vii)  Duly executed Lease Agreements in the forms attached as Schedules 1.5.1 and 1.5.2;

(viii)  Duly executed documents of assignment or transfer with respect to each of the transferable Permits and Licenses listed in Schedule 4.17;

(ix)  A certificate of an appropriate officer of Seller relating to the representations, warranties and covenants of Seller made herein as provided in Section 10.1(b) and (c);

(x)  Duly executed Toll Agreement in the form attached hereto as Schedule 7;

(xi)  Intentionally Omitted;

(xii)  The Title Policy; and

(xiii)  Any other documents reasonably necessary to effectuate the transactions contemplated hereby.

12.2 Documents to be Delivered by Purchaser.  At the Closing, Purchaser shall pay the Purchase Price to Seller by wire transfer and shall duly execute, where applicable, and deliver to Seller the following documents:

(i)  Copies of resolutions of the Purchaser, certified by the Secretary or Assistant Secretary of Purchaser, authorizing the execution, delivery and

HONDECHOOSICK-0000235
HON-DONAVAN0000244

performance of this Agreement and the transactions contemplated hereby;

(ii)   Duly executed assignment and assumption agreement with respect to the Assumed Liabilities in the form attached as Schedule 1.4.1;

(iii)   Duly executed Lease Agreements in the forms attached as Schedules 1.5.1 and 1.5.2;

(iv)   A certificate of an appropriate officer of Purchaser relating to the representations, warranties and covenants made herein by Purchaser, as provided in Sections 10.2(b) and (c);

(v)   Duly executed Toll Agreement in the form attached hereto as Schedule 7;

(vi)   Intentionally Omitted;

(vii)   Duly executed License in the form attached as Schedule 1.3(f); and

(viii)   Any other documents reasonably necessary to effectuate the transactions contemplated hereby.

ARTICLE 13.   POST CLOSING OBLIGATIONS

13.1 Further Assurances.  From time to time after the Closing, without further consideration, the parties shall cooperate with each other and shall execute and deliver instruments of transfer or assignment, or such other documents to the other party as such other party reasonably may request to evidence or perfect Purchaser's right, title and interest to the Assets, and otherwise carry out the transactions contemplated by this Agreement.  Recordation of any such instruments shall be at the sole expense of Purchaser.

13.2 Access to Books and Records.  After the Closing, Purchaser shall permit Seller, at Seller's sole expense, to have access to and the right to make copies of such of Seller's books, records and files as constitute part of the Assets for any reasonable purpose at any time during regular business hours, such as for use in litigation or financial reporting, tax return preparation, or tax compliance matters.  Prior to disposing of or destroying any such information or records after the Closing Date, Purchaser shall afford Seller a reasonable opportunity to segregate, remove or copy such books, records and files as Seller may select.  Purchaser shall not be required to retain such books, records and files beyond the expiration of any applicable statute of limitations, including extensions thereof.

HONDECHOOSICK-0000236
HON-DONAVAN0000245

13.3 <u>Cooperation in Litigation</u>.  The parties shall reasonably cooperate with each other at the requesting party's expense in the prosecution or defense of any litigation or other proceeding arising from or relating to the operation of the Business.

13.4 <u>Proprietary Information</u>.  Prior to the Closing Date, the Business was routinely supplied copies of proprietary and confidential information relating to strategic, technical, and/or marketing plans of Seller and its Affiliates and their various operations.  Although Seller has attempted to recover such information from the Business, some may still be present within the Business.  Purchaser therefore agrees that it will not use such information for any purpose whatsoever, and shall destroy any remaining copies.

<div align="center">ARTICLE 14.  <u>INDEMNIFICATION</u></div>

14.1 <u>Indemnification by Seller and Parent</u>.  Seller and Parent (collectively and individually referred to hereinafter in this Article 14 as "Seller" unless otherwise expressly provided), jointly and severally, shall defend, indemnify and hold harmless Purchaser and Purchaser's directors, shareholders, officers, employees, agents, Affiliates, successors and assigns from and against any and all claims, liabilities, obligations, losses, costs, expenses (including, without limitation, interest, penalties and reasonable attorneys' fees), fines, or damages of any kind or nature (individually a "**Loss**" and collectively "**Losses**"), as a result of, or based upon or arising out of:

(a)  any breach or violation by Seller of any of the covenants made by Seller in this Agreement or any agreement, certificate or similar document delivered pursuant hereto;

(b)  any breach of, or any inaccuracy or misrepresentation in, any of the representations or warranties made by Seller in this Agreement or in any Schedule, agreement, instrument, certificate or similar document required to be delivered pursuant to the terms hereof;

(c)  all Losses resulting from the assertion of claims made against the Assets sold hereunder or against Purchaser by creditors of Seller under any applicable bulk transfer law, including, but not limited to, the bulk transfer provisions of the Uniform Commercial Code of any state, or any similar statute, with respect to the transactions contemplated hereby; provided, that this Subsection shall in no event apply to Losses resulting from the assertion of claims included in the Assumed Liabilities; or

(d)  any and all Excluded Liabilities (other than Environmental Excluded Liabilities), it being understood

HONDECHOOSICK-0000237
HON-DONAVAN0000246

that neither the Hazardous Substances referred to in the
last sentence of Section 14.2(e)(B) which may have been
present prior to the Closing Date, nor Purchaser's obli-
gations under that provision with respect thereto, are
intended to or shall be deemed to constitute an Excluded
Liability;

    (e)   any and all of the following:

        (A)   the alleged or actual violation of any
Environmental Law prior to the Closing or subsequent to
the Closing to the extent the violation is a continua-
tion of a violation that existed as of the Closing,
provided that Purchaser gives Seller a Notice of Claim
(as hereinafter defined) with respect to such
continuing violation within two (2) years after the
Closing Date in which event the procedures set forth in
Schedule 14.1(e)(A) attached hereto shall apply;

        (B)   the presence, at any time on or prior to the
Closing Date, of Hazardous Substances on or in the
soil, groundwater or surface water at the Real Property
or at any property or facility used in connection with
the Business (including any property or facility at
which any Hazardous Substances were disposed or
treated), which presence constitutes an Environmental
Condition as of the Closing Date or which becomes an
Environmental Condition after the Closing Date due to a
change in Environmental Laws.

    14.1.1   _Limitation on Environmental Indemnification_.
Notwithstanding the foregoing, Seller's obligation to Purchaser
with respect to any Losses as a result of, or based upon or
arising out of the circumstances described in Section 14.1(e)
shall be limited to (i) third party claims, (ii) performance of
investigation and remediation activities, (iii) reimbursement of
or payment of out-of-pocket costs Purchaser may incur in
connection with investigation or remediation activities or
activities required to bring into compliance a continuing
violation of an Environmental Law existing as of the Closing, and
(iv) in the event any required investigation or remediation
activities in respect of a Notice of Claim given to Seller during
the three (3) year period following the Closing, or any
compliance activities in respect of a Notice of Claim given to
Seller pursuant to Section 14.1(e)(A) during the two (2) year
period following the Closing, shall limit or shut down
Purchaser's manufacturing operations, fifty percent (50%) of any
profits Purchaser can reasonably establish that it lost as a
result of such limitation on its manufacturing of Products for
sale, provided that in no event will Seller's obligation with
respect to such lost profits exceed $3,000,000 in the aggregate.
It is understood that Seller shall not be required to indemnify
Purchaser for any lost profits which Purchaser may claim as a

HONDECHOOSICK-0000238
HON-DONAVAN0000247

result of delays or changes in implementation of any of Purchaser's expansion plans due to the performance of required investigation or remediation or compliance activities. In no event will Seller be required to conduct remediation to standards more strict than those then required by applicable governmental entities for a manufacturing operation conducted at the Transferred Facilities similar to the Business as conducted as of the Closing Date.

14.2 <u>Indemnification by Purchaser</u>. Purchaser shall indemnify and hold harmless Seller, Parent and their respective directors, stockholder, officers, employees, agents, consultants, representatives, Affiliates, successors and assigns from and against any and all Losses, as a result of, or based upon or arising out of:

(a) any breach or violation by Purchaser of any of the covenants made by Purchaser in this Agreement or any agreement, certificate or similar document delivered pursuant hereto;

(b) any breach of, or any inaccuracy in any of the representations or warranties made by Purchaser in this Agreement, or in any Schedule, agreement, certificate, instrument or similar documents required to be delivered pursuant to the terms hereof;

(c) any Assumed Liability;

(d) the operation of the Business by Purchaser after the Closing Date except to the extent otherwise the obligation or responsibility of Seller under this Agreement or otherwise covered by Section 14.2(e) or (f);

(e) any and all of the following:

(A) the alleged or actual violation by the Business of any Environmental Law subsequent to the Closing, unless such violation existed on or prior to the Closing and falls within Seller's indemnification obligation under Section 14.1(e)(A), and

(B) the release or deposit, at any time subsequent to the Closing, of Hazardous Substance(s) onto or into the soil, groundwater or surface water at the Real Property or at any property or facility (excluding Seller's Lacrosse, WI property and facility) used in connection with the Business (including any property or facility at which any Hazardous Substances were disposed or treated), unless the release or deposit does not materially increase the cost of investigating or remediating an Environmental Condition for which Seller is obligated to indemnify Purchaser

NB1-235174.V4                          37                          10/30/95

HONDECHOOSICK-0000239
HON-DONAVAN0000248

pursuant to Section 14.1(e), provided that, if such
release or deposit does materially increase the cost of
investigating or remediating an Environmental Condition
for which Seller is obligated to indemnify Purchaser
pursuant to Section 14.1(e), the cost of investigation
and remediation shall be equitably allocated between
Seller and Purchaser taking into consideration their
relative contributions to the condition.  (For the
purposes of this subsection, an additional cost shall
be "material" if it adds more than $75,000 to the cost
of the investigation or remediation.)  In the event
such release or deposit subsequent to the Closing gives
rise to an Environmental Condition which did not exist
prior to such release or deposit, it is agreed that
Purchaser shall be responsible for the entire cost of
investigating and remediating such Environmental
Condition, including any Hazardous Substances
comprising a portion of the Environmental Condition,
regardless of whether such Hazardous Substances were
present prior to the Closing Date; or

(f)  Purchaser's hiring practices in connection with
its compliance with Section 6.1(a) to the extent arising
from claims by any employee listed in Schedule 6.1(a)(1)
that Purchaser and/or Seller unlawfully discriminated
against such employee in connection with Purchaser's hiring
decisions on the basis of such employee's age, race, gender,
religion or other legally protected classification.

14.2.1   <u>Limitation on Environmental Indemnification</u>.
Notwithstanding the foregoing, Purchaser's obligation to Seller
with respect to any Losses as a result of, or based upon or
arising out of the circumstances described in Section 14.2(e)
shall be limited to (i) third party claims, (ii) performance of
investigation and remediation activities, and (iii) reimbursement
of or payment of out-of-pocket costs Seller may incur in
connection with investigation or remediation activities or
activities required to bring into compliance a violation of an
Environmental Law subsequent to the Closing.  In no event will
Purchaser be required to conduct remediation to standards more
strict than those then required by applicable governmental
entities for a manufacturing operation conducted at the
Transferred Facilities similar to the Business as conducted as of
the Closing Date.

14.3  <u>Indemnification Procedure</u>.

(a)  Any party seeking indemnification hereunder (the
"**Indemnitee**") shall notify the party liable for such
indemnification (the "**Indemnitor**") in writing of any event,
omission or occurrence which the Indemnitee has determined
has given or could give rise to Losses which are
indemnifiable hereunder (such written notice being

HONDECHOOSICK-0000240
HON-DONAVAN0000249

hereinafter referred to as a "Notice of Claim"); provided, that a Notice of Claim in respect of any action at law or suit in equity by or against a third person as to which indemnification will be sought shall be given promptly after the action or suit is commenced.  A Notice of Claim shall specify in reasonable detail the nature and any particulars of the event, omission or occurrence giving rise to a right of indemnification.  Neither the failure of any Indemnitee to give notice as provided in this Section 14.3 nor any defect or error in the notices given shall relieve the Indemnitor of its obligations under this Section 14.3, except to the extent that the Indemnitor is actually prejudiced by such failure, defect or error.  After the giving of a Notice of Claim pursuant hereto, the amount of indemnification to which an Indemnitee shall be entitled shall be determined:  (i) by the written agreement between the Indemnitee and the Indemnitor; (ii) by a judgment or decree of any court of competent jurisdiction; or (iii) by any other means to which the Indemnitee and the Indemnitor shall agree.

     (b)  The Indemnitor shall have the right to conduct and control, through counsel of its choosing reasonably acceptable to the Indemnitee, the defense, compromise or settlement of any third person claim, action or suit against such Indemnitee as to which indemnification is sought by any Indemnitee from any Indemnitor hereunder, provided that the Indemnitor (i) has acknowledged and agreed in writing, within 14 days after the giving of a Notice of Claim or such shorter period as may be required to avoid any prejudice to the right of the Indemnitee, that, if the same is adversely determined, the Indemnitor has an obligation to provide indemnification to the Indemnitee in respect thereof and (ii) diligently and timely defends against such claim, action or suit.  In any such case the Indemnitee shall cooperate in connection therewith and shall furnish such records, information and testimony and attend such conferences, discovery proceedings, hearings, trials and appeals as may be reasonably requested by the Indemnitor in connection therewith; provided, that the Indemnitor shall not, without the written consent of the Indemnitee (which consent shall not be withheld unreasonably) compromise or settle any such claim, action or suit.  The Indemnified Party shall have the right to employ separate counsel in any claim, action or suit and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of the Indemnitee unless (i) the Indemnitor has agreed in writing to pay such fees and expenses, (ii) the Indemnitor has failed to assume the defense and employ counsel, or (iii) the named parties to any such claim, action or suit (including any impleaded parties) include both the Indemnitor and the Indemnitee and the Indemnitee shall have been advised in writing by its counsel that

HONDECHOOSICK-0000241
HON-DONAVAN0000250

representation of the Indemnitor and the Indemnitee by the same counsel would be inappropriate under applicable standards of professional conduct (whether or not such representation by the same counsel has been proposed) due to actual or potential differing conflicts of interest between them (in which case the Indemnitor shall not have the right to assume the defense of such claim, action or suit on behalf of the Indemnitee).

(c)   In the event Purchaser gives Seller a Notice of Claim for indemnification under Section 14.1(e), Seller shall notify Purchaser within ninety (90) days of Seller's receipt of the Notice of Claim whether or not Seller intends to conduct the required remediation and investigation activities.  During such ninety (90) day period, Purchaser shall permit Seller and its consultants reasonable access to the relevant property for the purposes of determining whether or not Seller agrees with the claim.  In the event a governmental authority requires action more quickly, Seller and Purchaser will cooperate with each other in good faith in order to negotiate a schedule reasonably acceptable to the governmental authority.  Seller shall have the right to reasonably conduct and shall have reasonable control over any and all investigation and remediation activities that it undertakes, provided that Seller diligently and timely commences and performs such activities.  Prior to the commencement of any such activities on the Real Property, Seller shall provide to Purchaser for its review and approval, which approval shall not unreasonably be withheld, the following:

(i)   a work plan setting forth in reasonable detail the work to be performed; and

(ii)   reasonably satisfactory evidence that Seller maintains, or has caused the party performing the work to maintain, insurance reasonably required by Purchaser (provided that such insurance is available at reasonable cost), naming Purchaser as an additional insured.

Seller shall provide to Purchaser copies of all reports, studies and sampling results, and drafts thereof, prepared with respect to the work and the Environmental Condition when and as such reports, studies or results become available.

(d)   In connection with the performance of any such investigation or remediation activities, Purchaser shall provide Seller and its representatives with access to the Transferred Facilities, and shall cooperate with all reasonable requests of Seller, provided that Seller shall

HONDECHOOSICK-0000242
HON-DONAVAN0000251

reimburse Purchaser for reasonable out-of-pocket costs incurred as a result of providing such assistance.

(e)   Seller shall use reasonable efforts to minimize any interference with the business operations of Purchaser and shall not materially interfere with such operations unless (y) no reasonable alternative action is available that would cause less interference, and (z) the proposed action or alternative action must be taken to satisfy a requirement of a governmental entity to investigate or remediate an Environmental Condition.

14.4 <u>Limitation on Certain Claims</u>.  Anything to the contrary contained herein notwithstanding, (i) no party shall assert any claim against the other for indemnification hereunder with respect to any Losses unless and until the amount of such Losses or claims recoverable by the claiming party shall exceed $200,000 calculated on a cumulative basis and not a per item basis, and then only in respect to the excess over said amount; provided, however, any Losses which arise pursuant to Sections 14.1(c), (d) or (e) or 14.2(c), (d), (e) or (f) shall not be subject to the $200,000 minimum set forth in this Section 14.4; and (ii) neither Purchaser nor Seller shall be entitled to recover from the other party more than an aggregate of $17,000,000 with respect to all claims for indemnity or damages in respect of matters for which it is entitled to be indemnified under (x) Sections 14.1(a), (b) or (c) in the case of Purchaser, and (y) Sections 14.2(a) or (b) in the case of Seller, whether such claims are brought under this Article 14 or otherwise.

14.5 <u>Term</u>.  This Article 14 shall survive the Closing and shall remain in effect as follows: (i) as to any indemnification obligation arising pursuant to Sections 14.1(a) or (b) or 14.2(a) or (b), this Article 14 shall survive the Closing, and shall remain in effect for a period of two (2) years after the Closing, (ii) as to any indemnification obligation arising pursuant to Sections 14.1(e) or 14.2(e), this Article 14 shall remain in effect for a period of twenty (20) years after the Closing, and (iii) as to any indemnification obligation arising pursuant to Sections 14.1(c) or (d) or 14.2(c), (d) or (f), this Article 14 shall remain in effect indefinitely.  The expiration of indemnity obligations under Article 14 shall not be deemed to constitute an assumption of liability by the party to whom the obligation ran or a waiver by such party of any other right or claim.

ARTICLE 15.   <u>MISCELLANEOUS</u>

15.1 <u>Expenses</u>.  Except as specifically set forth elsewhere herein, each of the parties hereto shall pay its own expenses and costs incurred or to be incurred by it in negotiating, closing and carrying out this Agreement.  In the event of any action for the breach of this Agreement or

HONDECHOOSICK-0000243
HON-DONAVAN0000252

misrepresentation by any party, the prevailing party shall be entitled to reasonable attorney's fees, costs and expenses incurred in such action.

15.2 <u>Notices</u>.  Any notice or communication given pursuant to this Agreement by a party hereto to the other party shall be in writing and hand delivered, or mailed by registered or certified mail, postage prepaid, return receipt requested (notices so mailed shall be deemed effective on the third day after mailing), or sent via facsimile (notices so transmitted shall be deemed effective upon transmission), with an original mailed as follows:

If to Seller:

> AlliedSignal Laminate Systems Inc.
> c/o AlliedSignal Inc.
> 101 Columbia Road
> Morristown, New Jersey  07962
> Attention:  Vice President and General Counsel
> Engineered Materials
> Fax No.:  (201) 455-6840

If to Purchaser:

> Furon Company
> 29982 Ivy Glenn Drive
> Laguna Niguel, California 92677
> Attention:  Chairman of the Board and General
> Counsel
> Fax No.:  (714) 363-6276

15.3 <u>Confidentiality</u>.  Seller and Purchaser have entered into a Confidentiality Agreement dated March 8, 1995, which notwithstanding any provision herein to the contrary shall survive the execution and delivery of this Agreement and any termination of this Agreement, but shall expire upon the consummation of the Closing and thereafter be of no further force or effect.

15.4 <u>Post Closing Services</u>.  Seller agrees that following the Closing Date Seller will continue to provide those services set forth on Schedule 15.4 for the periods specified in Schedule 15.4, provided, however that Purchaser and Seller shall agree on a fee to be paid to Seller which fully compensates for all its costs in providing such services including wage and expenses of Seller's employees and allocable overhead, and terms for the provision of such services.

15.5 <u>Counterparts</u>.  This Agreement may be executed simultaneously in two or more counterparts, each of which shall

HONDECHOOSICK-0000244
HON-DONAVAN0000253

be deemed an original, but all of which together shall constitute one and the same instrument.

15.6 **Entire Agreement**. Except for the Confidentiality Agreement referred to in Section 15.3, this Agreement is the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior communication, representations, agreements and understandings between the parties hereto, whether oral or written, including, without limitation, any financial or other projections or predictions regarding the Seller or the Business.

15.7 **Construction**. When the context so requires, references herein to the singular number include the plural and vice versa and pronouns in the masculine or neuter gender include the feminine. The headings contained in this Agreement and the tables of contents, exhibits and schedules are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

15.8 **Assignment**. This Agreement may not be assigned without the prior written consent of the other party hereto, which consent shall not unreasonably be withheld.

15.9 **Amendment**. This Agreement may be amended only by written agreements duly executed by representatives of both of the parties hereto.

15.10 **Applicable Law**. This Agreement shall be construed in accordance with the laws of the State of New York, disregarding its conflicts of laws principles which may require the application of the laws of another jurisdiction.

15.11 **Failure to Close**. If for any reason this Agreement is terminated prior to Closing, Purchaser shall promptly upon the request of Seller return to Seller all documents and other information (and notes made therefrom), including all originals and all copies thereof, theretofore delivered to Purchaser by or on behalf of Seller. Purchaser shall in any case comply with the terms of the Confidentiality Agreement referred to in Section 15.3.

15.12 **No Third Party Rights**. This Agreement is not intended and shall not be construed to create any rights in any parties other than Seller and Purchaser and no other person shall assert any rights as a third party beneficiary hereunder.

15.13 **Schedules**. Schedules attached hereto are incorporated into this Agreement and shall be deemed a part hereof as if set forth herein in full. References herein to "this Agreement" and the words "herein," "hereof" and words of similar import refer to this Agreement (including Schedules) as an entirety. In the event of any conflict between the provisions

HONDECHOOSICK-0000245
HON-DONAVAN0000254

of this Agreement and any such Schedule, the provisions of this Agreement shall control.

15.14 <u>Waivers</u>. Any waiver of rights hereunder must be set forth in writing. A waiver of any breach or failure to enforce any of the terms or conditions of this Agreement shall not in any way affect, limit or waive either party's rights at any tine to enforce strict compliance thereafter with every term or condition of this Agreement.

15.15 <u>Severability</u>. If and to the extent that any court of competent jurisdiction holds any provisions (or any part thereof) of this Agreement to be invalid or unenforceable, such holding shall in no way affect the validity of the remainder of this Agreement.

15.16 <u>Remedies Cumulative</u>. Except with respect to remedies for the breach of representations and warranties and except for the limitations on recovery of damages set forth in Sections 14.1.1, 14.2.1 and 14.4, all rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available and Article 14 shall not be deemed to preclude or otherwise limit in any way the exercise of any such other rights or pursuit of other remedies.

15.17 <u>Specific Performance</u>. Seller and Purchaser each acknowledge that, in view of the uniqueness of the Business and the transactions contemplated by this Agreement, each party would not have an adequate remedy at law for money damages in the event that this Agreement has not been performed in accordance with its terms, and therefore agrees that the other party shall be entitled to specific enforcement of the terms hereof in addition to any other remedy to which it may be entitled, at law or in equity.

[SIGNATURES ON FOLLOWING PAGE]

NB1-235174.V4                        44                        10/30/95

HONDECHOOSICK-0000246
HON-DONAVAN0000255

IN WITNESS WHEREOF, Seller and Purchaser have duly executed and delivered this Agreement as of the day and year first above written.

"SELLER"

AlliedSignal Laminate Systems Inc., a Delaware corporation

By: _____

Name:  Stanley R. Stevinson
Title: Assistant Secretary


"PARENT"

AlliedSignal Inc., a Delaware corporation

By: _____

Name:  Daniel K. Clift
Title: Director - Corporate Development


"PURCHASER"

Furon Company, a California corporation

By: _____

Name:  J. Michael Hagan
Title: Chairman

**Schedule A**
**Products**

<u>PSAT</u>

Skived PTFE Film
High Modulus Skived PTFE Film
High Modulus Extruded PTFE Film
Oriented PTFE Film
FEP Film
Polyimide Film
UHMW Polyethylene Film
PTFE / Glass Fabric
PTFE / Glass Fabric/Conductive
Glass Fabric - Single Side Coated
Glass Fabric - Double Side Coated
Silicone Glass
Aluminum Foil

<u>Flexible Composites</u>

Silicone Glass / White
Silicone Glass / Red
PTFE / Glass - Tear Resistant
PTFE / Glass - Super Smooth
PTFE / Glass - Standard
PTFE / Glass - Mechanical
PTFE / Glass - Porous
PTFE / Glass - Conductive
PTFE / Glass - White
PTFE / Glass - CYTEK™
Fluorglas II Laminate
Custom Fabricated Components
PTFE / Glass Filament
PTFE Lacing Tape

10/26/95
Doc. #33629 v5

HONDECHOOSICK-0000248
HON-DONAVAN0000257

Schedule A (Continued)
**Products**

<u>PTFE Film</u>

Virgin Skived Film
Reprocessed Skived Film
Extruded PTFE Film - Unsintered
Extruded PTFE Film - Sintered
Extruded PTFE Film - Low Density

<u>Microwave Laminate</u>

Fine Weave Glass
Medium Weave Glass
High Dielectric Constant
Low Dielectric Constant

10/26/95
Doc. #33629 v5

HONDECHOOSICK-0000249
HON-DONAVAN0000258

**Schedule 15.4**
**Post Closing Services to be Provided by Seller**

For a period of twelve (12) months after the date of this Agreement, Seller will make available to Purchaser processing capability under the Xerox Business Management System (XBMS) consistent with what is currently available to the Business. AlliedSignal data center in Tempe, AZ and the AlliedSignal Laminate Systems data center will continue to provide hardware and software support to include, but is not limited to, operation of the software at Tempe; data base management; agenda monitoring and abort notification and pre and/or post agenda data saves. The charge for these services will be $10,374 per month. Purchaser will have the right to terminate these services at the end of any month by giving at least thirty (30) days written notice to Seller.

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

**Schedule 14.1(e)(A)**
**Continuing Violation Procedures**

Purchaser will notify Seller in writing of any alleged continuing violation of any Environmental Law promptly after Purchaser's discovery thereof. Seller shall have a reasonable period of time to investigate and ascertain whether Seller agrees with Purchaser's claim, and Purchaser will cooperate with all reasonable requests of Seller in connection therewith. Seller and Purchaser will negotiate in good faith with respect to the corrective action, if any, required to be taken. Purchaser agrees that it will not disclose any violations or alleged violations to any governmental authority or third party unless such disclosure is required by law.

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002297

16

## EXHIBIT 7

## PRODUCT SPECIFICATIONS

The products will be produced in accordance with Mil-S-13949H, dated 24, December, 1992 and the appropriate guidelines set by the IPC.

In the event that Mil-S-13949H, or the IPC guidelines are revised during the term of this agreement, the superseding military specification or IPC guidelines will become the governing document.

In the event that any specification change referenced above impacts the cost to produce the Products, the compensation to be paid to AlliedSignal under this Agreement will be modified to reflect such changes in cost.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002296

15

EXHIBIT 4.1A

<u>DESCRIPTION OF ITEMS IN FIXED CHARGES</u>

<u>Description</u>

Maintenance
Janitors
Repairs & Maintenance
Perishable Tools
QA Wages/Expenses
Supervisory Wages
Fixed Fringes
Depreciation
Sales & Use Tax
Property Insurance
Property Taxes
Outside Security
Scrap Removal
Other Fixed Expenses

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002295

14

3) <u>Direct Costs</u>

All direct costs associated with the manufacture of metal clad PTFE/glass (microwave) laminates will be billed at actual cost on a monthly basis. Direct costs will include but not necessarily be limited to extraordinary maintenance charges for the following categories:

1. Remove, regrind and reinsert press platens
2. Purchasing replacement pumps
3. Purchasing replacement valves
4. Replacing heat exchanger coils (some can be repaired)
5. Controller electrical problems
6. Replacing insulation boards
7. Purchasing or regrinding stainless steel plates
8. Replacing stainless steel wool pads
9. Regrinding tray carriers
10. Plate refinishing

4) <u>Copper Foil</u>

A charge for Copper Foil purchased by AlliedSignal during the applicable month for use in the manufacture of the Products. Charges for Copper Foil during 1995 will be as follows:

| <u>Type</u> | <u>Charge ($/lb.)</u> |
|---|---|
| one-half (1/2) oz. | 5.95 |
| one (1) oz. | 3.95 |
| two (2) oz. | 4.25 |
| three (3) oz. | 4.50 |

The 1996 charges for Copper Foil will reflect the same percentage increase or decrease reflected in Oak-Mitsui's published list prices.

5) <u>Laboratory Testing Services</u>

AlliedSignal will also provide laboratory testing services requested by Furon with respect to the Products for a charge of $38/per hour.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002294

13

## EXHIBIT 4

## COMPENSATION

As compensation for AlliedSignal's services hereunder, Furon will pay AlliedSignal a monthly fee consisting of the following components:

1) <u>Variable Costs</u>

<u>Direct Variable Expenses:</u>     Furon will pay all direct labor and benefit costs for the nine (9) employees in LaCrosse who work in the production of the Products. Furon will pay the full amount of such costs for the nine (9) employees regardless of whether or not any Products were manufactured during such month, and regardless of the amount of time the employees spend in the manufacture of the Products. The first priority of these nine (9) employees will be the manufacture of the Products, but AlliedSignal may assign them to other duties to the extent they are not required for the manufacture of the Products.

<u>Allocated Variable Expenses:</u>     Furon will pay the portion of indirect variable expenses allocated to the Fluorglas Microwave Business on a basis consistent with past practice.  The ratios to be used for such allocation are set forth below and will not be adjusted based upon production levels:

| DESCRIPTION | ALLOCATION % |
| --- | --- |
| Factory Supplies | 1.7 |
| Packaging Supplies | 1.7 |
| Indirect Lab - Shipping | 1.7 |
| Indirect Lab - Q.A. | 1.7 |
| Utilities | 5.0 |
| Workmens Compensation | 1.7 |
| Welfare Insurance | 1.7 |
| SUI/FUI | 1.7 |
| FICA | 1.7 |
| Pension | 1.7 |
| Vacation Pay | 4.4 |
| Holiday Pay | 4.4 |

2) <u>Fixed Costs</u>

A charge of $11,500/month for fixed costs (see Exhibit 4.1A for detail).  Effective January 1, 1997 AlliedSignal will adjust the charge for fixed costs to reflect any changes in such fixed costs.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002293

12

<u>EXHIBIT 3.2</u>

<u>COPPER FOIL SPECIFICATIONS</u>

<u>Copper Foil</u>

Grade 1 electrodeposited copper foil will be supplied with a "special" PTFE treatment per Oak-Mitsui specification MF-150F and the applicable IPC specifications.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002292

11

EXHIBIT 3.1

RAW MATERIAL SPECIFICATIONS

PTFE/Glass

PTFE/coated glass fabric will be supplied per "Norplex/Oak" procurement specification 12.2C, effective date 2/19/92 and the applicable IPC specifications.

PTFE Film

Virgin skived PTFE film will be supplied per "Norplex/Oak" procurement specification 12.3A, effective date 1/20/89 and the applicable section of the SPI ISO/WD T602A.2.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

10

EXHIBIT 2.3

PRODUCT LEAD TIMES

| Series | Lead Time |
|--------|-----------|
|        |           |
| 601 | 10 Working Days |
| 602 | 10 Working Days |
| 603 | 10 Working Days |
| 605 | 10 Working Days |
| 501 | 10 Working Days |
| 501S | 10 Working Days |
| 502S | 10 Working Days |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002290

9

EXHIBIT 1.1(a)

PRODUCTS

Series 601
Series 602
Series 603
Series 605
Series 501
Series 501S
Series 502S

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002289

8

19.   <u>ENTIRE AGREEMENT</u>   This Agreement constitutes the entire agreement and understanding between the parties with respect to the subject matter hereof, and supersedes and replaces any and all prior understandings and agreements. The standard terms and conditions of any purchase order issued by FURON or order acknowledgment issued by ALLIEDSIGNAL shall not apply to any services or products under this Agreement.

20.   <u>DISPUTE COSTS.</u>   In the event of any action for breach of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs and expenses incurred in such action.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth below.

FURON COMPANY                  ALLIEDSIGNAL LAMINATE SYSTEMS, INC.


By: _____       By: _____

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

7

14.   FORCE MAJEURE.   Failure of either party to make or take delivery hereunder when due, if occasioned by circumstances beyond the reasonable control of the party so failing, including, but not limited to, Acts of God, fire, explosion, flood, accident, interruption of or delay in transportation, labor troubles (whether or not the demands of the employees involved are reasonable and within said party's power to concede), employee absenteeism, labor turnover, equipment breakdown, compliance with governmental orders or directions, and other circumstances of like or different character, shall not subject said party to any liability to the other, and at the option of either party, the total quantity to be delivered hereunder shall be reduced by the quantities so omitted.

15.   ASSIGNMENT.   This Agreement may not be assigned by either party without the prior written consent of the other party, which consent shall not unreasonably be withheld, provided that either party may assign this Agreement without such consent to its successor in or to the purchaser of the business to which this Agreement relates. Subject to the foregoing, this Agreement shall be binding on and shall inure to the benefit of the parties hereto and their successors and permitted assigns.

16.   CAPTIONS   Paragraph headings are for the convenience of the parties only, and are not to be construed as having substantive legal significance.

17.   GOVERNING LAW   This Agreement shall be governed by, and construed and interpreted in accordance with the laws of the State of Wisconsin.

18.   WAIVER   Waiver of any breach, or failure to enforce any of the terms, conditions or provisions of this Agreement at any time shall not in any way affect, limit or waive that party's right thereafter to enforce and compel compliance with each and every term, provision or condition.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

6

shall at its sole cost and expense move any of its other machinery and equipment if required to provide free and clear access to the Equipment.  ALLIEDSIGNAL represents and warrants that it has an exit and loading area sufficiently large to permit reasonable removal, loading and transportation of the Equipment without damage to ALLIEDSIGNAL's facility or personal property.

11.   LIABILITY.  Neither party shall be liable to the other for special, incidental, indirect, punitive or consequential damages.

12.   NOTICES.   Notices to either party shall be in writing and will be deemed made when delivered by hand, received by certified mail, return receipt requested, or when received by facsimile, with a copy by mail, addressed as follows:

        If to AlliedSignal:

            AlliedSignal Laminates Systems, Inc.
            230 North Front Street
            La Crosse, Wisconsin 54602-1448
            Attention: President
            Facsimile No:  (608) 791-2475

      If to FURON:

            FURON Company
            14 McCaffrey Street
            P.O. Box 320
            Hoosick Falls, NY  12090-0320
            Attention:_____
            Facsimile No: (518) 686-3161

      Either party may change its address for notice by giving notice to the other party.

13.   TITLE AND RISK OF LOSS.   Title to the Raw Materials and the Products shall remain in FURON.   AlliedSignal shall be responsible for damage to or loss of Raw Material and  Products while in possession of AlliedSignal, except to the extent such damage or loss results from the negligence of FURON.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

5

9.3     Either party may terminate this Agreement by giving written notice to the other party, in the event of a breach of the terms and conditions of this Agreement by the other party, which breach has not been cured with thirty (30) days after the breaching party has received written notice specifying the particulars of the breach from the non-breaching party.

9.4     If either party becomes insolvent, or if a petition in bankruptcy is filed by or against either party, the other party may terminate this Agreement immediately, by written notice.

10.     REMOVAL OF EQUIPMENT.  FURON shall, at its expense, disassemble and remove the Equipment from ALLIEDSIGNAL's facility within two (2) years after the closing under the Asset Purchase Agreement.  In the event this Agreement is terminated prior to the expiration of the two (2) year term, removal shall be completed within forty-five (45) days after termination, but in no event later than two (2) years after the date hereof.  Disassembly and removal of the Equipment shall be performed in a safe and workmanlike manner during ALLIEDSIGNAL's regular business hours or at such other time as mutually agreed upon.  Any contractor engaged by FURON to perform the disassembly and removal shall be reasonably satisfactory to AlliedSignal. FURON and its contractor, if any, shall comply with all safety and other applicable requirements of AlliedSignal applicable to ALLIEDSIGNAL's facility.  FURON shall be responsible for the cost of repairing any damage to ALLIEDSIGNAL's facility incurred in connection with the removal of the Equipment, and shall indemnify and hold AlliedSignal harmless from and against any and all claims, liabilities, losses, damages, costs and expenses, including reasonable attorneys fees arising in connection with the disassembly and removal of the Equipment.  ALLIEDSIGNAL shall at its sole cost and expense provide FURON reasonable access to the Equipment and to an exit and loading area for purposes of removal, each of which shall be clear of any obstruction that would unreasonably hinder disassembly, removal, loading and transportation of the Equipment. ALLIEDSIGNAL

4

7.    <u>WARRANTY.</u>   ALLIEDSIGNAL warrants that the Products supplied hereunder shall conform to the specifications set forth in Exhibit 7.  ALLIEDSIGNAL will promptly replace any non-conforming Products with Products that conform to the applicable specifications at ALLIEDSIGNAL'S cost (including the cost of Raw Materials), provided that ALLIEDSIGNAL will not be obligated to replace Products if the non-conformity is caused by the failure of the Raw Materials to meet the specifications set forth in Exhibit 3.1 or any other defect in the Raw Materials not caused by ALLIEDSIGNAL. Replacement of non-conforming Products shall be ALLIEDSIGNAL's sole obligation and FURON's exclusive remedy for failure of the Products to meet the applicable specifications. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, THE PRODUCTS SUPPLIED HEREUNDER ARE SUPPLIED WITHOUT WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE.  FURON agrees to indemnify, defend and hold ALLIEDSIGNAL harmless from and against any and all claims of and liabilities to third parties (including all costs and expenses and reasonable attorneys fees relating thereto) relating to or arising in connection with the Products manufactured under this Agreement, except to the extent arising from the failure of the Products to conform to the specifications set forth in Exhibit 7.

8.    <u>YIELD</u>.  ALLIEDSIGNAL shall in good faith attempt to maximize the yield of Products produced from Raw Materials.

9.    <u>TERM; TERMINATION</u>

9.1    The maximum term of this Agreement shall be two (2) years commencing on the date of closing under the Asset Purchase Agreement.

9.2    FURON may terminate this Agreement effective at any time prior to the expiration of the two (2) year term by giving AlliedSignal at least sixty (60) days prior written notice.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER                    HONDON-0002284

3

with Exhibit 4.1 attached hereto.  FURON will be responsible for any and all freight charges relating to the Products.

5.    PAYMENT.   Payment terms shall be net thirty (30) days from receipt of invoice.  In the event of a good faith dispute regarding the accuracy of any invoice from ALLIEDSIGNAL to FURON, pending resolution of such dispute, FURON may withhold payment only of the disputed amounts, and shall promptly remit the undisputed amounts. Any overdue amounts shall bear interest compounded monthly at the prime lending rate in effect at the time, as reported by The Wall Street Journal.

6.    EQUIPMENT.

6.1    ALLIEDSIGNAL shall place signs, of a size and bearing legends reasonably acceptable to ALLIEDSIGNAL, on and around the Equipment indicating that such Equipment is the property of FURON.

6.2    Representatives of FURON shall have reasonable access to the Equipment, during normal business hours, consistent with reasonable security arrangements established by ALLIEDSIGNAL.

6.3    ALLIEDSIGNAL shall perform and be responsible for normal care, maintenance and operation of the Equipment.  FURON will be responsible for all repairs and extraordinary maintenance.  An illustrative list of extraordinary maintenance items to be directly charged to FURON is included in Exhibit 4.  ALLIEDSIGNAL shall promptly advise FURON of any repairs or extraordinary maintenance required for the Equipment and ALLIEDSIGNAL will perform or arrange for such repairs or extraordinary maintenance at FURON's cost, after receiving FURON's approval on the cost and scope of such activities.

6.4    ALLIEDSIGNAL shall operate the Equipment in a safe and proper manner, in compliance with all Federal, State and local laws, rules and regulations.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002283

2

quantities in excess of the capacity of the Equipment assuming the availability of all ten openings when staffed two shifts per day, five days per week (total of nine employees).

2.2     Prior to the beginning of each calendar month FURON shall provide ALLIEDSIGNAL with its best estimate of the quantity of Products required by FURON during each of the following four (4) calendar months. Such estimates are for planning purposes only and shall not be binding upon either party.

2.3     FURON shall issue firm orders for Products from time to time in accordance with the applicable minimum lead time for the Products as set forth in Exhibit 2.3. While ALLIEDSIGNAL will use reasonable efforts to supply Products in shorter lead times when requested by FURON, ALLIEDSIGNAL shall have no obligation under this Agreement to fill orders on a shorter lead time than set forth in Exhibit 2.3.

3.     <u>SUPPLY OF RAW MATERIALS</u>

3.1     FURON shall deliver to ALLIEDSIGNAL the raw materials necessary for AlliedSignal to manufacture the Products,  except for electrodeposited copper foil (the "Raw Materials"). The Raw Materials shall meet the applicable specifications set forth in Exhibit 3.1. FURON shall arrange to have the necessary Raw Materials delivered to ALLIEDSIGNAL at such times and in such quantities which are sufficient to permit ALLIEDSIGNAL to fill FURON's orders. FURON shall maintain no less than fourteen (14) days of supply of Raw Materials at ALLIEDSIGNAL's facility.

3.2     ALLIEDSIGNAL will purchase electrodeposited copper foil meeting the specifications attached hereto as Exhibit 3.1 ("Copper Foil") required to manufacture Products. FURON shall be responsible for notifying ALLIEDSIGNAL as to the quantities of Copper Foil ALLIEDSIGNAL should purchase to fill FURON's orders.

4.     <u>COMPENSATION</u>.   As compensation for ALLIEDSIGNAL's services hereunder, FURON shall pay ALLIEDSIGNAL a monthly fee determined in accordance

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

**Schedule 7**

**TOLL AGREEMENT**

THIS AGREEMENT is made effective as of the _____ day of _____, 1995, by and between ALLIEDSIGNAL LAMINATE SYSTEMS, INC., a Delaware corporation ("ALLIEDSIGNAL") and FURON COMPANY, a California corporation ("FURON").

WITNESSETH:

WHEREAS, ALLIEDSIGNAL AND FURON have entered into an Asset Purchase Agreement of even date herewith (the "Asset Purchase Agreement") pursuant to which ALLIEDSIGNAL sold to FURON certain assets located in ALLIEDSIGNAL's LaCrosse, Wisconsin facility, which equipment is listed in Schedule 4.5(a) to the Asset Purchase Agreement (the "Equipment").

WHEREAS, FURON desires that AlliedSignal manufacture, and AlliedSignal has agreed to manufacture for FURON, during the period of time set forth herein, certain metal-clad PTFE/glass laminates on and subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises set forth herein, the parties agree as follows:

1.     PRODUCTS. ALLIEDSIGNAL agrees to manufacture for FURON the metal-clad PTFE/glass laminate products identified in Exhibit 1.1(a) (the "Products") using the Equipment.

2.     QUANTITY; FORECASTS; ORDERS

2.1    The quantities of Products ALLIEDSIGNAL will manufacture for FURON hereunder shall be established in accordance with the procedures set forth in Sections 2.2 and 2.3 below, provided that in no event shall AlliedSignal be obligated to supply

11/9/95
Doc. #33597 v3

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

**Schedule 7**
**Toll Agreement**


Attached


10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002280

### Schedule 6.14
### Health and Safety Issues

Reference is made to the memorandum from David Yopak to Don Bradley dated August 19, 1995 (the "Yopak Memo") and related correspondence which identified certain Health and Safety issues. Seller agrees to pay to Purchaser concurrently with the Closing the amount of $10,000 for compliance activities to be performed by Purchaser.  Seller also agrees to perform, or at its option and expense cause a third party to perform, the items listed below which were identified in the Yopak memo.  Except as set forth in this Schedule, Seller will have no obligation to Purchaser with respect to Health and Safety compliance matters (excluding third party claims in respect of conduct of the Business prior to the Closing).

**Overall HS&E Issues**

1.   Confined space plan:  Seller will conduct training and document training with respect to the confined space plan. (Completed 10/31 per Ken Brownell)

2.   Hazardous energy control:  Seller will make required improvements at the John Street facility with respect to the Lock Out/Tag Out program.

3.   Personal protection standard:  Seller will complete training, implementation and certifications for McCaffrey Street and River Road II.

4.   Floor loading marking:  Seller has issued a purchase order to calculate the floor loading limits and will mark required areas with calculated load limits.

5.   Emergency lighting:  Seller will correct deficiencies noted in the emergency lighting system as tested during the week of October 16.

**Liberty Street**

6.   Flammable storage:  Seller will make changes to the ventilation system at Liberty Street to meet the standards of OSHA Standard 1910.106(d).

**River Road I**

7.   Machine guarding - Seller will install guard for the lathe at River Road I.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002279

**Schedule 6.10**
**Underground Storage Tanks**

All underground storage tanks are identified in Schedule 4.10 Environmental Disclosure.

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002278

**Schedule 6.1(d)**
**Retention Bonus Arrangements**

Stay-on Bonus -- 5 employees total.

Purchaser responsible for amounts payable after Closing not to exceed $35,000 in the aggregate. Purchaser will reimburse Seller for amounts paid upon receipt of an invoice from Seller.

Detailed information to be provided to Purchaser under separate cover.

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER                    HONDON-0002277

Schedule 6.2

High-level Salaried Employees

| | |
|---|---|
| William E. Noonan Jr. | General Manager |
| John Hayden | H.R. Supervisor |
| Bob Nowak | Controller |
| Richard Lenyk | Manager Product Quality/Process Reliability |
| Bob Ellis | Product Manager |
| Paul Beaumont | Manufacturing Manager |
| Mark Merrell | Manufacturing Manager |
| John B. Brown | Sales Representative |
| Christopher Conner | Sales Representative |
| Jeff Howe | Sales Representative |
| Tom McDonald | Sales Representative |
| Kevin Manchester | Sales Representative |
| Tom Wysocki | Maintenance Supervisor |
| Patricia LaPorte | Customer Service Manager |
| Joe Springer | Q.C. Supervisor |
| Satbir Nayar | Export Sales |
| Richard Hermas | Sales Representative |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

Schedule 6.1 (a) (1)
<u>Non-Transferring Employees</u>

A.  Production

Ernest Bates
Lawrence Carknard
Russell Drozozal
Veronica Hoag
Diana Jansen
Steve Jones
Kevin Kubler
Wayne Magigano
Eugene McNair
Bertilla Noble
Daniel Parker
Brian White

B.  Administrative

Richard Brown
Karen Flynn
Werner Jansen
Frank Keese
Gerald Merkel
Henry Serre
Phil Guy
Dan Bolduc
Walt Sprague*

C.  Pre-Closing Hires

In Furon's discretion, any employees hired by Seller between the signing of the
Asset Purchase Agreement and the Closing.

---

*Notwithstanding anything to the contrary contained in the Asset Purchase
Agreement, Purchaser shall be responsible for any severance payments due Mr.
Sprague under Seller's severance plan.  Purchaser shall reimburse Seller for such
severance upon receipt of an invoice from Seller.

PLRGLAE.N3

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002275

**Schedule 5.6**
**Purchaser's Consents**

Federal Government requirements under the Hart Scott Rodino Antitrust Improvements Act of 1976.

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002274

**Schedule 4.22**
**Direct Reports and Key Employees**

Albertus Beumer - Manager, Microwave Products

Robert Ellis - Manager, Product Marketing

Gerald Merkel - Director of Sales

Robert Nowak - Controller

John Hayden - Supervisor, Human Resources

Richard Lenyk - Manager, Product Quality and Process Reliability

P. J. Beaumont - Manufacturing Manager

Mark Merrell - Manufacturing Manager

Philip Guy - Materials Manager

Ken Brownell - Manager of Health, Safety & Environmental

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002273

# VILLAGE OF HOOSICK FALLS                    *Parcel II*

24 MAIN STREET, P.O. BOX 247
HOOSICK FALLS, NEW YORK 12090-0247

## PROPERTY SEARCH
### Property Tax, Water, Sewer, and Solid Waste Rents

TO: Sneeringer & Carmody Abstract
    47 Second Street
    Troy, N.Y. 12180

PROPERTY ADDRESS: __McCaffrey Street/Carey Ave._____

OWNER OF PROPERTY
AT TIME OF SEARCH ___Norplex Oak - Fluorglas_____

    This  is  to certify that the undersigned has  searched  the
records  of the Village of Hoosick Falls for the above  mentioned
and found the following information:

| PROPERTY TAXES | | PAID | DATE |
|---|---|---|---|
| JUNE 19_95_   19,271.45 | | | Pd. 6/9/95 |
|   BASE TAX | | | |
|   RELEVY | | | |
|   PENALTY? | | | |
| TOTAL: | | YES OR NO | |

| WATER RENTS | | PAID | DATE |
|---|---|---|---|
| AUGUST 19___ UNMETERED | | YES OR NO | |
|   PENALTY IF ANY: | | | |
| MAY 19_95_ METERED  6420.09 | | YES OR NO | Pd. 6/7/95 |
|   PENALTY IF ANY: | | | |
| NOVEMBER 19___METERED | | YES OR NO | |
|   PENALTY IF ANY: | | | |

| SEWER RENTS | | PAID | DATE |
|---|---|---|---|
| NOVEMBER 19___UNMETERED | | YES OR NO | |
|   PENALTY IF ANY: | | | |
| MAY 19_95_ METERED  5,971.51 | | YES OR NO | Pd. 6/7/95 |
|   PENALTY IF ANY: | | | |
| NOVEMBER 19___ METERED | | YES OR NO | |
|   PENALTY IF ANY: | | | |

| SOLID WASTE RENTS | | PAID | DATE |
|---|---|---|---|
| JANUARY 19___ SOLID WASTE | | YES OR NO | |
|   PENALTY IF ANY: | | | |
| JULY 19___ SOLID WASTE | | YES OR NO | |
|   PENALTY IF ANY: | | | |

DATED: __6/28/95_____ SIGNATURE *Teresa C. Renfrew*_____

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

# VILLAGE OF HOOSICK FALLS

*Parcel I*

24 MAIN STREET, P.O. BOX 247
HOOSICK FALLS, NEW YORK 12090-0247

PROPERTY SEARCH
Property Tax, Water, Sewer, and Solid Waste Rents

TO: Sneeringer & Carmody Abstract
    47 Second Street
    Troy, N.Y. 12180

PROPERTY ADDRESS: __Liberty Street  & Liberty St. Boiler_____

OWNER OF PROPERTY
AT TIME OF SEARCH __Norplex Oak (Fluorglas)_____

This  is  to certify that the undersigned has  searched  the
records  of the Village of Hoosick Falls for the above  mentioned
and found the following information:

| PROPERTY TAXES | PAID | DATE |
|---|---|---|
| JUNE 19_95__    4,608.78 | | Pd. 6/9/95 |
|    BASE TAX | | |
|    RELEVY | | |
|    PENALTY? | YES OR NO | |
| TOTAL: | | |

| WATER RENTS | PAID | DATE |
|---|---|---|
| AUGUST 19___  UNMETERED | YES OR NO | |
|    PENALTY IF ANY: | | |
| MAY 19_95_ METERED  220.00 - 1,905.95 | YES OR NO | Pd. 6/7/95 |
|    PENALTY IF ANY: | YES OR NO | |
| NOVEMBER 19___METERED | | |
|    PENALTY IF ANY: | | |

| SEWER RENTS | PAID | DATE |
|---|---|---|
| NOVEMBER 19___UNMETERED | YES OR NO | |
|    PENALTY IF ANY: | | |
| MAY 19_95_ METERED  1,772.53 - 204.60 | YES OR NO | Pd. 6/7/95 |
|    PENALTY IF ANY: | YES OR NO | |
| NOVEMBER 19___ METERED | | |
|    PENALTY IF ANY: | | |

| SOLID WASTE RENTS | PAID | DATE |
|---|---|---|
| JANUARY 19___ SOLID WASTE | YES OR NO | |
|    PENALTY IF ANY: | | |
| JULY 19___ SOLID WASTE | YES OR NO | |
|    PENALTY IF ANY: | | |

DATED: _6/28/95_____ SIGNATURE_Teresa C. Penyfort____

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

# Lawyers Title
# Insurance Corporation

**NATIONAL HEADQUARTERS**
RICHMOND, VIRGINIA

**TAXES**

## PARCEL II

THE PREMISES ARE ASSESSED ON THE 1995 ASSESSMENT ROLL, Town of Hoosick to
Norplex Oak, Inc. c/o Fluorglas P.O. Box 320 Hoosick Falls

Carey Ave.
1 BLDG - 2nd Floor

ACRES 6.57         1404 D 181
Property Class 710 (Manufacturing)
TAX MAP #37.6-3-1
Hoosick Falls Central School District Code 382801

THE PREMISES ARE ASSESSED FOR $968,600.00.

TAX DUE 1/1/95 IN THE AMOUNT OF $17,977.28 is PAID January 16, 1995.

1995-1996 SCHOOL TAX IN THE AMOUNT OF $26,837.24 PAID September 22, 1995.

No Water or Sewer Tax Search made.

Personal checks will not be accepted for payment of taxes at closing.  Tax
payment must be cut from proceeds.

Page 2
S. & C. No. T-49781
Date: October 3, 1995

Form 100 Litho in U.S.A.
035-0-100-0040/2                    **ISSUING OFFICE COPY**

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER                    HONDON-0002270



# Lawyers Title
# Insurance Corporation

**NATIONAL HEADQUARTERS**
RICHMOND, VIRGINIA

## TAXES

**PARCEL I**

THE PREMISES ARE ASSESSED ON THE 1995 ASSESSMENT ROLL, Town of Hoosick to
Norplex Oak, Inc. c/o Fluorglas P.O. Box 320 Hoosick Falls

Liberty Street

FR FT 39.36 X 26.27     ACRES 11.09          1239 D 286
Property Class 710 (Manufacturing)
TAX MAP #27.10-9-20
Hoosick Falls Central School District Code 382801
20% of 50100

THE PREMISES ARE ASSESSED FOR $446,300.00 less BS/IMP CTS(47600) of
$10,020.00.

TAX DUE 1/1/95 IN THE AMOUNT OF $8,097.38 is PAID January 16, 1995.

1995-1996 SCHOOL TAX IN THE AMOUNT OF $12,157.52 PAID September 22, 1995.

No Water or Sewer Tax Search made.

Personal checks will not be accepted for payment of taxes at closing.  Tax
payment must be cut from proceeds.

Page 1
S. & C. No. T-49781
Date: October 3, 1995

**ISSUING OFFICE COPY**

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER
HONDON-0002269



## Lawyers Title
### Insurance Corporation

**NATIONAL HEADQUARTERS**
RICHMOND, VIRGINIA

**MORTGAGE**

**NONE**

Page 1
S. & C. No. Y-49781
Date: October 4, 1995

---

*MORTGAGE PAYOUT LETTER MUST BE PROVIDED AT CLOSING. IF MORE THAN ONE MORTGAGE SEPARATE PAYOFF LETTERS MUST BE PROVIDED FOR EACH.   TWO (2) BUSINESS DAYS PLUS WEEKENDS AND HOLIDAYS INTEREST MUST BE ADDED. PAYOUT LETTER MUST SPECIFY CHECK REQUIREMENTS.*

*THE CREDIT LINE MUST BE TERMINATED PRIOR TO CLOSING FOR ANY OF THE ABOVE MORTGAGES WHICH ARE HOME EQUITY/REVOLVING CREDIT MORTGAGES AND THE PAYOFF LETTER MUST INDICATE THAT THE PRINCIPAL BALANCE IS FIXED. AN ESCROW IN THE FACE AMOUNT OF THE MORTGAGE IS REQUIRED FOR ANY CREDIT LINE NOT TERMINATED PRIOR TO CLOSING.*

---

**ISSUING OFFICE COPY**
CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER
HONDON-0002268

NOU  3'95 10:11 FR O'MELUENY MYERS NB#1 714 669 6995 TO 912014556199---  P.05/05



**LawyersTitle**
**Insurance Corporation**

**NATIONAL HEADQUARTERS**
RICHMOND, VIRGINIA

14.  Survey, dated April 1995 and revised September 25, 1995, made by David
F. Barrass, Land Surveyor, shows:
a) fence, lawn and debris encroaching over northerly line from lands
now or formerly of Wilt and Liporace;
b) edge of lawn and gravel drive encroaching over northerly line from
lands now or formerly of Brenenstuhl;
c) Note #5 indicates that the Village of Hoosick Falls is
maintaining a portion of the paved road running to Carey Ave. as a
street;
d) shed is shown encroaching over northerly line from lands now or
formerly of Hayes;
e) pedestal is on northerly line;
f) edge of lawn and gravel and broken pavement parking area encroach
over easterly line;
g) utility line crosses northerly line and runs to pole with guy and
continues to pole near transformer; policy insures that the rights
and easements to maintain and operate said line do not interfere
with the use of the buildings and improvements shown.
Policy excepts rights and easements of others to the aforesaid gravel
drive and portion of the premises maintained as a street.

15.  Policy insures that Carey Ave. is a village street and the premises
have access thereto.

*Schedule B - Section 2*
*Page 3*
*S. & C. No. Y-49781*
*Date: October 18, 1995*

** TOTAL PAGE.005 **

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002267

# Lawyers Title
# Insurance Corporation

**NATIONAL HEADQUARTERS**
RICHMOND, VIRGINIA

10.   Survey, dated April 1995 and revised September 25, 1995, made by David
      F. Barrass, Land Surveyor, shows:
      a) variations from Liber 1239 cp 286;
      b) chainlink fence along and within easterly and northerly lines;
      c) lawn of adjoiner within northerly line;
      d) remains of wire fence along northerly line;
      e) pond over westerly portion of premises;
      f) Permanent Easement NYS Department of Public Works within southwest
         corner;
      g) remains of fence and fence within southerly line;
      h) shed of adjoiner encroaching over southerly line;
      i) apparent location of easements granted to New York Power and Light
         Corp. and Niagara Mohawk Corp. and New York Telephone Co. with
         utility poles and guys and overhead wires crossing southerly line
         and running to building on premises;
      j) gravel parking area encroaches onto Parcel 3 of Liber 842 cp 432;
         and
      k) paved road encroaches onto lands now or formerly of the Trustees
         of the Society of St. Stanislaws, Inc.

11.   Rights, if any, of property owners abutting the premises in and to the
      waters of the pond at the southwest corner of the premises; including,
      but not limited to, drainage, boating and fishing rights.

12.   Policy insures that Liberty St. is a village street and the premises
      have access thereto.

Parcel II

13.   Ingress-Egress Easement - Liber 449 cp 310. Policy insures that the
      rights exercised under easements set forth herein do not interfere
      with the use of the buildings and improvements on the property as
      shown on the survey used herein.

Schedule B - Section 2
Page 2
S. & C. No: T-49781
Date: October 4, 1995

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER                    HONDON-0002266



**NATIONAL HEADQUARTERS**
RICHMOND, VIRGINIA

*52*
*5/2ys 1*

### SCHEDULE B - SECTION 2

*This policy or policies to be issued will contain exceptions to the following unless the same are disposed to the satisfaction of the Company:*

**All Parcels**

1.   The amount of acreage or square footage is not insured.

2.   Water and sewer rents, if any.  Municipal departmental charges, if any, not returned to county tax enforcing officer for collection.

3.   Rights and easements, if any, of public utility companies to maintain and operate existing installations on the premises herein and streets adjacent thereto.

4.   No title is insured to any land lying in the bed of any street, road or avenue abutting, adjoining, passing through or crossing the premises herein.

**Parcel I**

7.   Flood Protection Easement of Liber 861 cp 451. Policy insures that the rights exercised under easements set forth herein do not interfere with the use of the buildings and improvements on the property as shown on the survey used herein.

8.   Loss or damage by reason of reinstatement of premises to full assessment by assessor.

9.   Utility Easements recited in Liber 1104 cp 431 and Liber 1239 cp 286. Policy insures that the rights exercised under easements set forth herein do not interfere with the use of the buildings and improvements on the property as shown on the survey used herein.

Schedule B - Section 2
Page 1
S. & C. No: Y-49781
Date: October 4, 1995



**Lawyers Title Insurance Corporation**

NATIONAL HEADQUARTERS
RICHMOND, VIRGINIA

8.   Closing deed to contain the following recital:

     O/E/M/ Acquisitions, Inc. a Delaware Corporation, was incorporated on
     June 23, 1967 and was authorized to do business in New York on June
     29, 1967.  On July 5, 1967, it changed its name to Dodge Industries,
     Inc. Dodge Industries, Inc. changed its name to Oak Materials Group,
     Inc. on December 1, 1975.  Said corporation was merged into Norplex /
     Oak, Inc. on January 1, 1987.  Norplex / Oak, Inc. was authorized to
     do business in New York on February 17, 1987.  Said corporation
     changed its name to Norplex Oak, Inc. on January 30, 1989 and changed
     its name to AlliedSignal Laminate Systems, Inc. on December 16, 1992.

9.   Deed from the Village of Hoosick Falls to certified owner for the
     westerly portion of Liberty Street to be recorded.  E&A form 5217 and
     TP-584 to be furnished.

10.  Affidavit from certified owner must be provided indicating that there
     are no leases, options to lease or persons in possession.

*RECORDING OFFICERS REQUIRE ALL INSTRUMENTS TO BE EXECUTED IN BLACK INK.*

*Schedule B - Section 1*
*Page 2*
*S. & C. No. T-49781*
*Date: October 4, 1995*

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER                    HONDON-0002264



# Lawyers Title
## Insurance Corporation

**NATIONAL HEADQUARTERS**
RICHMOND, VIRGINIA

*51*
*convout*
*of final*
*policy*

*SCHEDULE B -- SECTION 1*

*REQUIREMENTS*

*The following are the requirements to be complied with:*

1.  Closing deed or lease to recite sale is made with unanimous consent of Grantor's Board of Directors, in its regular course of business; and recite it does not include all or substantially all corporate assets.

2.  Deed to insured to be recorded. Executed E&A Form 5217 <u>Revised January, 1994</u> (Filing Fee $25.00) and Combined Real Property Gains Tax, Real Property Transfer Tax and Credit Line Mortgage Affidavit Form TP-584 (Filing Fee $6.00) to be provided. (Real Property Gains Tax Tentative Assessment and certified funds payable to NYS Department of Taxation and Finance must be provided when applicable.)

    In addition to an owner's policy of title insurance for the purchase price of a 1-4 residential dwelling, an optional rider is also available to insure homeowners for the Future market value for an additional premium of 10% of the basic rate for an owner's policy.

3.  Closing deed and mortgage to contain the same description set forth in Schedule A, Item 4 herein.

4.  Information Only - Parcel I tax map number is #27.10-9-20 and Parcel II #37.6-3-1.

5.  See over updated Village of Hoosick Falls Tax searches for Parcels I, II.

6.  Fee policy will except purchase money mortgage.

7.  Corporation franchise tax search against Norplex Oak, Inc. changed to AlliedSignal Laminate Systems, Inc. shows owes franchise reports and taxes for December 1994. Filing period December. Also owes License fee. Consolidated statement of tax liabilities to be issued by N.Y.S. Department of Tax and Finance (1-800-835-3554)

*RECORDING OFFICERS REQUIRE ALL INSTRUMENTS TO BE EXECUTED IN <u>BLACK INK</u>.*

*Schedule B -- Section 1*
*Page 1*
*S. & C. No. T-49781*
*Date: October 3, 1995*

Form 100 Litho in U.S.A.
CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002263

# Lawyers Title
## Insurance Corporation

**NATIONAL HEADQUARTERS**
RICHMOND, VIRGINIA

Parcel II

All that piece or parcel of property situate in the Village of Hoosick Falls, County of Rensselaer, State of New York and being bounded and described as follows:

Beginning at a point at the Southwest corner of lands now or formerly of Steven C. and Pamela M. Wilt (former Catherine Reilly Lot), said point being in the easterly boundary of the Boston and Maine Railroad Right of Way, and running thence from said point of beginning South 84° 22' 17" East along the southerly boundary of said lands now or formerly of Steven C. and Pamela M. Wilt, the southerly boundary of lands now or formerly of Mary Jane Liporace, and the southerly boundary of lands now or formerly of Chauncey A., Edwin E. and Norma L. Brenenstuhl 250.19 feet to a point; thence North 19° 37' 43" East along the easterly boundary of said lands now or formerly of Chauncey A., Edwin E. and Norma L. Brenenstuhl 81.83 feet to a point in the southerly boundary of Carey Avenue; thence South 84° 22' 17" East along the said southerly boundary of Carey Avenue 27.93 feet to an iron pin at the northwesterly corner of lands now or formerly of Walter Hayes; thence South 22° 28' 40" West along the westerly boundary of said lands now or formerly of Walter Hayes 82.96 feet to an iron pin; thence South 84° 22' 17" East along the southerly boundary of said lands now or formerly of Walter Hayes 154.00 feet to an iron pin; thence South 82° 43' 17" East along the southerly boundary of lands now or formerly of Darren R. and Pamela J. Kimball 89.50 feet to an iron pin; thence North 02° 46' 43" East along the easterly boundary of said lands now or formerly of Darren R. and Pamela J. Kimball 79.50 feet to a point in the aforementioned southerly boundary of Carey Avenue; thence South 84° 39' 17" East along the said southerly boundary of Carey Avenue 80.69 feet to an iron pipe at the northwesterly corner of lands now or formerly of Marilyn Jordan; thence South 03° 15' 43" West along the westerly boundary of said lands now or formerly of Marilyn Jordan 649.97 feet to an iron pin in the northerly boundary of lands now or formerly of The Village of Hoosick Falls; thence North 84° 50' 17" West along the said northerly boundary of lands now or formerly of The Village of Hoosick Falls 311.02 feet to an iron pin in the aforementioned easterly boundary of the Boston and Maine Railroad Right of Way; thence northerly along the said easterly boundary of the Boston and Maine Railroad Right of

Way the following two (2) courses and distances: 1) North 27° 39' 17" West 300.00 feet to an iron pin and 2) along a curve to the right having a radius of 1117.00 feet and a central angle of 18° 17' a distance of 356.52 feet to the point of beginning,

Form 100 Litho in U.S.A.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002262



# Lawyers Title
# Insurance Corporation

**NATIONAL HEADQUARTERS**
RICHMOND, VIRGINIA

## SCHEDULE A

### Parcel I con't

formerly of Stephen L. Bienkoski; the northerly boundary of lands now or formerly of Elizabeth Hayden, and the northerly boundary of lands now or formerly of John E. and William L. Bakaitis 1099.10 feet to an iron pin in the easterly boundary of Hovey Avenue; thence North 13° 08' 36" East along the easterly boundary of lands now or formerly of Frank and Stella Sicinski 524.49 feet to an iron pin in the southerly boundary of lands now or formerly of Edward J. Kaukas; thence North 80° 43' 36" East along the said southerly boundary of lands now or formerly of Edward J. Kaukas, the southerly end of Madison Street, and the southerly boundary of lands now or formerly of Paul Danforth and Nancy Pierce 441.33 feet to an iron pin; thence South 33° 32' 00" East along the westerly boundary of said lands now or formerly of Paul Danforth and Nancy Pierce 153.27 feet to an iron pin; thence North 80° 50' 57" East along the southerly boundary of said lands now or formerly of Paul Danforth and Nancy Pierce, the southerly end of Mystic Lane, the southerly boundary of lands now or formerly of John J. and Merence C. Burke, and the southerly boundary of lands now or formerly of Raymond Wrubleski and Barbara A. Brown 359.58 feet to an iron bar at the northwesterly corner of lands now or formerly of Francis X. and Karen L. Gorman; thence southerly and easterly along the boundary of said lands now or formerly of Francis X. and Karen L. Gorman the following three (3) courses and distances: 1) South 33° 01' 21" East 72.50 feet to an iron pin; 2) North 80° 50' 57" East 82.84 feet to an iron pin; and 3) South 31° 28' 05" East 118.50 feet to the point of beginning.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

NOU  3'95 10:10 FR O'MELUENY MYERS NB#1 714 669 6995 TO 912014556199---  P.02/05

# Lawyers Title
## Insurance Corporation

**NATIONAL HEADQUARTERS**
RICHMOND, VIRGINIA

SCHEDULE A

Parcel I

All that piece or parcel of property situate in the Village of
Hoosick Falls, County of Rensselaer, State of New York and being
bounded and described as follows:

Beginning at an iron pipe at the northwesterly corner of Liberty
Street, said pipe being located 205 feet westerly along the
northerly boundary of Liberty Street from the westerly boundary of
Mechanic Street; and running thence from said point of beginning
South 31° 28' 05" East along the westerly end of said Liberty
Street 37.85 feet to a point in the northerly boundary of lands now
or formerly of The Trustees of The Society of St. Stanislaws, Inc.;
thence westerly and southerly along the boundary of said lands now
or formerly of The Trustees of The Society of St. Stanislaws, Inc.
the following four (4) courses and distances: 1) South 80° 50' 57"
West 106.56 feet to a point; 2) along a curve to the left having a
radius of 42.00 feet and a central angle of 33° 29' 16" a distance
of 24.55 feet to a point; 3) South 47° 21' 18" West 102.24 feet to
an iron pin; and 4) South 42° 38' 42" East 196.82 feet to an iron
pin in the northwesterly boundary of River Road; thence
southwesterly along the said northwesterly boundary of River Road
and along a curve to the left having a radius of 363.00 feet and a
central angle of 00° 46' 25" a distance of 4.90 feet to a point in
the easterly boundary of lands now or formerly of the Village of
Hoosick Falls; thence northerly along the said easterly boundary of
lands now or formerly of the Village of Hoosick Falls and along a
curve to the left having a radius of 790.50 feet and a central
angle of 14° 33' 50" a distance of 200.94 feet to an iron pin;
thence along the northerly boundary of said lands now or formerly
of the Village of Hoosick Falls and along a curve to the right
having a radius of 78.00 feet and a central angle of 13° 24' 48" a
distance of 18.49 feet to an iron pin; thence southerly along the
westerly boundary of said lands now or formerly of The Village of
Hoosick Falls and along a curve to the right having a radius of
775.50 feet and a central angle of 15° 24' 31" a distance of 208.55
feet to a point in the aforesaid northwesterly boundary of River
Road; thence southwesterly along the said northwesterly boundary of
River Road and along a curve to the left having a radius of 363.00
feet and a central angle of 3° 54' 37" a distance of 24.77 feet to
an iron pin at the northeasterly corner of lands now or formerly of
William and Lucinda Thomson; thence South 87° 03' 03" West along
the northerly boundary of said lands now or formerly of William and
Lucinda Thomson, the northerly boundary of lands now or formerly of
Nancy L. Foster; the northerly boundary of lands now or formerly of
Robert L. Kowalik, the northerly boundary of lands now or formerly
of Deborah A. Philpott, the northerly boundary of lands now or

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

# Lawyers Title
# Insurance Corporation

**NATIONAL HEADQUARTERS**
RICHMOND, VIRGINIA

## COMMITMENT FOR TITLE INSURANCE

### SCHEDULE A

S. & C. NO. T-49781

1. *Effective Date:* March 30, 1995

2. *Policy or Policies to be Issued:*

    (a) ALTA Owner's Policy 1992                Amount $ 4,000,000
        (with N.Y. Endorsement Modifications)

    *Proposed Insured:*  **Furon Company**

    (b) ALTA Loan Policy - 92                   Amount $
        (with N.Y. Endorsement Modifications)

    *Proposed Insured:*  T/B/D

3. *Title to the* FEE SIMPLE *estate or interest in the land described or referred to in this Commitment is at the effective date hereof vested in:*

Parcel I: AlliedSignal Laminate Systems, Inc., successor in interest to Dodge Industries, Inc., acquired title by deed dated July 13, 1972 and recorded July 18, 1972 in Liber 1239 cp 286.

Parcel II: AlliedSignal Laminate Systems, Inc., successor in interest to Oak Materials Group, Inc., acquired title by deed dated April 2, 1986 and recorded April 10, 1986 in Liber 1404 cp 181; being a portion thereof.

4. *The land referred to in this Commitment is described as follows:*

"SEE SHEET ATTACHED"

*Countersigned at* Troy, New York                   *Schedule A - Page 1*
**SMEERINGER & CARNODY ABSTRACT CORP.**

By _____                        *Date:* October 3, 1995
   *Authorized Officer/Agent*
   *Telephone No.:* (518) 271-6201

# Sneeringer and Carmody
## ABSTRACT CORPORATION

| ALBANY | TROY | SARATOGA |
|---|---|---|
| 518-434-0127 | 518-271-6201 | 518-885-1237 |

50 Chapel Street
Albany, New York 12207

Lawyers Title Insurance Corporation
Norwalk National Division
2150 Post Road
Fairfield, Connecticut 06430-5669

Whiteman, Osterman & Hanna, Esqs
1 Commerce Plaza
Albany, New York 12260

O'Melveny & Myers
Suite 1700
610 Newport Center Drive
Newport Beach, CA 92660-6429
ATTN: Susan M. Mason, Esq.

Allied Signal, Inc.
Law Dept.
101 Columbia Rd.
Morristown, NJ   07962

---

S&C No. T49781                                        October 4, 1995
Premises:  Carey St., Hoosick
           Liberty St., Hoosick

New owner:      Furon Company

| | | |
|---|---|---:|
| Endorsement - Waiver of Arbitration | $ | 25.00 |
| Endorsement - Land Same As Survey | | 25.00 |
| Fee Policy -        $4,000,000.00 | | 13499.00 |
| Tax Search | | 150.00 |
| Extra Chain(s) of Title | | 900.00 |
| Village Tax Search | | 60.00 |
| Franchise Tax Search | | 30.00 |
| Disbursement | | 240.00 |
| | | ---------- |
| TOTAL | $ | 14929.00 |


           SATISFACTION OF MORTGAGE NOT PROVIDED AT
           CLOSING, $30.00 PLUS COST OF RECORDINGS

REPRESENTING LAWYERS TITLE INSURANCE CORPORATION

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002258

**Schedule 4.18(c)**
<u>**Title Commitments for McCaffrey Street and Liberty Street**</u>

See Attached.

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002257

**Schedule 4.18(b)**
**Exceptions to use of Transferred Facilities**

An underground water main that Seller owns and maintains extends from the Village of Hoosick Falls Public Water Works, under the Hoosick River, through lands of Kenneth Brownell Sr., through the south side of River Road 3's eastern property line to the River Road 3 plant, then around the south and west side of River Road 3 to the River Road 1 and 2 properties and plants. Seller is not aware of any recorded easement or right of way with respect to this pipeline.

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002256

**Schedule 4.18(a)(ii)**
**Leased Real Property**

NONE

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002255

**Schedule 4.4(b)**
**Material Adverse Changes**

NONE

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002167

Schedule 4.5(a)
**Condition of Property**

(i)  Personal property located at the Facilities:

See capital register attached as Appendix I

(ii) LaCrosse Machinery and Equipment used exclusively for the Fluorglas Microwave Business:

See list attached as Appendix II

Seller shall have the right to use the HP 8729B Network Analyzer with Fixtures (item number 31 on the attached list) at no charge for the duration of the Toll Agreement. Upon termination of the Toll Agreement, Seller shall have the right to remove at its expense any and all test cavities other than those which are required for testing Fluorglas Microwave products at X-Band. Seller shall be responsible for the cost of repairing any damage to such equipment incurred in connection with such use (ordinary wear and tear excepted) and in connection with Seller's removal of any test cavities.

(iii)Exceptions to condition of Personal Property:

Old rewind slitter no longer usable for slitting and currently used only as a rewind logger. Certain idle equipment has not been maintained in operating condition.
None of the equipment identified in this item (iii) is material to the operation of the Business as currently conducted.

(iv)Exceptions to condition of Facilities and Improvements:

1.  The deck work in the McCaffrey Street coating tower room is in need of repairs. Seller, based upon information provided by the General Manager of the Business, in good faith estimates the cost of the repairs to be approximately $60,000.

2.  The wooden roof eaves at Liberty Street are showing considerable evidence of dry rot. Repairs have been planned and budgeted for the summer of 1996. Seller, based upon information provided by the General Manager of the Business, in good faith estimates the cost of these repairs to be approximately $4,400.

    Repairs of these items are Purchaser's responsibility. Seller will not be responsible for the accuracy of the cost estimates, unless Seller has not acted in good faith with respect to the amounts of such estimates. The cost estimates contained herein are not to be construed as representations or warranties of Seller or Parent.

11/8/95
Doc. #33629 v7

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002168

**Appendix I to Schedule 4.5(a)**
**Capital Register**

See Attached.

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002169

OCT 26 '95 10:24 FLUORGLAS_ACCTG                                        P.2/17





*** MILLENNIUM ONLINE PRINT:

| (09/26/95) LOC KEY LNE | (09/26/95) LOC KEY ITEM NO | BK DESCRIPTION | BK ACQ YEAR | BK ACCT | BK COST | BK ACCM DEPR | NET BOOK VALUE (PAGE: 1) |
|---|---|---|---|---|---|---|---|
| 902 FL172 | 902 FL061 | LAND-LIBERTY ST. | 72 | 3311 | 3,000.00 | .00 | 3,000.00 |
| 902 FL175 | | | | 3311 | 3,000.00 | .00 | 3,000.00 |
| 902 FL503 | 902 FL049 | LAND INV-LIBERTY ST. *PAVING | 73 | 3316 | 2,152.50 | 2,152.50 | .00 |
| 902 A073042 | 902 FL046 | LAND INV-LIBERTY ST. *PAVING | 82 | 3316 | 24,322.51 | 24,322.51 | .00 |
| 902 A078545 | 902 FL050 | LAND INV-LIBERTY ST. *PAVING | 91 | 3316 | 1,142.76 | 579.54 | 563.22 |
| 902 A148180 | | LAND INV-LIBERTY ST. *EDGING | | 3316 | 1,142.76 | 579.54 | 563.22 |
| 902 FL021 | 902 FL115 | BUILDING INP-LIBERTY ST | 67 | 3326 | 29,617.77 | 29,054.55 | .00 |
| 902 FL023 | 902 FL118 | BUILDING INP-LIBERTY ST | 70 | 3326 | 1,037.60 | 1,037.60 | .00 |
| 902 FL203 | 902 FL095 | BUILDINGS-LIBERTY ST | 72 | 3326 | 5,244.23 | 5,244.23 | .00 |
| 902 FL096 | 902 FL096 | BUILDINGS-LIBERTY ST | 72 | 3326 | 5,289.43 | 5,289.43 | .00 |
| 902 FL210 | 902 FL097 | BUILDINGS-LIBERTY ST | 73 | 3326 | 57,298.34 | 57,298.34 | .00 |
| 902 FL211 | 902 FL098 | BUILDINGS-LIBERTY ST | 73 | 3326 | 20,680.58 | 18,405.69 | 2,274.89 |
| 902 FL212 | 902 FL099 | BUILDINGS-LIBERTY ST | 73 | 3326 | 171,731.40 | 171,731.40 | .00 |
| 902 FL214 | 902 FL100 | BUILDINGS-LIBERTY ST | 74 | 3326 | 12,591.41 | 12,591.41 | .00 |
| 902 FL216 | 902 FL101 | BUILDINGS-LIBERTY ST | 74 | 3326 | 5,980.00 | 5,083.00 | 897.00 |
| 902 FL217 | 902 FL102 | BUILDINGS-LIBERTY ST | 75 | 3326 | 36,503.90 | 36,503.90 | .00 |
| 902 FL220 | 902 FL122 | WATER SOFTNR*INP-LIBERTY ST | 75 | 3326 | 117.44 | 117.44 | .00 |
| 902 FL224 | 902 FL103 | BUILDINGS-LIBERTY ST | 76 | 3326 | 10,565.25 | 10,565.25 | .00 |
| 902 FL226 | 902 FL104 | BUILDINGS-LIBERTY ST | 76 | 3326 | 2,603.98 | 2,603.98 | .00 |
| 902 FL227 | 902 FL105 | BUILDINGS-LIBERTY ST | 77 | 3326 | 34,944.40 | 34,944.40 | .00 |
| 902 FL230 | 902 FL106 | BUILDING INP-LIBERTY | 77 | 3326 | 4,612.12 | 4,612.12 | .00 |
| 902 FL231 | 902 FL107 | BUILDINGS-LIBERTY ST | 77 | 3326 | 1,037.50 | 757.37 | 280.13 |
| 902 FL233 | 902 FL108 | BUILDINGS-LIBERTY ST | 79 | 3326 | 6,165.19 | 6,165.19 | .00 |
| 902 FL234 | 902 FL131 | BUILDINGS-LIBERTY ST | 79 | 3326 | 46,681.14 | 46,681.14 | .00 |
| 902 FL235 | 902 FL133 | BUILDING INP-LIBERTY | 80 | 3326 | 46,686.14 | 42,147.18 | 4,538.96 |
| 902 FL251 | 902 FL134 | BUILDING INP-LIBERTY ST | 80 | 3326 | 9,225.62 | 9,225.62 | .00 |
| 902 FL261 | 902 FL110 | BUILDINGS-LIBERTY ST | 81 | 3326 | 7,283.18 | 7,283.18 | .00 |
| 902 FL270 | 902 FL111 | BUILDING INP-LIBERTY ST. | 81 | 3326 | 12,933.31 | 12,933.31 | .00 |
| 902 FL277 | 902 FL139 | WATER SPRAY PIPING-RM. ST. | 82 | 3326 | 24,590.78 | 24,590.78 | .00 |
| 902 FL279 | 902 FL142 | OVERHEAD DOOR-WAREHOUSE-LIB. ST. | 84 | 3326 | 34,228.82 | 34,228.82 | .00 |
| 902 FL291 | 902 FL144 | CONCRETE FLOOR-P.F.A. AREA | 88 | 3326 | 4,700.00 | 4,700.00 | .00 |
| 902 FL296 | 902 FL146 | BUILDINGS-LIBERTY ST | 88 | 3326 | 8,495.80 | 8,495.80 | .00 |
| 902 FL301 | 902 FL147 | PLT. CONSOL. PROJ(STACK,CUPOLA,SPRINKLERS,ETC) | 88 | 3326 | 4,575.77 | 4,575.77 | .00 |
| 902 FL302 | 902 FL113 | SHIPPING DOCK-LIB ST. | 89 | 3326 | 2,651.40 | 2,651.40 | .00 |
| 902 FL304 | 902 FL151 | LOADING DOCK LEVELER-LIB. ST. | 89 | 3326 | 9,280.00 | 9,280.00 | .00 |
| 902 FL315 | 902 FL153 | OVERHEAD DOOR-LIB ST | 89 | 3326 | 50,000.00 | 31,250.00 | 18,750.00 |
| 902 FL316 | 902 FL154 | OVERHEAD DOOR-LIB ST | 89 | 3326 | 96,960.70 | 96,960.70 | .00 |
| 902 FL320 | 902 FL158 | BUILDING FACADE-LIB. ST. | 90 | 3326 | 30,550.29 | 30,550.29 | .00 |
| 902 FL322 | 902 FL159 | FLOOR REPAIR-P.F.A. ST.-RM. ST. | 90 | 3326 | 6,403.54 | 6,403.54 | .00 |
| 902 FL323 | 902 FL160 | APICAL "CLEAN" RM.-LIB. ST. | 90 | 3326 | 1,771.00 | 1,771.00 | .00 |
| 902 FL327 | 902 FL162 | FIRE SPR RKLERS-LB. F. WAREHOUSE | 91 | 3326 | 1,850.00 | 1,850.00 | .00 |
| 902 FL328 | 902 FL165 | FIRE SPRINKLERS-LB.ST.-BARREL STORAGE | 91 | 3326 | 1,724.70 | 1,724.70 | .00 |
| 902 FL329 | 902 FL167 | FENCING-GAS TANK-/S(C1-12) | 91 | 3326 | 23,700.00 | 23,700.00 | .00 |
| 902 FL334 | 902 FL169 | SPRINKLES-OFFICE AREF-LIB. ST.(O1-17) | 92 | 3326 | 7,400.00 | 7,400.00 | .00 |
| | 902 FL170 | ROOF REPLACEMENT-/S(C1-18) | 92 | 3326 | 148,776.78 | 126,458.36 | 22,316.22 |
| | | | | 3326 | 12,707.65 | 10,801.51 | 1,906.14 |
| | | | | 3326 | 2,487.00 | 2,113.95 | 373.05 |
| | | | | 3326 | 2,875.00 | 2,443.75 | 431.25 |
| | | | | 3326 | 8,703.72 | 5,668.47 | 3,052.25 |
| | | | | 3326 | 3,853.17 | 2,504.56 | 1,348.61 |
| | | | | 3326 | 16,500.00 | 10,725.00 | 5,775.00 |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002170

(0N/26/95)                    * * *  MILLENNIUM  ONLINE  PRINT:                                    (PAGE: 5)

| UNC KEY ITEM NO | BK DESCRIPTION | BK ACQ YEAR | ACC | BK COST | BK ACCM DEPR | NET BOOK VALUE |
|---|---|---|---|---|---|---|
| 9%2 A148177 | PLI UPGRADE-12" EXT TP CALENDER(94-25) | 95 | 133= | 53,617.66 | 1,218.58 | 52,399.08 |
| 9%2 A148181 | CATALYST PROCESS, ODOR ELIMINATION, ET (94-59) | 95 | 133 | 8,229.80 | 187.04 | 8,042.76 |
| 9%2 A148192 | PORT VACUUM CLEANER, W/ACCESS | 95 | 133 | 4,625.82 | 105.13 | 4,520.69 |
| 9%2 A148193 | LOW-DENSITY DIGITAL COMPARATOR | 95 | 133 | 6,315.00 | 143.52 | 6,171.48 |
| 9%2 A148194 | DIGITAL ANALYTICAL BALANCE - Q/C | 95 | 133 | 1,873.53 | 42.58 | 1,830.95 |
| 9%2 A148201 | PREC SAMPLE CUTTER 1 OF 2 | 95 | 133 | 1,895.00 | 43.07 | 1,851.93 |
| 9%2 A148202 | PREC SAMPLE CUTTER 2 OF 2 | 95 | 133 | 1,896.00 | 43.09 | 1,852.91 |
| 2 | | | | 4,193,607.24 | 2,103,091.69 | 2,090,515.55 |
| 9%2 FL350 | COPIER-XEROX-L/S SHIPPING(90-21 | 90 | 33Y | 2,198.86 | 2,198.86 | .00 |
| 9%2 FL351 | FAX MACH-L/S SHIP-AEW#35520(90-21) | 91 | 33Y | 1,457.93 | 1,457.93 | .00 |
| 9%2 FL415 | PRINTER-SER#65508 | 91 | 33Y | 1,217.43 | 1,217.43 | .00 |
| 9%2 FL425 | FAX MACH-AT&T-L/S S#IT(92-35) | 93 | 33Y | 1,564.00 | 1,564.00 | .00 |
| 9%2 FL510 | TERMINAL CONTROLLER-MOD#517A-11R-WCC ST | 93 | 33Y | 7,522.63 | 5,641.97 | 1,880.66 |
| 9%2 FL515 | P.C.-ETA T.-4860N2/56 W/ ACC(93-36) | 93 | 33Y | 2,824.04 | 2,118.03 | 706.01 |
| 9%2 FL517 | PRINT'G PRINTER W/D#5DA0L W/INTRFACE(93-62)EXT 1. | 93 | 33Y | 4,003.32 | 2,993.10 | 1,010.82 |
| 9%2 A040377 | BARCODE PRINTER PSMF | 94 | 34Y | 5,171.00 | 1,077.29 | 4,093.71 |
| 9%2 A040378 | BARCODE PRINTER SHAPES | 94 | 34Y | 6,995.00 | 1,040.63 | 3,954.37 |
| 9 2 A075049 | TENSILE LOAD/ELONG ANALYSIS SOFTWARE (94-24) | 94 | 34Y | 11,641.43 | 1,616.87 | 10,024.56 |
| 9 2 A075042 | PSMT PC ENVIRONMENT REPORTING | 95 | 35Y | 3,699.00 | 154.13 | 3,544.87 |
| 9 2 A075047 | PC LIB'ST MRP | 95 | 35Y | 3,822.12 | 159.26 | 3,652.86 |
| 9 2 A075048 | PC LIB'ST EXTRUDE'S TAPE | 95 | 35Y | 6,483.24 | 270.14 | 6,233.10 |
| 9 2 A148196 | PC-DATABASE MGMT Q/C-IB ST | 95 | 35Y | 4,763.24 | 198.47 | 4,564.87 |
| 9 2 A148200 | PC - SALES DEPT W/PRINTER | 95 | 35Y | 3,418.20 | 142.43 | 3,275.77 |
| 1 9 2 | | | | 64,821.54 | 21,889.94 | 42,931.60 |
| * | | | | 5,514,090.37 | 3,134,586.22 | 2,379,504.15 |
| | | | | 5,514,090.37 | 3,134,586.22 | 2,379,504.15 |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002171

OCT 26 '95 10:26 FLUORGLAS_ACCTG

P.4/17

(09/26/95)

* * * MILLENNIUM CHEMICAL PRINT: (PAGE: 2)



| LOC | KEY ITEM NO | BK DESCRIPTION | DEPR YEAR | ACCT | BK COST | BK ACCM DEPR | NET BOOK VALUE |
|---|---|---|---|---|---|---|---|
| 902 | FL172 | WAREHOUSE LIGHTING-LIB. ST.(92-7 | | 3314 | 1,567.50 | 1,018.88 | 548.62 |
| 902 | FL172 | OVERHEAD DOOR-EXT. TAP(92-19) | | 3314 | 1,960.00 | 1,274.00 | 686.00 |
| 902 | A05C?2 | TRG ADDITION EXT T. PAVILLION | | 3314 | 125,000.00 | 28,125.00 | 96,875.00 |
| 902 | A07?2 | EXTRUDER 12 & 16 CONTROL ROOM | | 3314 | 27,635.19 | 767.64 | 26,867.55 |
| 902 | A07?95 | COMPRESSOR PSAT | | 3314 | 23,519.73 | 196.00 | 23,323.73 |
| 902 | A14E-0 | BOILER CONVERSION-LIB ST. | | 3314 | 20,370.91 | 169.76 | 20,201.15 |
| 902 | FL021 | ROLL-SINTERING MACH | | 335? | 1,223,043.82 | 980,550.04 | 242,493.78 |
| 902 | FL021 | PORTABLE PRIMING STATION-PSAT | | 335? | 3,000.00 | 3,000.00 | .00 |
| 902 | FL026 | DRY POLYMER OVEN (87-2) | | 335? | 3,000.00 | 3,000.00 | .00 |
| 902 | FL021 | BAG ADDITION EXTRUDER | | 3357 | 104,000.00 | 104,000.00 | .00 |
| 902 | FL021 | METERING OVEN(87-3-POLYMER) | | 3357 | 185,282.34 | 185,282.34 | .00 |
| 902 | FL021 | SHEAR & STABILIZER(87-3-POLYMER) | | 3357 | 100.00 | 100.00 | .00 |
| 902 | FL021 | FARRELL CALENDAR(87-3-POLYMER) | | 3357 | 5,000.00 | 5,000.00 | .00 |
| 902 | FL121 | COX TESTER-PSAT(87-6) | | 335? | 30,000.00 | 30,000.00 | .00 |
| 902 | FL121 | SEIVING MANDRELS-LARGE BILLET(87-9 | | 335? | 6,555.00 | 6,555.00 | .00 |
| 902 | FL123 | COOLER-FARRELL CALENDAR(87-1 | | 335? | 2,300.00 | 2,300.00 | .00 |
| 902 | FL123 | BAGGING MACHINE-DYGERT & STONE-PSAT | | 335? | 1,258.08 | 1,258.08 | .00 |
| 902 | FL123 | LEDO SCALE(KCO BT42)DIG'L CONVE. | | 335? | 8,901.00 | 8,901.00 | .00 |
| 902 | FL123 | FRONE-PLATE EXTRUSION BARRELS-LI | | 3331 | 2,234.00 | 2,234.00 | .00 |
| 902 | FL123 | FARRELL CALENDAR REBUILD(87-31) | | 3331 | 1,446.26 | 1,004.50 | 441.76 |
| 902 | FL124 | CALENDAR ROLLS-FARRELL(88-02) | | 3331 | 1,364.47 | 1,283.52 | 80.95 |
| 902 | FL124 | MANDREL-LARGE SKIVER(88-14) | | 3331 | 19,176.00 | 18,038.36 | 1,137.64 |
| 902 | FL124 | COX LIFT-L13 ST. SHAVES-YALE(88-24 | | 3331 | 4,200.00 | 3,950.83 | 249.17 |
| 902 | FL125 | SKIVER MODS.(88-52) | | 3331 | 16,657.80 | 15,481.42 | 976.38 |
| 902 | FL125 | SKIVER MODS.(88-54) | | 3331 | 9,233.55 | 8,685.76 | 547.79 |
| 902 | FL125 | LEDO SCALE(KCO. #23(0)-SKIVING | | 3331 | 12,547.86 | 11,803.45 | 744.41 |
| 902 | FL125 | CYLINDER-SKIVING BILLET MOUNT | | 58 | 1,886.22 | 1,774.32 | 111.90 |
| 902 | FL125 | LCF CONSOLIDATION MISC. EQUIP. | | 58 | 3,337.40 | 3,139.42 | 198.08 |
| 902 | FL125 | SLITTER-CAMERONS??PACT-MYSTIK | | 3331 | 3,000.00 | 2,584.72 | 415.28 |
| 902 | FL125 | SLITTER-CAMERONS??PACT-MYSTIK | | 3331 | 60,000.00 | 51,694.33 | 8,305.67 |
| 902 | FL127 | SLITTER-CAMERONS??PACT-MYSTIK | | 3331 | 60,200.00 | 51,694.33 | 8,305.67 |
| 902 | FL131 | PSAT COATING TOWER UPGRADE | | 3331 | 171,470.24 | 147,734.00 | 23,736.24 |
| 902 | FL131 | PSAT COATING TOWER UPGRADE | | 3331 | 47,226.07 | 41,119.46 | 6,606.61 |
| 902 | FL132 | SPRAY BLEND MIXER & EMULSIFIER | | 3331 | 3,338.32 | 2,876.21 | 462.11 |
| 902 | FL132 | LEDO SCALE MOD. 218-EXT TAPE | | 3331 | 3,350.00 | 2,886.26 | 463.74 |
| 902 | FL133 | FIBER LABEL'G SYS(MOD 30 INDEX) | | 3331 | 12,311.33 | 10,607.10 | 1,704.23 |
| 902 | FL133 | LFL GAS DETECTOR(89-02) | | 3331 | 4,156.12 | 3,580.48 | 575.64 |
| 902 | FL133 | EXT TAPE 16"MILL PREFORMER MODS | | 3331 | 2,216.53 | 2,051.13 | 165.40 |
| 902 | FL133 | EXT TAPE 12" DIE BARRELS(89-04) | | 3331 | 4,500.00 | 3,877.08 | 622.92 |
| 902 | FL133 | SLITTER-CAMERONS??FACI UPGRADE | | 3331 | 12,881.50 | 11,098.35 | 1,783.15 |
| 902 | FL133 | SLITTER-CAMERONS??FACI UPGRADE | | 3331 | 12,881.50 | 11,098.35 | 1,783.15 |
| 902 | FL135 | COX, TAPE TOLEDO SCALE MODS | | 3331 | 2,535.00 | 2,184.08 | 350.92 |
| 902 | FL135 | PSAT TEST-PROG/DIG REL.THERMO | | 3331 | 7,596.80 | 6,572.88 | 1,023.92 |
| 902 | FL135 | PSAT 40" COATER ROLLS(89-34) | | 3331 | 3,652.00 | 3,146.46 | 505.54 |
| 902 | FL135 | GENERATOR-FARRELL CALENDAR(89-39 | | 3331 | 9,159.80 | 7,891.83 | 1,267.97 |
| 902 | FL135 | FARRELL CALENDAR D.C. DRIVE | | 3331 | 1,584.34 | 1,365.02 | 219.32 |
| 902 | FL135 | FARE SKIVING MANDREL(89-46) | | 3331 | 1,830.50 | 1,577.11 | 253.39 |
| 902 | FL135 | LIB ST Q.C. TEMP/HUMINITY(89-48 | | 3331 | 7,117.80 | 6,132.50 | 985.30 |
| 902 | FL135 | SKI TOWER #4 IN-LINE LAMINATOR | | 3331 | 12,303.12 | 10,600.03 | 1,703.09 |
| 902 | FL135 | SKI TOWER #4 IN-LINE LAMINATOR | | 3331 | 10,917.88 | 9,406.54 | 1,511.34 |

* * * MILLENNIUM ONLINE PRINT: * * * _AGE: 5)

| BK DESCRIPTIO | E ACQ YEAR | ACCT | BK COST | BK ACCM E" | NET BOOK VALUE |
|---|---|---|---|---|---|
| SLITTER KNIFE SPACERS-EXT TAPE(89-58) | 89 | 3331 | 7,514.44 | 6,50[illegible] | 1,045.74 |
| 60" OVEN COATING HEAD BACK & END DAMS 89-62) | 89 | 3331 | 3,379.44 | 2,91[illegible] | 467.81 |
| LOAD CELL(200#)FOR INSTRON TENSILE TESTER(89-67) | 89 | 3331 | [illegible],002.84 | 2,44[illegible] | 554.11 |
| RAM EXTRUDER-12" ASSEMBLY EXT TAPE(88 26) | 89 | 3331 | 32,883.00 | 28,33[illegible] | 4,551.92 |
| 12" PREFORM PRESS(88-26) | 89 | 3331 | 13,000.00 | 11,20[illegible] | 1,799.58 |
| 12" FLAT DIE ASSEMBLY(88-26) | 89 | 3331 | 18,000.00 | 15,50[illegible] | 2,491.70 |
| GURLEY SENSOMETER-LS QC-(90-09) | 90 | 3331 | [illegible],173.64 | 4,17[illegible] | .04 |
| DIELECTRIC TEST-HIPTRON'S-115V,50/60HZ,20AMPS(90-29) | 90 | 3331 | 4,40.32 | 4,41[illegible] | .04 |
| DENSIMETER-TMI MOD ED-120I(90-5[illegible]L/S | 90 | 3331 | 3,51.65 | 3,5[illegible] | .06 |
| 12" EXTRUDER MODS(88-26) | 90 | 3331 | 12,058.59 | 9,34[illegible] | 2,722.51 |
| HIST REMOVAL-LEVER SLITTER(89-2[illegible]) | 90 | 3331 | 1,948.4[illegible] | 1,50[illegible] | 439.54 |
| REWIND SLITTER #1-EXT TP(89-25A | 90 | 3331 | 35,116.26 | 26,55[illegible] | 8,558.49 |
| REWIND SLITTER #2-EXT TP(89-25B | 90 | 3331 | 35,116.26 | 26,55[illegible] | 8,558.49 |
| 50" COATER MODS(89-27) | 90 | 3331 | 5,026.81 | 3,85[illegible] | 1,173.97 |
| FLECK SKIVER MODS(89-47_) | 90 | 3331 | 28,429.25 | 22,01[illegible] | 6,413.24 |
| #4 TOWER IN-LINE LAMINATOR MODS(89-55) | 90 | 3331 | 2,636.27 | 2,01[illegible] | 517.93 |
| 16" EXT'R SPARE BEARINGS FOR CALENDER(89-56) | 90 | 3331 | 15,332.79 | 12,31[illegible] | 3,010.93 |
| CALIBRATION EQUIP FOR COATERS | 90 | 3331 | 3,554.03 | 2,7[illegible] | 737.22 |
| 6-SPOOL TAPE WINDING HEAD-TST(8-69) | 90 | 3331 | 2,458.03 | 1,9[illegible] | 516.75 |
| LIVE CENTER FOR INTERMEDIATE SKIVER(90-11) | 90 | 3331 | 9,624.05 | 7,42[illegible] | 2,171.05 |
| SPRAY BLEND MIXER-EXT T.(89-22) | 91 | 3331 | 9,649.94 | 6,41[illegible] | 3,238.35 |
| 12" ROUND DIE-EXT T.(89-50) | 91 | 3331 | 17,621.43 | 11,7[illegible] | 5,913.44 |
| 16" ROUND DIE(BACKUP)(90-18) | 91 | 3331 | 19,516.98 | 12,9[illegible] | 6,549.55 |
| 12" EXTR'R BACKUP FLAT DIE-JENNINGS(91-01) | 91 | 3331 | 17,253.00 | 11,41[illegible] | 5,788.79 |
| WEBER LABELING SYSTEM W/ACC-L/S(91-10) | 91 | 3331 | 5,675.00 | 3,43[illegible] | 2,776.94 |
| AIR CONDITIONER-CARB BLK MIX AR A(91-18) | 91 | 3331 | 4,950.00 | 3,23[illegible] | 1,621.15 |
| INSTRON TENSILE TESTER-L/S QC-MOD#1[illegible](92-42) | 92 | 3331 | [illegible],155.33 | 2,20[illegible] | 4,954.25 |
| THERMAL OXIDIZER-VOC EMISSIONS A AT'MTT-PSAT(90-01) | 92 | 3331 | 692,314.15 | 362,62[illegible] | 329,701.59 |
| TAKEUPS-SLITTERS 1&3(90-12) | 92 | 3331 | 2,803.79 | 1,47[illegible] | 1,334.60 |
| 20" 2NDARY TAKEUP-TOWER#4-PSAT(90-22) | 92 | 3331 | 2,117.90 | 1,12[illegible] | 1,015.48 |
| 60" 4-ZONE COATING TOWER-PSAT(90-25) | 92 | 3331 | 486,855.83 | 253,37[illegible] | 233,482.05 |
| #4 TOWER MODS(90-30) | 92 | 3331 | 8,482.49 | 4,43[illegible] | 4,058.40 |
| ARROW SLITTER MODS-PSAT(91-19) | 92 | 3331 | 2,432.70 | 1,25[illegible] | 1,166.64 |
| PILL PREFORMER #2-JENNINGS-EXT T.(91-23) | 92 | 3331 | 16,171.87 | 8,65[illegible] | 7,505.28 |
| ARROW SLITTER MOD #325-8-48(91-25) | 92 | 3331 | 44,532.54 | 23,32 2 | 21,200.42 |
| DRYCANS FOR 12" LINE-EXT T.(91-33) | 92 | 3331 | 35,185.00 | 18,45 0 | 16,669.90 |
| PILL LOADER-16"LINE-EXT T.(91-4[illegible]) | 92 | 3331 | 2,957.44 | 1,59 5 | 1,418.29 |
| 16" DIE MODS(92-04) | 92 | 3331 | 0,378.00 | 5,41 5 | 4,976.55 |
| 3-ROLL PAINT MILL-EXT T.(92-08) | 92 | 3331 | 660.00 | 48 9 | 181.61 |
| LOBS PILOT POLLUTION TESTER(92-10) | 92 | 3331 | 6,784.11 | 8,72[illegible]2 | 8,647.19 |
| LIFT TABLE-EXT T. PREFORM AREA(92-11 | 92 | 3331 | 1,755.00 | 54[illegible]8 | 660.82 |
| RUBBER CTD ROLLS-EXT T. CANS(92-17) | 92 | 3331 | 3,467.00 | 1,58[illegible]3 | 1,758.57 |
| LIFT CARTS-SOUTHWORK MOD A-800-L/S SHIP(92-28) | 92 | 3531 | 3,499.00 | 2,09[illegible]7 | 1,469.83 |
| SCISSOR LIFT-AUTOQLIP MOD#3652-L/S SHIP(92-29A) | 92 | 3331 | 3,335.30 | 1,63[illegible]5 | 1,551.55 |
| GARBAGE COMPACTOR-EFI-L/S(92-3[illegible]) | 92 | 3331 | 1,[illegible]47.01 | 5,81[illegible]7 | 5,745.74 |
| MAIL. MACH.-SMART METER SER#8-[illegible]932(92-31)L/SSHIP | 92 | 3331 | 4,720.36 | [illegible]6[illegible] | 2,163.73 |
| POSTAL SCALE-MAILMATE(92-31) | 92 | 3331 | 884.21 | [illegible]9[illegible]1 | 330.50 |
| 12" ON-LINE THICK. GUAGE-ELECTRO GUAGE(92-32) | 92 | 3531 | 32,[illegible]89.26 | [illegible]5[illegible]3 | 15,124.43 |
| SPECTROPHOTOMETER-EXT T.(91-20 | 93 | 3531 | 29,[illegible]5.64 | 8,[illegible]3[illegible]5 | 21,142.49 |
| 16" EXTRUDER BARREL(92-13) | 93 | 3331 | 4,[illegible]05.60 | [illegible]9[illegible]8 | 3,166.52 |

(09/26/95)     * * * MILLENNIUM ONLINE PRINT     (PAGE 4)

| LOC | KEY ITEM NO | BK DESCRIPTION | YR CO FR | ACCT | BK COST | BK ACCM DPR | NET BOOK VALUE |
|---|---|---|---|---|---|---|---|
| 902 | FL470 | POLLUTION ABATEMENT EXT TAPE(92-37) | 92 | 3331 | 503,056.92 | 441,3.76 | 56,572.16 |
| 902 | FL472 | SCALE-METTLER $8 OHD-EXPL-PROOF PSAT MIX(93-02) | 93 | 3331 | 3,165.82 | 65.39 | 235.43 |
| 902 | FL474 | L'FL GAS DETECTOR PSAT TONER #4(93-09) | 93 | 3331 | 9,670.00 | 671.69 | 998.31 |
| 902 | FL476 | DENSIMETER-KM #4 PILOT-EXT T.(93-12A) | 93 | 3331 | 3,515.34 | 75.69 | 524.65 |
| 902 | FL477 | MANUAL PUNCH PRESS 1,DIES(93-12) | 93 | 3331 | 4,703.00 | 25.72 | 388.28 |
| 902 | FL478 | 12" CALENDAR ROLL TEMP CONTROL(93-13) | 93 | 3331 | 7,592.79 | 15.47 | 457.32 |
| 902 | FL479 | MINEMATIC FIELDLESS GUAGE-EXT T.(93-16) | 93 | 3331 | 11,821.64 | 82.84 | 474.80 |
| 902 | FL482 | ROLL CARTS-SET 2 (93-28) | 93 | 3331 | 1,149.00 | 10.55 | 635.84 |
| 902 | FL483 | CORONA ETCHER-I LITE(-EQ-PSAT OVEN(93-29) | 93 | 3331 | 21,040.11 | 97.55 | 132.58 |
| 902 | FL484 | PAGER-VIBRATING IN ALARM(93-31) | 93 | 3331 | 1,990.15 | 59.73 | 628.42 |
| 902 | FL487 | SLITTER SPACERS-SET-(93-34) | 93 | 3331 | 1,658.69 | 31.26 | 08.43 |
| 902 | FL488 | HVAC-50 TON-EXT—(93-35) | 93 | 3331 | 134,682.67 | 15,57.50 | 9,885.17 |
| 902 | FL490 | REWIND INSPECT ROLL-PSAT(93-42) | 93 | 3331 | 12,396.72 | 26.58 | 918.14 |
| 902 | FL493 | ROSS MIXER-XELT & LAT-EXT T.(93-47) | 93 | 3331 | 2,425.00 | 82.03 | 73.97 |
| 902 | FL494 | FARREL CALENDAR ROW LOAD CELL SYS(93-50) | 93 | 3331 | 6,650.09 | 39.64 | 515.66 |
| 902 | FL495 | FLEXK SLITTER SPEC ROLLS(93-53) | 93 | 3331 | 4,797.95 | 50.14 | 428.53 |
| 902 | FL496 | SCALE TOLEDO DIGITAL TE 1000M-EXT T.(93-55) | 93 | 3331 | 41,391.13 | 1,54.34 | 770.87 |
| 902 | FL497 | AUTO LATHE SLITTER-ZEVIMINI-HDO ES9/10-PSAT(93-56) | 93 | 3331 | | 22.52 | 036.02 |
| 902 | FL498 | LASER MICROMETER-METRIOYO(93-58)EXT T. | 93 | 3331 | 3,452.84 | 578.9? | 431.73 |
| 902 | FL499 | FARRELL CALENDAR PAYOFF(93-60) | 93 | 3331 | | 74.11 | 849.52 |
| 902 | FL505 | PILOT SOLVENT COATER(93-91-52) | 93 | 3331 | 50,635.50 | 2,265.79 | 2,660.39 |
| 902 | A040370 | FLAT DIELINE PRESS-DIA PRESS EXT TAPE | 9 | 3331 | 25,553.16 | 245.77 | 119.35 |
| 902 | A040373 | ALUMINUM WELDITE A'R SHAFT | 9 | 3331 | 2,857.20 | 25.46 | 139.39 |
| 902 | A040375 | UPDATE POLYMER CAL PSAT | 9 | 3331 | 19,762.08 | 27.33 | 951.06 |
| 902 | A040379 | ROLL STORAGE RACKS EXT TAPE | 9 | 3331 | | 59.90 | 25.71 |
| 902 | A040380 | 60" LINE SCALE 1 MONIT PSAT | 9 | 3331 | 2,516.70 | 16.23 | 041.94 |
| 902 | A040381 | FARRELL CALENDER ROLLS PSAT | 9 | 3331 | 24,837.37 | 32.43 | 1,994.54 |
| 902 | A040382 | MONORAIL FORKHEADS#2F EXT TAPE | 9 | 3331 | 3,372.81 | 18.2? | 427.50 |
| 902 | A040585 | ETCH BOILER DV/2 10' EXTRUDER | 9 | 3331 | 12,870.00 | 1.1 | 115.12 |
| 902 | A040587 | CHART RECORDER r 10' EXTRUDER | 9 | 3331 | 4,524.24 | 1.1 | 395.33 |
| 902 | A073035 | FLAT DIE 48-EXTRUDER(93-6) | 9 | 3331 | 35,744.00 | 16.6 | 951.65 |
| 902 | A073036 | QC 148 HUMIDIFIER (93-43) | 9 | 3331 | 5,368.32 | 5.6 | 450.50 |
| 902 | A073038 | 16" FLAT DIE FIT EXTRUDER (93-54) | 9 | 3331 | 76,780.00 | 1.5.6 | 70,955.33 |
| 902 | A073039 | FLAT DIE DIE 1 FRAME (93-66) | 9 | 3331 | 33,561.00 | 2.5 | 34,088.50 |
| 902 | A073040 | 20" RUF SLITTER(93-73) | 9 | 3331 | 18,520.61 | 1.55 | 1,115.55 |
| 902 | A073044 | MIX ROOM SIFTER(94-9) | 9 | 3331 | 4,097.00 | 5.3 | 1,780.62 |
| 902 | A073045 | HEATED MIX TANK ETCHING (94-9) | 9 | 3331 | 15,138.44 | 18.2 | 14,597.59 |
| 902 | A073046 | PSAT CORE FR.NTER (94-10) | 9 | 3331 | 39,185.30 | 9.4 | 35,214.99 |
| 902 | A073050 | SPARE HOT CALENDAR ROLLS (94-26) | 9 | 3331 | 28,810.17 | 1.03 | 22,810.92 |
| 902 | A073052 | LOW DENSITY THICKNESS GAUGE (94-34) | 9 | 3331 | 5,835.00 | 42.0 | 3,950.95 |
| 902 | A073062 | Q.C. SAMPLE CUTTERS (94-48) | 9 | 3331 | 3,788.95 | 29.0 | 5,37.91 |
| 902 | A073066 | PROCESS CHANGE TO REDUCE ODOR (94-54) | 9 | 3331 | 2,542.21 | 2.5 | 2,509.62 |
| 902 | A078050 | CAN LINE STARE PARTS | 9 | 3331 | 5,115.47 | 5.2 | 999.21 |
| 902 | A148170 | 12" E.T. CALENDAR UPGRADE (93-68) | 9 | 3331 | 10,974.52 | 269.45 | 522.10 |
| 902 | A148171 | 16" E.T. CALENDAR UPGRADE (93-68) | 9 | 3331 | 4,663.66 | 1.4 | 157.67 |
| 902 | A148172 | 16" EXT-LINE ID CONVERSION UPGRADE | 9 | 3331 | 99,765.69 | 2.27.33 | 97,467.80 |
| 902 | A148173 | 12" EXT TP LAMINATOR COHESION UPGRADE(93-76) | 9 | 3331 | 38,198.66 | 488.51 | 37,370.51 |
| 902 | A148174 | EXTRUDER RODAU IC CONTROLS(93-76) | 9 | 3331 | 38,016.12 | 84.08 | 37,052.12 |
| 902 | A148175 | 16" CALENDAR HEATING UPGRADE(93-76) | 9 | 3331 | 8,858.94 | 21.3 | 3,657.60 |
| 902 | A148176 | CONTROL ROOM FLEX TAPE LINES(93-76) | 9 | 3331 | 57,966.14 | 1,27.4 | 55,441.73 |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002174

OCT 26 '95 14:51 [illegible]                                          154/184

McCaffrey S==

(09/26/95)   *** MILLENNIUM ONLINE PRINT ***                              PAGE: E1

| LOC | KEY ITEM MD | BK DESCRIPTION | BK ACQ YEAR | BK ACCT | BK COST | BK ACCM DEPR | NET BOOK VALUE |
|---|---|---|---|---|---|---|---|
| 901 | FL521 | -RUCK & AUTO ADDS-1978-TRI-POINT | 78 | 3356 | 15,144.00 | 15,144.00 | .00 |
| 901 | FL522 | -RUCK & AUTO ADDS-1979-ORG | 79 | 3356 | 9,334.74 | 9,334.74 | .00 |
| 901 | FL523 | -RUCK & AUTO ADDS-1981 | 81 | 3356 | 4,234.70 | 4,234.70 | .00 |
| 901 | FL524 | -RUCK & AUTO ADDS-1981-ORG | 81 | 3356 | 7,420.00 | 7,424.00 | .00 |
| 901 | FL527 | 43-FORD TAURUS(1FABP52U2JG199469)GB-28)SCHROEDER | 88 | 3356 | 12,824.49 | 12,824.29 | .00 |
| 901 | FL529 | USED INTERNAT'L TRCK(1HTLAHGM XGHA593320)(90-27) | 90 | 3356 | 9,095.00 | 9,095.00 | .00 |
| 901 | FL531 | 91-FRD TRUS STAWAG(1FACP55U9NA139349)(90-41)RABROWN | 91 | 3356 | 13,196.24 | 13,196.24 | .00 |
| 901 | FL533 | 92-PONT GRND AM(1G2NE5 4WX4NC220374)(92-12)COOK | 92 | 3356 | 15,272.26 | 15,194.26 | .00 |
| 901 | FL537 | 93-BONNEVILLE(1G2HK53L9P126929)(93-38)HERKEL | 93 | 3356 | 15,875.26 | 15,272.26 | .00 |
| 901 | FL538 | 93-TAURUS(1FALP52U9PA168789)(93-39)BROWN | 93 | 3356 | 17,646.99 | 10,984.37 | .0 |
| 901 | FL539 | 93-EXPLORER(1FMDU34X5PUB09360)Y93-40)NOONAN | 93 | 3356 | 14,651.73 | 14,017.00 | 4,411.7 |
| 901 | A073G6 | 94-TAURUS(1FALP52U3RA174451)MANCHESTER(94-63) | 94 | 3356 | 14,017.00 | 10,451.7? | 3,642.0 |
| 901 | A073G4 | 94-MERCVILQR(4M20V11WXRDJ29441) KOOE (94-64) | 94 | 3356 | 16,437.60 | 4,554.03 | 3,504.2 |
| 901 | A073G6 | 94-TAJRUS(1FALP52U6RA190110) RICHARD (94-65) | 94 | 3356 | 18,744.66 | 5,200.85 | 11,871.5 |
| 901 | A073P4 | 94-TAJRUS (1FARL57U4RG199917) MCDONALD (94-66) | 94 | 3356 | 17,185.60 | 4,775.93 | 13,537.3 |
| 901 | A073P1 | 94 PINTIAC SPARK(1GHD4G6CR125879)R.BROWN (94-67) | 94 | 3356 | 18,158.15 | 5,095.02 | 12,411.2 |
| 2 |  |  |  | 3356 | 18,169.25 | 5,041.60 | 13,258.8 |
|  |  |  |  | 3356 | 265,080.27 | 189,026.28 | 13,122.3 |
| 901 | FL054 | NOOLS & DIES ADDS-1973 | 73 | 3361 | 1,518.48 | 1,518.48 | 75,781.3 |
| 901 | FL055 | NOOLS & DIES ADDS-1975 | 75 | 3361 | 3,213.00 | 3,213.00 | .00 |
| 901 | FL056 | NOOLS & DIES ADDS-1976 | 76 | 3361 | 2,520.89 | 2,520.89 | .0 |
| 901 | FL057 | FOOLS & DIES ADDS-1977 | 77 | 3361 | 6,940.99 | 6,940.99 | .0 |
| 901 | FL058 | FOOLS & DIES ADDS-1982 | 82 | 3361 | 15,895.41 | 15,895.41 | .0 |
| 901 | FL059 | FOOLS & DIES ADDS-1984 | 84 | 3361 | 27,253.88 | 27,253.88 | .0 |
| 2 |  |  |  | 3361 | 57,342.65 | 57,342.65 | .0 |
| 901 | ATX00151 | RECONCILING FAMS ASSET CLASS/YR 01/61 | 61 | 7111 | .00 | .00 | .0 |
| 901 | ATX00373 | RECONCILING FAMS ASSET CLASS/YR 05/73 | 73 | 7111 | .00 | .00 | .0 |
| 901 | ATX00275 | RECONCILING FAMS ASSET CLASS/YR 04/75 | 75 | 7111 | .00 | .01 | .01 |
| 901 | ATX00581 | RECONCILING FAMS ASSET CLASS/YR 05/81 | 81 | 7111 | .00 | .01 | .0 |
| 901 | ATX00585 | RECONCILING FAMS ASSET CLASS/YR 05/85 | 85 | 7111 | .00 | .01 | .0 |
| 901 | ATX00586 | RECONCILING FAMS ASSET CLASS/YR 05/86 | 86 | 7111 | .00 | .01 | .0 |
| 901 | ATX00587 | RECONCILING FAMS ASSET CLASS/YR 05/87 | 87 | 7111 | .00 | .01 | .0 |
| 901 | ATX00588 | RECONCILING FAMS ASSET CLASS/YR 05/88 | 88 | 7111 | .00 | .01 | .0 |
| 901 | ATX00589 | RECONCILING FAMS ASSET CLASS/YR 05/89 | 89 | 7111 | .00 | .01 | .0 |
| 901 | ATX00590 | RECONCILING FAMS ASSET CLASS/YR 05/90 | 90 | 7111 | .00 | .01 | .0 |
| 901 | ATX00591 | RECONCILING FAMS ASSET CLASS/YR 05/91 | 91 | 7111 | .00 | .01 | .0 |
| 901 | ATX00592 | RECONCILING FAMS ASSET CLASS/YR 05/92 | 92 | 7111 | .00 | .01 | .0 |
| 901 | ATX00593 | RECONCILING FAMS ASSET CLASS/YR 05/93 | 93 | 7111 | .00 | .00 | .00 |
| 2 |  |  |  | 7111 | .00 | .00 | .00 |
| 1 |  |  |  |  | 11,450,220.77 | 9,844,955.36 | 1,605,265.41 |
| * |  |  |  |  | 11,450,220.77 | 9,844,955.36 | 1,605,265.41 |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

(09/26/95)                          *** MILLENNIUM ONLINE PRINT: ***

| LDC | KEY ITEM NO | BK DESCRIPTION | BK ACQ YEAR | ACCT | BK COST | BK ACCM DEPR | NET BOOK VALUE |
|---|---|---|---|---|---|---|---|
| 901 | FL064 | LAND-MCCAFFREY ST. | 68 | 3311 | 1,101.00 | .00 | 1,101.00 |
| 901 | FL065 | LAND-MCCAFFREY ST. | 79 | 3311 | 17,160.00 | .00 | 17,160.00 |
| 901 | FL066 | LAND-MCCAFFREY ST. | 80 | 3311 | 514.06 | .00 | 514.06 |
| 901 | | | | 3311 | 18,775.06 | .00 | 18,775.06 |
| 2 | | | | | | | |
| 901 | FL043 | LAND IMP-MCC. ST. PARKING | 69 | 3316 | 3,213.31 | 3,213.31 | .00 |
| 901 | FL044 | LAND IMP-MCC. ST. PARKING | 77 | 3316 | 5,892.00 | 5,892.00 | .00 |
| 901 | FL045 | LAND IMP-MCC. ST. PARKING | 78 | 3316 | 13,216.30 | 13,216.30 | .00 |
| 901 | FL048 | LAND IMP-MCC. ST. PARKING | 80 | 3316 | 3,500.00 | 3,500.00 | .00 |
| 901 | FL047 | LAND IMP-MCC. ST. PARKING | 84 | 3316 | 8,690.00 | 8,690.00 | .00 |
| 901 | | | | 3316 | 34,511.61 | 34,511.61 | .00 |
| 901 | FL051 | LEASE IMP-ADVERTISING DEPT. | 75 | 3321 | 374.50 | 374.50 | .00 |
| 901 | FL052 | LEASE IMP-ADVERTISING DEPT. | 76 | 3321 | 2,589.71 | 2,589.71 | .00 |
| 901 | FL053 | LEASE IMP-ADVERTISING DEPT. | 77 | 3321 | 2,622.82 | 2,622.82 | .00 |
| 901 | | | | 3321 | 5,587.03 | 5,587.03 | .00 |
| 2 | | | | | | | |
| 901 | FL114 | BUILDING IMP-MCC. ST. | 67 | 3326 | 39,191.58 | 39,191.58 | .00 |
| 901 | FL093 | BUILDINGS-MCC. ST. | 68 | 3326 | 484,692.50 | 484,692.50 | .00 |
| 901 | FL116 | BUILDING IMP-MCC. ST. | 68 | 3326 | 17,716.66 | 17,716.66 | .00 |
| 901 | FL117 | BUILDING IMP-MCC. ST. | 69 | 3326 | 43,830.05 | 43,830.05 | .00 |
| 901 | FL094 | BUILDINGS-MCC. ST. | 70 | 3326 | 5,000.00 | 5,000.00 | .00 |
| 901 | FL119 | BUILDING IMP-MCC. ST. | 72 | 3326 | 12,444.62 | 12,444.62 | .00 |
| 901 | FL121 | BUILDING IMP-MCC. ST. | 74 | 3326 | 12,735.85 | 12,735.85 | .00 |
| 901 | FL123 | BUILDING IMP-MCC. ST. | 77 | 3326 | 742.00 | 742.00 | .00 |
| 901 | FL125 | BUILDINGS-MCC. ST. | 78 | 3326 | 45,067.79 | 45,067.79 | .00 |
| 901 | FL129 | BUILDING IMP-MCC. ST. | 79 | 3326 | 434,114.04 | 434,114.04 | .00 |
| 901 | FL107 | BUILDINGS-MCC. ST. | 79 | 3326 | 26,924.15 | 26,924.15 | .00 |
| 901 | FL130 | BUILDING IMP-MCC. ST. | 80 | 3326 | 1,957.66 | 1,957.66 | .00 |
| 901 | FL133 | BUILDING IMP-MCC. ST. | 81 | 3326 | 67,830.79 | 67,830.79 | .00 |
| 901 | FL135 | BUILDING IMP-MCC. ST. | 82 | 3326 | 39,548.08 | 39,548.08 | .00 |
| 901 | FL136 | BUILDING IMP-MCC. ST. | 83 | 3326 | 28,924.71 | 28,924.71 | .00 |
| 901 | FL137 | BUILDING IMP-MCC. ST. | 84 | 3326 | 38,015.27 | 38,015.27 | .00 |
| 901 | FL138 | BUILDING IMP-MCC. ST. | 85 | 3326 | 31,577.52 | 31,577.52 | .00 |
| 901 | FL140 | BUILDING IMP-MCC. ST. | 85 | 3326 | 1,350.00 | 1,350.00 | .00 |
| 901 | FL141 | BUILDING IMP-MCC. ST. | 87 | 3326 | 5,586.28 | 5,586.28 | .00 |
| 901 | FL143 | TELEPHONE WIRING INSTALL.-MCC. ST. | 88 | 3326 | 2,340.00 | 2,340.00 | .00 |
| 901 | FL145 | "ALLIEDSIGNAL" SIGN-FRONT ENTRANCE-MCC. ST. | 88 | 3326 | 3,500.00 | 3,500.00 | .00 |
| 901 | FL155 | REMODEL CUSTOMER SERVICE AREA | 89 | 3326 | 11,113.40 | 11,113.40 | .00 |
| 901 | FL156 | WAREHOUSE FLOOR REHAB-MCC. ST. | 89 | 3326 | 3,500.00 | 3,500.00 | .00 |
| 901 | FL157 | AUTO DOOR CLOSURE-TOWER RM. | 89 | 3326 | 3,328.00 | 3,328.00 | .00 |
| 901 | FL161 | APICAL LEVER RK.-MCC. ST. | 91 | 3326 | 163,600.00 | 138,550.00 | 24,450.00 |
| 901 | FL164 | DOCK LEVELER-MCC. ST. | 92 | 3326 | 3,000.00 | 2,550.00 | 450.00 |
| 901 | FL168 | SPRINKLERS-OFFICE AREA-MCC. ST. (91-17) | 92 | 3326 | 3,650.00 | 2,550.50 | 1,099.50 |
| 901 | FL171 | WAREHOUSE LIGHTING-MCC. ST.-(91-38) | 92 | 3326 | 3,438.78 | 2,255.21 | 1,203.57 |
| 901 | FL176 | AIR CONDITION FABRIC BREAK RM.(92-24) | 92 | 3326 | 2,600.00 | 1,690.00 | 910.00 |
| 901 | FL177 | HEAT PUMP COMPRESSOR-MCC. ST.(92-25) | 92 | 3326 | 3,375.00 | 2,193.75 | 1,181.25 |
| 901 | FL178 | DOCK LEVELER-MCC. ST.(92-41) | 93 | 3326 | 4,694.07 | 3,051.14 | 1,642.93 |
| 901 | FL302 | SALES OFFICE REBUILD(93-07) | 93 | 3326 | 15,394.14 | 6,927.36 | 8,466.78 |
| 901 | A040388 | TOWER ROOM SKYLIGHT CUPOLA | 93 | 3326 | 4,160.00 | 173.33 | 3,986.67 |
| 901 | A073048 | ROOF REPLACEMENT(94-23) | 94 | 3326 | 15,181.69 | 421.71 | 14,759.98 |
| 901 | A076546 | MCCAFFREY ST PLANT SIDING | 94 | 3326 | 1,582.32 | 121.12 | 1,461.20 |
| 901 | A148187 | TWR ROOM WATER FILTRATION SYSTEM | 95 | 3326 | 3,252.38 | 27.10 | 3,225.28 |
| 2 | | | | 3326 | 1,594,059.73 | 1,517,974.57 | 76,085.16 |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

(09/26/95)  *** MILLENIUM ONLINE PRINT:                            * * *          (PAGE: 2)

| LOC | KEY | ITEM NO | BK DESCRIPTION | BK ACQ YEAR | BK ACCT | BK COST | BK ACCM DEPR | NET BOOK VALUE |
|---|---|---|---|---|---|---|---|---|
| 901 | FL067 | | BLDG. EQUIP. ADDS-1965 | 65 | 3331 | 57,424.73 | 57,424.73 | .00 |
| 901 | FL063 | | BLDG. EQUIP. ADDS-1966 | 66 | 3331 | 7,046.73 | 7,046.73 | .00 |
| 901 | FL069 | | BLDG. EQUIP. ADDS-1967 | 67 | 3331 | 310.24 | 310.24 | .00 |
| 901 | FL070 | | LAB & TEST EQUIP. ADD-1967 | 67 | 3331 | 3,138.98 | 3,138.98 | .00 |
| 901 | FL001 | | MACH & EQUIP ADDS-1966 | 68 | 3331 | 126,109.66 | 126,109.66 | .00 |
| 901 | FL072 | | BLDG EQUIP ADDS-1968 | 68 | 3331 | 263.21 | 263.21 | .00 |
| 901 | FL183 | | LAB & TEST EQUIP. ADDS-1968 | 68 | 3331 | 8,079.37 | 8,079.37 | .00 |
| 901 | FL002 | | MACH & EQUIP ADDS-1969 | 69 | 3331 | 77,792.60 | 77,792.60 | .00 |
| 901 | FL181 | | LAB & TEST EQUIP. ADDS-1969 | 69 | 3331 | 2,130.95 | 2,130.95 | .00 |
| 901 | FL005 | | MACH & EQUIP ADDS-1970 | 70 | 3331 | 102,003.33 | 102,003.33 | .00 |
| 901 | FL182 | | LAB & TEST EQUIP. ADDS-1970 | 70 | 3331 | 925.90 | 925.90 | .00 |
| 901 | FL004 | | MACH & EQUIP ADDS-1971 | 71 | 3331 | 127,971.50 | 127,971.50 | .00 |
| 901 | FL185 | | LAB & TEST EQUIP. ADDS-1971 | 71 | 3331 | 4,761.95 | 4,761.95 | .00 |
| 901 | FL003 | | MACH & EQUIP ADDS-1972 | 72 | 3331 | 29,877.19 | 29,877.19 | .00 |
| 901 | FL184 | | LAB & TEST EQUIP. ADD-1972 | 72 | 3331 | 855.40 | 855.40 | .00 |
| 901 | FL006 | | MACH & EQUIP ADDS-1975 | 73 | 3331 | 923,296.44 | 923,296.44 | .00 |
| 901 | FL105 | | LAB & TEST EQUIP. ADD-1973 | 73 | 3331 | 12,679.06 | 12,679.06 | .00 |
| 901 | FL007 | | MACH & EQUIP ADDS-1974 | 74 | 3331 | 164,662.86 | 164,662.86 | .00 |
| 901 | FL186 | | LAB & TEST EQUIP. ADDS-1974 | 74 | 3331 | 402.65 | 402.65 | .00 |
| 901 | FL008 | | MACH & EQUIP ADDS-1975 | 75 | 3331 | 222,090.28 | 222,090.28 | .00 |
| 901 | FL187 | | LAB & TEST EQUIP. ADD-1975 | 75 | 3331 | 521.08 | 521.08 | .00 |
| 901 | FL109 | | MACH & EQUIP ADDS-1976 | 76 | 3331 | 238,271.55 | 238,271.55 | .00 |
| 901 | FL188 | | LAB & TEST EQUIP. ADDS-1976 | 76 | 3331 | 285.30 | 285.30 | .00 |
| 901 | FL090 | | MACH & EQUIP ADDS-1977 | 77 | 3331 | 256,111.87 | 256,111.87 | .00 |
| 901 | FL071 | | BLDG. EQUIP. ADDS-1977 | 77 | 3331 | 197.09 | 197.09 | .00 |
| 901 | FL109 | | LAB & TEST EQUIP. ADDS-1977 | 78 | 3331 | 4,214.48 | 4,214.48 | .00 |
| 901 | FL011 | | MACH & EQUIP ADDS-1973 | 78 | 3331 | 425,054.85 | 425,054.85 | .00 |
| 901 | FL012 | | MACH & EQUIP ADDS-1972 | 79 | 3331 | 684,755.38 | 684,755.38 | .00 |
| 901 | FL110 | | LAB & TEST EQUIP. ADDS-1979 | 79 | 3331 | 46,675.18 | 46,675.18 | .00 |
| 901 | FL013 | | MACH & EQUIP ADDS-1980 | 80 | 3331 | 305,832.95 | 305,832.95 | .00 |
| 901 | FL141 | | LAB & TEST EQUIP. | 80 | 3331 | 28,023.64 | 28,023.64 | .00 |
| 901 | FL014 | | MACH & EQUIP ADDS-1981 | 81 | 3331 | 604,155.63 | 604,155.63 | .00 |
| 901 | FL192 | | LAB & TEST EQUIP. ADDS-1981 | 81 | 3331 | 62,671.93 | 62,671.93 | .00 |
| 901 | FL193 | | MACH & EQUIP. ADDS-1982 | 82 | 3331 | 270,753.37 | 270,753.37 | .00 |
| 901 | FL195 | | LAB & TEST EQUIP. ADDS-1982 | 82 | 3331 | 5,558.20 | 5,558.20 | .00 |
| 901 | FL016 | | MACH & EQUIP ADDS-1983 | 83 | 3331 | 231,202.66 | 231,202.66 | .00 |
| 901 | FL194 | | LAB & TEST EQUIP. ADDS-1983 | 83 | 3331 | 10,684.55 | 10,684.55 | .00 |
| 901 | FL017 | | MACH & EQUIP ADDS-1984 | 84 | 3331 | 167,808.03 | 167,808.03 | .00 |
| 901 | FL195 | | LAB & TEST EQUIP. ADDS-1984 | 84 | 3331 | 42,991.96 | 42,991.96 | .00 |
| 901 | FL196 | | MACH & EQUIP ADDS-1985 | 85 | 3331 | 154,291.95 | 154,291.95 | .00 |
| 901 | FL020 | | LAB & TEST EQUIP. ADDS-1955 | 85 | 3331 | 2,351.90 | 2,351.90 | .00 |
| 901 | FL022 | | FABRIC TOWER EXHAUST SYSTEM | 86 | 3331 | 8,000.00 | 8,000.00 | .00 |
| 901 | FL034 | | STATIC ELIMINATOR-FABRIC TOWER | 86 | 3331 | 7,000.00 | 7,000.00 | .00 |
| 901 | FL035 | | WATER PURITY SYSTEM-FABRIC | 86 | 3331 | 4,222.57 | 4,222.57 | .00 |
| 901 | FL026 | | P.C.-ACCTG | 86 | 3331 | 2,500.00 | 2,500.00 | .00 |
| 901 | FL036 | | P.C.-ADM | 86 | 3331 | 2,500.00 | 2,500.00 | .00 |
| 901 | FL037 | | P.C.-Q.C. | 86 | 3331 | 2,500.00 | 2,500.00 | .00 |
| 901 | FL197 | | LAB & TEST EQUIP. Q.; MISC.-1986 | 86 | 3331 | 7.96 | 7.96 | .00 |
| 901 | FL236 | | FABRIC TOWER SCRUBBER (87-1) | 87 | 3331 | 82,410.64 | 82,410.64 | .00 |
| 901 | FL237 | | #1 BILLET PRESS(87-3-POLYM-BR) | 87 | 3331 | 20,000.00 | 20,000.00 | .00 |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002177

OCT 26 '95 10:48  EH HODGES ACCTG                                        P.4/10



(09/26/95)  * * * MILLENNIUM ONLINE PRINT: * * *                    PAGE:

| LOC | KEY | ITEM NO | DESCRIPTION | BK ACCT | BK ACQ YEAR | GR COST | BK ACCM DEPR | NET BOOK VALUE |
|-----|-----|---------|-------------|---------|-------------|---------|--------------|----------------|
| 901 | | FL208 | BILLET STRIPPER (T=POLYMER) | 3331 | 87 | 2,000 | 2,001.00 | .00 |
| 901 | | FL213 | #10 EXTRUDER SEB L=E(P-5) | 3331 | 87 | 35,150 | 35,533.00 | .00 |
| 901 | | FL215 | AIR COMPRESSOR-S X(S-37-7) | 3331 | 87 | 3,250 | 3,353.00 | .00 |
| 901 | | FL218 | EXHAUST HOOD-AM CL BELT DEPT(87-12) | 3331 | 87 | 2,392 | 2,392.00 | .00 |
| 901 | | FL219 | FORK LIFT-KOLD/E-SHOW-WEBER&CLARK(87-13) | 3331 | 87 | 12,477 | 12,877.00 | .00 |
| 901 | | FL221 | CHAIN LIFT/HOIST BELT DEPT(87-19) | 3331 | 87 | 1,073 | 1,075.00 | .00 |
| 901 | | FL222 | #10 EXTRUDER HEA CHI CONTROLS(87-24) | 3331 | 87 | 9,345 | 9,345.00 | .00 |
| 901 | | FL223 | #1 MARINE TOWER BLE SYSTEM(87-26) | 3331 | 87 | 2,696 | 2,895.00 | .00 |
| 9X1 | | FL225 | MIX ROOM EXHAUST SYS-FABRIC(87-41) | 3331 | 87 | 2,695 | 2,895.00 | .00 |
| 901 | | FL228 | STORAGE RACKS HOLDE-EXTRUSION(87-30) | 3331 | 87 | 6,169 | 6,169.00 | 371.97 |
| 9X1 | | FL229 | MAT'L HANDLING CL=HOLD/EXT(87-38) | 3331 | 88 | 4,226 | 4,226.00 | 250.76 |
| 901 | | FL232 | #10 EXTRUDER MODS(88-15) | 3331 | 88 | 1,119 | 3,975.00 | 659.66 |
| 9X1 | | FL236 | #10 EXTRUDER BILLE=TOFF SAW(87-18) | 3331 | 88 | 4,100 | 10,452.00 | 237.55 |
| 901 | | FL237 | AIR MAKE-UP FABR C TOWERS #2, #3, #4(87-20) | 3331 | 88 | 39,200 | 34,874.00 | 2,325.61 |
| 901 | | FL238 | PAKFF MOLL BRAC CNTROLS-FABRIC TOWERS(87-21) | 3331 | 88 | 1,106 | 1,795.00 | 113.11 |
| 901 | | FL239 | S.C.R.FABRIC TOWER FIRE REBUILD #3, #4(87-23) | 3331 | 88 | 6,154 | 6,154.00 | 365.14 |
| 901 | | FL240 | ELEKTRIK CLUTCHES-ELEC TOWER #1(87-28) | 3331 | 88 | 3,424 | 3,424.00 | 280.79 |
| 901 | | FL241 | ROD EXTRUDER(87/88)/MP2 CRADE(87-36) | 3331 | 88 | 3,453 | 22,623.00 | 1,390.79 |
| 901 | | FL242 | PLATENS&ADAPTERS-EPHTES XEROX BELT-MAKER(88-05) | 3331 | 88 | 9,210 | 8,675.00 | 547.09 |
| 901 | | FL243 | FABRIC POWERS FABT C EAT ZONES(88-10) | 3331 | 88 | 2,676 | 2,700.00 | 170.74 |
| 901 | | FL244 | FOULING&ENHUANCE CS TR(88-13) | 3331 | 88 | 5,055 | 4,735.00 | 298.71 |
| 901 | | FL245 | FABRIC POWERS#1, #2 CED CONTROLS(88-15) | 3331 | 88 | 4,271 | 4,017.00 | 253.39 |
| 901 | | FL246 | FABRIC POWER #1 CED CONTROLS(88-16) | 3331 | 88 | 984 | 925.00 | 58.40 |
| 901 | | FL247 | FABRIC POWER STC=SAW STATIONS(88-17) | 3331 | 88 | 613 | 575.00 | 36.37 |
| 901 | | FL248 | TOLEDO SCALES-OOM MAD/EXT(88-19) | 3331 | 88 | 4,624 | 4,555.00 | 274.67 |
| 901 | | FL250 | TENPILE TESTER(SEM CODY(INSTRON)(88-22) | 3331 | 88 | 18,417 | 16,492.00 | 1,088.94 |
| 901 | | FL252 | 1.5-TON ARSSMBLY(S-20) | 3331 | 88 | 10,061 | 10,061.00 | 630.99 |
| 901 | | FL253 | FABRIC MIXER TBL(88-55) | 3331 | 88 | 20,825 | 20,825.00 | 1,313.44 |
| 901 | | FL254 | HEATER BANKS LAKE=ETRUDER(88-36) | 3331 | 88 | 6,112 | 5,843.00 | 368.55 |
| 901 | | FL256 | FABRIC TOWER REBLDG#4&URNALS, DIPPANS ETC(88-49) | 3331 | 88 | 22,437 | 21,482.00 | 1,355.12 |
| 901 | | FL257 | LAWN TRLCTOR | 3331 | 88 | 4,912 | 3,771.00 | 238.02 |
| 901 | | FL258 | GLOSSMETER-HINTER RED=FABRIC(88-51) | 3331 | 88 | 4,490 | 3,762.00 | 237.31 |
| 901 | | FL259 | MIN-COR ROLL-FABR INSPECTION TABLES(88-53) | 3331 | 88 | 3,405 | 3,198.00 | 201.75 |
| 901 | | FL260 | OVENHEAU HOIST=HD ETR(88-66) | 3331 | 88 | 4,636 | 4,361.00 | 275.06 |
| 901 | | FL282 | #15 ROD EXTRUDER FED SYSTEM(87-32) | 3331 | 89 | 955 | 685.00 | 129.63 |
| 901 | | FL283 | FABRIC COAC(18 INGE WEB(88-01) | 3331 | 89 | 798,162 | 687,855.00 | 110,513.82 |
| 901 | | FL284 | FABRIC INJECTION HEAT ZONES(88-09) | 3331 | 89 | 5,252 | 4,555.00 | 727.08 |
| 901 | | FL285 | ROD EXT-IR/MODS-CD(SS-12) | 3331 | 89 | 1,014 | 873.00 | 160.36 |
| 901 | | FL286 | FABRIC OVER SCLEAR SUPLEMENTAL(88-21) | 3331 | 89 | 26,107 | 24,216.00 | 3,090.84 |
| 901 | | FL287 | FABRIC TOWER FO=CLUB(88-34) | 3331 | 89 | 182 | 417.00 | 67.03 |
| 9Z1 | | FL288 | UPGRADE BILLIT COD F SAW(88-43) | 3331 | 89 | 1,914 | 1,656.00 | 265.24 |
| 9Z1 | | FL289 | FORC LIFT-GOLD/4=METER MOD. @ESSKXL(88-46) | 3331 | 89 | 19,015 | 14,342.00 | 2,651.57 |
| 9Z1 | | FL292 | EXTRUDE DIE TUEA SSMBLY-378(88-63) | 3331 | 89 | 4,564 | 4,564.00 | 1,222.81 |
| 9Z1 | | FL293 | EXTRUDE DIE TUEA SSMBLY-305(88-64) | 3331 | 89 | 12,464 | 10,725.00 | 1,724.80 |
| 9Z1 | | FL294 | EXTRUDE DIE TUEA SSMBLY-335(88-64) | 3331 | 89 | 12,464 | 11,977.00 | 3,040.98 |
| 9Z1 | | FL300 | DIE TUB-LARE EXTRDME PRESS(88-65) | 3331 | 89 | 21,966 | 11,444.00 | 2,971.79 |
| 901 | | FL301 | LARE EXTR/DIE TIS(E-70) | 3331 | 89 | 21,446 | 6,165.00 | 994.44 |
| 901 | | FL303 | FABRIC TOER MODS(4-9-99) | 3331 | 89 | 7,181 | 16,841.00 | 3,030.40 |
| 901 | | FL307 | #6 FABR C TOWER INLET UPGRADE(89-13) | 3331 | 89 | 21,394 | 11,644.00 | 2,353.27 |
| 901 | | FL308 | BELT PRESS-4#YE BUILNG(89-15) | 3331 | 89 | 17,104 | | |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002178

*** MILLENNIUM ONLINE PRINT:

| <Y-26/93> ITEM NO | BK DESCRIPTION | BK ACQ YEAR | ACC | (09/24) LOC |
|---|---|---|---|---|
| FL309 | BELT SEWING MACH-UIK1 LUH521-2 NEEDLE(89-1?) | 89 | 335 | 901 |
| FL310 | BELT SMALL PRESS UPGRADES(89-15) | 89 | 335 | 901 |
| FL311 | BELT PRESS EXHAUST SYSTEM(89-15) | 89 | 335 | 901 |
| FL312 | BELT FOLDING ASS.-XEROX SLINGS(89-15) | 89 | 335 | 901 |
| FL314 | FABRIC TOWER GUARDS #S 1,2,3,5,7(89-19) | 89 | 335 | 901 |
| FL317 | MOLD/EXT LG. BILLET OVER #8(89-30) | 89 | 335 | 901 |
| FL318 | FABRIC BOMB CART SCISSOR LIFTS(89-32) | 89 | 335 | 901 |
| FL319 | FABRIC TOWER #1 ENCLOSURE(89-33) | 89 | 335 | 901 |
| FL325 | FABRIC BOMB CART SCISSOR LIFT(89-43) | 89 | 335 | 901 |
| FL326 | FABRIC BOMB CART SCISSOR LIFT(89-43) | 89 | 335 | 901 |
| FL331 | STAINLESS STEEL PASHSINK-FABRIC(89-51) | 89 | 335 | 901 |
| FL332 | BILLET TRANSFER LACKS-HOLDING(89-53) | 89 | 335 | 901 |
| FL333 | UTILITY CART-BEL S(89-54) | 89 | 335 | 901 |
| FL356 | ACCELERATED WEATHER TESTER-KCC ST QC(90-20) | 90 | 353 | 901 |
| FL357 | DIELECTRIC TEST-HI-TRON'S-115V,50/60HZ,20AMPS(90-29) | 90 | 353 | 901 |
| FL359 | DENSIMETER-TMI KWD ED-120T(90-32)KCC ST | 90 | 353 | 901 |
| FL361 | LAB FABRIC COATING TOWER(89-20) | 90 | 353 | 901 |
| FL363 | 1 3/8" DIE TUBE ASSBLY(88-44) | 90 | 353 | 901 |
| FL364 | 2 1/2" DIE TUBE ASSBLY(88-44) | 90 | 353 | 901 |
| FL365 | 4" DIE TUBE ASSBLY(88-44) | 90 | 353 | 901 |
| FL366 | 1 3/4" DIE TUBE ASSBLY(88-45) | 90 | 353 | 901 |
| FL367 | 2 3/4" DIE TUBE ASSBLY(88-45) | 90 | 353 | 901 |
| FL368 | 3 1/2" DIE TUBE ASSBLY(88-45) | 90 | 353 | 901 |
| FL369 | #10 EXTRUDER KOOS(88-65) | 90 | 353 | 901 |
| FL374 | LIFT TABLE-MOLD/EXT(89-37) | 90 | 353 | 901 |
| FL375 | PNEUMATIC EDGE SEALING PRESS-BELTS(89-44) | 90 | 353 | 901 |
| FL380 | #7 TOWER ENCLOSURE-FABRIC(89-60) | 91 | 355 | 901 |
| FL381 | 10K-O-VAC-FABRIC TOWER #7(89-63) | 91 | 355 | 901 |
| FL385 | 16" CAN-LINE THICKNESS GUAGE-EXT T.(90-02) | 91 | 355 | 901 |
| FL386 | FABRIC CREOSIDE WATER RINSE(90-05) | 91 | 355 | 901 |
| FL387 | FOLDING JIG-XEROX BELTS(90-07) | 91 | 355 | 901 |
| FL390 | SMALL PRESS EXHAUST KOOS-BELTS(90-19) | 91 | 355 | 901 |
| FL392 | TRANSFER PUMP-DISPERSION MIXES-FABRIC(90-1! | 91 | 355 | 901 |
| FL393 | DOCK LEVELER-MD1 ST SHIPPING(90-36) | 91 | 355 | 901 |
| FL398 | #9 COATING TOWEI(VERTICAL PROJECT)(90-A) | 91 | 355 | 901 |
| FL400 | MAILING MACH.-P4-C-TECH(90-49) | 91 | 355 | 901 |
| FL403 | DISPLAY-P/D COM-UTER(91-04) | 92 | 355 | 901 |
| FL404 | PRESSURE TRANSDUCER & READOUT-MOLD/EXT(91-06) | 92 | 355 | 901 |
| FL405 | BALER-SCRAP PAP R(91-13) | 92 | 355 | 901 |
| FL406 | WEBER LABELING SYSTEM W/ACC-KCC ST(91-16) | 91 | 35. | 901 |
| FL409 | STATIC BARS-FAB IC TOWERS(91-24) | 91 | 355 | 901 |
| FL410 | DIGITAL BALANCE FISH SCIENTIFIC1(91-35) | 91 | 355 | 901 |
| FL419 | D-LECTRIC TEST REIPYNKS KON4750-2(91-10) | 91 | 355 | 901 |
| FL429 | DENSIMETER-VOLT-EXT-TMI KWD ED-120T(91-45) | 92 | 355 | 901 |
| FL438 | MOLDING PRESS #4 KOOS(89-41) | 92 | 355 | 901 |
| FL440 | PROPANE TANK-KCC ST(91-27) | 92 | 355 | 901 |
| FL441 | WEBER BAR-CODING EQUIP(91-37) | 92 | 355 | 901 |
| FL443 | #2 TOWER HEATER UPGRADE-FABRIC(91-39) | 92 | 13 | 901 |
| FL445 | 60" CALENDAR-FABRIC(91-43) | 92 | 13 | 901 |

2

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002179

OCT 26 '95 10:43 FLUORGLAS_ACCTG                                                P.1/10



(09/26/95)  * * * *  MILLENNIUM ONLINE PRINT:  * * *  (PAGE:
LOC KEY ITEM NO   BK DESCRIPTION   BK ACQ YEAR / CC   BK COST   BK ACCM DEPR   NE BOOK V.NUE

| LOC KEY ITEM NO | BK DESCRIPTION | BK ACQ YEAR | CC | BK COST | BK ACCM DEPR | NE BOOK V.NUE |
|---|---|---|---|---|---|---|
| 901 F.446 | #9 FABRIC TOWER HOOD-WEB FLUTTER(92-2) | 92 | 333 | 5,936.97 | 3,019.79 | 847.18 |
| 901 F.448 | PNEUMATIC ACTION GRIPS-HCC ST QC(92-05) | 92 | 333 | 2,183.02 | 1,116.11 | 1,046.91 |
| 901 F.454 | HYDRAULIC PRESS CONTROLS-LG MOLD PRESS(92-1B) | 92 | 333 | 12,197.36 | 6,317.92 | 849.46 |
| 901 F.455 | #6 TOWER DC DRIVES(92-26) | 92 | 333 | 2,026.86 | 1,034.85 | 972.01 |
| 901 F.460 | MAIL. MACH.-SMART METER SER#M-20034(92-31)HCC SHIP | 92 | 333 | 4,720.36 | 2,456.63 | 263.73 |
| 901 F.463 | COMPACTOR-31 CU. YD. SELF CONTAINED(92-36)-BFI | 92 | 333 | 11,019.38 | 5,734.84 | 284.54 |
| 901 F.464 | #9 TOWER COATING HEAD-APTICAL | 92 | 333 | 103,820.00 | 54,031.35 | 5,788.65 |
| 901 F.467 | HORIZONTAL EXTR UPGRADE(91-31) | 92 | 333 | 10,152.78 | 2,885.67 | 297.31 |
| 901 F.469 | WIRE WOUND METERING BARS #9 FABRIC TOWER(92-15) | 92 | 333 | 1,694.74 | 424.64 | 426.64 |
| 901 F.471 | SPARE 60" CALENDAR ROLLS-FABRIC(93-01) | 93 | 333 | 35,100.00 | 9,811.88 | 20,228.12 |
| 901 F.473 | BAGGING MACH-PSAT PACKING(93-08) | 93 | 333 | 20,089.56 | 5,690.19 | 1,439.27 |
| 901 F.475 | BLOWER SPEED CONTROLS-FABRIC TOWER#8(93-10) | 93 | 333 | 6,084.00 | 1,711.13 | 372.87 |
| 901 F.480 | 2-PEN TEMP RECRDR-XEROX BELT LAMINATOR(93-23) | 93 | 333 | 1,756.73 | 494.08 | 262.65 |
| 901 F.486 | LAM-CAL EXHAUST SYSTEM(93-33) | 93 | 333 | 7,010.20 | 1,971.62 | 1,038.38 |
| 901 F.489 | #8 TOWER LITEWEIGHT SHAFT-DANB GRAPH (93-37) | 93 | 333 | 11,915.39 | 3,351.20 | 1,564.19 |
| 901 F.491 | MANDREL-CHROME-LG. BILLET MOLD/EXT(93-44) | 93 | 333 | 4,450.00 | 1,251.57 | 198.43 |
| 901 F.492 | #8 TOWER EXHAUST SPEED CONTROLS(93-45) | 93 | 333 | 2,283.39 | 628.07 | 550.33 |
| 901 F.500 | BELT PRESS HOOD-LARGER THROAT(93-61) | 93 | 333 | 2,137.86 | 601.26 | 336.40 |
| 901 F.501 | LIFT-PRESTO PLATFORM-120"FABRIC(93-67) | 93 | 333 | 2,583.13 | 293.54 | 289.59 |
| 901 U40374 | SHIPPING SCALE MCCAFFREY ST | 94 | 333 | 2,325.96 | 264.31 | 1,061.45 |
| 901 U40383 | PRESS CHART RECORDER MOLDING | 94 | 333 | 1,609.26 | 182.97 | 1,426.39 |
| 901 U40386 | LDOOK COATING UPGRADE FABRIC | 94 | 333 | 3,390.00 | 385.23 | 3,004.77 |
| 901 U40389 | TOWER EXHAUST 1HP FABRIC | 94 | 351 | 1,525.00 | 173.30 | 351.70 |
| 901 U40390 | PRESTO LIFT MOLDING | 94 | 333 | 7,661.82 | 580.84 | 1,081.58 |
| 901 U73034 | EXTRUDER 4 SAFETY IMPROVEMENT(92-38) | 94 | 333 | 24,120.90 | 1,832.54 | 22,935.55 |
| 901 U73043 | BELT DEPT PROCESS IMPROVEMENT (93-77) | 94 | 333 | 1,982.19 | 144.11 | 258.18 |
| 901 U73060 | VISCOMETER FOR FABRIC MIX ROOM (94-46) | 94 | 333 | 1,775.73 | 134.53 | 541.20 |
| 901 U73063 | SURFACE FINISH TESTER (94-69) | 94 | 333 | 466,825.31 | 35,365.55 | 431,459.76 |
| 901 U73072 | TWR 3 HOT AIR CONVERSION FABRIC (93-41) | 95 | 333 | 7,965.00 | 180.28 | 1,782.02 |
| 901 U118168 | ARROW SLITTER MODIFICATIONS(93-04) | 95 | 333 | 17,180.27 | 390.46 | 2,789.81 |
| 901 U118169 | VACUUM TABLE/WEB CLEANER(93-049) | 95 | 351 | 24,669.75 | 560.58 | 2,109.37 |
| 901 U73535 | CYTEK LARGE PRESS CUSTBAR | 95 | 333 | 11,038.47 | 250.55 | 1,777.82 |
| 901 U73537 | WAREHOUSE #2 PALLET RACK FABRIC | 95 | 353 | 8,410.12 | 190.94 | 218.98 |
| 901 U73539 | CHART RECORDERS FABRIC | 95 | 356 | 6,992.08 | 158.21 | 433.77 |
| 901 U73540 | NIM-CORE AIR SHAFTS FABRIC | 95 | 333 | 3,434.00 | 73.35 | 355.95 |
| 901 U73569 | ELKENDORF TEARING TESTER | 95 | 356 | 4,027.09 | 91.52 | 355.17 |
| 901 U78552 | MOLDED BILLET PALLETS/MOLDING | 95 | 356 | 3,198.18 | 72.59 | 125.49 |
| 901 U48178 | BELT GRINDER/SKIVER, W/VAC(94-44) | 95 | 356 | 16,301.52 | 370.49 | 228.43 |
| 901 U48182 | DIFF. SCAN. CALORIMETER, W/PRESS.(94-70) | 95 | 333 | 2,280.25 | 51.32 | 228.43 |
| 901 U48183 | Q/C DIGITAL BALANCE SCALE(94-70) | 95 | 333 | 4,856.00 | 110.36 | 745.44 |
| 901 U48185 | NIM-COR 3" AIRSHAFT, 1 OF 2 | 95 | 333 | 2,999.00 | 68.12 | 744.64 |
| 901 U48186 | NIM-COR 3" AIRSHAFT, 2 OF 2 | 95 | 333 | 2,751.00 | 62.37 | 568.53 |
| 901 U48209 | POLYBOARD EXPANDER ROLL TOWER #2 | 95 | 333 | 2,271.18 | 63.7 | 222.90 |
| 2 | | | | 8,473,318.47 | 7,312,095.37 | 1,16... |
| 901 5 072 | FURN. & FIX. ADDS-1968 | 68 | 356 | 6,488.30 | 6,483.50 | .00 |
| 901 5 073 | FURN. & FIX. ADDS-1969 | 69 | 356 | 3,300.50 | 3,300.50 | .00 |
| 901 5 074 | FURN. & FIX. ADDS-1970 | 70 | 356 | 2,545.24 | 2,545.24 | .00 |
| 901 5 075 | FURN. & FIX. ADDS-1971 | 71 | 356 | 62.00 | 62.00 | .00 |
| 901 5 076 | FURN. & FIX. ADDS-1972 | 72 | 356 | 32,689.70 | 32,687.70 | .00 |
| 901 5 077 | FURN. & FIX. ADDS-1973 | 73 | 356 | 49,099.67 | 49,099.67 | .00 |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002180

OCT 26 '95 10:44 FLUORGLAS_ACCTG                                    P.2/10

<09/26/95>                    * * * MILLENIUM ONLINE PRINT: * * *                         (PAGE: 6)



| LOC | KEY ITEM NO | BK DESCRIPTION | BK ACQ YEAR | ACCT | BK COST | BK ACCM DEPR | NET BOOK VALUE |
|---|---|---|---|---|---|---|---|
| 901 | FL078 | FURN. & FIX. ADDS-1974 | 74 | 3336 | 10,747.66 | 10,747.66 | .00 |
| 901 | FL079 | FURN. & FIX. ADDS-1975 | 75 | 3336 | 11,218.62 | 11,218.62 | .00 |
| 901 | FL080 | FURN. & FIX. ADDS-1976 | 76 | 3336 | 16,261.98 | 16,261.98 | .00 |
| 901 | FL081 | FURN. & FIX. ADDS-1977 | 77 | 3336 | 11,014.83 | 11,014.83 | .00 |
| 901 | FL082 | FURN. & FIX. ADDS-1978 | 78 | 3336 | 14,390.18 | 14,390.18 | .00 |
| 901 | FL083 | FURN. & FIX. ADDS-1979 | 79 | 3336 | 26,718.15 | 26,718.15 | .00 |
| 901 | FL084 | FURN. & FIX. ADDS-1980 | 80 | 3336 | 55,914.20 | 55,914.20 | .00 |
| 901 | FL085 | FURN. & FIX. ADDS-1981 | 81 | 3336 | 67,982.40 | 67,982.40 | .00 |
| 901 | FL198 | FURN. & FIX. ADDS-1982 | 82 | 3336 | 17,535.30 | 17,535.30 | .00 |
| 901 | FL199 | FURN. & FIX. ADDS-1983 | 83 | 3336 | 36,725.83 | 36,725.83 | .00 |
| 901 | FL200 | FURN. & FIX. ADDS-1984 | 84 | 3336 | 10,476.06 | 10,476.06 | .00 |
| 901 | FL201 | FURN. & FIX. ADDS-1985 | 85 | 3336 | 12,495.15 | 12,495.15 | .00 |
| 901 | FL202 | MCC. ST. CONFERENCE RM. F & F(87-8) | 87 | 3336 | 17,160.06 | 14,157.03 | 3,003.03 |
| 901 | FL268 | PRINTER STAND W/CASTERS(88-18) | 88 | 3336 | 935.57 | 692.80 | 242.77 |
| 901 | FL269 | PORTABLE TRADE SHOW BOOTH(89-39) | 89 | 3336 | 5,038.26 | 3,148.91 | 1,883.35 |
| 901 | FL270 | 19" COLOR TELEVISION(88-19) | 88 | 3336 | 320.00 | 200.00 | 120.00 |
| 901 | FL271 | VIDEO CASSETTE RECORDER(88-19) | 88 | 3336 | 427.88 | 267.43 | 160.45 |
| 901 | FL272 | EXECUTIVE CHAIR-ACCTG(88-19) | 88 | 3336 | 360.00 | 225.00 | 135.00 |
| 901 | FL273 | CONFERENCE RM. FURN.(48-19) | 89 | 3336 | 1,807.78 | 1,129.86 | 677.92 |
| 901 | FL354 | F & F-VARIOUS(90-12) | 89 | 3336 | 7,012.11 | 3,681.35 | 3,330.76 |
| 901 | FL411 | FURNITURE-PERSON'L OFF.(TABLE,DESK,& CHAIR)(91-02) | 91 | 3336 | 2,881.43 | 1,224.63 | 1,656.85 |
| 901 | FL428 | MAHOGANY TABLE & CHAIRS(92-03)EODUOC | 92 | 3336 | 2,684.19 | 872.36 | 1,811.83 |
| 901 | FL504 | WORKSTATION FOR RECEPTION AREA(93-05) | 93 | 3336 | 2,703.89 | 608.38 | 2,095.51 |
| 901 | A073056 | FURNITURE & FIXTURES (94-40) | 94 | 3336 | 1,624.67 | 135.39 | 1,489.28 |
| | | | | | 428,639.66 | 412,006.91 | 16,632.75 |
| 901 | FL028 | COMPUTING EQUIP. ADDS-1980 | 80 | 3341 | 11,303.15 | 11,303.15 | .00 |
| 901 | FL029 | COMPUTING EQUIP. ADDS-1981 | 81 | 3341 | 24,690.99 | 24,690.99 | .00 |
| 901 | FL204 | P.C.-SALES(87-16) | 87 | 3341 | 2,383.96 | 2,383.96 | .00 |
| 901 | FL205 | P.C.-ENG.(87-29) | 87 | 3341 | 10,786.60 | 10,786.60 | .00 |
| 901 | FL030 | P.C.-A.C.C. | 88 | 3341 | 5,687.05 | 5,687.05 | .00 |
| 901 | FL031 | P.C.-SALES | 88 | 3341 | 4,940.95 | 4,940.95 | .00 |
| 901 | FL032 | P.C.-ACCTG | 88 | 3341 | 2,848.50 | 2,848.50 | .00 |
| 901 | FL033 | P.C.-MFG | 88 | 3341 | 2,848.50 | 2,848.50 | .00 |
| 901 | FL034 | XEROX IBM TERMINALS | 88 | 3341 | 2,494.30 | 2,494.30 | .00 |
| 901 | FL035 | P.C.-SALES | 88 | 3341 | 3,690.00 | 3,690.00 | .00 |
| 901 | FL016 | XEROX IBM TERMINAL | 88 | 3341 | 140.56 | 140.56 | .00 |
| 901 | FL037 | PORTABLE P.C.-ENGR. | 88 | 3341 | 1,965.76 | 1,965.76 | .00 |
| 901 | FL038 | HIGH-SPEED PRINTER #1 | 88 | 3341 | 6,000.00 | 6,000.00 | .00 |
| 901 | FL039 | HIGH-SPEED PRINTER #2 | 88 | 3341 | 6,000.00 | 6,000.00 | .00 |
| 901 | FL274 | A.T.&T. TELEPHONE SYSTEL 75XE(88-29) | 89 | 3341 | 78,472.51 | 78,472.51 | .00 |
| 901 | FL275 | ENGINEERING COMPUTER W/AUTOCAD(88-41) | 89 | 3341 | 7,958.69 | 7,958.69 | .00 |
| 901 | FL276 | P.C.FOR ADM.NET POWERMATE, VGA MONITOR +ACC(85-14) | 89 | 3341 | 6,807.34 | 6,807.34 | .00 |
| 901 | FL277 | P.C.FOR ACCTG.IBM PS/2 &CO. 50 W/ACC(89-51) | 89 | 3341 | 5,093.78 | 5,093.78 | .00 |
| 901 | FL344 | FAX MACH-CUST SERV AT&T W60 9035FX(90-38) | 90 | 3341 | 3,236.79 | 3,236.79 | .00 |
| 901 | FL345 | P.C.-SWITCHBOARD(90-03) | 90 | 3341 | 2,745.62 | 2,745.62 | .00 |
| 901 | FL346 | FAX MACH MOD-881 15TON(90-03) | 90 | 3341 | 2,058.51 | 2,058.51 | .00 |
| 901 | FL347 | P.C.-MCC ST QC-286/12.(WHZ,1M,1.44F,101KB(90-24) | 90 | 3341 | 2,040.00 | 2,040.00 | .00 |
| 901 | FL348 | P.C.-SALESNEC536 SX/1**FCA NON W/ACC(90-14) | 90 | 3341 | 4,671.00 | 4,671.00 | .00 |
| 901 | FL349 | PROG DEV COMP-386/CAD NON(90-17) | 90 | 3341 | 8,678.49 | 8,678.49 | .00 |
| 901 | FL352 | FAX MACH-ACCT-AT&T3520D NON(90-21) | 90 | 3341 | 1,457.93 | 1,457.93 | .00 |

2

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002181

```
(09/26/95)          * * *  MILLENNIUM  ONLINE  PRINT *  * *                              (PAGE:      )
```

| LOC | KEY ITEM NO | BK DESCRIPTION | BK ACQ YEAR | ACCT | BK COST | BK ACCM DEPR | NET BOOK VALUE |
|---|---|---|---|---|---|---|---|
| 901 | FL353 | TERMINAL CONTROLLER-36PORT MOD#5174-01R(89-28) | 90 | 3341 | 10,467.00 | 10,467.00 | .00 |
| 901 | FL412 | H-P LASERJET PRINTER-SWITCHBRD(91-07) | 91 | 3361 | 2,175.55 | 2,175.55 | .00 |
| 901 | FL413 | PRINTER SER#64703 | 91 | 3361 | 1,217.43 | 1,217.43 | .00 |
| 901 | FL414 | PRINTER SER#64707 | 91 | 3361 | 1,217.43 | 1,217.43 | .00 |
| 901 | FL416 | LAPTOP-TANDY 2810 HD W/ACC(91-26)ZILLIAUX | 91 | 3341 | 2,356.35 | 2,356.35 | .00 |
| 901 | FL417 | NOTEBOOK COMP'R-SAMSUNG 80386SX W/ACC(91-44)WOONAH | 91 | 3341 | 1,407.00 | 1,407.00 | .00 |
| 901 | FL418 | NOTEBOOK COMP'R-SAMSUNG 80386SX W/ACC(91-44)ELLIS | 91 | 3341 | 1,407.00 | 1,407.00 | .00 |
| 901 | FL422 | MESAS W/O SYS-KAIMI(91-29) | 92 | 3341 | 16,323.79 | 16,323.79 | .00 |
| 901 | FL423 | AT&T AUDIX VOICE MAIL SYS(91-30) | 92 | 3341 | 16,023.15 | 16,023.15 | .00 |
| 901 | FL424 | FAX MACH-AT&T-ADMIN(92-01) | 92 | 3341 | 1,578.44 | 1,578.44 | .00 |
| 901 | FL426 | LAPTOP-DELL N125/ 2KB RAM, 80MB HD(92-39)MERKEL | 92 | 3341 | 2,264.15 | 2,264.15 | .00 |
| 901 | FL427 | P.C.-PROD DEV-SER#66 50 W/ACC(92-40) | 92 | 3341 | 2,542.80 | 2,542.80 | .00 |
| 901 | FL507 | H-P LASERJET PRINTER(93-03)SALES-SECRETARY | 93 | 3361 | 2,569.45 | 2,569.45 | .00 |
| 901 | FL509 | TERMINALS-BULK PURCHASE-25-(93-11) | 93 | 3341 | 10,525.26 | 1,326.79 | ?,?26 |
| 901 | FL510 | TERMINAL CONTROLLER-MOD#5174-11R-NCC S' | 93 | 3341 | 7,522.63 | 5,04.2?7 | 2,?48.?7 |
| 901 | FL511 | FILESERVER-QC DATABASE(93-19) | 93 | 3341 | 4,945.90 | 3,70?.93 | 1,?25.97 |
| 901 | FL512 | P.C.-ACCTG(93-25) | 93 | 3341 | 2,689.43 | 2,01?.07 | ?7.36 |
| 901 | FL513 | PRINTRONICS PRINTER#0046040L-BAR CODE(*3-30) | 93 | 3341 | 8,155.10 | 6,1?.33 | 2,85?.77 |
| 901 | FL514 | DOT MATRX PRINTR-FUJITSU DL5800(93-27) | 93 | 3341 | 1,595.73 | 1,04?.30 | ???.43 |
| 901 | FL516 | NOTEBOOK-486 SLC 33MHZ W/ACC(93-46)MICCEY | 93 | 3341 | 2,351.95 | 1,76?.21 | 58?.74 |
| 901 | A040376 | BAR CODING EQUIPMENT EXT TAPE | 94 | 3341 | 3,40?.19 | 71?.25 | 2,69?.94 |
| 901 | A073053 | EWH MAIL POSTOFFICE (94-37) | 94 | 3341 | 2,752.38 | 385.28 | 2,3?7.10 |
| 901 | A073054 | ENTERPRISE WIDE NETWORK EXPANSION (94-28) | 94 | 3341 | 35,?55.02 | 4,382.34 | 25,?71.68 |
| 901 | A073055 | AT & T SYSTEM 75 PHONE UPGRADE (94-39) | 94 | 3341 | 17,001.33 | 2.16.16 | 14,??5.17 |
| 901 | A073059 | EWH EXPANSION-2 (94-43) | 94 | 3341 | -6,086.34 | 84-.33 | ?5.01 |
| 901 | A073061 | BAR CODING EQUIPMENT (94-47) | 94 | 3341 | 4,244.95 | 58?.58 | 3,6?.37 |
| 901 | A073064 | VISION 2000 ROLL OUT (94-50) | 94 | 3341 | 4,181.76 | 58?.60 | 3,?4?.96 |
| 901 | A073065 | TWO SALES COMPUTERS SYSTEMS (94-51) | 94 | 3341 | 7,335,.62 | 1,01?.73 | 6,??-.09 |
| 901 | A073056 | ENTERPRISE WIDE NETWORK | 95 | 3341 | 79,005.00 | 3,29?.7? | 75,?.21 |
| 901 | A073541 | CONNECT REMOTE SITES EWN | 95 | 3341 | 20,501.67 | 85-.33 | 19,?4?.54 |
| 901 | A073544 | EXPAND LAN SERVER | 95 | 3341 | 3,761.64 | 15-.?? | 3,?.5.?00 |
| 901 | A073551 | SALES PC | 95 | 3341 | 2,764.60 | 11?.20 | 2,??.40 |
| 901 | A073553 | CUSTOMER SVC PC'S | 95 | 3341 | 33,869.34 | 1,41?.22 | 32,?15.12 |
| 901 | A073555 | ACCTG PC'S PAYROLL | 95 | 3341 | 6,595.94 | 27?.75 | 6,?15.19 |
| 901 | A073556 | COST ACCTG PC | 95 | 3341 | 3,541.32 | 14?.56 | 3,?95.76 |
| 901 | A148194 | PC-Q/C LAB, FOR DSC-6(94-70) | 95 | 3341 | 2,48?.60 | 10?.50 | 2,?1?.10 |
| 901 | A148195 | PC-ADMIN BACK-UP W/ACCESS | 95 | 3341 | 3,501?.52 | 142?.98 | 3,?5?.54 |
| 901 | A148197 | PC-CONTROLLER'S OFFICE ACCTG | 95 | 3341 | 3,977?.32 | 16?.56 | 3,?1?.76 |
| 901 | A148198 | COLOR LASER PRINTER - ADMIN SEC | 95 | 3341 | 6,78?.43 | 28?.64 | 6,??.87 |
| 901 | A148199 | PC & EQPT - MARKETING AREA | 95 | 3341 | 3,764.55 | 15?.78 | 3,?1?.87 |
| 901 | A148203 | PC & MISC EQPT A/P ACCTG | 95 | 3341 | 2,655.52 | 11?.08 | 2,?3?.54 |
| 901 | A148204 | PC & MISC EQPT - PURCHASING DPT | 95 | 3341 | 3,465.55 | 14?.32 | 3,?1?.24 |
| 901 | A148206 | PC MISC EQPT FABRIC MRP | 95 | 3341 | 3,465.55 | 14?.32 | 3,?1?.24 |
| 901 | A148207 | LAPTOP PC W/MODEM - GENL MGR | 95 | 3341 | 3,12?.52 | 13?.06 | 3,?9?.46 |
| 901 | A148208 | PC & MISC EQPT - DATA PROC AREA | 95 | 3341 | 3,454.16 | 14-.?? | 3,?.?.07 |
| 901 | A148209 | PC & MISC EQPT - ISES DEVELOPMENT | 95 | 3341 | 3,454.16 | 14?.?9 | 3,?.?.07 |
| 901 | FL518 | TRUCK & AUTO ADDS-1976 | 76 | 3356 | 572,506.29 | 316,13.21 | 256,?8.48 |
| 901 | FL519 | TRUCK & AUTO ADDS-1977-CMG | 77 | 3356 | 16,665.72 | 16,666.72 | .00 |
| 901 | FL520 | TRUCK & AUTO ADDS-1978 | 78 | 3356 | 21,784.50 | 6,899.34 | .00 |
|     |       |                        |    |      |           | 21,784.50 |    |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002182

OCT 26 '95 10:46 FLUORGLAS_ACCTG                                          P.4/10

(09/26/95)     * * * MILLENNIUM ONLINE PRINT:     * * *                        (PAGE: 1)



| LOC | KEY ITEM NO | BK DESCRIPTION | BK ACQ YEAR | BK ACCT | BK COST | BK ACCH DEPR | NET BOOK VALUE |
|-----|-------------|----------------|-------------|---------|---------|--------------|----------------|
| 903 | FL060 | LAND-JOHN ST. | 67 | 3311 | 2,203.00 | .00 | 2,203.00 |
| 903 | | | | 3311 | 2,203.00 | .00 | 2,203.00 |
| 903 | FL040 | LAND JHP JOHN ST. PARKING | 65 | 3316 | 5,559.30 | 5,559.30 | .00 |
| 903 | FL041 | LAND JHP JOHN ST. PARKING | 67 | 3316 | 685.44 | 685.44 | .00 |
| 903 | | | | 3316 | 6,244.74 | 6,244.74 | .00 |
| 903 | FL086 | B ILDING-JOHN ST. | 61 | 3326 | 114,763.50 | 114,763.50 | .00 |
| 903 | FL091 | B ILDING-JOHN ST. | 65 | 3326 | 4,435.54 | 4,435.54 | .00 |
| 903 | FL148 | B ILDF R-RG(FIREBRK, PIPES, INSULATION) | 88 | 3326 | 3,770.51 | 3,770.51 | .00 |
| 903 | A0765345 | ANX COMP/SROR YARN | 95 | 3326 | 8,370.14 | 69.75 | 8,300.39 |
| 903 | | | | 3326 | 131,339.69 | 123,039.30 | 8,300.39 |
| 903 | FL019 | ANX COMP/SROR-JS | 86 | 3331 | 15,000.00 | 15,000.00 | .00 |
| 903 | FL265 | R SS DIST ..CATING RILL(88-07) | 88 | 3331 | 9,278.00 | 8,727.57 | 550.43 |
| 903 | FL266 | Y EXH AVN KDS(PAYFF/TAK'PS/SP'N'RS/FUL'YS)(88-06) | 88 | 3331 | 5,229.55 | 4,919.30 | 310.25 |
| 903 | FL267 | Y EXH AVN HEATER REPLACEMENTS(88-31) | 88 | 3331 | 3,114.00 | 2,929.26 | 184.74 |
| 903 | FL321 | Y EXH AVN HEATERS(85-56) | 89 | 3331 | 1,766.37 | 1,521.85 | 244.52 |
| 903 | FL435 | Y EXH AVN KDS +DDS-AIT ILOW(93-52) | 93 | 3331 | 4,026.13 | 1,132.35 | 2,893.78 |
| 903 | | | | 3331 | 1,609.21 | 121.91 | 1,487.30 |
| 903 | AO73036 | E ULS JN RKT (95-2) | 94 | 3331 | 5,671.02 | 32,356.24 | 5,671.02 |
| 903 | | | | 3331 | 35,023.26 | 161,636.28 | 16,174.41 |
| | | | | | 177,810.69 | 161,636.28 | 16,174.41 |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002183

OCT 26 '95 10:46 FLUORGLAS_ACCTG                                   P.5/10



(09/26/95)                    * * * MILLENNIUM ONLINE PRINT *                              (PAGE:   1)

| LOC | KEY ITEM NO | BK DESCRIPTION | BK ACQ YEAR | BK ACCT | BK COST | BK ACCM DEPR | NET BOOK VALUE |
|---|---|---|---|---|---|---|---|
| 904 | FL065 | LAND-R.R.#1 | 65 | 511 | 1,101.00 | .00 | 1,101.00 |
| 2 | 904 | | | 511 | 1,101.00 | .00 | 1,101.00 |
| 904 | FL042 | LAND IMP-R.R.#1 PARKING | 69 | 516 | 3,152.69 | 3,152.69 | .00 |
| 2 | 904 | | | 516 | 3,152.69 | 3,152.69 | .00 |
| 904 | FL087 | BUILDINGS-R.R.#1 | 65 | 526 | 19,500.00 | 19,500.00 | .00 |
| 904 | FL089 | BUILDINGS-R.R.#1 | 65 | 526 | 4,435.54 | 4,435.54 | .00 |
| 904 | FL124 | BUILDING IMP-R.R.#1 | 76 | 526 | 15,466.65 | 15,466.65 | .00 |
| 904 | FL173 | OIL BURNER UPGRADE-R.R.#1(92-6) | 92 | 526 | 1,205.00 | 783.25 | 421.75 |
| 2 | 904 | | | 526 | 40,607.19 | 40,185.44 | 421.75 |
| 904 | FL123 | TOOL GRINDER-DO-ALL 6-612K(89-49) | 89 | 531 | 7,638.62 | 6,581.23 | 1,057.39 |
| 904 | FL330 | BLADE GRINDER KOOS(89-49) | 89 | 531 | 268.58 | 231.40 | 37.18 |
| 904 | FL335 | SUPER-LIFT-650#-MAINT(89-57) | 89 | 531 | 1,115.00 | 960.66 | 154.34 |
| 904 | FL339 | UNIVERSAL GRINDING ATTACH(89-72) | 89 | 531 | 2,761.01 | 2,378.81 | 382.20 |
| 904 | FL384 | PORTABLE PIPE-THREADER-MAINT(89-70) | 89 | 531 | 2,500.00 | 1,936.04 | 563.96 |
| 904 | FL394 | TRUCK SANDER-MAINT(90-46) | 90 | 531 | 2,999.44 | 2,322.81 | 676.63 |
| 904 | FL399 | PLASMA ARC CUTTER(90-45) | 90 | 531 | 2,300.00 | 1,528.16 | 771.84 |
| 904 | FL402 | DRILL PRESS-MAINT(91-05) | 91 | 531 | 1,450.00 | 963.41 | 486.59 |
| 904 | FL444 | BELT SANDER-MAINT(91-62) | 91 | 531 | 3,066.32 | 1,595.81 | 1,470.51 |
| 904 | FL452 | LIFT TRUCK(USED)-MAINT(92-14) | 92 | 535 | 5,000.00 | 2,602.17 | 2,397.83 |
| 904 | FL481 | PORTABLE AIR CLEAR-MAINT(93-24) | 93 | 535 | 2,929.50 | 823.92 | 2,105.58 |
| 904 | FL506 | DIGITAL DATA REC-MAINT-TRACOR WESTRONICS(93-26) | 93 | 531 | 3,821.29 | 1,719.58 | 2,101.71 |
| 2 | 904 | | | 531 | 35,849.76 | 23,644.00 | 12,205.76 |
| 904 | FL363 | DESK-TOP XEROX COPIER-MAINT(90-33) | 93 | 541 | 4,895.92 | 204.00 | 4,691.92 |
| 904 | A148190 | AUTOCAD SYSTEM, PC,MONITOR, ETC. | 95 | 541 | 2,030.40 | 84.60 | 1,945.80 |
| 904 | A148191 | LASER 4V PRINTER, RRI AUTOCAD SYS | 95 | 541 | 8,717.50 | 2,079.78 | 6,637.72 |
| 2 | 904 | | | 541 | .00 | .00 | .00 |
| 904 | FL525 | MAINT.CHEVY PICKUP-USED(87-36) | | 556 | 6,105.67 | 6,105.67 | .00 |
| 904 | FL526 | MAINT.CHEVY VAN-1985-USED(87-36) | 89 | 556 | 5,019.71 | 5,019.71 | .00 |
| 904 | FL528 | USED ENGINE FOR '85 CHEVY VAN(89-59) | 89 | 556 | 6,877.75 | 6,877.75 | .00 |
| 904 | FL531 | USED DUMP TRK-1988CHEVY(1G8JV34W60JJ1C3072)(91-14) | 91 | 556 | 18,003.13 | 18,003.13 | .00 |
| 2 | 904 | | | 556 | 107,431.27 | 87,065.04 | 20,366.23 |
| 1 | 904 | | | | | | |
| * | | | | | 107,431.27 | 87,065.04 | 20,366.23 |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002184

(09/26/95)

*K β 2*

### * * * MILLENNIUM ONLINE PRINT:

| LOC | KEY ITEM NO | BK DESCRIPTION | BK ACQ YEAR | ACCT | BK COST | BK ACCM DEPR | NET BOOK VALUE 1) |
|---|---|---|---|---|---|---|---|
| 905 | FL062 | LAND-R.R.#2 | 63 | 2311 | 4,000.00 | .00 | 4,000.00 |
| 905 | FL088 | BUILDINGS-R.R.#2 | 63 | 2311 | 4,000.00 | .00 | 4,000.00 |
| 905 | FL090 | BUILDINGS-R.R.#2 | 65 | 3326 | 114,324.30 | 114,324.30 | .00 |
| 905 | FL092 | BUILDINGS-R.R.#2 | 65 | 3326 | 30,128.31 | 30,128.31 | .00 |
| 905 | FL123 | BUILDING IMP-R.R.#2 | 66 | 3326 | 33.87 | 33.87 | .00 |
| 905 | FL127 | BUILDING IMP-R.R.#2 | 75 | 3326 | 185,920.64 | 185,920.64 | .00 |
| 905 | FL128 | BUILDING IMP-R.R.#2 | 77 | 3326 | 28,029.83 | 28,029.83 | .00 |
| 905 | FL132 | BUILDING IMP-R.R.#2 | 78 | 3326 | 408.00 | 400.00 | .00 |
| 905 | FL112 | BUILDINGS-R.R. | 78 | 3326 | 14,853.39 | 14,853.39 | .00 |
| 905 | FL149 | BUILDINGS-R.R. | 82 | 3326 | 167,890.18 | 145,504.83 | 22,385.35 |
| 905 | FL174 | ROOF REPLACE  R.R.#2 | 88 | 3326 | 26,169.00 | 26,169.00 | .00 |
| 905 | A040384 | OIL BURNER L  IE+R,R,#2(92-6) | 89 | 3326 | 1,205.00 | 783.25 | 421.75 |
| 905 | A078538 | RRD2 BLDG MC  IEK PROJECT | 94 | 3326 | 29,036.80 | 1,209.87 | 27,826.93 |
| 905 | A078554 | PSAT ETCH HV  JGR DESIGN | 95 | 3326 | 12,715.66 | 105.96 | 12,609.70 |
| 905 | A078554 | INSTALL 2000  AS TANK PSAT | 95 | 3326 | 4,750.00 | 39.51 | 4,710.42 |
| 905 | A148179 | VENT AND FIRE  STERS-ETC ROOM(94-45) | 95 | 3326 | 12,601.80 | 105.02 | 12,496.78 |
| 905 | FL262 | ETCHING-PH NEUTRALIZATION/DISCHARGE(87-15) | 58 | 3326 | 628,058.78 | 547,607.84 | 80,450.93 |
| 905 | FL263 | ETCHER ROLLS-64 KNURLED(88-11) | 58 | 3351 | 15,569.42 | 14,645.75 | 923.67 |
| 905 | FL264 | ETCHER HEATERS(88-59) | 58 | 3351 | 2,888.43 | 2,717.01 | 171.36 |
| 905 | FL315 | ETCHER MODS-P.H. NEUTRALIZATION(89-21) | 89 | 3351 | 2,718.60 | 2,557.32 | 161.28 |
| 905 | FL382 | SANDPIPER PUMP-NAPTHALENE RENOVAL-ETCHING(89-64) | 89 | 3351 | 6,525.08 | 5,621.83 | 903.25 |
| 905 | FL388 | ETCHING CHARCOAL FILTRATION SYSTEM(90-08) | 90 | 3351 | 6,500.74 | 6,583.09 | 1,917.65 |
| 905 | FL391 | ETCHING CHARCOAL FILTER SYS. #2(90-28) | 90 | 3351 | 4,891.43 | 3,787.99 | 1,103.44 |
| 905 | FL465 | ETCHING EFFLUENT OUTFALL(90-47) | 93 | 3351 | 3,187.04 | 2,468.06 | 718.95 |
| 905 | A073041 | CYTEK TAB PRESS (93-74) | 93 | 3351 | 6,788.92 | 1,909.38 | 4,879.54 |
| 905 | A073047 | GAS LINE VAPORIZER (94-20) | 94 | 3351 | 46,807.57 | 3,546.03 | 43,261.54 |
| 905 | A073051 | HEAT EXCHANGER ETC RR2 (94-27) | 94 | 3351 | 5,189.85 | 393.17 | 4,796.68 |
| 905 | A073057 | ASSEMBLY TABLES CUSFAB (94-41) | 94 | 3351 | 20,240.66 | 1,533.38 | 18,707.28 |
| 905 | A073058 | PLATENS DODGE PRESS CUSFAB (94-42) | 94 | 3351 | 6,463.80 | 489.68 | 5,974.12 |
| 905 | A148189 | CUTTING TABLE, W/Z-EDGE(95-16) | 95 | 3331 | 1,796.00 | 136.82 | 1,669.18 |
| 905 | | | | 3331 | 40.82 | 1,755.18 | 86,945.12 |
| 905 | | | | 3361 | 46,430.42 | 550.42 | 6,054.58 |
| 905 | A148188 | ANT. COVER TEMPLATES(S), (95-15) | 95 | 3361 | 6,605.00 | 550.42 | 6,054.58 |
| 905 | | | | 3361 | 6,605.00 | 550.42 | 6,054.58 |
| | | | | | 772,037.32 | 594,588.69 | 177,448.63 |
| | | | | | 772,037.32 | 594,588.69 | 177,448.63 |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002185

**Appendix II to Schedule 4.5(a)**
**LaCrosse Microwave Machinery and Equipment**

**Microwave Equipment Asset List  (July 1995)**                    <u>Location</u>

1)    American Hydrotherm Thermal Liquid Heater                     Boiler Area
        Model #450-3D-80
        Coil Design:  300 PSI 850 degrees
        Operating Temperature: 650 degrees
        Design Output: 4,500,000 BTU/hr.
        Maximum Fuel: 6,000 CFH Natural Gas @ 15 PSI
        Heating Fluid: Syltherm 800 (962 gal capacity)

2)    Expansion Tank - American Hydrotherm 650 gallons              Elevated
                                                                    Outside

3)    Plate and Frame Heat Exchanger (1994)                         Warehouse
        Built by American Hydrotherm
        327 Sq. Ft. Trantor "Superchanger"
        Goulds - 3x4x8 Circulating Pump - 400 GPM
        10 HP 480V 3ph 1800 rpm Motor
        Amtrol AX-60 Expansion Tank
        and associated controls

4)    10 Opening Hydraulic Laminating Press                         Press Area
        with 2 30" Rams
        with 42" by 72" Platens

5)    Hydraulic System Vickers Fixed Displacement Vane Pump         Press Pit
        Vickers Variable Piston Pump
         20 HP Lincoln 480V 3ph 1800 rpm Motor
        400 gallon Hydraulic Reservoir
        Air to Oil Heat Exchanger 580 BTU/hr
        All associated valves and controls

6)    Press Control Panel by Control Assemblies Co.                 Press Area
        Allen Bradley PLC-2 Controller
        Leeds & Northrup Model 063206 Chart Recorder
        Automation Systems IPT 100 - Operator Interface
        2 Barber Coleman 560 Digital Controllers

11/2/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER                                    HONDON-0002186

|  |  | Location |
|---|---|---|
| 7) | Stainless Steel Press Plates | Press/ |
|  | 38" X 53" - 247 Plates (74-25% used, 82-50% used, | Breakdown |
|  | 91-80% used |  |
|  | 38" X 66" - 76 Plates |  |
|  | 38" X 72" - 59 Plates |  |
| 8) | Stainless Steel Wool Pads | Press |
|  | 40" X 55" - 6 (80% used) in-house, 6 on order |  |
|  | 40" X 67" - 3 (10% used) |  |
|  | 40" X 72" - 3 (20% used) |  |
| 9) | Carrier Trays | Press |
|  | 47" X 72" - 11 (Refinished 2/95) |  |
|  | 47" X 72" - 12 (Need to be Refinished) |  |
| 10) | Primary Loop Heating | Boiler Room |
|  | Pump: Dean Pump Division |  |
|  | Size: 3x4x11.5 |  |
|  | Model: R-434 |  |
|  | 1750 rpm 750 degrees F |  |
|  | Motor:  US Electrical 25 HP |  |
|  | Model:  B522 |  |
|  | Frame 284T |  |
|  | 230/460 V 3 ph |  |
| 11) | Secondary Loop Heating | Boiler Room |
|  | Pump: Dean Pump Division |  |
|  | Size: 3x4x13.5 |  |
|  | Model R-434 700 GPM |  |
|  | 1750 rpm 750 degrees F |  |
|  | Motor:  US Elecrical 40 HP |  |
|  | Model A865 Frame 342T TE |  |
|  | 230/460 V 3ph |  |
| 12) | Shell & Tube Heat Exchanger | Boiler Room |
|  | KAM Thermal Equipment Co. |  |
|  | S/N 7232 Built 11/87 |  |
|  | Shell 250 PSI @ 750 degrees F |  |
|  | Tubes 150 PSI @ 500 degrees F |  |

11/2/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002187

|   |   | Location |
|---|---|---|
| 13) | Press Load/Unload System (10 Openings) | Press Area |
|   | Built by Accudyne Engineering |   |
|   | 2- 10 Opening Cassettes and Loader Assembly |   |
|   | Breakdown Converoes |   |
| 14) | Spare Parts for the Press |   |
|   | Dean Pump for Loop Heating | Maintenance |
|   | Spare Gaskets for Heat Exchangers | Maintenance |
|   | One spare seal and gaskets for Dean Pumps | Maintenance |
|   | 55 gallon drum for Syltherm 800 Oil | Warehouse |
|   | One half set of insulation boards for the Press | M'wave Storage |
| 15) | Layup Room Conveyor System | Layup |
|   | Built by Accudyne Engineering |   |
| 16) | Autoquip Scissors Lift | Layup |
|   | 6,000 lbs. lift capacity asset #643 |   |
| 17) | Rosenthal 60" Copper Cutter | Copper Cutting |
|   | Model WA-S-5-HVAA Serial #6912 | Room |
| 18) | Autoquip Scissors List Model 36C3E60 | Copper Cutting |
|   | 74" X 44" Platform with Rollers | Room |
| 19) | Contrex Model B1812 J.B. Crane | Copper Cutting |
|   |   | Room |
| 20) | 3 Air Deionizers | Cutting/Ply-up |
|   |   | Room |
| 21) | Texas Instruments Computer | Raw Material |
|   |   | Storage |
| 22) | 1 Gardner-Denver Air Operated Chain Hoist | Raw Material |
|   | Model 75150AD5 | Storage |
| 23) | Crown Manually Propelled Straddle Lift | Raw Material |
|   | Model 15BT110 S/N 39279 | Storage |
|   | Attachment for lifting 12" Diameter Rolls with 3" |   |
|   | ID Cores |   |
|   | Capacity 200 lbs. Rolls |   |

11/2/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002188

<u>Location</u>

24) Wysong 52" Shear Model #1452
      14 ga. capacity - 85 strokes/minute
      Front Gauge - rear conveyor            Paneling Area

25) Edwards 72" Shear Model 2.5/200 DD      Paneling Area
      14 ga. capacity

26) Wysong 54" Shear Model 1252         Paneling Area
      Front gauge - shaker bed return
      47"x44" Platform with Rollers

27) American Mfg. Scissors Lift        Breakdown Area
      Triple Escalating - 40"x55" Platform with Rollers

28) L-Sealer - Polybagger 40"x60"       Paneling Area
      Wrap-O-Matic Model LHM 40X 60 S/N 55870

29) Meyer Hydraulics Cherry Picker      Raw Material
      1,000 lbs capacity             Storage

30) Capacitance Meter for GE Medical     Engineering

31) HP 8729B Network Analyzer with Fixtures   Test Lab

32) Roller Storage Racks
      3 sections of 4'x5' 6 opening racks     Paneling
      3 sections of 4'x5' 3 opening racks     Paneling
      1 section of 52"x 80" 6 opening rack    Near Breakdown
      1 section of 45"x76" 7 opening rack    Copper Room
      1 section of 45"x76" 7 opening rack    Lay-up Room
      1 section of 45"x76" 10 opening rack   Raw Material
                                   Storage

33) 2 "A" Frame Mandrel Storage Carts/Racks
      2 Carrier Tray Carts           Breakdown
      1 Rod Type Rack for Rolled Material   Raw Material
                                   Storage

34) 14 Push Carts for Material Movement   Paneling/Cutting

11/2/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002189

|  |  | Location |
|---|---|---|
| 35) | Flat Shelving |  |
|  | 12 - 4'x12' Shelves with Uprights | Raw Material Storage |
|  | 5 - 4'x 9' Shelves with Uprights | Raw Material Stoage |
|  | 6 - 4'x 12' Shelves with Uprights | Microwave Warehouse |
| 36) | Sure Shot Sprayer for Frecote Spraying | Breakdown |
| 37) | Fabric Cutting Tables - 2 (One with fabric unwind capability) | Plyup Room |
| 38) | 2 - 8 Opening Plyup Storage Carts | Plyup Room |

11/2/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002190

**Schedule 4.5(b)**
**Exceptions to Sufficiency of Assets**

The quality control laboratory equipment identified as an excluded asset in Schedule 1.3(h) is required to test microwave laminates products for conformity with Mil-S-13949H.

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002191

**Schedule 4.6(a)**
**Intellectual Property Exclusively Used in the Business**

**Patents and Patent Applications:**

| FILE NUMBER | COUNTRY | PATENT NUMBER | ISSUE DATE | APPLICATION NUMBER | FILING DATE |
|---|---|---|---|---|---|
| 30-3320 | USA | 5,322,727 | 6/21/94 | | |
| | USA | | | 08/248,995 | 5/25/94 |
| | CANADA | 2,146,441 | 10/21/93 | | |
| | EUROPE | 93924392.9 | 10/21/93 | | |
| | JAPAN | 510386/94 | 10/21/93 | | |
| 30-3396 | USA | 5,368,924 | 11/29/94 | | |
| | | | | 08/208,252 | 3/9/94 |
| 30-3477 | USA | 5,385,765 | 1/31/95 | | |
| | CANADA | 2,146,440 | 10/13/93 | | |
| | EUROPE | 93923390.4 | 10/13/93 | | |
| 30-3548 | USA | 5,360,379 | 11/1/94 | | |
| | USA | 5,451,189 | 9/19/95 | | |
| | ARGENTINA | | | 329,682 | 10/5/94 |
| | CHILE | | | 1553-94 | 10/24/94 |
| | MEXICO | | | 94-7494 | 9/29/94 |
| | PCT | | | US94/10157 | 9/13/94 |
| 30-3777 | USA | | | 08/468,169 | 6/6/95 |

**Intellectual Property Agreements:**

1. Dow Corning - January 21, 1994

2. Acton Technologies - May 10, 1994

3. EMI Communications - October 4, 1994

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002192

**Schedule 4.6(a) (Continued)**

<u>**Registered Trademarks:**</u>

<u>**Mark:  FLUORGLAS**</u>

| | | | |
|---|---|---|---|
| Australia | 207254 | Italy | 335888 |
| Australia | 298019 | Italy | 484664 |
| Australia | 298020 | Japan | 806154 |
| Benelux | 339959 | Japan | 1499803 |
| Canada | 154816 | Japan | 1707587 |
| France | 1353881 | Spain | 822199 |
| France | 1390358 | Spain | 540403 |
| Great Britain | 1062300 | Switzerland | 287146 |
| Great Britain | 1062301 | Venezuela | 96999 |
| Great Britain | 1331336 | United States | 1042721 |
| Ireland | 90738 | | |
| Ireland | 90739 | | |
| Ireland | 90740 | | |

<u>**Mark:  MANS HANDS**</u>

United States  1105855

<u>**Mark:  SEAL PAK**</u>

| | | | |
|---|---|---|---|
| Benelux | 347007 | Italy | 484663 |
| Canada | 174912 | Sweden | 123357 |
| France | 1388155 | United States | 1110028 |
| Germany | 878095 | | |

<u>**Mark:  MYSTIK**</u>

United States  729929

**Common Law Trademarks (not registered):**

Cytek
Duraseal
Durabrite

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002193

**Schedule 4.6(b)**
**Intellectual Property Not Exclusively Used in Business**

NONE

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002194

**Schedule 4.6(c)**
**Intellectual Property Claims**

NONE

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002195

**Schedule 4.7**
**Contracts**

<u>PART (1) - LIST OF CONTRACTS</u>

(a)   <u>Payment obligations of $25,000 or more</u>:

- See list attached as Appendix I.
- See list of Purchase Order Commitments attached as Appendix II.

(b)   <u>Unexpired Term in excess of six (6) months</u>:

- See list attached as Appendix I.

(c)   <u>Extensions of credit in excess of $25,000</u>:

- See list of domestic sales commitments in attached Appendix III.
- See list of foreign sales commitments in attached Appendix III.

(d)   <u>Borrowing Agreements</u>:

NONE.

(e)   <u>Agreements outside of ordinary course of Business</u>

NONE.

(f)   <u>Other Material Agreements</u>

NONE.

(g)   <u>Miscellaneous Agreement</u>

- Joint Development Agreement with The Perkin Elmer Corporation Metco Division dated March 11, 1991.

- Retention Bonus Arrangements identified in Schedule 6.1(d).

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002196

**Schedule 4.7**
**Contracts (Continued)**

- Sales Representative Agreements

  - C.J. Garvey & Co. (2/1/91)
  - Corbett Smith Company (6/22/87)
  - James Palmer & Associates Inc. (5/1/87)
  - Eastern Electronic Sales/Ray Bishop (9/17/93)

## PART 2 - EXCEPTIONS

NONE.

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002197

## APPENDIX I TO SCHEDULE 4.7 - CONTRACTS

*Denotes consent required for assignment.

| Lease Agreements | Term | Equipment |
|---|---|---|
| *1.  Tab Products (3/20/95) | Expires 3/98 | Burster |
| 2.  Computer Sales International (3/7/95) | Expires 3/96 | Printers |
| 3.  Scovill Fastener Inc. | Renewed annually | DOT Fastener |

| Maintenance Agreements | Term | Equipment |
|---|---|---|
| 1.  Eastern Heating & Cooling Inc. | Expires 11/98 | Heating System |
| *2.  AT&T | Expires 8/99 | Telephone Equipment |

| Consignment Agreements | Term | Material |
|---|---|---|
| *1.  E.I. DuPont (6/14/94) | Renewed annually | Misc. PTFE grades |
| *2.  Daikin America (8/1/94) | Renewed annually | PTFE |
| 3.  E.I. DuPont (9/18/91) | Renewed annually | Teflon™ 200C, 200C20 |
| 4.  BGF Industries (6/9/93) | Renewed annually | Glass fibers |
| 5.  A.J. Oster Foils (8/5/92) | Renewed annually | Aluminum foil |
| 6.  Furon (12/27/91) | Renewed annually | UHMW foil |
| 7.  Industrial Coating Group (5/12/94) | Renewed annually | Release papers |
| 8.  ICI Americas Inc. (9/5/95) | Renewed annually | PTFE |
| 9.  Hoechst Celanese (12/12/91) | Renewed annually | PTFE |
| 10.  Titeflex | Renewed annually | Fabric/Foil |
| 11.  Parlex | Renewed annually | Film/PSAT |
| 12.  Airtech Europ | Renewed annually | Fabric/PSAT |

Seller also has consignment arrangements with GE Silicones for adhesives, Bedford Weaving for glass fabric and MFP for PTFE (Repro) under which the suppliers have consignment stock at Seller's facilities.  These arrangements are all terminable upon less than six (6) month's notice.

11/2/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002198

| Supplier Agreements | Term | Equipment |
|---|---|---|
| 1. Eastern Heating & Cooling Inc. | Expires 11/98 | Heating System |
| 2. BGF | Expires 12/31/96 | Fiberglass |
| *3. G.E. Silicones | Expires 12/31/96 | Adhesives |
| *4. Air Page | Expires 10/1/98 | Air Pagers |

The Business utilizes various services provided under master agreements covering numerous AlliedSignal locations. These agreements are not being assigned to Purchaser hereunder.

| Secrecy Agreements | Date |
|---|---|
| 1. Formulab Inc. | June 8, 1995 |
| 2. Ashe Controls | May 4, 1995 |
| 3. Wolverine (Massachusetts) Corp. | March 31, 1995 |
| 4. Team Tech Machines | March 31, 1995 |
| 5. Fairview Machine | March 31, 1995 |
| 6. B.F. Perkins | April 28, 1992 |
| 7. Akron Tool & Die | December 8, 1993 |
| 8. Acton Technologies Inc. | May 10, 1994 |
| 9. Lawrence Technology | August 18, 1993 |
| 10. Data Page | October 9, 1992 |
| 11. Tesa Tuck | December 10, 1990 |
| 12. Allied-Apical | January 7, 1992 |
| 13. DuPont | January 21, 1992 |
| 14. Dow Corning | July 2, 1990 |
| 15. Daikin America | October 8, 1993 |

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002199

## APPENDIX II TO SCHEDULE 4.7 CONTRACTS

Purchase Order

The attached lists each purchase order outstanding as of the date of the attached in an amount exceeding $25,000 as of the date set forth in the attached list.

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002200

Appendix II

**4.7 Contracts**

**Obligation of Seller to Pay an Amount of $25,000 or More**

PM6004   SPECIAL OPEN PURCHASE ORDER REPORT                    10-24-95   PAGE                    TOTAL ORG                    1

| VENDOR# / VENDOR NAME / REQUESTOR | PART NUMBER / DESCRIPTION / ACCT. NO. | P.O. # | ITEM U/M P.O. UNIT COST | STD COST RELEASES | SCH DOL | DUE DATE | QTY REC'D | DTE REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| 4595 | -118 ST | | | | | | | | |
| AMERICAN GAHN CORP. | WINDING MACHINE | 228683 | 1 | 24 | 145512.00 | | | | |
| KEN LENSETH | 27000 | | | | | | | | |
| -MC-LOU | | | 4063.0000 | .0000 | 145512.00 | 7-10-95 | 0 | 0-00-00 | 24 |
| 7034 | 2116/44 | | | | | | | | |
| BEDFORD WEAVING MILL | 2116 CLASS 44" | 3184 | 1 LY | 25000 | 25000.00 | | | | |
| JAMES HYDE | 18330 | | | | | | | | |
| -MC-LOU | | | 1.2500 | 1.2500 | 20000 | 20000.00 | 6-23-95 | 2041 | 8-21-95 | 102A |
| -MC-LOU | | | 3065 | 3831.25 | | 6-30-95 | | | 4000 |
| 7034 | 2116/44 | | | | | | | | |
| BEDFORD WEAVING MILL | 2116 CLASS 44" | 3411 | 1 LY | 28000 | 35000.00 | | | | |
| JAMES HYDE | 18330 | | | | | | | | |
| -MC-LOU | | | 1.2500 | 1.2500 | 2000 | 2500.00 | 9-29-95 | 1849 | 10-23-95 | 151 |
| -MC-LOU | | | 2000 | 2500.00 | | 10-06-95 | 0 | 0-00-00 | 2000 |
| -MC-LOU | | | 2000 | 2500.00 | | 10-13-95 | 0 | 0-00-00 | 2000 |
| -MC-LOU | | | 2000 | 2500.00 | | 10-20-95 | 0 | 0-00-00 | 2000 |
| -MC-LOU | | | 2000 | 2500.00 | | 10-27-95 | 0 | 0-00-00 | 2000 |
| 7034 | 1165/38-RAW | | | | | | | | |
| BEDFORD WEAVING MILL | 1165 RUN OF MILL 38" | 3442 | 1 LY | 30000 | 51000.00 | | | | |
| JAMES HYDE | 18330 | | | | | | | | |
| -MC-LOU | | | 1.7300 | 1.7100 | 2609 | 4513.57 | 9-01-95 | 1497 | 10-12-95 | 1112 |
| 7034 | 1677/38 | | | | | | | | |
| BEDFORD WEAVING MILL | 1677 RAW GLASS 38" | 3461 | 1 LY | 48000 | 48000.00 | | | | |
| JAMES HYDE | 18330 | | | | | | | | |
| -MC-LOU | | | .8500 | .8500 | 3000 | 2550.00 | 9-29-95 | 2764 | 10-23-95 | 236 |
| -MC-LOU | | | 3000 | 2550.00 | | 10-06-95 | 0 | 0-00-00 | 3000 |
| -MC-LOU | | | 3000 | 2550.00 | | 10-13-95 | 0 | 0-00-00 | 3000 |
| -MC-LOU | | | 3000 | 2550.00 | | 10-20-95 | 0 | 0-00-00 | 3000 |
| -MC-LOU | | | 3000 | 2550.00 | | 10-27-95 | 0 | 0-00-00 | 3000 |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002201

PMB004   SPECIAL OPEN PURCHASE ORDER REPORT          10-24-95   PAGE   2

| VENDOR# / VENDOR NAME / REQUESTOR | PART NUMBER / DESCRIPTION / ACCT. NO. | P.O. | ITEM | U/M | UNIT COST | STD COST | TOTAL GRD | RELEASES | SCH DOL | DUE DATE | QTY REC'D | DTE REC'D | BAL DUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| -MC-LOW | | | | | | | | 3000 | 2550.00 | 11-03-95 | 0 | 0-00-00 | 3000 |
| -MC-LOW | | | | | | | | 3000 | 2550.00 | 11-10-95 | 0 | 0-00-00 | 3000 |
| -MC-LOW | | | | | | | | 3000 | 2550.00 | 11-17-95 | 0 | 0-00-00 | 3000 |
| -MC-LOW | | | | | | | | 3000 | 2550.00 | 12-01-95 | 0 | 0-00-00 | 3000 |
| -MC-LOW | | | | | | | | 3000 | 2550.00 | 12-08-95 | 0 | 0-00-00 | 3000 |
| -MC-LOW | | | | | | | | 3000 | 2550.00 | 12-15-95 | 0 | 0-00-00 | 3000 |
| -MC-LOW | | | | | | | | 3000 | 2550.00 | 12-22-95 | 0 | 0-00-00 | 3000 |
| -MC-LOW | 2116/44  2116 GLASS 44"  19330 | 3462 | 1 | LY | 1.2500 | | 24000  30000.00 | 3000 | 2550.00 | 12-29-95 | 0 | 0-00-00 | 3000 |
| 7034  BEDFORD WEAVING MILL  JAMES HYDE | | | | | | | | | | | | | |
| -MC-LOW | | | | | | | | 3000 | 3750.00 | 11-17-95 | 27 | 11-10-95 | 3000 |
| -MC-LOW | | | | | | | | 3000 | 3750.00 | 12-01-95 | 0 | 0-00-00 | 3000 |
| -MC-LOW | | | | | | | | 3000 | 3750.00 | 12-08-95 | 0 | 0-00-00 | 3000 |
| -MC-LOW | | | | | | | | 3000 | 3750.00 | 12-15-95 | 0 | 0-00-00 | 3000 |
| -MC-LOW | | | | | | | | 3000 | 3750.00 | 12-22-95 | 0 | 0-00-00 | 3000 |
| -MC-LOW | 1165/38-ROM  1165 RUN OF MILL 38"  19330 | 3494 | 1 | LY | 1.7300 | | 15000  25950.00 | 3000 | 3750.00 | 12-29-95 | 0 | 0-00-00 | 3000 |
| 7034  BEDFORD WEAVING MILL  JAMES HYDE | | | | | | | | | | | | | |
| -MC-LOW | | | | | 1.7100 | | | 5000 | 8650.00 | 12-01-95 | 2595 | 10-22-95 | 2415 |
| -MC-LOW | | | | | | | | 5000 | 8650.00 | 12-15-95 | 0 | 0-00-00 | 5000 |
| -MC-LOW | 1080/41-ROM  19330 | 3172 | 1 | LY | | | 27000  238890.00 | 5000 | 8650.00 | 12-29-95 | 0 | 0-00-00 | 5000 |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002202

PM9004   SPECIAL OPEN PURCHASE ORDER REPORT                    10-24-95  PAGE  3

| VENDOR# / VENDOR NAME / REQUESTOR | P.O.# | PART NUMBER / DESCRIPTION / ACCT. NO. | ITEM# H/L | P.O. UNIT COST / RELEASES | STD COST / SCH DOL | TOTAL ORD / DUE DATE | EXT DOL | QTY REC'D | DTE REC'D | BAL DUE |
|---|---|---|---|---|---|---|---|---|---|---|
| 2450 BGF INDUSTRIES, INC. JAMES HYDE | | 1090 RUN OF MILL 41" 18330 | | 1.0700 | 1.0700 3000 | 3210.00 12-01-95 | 44399.42 | 41 | 5-26-95 | 2959 |
| 2450 BGF INDUSTRIES, INC. JAMES HYDE | 3476 | 116 GLASS 38" 18330 | 1 LY | 2.4100 | 2.4100 1034 | 2491.74 6-16-95 | | 31 | 6-15-95 | 1003 |
| 2450 BGF INDUSTRIES, INC. JAMES HYDE | 3478 | B5035 BETA GLASS 50" 18330 | 1 LY | 10.3000 | 9.6500 2414 | 24864.20 6-23-95 | 30920.00 | 948 | 7-18-95 | 1466 |
| 2450 BGF INDUSTRIES, INC. JAMES HYDE | 3482 | 1090 RUN OF MILL 38" 18330 | 1 LY | .9400 | .9400 4973 | 4674.62 6-16-95 | 51700.00 | 1461 | 7-17-95 | 3512 |
| 2450 BGF INDUSTRIES, INC. JAMES HYDE | 3408 | 116 GLASS 41" 18330 | 1 LY | 2.6100 | 2.6100 2000 | 5220.00 9-08-95 | 46980.00 | 1225 | 9-11-95 | 775 |
| 2450 BGF INDUSTRIES, INC. JAMES HYDE | 3413 | 1080/38 ROW 1080 RUN OF MILL 38" 18330 | 1 LY | .9400 | .9400 5000 | 4700.00 9-29-95 | 311000.00 | 3325 | 9-29-95 | 1675 |
| 2450 BGF INDUSTRIES, INC. JAMES HYDE | 3410 | 1290/48 1290 RAW GLASS 48 WIDE 18330 | 2 LY | 1.7800 | 1.7800 31453 | 55986.34 10-04-95 | | 1957 | 10-05-95 | 443 |
| MC-LOW | | | | | 2600 4628.00 | 4628.00 10-27-95 | | 0 | 0-00-00 | 2600 |
| MC-LOW | | | | | 2600 4628.00 | 4628.00 11-17-95 | | 0 | 0-00-00 | 2600 |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

PHS001   SPECIAL OPEN PURCHASE ORDER REPORT          10-24-95   PAGE

| P.O.# | PART NUMBER DESCRIPTION ACCT. NO. / VENDOR NAME REQUESTOR | ITEM U/M | P.O. UNIT COST | STD COST RELEASES | SCH QQL | DUE DATE | TOTAL ORD EXT QQL | QTY REC'D | DTE REC'D | BAL DUE |
|---|---|---|---|---|---|---|---|---|---|---|
| | -MC-LOW | | | 2600 | 4628.00 | 12-01-95 | | 0 | 0-00-00 | 2600 |
| | -MC-LOW | | | 2600 | 4628.00 | 12-06-95 | | 0 | 0-00-00 | 2600 |
| | -MC-LOW | | | 2600 | 4628.00 | 12-22-95 | | 0 | 0-00-00 | 2600 |
| | -MC-LOW | | | 2600 | 4628.00 | 12-29-95 | | 0 | 0-00-00 | 2600 |
| | -MC-LOW | | | 2600 | 4628.00 | 1-18-96 | | 0 | 0-00-00 | 2600 |
| | -MC-LOW | | | 2600 | 4628.00 | 1-26-96 | | 0 | 0-00-00 | 2600 |
| 3432 | 116/38 116 GLASS 38" 18330 — 6450 BGF INDUSTRIES, INC. JAMES HYDE | 1 LY | 2.4100 | 2.4100 | 26000 | | 63020.00 | | | |
| | -MC-LOW | | | 2000 | 4820.00 | 10-20-95 | | 1991 | 10-19-95 | 9 |
| | -MC-LOW | | | 2000 | 4820.00 | 10-27-95 | | 0 | 0-00-00 | 2000 |
| | -MC-LOW | | | 2000 | 4820.00 | 11-10-95 | | 0 | 0-00-00 | 2000 |
| | -MC-LOW | | | 2000 | 4820.00 | 11-17-95 | | 0 | 0-00-00 | 2000 |
| | -MC-LOW | | | 2000 | 4820.00 | 12-01-95 | | 0 | 0-00-00 | 2000 |
| | -MC-LOW | | | 2000 | 4820.00 | 12-15-95 | | 0 | 0-00-00 | 2000 |
| 3433 | 1080/41-ROM 1080 RUN OF MILL 41" 18330 — 6450 BGF INDUSTRIES, INC. JAMES HYDE | 1 LY | 1.0700 | 1.0700 | 30338 | | 32461.66 | | | |
| | -MC-LOW | | | 3000 | 3210.00 | 10-27-95 | | 2068 | 10-19-95 | 932 |
| | -MC-LOW | | | 3000 | 3210.00 | 11-10-95 | | 0 | 0-00-00 | 3000 |
| | -MC-LOW | | | 3000 | 3210.00 | 11-17-95 | | 0 | 0-00-00 | 3000 |
| 3434 | 116/41 116 GLASS 41" 18330 — 6450 BGF INDUSTRIES, INC. JAMES HYDE | 1 LY | 2.6100 | 2.6100 | 14000 | | 36540.00 | | | |
| | -MC-LOW | | | 2000 | 5220.00 | 10-27-95 | | 132 | 10-19-95 | 1868 |
| | -MC-LOW | | | 2000 | 5220.00 | 11-10-95 | | 0 | 0-00-00 | 2000 |
| | -MC-LOW | | | 2000 | 5220.00 | 11-17-95 | | 0 | 0-00-00 | 2000 |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER
HONDON-0002204

PM6004 --- SPECIAL OPEN-PURCHASE-ORDER REPORT --- 10-24-95 - PAGE 5

| VENDOR NAME REQUESTOR | PART NUMBER DESCRIPTION ACCT. NO. | P.O.# | ITEM U/M | P.O. UNIT COST RELEASES | STD COST SCH DOL | TOTAL ORD DUE DATE | EXT DOL | QTY REC'D | DTC REC'D | BAL BUF |
|---|---|---|---|---|---|---|---|---|---|---|
| -MC-LOU | | | | 2000 | 5220.00 | 12-01-95 | | 0 | 0-00-00 | 2000 |
| 6450 BGF INDUSTRIES, INC. JAMES HYDE | 14261/120- 14261 BARE GLASS,120"W,AMT/CVR 18330 | 3446 | 1 LY | 20.6900 | 24.9500 | 8-31-95 | 68277.00 | 374 | 9-06-95 | 218 |
| -MC-LOU | | | | 572 | 122241.48 | | | | | |
| -MC-LOU | | | | 2100 | 43419.00 | 12-14-95 | | 0 | 0-00-00 | 2100 |
| 6450 BGF INDUSTRIES, INC. JAMES HYDE | 1080/3B-ROM 1080-RUN-OF-MILL-38" 18330 | 3459 | 1 LY | 8400 | 60000 | 56400.00 | | 3570 | 10-19-95 | 1430 |
| -MC-LOU | | | | 5000 | 4700.00 | 10-20-95 | | 0 | 0-00-00 | 5000 |
| -MC-LOU | | | | 5000 | 4700.00 | 10-27-95 | | 0 | 0-00-00 | 5000 |
| -MC-LOU | | | | 5000 | 4700.00 | 11-03-95 | | 0 | 0-00-00 | 5000 |
| -MC-LOU | | | | 5000 | 4700.00 | 11-10-95 | | 0 | 0-00-00 | 5000 |
| -MC-LOU | | | | 5000 | 4700.00 | 11-17-95 | | 0 | 0-00-00 | 5000 |
| -MC-LOU | | | | 5000 | 4700.00 | 12-01-95 | | 0 | 0-00-00 | 5000 |
| -MC-LOU | | | | 5000 | 4700.00 | 12-08-95 | | 0 | 0-00-00 | 5000 |
| -MC-LOU | | | | 5000 | 4700.00 | 12-15-95 | | 0 | 0-00-00 | 5000 |
| -MC-LOU | | | | 5000 | 4700.00 | 12-22-95 | | 0 | 0-00-00 | 5000 |
| -MC-LOU | | | | 5000 | 4700.00 | 12-29-95 | | 0 | 0-00-00 | 5000 |
| 6450 BGF INDUSTRIES, INC. JAMES HYDE | 1080/41-ROM 1080-RUN-OF-MILL-41" 18330 | 3505 | 1 LY | 1.0700 | 36000 | 38520.00 | | 0 | 0-00-00 | 4000 |
| -MC-LOU | | | | 4000 | 4280.00 | 1-05-96 | | 0 | 0-00-00 | 4000 |
| -MC-LOU | | | | 4000 | 4280.00 | 1-19-96 | | 0 | 0-00-00 | 4000 |
| -MC-LOU | | | | 4000 | 4280.00 | 2-02-96 | | 0 | 0-00-00 | 4000 |
| -MC-LOU | | | | 4000 | 4280.00 | 2-16-96 | | 0 | 0-00-00 | 4000 |
| -MC-LOU | | | | | | | | | | |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002205

| VENDOR# / VENDOR NAME / REQUESTOR | PART NUMBER / DESCRIPTION / ACCT. NO. | P.O.# | ITEM / UNIT COST | U/M | CTD COST RELEASES | TOTAL ORD / SCH DOL | EXT DOL / DUE DATE | QTY REC'D | DTE REC'D | BAL DUE |
|---|---|---|---|---|---|---|---|---|---|---|
| 6450 B&F INDUSTRIES, INC. | 1080/38 RGH  1080 RUN OF MILL 38" | 3508 | 1  .9700 | LY | | 72000 | 67,680.00 | | | |
| JAMES HYDE | 18530 | | | | | | | | | |
| -MC-LOW | | | | | 4000 | 4280.00 | 3-01-96 | 0 | 0-00-00 | 4000 |
| -MC-LOW | | | | | 4000 | 4280.00 | 3-15-96 | 0 | 0-00-00 | 4000 |
| -MC-LOW | | | | | 4000 | 4280.00 | 3-29-96 | 0 | 0-00-00 | 4000 |
| -MC-LOW | | | | | 4000 | 4280.00 | 4-12-96 | 0 | 0-00-00 | 4000 |
| -MC-LOW | | | | | 4000 | 4280.00 | 4-26-96 | 0 | 0-00-00 | 4000 |
| -MC-LOW | | | | | 6000 | 5640.00 | 1-05-96 | 0 | 0-00-00 | 6000 |
| -MC-LOW | | | | | 6000 | 5640.00 | 1-12-96 | 0 | 0-00-00 | 6000 |
| -MC-LOW | | | | | 6000 | 5640.00 | 1-19-96 | 0 | 0-00-00 | 6000 |
| -MC-LOW | | | | | 6000 | 5640.00 | 2-02-96 | 0 | 0-00-00 | 6000 |
| -MC-LOW | | | | | 6000 | 5640.00 | 2-09-96 | 0 | 0-00-00 | 6000 |
| -MC-LOW | | | | | 6000 | 5640.00 | 2-16-96 | 0 | 0-00-00 | 6000 |
| -MC-LOW | | | | | 6000 | 5640.00 | 3-01-96 | 0 | 0-00-00 | 6000 |
| -MC-LOW | | | | | 6000 | 5640.00 | 3-08-96 | 0 | 0-00-00 | 6000 |
| -MC-LOW | | | | | 6000 | 5640.00 | 3-15-96 | 0 | 0-00-00 | 6000 |
| -MC-LOW | | | | | 6000 | 5640.00 | 3-29-96 | 0 | 0-00-00 | 6000 |
| -MC-LOW | | | | | 6000 | 5640.00 | 4-05-96 | 0 | 0-00-00 | 6000 |
| -MC-LOW | | | | | 6000 | 5640.00 | 4-12-96 | 0 | 0-00-00 | 6000 |
| 6450 B&F INDUSTRIES, INC. | 116/38  116 GLASS 38" | 3513 | 1  2.4100 | LY | | 13000 | 43,980.00 | | | |
| JAMES HYDE | 18530 | | | | | | | | | |
| -MC-LOW | | | | | 2000 | 4820.00 | 1-05-96 | 0 | 0-00-00 | 2000 |
| -MC-LOW | | | | | 2000 | 4820.00 | 1-19-96 | 0 | 0-00-00 | 2000 |
| -MC-LOW | | | | | 2000 | 4820.00 | 1-26-96 | 0 | 0-00-00 | 2000 |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002206

| VENDOR# / VENDOR NAME / REQUESTOR | PART NUMBER / DESCRIPTION / ACCT. NO. | P.O.# | ITEM U/M | P.O. UNIT COST | CUST STD COST RELEASES | TOTAL ORD SCH DOL | EXT DOL DUE DATE | QTY REC'D | DTE REC'D | BAL DUE |
|---|---|---|---|---|---|---|---|---|---|---|
| -MC-LOU | | | | | 2000 | 4820.00 | 2-09-96 | 0 | 0-00-00 | 2000 |
| -MC-LOU | | | | | 2000 | 4820.00 | 2-23-96 | 0 | 0-00-00 | 2000 |
| -MC-LOU | | | | | 2000 | 4820.00 | 3-08-96 | 0 | 0-00-00 | 2000 |
| -MC-LOU | | | | | 2000 | 4820.00 | 3-15-96 | 0 | 0-00-00 | 2000 |
| -MC-LOU | | | | | 2000 | 4820.00 | 3-29-96 | 0 | 0-00-00 | 2000 |
| -MC-LOU | | | | | 2000 | 4820.00 | 4-05-96 | 0 | 0-00-00 | 2000 |
| 2450 BGF INDUSTRIES, INC. / JAMES HYDE | 116741 116 GLASS 41" 18830 | 3514 | 1 LY | 2.6100 | 2.6100 | 18000 | 46900.00 | | | 7 |
| -MC-LOU | | | | | 2000 | 5220.00 | 1-05-96 | 0 | 0-00-00 | 2000 |
| -MC-LOU | | | | | 2000 | 5220.00 | 1-12-96 | 0 | 0-00-00 | 2000 |
| -MC-LOU | | | | | 2000 | 5220.00 | 1-26-96 | 0 | 0-00-00 | 2000 |
| -MC-LOU | | | | | 2000 | 5220.00 | 2-03-96 | 0 | 0-00-00 | 2000 |
| -MC-LOU | | | | | 2000 | 5220.00 | 2-16-96 | 0 | 0-00-00 | 2000 |
| -MC-LOU | | | | | 2000 | 5220.00 | 2-23-96 | 0 | 0-00-00 | 2000 |
| -MC-LOU | | | | | 2000 | 5220.00 | 3-08-96 | 0 | 0-00-00 | 2000 |
| -MC-LOU | | | | | 2000 | 5220.00 | 3-15-96 | 0 | 0-00-00 | 2000 |
| -MC-LOU | | | | | 2000 | 5220.00 | 3-29-96 | 0 | 0-00-00 | 2000 |
| 3606 CAMDEN ELECTRIC / HANK SERRE | HYDRAULICS 27000 | 229261 | 1 | 29412.0000 | 1 | 29412.00 | 29412.00 5-04-95 | 0 | 0-00-00 | 1 |
| 1102 CLARK SCHUEBEL FIBER / JAMES HYDE | 116 GLASS 38" WIDE 18320 | 3498 | 1 LY | 1.1400 | 1.1400 | 60000 | 63400.00 11-20-95 | 204 | 10-23-95 | 1 |
| -MC-LOU | | | | | 20000 | 22000.00 | | | | 19796 |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER
HONDON-0002207

| VENDOR NUMBER VENDOR NAME REQUESTOR | PART NUMBER DESCRIPTION ACCT. NO. | P.O. # | ITEM | U/M | P.O. UNIT COST | STD COST | RELEASES | SCH. DOL | QUE DATE | QTY REC'D | QTE REC'D | TOTAL ORD EXT BAL | BAL DUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3932 CLEAN-HARBORS, INC. KEN BROWNELL | -MC-LOW REMOVAL-OF-OIL 27000 | 2296677 | 1 | | 55000.0000 | | | .0000 | 12-20-95 | 0 | 0-00-00 | 55000.00 | 20000 |
| | | | | | | | 20000 | 22800.00 | | | | | 20000 |
| 1873 CONNEAUT INDUSTRIES JOSEPH SMITH | -LIB ST 225-1/2 BARE YARN 18220 | 2291187 | 1 | LB | 5.8100 | 5.8100 | 437 | 2538.97 | 9-28-95 | 384 | 10-16-95 | 6689 38863.09 | 53 |
| 1873 CONNEAUT INDUSTRIES JOSEPH SMITH | -LIB ST 450-1/2 BARE-YARN 18220 | 2291749 | 1 | LB | 6.9500 | 6.9500 | 500 | 3475.00 | 10-05-95 | 367 | 10-16-95 | 5000 34750.00 | 133 |
| -LIB ST | | | | | | | 500 | 3475.00 | 10-12-95 | 0 | 0-00-00 | | 500 |
| -LIB ST | | | | | | | 500 | 3475.00 | 10-19-95 | 0 | 0-00-00 | | 500 |
| -LIB ST | | | | | | | 500 | 3475.00 | 10-26-95 | 0 | 0-00-00 | | 500 |
| -LIB ST | | | | | | | 500 | 3475.00 | 11-09-95 | 0 | 0-00-00 | | 500 |
| 1873 CONNEAUT INDUSTRIES JOSEPH-SMITH | -LIB ST 225-1/2 BARE YARN 18220 | 2290090 | 1 | LB | 5.8100 | 5.8100 | 5000 | 29050.00 | 9-21-94 | 0 | 0-00-00 | 5000 29050.00 | 5000 |
| 4240 CONVERTING MACH CEVE MARK-HERNELL | -MC-UP SLITTING-MACHINE 27000 | 2288871 | 1 | | 67000.0000 | .0000 | | 67000.00 | 4-28-95 | 0 | 0-00-00 | 67000.00 | 1 |
| 1611 CUSTOM COMPOUNDING, JAMES HYDE | 500094 TF1202 HOECHST F/F MOLD RESIN 18550 | 2299564 | 1 | LB | 6.8500 | 6.8500 | 27000 | 170430.00 | 12-25-95 | 2200 | 10-19-95 | 30000 205500.00 | 25600 |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002208

PHR004 - SPECIAL OPEN PURCHASE ORDER REPORT                                10-24-95   PAGE  9

| VENDOR NAME / REQUESTOR | P.O.# | PART NUMBER / DESCRIPTION / ACCT NO | ITEM U/M | P.O. UNIT COST | RELEASES | SCH DDL | TOTAL ORD | EXT DOL | DUE DATE | QTY REC'D | DTE REC'D | BAL DUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4412 DAIKIN AMERICA INC / JAMES HYDE  -MC-UP | 2229965 | 500098  M12 VIRGIN MOLDING RESIN  18550 | 1 LB | 4.7500 | 50000 | 237500.00 | 50000 | 237500.00 | 12-23-95 | 2645 | 10-11-95 | 47355 |
| 4412 DAIKIN AMERICA INC / STEVE BAKER  -MC-UP | 2229966 | 500094  PATHEN M-15 MOLDING RESIN  18550 | 1 LB | 4.7500 | 11776 | 55936.00 | 25000 | 118750.00 | 12-23-95 | 2424 | 10-18-95 | 9352 |
| 6954 DOW CORNING CORP / GERRY SURDAM  -LIB ST | 2295547 | 400127  ADHSV 7197 DOW (2904 SUBST)  18440 | 1 LB | 3.3100 | 20100 | 66531.00 | 69000 | 228390.00 | 12-23-95 | 2100 | 10-20-95 | 18000 |
| 6954 DOW CORNING CORP / GERRY SURDAM  -LIB ST | 2295548 | 400040  ADHSV Q3-7566 DOW SIL-ICONE  10440 | 1 LB | 4.1000 | 10000 | 41000.00 | 28000 | 114800.00 | 12-23-95 | 2100 | 10-20-95 | 7900 |
| 3063 DUPONT ELECTRONICS / GERRY SURDAM  -LIB ST | 2229433 | 400065  FLM PLYMD IM-35"HG"ID  18440 | 1 LB | 56.0200 | 1000 | 56020.00 | 2000 | 112000.00 | 8-21-95 | 786 | 9-05-95 | 214 |
| 3063 DUPONT ELECTRONICS / GERRY SURDAM  -LIB ST | 2229693 | 400069  FLM PLYMD PM-35"HG"ID  18440 | 1 LB | 56.0000 | 500 | 28000.00 | 500 | 28000.00 | 8-24-95 | 469 | 9-20-95 | 31 |
| 3063 DUPONT ELECTRONICS / GERRY SURDAM  -LIB ST | 2229814 | 400055  FLM PLYMD IM-35"HG"ID  18440 | 2 LB | 56.0200 | 500 | 28010.00 | 1000 | 56020.00 | 10-06-95 | 380 | 10-05-95 | 120 |
| 6701 DUPONT POLYMERS / DOUGLAS W. PRATT  -LIB ST | 2229073 | T67  T67 DUPONT RESIN-EXT TAPE  18660 | 1 LB | 7.6500 | 6000 | 45900.00 | 6000 | 45900.00 | 12-23-95 | 480 | 10-03-95 | 5520 |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

PM6004    SPECIAL OPEN PURCHASE ORDER REPORT                    10-24-95  PAGE  10

| VENDOR NBR / VENDOR NAME / REQUESTOR | PART NUMBER DESCRIPTION ACCT. NO. | P.O. # | ITEM# | U/M | P.O. UNIT COST | STD COST RELEASES | SCH DOL | QUE DATE | TOTAL QRD / EXT DOL DUE DATE | QTY REC'D | DTE REC'D | BAL DUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6701 -LIB ST  DUPONT POLYMERS  DOUGLAS U. PRATT | T 60  T 60 RESIN  18660 | 229374 | 1 | LB | .2000 | 50000  37040 | .2000 | 229648.00 | 310000.00  12-23-95 | 5280 | 10-17-95 | 31760 |
| 6701 -LIB ST  DUPONT POLYMERS  DOUGLAS U. PRATT | 602-A  DUPONT TEFLON RESIN FOR L/B  18660 | 229075 | 1 | LB | 8.2600 | 7500  4620 | 8.2600 | 38115.00 | 61875.00  12-23-95 | 490 | 10-10-95 | 4140 |
| 6701 -MC-LOU  DUPONT POLYMERS  JAMES HYDE | T120-FEP  T120-FEP DISPERSION  18330 | 229960 | 1 | LB | 16.5000 | 2700  2700 | 16.5000 | 44550.00 | 44550.00  12-23-95 | 0 | 0-00-00 | 2700 |
| 6701 -MC-LOU  DUPONT POLYMERS  JAMES HYDE | T30  T30 TFE DISPERSION  18330 | 229961 | 1 | LB | 5.8500 | 6000  2704 | 5.8500 | 15818.40 | 35100.00  12-23-95 | 2640 | 10-17-95 | 1056 |
| 6701 -MC-LOU  DUPONT POLYMERS  JAMES HYDE | T30B  T30B TFE DISPERSION  18330 | 229963 | 1 | LB | 5.8500 | 5000  2516 | 5.8500 | 14718.60 | 29250.00  12-23-95 | 1648 | 10-17-95 | 868 |
| 6701 -RR2  DUPONT POLYMERS  JAMES HYDE | 7A  7A VIRGIN MOLDING RESIN  18550 | 229988 | 1 | LB | 4.8500 | 100000  79200 | 4.8500 | 384120.00 | 485000.00  12-23-95 | 6400 | 10-17-95 | 72800 |
| 1194 -LIB ST  ENDURA PRODUCTS  GERRY SURDAM | 400015  00401 KRAFT 40"W REL/LNR  10440 | 228947 | 3 | 1Y | .9630 | 64380  15000 | .9630 | 14445.00 | 61997.94  11-02-95 | 1530 | 10-05-95 | 13470 |
| -LIB ST | | | | | | 10000 | 9630.00 | | 12-14-95 | 0 | 0-00-00 | 10000 |
| -LIB ST | | | | | | 15000 | 144445.00 | | 1-11-95 | 0 | 0-00-00 | 15000 |
| -MC-LOU | | | | | | | | | | | | |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002210

DKG604   SPECIAL OPEN PURCHASE ORDER REPORT                                   10-24-95   PAGE   11

| VENDOR#  VENDOR NAME  REQUESTOR | PART NUMBER  DESCRIPTION  ACCT. NO. | P.O.# | ITEM#  U/M | P.O. UNIT COST | STD COST | RELEASES SCH QUL | TOTAL ORD | DUE DATE | QTY REC'D | OTC REC'D | EXT DOL | BAL DUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4413  GE SUPPLY  KEN LENSETH | 15KV-SWITCHGEAR  27000 | 229685 | 1  LB 6T | 145000.0000 | .0000 | | 2 | 29000.00 | 0-00-00 | | | 2 |
| 1181  GENERAL ELECTRIC COM  GERRY DURHAM | 400002  SR519 GE SILICONE ADHSV  18440 | 229977 | 1  LB 6T | 6.0600 | 5.7700 | 18600 | 24000 | 145440.00 | 1200  10-18-95 | | | 14000 |
| 1181  GENERAL ELECTRIC COM  GERRY DURHAM | 400007  SR574 GE SILICONE ADHSV  18440 | 229979 | 1  LB 6T | 9.6800 | 9.2200 | 3900 | 4200  31944.00 | 40656.00  12-23-95 | 1200  10-18-95 | | | 3100 |
| 4499  JACK HALL PLUMBING/H  BOB FREDERICKSON | REMOVE-BOILER  27000 | 308044 | 1  MH | 27208.2200 | .0000 | | 1  27208.22 | 27208.22  8-03-95 | 0  0-00-00 | | | 1 |
| 3443  HOECHST CELANESE COR  GERRY DURHAM | 400116  LINER,FA46,YELLOW,40"U,S24  18410 | 230057 | 1  LY 6T | .6890 | .6600 | 70000 | 70000  48230.00 | 48230.00  12-10-95 | 0  0-00-00 | | | 70000 |
| 7756  ICI FLUOROPOLYMERS  DOUGLAS H PRATT | 600002  C0123 HPS 310-550  40440 | 229871 | 1  LB 6T | 6.2000 | 6.3000 | 7800 | 7800  45756.00 | 48360.00  12-23-95 | 3360  10-04-95 | | | 4020 |
| 7756  ICI FLUOROPOLYMERS  DOUGLAS H PRATT | 600003  C0123 "TST SPEC"  18440 | 229872 | 1  LB 6T | 6.0000 | 6.0000 | 29240 | 36000  176040.00 | 216000.00  12-23-95 | 9240  10-11-95 | | | 26400 |
| 7756  ICI FLUOROPOLYMERS  JAMES HYDE | A018  A018 TFE DISPERSION  18420 | 229256 | 1  LB 6T | 5.8500 | 5.8500 | 300022 | 40000  1746427.95 | 234000.00  12-23-95 | 2678  10-19-95 | | | 37549 |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002211

| VENDOR NAME / REQUESTOR | PART NUMBER DESCRIPTION / ACCT. NO. | P.O.# | ITEM | U/M | P.O. UNIT COST | STD COST | RELEASES | SCH QOL | TOTAL ORD / EXT QOL | DUE DATE | QTY REC'D | OTC REC'D | BAL DUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7756 IGI FLUOROPOLYMERS — JAMES HYDE — -MC-LOW | A0439 TFE DISPERSION — 10330 | 229957 | 1 | LB | 6.8500 | 5.8500 | 35000 | 28840 | 204750.00 / 168714.00 | 12-23-95 | 1528 | 10-19-95 | 27312 |
| 6451 JHS GLASS FABRICS — JAMES HYDE — -MC-LOW | 7628/38-CUT — 7628 HEAT CLEANER GLASS 38" — 18330 | 3426 | 1 | LY | 1.0500 | 1.0300 | 24500 | 24500 | 25725.00 | | | | |
| | | 3424 | | | | | 2500 | 2500 | 2625.00 | 11-17-95 | 156 | 11-20-95 | 2344 |
| | | | | | | | 2066 | 2066 | 2169.30 | 12-22-95 | 0 | | 2066 |
| 8115 MATHESON GAS PRODUCT — GERRY BURHAM — -RR2 | SODIUM,NAPTHOLENE — 229040 | 229932 | 1 | | 18.1200 | .0000 | 2000 | | 36240.00 | 10-02-95 | | | |
| — -RR2 | | | | | | | 400 | 400 | 7248.00 | 11-17-95 | 0 | 0-00-00 | 400 |
| — -RR2 | | | | | | | 400 | 400 | 7248.00 | 12-15-95 | 0 | 0-00-00 | 400 |
| — -RR2 | | | | | | | 300 | 300 | 3624.00 | 12-30-95 | 0 | 0-00-00 | 300 |
| 3296 MFP — JAMES HYDE — -MFP | REPRO1-MFP — REPRO RESIN, MFGD BY M.F.P. — 18550 | 3501 | 1 | LB | 3.5000 | 3.8500 | 20000 | 20000 | 70000.00 | 10-27-95 | 0 | 0-00-00 | 20000 |
| 4674 NEAD PRODUCTS — JAMES HYDE — -NC-LOW | 14261/120 — 14261 BARE GLASS,120"W,ANT/CVR — 18330 | 34401 | 1 | LY | 24.9500 | 24.9500 | 1200 | 1200 | 29940.00 | 8-21-95 | 304 | 9-05-95 | 894 |
| 2051 OWENS-CORNING FIBERG — JOSEPH SMITH — -LYB-GF | 150-1/4 — 150-1/4 B4 SEWING THREAD — 18330 | 2292333 | 1 | LB | 12.6000 | 12.5500 | 5000 | 500 | 63000.00 / 6300.00 | 10-12-95 | 79 | 10-11-95 | 421 |
| 4287 ROSS INCINERATION SV — -NC-LOW | DISPOSAL/WASTE — 2300085 | 2300085 | 1 | | 100000.0000 | .0000 | 1 | | 100000.00 | | | | |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002212



HONDON-0002213

## APPENDIX III TO SCHEDULE 4.7 CONTRACTS

Sales Commitments

The attached lists each sales commitment in which credit has been extended to customers in an amount exceeding $25,000, except for sales commitments in the ordinary course of business having terms of (i) 30 days or less for domestic sales, and (ii) 60 days or less for foreign sales.

See attached memo from W. Noonan.

11/1/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

OCT-27-1995  14:36  FROM  ALLIEDSIGNAL FLUORGLAS PR  TO      92014556199   P.01

 **AlliedSignal**
A D V A N C E D
M A T E R I A L S

*Memorandum*
Fluorglas Products
Hoosick Falls, New York

Fax Transmission

1 Page

DATE:       October 27, 1995

TO:         Mike Prokop                    FAX:  (201) 455-6199

FROM:       Bill Noonan                    FAX:  (518) 686-3161

SUBJECT:    *Asset Sale Agreement*
            *Re:    Changed Schedule - Representations & Warranties*

A review of the special Open Backlog Report OBS031.5, dated 10/27/95, indicates that
there are *NO* open sales which require Fluorglas to, "(c) provide an extension of credit of
over 30 days for domestic sales, or 60 days for foreign sales, to any customer or client of the
business for any amount over $25,000".

WEN/gs

                                                            TOTAL P.01

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER                    HONDON-0002215

**Schedule 4.8**
**Liens and Encumbrances**

NONE

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002216

**Schedule 4.9**
**Litigation and Proceedings**

I.    Employee Litigation

1. Rosemary Roberson v. AlliedSignal and Fluorglas; NDNY; No. 95-CV-0616. [Previously listed as Roberson v. AlliedSignal Inc. and Fluorglas; EEOC; Notice of Right to Sue #165930226]

Ms. Roberson has sued Fluorglas on the grounds that it allegedly discriminated against her based on a disability.  Until September 9, 1991, Ms. Roberson worked at Fluorglas as a preformer in its extruder tape department.  The preformer position requires physical exertions, including moving drums of materials around the plant floor.  She was placed on medical leave because of an alleged work-related accident that occurred on August 29, 1991.  In September 1992, Fluorglas terminated Ms. Roberson pursuant to Fluorglas' "Leaves of Absence" policy.

2. Karen Flynn, a data entry operator at the Liberty Street facility, has alleged sexual harassment by a male production group leader.  Fluorglas has investigated the allegation.  No claim has been filed with the EEOC or any other agency.

II.   Third Party Litigation

1. Madison, Thomas v. Farrell Corp. and M.A. Crowley Trucking; and M.A. Crowley Trucking, Inc. v. Fluorglas; NDNY; No. 94-CV-989.

Employee claim for injuries incurred while operating hot calender mixing machine owned by Fluorglas.  Farrell manufactured the hot calender mixing machine and M.A. Crowley Trucking delivered the machine to Fluorglas.

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

**Schedule 4.10**
**Environmental Disclosure**

See attached.  The attachments to Schedule 4.10 have been provided under separate cover.

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002218

**ALLIEDSIGNAL FLUORGLAS**
**DISCLOSURE DOCUMENT**
**SCHEDULE 4.10**
**ADDENDUM #4**

Underground Storage Tanks

During August 1995, the underground petroleum storage tanks at McCaffrey Street, John Street, Liberty Street and the River Road facilities were excavated. Soil samples were collected at the excavation sites and analyzed pursuant to the requirements of the NY DEC STARS memo. Attachment A is a copy of the tank removal report, including analytical results, provided by the excavation contractor, Clean Harbors, Inc.

Attachment B is a copy of the Petroleum Bulk Storage Applications submitted to NY DEC that indicate closure of the tanks.

NY DEC Air Inspection

On October 24, 1995, Pete Empie, of NY DEC conducted an air quality inspection at the Liberty and McCaffrey Street facilities. No deficiencies were noted duirng the inspection. Mr. Empie did not leave an inspection report.

10/27/95

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002219

## ALLIEDSIGNAL FLUORGLAS
## DISCLOSURE DOCUMENT
## SCHEDULE 4.10
## ADDENDUM #3

### McCaffrey Street

### Air Permits

As stated in the Disclosure Document, the Operating Permit for Tower 8 expired on May 1, 1994. Pete Empie, Principal Engineering Technician with the NY DEC, has indicated that the DEC will not be issuing permit renewals at this time. Instead, renewals will be issued as part of the State's Title V permit program. Attachment A is a letter from Pete Empie to Rich Callahan, Manager HS&E for AlliedSignal's Oak Mitsui facility in Hoosick Falls. The letter indicates the DEC is no longer issuing renewals for air permits and that all permits are extended for five years even if they have expired.

### Liberty Street

### Odor Issue

The Disclosure Document references odor complaints received at Liberty Street from neighbors. The odors were attributed to the operation of the "Can Line, L3." Since receipt of the odor complaints numerous activities have been undertaken to abate the odors. These activities included but were not limited to: 1) raising the stack height to eliminate building downwash effects; 2) adding additional catalyst to the bed; 3) eliminating the use of PAE, a surfactant used in the process; 4) "baking out" the catalyst to remove any residual PAE; 5) modifying the burner box on the oxidizer; and 6) installing a new baffle plate downstream of the burner to ensure even temperature distribution across the catalyst bed. According to Bill Noonan, Fluorglas General Manager, no odor complaints have been received since August 1, 1995. Therefore, we believe that this issue has been resolved. A permit application needs to be submitted to DEC to indicate the modifications made to the stack. Additionally, a stack test will need to be performed to demonstrate that the catalytic oxidizer is continuing to maintain the destruction efficiency required by the permit.

### NSPS/RACT

As stated in the Disclosure Document, the PSAT lines are subject to the New Source Performance Standards for Pressure Sensitive Tape and Label Surface Coating Operations and the NY Surface Coating Regulations. During a facility review it was determined that the recordkeeping requirements, of these two standards, were not being complied with. The facility has indicated that corrective actions have been implemented and the required records are now being maintained.

10/9/95

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER                                    HONDON-0002220

<u>Facility Audits</u>

Provided in Attachment B are copies of facility audits that have been performed since January 1, 1993.  All violations noted in these audits have been corrected.

10/9/95

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002221

## ALLIEDSIGNAL FLUORGLAS
## DISCLOSURE DOCUMENT
## SCHEDULE 4.10
## ADDENDUM #2

### OSHA Cadmium Citation

On September 14, 1995, AlliedSignal received official notice of a Stipulated Settlement in the matter of the OSHA citation issued June 22, 1995. The penalty has been reduced to $4500.00. A copy of the agreement is provided in Attachment A for your review.

### OSHA Safety Citation

On March 24, 1995, the facility was issued an OSHA citation alleging non-compliance with four OSHA standards. A copy of the citation is provided in Attachment B for your review. The status of each violation is discussed below:

**Zero Energy Standard:** The corrective actions to abate this citation have been implemented and the fine has been paid.

**Exit Marketing:** The corrective actions to abate this citation have been implemented. No penalty was proposed.

**PPE Standard:** The corrective actions to abate this citation have been implemented. No penalty was proposed.

**Hazard Communication:** The corrective actions to abate this citation have been implemented. No penalty was proposed.

9/22/95

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002222

## ALLIEDSIGNAL FLUORGLAS
## DISCLOSURE DOCUMENT
## SCHEDULE 4.10
## ADDENDUM #1

Past Disposal Activities

In the mid 1960's to mid 1970's waste adhesive and clean-up waste containing solvents was disposed of at the Hoosick landfill. The procedure typically consisted of transporting the material to the landfill where it was burned for disposal. However, some of the drums of waste were apparently buried in the landfill. No information is available regarding the exact characteristics of the waste or the volume that may have been buried.

9/20/95

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002223

SCHEDULE 4.10

HEALTH, SAFETY AND ENVIRONMENTAL DISCLOSURE SCHEDULE
ALLIEDSIGNAL FLUORGLAS
HOOSICK FALLS, NY

## BACKGROUND

AlliedSignal Fluorglas is a manufacturer of Pressure Sensitive Adhesive Tape (PSAT),
Teflon coated fiberglass cloth and yarn and Teflon tape. The business consists of six sites
located in Hoosick Falls, NY, (McCaffrey Street, Liberty Street, John Street, River Road
1, River Road 2 and River Road 3.) A description of each site, the products manufactured
and a summary of relevant health, safety and environmental issues are noted below.

### *McCaffrey Street*

The McCaffrey Street facility produces a wide variety of PTFE (Teflon) coated fiberglass
and molded and extruded PTFE intermediates. The facility is also used for administrative
offices and R&D. Approximately 95 employees work at the site. Manufacturing
operations occur 24 hours per day 7 days per week.

Process Description

In the manufacturing process woven fiberglass is coated with a dispersion of premixed
liquid Teflon and an organic liquid surfactant. The mixture is fed from a drum into a
coating dip pan. The coated fabric is then cured in an oven and collected on a web. Each
coating tower has its own curing oven either gas-fired or infra-red. The coated material is
then sized and calendared in a large laminate calendaring machine where heat and pressure
are applied.

The Teflon molding operation includes four (4) molding presses and six (6) electric
sintering ovens. Teflon, virgin or reprocessed, is added, via a hopper, to the molding
press where high pressure is applied and a Teflon mold is formed. The mold is then
transferred to the curing oven for sintering.

The extrusion process includes one continuous heated and pressured extruder and sixteen
(16) rod extruders. The process utilizes powder Teflon and produces various extruded
products.

Air Quality

The fabric coating operation includes eight (8) coating towers designated T1, T2, T3, T5,
T6, T7, T8 and T9. The table below summarizes the permit information for each of the
coating towers. Copies of the permits are included in Attachment A. The permits include
a process description, emission calculations, expiration dates and special conditions.

Revised 9/12/95                                    1

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

| Tower Number | Emission Point Number | Material Emitted | Estimated Emission Amount (lbs/yr) | Permit Type | Control Equipment | Expiration Date |
|---|---|---|---|---|---|---|
| 1 | M1 | Triton X | 3066 | Operating | None | 12/12/99 |
| 2 | M9 | Triton X | 3329 | Construction | Scrubber | 12/12/95 |
|   | M10 | Triton X | 88 | Construction | None | 12/12/95 |
| 3 | M3 | Triton X | 3066 | Operating | None | 12/12/99 |
| 5 | M4 | Triton X | 2891 | Operating | None | 12/12/99 |
| 6 | M5 | Triton X | 3723 | Operating | None | 12/12/99 |
|   | M11 | Triton X | 657 | Construction | None | 12/12/95 |
| 7 | M7 | Triton X | 3679 | Operating | None | 12/12/99 |
| 8 | M6 | Triton X | 3161 | Operating | Scrubber | 05/01/94 |
| 9 | M8 | Triton X | 1843 | Operating | Scrubber | 05/01/99 |

The exhaust gases from Tower 8 ( Emission point M6) and Tower 9 (Emission Point M8) are treated in a common wet cyclone scrubber before being discharged to the atmosphere. The scrubber is used for opacity control. The air emission permit for Tower 8 expired on May 1, 1994. Conversations with the NY DEC have indicated that the agency will not reissue permits at this time but will reissue them as part of the Title V Operating Permit program. The current permit for Tower 9 expires 5/1/99. On June 6, 1995, an application was submitted to NY DEC requesting a modification of the permit for Tower 9 (Emission Point M8). The request was for approval to modify the stack by increasing the height to 19 feet. No response has been received from DEC.

Tower 6 has two emission points, designated M5 and M11. Emission point M5 is equipped with a wet cyclone scrubber which is used for opacity control. A state operating permit has been issued for this source. It has an expiration date of 12/12/99. There are no controls on M11. A state construction permit has been issued for this source. It has an expiration date of 12/12/95. A request for issuance of an operating permit was submitted to NY DEC on June 6, 1995. To date no response has been received from the Agency. However, the facility can operate this source under the construction permit until an operating permit is issued.

Tower 2 has two emission points, designated M9 and M10. Emission point M9 is equipped with a scrubber which has a rated efficiency of 85% for Triton X compounds. There are no controls on M10. Both emission points for this tower has been issued construction permits by DEC. The construction permits expire 12/12/95. A request for issuance of an operating permit was submitted to NY DEC on June 6, 1995. To date no response has been received from the Agency. However, the facility can operate these sources under the construction permits until operating permits are issued.

Exhaust gases from the rest of the towers emit directly to the atmosphere.

Revised 9/12/95                                    2

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002225

The facility also coats chrome pigmented Teflon with aluminum on Tower 7. The only emission from this process is water vapor.

The calendaring machines are discharged via roof vents to the atmosphere. No permit is required for this source since the only emission is heat.

The exhaust gases from each of the Teflon molding sintering ovens are vented to the atmosphere via its own dedicated vent. No permits are required for these sources since the only emissions are heat.

The facility has one boiler rated at 300,000 BTU/hr that burns #2 fuel oil. It is used for facility heating and, due to its size is exempt from NY DEC permitting requirements.

The facility is located in a "Marginal" Non-Attainment area classified as an Ozone transport region. The VOC and NOx threshold for "Major Source" are 50 Tons Per Year (TPY) and 100 TPY, respectively. This facility would be a "minor" source for purposes of Title V permitting.

DEC conducted an air quality inspection at the facility on May 7, 1991. No violations were noted during the inspection, however, several recommendations were made. A copy of the inspection report is included in Attachment B. Additionally, the EPA and DEC conducted a joint air inspection during the summer of 1992. No report was issued.

Water Pollution Control

Wastewater generated at the facility is discharged to the treatment plant for the Village of Hoosick Falls. The wastewater consists of scrubber water blowdown and sanitary wastewater. The discharge of the wastewater is governed by the local sewer ordinance. No permit is required for the discharge. Attachment C is a copy of a letter from the treatment plant operator indicating that the discharge from the McCaffrey Street facility is acceptable to the POTW. There are no direct water discharges from the facility.

The McCaffrey Street facility is not subject to the stormwater permitting regulations. The facility is exempt based on its SIC code, 2295 and 3089, and the fact that there is no stormwater exposed to industrial activity at the site. A letter was submitted to DEC on October 25, 1991, indicating the facility status regarding stormwater permitting. A copy of the letter is included in Attachment D.

Drinking water is supplied to the site by the Village. Tests of drinking water fountains at the facility have indicated acceptable levels of copper and lead. A copy of the test results is included in Attachment E.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002226

Oil & Spill Prevention

Raw materials for facility operations are primarily stored in drums in the warehouse.
There is no bulk storage of raw materials at the facility.

The facility had one 10,000 gallon underground storage tank. The tank was used to store
#2 fuel oil for on site heating purposes and therefore, was exempt from the Underground
Storage Tank regulations at 40 CFR 280. The tank installation date is unknown.

The fuel oil tank was subject to the NY Petroleum Bulk Storage Tank Regulations. These
regulations required tank registration and tightness testing. The current registration
certificate was issued on 9/2/93 and expires on 3/24/97. The last tightness test was
conducted in November 1992. At that time the tank passed the tightness test. Retesting
of the tank is not required until November 1997. A copy of the registration certificate and
the tank test report are included in Attachment F. An annual standpipe analysis is also
performed on the tank. A copy of the 1994 results are included in Attachment F.

The tank was removed in August 1995. No visible contamination was noted during tank
removal. Soil samples were collected during the removal, however, the analytical results
are not yet available.

The only other bulk storage tank at the facility is a 18,000 gallon aboveground LP gas
tank. The LP Gas is used for process heating. This tank is not subject to any permit or
registration requirements.

Solid & Hazardous Waste

The facility is a Large Quantity Generator of Hazardous Waste.  It's EPA ID Number is
NYD004986741. The types of hazardous waste generated at the facility include D007
wastes from the aluminum coating of Teflon and lab packs. All waste generated on site is
shipped off-site for disposal.

The facility is required to submit an annual hazardous waste generators report. A copy of
the 1994 report can be found in Attachment G.

Miscellaneous

There is one transformer at the facility. It is owned by the public utility, Niagara Mohawk.
The utility has indicated that the transformer contains 237 ppm of PCBs.

Facility personnel have indicated that prior to 1981, hydraulic oil was used as a dust
suppressant on plant roads. No analytical information is available regarding the oil.

Revised 9/12/95                          4

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

### *John Street*

The John Street facility produces PTFE coated yarn. The yarn is used in braided wire and cable applications. Approximately 14 people work at the site. Manufacturing operations occur 24 hours per day 5 days per week.

Process Description

In the manufacturing process fiberglass yarn is coated with a dispersion of premixed liquid Teflon and an organic liquid surfactant. The mixture is fed from a drum into a coating dip pan. The coated yarn is then cured in an oven and collected on a spool. Some of the yarn is heated in an oven prior to coating. The process is designed to drive off starch that is on the yarn

Air Quality

The table below summarizes the permit information for the air emission sources at the facility. Copies of the permits are included in Attachment H. The permits include a process description, emission calculations, expiration dates and special conditions.

| Equipment Type | Emission Point Number | Material Emitted | Estimated Emission Amount (lbs/yr) | Permit Type | Control Equipment | Expiration Date |
|---|---|---|---|---|---|---|
| Coater | J3 | Triton X | 300 | Operating | None | 12/31/96 |
| Coater | J6 | Triton X | 300 | Operating | None | 12/31/96 |
| Coater | J8 | Triton X | 300 | Operating | None | 12/31/96 |
| Oven | J9 | Starch Based Sizing | 799 | Operating | None | 12/31/96 |
| Boiler | J10 | | | Operating | None | 12/31/96 |

The yarn coating operation consists of three (3) coating lines, designated J3, J6 and J8. Each line has its own oven. Two of the ovens are heated by LP Gas, the third is electric. The equipment is permitted by NY DEC. The permits expire 12/31/96. None of the equipment is equipped with pollution control equipment.

The site also has one heat cleaning oven. The oven is designated as emission source J9. The equipment is permitted by NY DEC. The permit expires 12/31/96. There is no pollution control equipment on this source.

The facility has one 3.2 MM BTU/hr boiler that burns #4 fuel oil. The source designation is J10. It has been issued an air emissions operating permit by NY DEC which expires 12/31/96.

Revised 9/12/95                                    5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER                               HONDON-0002228

The facility is located in a "Marginal" Non-Attainment area classified as an Ozone transport region. The VOC and NOx threshold for "Major Source" are 50 Tons Per Year (TPY) and 100 TPY, respectively. The facility is a "minor source" of air pollution, and therefore, is not subject to the permitting requirements of Title V.

The NY DEC conducted an air emission inspection at the facility on January 10, 1992. During that inspection the agency indicated that emission points J3, J6, J8 and J10 were operating in compliance with all New York State air pollution control regulations. The inspection also noted that a modification had been made to emission point J9 without first obtaining prior DEC approval. A permit modification was submitted to NY DEC in March 1992, to correct this deficiency. A copy of the inspection report can be found in Attachment I. A revised permit was issued on November 25, 1992. A copy of the permit can be found in Attachment H.

<u>Water Pollution Control</u>

Wastewater generated at the facility is discharged to the treatment plant for the Village of Hoosick Falls. The wastewater consists of sanitary water and process wash up water. The discharge of the wastewater is governed by the local sewer ordinance. No permit is required for the discharge. Attachment J is a copy of a letter from the treatment plant operator indicating that the discharge from the John Street facility is acceptable to the POTW. There are no direct water discharges from the facility.

The John Street facility is not subject to the stormwater permitting regulations. The facility is exempt based on its SIC code, 2295, and the fact that there is no stormwater exposed to industrial activity at the site.   A letter was submitted to DEC on October 25, 1991, indicating the facility status regarding stormwater permitting. A copy of the letter is presented in Attachment K.

Drinking water is supplied to the site by the Village. Tests of drinking water fountains at the facility have indicated acceptable levels of copper and lead. A copy of the test results is included in Attachment L.

<u>Oil & Spill Prevention</u>

Raw materials, for facility operations, are stored in drums inside the building. There is no bulk storage of raw materials at the facility.

The facility had one 10,000 gallon underground storage tank. The tank was used to store #4 fuel oil for on site heating purposes and therefore, was exempt from the Underground Storage Tank regulations at 40 CFR 280. The tank was installed in 1970.

The fuel oil tank was subject to the NY Petroleum Bulk Storage Tank Regulations. These regulations required tank registration and tightness testing. The current registration certificate was issued on 9/2/93 and expires on 3/24/97. The last tightness test was

Revised 9/12/95                                           6

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

conducted in September 1992. At that time the tank passed the tightness test. Retesting of the tank is not required until September 1997. A copy of the registration certificate and the tank test report are presented in Attachment M. An annual standpipe analysis is also performed on the tank. A copy of the 1994 results are included in Attachment M.

The tank was removed in August 1995. No visible contamination was noted during tank removal. Soil samples were collected during the removal, however, the analytical results are not yet available.

The only other bulk storage tank at the facility is a 7,500 gallon aboveground LP gas tank. The LP Gas is used for process heating. This tank is not subject to any permit or registration requirements.

<u>Miscellaneous</u>

Prior to January 1989, wash water from cleanup of a chrome pigmented Teflon dispersion spray coating operation was discharged to the ground under the building. The equipment was subsequently dismantled and disposed of off site. It is our belief that the material discharged to the ground was not a hazardous waste. Attachment N provides the basis for this belief.

The third floor of the building was previously used for a silicone and acrylic resin coating operation. There is evidence of contamination on the floor from the adhesives used. No data is available to characterize the contamination.

<u>Solid & Hazardous Waste</u>

At the present time the facility does not generate any hazardous waste. However, it maintains an EPA ID Number. The number is NYD000829580.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002230

## *River Road 1*

The River Road 1 facility is used as a maintenance shop. Approximately 18 employees work at the site. The facility operates 8 hours per day five days per week.

### Air Quality

The facility has two boilers, approximately 330,000 BTU/hr, that burn #2 fuel oil. There are no other air emission sources at the facility. No air permits are required for the boilers due to their size.

### Water Quality

The only wastewater generated on site is sanitary wastewater. It is discharged to a leachfield on site. No permit is required for this discharge due to the volume of material discharged.

The facility is exempt from the stormwater permitting requirements. This is due to the fact that all roof drainage sheets off the building to the ground. A letter was submitted to DEC on October 25, 1991, indicating the facility status regarding stormwater permitting. A copy of the letter is presented in Attachment O.

Drinking water is supplied to the site by the Village. Tests of drinking water fountains have indicated acceptable levels of copper and lead. A copy of the test results is included in Attachment P.

### Oil & Spill Prevention

The facility had one 1,000 gallon underground storage tank. The tank was used to store #2 fuel oil for on site heating purposes and therefore, was exempt from the Underground Storage Tanks regulations at 40 CFR 280. The tank was installed in 1965.

Due to the size of the tank it is not subject to the NY Petroleum Bulk Storage Tank Regulations. However, a tightness test was conducted in September 1992. At that time the tank passed the tightness test. A copy of the tank test report is presented in Attachment Q. An annual standpipe analysis is also performed on the tank. A copy of the 1994 results are included in Attachment Q.

The tank was removed in August 1995. No visible contamination was noted during tank removal. Soil samples were collected during the removal, however, the analytical results are not yet available.

Small quantities of maintenance chemicals are stored within the building. There is no outdoor or bulk storage of materials at the site.

Revised 9/12/95                                          8

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER                                          HONDON-0002231

### *River Road 2*

The River Road 2 facility is used to etch Teflon coated substrate, as a custom fabrication shop for Teflon products and as a wood working shop. Approximately 6 employees work at the site. It operates 8-16 hours per day 5 days per week depending on production needs.

Process Description

The process consists of etching Teflon coated fiberglass and Teflon extrusion with sodium naphthalene and glycol ether. Water used in the etching operation is circulated through a treatment system and reused in the etching process.

Air Quality

The etching operation previously was permitted by the NY DEC. However, process modifications have eliminated the air emissions and, therefore, the air permit is not longer required. On June 30, 1994, a letter was submitted to DEC to cancel the air permit. To date no response has been received from the Agency. A copy of the letter to DEC is located in Attachment T.

The facility has two boilers. One boiler is rated at 669,000 BTU/hr and is fueled with LP Gas. It is used for process heat and is exempt from the NY DEC permitting requirements due to its size and the fuel used. The second boiler is rated at 1.2 MM BTU/hr and is fueled with #2 fuel oil. It is used to heat the facility and is also exempt from the NY DEC permitting rules due to its size and the fuel used.

Water Quality

Wastewater generated at the facility consists of water from the etching process and sanitary water.

Water from the etching process was previously discharged to a on-site leachfield under SPDES permit #NY0109991. The facility had difficulties meeting the fluoride discharge limits in the permit. Therefore, in June 1994, the process was modified so that the water is treated in a closed loop system and recirculated back to the etch tank. Spent water from the etching process is now collected in drums and shipped offsite for disposal. On July 5, 1994, a letter was submitted to DEC to relinquish the SPDES permit. A copy of the letter to DEC is located in Attachment U.

There are two leachfields on site. One is an abandoned process leachfield. The second is currently used to discharge sanitary wastewater from the facility. No permit is required for this leachfield due to the volume of material discharged to it.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER                    HONDON-0002232

Solid & Hazardous Waste

The River Road 1 facility is contiguous with the River Road 2 facility. As such, the two sites share one EPA ID Number. The number is NYD991291881. The only hazardous waste generated at the River Road 1 site is waste naphtha from a parts cleaner. All wastes are disposed of off-site.

The facility is required to submit an annual hazardous waste generators report. A copy of the 1994 report, that includes information on the River Road 1 and River Road 2 facilities, can be found in Attachment R.

Miscellaneous

In 1977, Oak Materials Group, the previous owners of the site, disposed of approximately 260 cubic yards of copper hydroxide sludge on site with the approval of the Rennselaer County Health Department. The material was F006 hazardous waste. In 1984 an agreement was reached with the NY DEC to perform a site investigation. The investigation indicated that the material had not changed nor had it migrated off site. In 1987 the material was excavated and disposed of off site. On August 22, 1991, the DEC indicated that the site had been properly remediated and that no further action is required. A copy of the letter from DEC can be found in Attachment S.

Revised 9/12/95                               9

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER                               HONDON-0002233

The facility is exempt from the stormwater permitting requirements. This is due to the fact that all roof drainage sheets off the building to the ground. A letter was submitted to DEC on October 25, 1991, indicating the facility status regarding stormwater permitting. A copy of the letter is presented in Attachment V.

Drinking water is supplied to the site by the Village. Tests of drinking water fountains at the facility have indicated acceptable levels of copper and lead. A copy of the test results is included in Attachment W.

Oil & Spill Prevention

The facility had one 4,000 gallon underground storage tank. The tank was used to store #2 fuel oil for on site heating purposes and therefore, is exempt from the Underground Storage Tank regulations at 40 CFR 280. The tank was installed in 1975.

The fuel oil tank was subject to the NY Petroleum Bulk Storage Tank Regulations. These regulations required tank registration and tightness testing. The current registration certificate was issued on 9/2/93 and expires on 3/24/97. The last tightness test was conducted in September 1992. At that time the tank passed the tightness test. Retesting of the tank is not required until September 1997. A copy of the registration certificate and the tank test report are presented in Attachment X. An annual standpipe analysis is also performed on the tank. A copy of the 1994 results are included in Attachment X.

The tank was removed in August 1995. No visible contamination was noted during tank removal. Soil samples were collected during the removal, however, the analytical results are not yet available.

There are two other bulk storage tanks at the facility. The first is a 2,000 gallon above ground LP Gas tank. The gas is used for hot air makeup for the etching process. The second tank is a 10,000 gallon above ground nitrogen tank. The nitrogen is used to blanket the etchant. No permitting or registration requirements are applicable to these tanks.

Liquid raw materials, used on site, are stored in drum quantities inside the building.

Solid & Hazardous Waste

As previously mentioned, the River Road 1 and River Road 2 facilities are contiguous. Therefore, these facilities share one EPA ID Number - NYD991291881. Hazardous waste generated on site includes: cleaning liquids, flammable liquids and lab packs. All wastes are shipped off-site for disposal.

The facility is required to submit an annual hazardous waste generators report. A copy of the 1994 report, that includes information on the River Road 1 and River Road 2 facilities, can be found in Attachment R.

Revised 9/12/95                                    11

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

## Liberty Street

The Liberty Street facility produces a wide variety of PTFE film products and PSAT products on three process lines including skiving, extrusion and Pressure Sensitive Adhesive Tape (PSAT) process. Approximately 80 employees work on site. Manufacturing operations occur 24 hours per day 7 days per week depending on production demands.

### Process Description

In the extrusion process, the plant uses two wide web extruded tape lines that are connected to one catalytic oxidizer. The 12-inch and 16-inch wide web extruded tape lines manufacture a PTFE film product consisting of PTFE resins, aliphatic hydrocarbon solvent, inorganic coloring dyes and an organic surfactant for wetability.

The above mentioned materials are uniformly mixed together and compacted to form solid cylindrical pills. The compacted pills are extruded through a die and transformed into a continuous web. This web is then passed through an in-line calendar that manufactures the web to a required film thickness. The film is then in-line wrapped externally over internally steam heated cans that cause the aliphatic hydrocarbon solvent and components of the organic surfactant to vaporize out of the film.

In the PSAT process, the plant manufacturers silicone adhesive tape and acrylic PSAT products on three coating machines. The silicone PSA's are applied from a formulation containing xylene and toluene. The acrylic PSA's are applied from a formulation containing isopropanol, heptane, ethyl acetate and toluene. The PSA's are applied on a variety of substrates using reverse roll coater or metering bars. The product is drawn through an oven where the solvent is evaporated. The product then passes through a second portion of the oven at a higher temperature to cure the adhesive, exits the oven and is wound on a roll.

### Air Quality

The table below summarizes the permit information for the air emission sources at the facility. Copies of the permits are included in Attachment Y. The permits include a process description, emission calculations, expiration dates and special conditions.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER                    HONDON-0002235

| Equipment Type | Emission Point Number | Material(s) Emitted | Estimated Emission Amount (lbs/yr) | Permit Type | Control Equipment | Expiration Date |
|---|---|---|---|---|---|---|
| Can Line (2) | L3 | -Aliphatic Hydrocarbon | -46000 | Operating | Catalytic Oxidizer | 11/30/97 |
| | | -Isopropanol | -5.26 | | | |
| | | -Methyl 2-Pyrrolidone | 29.78 | | | |
| 60" Line 40" Line Tower 4 | L9 | - Xylene | -2585 | Operating | Thermal Oxidizer | 11/30/97 |
| | | - Toluene | -19638 | | | |
| | | - Isopropanol | -5995 | | | |
| | | - Heptane | -8465 | | | |
| | | - Ethyl Acetate | - 3263.5 | | | |

The extrusion process consists of two wide web extruded tape lines that are connected to one catalytic oxidizer. The emission point designation for the oxidizer is L3. The catalytic oxidizer is designed to destroy VOC laded air from the can line as well as fugitive emissions from the extruder, accumulator and calendar sections of the equipment. The oxidizer was installed in March 1993. Source testing, performed in February 1994, indicated an average destruction efficiency of 93.7%.. An operating permit for the equipment was issued by NY DEC on February 9, 1995. A copy of the operating permit can be found in Attachment Y.

In May 1994, the facility began receiving odor complaints from local neighbors. Upon investigation it was determined that the odors were associated with PAE, a material used in the process as a wetting agent. Actions are being taken to reformulate the product to remove PAE from the process.

On December 15, 1994, NY DEC received calls from neighbors of the Liberty Street facility regarding the odors. On December 22, 1994, DEC visited the site to look at the Catalytic Oxidizer. On January 13, 1995, the NY DEC issued a draft Consent Order to the facility regarding the odor complaints. The Consent Order listed a number of corrective actions the facility was required to take to eliminate the odors. A final Consent Order was never issued.

During early February 1995, AlliedSignal implemented a number of corrective actions to address the odors. These actions included: 1) adding two additional feet of catalyst to the oxidizer; 2) raising the oxidizer stack an additional 20 feet to minimize the building downwash effects; and 3) adding a new burner box to reduce system leaks. NY DEC granted the facility permission to make these modifications on February 7, 1995. A copy of the letter from DEC can be found in Attachment Y. The DEC requires that a permit modification application be submitted and a new stack test be performed. Work is

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER                    HONDON-0002236

continuing to identify and correct the source of the odors. A permit modification application will be submitted to the DEC when all modifications are finalized. Preparation of the stack test protocol is in process.

The facility has two process boilers on the can line. Due to their size these boilers are exempt from NY DEC air permitting regulations. They burn LP Gas.

In the PSAT process, the solvent from three coating lines, designated Tower 4, the 40" line and the 60" line, is exhausted to a recuperative fume incinerator (L9) and then to atmosphere. The incinerator uses one propane-fired burner rated at 9 MM BTU/hr. Source testing was performed on the recuperative fume incinerator in October 1992. Test results indicated an average destruction efficiency of 92.1% at an operating temperature of 1300 °F. The NY DEC issued an operating permit for this source on February 9, 1995. A copy of the permit can be found in Attachment Y.

The PSAT lines are subject to the Federal New Source Performance Standard for Pressure Sensitive Tape and Label Surface Coating Operations, 40 CFR 60 Subpart RR. The lines are also subject to NY Surface Coating Regulations at Title 6 Part 228.

An internal review of facility operations indicated that records required by both the NSPS and the NY Surface Coating Regulations were not being maintained. The facility is in the process of modifying their recordkeeping procedures to comply with the requirements.

The facility has one boiler used for facility heating. On February 18, 1995, modifications were made to this boiler to convert it from #4 fuel oil to LP Gas. Currently it burns only LPG and is rated at 3.9 MM BTU/hr. Due to the size of the boiler and the type of fuel used no permit is needed. On February 16, 1995, a letter was submitted to DEC notifying them of the boiler modifications. A copy of the letter is included in Attachment Z.

The facility is located in a "Marginal" Non-Attainment area classified as an Ozone transport region. The VOC and NOx threshold for "Major Source" are 50 Tons Per Year (TPY) and 100 TPY, respectively. The Liberty Street facility is a "Major Source" and therefore, is subject to the Federal Title V permitting regulations.

Pursuant to the New York air regulations at Part 202 the facility is required to submit an annual emissions inventory to DEC. A copy of the 1994 emissions inventory is included in Attachment AA.

Water Quality

Wastewater generated at the facility is discharged to the treatment plant for the Village of Hoosick Falls. The wastewater consists of sanitary wastewater, non-contact cooling water, wash water from pill making and boiler blowdown. The discharge of the wastewater is governed by the local sewer ordinance. No permit is required for the

Revised 9/12/95                           14

discharge. Attachment BB is a copy of a letter from the treatment plant operator indicating that the discharge for the Liberty Street facility is acceptable to the POTW.

The Liberty Street facility is not subject to the stormwater permitting regulations. All roof drainage sheets off the building to the ground. There are no outside material storage or other industrial activities "exposed" to stormwater. A letter was submitted to DEC on October 25, 1991, indicating the facility status regarding stormwater permitting. A copy of the letter is presented in Attachment CC.

Drinking water is supplied to the site by the Village. Tests of drinking water fountains at the facility have indicated acceptable levels of copper and lead. A copy of the tests results is included in Attachment DD.

Oil & Spill Prevention

Raw materials for facility operations are stored in drums at the facility.

The facility had one 8,000 gallon underground storage tank. The tank was used to store #4 fuel oil for on site heating purposes and therefore, is exempt from the Underground Storage Tank regulations at 40 CFR 280. The tank was installed in 1970.

The tank was subject to the NY Petroleum Bulk Storage Tank Regulations. These regulations required tank registration and tightness testing. The current registration certificate was issued on 9/2/93 and expires on 3/24/97. The last tightness test was conducted in September 1992. At that time the tank passed the tightness test. Retesting of the tank is not required until August 1997. A copy of the registration certificate and the tank test report are presented in Attachment EE. An annual standpipe analysis is also performed on the tank. A copy of the 1994 results are included in Attachment EE.

On February 20, 1995, the tank was drained and temporarily closed. It was removed in August 1995. Contamination was noted at the fill pipe during tank removal. Soil samples were collected during the removal, however, the analytical results are not yet available.

The facility has one 18,000 gallon above ground LP Gas tank. The LP Gas is used for oxidizer fuel and process heat. This tank is not subject to any permit or registration requirements.

Solid & Hazardous Waste

The Liberty Street facility is a Large Quantity Generator of Hazardous Waste. The EPA ID Number for the facility is NYD000829598. Hazardous waste generated on site includes: petroleum naphtha from a parts washer, waste resin and solvent and waste kerosene from the Can Line. All hazardous waste generated on site is shipped off-site for disposal.

Revised 9/12/95                                   15

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER                                   HONDON-0002238

The facility is required to submit an annual hazardous waste generators report.  A copy of the 1994 report can be found in Attachment FF.

Construction debris, i.e., gravel and cinder blocks, are disposed of on the back side of the property.  All of this material is non-hazardous.

In the mid 1960's to mid 1970's waste adhesive and clean-up waste containing solvents was disposed of at the Hoosick landfill.  The procedure typically consisted of transporting the material to the landfill where it was burned for disposal.  However, some of the drums of waste were apparently buried in the landfill.  No information is available regarding the exact characteristics of the waste or the volume that may have been buried.

<u>Miscellaneous</u>

The facility is subject to the SARA Title III reporting requirements.  Reporting is required for toluene and xylene.  A copy of the 1994 reports are located in Attachment GG.

Revised 9/12/95                    16

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER                    HONDON-0002239

### *River Road 3*

The River Road 3 facility was previously used as a laminates manufacturing facility. Currently, it is used as an empty drum warehouse and an idle equipment warehouse.

#### Air Quality

The facility has one boiler rated at 1.07 M BTU/hr. It uses No. 2 fuel oil. Due to its size and the type of fuel burned it is exempt from the NY DEC air permitting rules.

#### Water Quality

The facility previously discharged process and sanitary wastewater to three an on-site leachfields, one process and two sanitary, under a SPDES permit. Since there are no production processes currently operating on site there is no longer a need for the SPDES permit. The permit was, therefore, deleted by DEC on August 6, 1993. A copy of the letter from DEC is included in Attachment HH. Sanitary wastewater continues to be discharged to the leachfield.

#### Oil & Spill Prevention

The facility had two underground storage tanks. The first is an 8,000 gallon #2 fuel oil tank used for on site heating purposes and therefore, was exempt from the Underground Storage Tank regulations at 40 CFR 280. The tank installation date is unknown. The second tank was also used to store #2 fuel oil. It has a capacity of 275 gallons and, therefore, is exempt from all requirements.

The 8,000 gallon fuel oil tank was subject to the NY Petroleum Bulk Storage Tank Regulations. These regulations required tank registration and tightness testing. The current registration certificate was issued on September 2, 1993 and expires on March 24, 1997. The last tightness test was conducted in September 1992. At that time the tank passed the tightness test. A copy of the registration certificate and the tank test report are presented in Attachment II.

Both tanks were removed in August 1995. No visible contamination was noted during the removal of the 275 gallon tank. Approximately 12 cubic yards of contamination was noted during removal of the 8,000 gallon tank. Soil samples were collected from both excavations during the removal, however, the analytical results are not yet available.

The facility has two 1,850 gallon above ground LP Gas tanks. The LP Gas was used for building heat, currently they are not used. The tanks are not subject to any permit or registration requirements.

Revised 9/12/95                                    17

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER                                    HONDON-0002240

<u>Solid & Hazardous Waste</u>

The River Road 3 facility is contiguous with the River Road 1 and River Road 2 facilities. Therefore, all of these facilities share one EPA ID Number, NYD991291881. No hazardous waste was been generated at this facility in 1994.

Revised 9/12/95                                18

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

**Schedule 4.11**
**Employee Benefit Plans**

I)   WELFARE PLANS

Health Maintenance Organizations
Comprehensive Medical Plan
Retiree Medical Plan (Salaried)
Group Term Life
Group Universal Life
Group Accidental Death and Dismemberment
Business Travel Accident Insurance
Short-Term Disability Plan (Salaried and Hourly)
Long-Term Disability Plan (Salaried)
Dental Plan
Vision Plan
Prescription Drug Plan

II)  PENSION AND SAVINGS PLANS

AlliedSignal Inc. Retirement Program
AlliedSignal Inc. Supplemental Retirement Program
AlliedSignal Hourly Employees' Pension Plan
Oak Materials Group Pension Plan
AlliedSignal Savings Plan
AlliedSignal Supplemental Savings Plan
AlliedSignal Thrift Savings Plan

III) OTHER BENEFIT PLANS

AlliedSignal Scholarship Program
Service and Retirement Award Program
Vacation Policy
Holidays
Relocation Assistance Plan
Tuition Assistance Program
Jury Duty Pay
Bereavement Policy
Military Leave Policy
Family Medical Leave Policy
Job Posting
Severance Program and Policies
Norplex Oak Severance Program and Policies
Employee Assistance Program

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002242

**Schedule 4.11 (Continued)**
**Employee Benefit Plans**

      Adoption Program
      Matching Gifts Program
      Safety Equipment Allowance
      Patent Awards
      Credit Unions
      Payroll Deductions for US Savings Bonds Program

IV)    BONUS PROGRAMS

      A)    Sales Incentive Plan -- 1 employee -- AlliedSignal retained liability
      B)    Reference is made to Schedule 6.1(d)

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002243

**Schedule 4.12**
**Employees**

Part I - Employees

    See attached list.

    Consultants: NONE

    Agents:  See sales representative agreements in Schedule 4.7 Contracts.

Part II - Employment claims and litigation

Reference is made to Schedule 4.9, Litigation.

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002244

ATTACHMENT TO SCHEDULE 4.1

LIST OF FLUORGLAS EMPLOYEES

Page 1 of 5

| LNAME | FNAME | MI | BASE RATE | ANNUAL BASE | SECTOR |
|---|---|---|---|---|---|
| ALBRYCHT | HERBERT | H | 11.73 | 24,398.40 | EMS |
| BARBER | STEVEN | H | 14.20 | 29,536.00 | EMS |
| BARTHOLDI | VINCENT | P | 11.73 | 24,398.40 | EMS |
| BARTLETT | EVERETT | H | 12.10 | 25,168.00 | EMS |
| BATES | ERNEST | J | 11.73 | 24,398.40 | EMS |
| BEAUMONT | PAUL | | 5,308.34 | 63,700.08 | EMS |
| BENKOSKI | ROBERT | J | 13.93 | 28,974.40 | EMS |
| BETIT | SCOTT | A | 11.73 | 24,398.40 | EMS |
| BEUMER | ALBERTUS | | 6,666.67 | 80,000.04 | EMS |
| BISSON | CAROL | J | 11.73 | 24,398.40 | EMS |
| BOLDUC | DANIEL | A | 7,083.33 | 84,999.96 | EMS |
| BORFT | ALAN | J | 11.02 | 22,921.60 | EMS |
| BRAKAN | RONALD | C | 11.73 | 24,398.40 | EMS |
| BREHENSTUHL | PAIGE | | 11.02 | 22,921.60 | EMS |
| BRIGGS | JOHN | W | 14.20 | 29,536.00 | EMS |
| BROGUE | BARRY | | 11.73 | 24,398.40 | EMS |
| BROGUE | SHARI | M | 1,866.67 | 22,400.04 | EMS |
| BROMIRSKI | RICHARD | A | 11.73 | 24,398.40 | EMS |
| BROWN | JOHN | H | 4,052.50 | 48,630.00 | EMS |
| BROWN | RICHARD | M | 3,641.66 | 43,699.92 | EMS |
| BROWNELL | KENNETH | E | 3,791.66 | 45,499.92 | EMS |
| BRUNDIGE | KEVIN | J | 11.73 | 24,398.40 | EMS |
| CALHOUN | MARK | P | 11.73 | 24,398.40 | EMS |
| CALHOUN | SHIRLEY | A | 11.73 | 24,398.40 | EMS |
| CALLAHAN | DENNIS | W | 11.73 | 24,398.40 | EMS |
| CALLAHAN | MICHAEL | D | 12.51 | 26,020.80 | EMS |
| CARDILLO | LOUIS | A | 11.37 | 23,649.60 | EMS |
| CARELLI | CHARLES | | 13.96 | 29,036.80 | EMS |
| CARCHARD | EDWARD | P | 11.73 | 24,398.40 | EMS |
| CARCHARD | LAWRENCE | | 11.73 | 24,398.40 | EMS |
| CIPPERLY | GLENN | W | 11.73 | 24,398.40 | EMS |
| CIPPERLY | KENNETH | A | 11.73 | 24,398.40 | EMS |
| CIUK | LOUISE | R | 11.02 | 22,921.60 | EMS |
| CLARK | JAMES | C | 11.73 | 24,398.40 | EMS |
| CLYDE | ROBERT | S | 12.90 | 26,832.00 | EMS |
| CONNOR | CHRISTOPHER | J | 3,900.00 | 46,800.00 | EMS |
| DELUCA | BARBARA | J | 1,975.00 | 23,700.00 | EMS |
| DRAKE | DANIEL | | 11.73 | 24,398.40 | EMS |
| DROZDZAL | RUSSELL | J SR | 11.73 | 24,398.40 | EMS |
| ELLIS | ROBERT | G | 6,416.67 | 77,000.04 | EMS |
| ELWELL | ROBERT | W | 11.73 | 24,398.40 | EMS |
| FERRANMINI | ROBERT | W | 12.12 | 25,209.60 | EMS |
| FITCHETT | NEIL | H | 4,008.34 | 48,100.08 | EMS |
| FITZPATRICK | JOHN | JR | 12.90 | 26,832.00 | EMS |
| FLANDERS | DAVID | | 11.73 | 24,398.40 | EMS |
| FLYNN | KAREN | | 1,525.00 | 18,300.00 | EMS |
| FOSTER | JOHN | D | 11.73 | 24,398.40 | EMS |
| FRALEY | WILLIAM | A | 3,841.67 | 46,100.04 | EMS |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

| LNAME | FNAME | M I | S U F | BASE RATE | ANNUAL BASE | SEC-TOR |
|---|---|---|---|---|---|---|
| FREDERICKSON | CLIFFORD | | | 16.90 | 35,152.00 | EHS |
| FREEMAN | PETER | A | | 11.37 | 23,649.60 | EHS |
| GATES | SCOTT | M | | 10.00 | 20,800.00 | EHS |
| GODDERMOTE | ROXANE | R | | 11.73 | 24,398.40 | EHS |
| GODDERMOTE | CHRISTIAN | | | 12.90 | 26,832.00 | EHS |
| GOYER | RAY | M | | 11.37 | 23,649.60 | EHS |
| GRIFFITH | BRIAN | J | | 14.20 | 29,536.00 | EHS |
| GROBUSKI | STEVEN | A | | 11.73 | 24,398.40 | EHS |
| GROBUSKI | JOSEPH | E | | 11.73 | 23,649.60 | EHS |
| GROBUSKI | ROBERT | | | 11.37 | 23,649.60 | EHS |
| GROGAN | STEPHEN | T | | 11.73 | 24,398.40 | EHS |
| GROGAN | GARY | | | 11.73 | 24,398.40 | EHS |
| GUILE | JAMES | A | | 11.73 | 24,398.40 | EHS |
| GUY | GEORGE | H | JR | 11.73 | 24,398.40 | EHS |
| HALE | PHILLIP | C | | 5,375.00 | 64,500.00 | EHS |
| HAMILTON | DONALD | D | | 11.37 | 23,649.60 | EHS |
| HARRIS | ROBERT | F | | 3,375.00 | 40,500.00 | EHS |
| HARRIS | MICHAEL | A | | 11.73 | 24,398.40 | EHS |
| HASEMAN | PAUL | | | 13.93 | 28,974.40 | EHS |
| HASEMAN | GLENN | A | | 3,950.00 | 47,400.00 | EHS |
| HASKELL | VIRGINIA | M | | 11.02 | 22,921.60 | EHS |
| HAUSER | ALAN | B | | 11.73 | 24,398.40 | EHS |
| HAYDEN | RICHARD | J | | 4,333.34 | 52,000.00 | EHS |
| HAYNES | JOHN | A | | 4,158.34 | 49,900.08 | EHS |
| HENDRICKSON | KELLY | W | | 11.73 | 24,398.40 | EHS |
| HERRINGTON | ROBERT | | | 13.93 | 28,974.40 | EHS |
| HICKEY | CHARLES | | | 11.37 | 23,649.60 | EHS |
| HICKEY | JOHN | H | | 11.73 | 24,398.40 | EHS |
| HICKEY | NANCY | P | | 11.73 | 24,398.40 | EHS |
| HOAG | SUE | G | | 11.73 | 24,398.40 | EHS |
| HOAG | JOSEPH | | | 11.37 | 23,649.60 | EHS |
| HODGES | VERONICA | L | | 11.73 | 24,398.40 | EHS |
| HOUGHTON | WILLIAM | W | | 11.37 | 23,649.60 | EHS |
| HOUGHTON | JOHN | W | | 13.93 | 28,974.40 | EHS |
| HOKE | MERTON | R | | 3,841.67 | 46,100.04 | EHS |
| KURLEY | JEFF | | | 11.73 | 24,398.40 | EHS |
| HYDE | ANDREW | F | | 16.11 | 33,508.80 | EHS |
| HYDE | ARTHUR | P | | 3,008.34 | 36,100.08 | EHS |
| INSCO | JAMES | P | | 13.29 | 27,643.20 | EHS |
| JANSEN | LEONARD | E | | 11.02 | 22,921.60 | EHS |
| JANSEN | DIANA | A | | 3,941.66 | 47,299.92 | EHS |
| JOHNSON | WERNER | V | JR | 16.11 | 33,508.80 | EHS |
| JONES | LLOYD | H | | 11.37 | 23,649.60 | EHS |
| KAUFMANN | STEVEN | S | | 11.73 | 24,398.40 | EHS |
| KEESE | GEORGE | M | | 4,005.00 | 48,060.00 | EHS |
| KIMBALL | FRANK | R | | 11.73 | 24,398.40 | EHS |
| KING | DARREN | A | | 11.37 | 23,649.60 | EHS |
| | FAITH | | | | | |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002246

| LNAME | FNAME | S M U F I | BASE RATE | ANNUAL BASE | SEC-TOR |
|---|---|---|---|---|---|
| KIPP | DAVID | | 11.73 | 24,398.40 | EHS |
| KIPP | JILL | | 1,862.50 | 22,350.00 | EHS |
| KUEBLER | RICHARD | A | 12.90 | 26,832.00 | EHS |
| KUGLER | KEVIN | P | 13.93 | 28,974.40 | EHS |
| LA PERLE | LEO | M | 11.73 | 24,398.40 | EHS |
| LA ROCHE | LEO | H | 11.73 | 24,398.40 | EHS |
| LAPORTE | PATRICIA | J | 3,125.00 | 37,500.00 | EHS |
| LAWSON | TIMOTHY | A | 11.73 | 24,398.40 | EHS |
| LEBARRON | KATHLEEN | J | 11.37 | 23,649.60 | EHS |
| LEBARRON | LARRY | E | 11.73 | 24,398.40 | EHS |
| LEESEMAN | MARILYN | D | 2,150.00 | 25,800.00 | EHS |
| LENSETH | KENNETH | G | 4,650.00 | 55,800.00 | EHS |
| LENYK | RICHARD | P | 6,850.00 | 82,200.00 | EHS |
| LETRE | JOHN | M | 11.73 | 24,398.40 | EHS |
| LITTLEFIELD | EVA | D | 2,029.17 | 24,350.04 | EHS |
| MAGISANO | WAYNE | L | 11.73 | 24,398.40 | EHS |
| MANCHESTER | KEVIN | | 4,225.00 | 50,700.00 | EHS |
| MARCOUX | ERNEST | | 14.20 | 29,536.00 | EHS |
| MAYER | JOSEPH | | 11.73 | 24,398.40 | EHS |
| MC NAIR | EUGENE | S | 11.73 | 24,398.40 | EHS |
| MCDONALD | THOMAS | V | 4,283.34 | 51,400.08 | EHS |
| MCGARVIN | PATRICIA | J | 1,920.84 | 23,050.08 | EHS |
| MCGUIRE | EDWARD | P | 11.73 | 24,398.40 | EHS |
| MCGUIRE | MICHAEL | T | 14.67 | 30,513.60 | EHS |
| MCGUIRE | PATRICK | A | 11.73 | 24,398.40 | EHS |
| MCNAIR | GEAN | | 11.73 | 24,398.40 | EHS |
| MELESKY | LINDA | K | 2,025.00 | 24,300.00 | EHS |
| MERKEL | GERALD | R | 6,816.67 | 81,800.04 | EHS |
| MERRELL | MARK | V | 5,016.67 | 60,200.04 | EHS |
| MERRILL | DOUGLAS | P | 4,166.66 | 49,999.92 | EHS |
| MICLETTE | JOHN | A JR | 11.37 | 23,649.60 | EHS |
| MILLIMAN | ROBERT | T JR | 11.37 | 23,649.60 | EHS |
| MINKLER | CURTIS | J JR | 14.20 | 29,536.00 | EHS |
| MORGELLO | ALICE | B | 1,862.50 | 22,350.00 | EHS |
| MORIN | PEGGY | A | 1,691.67 | 20,300.04 | EHS |
| MORIN | RAYMOND | | 11.73 | 24,398.40 | EHS |
| MORIN | TIMOTHY | P | 11.02 | 22,921.60 | EHS |
| MULLEN | ANN | | 11.02 | 22,921.60 | EHS |
| MULVIHILL | FRANK | P | 11.73 | 24,398.40 | EHS |
| NAPOLI | PAUL | | 4,166.67 | 50,000.04 | EHS |
| NAYAR | SATBIR | S | 4,659.17 | 55,910.04 | EHS |
| NILES | ROBERT | F | 11.37 | 23,649.60 | EHS |
| NOBLE | BERTILLA | M | 11.73 | 24,398.40 | EHS |
| NOONAN | WILLIAM | E JR | 8,333.34 | 100,000.08 | EHS |
| NORTH | LEON | B JR | 11.37 | 23,649.60 | EHS |
| NORTON | JEFFREY | M | 11.73 | 24,398.40 | EHS |
| NOVAK | ROBERT | S | 5,633.34 | 67,600.08 | EHS |
| O'BRIEN | DENNIS | C | 11.73 | 24,398.40 | EHS |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

4 of 5

| LNAME | FNAME | MI | SUF | BASE RATE | ANNUAL BASE | SECTOR |
|---|---|---|---|---|---|---|
| ORDWAY | TIMOTHY | A | | 11.73 | 24,398.40 | EMS |
| OSTERHOUT | WILLIAM | J | | 6.50 | 15,520.00 | EMS |
| PARKER | DANIEL | P | | 11.73 | 24,398.40 | EMS |
| PECKHAM | HAROLD | L | | 11.73 | 24,398.40 | EMS |
| PENNUCCI | JOSEPH | | | 11.73 | 24,398.40 | EMS |
| PENSYL | MYRON | | | 11.73 | 24,398.40 | EMS |
| PHILLIPS | GEORGE | | | 11.02 | 22,921.60 | EMS |
| PHILLIPS | LYNWOOD | | | 11.73 | 24,398.40 | EMS |
| PIERCE | MARYANN | | | 11.73 | 24,398.40 | EMS |
| POKERS | ANNETTE | M | | 2,395.84 | 28,750.08 | EMS |
| POKERS | JAMES | | | 11.73 | 24,398.40 | EMS |
| PRATT | DOUGLAS | W | | 3,125.00 | 37,500.00 | EMS |
| PROVENSAL | WILLIAM | | | 12.90 | 26,832.00 | EMS |
| PUGLIESE | COLLEEN | L | | 11.02 | 22,921.60 | EMS |
| RADCLIFFE | BARBARA | | | 11.73 | 24,398.40 | EMS |
| RANCOURT | MICHAEL | | | 12.50 | 26,000.00 | EMS |
| RICE | WILLIAM | L | | 11.37 | 23,649.60 | EMS |
| RICHARD | HERMAS | J | | 4,783.34 | 57,400.08 | EMS |
| RIMKUNAS | STANLEY | J | | 4,425.00 | 53,100.00 | EMS |
| ROBINSON | SUSAN | | | 11.37 | 23,649.60 | EMS |
| RUDITIS | FRANCES | | | 11.02 | 22,921.60 | EMS |
| SARGOOD | CHRISTOPHER | A | | 11.37 | 23,649.60 | EMS |
| SARGOOD | WILLIAM | A | SR | 11.37 | 24,398.40 | EMS |
| SCHOOP | RANDY | A | | 11.73 | 24,398.40 | EMS |
| SCRIBER | CHARLES | W | | 13.29 | 27,643.20 | EMS |
| SERRE | HENRY | A | | 4,023.33 | 48,279.96 | EMS |
| SKAYS | PHYLLIS | E | | 11.73 | 24,398.40 | EMS |
| SHERMAN | PHILLIP | | | 11.73 | 24,398.40 | EMS |
| SHUHART | DAVID | F | | 11.73 | 24,398.40 | EMS |
| SMITH | DONALD | R | | 11.73 | 24,398.40 | EMS |
| SMITH | GAIL | M | | 2,450.00 | 29,400.00 | EMS |
| SMITH | JOSEPH | | JR | 14.20 | 29,556.00 | EMS |
| SPRAGUE | JOANN | | | 1,754.17 | 21,050.04 | EMS |
| SPRAGUE | TERRY | E | | 11.73 | 24,398.40 | EMS |
| SPRAGUE | WALTER | J | JR | 4,133.34 | 49,600.08 | EMS |
| SPRINGER | JOSEPH | G | | 3,433.34 | 41,200.08 | EMS |
| SPRINGER | LINDA | L | | 14.20 | 29,536.00 | EMS |
| SPRINGER | ROLAND | L | | 11.73 | 24,398.40 | EMS |
| STEWART | JOANNE | | | 11.02 | 22,921.60 | EMS |
| SUROAM | GERALD | A | | 14.20 | 29,556.00 | EMS |
| TATE | DONALD | | | 11.73 | 24,398.40 | EMS |
| TATE | RONALD | | | 11.73 | 24,398.40 | EMS |
| TELFORD | NORMAN | C | SR | 11.37 | 23,649.60 | EMS |
| THOMAS | RANDY | L | | 11.73 | 24,398.40 | EMS |
| THORPE | BEVERLEY | C | | 11.00 | 22,880.00 | EMS |
| THURBER | MARILYNN | | | 11.73 | 24,398.40 | EMS |
| TILLEY | RAYMOND | V | JR | 11.73 | 24,398.40 | EMS |
| VANDERKAR | JANET | | | 2,139.59 | 25,675.08 | EMS |
| Trine | Rich | | | 4,516.66 | 54,200.00 | EMS |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002248

5 of 5

| LNAME | FNAME | M I | S U F | BASE RATE | ANNUAL BASE | SEC-TOR |
|---|---|---|---|---|---|---|
| VARS | WESLEY | | JR | 11.73 | 24,398.40 | EMS |
| WAGNER | TIMOTHY | | | 11.37 | 23,649.60 | EMS |
| WAGNER | TODD | | | 16.11 | 33,508.80 | EMS |
| WATSON | BRYAN | L | | 11.37 | 23,649.60 | EMS |
| WEATHERWAX | RAYMOND | E | | 11.73 | 24,398.40 | EMS |
| WEBSTER | SALLY | A | | 1,904.17 | 22,850.04 | EMS |
| WEEDEN | ELAINE | | | 14.20 | 29,536.00 | EMS |
| WERNER | JOZSEF | | | 11.73 | 24,398.40 | EMS |
| WHITE | BRIAN | P | | 11.73 | 24,398.40 | EMS |
| WHITTON | RONALD | J | | 11.73 | 24,398.40 | EMS |
| WILDER | ANDREW | | | 11.37 | 23,649.60 | EMS |
| WILOOL | JOSEPH | E | | 11.73 | 24,398.40 | EMS |
| WOODCOCK | SHARON | L | | 11.37 | 23,649.60 | EMS |
| WYSOCKI | THOMAS | C | | 4,333.34 | 52,000.08 | EMS |
| YANKUS | EDWARD | V | JR | 4,166.66 | 49,999.92 | EMS |
| YWANISKI | BEVERLY | | | 11.02 | 22,921.60 | EMS |
| YWANISKI | THOMAS | | | 11.02 | 22,921.60 | EMS |
| YOUNG | CARL | F | | 11.73 | 24,398.40 | EMS |
| YOUNG | ROLAND | | JR | 11.37 | 23,649.60 | EMS |
| YOUNG | TERRY | W | | 11.73 | 24,398.40 | EMS |
| YUREWITCH | JOHN | J | | 14.67 | 30,513.60 | EMS |
| YUREWITCH | WILLIAM | | | 11.02 | 22,921.60 | EMS |

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002249

**Schedule 4.13**
**Undisclosed Liabilities**


NONE


10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002250

Schedule 4.14
**Compliance with Law**

Reference is made to Schedule 4.10, Health, Safety and Environmental Disclosure

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002251

**Schedule 4.15**
**Consents**

The Permits and Licenses identified in Schedule 4.10 require Purchaser to file applications for transfer or reissuance.

Federal Government requirements under the Hart Scott Rodino Antitrust Improvements Act of 1976.

As specifically identified in Schedule 4.7, certain contracts require consent of the other party for assignement of the contract.

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002252

**Schedule 4.17**
**Permits and Licenses**

All material Permits and Licenses are expressly identified in Schedule 4.10, Health, Safety and Environmental Disclosure.

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

**Schedule 4.18(a)(i)**
**<u>Facilities</u>**

(i)   <u>The Facilities.</u>

Facilities owned by Seller and currently used primarily for the operation of the Business:

Facilities at the following locations in Hoosick Falls, NY:

<div align="center">

14 McCaffrey Street
Liberty Street
John Street
River Road I
River Road II

</div>

10/26/95
Doc. #33629 v5

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

HONDON-0002254