**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHELE BAKER; CHARLES CARR; ANGELA CORBETT; PAMELA FORREST; MICHAEL HICKEY, individually and as parent and natural guardian of O.H., infant; KATHLEEN MAIN-LINGENER; KRISTIN MILLER, as parent and natural guardian of K.M., infant; JENNIFER PLOUFFE; SILVIA POTTER, individually and as parent and natural guardian of K.P, infant; and DANIEL SCHUTTIG, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>v.<br><br>SAINT-GOBAIN PERFORMANCE PLASTICS CORP., and HONEYWELL INTERNATIONAL INC. f/k/a ALLIED-SIGNAL INC. and/or ALLIEDSIGNAL LAMINATE SYSTEMS, INC., E.I. DUPONT DE NEMOURS AND COMPANY, INC., and 3M CO.,<br><br>          Defendants. | Case No. 1:16-CV-00917-LEK-DJS |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT, PRELIMINARY CERTIFICATION OF SETTLEMENT CLASSES, AND APPROVAL OF NOTICE PLAN**

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ................................................................................ iv

INTRODUCTION .............................................................................................. 1

BACKGROUND OF THE LITIGATION ......................................................... 2

MEDIATION AND SETTLEMENT NEGOTIATIONS ................................... 6

SUMMARY OF THE PROPOSED SETTLEMENT TERMS ........................... 7

I.  The Settlement Class Definitions ................................................. 8

    A.  Municipal Water Property Settlement Class: ...................... 8

    B.  Private Well Water Settlement Class: .................................. 8

    C.  Nuisance Settlement Class: .................................................. 8

    D.  Medical Monitoring Settlement Class: ................................ 8

II.  Excluded Persons .......................................................................... 9

III.  Benefits of the Settlement ............................................................ 9

    A.  The $65.25 million Settlement. ........................................... 9

    B.  Allocation of Settlement Fund ............................................ 10

        1.  Property Settlement Classes .................................... 10

        2.  Nuisance Settlement Class ....................................... 10

        3.  Medical Monitoring Settlement Class ..................... 11

        4.  Attorneys' Fees and Case Expenses ........................ 11

        5.  Service Awards ........................................................ 11

        6.  General Settlement Administration Costs ................ 12

        7.  Excess Funds ........................................................... 12

    C.  Class Member Payments ...................................................... 12

|  | 1. | Property Settlement Class members | 12 |
|  | 2. | Nuisance Class Members | 13 |
| D. | Medical Monitoring Class Program | | 14 |
| E. | General Settlement Administrator and Medical Monitoring Administrator | | 15 |

| IV. | Class Notice | 16 |
| V. | Opt Out Procedures | 17 |
| VI. | Objection Procedures | 18 |
| VII. | Attorneys' Fees, Costs, and Service Awards | 18 |
| VIII. | Releases | 18 |

| ARGUMENT | | 19 |
| I. | The Court "will likely be able to" approve the Settlement as "fair, reasonable, and adequate" under Rule 23(e)(2). | 20 |
|  | A. | The legal standard for preliminary approval. | 20 |
| II. | The Proposed Settlement Meets the Requirements For Preliminary Approval. | 21 |
|  | A. | The Class Representatives and Interim Class Counsel have adequately represented the Class. | 21 |
|  | B. | The Settlement was negotiated at arm's length. | 23 |
|  | C. | The relief provided for the Settlement Classes is significant, taking into account the relevant factors. | 25 |
|  |  | 1. The relief provided by the Settlement is significant. | 25 |
|  |  |  | i. Property Damage Settlement Classes | 26 |
|  |  |  | ii. Nuisance Damage Settlement Class | 27 |
|  |  |  | iii. Medical Monitoring Settlement Class | 28 |
|  |  | 2. The costs, risks, and delay of trial and appeal make the relief provided by the Settlement even more valuable. | 30 |

3. The method of distributing the relief to the Settlement Class is highly effective. ..................................................................... 32

4. Attorneys' fees will be paid only after Court approval and in an amount justified by the Settlement. ................................................ 34

5. Disclosure of side agreements. .................................................... 36

6. The Settlement treats Class Members equitably relative to each other. ..................................................................................... 37

III. The Court will "likely be able to" certify the Settlement Class for purposes of entering judgment on the Settlement. .............................................. 38

    A. The Settlement Classes meet the requirements of Rule 23(a). ....................... 38

        1. The Settlement Classes are so numerous that joinder of all members is impracticable. ........................................................... 38

        2. The Class Representatives' claims are typical of the claims of the Settlement Classes. .................................................... 39

        3. The Class Representatives will fairly and adequately protect the interests of the Settlement Classes. ............................. 41

        4. The Settlement Classes are Ascertainable ................................. 41

    B. The Settlement Classes meet the requirements of Rule 23(b)(3). .................. 42

        1. Common questions of law and fact predominate over any questions affecting only individual members of the Settlement Classes. ................. 42

        2. The Settlement Classes are superior to other methods for the fair and efficient adjudication of the controversy. ................................... 44

IV. The Court should approve the form of notice and direct notice to be sent to the Settlement Classes. .......................................................... 44

V. The Court should schedule a final approval hearing. .................................. 45

CONCLUSION .................................................................................. 46

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*532 Madison Gourmet Foods, Inc. v. Finlandia Center, Inc.*,
    96 N.Y.2d 280 (2009) ........................................................................ 1

*Air Cargo Shipping Servs. Antitrust Litig.*,
    2015 WL 5918273 (E.D.N.Y.  Oct.  9, 2015) ................................ 24

*Amchem Prod., Inc. v. Windsor*,
    521 U.S. 591 (1997) ........................................................ 41, 42, 44

*AOL Time Warner, Inc.*,
    2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) .................................... 23

*Baker v. Saint-Gobain Performance Plastics Corp.*,
    No. 17-3942 (2d Cir.) ...................................................................... 4

*Baker v. Saint-Gobain Performance Plastics Corp.*,
    959 F.3d 70 (2d Cir. 2020) .............................................................. 4

*Benoit v. Saint-Gobain Performance Plastics Corp.*,
    959 F.3d 491 (2d Cir. 2020) ............................................................ 1

*Blum v. Stenson*,
    465 U.S. 886 (1984) ...................................................................... 35

*Cardiology Assocs., P.C. v. Nat'l Intergroup, Inc.*,
    1987 WL 7030 (S.D.N.Y. Feb. 13, 1987) .................................... 31

*Caronia v. Philip Morris USA, Inc.*,
    22 N.Y.3d 439 (2013) ...................................................................... 1

*Catholic Healthcare W. v. U.S. Foodservice Inc. (In re Foodservice Inc. Pricing Litig.)*,
    729 F.3d 108 (2d Cir. 2013) .......................................................... 42

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck- Medco Managed Care, L.L.C.*,
    504 F.3d 229 (2d Cir. 2007) .......................................................... 35

*Charron v. Wiener*,
    731 F.3d 241 (2d Cir. 2013) .................................................... 20, 41

*Checking Acct. Overdraft Litig.*,
    275 F.R.D. 654 (S.D. Fla. 2011) .................................................. 24

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974) ................................................................ 25, 31

*Clapp v. Accordia Life & Annuity Co.*,
    No. 2:17-cv-02097-CSB-EIL (C.D. Ill. June 23, 2020) ............................ 24

*Clark v. Ecolab Inc.*,
    2010 WL 1948198 (S.D.N.Y. May 11, 2010) ........................................ 24

*Consol. Rail Corp. v. Town of Hyde Park*,
    47 F.3d 473 (2d Cir. 1995) ................................................................... 38

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007) ................................................................... 41

*EVCI Career Colls. Holding Corp. Sec. Litig.*,
    2007 WL 2230177 (S.D.N.Y. July 27, 2007) ........................................ 19, 35

*Fleisher v. Phoenix Life Ins. Co.*,
    2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015) ...................................... 24

*Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*,
    301 F.R.D. 116 (S.D.N.Y. 2014) ........................................................... 39

*Fresno Cty. Employees' Ret. Ass'n v. Isaacson/Weaver Fam. Tr.*,
    925 F.3d 63 (2d Cir. 2019) ................................................................... 35

*Global Crossing Securities and ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) ........................................................... 31

*Gortat v. Capala Bros.*,
    257 F.R.D. 353 (E.D.N.Y. 2009) ........................................................... 38

*Gulbankian v. MW Mfrs., Inc.*,
    2014 WL 7384075 (D. Mass. Dec. 29, 2014) ...................................... 24

*Hadel v. Gaucho, LLC*,
    2016 WL 1060324 (S.D.N.Y. Mar. 14, 2016) ...................................... 19

*Hall v. Children's Place Retail Stores, Inc.*,
    669 F. Supp. 2d 399 (S.D.N.Y. 2009) ................................................... 26

*Handschu v. Special Services Div.*,
    787 F.2d 828 (2d Cir. 1986) ................................................................ 45

*Hayes v. Harmony Gold Min. Co.*,
    2011 WL 6019219 (S.D.N.Y. Dec. 2, 2011) ........................................ 35, 36

*Hoosick Falls PFOA Cases*,
　　No. 19-cv-018 (N.D.N.Y.) ................................................................. 5

*IMAX Sec. Litig.*,
　　283 F.R.D. 178 (S.D.N.Y. 2012)......................................................... 32

*Initial Public Offering Secs. Litig.* ("*In re IPO*"),
　　671 F. Supp. 2d 467 (S.D.N.Y. 2009)................................... 25, 26, 30

*Interpublic Sec. Litig.*,
　　2004 WL 2397190 (S.D.N.Y. Oct. 26, 2004) .................................... 26

*Lipuma v. Am. Express Co.*,
　　406 F. Supp. 2d 1298 (S.D. Fla. 2005)............................................... 31

*Maley v. Del Global Techs. Corp.*,
　　186 F. Supp. 2d 358 (S.D.N.Y. 2002) ................................................ 31

*Mandel v. Geloso*,
　　206 A.D.2d 699 (3d Dep't 1994) ....................................................... 28

*Marisol A. v. Giuliani*,
　　126 F.3d 372 (2d Cir. 1997)......................................................... 38, 40

*Marsh & McLennan, Cos. Sec. Litig.*,
　　2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009)................................... 31

*McBean v. City of New York*,
　　228 F.R.D. 487 (S.D.N.Y. 2005)....................................................... 43

*McReynolds v. Richards- Cantave*,
　　588 F.3d 790 (2d Cir. 2009)............................................................... 19

*Merrill Lynch Tyco Rsch. Sec. Litig.*,
　　249 F.R.D. 124 (S.D.N.Y. 2008)....................................................... 26

*Millien v. Madison Square Garden Co.*,
　　2020 WL 4572678 (S.D.N.Y. Aug. 7, 2020) .................................... 23

*Moore v. PaineWebber, Inc.*,
　　306 F.3d 1247 (2d Cir. 2002) ...................................................... 42, 43

*Morris v. Affinity Health Plan, Inc.*,
　　859 F. Supp. 2d 611 (S.D.N.Y. 2012)............................................... 23

*Moukengeshcaie v. Eltman, Eltman & Cooper, P.C.*,
　　2020 WL 5995978 (E.D.N.Y.  Apr.  21, 2020)................................. 36

*Nissan Radiator/Transmission Cooler Litig.*,
    2013 WL 4080946 (S.D.N.Y. May 30, 2013) ................................................................ 40

*Nobles v. MBNA Corp.*,
    2009 WL 1854965 (N.D. Cal. June 29, 2009) ........................................................ 31, 32

*PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. Mar. 20, 1997) ............................................................. 23, 24

*Patriot Nat'l, Inc. Sec. Litig.*,
    828 F. App'x 760 (2d Cir. 2020) ........................................................................... 25, 26

*Petrobas Securities*,
    862 F.3d 250 (2d Cir. 2017) ........................................................................................ 41

*Prudential Inc. Secs. Ltd. P'ships Litig.*,
    1995 WL 798907  (S.D.N.Y.  Nov.  20, 1995) .......................................................... 26

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015) ........................................................................................ 42

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993) ........................................................................................ 40

*Rowe v. E.I. DuPont de Nemours & Co.*,
    2008 WL 5412912 (D.N.J. Dec. 23, 2008) .......................................................... 43, 44

*Rubio-Delgado v. Aerotek, Inc.*,
    2015 WL 3623627 (N.D. Cal. June 10, 2015) ........................................................... 24

*Saint-Gobain Performance Plastics Corp. et al. v. Baker et al.*,
    No. 17-493 (2d Cir.) ..................................................................................................... 3

*Seekamp v. It's Huge, Inc.*,
    2012 WL 860364 (N.D.N.Y. Mar. 13, 2012) ............................................................. 40

*Stiglianese v. Vallone*,
    168 Misc. 2d 446 (Civil Ct. Bronx Cnty. 1995) ......................................................... 28

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*,
    258 F. Supp. 2d 254 (S.D.N.Y. 2003) ........................................................................ 31

*Sullivan v. Saint-Gobain Performance Plastics Corp.*,
    No. 16-cv-125 (D. Vt.) ................................................................................................ 16

*Sykes v. Mel S. Harris & Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015) ......................................................................................... 39

*Taylor v. Leardi*,
    120 A.D.2d 727 (2d Dep't 1986) ...................................................................... 28

*Telik Inc. Sec. Litig.*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008) .............................................................. 37

*Trinidad v. Pret a Manger (USA) Ltd.*,
    2014 WL 4670870 (S.D.N.Y. Sept. 19, 2014) ................................................ 26

*Vargas v. Capital One Fin. Advisors*,
    559 F. App'x 22 (2d Cir. 2014) ....................................................................... 45

*Veeco Instruments Inc. Sec. Litig.*,
    2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) .................................................. 35

*Velez v. Novartis Pharm. Corp.*,
    2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010) ................................................ 35

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ......................................................................................... 39

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.* ("*Visa*"),
    396 F.3d 96 (2d Cir. 2005) ....................................................................*passim*

*Warner Commc'ns Sec. Litig.*,
    618 F. Supp. 735 (S.D.N.Y. 1985) .................................................................. 23

*Zeltser v. Merrill Lynch & Co., Inc.*,
    2014 WL 4816134 (S.D.N.Y. Sept. 23, 2014) ................................................ 44

*Zivkovic v. Laura Christy LLC*,
    329 F.R.D. 61 (S.D.N.Y. 2018) ...................................................................... 39

## STATUTES

28 U.S.C. § 1292(b) ................................................................................................... 3

Federal Rule of Civil Procedure 12(b)(6) ................................................................. 3

Federal Rule of Civil Procedure 23 .................................................................*passim*

Federal Rule of Civil Procedure 30(b)(6) ................................................................. 4

Federal Rule of Civil Procedure 41(a)(2) .................................................................. 9

**OTHER SOURCES**

Federal Rule of Civil Procedure 23(C) advisory committee's note to 2018 amendments............ 36

Federal Rule of Civil Procedure 23(e)(2) advisory committee's note to 2018 amendments .. 20, 21

Federal Rule of Civil Procedure 23(e)(C) advisory committee's note to 2018 amendments........ 32

Manual for Complex Litig. (Third) § 30.42 (1995)..................................................................... 23

## INTRODUCTION

The $65,250,000 proposed settlement of this class action represents an excellent recovery for the Settlement Classes in a groundbreaking case—the first since the New York State Court of Appeals' decision in *Caronia v. Philip Morris USA, Inc.*, 22 N.Y.3d 439 (2013), to assess whether asymptomatic individuals exposed to a toxic substance may seek consequential medical monitoring damages.[1] After this Court denied Defendants' motion to dismiss Plaintiffs' claims asserting a toxic injury caused by exposure and accumulation of perfluorooctanoic acid (PFOA) in their blood, the Plaintiffs successfully litigated the legal validity of their claims before the Second Circuit Court of Appeals, obtaining a decision affirming that "allegations of the physical manifestation of or clinically demonstrable presence of toxins in the plaintiff's body are sufficient to ground a claim for personal injury and that for such a claim, if proven, the plaintiff may be awarded, as consequential damages for such injury, the costs of medical monitoring." *Benoit v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 491, 501 (2d Cir. 2020). The Second Circuit's ruling also firmly recognized and affirmed this Court's order holding that under New York law, defendants have a duty to ensure their manufacturing processes do not contaminate drinking water and properties in the surrounding community and that the Court of Appeals' decision in *532 Madison Gourmet Foods, Inc. v. Finlandia Center, Inc.*, 96 N.Y.2d 280 (2009), did not "relieve users of hazardous substances of any duty to avoid allowing those substances to contaminate residents' drinking water." *Benoit*, 959 F.3d at 504.

After extensive motion and appellate practice, discovery, expert analysis, three full-day sessions with a neutral and esteemed mediator, the proposed Settlement before the Court—which includes $20,695,000 in cash payments to class members who asserted diminution in property value claims, $7,761,683 in cash payments to class members who asserted private nuisance

---

[1] Terms that are capitalized in this memorandum shall be defined as they are in the Settlement Agreement.

1

claims, and $22,825,000 to fund a ten-year medical monitoring program designed by Plaintiffs'

expert and medical professional, Dr. Alan Ducatman—will provide Settlement Class Members

with both monetary relief and medical screening for PFOA-related health conditions. This

resolution is supported by each class representative Plaintiff and will assist the Hoosick Falls

community as it continues to recover from the impacts of widespread PFOA contamination

throughout the Village and Town. Moreover, the proposed Settlement represents a resolution

with only three of four named Defendants; Defendant E.I. DuPont de Nemours & Co.

("DuPont") is not be a party to this settlement and Plaintiffs will continue the litigation against

DuPont while the approval process for this settlement proceeds.

Given the risks and uncertainties of continued litigation against all Defendants, including

the uncertainties associated with continued delay of monetary and medical relief to the

Settlement Class Members, the proposed Settlement easily meets the Second Circuit's standard

for preliminary and, ultimately, final approval. Plaintiffs respectfully request that the Court grant

preliminary approval and order notice to be distributed pursuant to the Notice Program.

## BACKGROUND OF THE LITIGATION

On February 24, 2016, Plaintiffs Michele Baker, Angela Corbett, Michelle O'Leary, and

Daniel Schuttig filed the first class action complaint alleging that Defendants Saint-Gobain

Performance Plastics Corp. ("Saint-Gobain") and predecessors of Honeywell International Inc.

("Honeywell") caused community-wide water contamination with the toxic, man-made chemical

PFOA. (Dkt. 1 at 4-5.) Three other putative class action lawsuits were subsequently filed. (*Id.* at

6-7.) On July 27, 2016, the Court consolidated these actions, appointed attorneys from Faraci

Lange, LLP and Weitz & Luxenberg, P.C. as interim co-lead class counsel, and directed

Plaintiffs to file a consolidated pleading. (*Id.* at 13-16.)

Plaintiffs filed a consolidated class action complaint on August 26, 2016. (Dkt. 9.) The

complaint asserted claims for negligence, trespass, nuisance, and strict liability, and sought monetary damages for diminution in property value, discomfort and inconvenience related to the deprivation of potable drinking water and installation of point-of-entry treatment (POET) systems, and a court-ordered medical monitoring program. (*Id.*) Defendants Saint-Gobain and Honeywell moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on September 26, 2016. (Dkt. 13.) Among other things, Defendants argued that New York State law did not allow for asymptomatic plaintiffs exposed to toxic substances to seek consequential medical monitoring damages, (Dkt. 13-1 at 36-41), and that Defendants had no duty to prevent economic harm to neighboring properties, (*id.* at 31-35).

On February 6, 2017, the Court entered an order granting in part and denying in part the motion to dismiss. (Dkt. 33.) In particular, the Court ruled that plaintiffs who obtained their drinking water from the Village Municipal Water System could not state a claim for nuisance because they had not "suffered a unique wrong compared to the rest of the community." (*Id.* at 23.) The Court denied the motion in all other respects. The Court further ruled that Defendants' motion raised "several complex and novel issues of New York law as to which the existing case law is significantly muddled," and *sua sponte* certified its order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). (*Id.* at 36-37.)

Shortly thereafter, Defendants petitioned the Second Circuit Court of Appeals for interlocutory review of this Court's motion to dismiss order and moved to stay all proceedings pending such review. The Second Circuit granted a temporary stay of proceedings while it considered Defendants' petition for review. (*See Saint-Gobain Performance Plastics Corp. et al. v. Baker et al.*, No. 17-493, Dkt. 38 (2d Cir.).) Over nine months later, on December 8, 2017, the Second Circuit denied Defendants' motion to stay proceedings in the District Court but granted the petition for interlocutory review pursuant to 28 U.S.C. § 1292(b). (*Id.*, Dkt. 39.)

Following denial of Defendants' motion to stay proceedings, discovery commenced before this Court. (Joint Declaration of Plaintiffs' Counsel ("Joint Dec."), attached hereto, at ¶¶ 10-14.) The parties engaged in significant discovery efforts, involving several sets of written discovery requests and interrogatories served by and on each party, voluminous document productions, quarterly conferences with Magistrate Judge Stewart, depositions of each Plaintiff as well as eleven depositions of current or former employees of Saint-Gobain and/or Honeywell, Rule 30(b)(6) depositions for each company, and one non-party witness. (*Id.*).

On February 23, 2018, Saint-Gobain and Honeywell filed an opening brief in the Second Circuit seeking reversal of this Court's motion to dismiss order. (*Baker v. Saint-Gobain Performance Plastics Corp.*, No. 17-3942, Dkt. 51-1 (2d Cir.).) The Chamber of Commerce of the United States of America, Pharmaceutical Research and Manufacturers of America, and the Business Council for New York State, as well as the Product Liability Advisory Council and National Association of Manufacturers moved for leave to file two amicus briefs in Defendants' support. (*See id.*, Dkts. 57-1, 66-1.) Plaintiffs opposed these motions, though they were ultimately granted. Plaintiffs filed their opening brief on May 29, 2018. (*Id.*, Dkt. 118.) The Natural Resources Defense Council and Public Justice P.C. each moved for leave to file an amicus brief in support of Plaintiffs. (*Id.*, Dkt. 129, 130.) Defendants filed a reply brief on June 22, 2018, (*id.*, Dkt. 139), and the Second Circuit held oral argument on April 17, 2019. On May 18, 2020, the Second Circuit affirmed this Court's motion to dismiss ruling in all respects, holding that Plaintiffs pled viable common law claims seeking diminution in property value, private nuisance, and medical monitoring damages. *Benoit*, 959 F.3d 491; *see also Baker v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 70 (2d Cir. 2020).

On December 10, 2018, Plaintiffs filed their First Amended Master Consolidated Class Action Complaint, naming Defendants 3M Company ("3M") and E.I. DuPont de Nemours & Co.

("DuPont") as additional Defendants. (Dkt. 79.) In this pleading, Plaintiffs alleged that 3M and DuPont manufactured PFOA and PFOA-containing products that were sold to Saint-Gobain and Honeywell's predecessors. Plaintiffs further claimed that 3M and DuPont inadequately warned their customers of the dangers posed by PFOA's use and thereby breached a duty to those living in proximity to where these products were used. Plaintiffs thereafter propounded discovery requests and interrogatories on each newly-named Defendant and engaged in motion practice with DuPont on the scope discovery. (*See In re Hoosick Falls PFOA Cases*, No. 19-cv-018, Dkt. 19 (N.D.N.Y.).) In response to Plaintiffs' document requests, both 3M and DuPont made extensive document productions. (Joint Dec. at ¶ 13-14.) Between June 23, 2020 and September 2, 2020, Plaintiffs deposed seven former DuPont employees. Each of these depositions occurred via Zoom because of the limitations imposed by the COVID-19 pandemic. (*Id.* at ¶ 15.)

On April 6, 2020, Plaintiffs moved for class certification and served eight expert reports in support. (Dkt. 145.) In their motion, Plaintiffs sought to certify four classes: (i) property owners who obtained drinking water from the Village Municipal Water System and were seeking diminution in property value; (ii) property owners who obtained drinking water from contaminated privately owned wells and were seeking diminution in property value; (iii) property owners and renters who obtained drinking water from a privately owned contaminated well upon which a POET was installed and were seeking nuisance damages; and (iv) individuals exposed to PFOA in their drinking water who subsequently received blood test results demonstrating the presence of PFOA in their blood serum above background levels and were seeking consequential medical monitoring damages. On April 9, 2020, Plaintiffs filed their Second Amended Master Consolidated Class Action Complaint, which conformed the operative pleading to Plaintiffs' motion for class certification.[2] (Dkt. 171.) Defendants answered the Second Amended Complaint

---

[2] Plaintiffs' Second Amended Complaint modified the geographical scope of the proposed Private Well

on June 23, 2020. (Dkts. 187-190.)

On July 30, 2020, Defendants served eight expert reports. The parties thereafter commenced expert deposition discovery, during which sixteen expert witnesses were deposed between October 2020 and December 2020, all via Zoom. (Joint Dec. at ¶ 20.)

Following expert depositions, Defendants filed a joint opposition to Plaintiffs' motion for class certification on January 14, 2021. (Dkt. 230.) Defendants 3M and DuPont filed a separate opposition to class certification raising arguments specific to Plaintiffs' failure to warn claims. (Dkt. 234.) Finally, Defendants filed a joint motion to exclude all of Plaintiffs' expert testimony, as well as a separate motion to strike the testimony of Nicholas P. Cheremisinoff, who passed away in 2020 after authoring his expert report. (Dkts. 229, 232.) Plaintiffs filed replies in support of their motion for class certification and separate briefs in opposition to Defendants' motions to exclude and/or strike expert testimony on February 18, 2011. (Dkts. 244, 245, 247.) Defendants filed replies in support of their motions to exclude and/or strike on March 11, 2021. (Dkts. 260, 262.) On May 7, 2021, the Court denied Defendants' joint motion to exclude Plaintiffs' expert testimony in its entirety. (Dkt. 265.)

## MEDIATION AND SETTLEMENT NEGOTIATIONS

After submission of all papers in support of or in opposition to Plaintiffs' motion for class certification and Defendants' motions to exclude and/or strike expert testimony, the Parties mutually agreed to attempt to mediate a resolution of this matter and each side proposed a list of three mediators. (Joint Dec. at ¶ 23.) The Parties mutually agreed to select Professor Eric Green of Resolutions, LLC as mediator. After an initial joint conference call with Professor Green, the parties were directed to submit Mediation Statements of no more than twenty-five double-spaced

---

Property Damage Class and the Nuisance Class to exclude certain property addresses in the Northeastern portion of the Town of Hoosick. The proposed Settlement, however, includes all contaminated properties in the Town of Hoosick and the owners and renters of those properties with nuisance claims.

pages to the mediator, with copies to all parties by April 2, 2021. The parties also were directed, at their discretion, to submit an ex parte memo to the mediator. After the summaries and ex parte memoranda were submitted, Professor Green spoke to the Plaintiffs' counsel and counsel for each of the Defendants independently in advance of the first scheduled day of mediation. (*Id.*)

On April 12, 2021, the Parties engaged in a full-day mediation before Professor Green. (*Id.* at ¶ 24.) The parties did not reach an agreement in principle by the end of the first day of mediation. When the session ended, Plaintiffs and the Settling Defendants agreed to schedule two additional dates to continue the mediation, April 30, 2021, and May 5, 2021. (*Id.*) Plaintiffs and the Settling Defendants negotiated for another full day on April 30, 2021, but again did not reach an agreement, although progress was made. At the end of the third day of mediation on May 5, 2021, Plaintiffs and the Settling Defendants believed they reached an agreement in principle. In multiple sessions between May 5 and the date the Settlement was executed, the Parties negotiated the detailed Settlement Agreement and associated exhibits, including the parameters of the Medical Monitoring Program. During this process, it became apparent that the parties had not reached agreement as to the geographic scope of the Private Well Water Settlement Class and the Nuisance Settlement Class. (*See* fn. 1, *supra*.) This led to further negotiations between Plaintiffs and the Settling Defendants and eventually to another session with Professor Green on June 29, 2021. During this final session, the settling parties reached agreement on all outstanding terms of the Settlement. (*Id.*)

## SUMMARY OF THE PROPOSED SETTLEMENT TERMS

The proposed Settlement provides for agreed certification of four Settlement Classes, notice, and cash payments to Settlement Class Members as well as funding of the Medical Monitoring Program.

I.      **The Settlement Class Definitions**

A.      **Municipal Water Property Settlement Class:**

All Persons who are or were owners of Residential Property that was supplied with drinking water from the Village Municipal Water System, and who purchased that property on or before December 16, 2015 and owned that property as of December 16, 2015

B.      **Private Well Water Settlement Class:**

All Persons who are or were owners of Residential Property located in the Village of Hoosick Falls or the Town of Hoosick that was supplied with drinking water from a private well in which PFOA was detected, and who owned that property at the time PFOA in the property's private well was discovered through a water test on or after December 16, 2015.

C.      **Nuisance Settlement Class**

All Persons who are or were owners or renters of Residential Property located in the Village of Hoosick Falls or the Town of Hoosick that was supplied with drinking water from a privately owned well in which PFOA was detected, had a point-of-entry treatment (POET) system installed to filter water from that well, and who either (i) owned and occupied that property at the time PFOA in the property's private well was discovered through a water test on or after December 16, 2015; or (ii) rented and occupied the property at the time PFOA in the property's private well was discovered through a water test on or after December 16, 2015.

D.      **Medical Monitoring Settlement Class:**

All individuals who, for a period of at least six months between 1996 and 2016, have (a) ingested water supplied by the Village Municipal Water System or from a private well in the Village of Hoosick Falls or Town of Hoosick in which PFOA has been detected, and (b) underwent blood serum tests that detected a PFOA level in their blood above 1.86 µg/L; or any natural child (i) who was born to a female who meets and/or met the above criteria at the time of the child's birth and (ii) whose blood serum was tested after birth and detected a PFOA level above 1.86 µg/L.

(Settlement at ¶ 1(gg), (jj), (oo), (iii).) The Parties agree, solely for the purposes of settlement, that the Settlement Classes meet the requirements for class certification under Federal Rules of Civil Procedure 23(a) and 23(b)(3).

## II.     Excluded Persons

Excluded from the Settlement Classes will be the following:

i.      any Person who has timely and validly excluded himself, herself or itself from the Settlement Classes, in accordance with Section 12 of the Agreement;

ii.     any Person who has previously filed a lawsuit alleging a PFOA-related injury or illness, including without limitation a spousal derivative claim, or seeking medical monitoring or property damages, related to the presence of PFOA in the Village Municipal Water System, in private wells in the Village or Town, on or at their property, and/or in their blood, except for the Action, that has not been dismissed and/or in which a request to dismiss pursuant to Fed. R. Civ. P. 41(a)(2) is not pending as of thirty (30) days prior to the Fairness Hearing;

iii.    the Settling Defendants, any entity or division in which the Settling Defendants have a controlling interest, their legal representatives in this Action, and their officers, directors, assigns and successors;

iv.     the judge to whom this Action is assigned, any member of the judge's immediate family and the judge's staff, or any other judicial officer or judicial staff member assigned to this case, any Class Counsel, including their partners, members, and shareholders, and any immediate family members of Class Counsel;

v.      any State, including without limitation the United States, or any of its agencies, and the Village of Hoosick Falls and the Town of Hoosick.

(Settlement at ¶ 1(r).)

## III.     Benefits of the Settlement

### A.     The $65.25 million Settlement.

The Settling Defendants have agreed to pay the sum of $65,250,000 into a common Settlement Fund to make cash payments to Settlement Class Members, fund the Medical Monitoring Program for ten years, pay attorneys' fees and case expenses, as well as Administrative Expenses associated with notice, claims administration, opt outs, and objectors. (Settlement at ¶ 2(b).) The Settling Defendants will pay $10 million within twenty (20) days of Preliminary Approval of this Settlement by the Court, which will represent the Preliminary

Settlement Fund. This Fund will be used to pay for the Notice Program and to process claims, opt-outs and objections. This fund will also earn interest that accrues to the benefit of the Nuisance Settlement Classes. (*Id.*) If the Settlement achieves Final Approval and becomes effective, the Settling Defendants will then pay the remaining $55.25 million to create the Settlement Fund. After the Effective Date, not a single dollar will revert to the Settling Defendants under any circumstances. (*Id.*)

### B.    Allocation of Settlement Fund

The Parties propose that the Settlement Fund be allocated as follows between the four Settlement Classes, attorneys' fees, costs, Administrative Expenses and Class Representative Service Awards:

#### 1.    Property Settlement Classes

The sum of twenty million, seven hundred thousand dollars ($20,700,000) shall be allocated from the Settlement Fund for distribution to Property Settlement Class Members who demonstrate eligibility for either the Municipal Water Property Settlement Class or the Private Well Water Property Settlement Class. This portion of the Settlement Fund represents cash payments to compensate class members for diminution of their property value due to the presence of PFOA. (Settlement ¶ 4(a).)

#### 2.    Nuisance Settlement Class

The sum of seven million, seven hundred sixty-one thousand, six hundred eighty-three dollars ($7,761,683), plus the interest earned on the Preliminary Settlement Fund prior to Final Approval, will be allocated from the Settlement Fund for distribution to Nuisance Settlement Class Members who demonstrate eligibility. This portion of the Settlement Fund represents cash payments to compensate class members for the discomfort and inconvenience of temporarily losing their access to potable drinking water and the subsequent installation of POETs in their

homes. (Settlement ¶ 4(b).)

      3.   Medical Monitoring Settlement Class

The sum of twenty-two million, eight hundred thousand dollars ($22,800,000), plus any other remaining portion of the Settlement Fund that is not utilized or allocated for other purposes, shall be allocated from the Settlement Fund to pay for the ten-year Medical Monitoring Program. (Settlement ¶ 4(c).) This portion of the Settlement Fund will provide a program of annual testing and observation for the medical conditions Plaintiffs' expert, Dr. David Savitz, testified are causally linked to PFOA exposure. (Dkt. 165.)

      4.   Attorneys' Fees and Case Expenses

Prior to the Final Approval hearing, Class Counsel will request attorneys' fees of twelve million, three hundred ninety-seven thousand, five hundred dollars ($12,397,500) to be awarded to Class Counsel for their efforts in bringing about the Settlement. This amounts to 19% of the total Settlement Fund. The Settling Defendants have agreed not to oppose the application for attorneys' fees in this amount. (Settlement ¶ 5(a).) Class Counsel will request reimbursement of case expenses incurred to date in the amount of $1,040,817. (*Id.*)

      5.   Service Awards

Class Counsel will request that each of the ten class representative Plaintiffs receive awards of $25,000 for their service to the classes in this case. (Settlement ¶ 5(b).) Each Plaintiff responded to discovery and interrogatories served on them by Defendants, appeared for a deposition (some of which lasted a full seven hours) and represented absent class members by assisting counsel throughout this case and during settlement negotiations. The total of these proposed service awards will be $250,000. The Settling Defendants have agreed not to oppose this application.

6. General Settlement Administration Costs

The General Settlement Administration Costs shall be paid from the Preliminary Settlement Fund and shall not exceed $300,000.[3] These costs shall include, but shall not be limited to, the costs incurred for the performance by the General Administrator of duties related to dissemination of Class Notice, administration of the Escrow Account, processing claims, opt-outs and objections, and administration of the Preliminary Settlement Fund and Settlement Fund in accordance with the Agreement. (Settlement ¶ 5(c).)

7. Excess Funds

To the extent that any amounts remain in the Settlement Fund after all payments have been made to fund all of the Settlement Classes, attorneys' fees and case expenses approved by the Court, and General Settlement Administrative Costs, as well as, any tax-related expenses, and any Court-approved Service Awards, those remaining amounts shall be added to the Medical Monitoring Settlement Class Allocation. (Settlement ¶ 4(d).)

**C.    Class Member Payments**

The General Administrator will provide payments directly to each eligible Property Settlement Class and Nuisance Settlement Class member as follows:

1. Property Settlement Class members

To calculate the Property Settlement Class Member Payment for each class member, the General Administrator shall total the full market values of all Eligible Properties as determined by the 2015 Tax Assessment Roll for the Town of Hoosick, which will comprise the denominator of a fraction.[4] The full market value of each Eligible Property, as determined by the 2015 Tax

---

[3] In the event of exceptional circumstances, the Settlement provides that an additional amount of up to $200,000 may be paid from the Preliminary Settlement Fund for General Administrative Costs.  (Settlement, ¶ 5(c).)

[4] The Settlement calls for use of the 2015 Tax Assessment because it is the last tax year prior to discovery of PFOA contamination in the Village Municipal Water System.

Assessment Roll, shall comprise the numerator of this fraction, which will then be multiplied by the Property Payment Allocation to yield the individual amount due to the Property Settlement Class Member(s) who owned the Eligible Property as of December 15, 2016. The amount payable for each Eligible Property shall be based upon this fraction regardless of the number of owners of such property. If there are multiple Property Settlement Class Members who owned an individual Eligible Property as of December 15, 2016, and demonstrate eligibility in accordance with Section 3(b)(i) or (ii) of the Settlement, the General Administrator shall either make a joint payment to all such Property Settlement Class Members or it shall pay all such members separately in equal shares. (Settlement ¶ 4(a)(i)-(ii).) It is estimated that this payment will equal approximately 63% of the midpoint of the three year and eight year diminution estimates determined by Plaintiffs' expert Dr. Jeffry Zable. (Joint Dec. ¶¶ 36-37.) This estimate is based upon the approximate number of potential Eligible Properties (approximately 1,800) and the average sale price of a home in the Town of Hoosick over the three-year period from 2017-2019. (*See* Expert Rpt. of Jeffrey E. Zabel, Ph.D., Dkt. 168; Joint Dec. ¶¶ 32-36.) If less than 100% of potentially eligible Property Damage Settlement Class members submit Claim Forms and other documents to demonstrate eligibility, then the payment for each property will be higher.

2. <u>Nuisance Class Members</u>

To calculate the Nuisance Settlement Class Member Payment, the Nuisance Payment Allocation shall be divided evenly by the General Administrator among all Nuisance Damage Settlement Class Members who demonstrate eligibility in accordance with Section 3(b)(iii) of the Settlement and an equal share shall be paid to each Nuisance Settlement Class Member. (Settlement ¶ 4(b)(i)-(ii).) It is estimated that each eligible Nuisance Settlement Class member will receive approximately $10,000. (Joint Dec. ¶ 38.) POET systems were installed in approximately 500 homes in the Town of Hoosick and, for purposes of settlement, the Parties

assumed that there are approximately 1.5 residents per home. If less than 100% of potentially eligible Nuisance Settlement Class members submit Claim Forms and other documents to demonstrate eligibility, then the payment for each eligible class member will be slightly higher. If there are more eligible Nuisance Settlement Class members than estimated, the payment could be slightly lower.

### D.   Medical Monitoring Class Program

Following the Effective Date, the General Administrator shall pay $22,800,000, plus any excess funds, into an account established by the Medical Monitoring Administrator for purposes of operating the Medical Monitoring Program. (Settlement ¶ 4(c)(i).) The Medical Monitoring Program shall begin on the Effective Date (as defined in the Settlement, ¶ 1(m)) and shall terminate at the earlier of (a) when the Medical Monitoring Allocation has been expended; or (b) when all bills submitted to the Medical Monitoring Administrator for services under the Medical Monitoring Program rendered on or before the ten (10) year anniversary of the Effective Date are paid. (Settlement ¶ 4(c)(ii).) The testing and services protocols provided by the Medical Monitoring Program, their frequency, and other details concerning the operation of the Medical Monitoring Program, are set forth in Appendix A to the Settlement.

The amount, if any, remaining of the Medical Monitoring Allocation when the Program terminates shall be distributed as follows:

- An amount equal to the Medical Monitoring Disbursement (the amount that has been expended under the Program during its operation) or to the Medical Monitoring Remainder (the amount of the Medical Monitoring Allocation that remains at the termination of the Program), whichever is less, shall be distributed on a pro-rata basis to all Participants in the Medical Monitoring Program based on their level of participation during its term, as determined by

the Medical Monitoring Administrator. For example, Participants who have participated in all services available to them under the Medical Monitoring Program shall receive one pro-rata share, while Participants who have participated in 50% of services available to them under the Medical Monitoring Program shall receive one-half of a pro-rata share. (Settlement ¶ 4(c)(v)(1).)

- In the event the Medical Monitoring Remainder is greater than the Medical Monitoring Disbursement, an amount equal to the difference between the Medical Monitoring Remainder and the Medical Monitoring Disbursement will be paid as a contribution to a not-for-profit organization that focuses on health and well-being of residents in or around the Town of Hoosick that serves the Town of Hoosick and/or Village of Hoosick Falls community. The Parties will work together to identify the appropriate recipient organization within 120 days of the Effective Date and thereafter seek Court approval of their selection. If the recipient organization identified by the Parties ceases to exist at any time after the Effective Date but before termination of the Medical Monitoring Program pursuant to Section 4(c)(ii), the Parties shall meet and confer in good faith to propose a reasonable substitute recipient organization and shall seek Court approval of their proposal.

(Settlement ¶¶ 4(c)(v)(1)-(2).)

### E.    General Settlement Administrator and Medical Monitoring Administrator

The Settlement provides that KCC Class Action Services LLC will serve as the General Administrator. (Settlement at ¶ 2(a)(i).) KCC is a leading class action notice and claims administrator comprised of seasoned class action practitioners. KCC has administered more than

7,000 settlements and has the largest domestic infrastructure in the industry with a large call center that can evaluate thousands of claims per day. (Settlement, Exhibits D & F.) The Settling Defendants do not object to the appointment of KCC as General Administrator.

The Settlement provides that the Medical Monitoring Administrator will be Edgar C. Gentle, Esq. (Settlement ¶ 2(a)(ii).) Mr. Gentle submitted an expert report in this case outlining his experience and skill in administering medical monitoring programs. (*See* Dkt. 163.) In particular, Mr. Gentle has been appointed administrator of four settlements that provide medical testing or access to medical clinics for classes of individuals. (*Id.*) He also provided expert testimony for the plaintiffs in *Sullivan v. Saint-Gobain Performance Plastics Corp.*, No. 16-cv-125 (D. Vt.), a factually similar PFOA class action pending in the District of Vermont. The Settling Defendants do not object to Mr. Gentle serving in this capacity. (Settlement ¶ 2(a)(ii).)

## IV.   Class Notice

Within thirty days of Preliminary Approval, or by the time specified by the Court, the General Administrator shall commence the Notice Program, including by mailing the Notice Form in such form as is approved by the Court. The General Administrator shall transmit the Notice Form via direct mail to all owners of Residential Properties that obtain drinking water from the Village Municipal Water System and owners and renters of Residential Properties in the Town of Hoosick or the Village that obtain drinking water from private wells in which PFOA was detected on or after December 2015. (Settlement ¶ 11(b).) The Settling Defendants have agreed to confidentially provide the General Administrator with the addresses of properties at which PFOA was detected in private wells so that each of these properties receives direct mail Notice. (*Id.* ¶ 11(a).) The Parties respectfully request that the Court approve the Notice form attached as Exhibit B to the Settlement (Exhibit 1 to the Joint Declaration).

Commencing on the Notice Date, the General Administrator will implement the Notice

Program. As set forth in more detail in Exhibit F to the Settlement (Exhibit 1 to the Joint Declaration), the Notice Program shall consist of direct mail; internet, national and social media impressions; a national press release; and a community outreach effort. (Settlement ¶ 11(c).) The General Administrator will also maintain a Settlement Website containing the Second Amended Complaint, this Agreement, the Notice Form, Plaintiffs' motion seeking Preliminary Approval, the Preliminary Approval Order, Plaintiffs' motion seeking Final Approval, the Final Approval Order, the Claim Form, and such other documents as the Parties agree to post or that the Court orders posted. These documents shall remain on the Settlement Website for at least six months after Final Approval. The Settlement Website's URL will be www.hoosickfallspfoasettlement.com. (*Id.* ¶ 11(d).)

As set forth in the proposed Preliminary Approval Order, the Parties also respectfully request that the Court establish the following schedule after Preliminary Approval: (1) deadline for sending Class Notice (the Notice Date): thirty (30) days from Preliminary Approval; (2) Opt-Out Deadline: one hundred and five (105) days from the Notice Date; (3) Objection Deadline: one hundred and five (105) days from Notice Date; (4) deadline for filing motions for approval of Plaintiffs' Service Awards and attorneys' fees and costs: one-hundred fifty (150) days from Preliminary Approval; (5) Fairness Hearing: one-hundred eighty (180) days from Preliminary Approval, or as soon thereafter as is mutually convenient. (Settlement ¶ 8(d).)

## V.    Opt Out Procedures

A Settlement Class Member may opt-out of the Settlement Class at any time prior to the Opt-Out Deadline, which is 105 calendar days from the Notice Date (or such other date as ordered by the Court), provided the opt-out notice that must be sent to the Settlement Administrator is postmarked no later than the Opt-Out Deadline. (Settlement ¶ 12(a).) If a class member jointly owns an Eligible Property with another class member and elects to opt out from

17

the Settlement Class, then all owners of the property shall be deemed to have opted out of the Settlement with respect to that property. (*Id.* ¶ 12(d).)

## VI.    Objection Procedures

The Settlement also provides a procedure for Settlement Class Members to object to the Settlement, to the application for attorneys' fees and costs, and/or to the Service Awards. (Settlement ¶ 13.) Objections must be submitted no later than the Objection Deadline, as specified in the Notice, which is 105 days after the Notice Date (or such other date as ordered by the Court). (Settlement ¶ 1(tt).) If submitted by mail, an objection shall be deemed to have been submitted when postmarked.

## VII.   Attorneys' Fees, Costs, and Service Awards

Attorneys' fees and costs, as determined and approved by the Court, are to be paid out of the Settlement Fund. (Settlement ¶ 2(b)(ii).) Class Counsel intends to apply for an award of attorneys' fees of up to 19% of the $65,250,000 million Settlement Fund, and reimbursement of reasonable litigation costs, to be approved by the Court. (*Id.* ¶ 5(a).) The Settling Defendants agree not to oppose an application for attorneys' fees of up to 19% of the Settlement. (*Id.*)

Subject to Court approval, the Class Representatives shall be entitled to receive a Service Award of up to $25,000 each for their role as the Class Representatives. (*Id.* at ¶ 5(b).) The Service Award shall be paid from the Settlement Fund.

## VIII.  Releases

In consideration for the Settlement, Class Members are releasing claims relating to diminution in property value, nuisance damages and consequential medical monitoring damages arising out of any claims of PFAS exposure or contamination from the Hoosick Falls facilities. Class members will retain their rights to bring claims against the Settling Defendants for any damages (including for screenings, tests, examinations, and/or diagnostic procedures) related to

past, present, or future manifested bodily injuries that result in a medically diagnosed condition allegedly related to PFAS (including PFOA) exposure.[5] In other words, no Settlement Class Member is releasing personal injury claims relating to diagnosed health conditions. The Release language is set forth in Section 6(b) of the Settlement.

## ARGUMENT

Rule 23(e) requires judicial approval of a class action settlement. Fed. R. Civ. P. 23(e). Rule 23(e)(1)(B) directs a court to grant preliminary settlement approval and direct notice to the proposed class if the court "will likely be able to" grant final approval under Rule 23(e)(2) and "will likely be able to" certify a settlement class for purposes of entering judgment. Fed. R. Civ. P. 23(e)(1)(B).

In considering approval of a proposed settlement, courts are mindful of the "strong judicial policy in favor of settlements particularly in the class action context." *McReynolds v. Richards-Cantave*, 588 F.3d 790, 804 (2d Cir. 2009). Given this policy, "[a]bsent fraud or collusion," courts "should be hesitant to substitute [their] judgment for that of the parties who negotiated the settlement." *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05 Civ. 10240 (CM), 2007 WL 2230177, at *4 (S.D.N.Y. July 27, 2007). Moreover, "[c]ourts encourage early settlement of class actions, when warranted, because early settlement allows class members to recover without unnecessary delay and allows the judicial system to focus resources elsewhere." *Hadel v. Gaucho, LLC*, No. 15 Civ. 3706, 2016 WL 1060324, at *2 (S.D.N.Y. Mar. 14, 2016) (collecting cases). This is particularly true in a case such as this one where medical monitoring is to be provided to class members who have been exposed to a toxic substance and where delay in the resolution of the case will lead to delay in providing the essential testing and monitoring needed to assure early diagnosis and treatment of related illnesses.

---

[5] For purposes of the Settlement, "manifested bodily injuries that have resulted in a medically diagnosed condition" do not include the detection or accumulation of PFAS (including PFOA) in blood or other bodily tissue.

Here, the Court should grant preliminary approval because it "will likely be able to" both grant final approval to the Settlement as "fair, reasonable, and adequate" and certify the Settlement Classes for purposes of entering judgment after notice and a final approval hearing.

I.    **The Court "will likely be able to" approve the Settlement as "fair, reasonable, and adequate" under Rule 23(e)(2).**

    A.    **The legal standard for preliminary approval.**

Rule 23(e)(2) sets out the factors a court must consider in determining whether a proposed class action settlement is "fair, reasonable, and adequate." Those factors are whether:

    (A)  the class representatives and class counsel have adequately represented the class;

    (B)  the proposal was negotiated at arm's length;

    (C)  the relief provided for the class is adequate, taking into account:

        (i) the costs, risks, and delay of trial and appeal;

        (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

        (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

        (iv) any agreement required to be identified under Rule 23(e)(3); and

    (D)  the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

As the Advisory Committee's note to the 2018 Rule 23 Amendment explains, subsections (A) and (B) focus on the "procedural" fairness of a settlement and subsections (C) and (D) focus on the "substantive" fairness of the settlement. Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendments. These factors are similar to the "procedural" and "substantive" factors the Second Circuit developed prior to the amendment. *See Charron v. Wiener*, 731 F.3d 241, 247 (2d Cir. 2013) (explaining that courts evaluate procedural and substantive fairness of a class

settlement). The 2018 amendment, however, recognizes that "[t]he sheer number of factors" considered in various Circuits "can distract both the court and the parties from the central concerns that bear on review under Rule 23(e)(2)." Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendments. The 2018 Amendment "therefore directs the parties to present the settlement to the court in terms of a shorter list of core concerns, by focusing on the primary procedural considerations and substantive qualities that should always matter to the decision whether to approve the proposal." *Id.*

## II.     The Proposed Settlement Meets the Requirements For Preliminary Approval.

The proposed Settlement with three of the four Defendants in this case is plainly "fair, reasonable, and adequate" considering the relevant factors, and the Court should grant preliminary approval and direct notice because the Court "will likely be able to" grant final approval after considering those factors.

### A.     The Class Representatives and Interim Class Counsel have adequately represented the Class.

First, the Class Representatives and Interim Class Counsel have adequately represented the Settlement Classes. *See* Fed. R. Civ. P. 23(e)(2)(A). Interim Class Counsel have extensive experience in class action litigation in general and in cases involving environmental contamination. (Joint Dec. §10, and Exhibits 4-6.) Here, Interim Class Counsels' combined expertise allowed them to build a strong case in a highly complex area involving multiple areas of scientific and medical expertise. (*See id*.) Interim Class Counsel were able to develop evidence related to the liability of each Defendant, the fate and transport of PFOA in the environment after being released from aqueous fluoropolymer dispersions used to coat fabrics in Hoosick Falls, the epidemiology of PFOA exposure and appropriate medical monitoring procedures for PFOA-related illnesses. Without their persistence, expertise, and willingness to invest time and financial

resources in this matter, the Settlement Classes would have been left without legal recompense. (*Id*. at § XI.) Interim Class Counsel engaged in extensive written and oral advocacy on the claims, resulting in this Court's denial of Defendants' motion to dismiss and the Second Circuit's affirmance of this Court's Decision and Order. (*Id.* at ¶ 62.)

Interim Class Counsel aggressively pursued discovery of relevant evidence, obtaining millions of pages of documents and electronic files through requests for production served on Defendants and subpoenas served on State agencies, and then organized and reviewed this massive amount of data using a document review platform. (*Id.* ¶¶ 10-16.) Interim Class Counsel conducted nearly two dozen depositions of current and former employees of Defendants, as well as non-parties. (*Id.*) The results of Interim Class Counsel's efforts, along with their significant experience in this type of litigation, culminated in the Settlement for approximately 63% of estimated midpoint between the eight year and three year diminution estimates modeled by Plaintiffs real estate economics expert, Dr. Jeffrey Zabel,  an additional reasonable settlement amount for annoyance and inconvenience suffered by Nuisance Class members for being deprived for approximately six months of the use of their private wells based upon past awards in nuisance cases and sufficient funding for a ten year medical monitoring program providing services for 2,000 participants. (Joint Dec. § IV.) Moreover, because Defendant DuPont is not participating in the Settlement, Interim Class counsel will continue to prosecute this case against DuPont with the potential for further recovery that will likely increase the final recovery for all class members.

Similarly, the class representative Plaintiffs timely responded to written discovery requests and produced hundreds of pages of documents. (*Id.* ¶ 28(F)). The class representative Plaintiffs also timely responded to alleged discovery deficiencies sent by Defendants, which required Plaintiffs to undertake additional time and effort to ensure

discovery compliance, including completing additional document searches and participating in multiple phone calls or in-person meetings with Interim Class Counsel. (*Id.*) Each Class Representative also sat for a full day deposition. (*Id.*) Through their service to the classes, the Class Representatives became the face of this litigation in Hoosick Falls. The Class Representatives also assisted Interim Class Counsel throughout negotiations providing important feedback and then reviewed and approved the terms of the Settlement. (*Id.*)

The class representative Plaintiffs and Interim Class Counsel "have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement." *In re AOL Time Warner, Inc.*, No. 02 CIV. 5575 (SWK), 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006); *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 745 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) (approving settlement where "[d]iscovery is fairly advanced and the parties certainly have a clear view of the strengths and weaknesses of their cases"); *Millien v. Madison Square Garden Co.*, No. 17-CV-4000 (AJN), 2020 WL 4572678, at *5 (S.D.N.Y. Aug. 7, 2020) (same). Accordingly, Interim Class Counsel and the class representative Plaintiffs have adequately represented the Class. Fed. R. Civ. P. 23(e)(2)(A).

## B. The Settlement was negotiated at arm's length.

Next, the Settlement is the product of hard-fought, arm's-length negotiations under a very experienced and well-respected mediator, Professor Eric Green. *See* Fed. R. Civ. P. 23(e)(2)(B). "To determine procedural fairness, courts examine the negotiating process leading to the settlement." *Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 618 (S.D.N.Y. 2012). "A 'presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.'" *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.* ("*Visa*"), 396 F.3d 96, 116 (2d Cir. 2005) (quoting Manual for Complex Litig. (Third) § 30.42 (1995)). Moreover, in such circumstances, "great

weight is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. Mar. 20, 1997); *see also Clark v. Ecolab Inc.*, Nos. 07 Civ. 8623, 04 Civ. 4488, 06 Civ. 5672, 2010 WL 1948198, at *4 (S.D.N.Y. May 11, 2010) ("In evaluating the settlement, the Court should keep in mind the unique ability of class and defense counsel to assess the potential risks and rewards of litigation."). Interim Class Counsel, who have extensive experience litigating and settling environmental contamination cases in New York and across the country, are of the opinion that the Settlement is an outstanding result for the Settlement Classes. (Joint Dec. at ¶ 68.)

Further, the Settlement was reached only after multiple mediation sessions with Professor Eric Green. Professor Eric Green has been recognized as "a highly experienced and very well-regarded mediator," *Fleisher v. Phoenix Life Ins. Co.*, Nos. 11-CV-8405 (CM), 14-cv-8714 (CM), 2015 WL 10847814, at *1 (S.D.N.Y. Sept. 9, 2015). *See also In re Checking Acct. Overdraft Litig.*, 275 F.R.D. 654, 658 (S.D. Fla. 2011) (noting Professor Green is "an experienced and well-respected mediator"); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775 JG VVP, 2015 WL 5918273, at *2 n.3 (E.D.N.Y. Oct. 9, 2015) (same); *Gulbankian v. MW Mfrs., Inc.*, No. CIV.A. 10-10392-RWZ, 2014 WL 7384075, at *1 (D. Mass. Dec. 29, 2014) (same). As the Central District of Illinois observed, Professor Green's "guidance and participation in mediating this matter between the parties, and reviewing their settlement agreement, demonstrates that this matter was negotiated at arm's length and absent any collusion between the parties' counsel to the detriment of the class." *Clapp v. Accordia Life & Annuity Co.*, No. 2:17-cv-02097-CSB-EIL at 26–27 (C.D. Ill. June 23, 2020) (ECF 66). *See also Visa*, 396 F.3d at 117 (agreeing with Professor Green's assessment that the settlement was negotiated at arm's length and was procedurally fair); *Rubio-Delgado v. Aerotek, Inc.*, No. 13-CV-03105-SC, 2015

24

WL 3623627, at *4 (N.D. Cal. June 10, 2015) (same). *See also* Fed. R. Civ. P. 23(e)(2)(A) & (B) advisory committee's note to 2018 amendments ("[T]he involvement of a neutral or court-affiliated mediator or facilitator in those negotiations may bear on whether they were conducted in a manner that would protect and further the class interests.").

This Settlement was negotiated at arm's length and was procedurally fair. *See* Fed. R. Civ. P. 23(e)(2)(B).

### C.     The relief provided for the Settlement Classes is significant, taking into account the relevant factors.

#### 1.     The relief provided by the Settlement is significant.

Perhaps the best indicator of the fairness of the Settlement is the significance of the relief it provides—$65.25 million dollars in total value for the partial settlement of this litigation. This represents a recovery of approximately 63% of the midpoint damage calculation (the mid-point of the three-year analysis and the eight-year analysis) set forth in Dr. Zabel's report. (Joint Dec. § IV(A).) for the Property Damage Settlement Class members, a significant recovery for the Nuisance Class members and a robust Medical Monitoring Program that will provide early diagnosis and opportunities of treatment for approximately 2,000 class members for ten years. (Joint Dec. §IV.)

The Second Circuit has recognized that "[t]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth of a single percent of the potential recovery." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n.2 (2d Cir. 1974). Consistent with that principle, courts often approve class settlements even where the benefits represent "only a fraction of the potential recovery." *See, e.g.*, *In re Initial Public Offering Secs. Litig.* ("*In re IPO*"), 671 F. Supp. 2d 467, 483-85 (S.D.N.Y. 2009). In a recent decision, the Second Circuit upheld approval of a settlement that represented 6.1% of the class's

maximum potential damages. *In re Patriot Nat'l, Inc.  Sec. Litig.*, 828 F. App'x 760, 762 (2d Cir. 2020). And in *In re IPO*, the court approved a settlement that provided only 2% of defendants' maximum possible liability, observing that "the Second Circuit has held that . . . even a fraction of the potential recovery does not render a proposed settlement inadequate." 671 F. Supp. 2d at 484. *See, e.g.*, *In re Prudential Inc. Secs. Ltd. P'ships Litig.*, MDL No. 1005, M-21-67, 1995 WL 798907 (S.D.N.Y. Nov. 20, 1995) (approving settlement of between 1.6 and 5% of claimed damages); *In re Merrill Lynch Tyco Rsch. Sec. Litig.*, 249 F.R.D. 124, 135 (S.D.N.Y. 2008) (approving settlement at 3% of estimated damages); *Hall v. Children's Place Retail Stores, Inc.*, 669 F. Supp. 2d 399, 402 (S.D.N.Y. 2009) (same, 5 to 12% of maximum damages); *In re Interpublic Sec. Litig.*, No. 02 CIV.6527(DLC), 2004 WL 2397190, at *8 (S.D.N.Y. Oct. 26, 2004) (same, 10 to 20%  of damages estimate); *Trinidad v. Pret a Manger (USA) Ltd.*, No. 12 CIV. 6094 PAE, 2014 WL 4670870, at *7 (S.D.N.Y. Sept. 19, 2014) (same, 20 to 25% of maximum recovery). Here, the Settlement easily accords with Second Circuit authorities and will provide monetary relief and medical monitoring services to class members without further delay of this years-long litigation.

i.    Property Damage Settlement Classes

Plaintiffs' expert real estate economist, Dr. Jeffrey Zabel of Tuft's University, has analyzed all real property sales in the Town of Hoosick and compared them to sales in comparable towns near Hoosick whose water was not contaminated with PFOA using what is referred to as the "hedonic regression method" of calculating the effect on the real estate market caused by the contamination. (*See* Zabel Rep., Dkt. 168.) For the four-year period prior to 2016, the year the contamination was discovered, the average sale price (controlling for other variables) between the Town of Hoosick and the control areas tracks similarly. When comparing the sales between the Town of Hoosick and the control group from 2016-2019, after discovery of PFOA,

the average sale price in Hoosick was 21.02% below the control group. When comparing the eight years from 2012-2019, the difference between the sale prices in the Town of Hoosick and the control group is 8.75%. The average sale price of homes in the Town of Hoosick from 2016-2019 was $121,739. Using the 8.75% loss estimation, that translates to $10,652.16 per home. Using the 21% loss estimate, this translates to $25,565 per home. As this Court recognized, "[t]he exact diminution in value depends on how such diminution is defined." (Dkt. 265 at 14.) The midpoint between these two estimated losses is $18,108.68 per home. There are approximately 1300 homes serviced by the Hoosick Falls Village Water District. There are an additional approximately 500 homes in the class area that are serviced by private wells contaminated with PFOA. This Court has ruled that "Dr. Zabel's methodology has been widely and accepted by courts," and "the traditional *Daubert* factors support the admissibility of his testimony." (Dkt. 265 at 15.)

The proposed settlement of $20,700,000 represents approximately 63% of the midpoint damage calculation (the mid-point of the three-year analysis and the eight-year analysis) set forth in Dr. Zabel's report. (Joint Dec. § IV(A).)

The significant recovery strongly supports preliminary approval of the Property Damage Settlement Class Settlement. *See* Fed. R. Civ. P. 23(e)(2)(C).

ii.   Nuisance Damage Settlement Class

Nuisance damage estimates are subjective and left to the discretion of the jury. Eligible members of the Nuisance Settlement Class were deprived of the use of their drinking water for approximately 3-6 months in 2016 after their wells tested positive for PFOA and prior to the installation of a POET filtration system on their well water to remove the toxin. There are approximately 500 homes that may have had eligible Nuisance Settlement Class Members living in these homes, either as owners or renters, at or around the time PFOA was discovered in late

27

2015. To be eligible, the owner or renter had to inhabit the home during these months and thereafter when the POET systems were installed. It is estimated that each Nuisance Settlement Class Member will receive approximately $10,000 for the annoyance and inconvenience they experienced as a result of the private nuisance created by the Processing Defendants (Honeywell and Saint-Gobain).[6] In light of the fact-specific nature of nuisance damages, it is respectfully submitted that this is an appropriate recovery for this class with a total of $7,761,683 to be distributed among eligible class members. *See, e.g.*, *Taylor v. Leardi*, 120 A.D.2d 727 (2d Dep't 1986) ($60,000 awarded to plaintiff in nuisance for damage to home ($18,000) and annoyance and inconvenience of being subjected to blasting); *Mandel v. Geloso*, 206 A.D.2d 699 (3d Dep't 1994) ($4,000 awarded to homeowner living next to motel due to nuisance caused by air conditioning unit noise and odor); *Stiglianese v. Vallone*, 168 Misc. 2d 446 (Civil Ct. Bronx Cnty. 1995) ($25,000 awarded due to loud music causing a nuisance over a three-year period and more than 350 separate instances). The significant recovery strongly supports preliminary approval of the Nuisance Settlement Class. *See* Fed. R. Civ. P. 23(e)(2)(C).

iii.    <u>Medical Monitoring Settlement Class</u>

The amount apportioned to the proposed Medical Monitoring Settlement Class will pay for medical monitoring services for all individuals who consumed contaminated water at their homes for at least six months between 1996 and 2016 and whose blood has been tested for PFOA and found to contain 1.86 ug/L (parts per billion) or more of this toxin. The threshold quantity of PFOA required for inclusion in the class was established by Plaintiffs' expert, Dr. Alan Ducatman, and, as this Court explained, "is consistent with ATSDR regulations concerning medical monitoring." (Dkt. 265 at 10.) In 2016, the NYSDOH provided free blood testing in Hoosick Falls and approximately 2,000 individuals tested above 1.86 ug/L. The Medical

---

[6] Nuisance claims were not alleged against Defendants 3M and DuPont.

Monitoring Program will provide class members with testing and screening intended to provide early diagnosis and treatment of thyroid disease, ulcerative colitis, kidney cancer, testicular cancer, elevated uric acid level, abnormal liver function, hyperlipidemia, and hypertensive disorder related to pregnancy. (Appendix A ¶ d.) Plaintiffs' expert, Dr. David Savitz, has testified that these conditions are caused by exposure to PFOA. This Court ruled that Dr. Savitz's testimony was reliable and consistent with the findings of scientific authorities. (Dkt. 265 at 7-8.)

The Medical Monitoring Program is funded so that it will provide monitoring services for ten years. This represents approximately 40% of a 25 year program. Although it is anticipated that participation in the program will be high, based upon other similar programs previously established in other litigation, it is highly likely that participation will be somewhat less than 100% of those eligible, at least over the ten-year life of the Program. Any money remaining in the Program at its termination will not revert to the Settling Defendants. Instead, the Settlement requires any excess up to an amount equal to the amount expended during the Program's operation to be distributed pro-rata among the participants. (Settlement ¶ 4(c)(v).)  These expected future cash payments may be used by participants to fund continuing monitoring for these individuals beyond ten years or for other purposes at the discretion of the recipient. This means that it is likely participants in the program will receive funding for future monitoring beyond ten years if they choose. In the unlikely event that there is still money remaining after this pro rata distribution, such funds will be provided to a worthy charitable institution in the area with a mission consistent with the goals of the medical monitoring program. (*Id.*)

A medical monitoring program funded for ten years to cover approximately 2,000 participants at a cost of $22,800,000 is a significant recovery strongly supporting preliminary approval of the Medical Monitoring Settlement Class Settlement. *See* Fed. R. Civ. P. 23(e)(2)(C).

**2.      The costs, risks, and delay of trial and appeal make the
relief provided by the Settlement even more valuable.**

The amount of the Settlement is even more significant when considered against the substantial costs, risks, and delays of continued litigation. *See* Fed. R. Civ. P. 23(e)(2)(C)(i). The relief provided by the Settlement is concrete, guaranteed, and immediate, while the results from continued litigation against the Settling Defendants would be delayed at best and lower in value at worst. This is particularly important regarding the Medical Monitoring Settlement Class. More than five years have now elapsed since PFOA contamination was discovered in the Village of Hoosick Falls and the private wells in the Town of Hoosick. If approved, this Settlement will permit monitoring to begin immediately after Final Approval and eligible participants will obtain the benefits of early diagnosis and treatment of any PFOA-related illness. Without this Settlement, it could be several years before such a program could be established after trial.

The Settling Defendants are sophisticated and well-funded opponents with the resources to delay prosecution of the claims at every potential opportunity, through trial and potentially multiple appeals. There is little doubt that continued litigation against the Settling Defendants would likely span years and would be costly to the parties and a tax on judicial resources. Members of the Settlement Classes were likely unable to bring their own claims against the Settling Defendants due to the expense involved in proving these claims when compared to the damages recoverable by individual eligible class members.

Defeating summary judgment, achieving a litigated verdict at trial, and then sustaining any such verdict on appeal is a prolonged, complex, and risky proposition that would require substantial additional time and expense. *See In re IPO*, 671 F. Supp. 2d at 481 (finding that the complexity, expense, and duration of continued litigation supports approval where, among other things, "motions would be filed raising every possible kind of pre-trial, trial and post-trial issue

conceivable"). The substantial risk of continued litigation weighs in favor of approving the Settlement. *In re Global Crossing Securities and ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004).

Apart from substantial risk and expense, courts overwhelmingly recognize that the delay of resolution of the litigation by itself is a significant consideration in approving a settlement. As the Court explained in *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003), "even if a [plaintiff] or class member was willing to assume all the risks of pursuing the actions through further litigation . . . the passage of time would introduce yet more risks . . . and would in light of the time value of money, make future recoveries less valuable than this current recovery." Inevitable litigation delays "not just at the trial stage, but through post-trial motions and the appellate process, would cause Settlement Class Members to wait years for any recovery, further reducing its value." *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002) (citing *Grinnell*, 495 F.2d at 467). *See In re Marsh & McLennan*, *Cos. Sec. Litig.*, No. 04 Civ. 8144(CM), 2009 WL 5178546, at *5 (S.D.N.Y. Dec. 23, 2009) (noting the additional expense and uncertainty of "inevitable appeals" and the benefit of Settlement, which "provides certain and substantial recompense to the Class members now"); *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1322 (S.D. Fla. 2005) (likelihood that appellate proceedings could delay class recovery "strongly favor[s]" approval of a settlement); *Cardiology Assocs., P.C. v. Nat'l Intergroup, Inc.*, No. 85 CIV. 3048 (JMW), 1987 WL 7030, at *3 (S.D.N.Y. Feb. 13, 1987) ("[E]ven assuming a favorable jury verdict, if the matter is fully litigated and appealed, any recovery would be years away.").

The $65.25 million recovery readily falls within the range of reasonable results given the complexity of the case and the significant barriers that stand between today and a final, collected judgment. *Nobles v. MBNA Corp.*, No. C 06-3723 CRB, 2009 WL 1854965, at *2 (N.D. Cal. June

29, 2009) ("The risks and certainty of recovery in continued litigation are factors for the Court to balance in determining whether the Settlement is fair."); Fed. R. Civ. P. 23(e)(2)(C)(i). Again, the added factor of this Settlement funding a medical monitoring program that can begin immediately after Final Approval presents a significant and tangible benefit to the Medical Monitoring Settlement Class members whose medical testing and surveillance for serious illnesses, including cancers, might have to wait years if this Settlement had not been reached.

### 3. The method of distributing the relief to the Settlement Class is highly effective.

In addition to the substantial Settlement Fund, the Settlement also effectively distributes the relief to the Settlement Class Members with only reasonable requirements imposed on class members to establish eligibility, a factor the Court must review under Fed. R. Civ. P. 23(e)(2)(C)(ii). A plan for allocating settlement proceeds, like the Settlement itself, should be approved if it is fair, reasonable, and adequate. *See, e.g.*, *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 192 (S.D.N.Y. 2012). "Measuring the proposed relief may require evaluation of any proposed claims process." Fed. R. Civ. P. 23(e)(C) advisory committee's note to 2018 amendments.

Here, the formula to determine the monetary relief to each member of the Property Settlement Classes is fair and equitable. The Town of Hoosick Tax Assessment Roll for 2015 and its assessment of the *full market value* for each Eligible Property provides an objective and consistent method of valuing properties prior to the discovery of PFOA in the drinking water in late 2015. The Settlement uses this value for each property as a numerator of a fraction and the total full market value of all Eligible Properties as a denominator to fairly apportion the amount allocated to these two classes. Once eligibility is determined, the General Administrator can quickly and easily compute each eligible class member's payment and send that payment expeditiously.

The Settlement requires only that Property Damage Class Members complete a short Claim Form and provide proof of ownership during the relevant time period, water source, and, for Private Well Settlement Class Members, a well test showing PFOA contamination. The General Administrator is also permitted to obtain proof of public water service and contamination of a property's private well through public records or records provided by Defendants, thus eliminating the need for class members to provide such proof, and thereby simplifying and minimizing the burden on class members. (Settlement ¶ 3(b)(i)-(ii).)

Similarly, the Nuisance Settlement Class consists of individuals whose private wells were contaminated with PFOA and who have all suffered similar annoyance and inconvenience damages. Each of these eligible class members will receive a pro-rata share of the amount allocated to the Nuisance Settlement Class shortly after eligibility of all class members is determined by the General Administrator. The General Administrator will determine eligibility based upon documents submitted by the Claimant, publicly available information, information provided by the Settling Defendants concerning properties where POETs were installed, well testing data obtained from state agencies, and a simple declaration of residence signed by each class member at the time he or she submits a Claim Form. (Settlement ¶ 3(b)(iii).) Again, because the General Administrator can obtain certain confirmatory information from sources other than the Claimant, each Claimant's burden is substantially minimized and the likelihood of an eligibility determination increased.

Eligibility for the Medical Monitoring Settlement Class will be determined by proof of a blood test showing PFOA blood levels above 1.86 ug/L, reference to publicly available information regarding water source and testing provided by the Settling Defendants and state agencies, and a simple declaration attesting to residency at a home with contaminated drinking water for a period of at least six months between 1996 and 2016. (Settlement ¶ 3(b)(iv).) For

parents of children who were exposed, similar information will be required to establish the minor's blood level and source of exposure, as well as the mother's blood level if the exposure occurred in utero. (*Id.* ¶ 3(b)(iv). A parent or legal guardian submitting a claim on behalf of a minor must also complete a declaration, the form of which will be provided by the General Administrator, attesting to his or her legal right to submit a claim on the minor's behalf. (*Id.* ¶ 6(d).) Once qualified, the class members will be eligible to receive services outlined in Appendix A to the Settlement without cost to them, which will include blood and urine testing and clinical evaluations on an annual basis for ten years. If development of an illness is suspected, class members will be referred promptly for appropriate diagnosis and treatment. (See Settlement, Appendix A.)

The Settlement's distribution method is ideal and supports approval. *See* Fed. R. Civ. P. 23(e)(2)(C)(ii).

### 4.   Attorneys' fees will be paid only after Court approval and in an amount justified by the Settlement.

Rule 23(e)(2)(C)(iii) requires evaluation of the terms of any proposed attorneys' fees, including timing of payment. The Settlement provides that attorneys' fees will be paid from the Settlement Fund only after a separate application is made, Settlement Class Members have a chance to object, and the Court determines the appropriate amount. Under the Settlement, Settling Defendants will not object to a fee request of up to 19% of the Settlement Fund. While an application for fees has yet to be made, the Notice will explain that Class Counsel will request no more than 19% the Settlement Fund.

A percentage-of the fund fee is appropriate here. As stated by the Second Circuit: "[t]he trend in this Circuit is toward the percentage method which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution

of litigation[.]" *Visa*, 396 F.3d at 121 (internal citations omitted). Indeed, "[t]his is consistent with the line of cases in which the Supreme Court held that in the case of a common fund, the fee awarded should be determined on a percentage-of-recovery basis." *In re EVCI Career Colleges Holding Corp. Sec. Litig.*, No. 05 CIV 10240 CM, 2007 WL 2230177, at *15 (S.D.N.Y. July 27, 2007) (citing, *e.g.*, *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984)).

By contrast, the lodestar method "create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in a gimlet-eyed review of line-item fee audits." *Visa*, 396 F.3d at 121. The percentage approach remedies this central flaw in the lodestar method because class counsel's recovery is linked to the benefit recovered for the class. It "provides class counsel with the *incentive* to maximize the settlement payout for the class because a larger settlement yields a proportionally larger fee." *Fresno Cty. Employees' Ret. Ass'n v. Isaacson/Weaver Fam. Tr.*, 925 F.3d 63, 71 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 385, 205 L. Ed. 2d 218 (2019) (emphasis added). Accordingly, the percentage method is the better method for determining appropriate attorneys' fees in this type of class action.

Moreover, the requested percentage is reasonable. "[F]ederal courts have established that a standard fee in complex class action cases like this one, where plaintiffs' counsel have achieved a good recovery for the class, ranges from 20 to 50 percent of the gross settlement benefit," and "[d]istrict courts in the Second Circuit routinely award attorneys' fees that are 30 percent or greater." *Velez v. Novartis Pharm. Corp.*, No. 04 CIV 09194 CM, 2010 WL 4877852, at *21 (S.D.N.Y. Nov. 30, 2010); *see also Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 235–36 (2d Cir. 2007) (affirming 30% fee award of $42.5 million to counsel); *In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695CM, 2007 WL 4115808, at *1 (S.D.N.Y. Nov. 7, 2007) (awarding 30%); *Hayes v. Harmony Gold Min.*

*Co.*, No. 08 CIV. 03653 BSJ, 2011 WL 6019219, at *1 (S.D.N.Y. Dec. 2, 2011) *aff'd,* 509 F. App'x 21 (2d Cir. 2013) (awarding one-third).

Furthermore, in the calculation of the "overall settlement value for purposes of the 'percentage of the recovery' approach, courts include the value of both the monetary and non-monetary benefits conferred on the Class." *Fleischer v. Phoenix Life Ins. Co.,* Nos. 11-cv-8405 (CM), 14-cv-8714 (CM), 2015 WL 10847814, at *15 (S.D.N.Y. Sept. 9, 2015). Here, the $65.25 million Settlement Fund, which includes notice and administration costs, is all properly considered part of the fund. *See, e.g., Moukengeshcaie v. Eltman, Eltman & Cooper, P.C.*, No. 14CV7539MKBCLP, 2020 WL 5995978, at *2 (E.D.N.Y. Apr. 21, 2020), report and recommendation adopted sub nom., 2020 WL 5995650 (E.D.N.Y. Oct. 8, 2020) (awarding percentage of overall value of fund that included debt forgiveness); *Velez*, 2010 WL 4877852, at *4, *18 (awarding fees on total value of fund, including monetary and nonmonetary relief). The Medical Monitoring Settlement Class allocation provides indirect financial benefit, but more importantly, the possibility of early diagnosis and treatment of illnesses related to consumption of contaminated drinking water.

Simply put, any request for fees will be supported by law and evidence, and such a request supports preliminary approval. *See* Fed. R. Civ. P. 23(e)(2)(C)(iii).

### 5.     Disclosure of side agreements.

Rule 23(e)(2)(C)(iv) requires the Court to consider any side agreements that must be disclosed under Rule 23(e)(3). This is because side agreements can result in inequitable treatment of class members. Fed. R. Civ. P. 23(C) advisory committee's note to 2018 amendments. Here, there are two side agreements that require disclosure. The first involves the percentage of opt-outs compared to the percentage of eligible class members. Under the terms of this side agreement, if a significant percentage of eligible class members opt out of the Settlement, the

Settling Defendants have the option to terminate the agreement. This percentage was placed in a side agreement so as not to incentivize any counsel or group of individuals to attempt to coerce payments of greater benefits or fees by organizing an effort to opt out en masse. (Settlement ¶ 18(b).) There is no cause to doubt the adequacy and fairness of the Settlement by putting this threshold percentage in a side agreement while at the same time alerting class members through the Notice that an unstated but significant percentage of potential class members must participate for the Settlement to proceed.

The second side agreement is an agreement among the Settling Defendants regarding each Defendant's responsibility to pay a percentage of the Settlement Fund. Plaintiffs are not aware of the terms of this agreement, but only its existence.

### 6. The Settlement treats Class Members equitably relative to each other.

The Court must also consider whether the Settlement treats Settlement Class Members equitably relative to one another. *See* Fed. R. Civ. P. 23(e)(2)(D). Here, the Settlement treats Settlement Class Members in all four classes equitably relative to one another because the amount each Property and Nuisance Settlement Class Member receives is based on a fair and transparent formula that guarantees equity. All Medical Monitoring Settlement Class members will also be treated the same and be entitled to the same monitoring protocol once eligibility is determined (with the exception of gender-specific conditions). *See Maley*, 186 F. Supp. 2d at 367 ("An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel."); *In re Telik Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 580 (S.D.N.Y. 2008) ("A reasonable plan may consider the relative strengths and values of different categories of claims.").

III.   **The Court will "likely be able to" certify the Settlement Class for purposes of entering judgment on the Settlement.**

To determine whether the Court will "likely be able to" certify the Settlement Classes for purposes of entering judgment on the Settlement, the Court looks to the requirements of Rule 23(a) (numerosity, commonality, typicality, and adequacy) and the requirements of any subsection of Rule 23(b), here subsection 23(b)(3) (predominance and superiority). The Second Circuit has emphasized that Rule 23 should be "given liberal rather than restrictive construction." *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997). Indeed, it is "beyond peradventure that the Second Circuit's general preference is for granting rather than denying class certification." *Gortat v. Capala Bros.*, 257 F.R.D. 353, 361–62 (E.D.N.Y. 2009) (quotation omitted). For the reasons set forth below, the proposed Settlement Classes meet all of the requirements for certification.

A.   **The Settlement Classes meet the requirements of Rule 23(a).**

1.   **The Settlement Classes are so numerous that joinder of all members is impracticable.**

Rule 23(a)(1) requires that "the class be so numerous that joinder of all members is impracticable." Numerosity does not require a fixed number of class members but "is presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). The Second Circuit has found this requirement met where a class is "obviously numerous." *Marisol A.*, 126 F.3d at 376. Here, each of the Settlement Classes encompasses at least several hundred members. There are approximately 1300 homes that obtain water from the Village Municipal Water System and another 500 homes whose private wells were contaminated with PFOA. In addition, approximately 2,000 individuals obtained blood serum tests demonstrating a PFOA blood level above 1.86 ug/L, which is the threshold for eligibility in the Medical Monitoring Program. Numerosity is easily met with each of the four Settlement Classes. *See Marisol A.*, 126 F.3d at 376.  There are questions of law and fact common to the Settlement

Classes.

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Rule 23(a)(2) is a "low hurdle," *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 131 (S.D.N.Y. 2014), and "for purposes of Rule 23(a)(2) even a single common question will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). Commonality requires only that the proposed class members' claims "depend upon a common contention," which "must be of such a nature that it is capable of class wide resolution," meaning that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. Damages resulting from a "unitary course of conduct" are sufficient to show commonality. *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 85 (2d Cir. 2015). "The claims for relief need not be identical for them to be common." *Zivkovic v. Laura Christy LLC*, 329 F.R.D. 61, 69 (S.D.N.Y. 2018).

Here, each of the Settlement Class Members share the common, class-wide question of whether and to what extent the Settling Defendants are liable for the presence of PFOA in the Village Municipal Water System, in private wells throughout the Town of Hoosick, on class members' properties, and in Medical Monitoring Settlement Class Members' blood; whether the Settling Defendants' actions caused Plaintiffs' property values to diminish; whether the presence of PFOA in a private well constitutes a private nuisance; and whether the Medical Monitoring Settlement Class Members are at increased risk of disease and harm as a result of exposure to PFOA in the class area warranting future medical surveillance. The commonality requirement is satisfied in this case.

> **2.     The Class Representatives' claims are typical of the claims of the Settlement Classes.**

Rule 23(a)(3) requires that the class representatives' claims be "typical" of the claims of

the class. The commonality and typicality requirements tend to merge, and demonstrating typicality under Rule 23(a)(3) requires only that "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A.*, 126 F.3d at 376. The typicality requirement "is not demanding." *Seekamp v. It's Huge, Inc.*, No. 1:09-cv-00018 (LEK/DRH), 2012 WL 860364, at *3 (N.D.N.Y. Mar. 13, 2012). "[D]ifferences in the degree of harm suffered, or even in the ability to prove damages, do not vitiate the typicality of a representative's claims." *In re Nissan Radiator/Transmission Cooler Litig.*, No. 10 CV 7493 VB, 2013 WL 4080946, at *19 (S.D.N.Y. May 30, 2013). Rather, "the typicality requirement requires that the disputed issue of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *Id.* Typicality is therefore satisfied "irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993).

Here, the class representative Plaintiffs' claims arise from the same course of conduct as the claims of the Settlement Classes. In particular, Plaintiffs and Settlement Class Members claim that PFOA contaminated their drinking water, properties, and bodies, causing diminution in property value, nuisance, and personal injury via toxic exposure. Plaintiffs and Settlement Class Members also seek the same damages for these harms. Plaintiffs and Property Settlement Class Members seek diminution in value for the contamination of their properties; Plaintiffs and Nuisance Settlement Class Members seek damages related to the annoyance and inconvenience of temporarily losing access to potable water and the subsequent installation of POETs in their homes; and Plaintiffs and Medical Monitoring Settlement Class Members seek the same medical monitoring relief as a result of exposure and blood accumulation of PFOA. Typicality is satisfied.

### 3.   The Class Representatives will fairly and adequately protect the interests of the Settlement Classes.

Rule 23(a)(4) requires that the class representatives will "fairly and adequately protect the interests of the class." This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Adequacy turns on "whether (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007) (internal quotations omitted).

The first requirement is satisfied by showing that "the members of the class possess the same interests" and that "no fundamental conflicts exist" between the class members. *Charron*, 731 F.3d at 249. Here, the class representative Plaintiffs share the same interests as the Settlement Class in seeking monetary recoveries for property damage and nuisance and establishment of a medical monitoring program to provide regular testing and treatment. Plaintiffs, like all Settlement Class Members, were harmed by the same conduct of the Settling Defendants, and the class representatives have no interests antagonistic to the Settlement Classes. With respect to the second requirement, proposed Interim Settlement Class Counsel are highly qualified and experienced in environmental class actions generally and toxic tort litigation and have worked diligently to prosecute this case to a settlement. (*See* Joint Dec. at §X., Exhibits 4-6.)

### 4.   The Settlement Classes are Ascertainable

The Second Circuit has recognized "an implied requirement of ascertainability in Rule 23, which demands that a class be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *In re Petrobas Securities*, 862 F.3d 250, 257 (2d Cir. 2017) (internal quotation and quotation marks omitted). This is a

"modest threshold requirement [that] will only preclude certification if a proposed class definition is indeterminate in some fundamental way." *Id.* at 269. Here, the Settlement Classes are defined using objective criteria; class membership is based on property ownership or a leasehold interest in the Village of Hoosick Falls and Town of Hoosick, water tests demonstrating PFOA contamination, or blood serum tests demonstrating blood serum levels. These objective criteria allow Settlement Class Members to know whether they are in or out of the classes. Ascertainability is thus satisfied.

### B.    The Settlement Classes meet the requirements of Rule 23(b)(3).

Rule 23(b)(3) requires that common questions of law or fact "predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). This inquiry examines "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. As the Second Circuit has explained, "[p]redominance is satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (quoting *Catholic Healthcare W. v. U.S. Foodservice Inc. (In re Foodservice Inc. Pricing Litig.)*, 729 F.3d 108, 118 (2d Cir. 2013)). Here, the Rule 23(b)(3) requirements are met because the predominant issue in the litigation centers on Defendants' joint and several liability for causing the community-wide contamination of Hoosick Falls with PFOA.

### 1.    Common questions of law and fact predominate over any questions affecting only individual members of the Settlement Classes.

"Class-wide issues predominate if resolution of some of the legal or factual questions . . .

can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002). Where plaintiffs are "unified by a common legal theory" and by common facts, the predominance requirement is satisfied. *McBean v. City of New York*, 228 F.R.D. 487, 502 (S.D.N.Y. 2005).

Here, common questions of law and fact predominate for each of the Settlement Classes. The central issue in this case—Defendants' liability for the community-wide contamination—is subject to classwide proof that would drive resolution of Plaintiffs' claims. Plaintiffs allege that for decades, Saint-Gobain and Honeywell performed the same fabric coating operation at the same facility and allowed uncontrolled PFOA exhaust to exit the stacks and settle across the Hoosick Falls community, and also released liquid waste containing PFOA into the ground that migrated to the Village supply wells. Classwide proof would focus on appropriate pollution controls, or lack thereof, the fate and transport of PFOA to the environment, and the appropriate precautions, if any, taken to prevent widespread contamination. Common proof would likewise focus on knowledge that 3M had regarding PFOA but did not share, as well as the adequacy of any warnings conveyed by 3M to its customers, including Saint-Gobain and Honeywell's predecessors. These central issues are by far the most important in the case and their common resolution would achieve important and dispositive efficiencies. *See Roach*, 778 F.3d at 405. With regard to the Medical Monitoring Settlement Class, Plaintiffs have proposed a class defined by demonstrable exposure provable on a classwide basis, rendering exposure (in addition to liability) a common issue of fact. *See Rowe v. E.I. DuPont de Nemours & Co.*, No. 06-1810 (RMB), 06-3080 (RMB), 2008 WL 5412912, at *14 (D.N.J. Dec. 23, 2008) (explaining that plaintiffs exposed to PFOA may have achieved class certification by "conduct[ing] blood serum tests of the proposed class members to determine whether they indeed have elevated levels of

43

PFOA above the general population, which is useful in determining historical exposure").
According to Plaintiffs' experts, these exposures cause certain health conditions requiring regular
monitoring in an exposed population. In short, the central issues in this case are common and
provable classwide. Predominance is satisfied.

> ### 2. The Settlement Classes are superior to other methods for the fair and efficient adjudication of the controversy.

Resolving this litigation through the Settlement Classes is plainly superior to litigation by
individual Settlement Class Members. Most Settlement Class Members lack the financial
resources to prosecute individual actions, and the value of any individual claim is simply too low
to justify individual cases. *See Amchem Prods.*, 521 U.S. at 617 (explaining that the "policy at
the very core of the class action mechanism is to overcome the problem that small recoveries do
not provide the incentive for any individual to bring a solo action prosecuting his or her rights"
(internal quotation omitted)). This is especially true here against well-funded defendants like
Saint-Gobain, Honeywell, and 3M. "Employing the class device here will not only achieve
economies of scale for Class Members, but will also conserve judicial resources and preserve
public confidence in the integrity of the system by avoiding the waste and delay of repetitive
proceedings and preventing inconsistent adjudications." *Zeltser v. Merrill Lynch & Co., Inc.*, No.
13 Civ. 1531(FM), 2014 WL 4816134, at *3 (S.D.N.Y. Sept. 23, 2014). Accordingly, the
Settlement Classes are the superior method of adjudicating this action.

For all the reasons discussed above, the Settlement Classes meet all of the
requirements for certification and the Court "will likely be able to" certify them for purposes
of entering judgment on the Settlement.

## IV. The Court should approve the form of notice and direct notice to be sent to the Settlement Classes.

Once the Court has determined that preliminary approval is appropriate, it must direct

notice to the proposed class that would be bound by the settlement. Fed. R. Civ. P. 23(e)(1). "The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness." *Visa*, 396 F.3d at 113 (citations omitted). The Court is given broad power over which procedures to use for providing notice so long as the procedures are consistent with the standards of reasonableness that the Constitution's due process guarantees impose. *See Handschu v. Special Services Div.*, 787 F.2d 828, 833 (2d Cir. 1986) ("[T]he district court has virtually complete discretion as to the manner of giving notice to class members."). "When a class settlement is proposed, the court 'must direct to class members the best notice that is practicable under the circumstances.'" *Vargas v. Capital One Fin. Advisors*, 559 F. App'x 22, 26 (2d Cir. 2014) (summary order) (quoting Fed. R. Civ. P. 23(c)(2)(B),(e)(1)). The notice must include: "(i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who request exclusions; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B).

Here, the proposed form of notice, attached as Exhibit B to the Settlement Agreement, plans for disseminating the notice by direct mail, local and national news, and via social media, and proposal to establish a settlement website featuring the notice form constitute the best notice practicable. The form of notice is written in plain language and provides the required information.

### V.    The Court should schedule a final approval hearing.

The last step in the Settlement approval process is a final approval hearing at which the Court will make its final evaluation of the Settlement. Plaintiffs and Interim Class Counsel request that the Court schedule the final approval hearing 180 days after entry of the Preliminary

Approval Order.

## CONCLUSION

The Settlement achieves an outstanding result in complex litigation that advanced the law and will provide class members with substantial monetary relief and a ten-year medical monitoring program. It was achieved after five years of litigation, an appeal to the Second Circuit, and full briefing of class certification and *Daubert* motions, significant discovery and depositions, and three hard-fought mediations that were presided over by a preeminent mediator. The resulting Settlement is fair, adequate and reasonable, and this Court should grant preliminary approval to the Settlement.

Dated:   July 21, 2021
           Rochester, New York

                                   FARACI LANGE, LLP

                                   */s/ Stephen G. Schwarz*
                                   Stephen G. Schwarz, Esq.
                                   Hadley Lundback Matarazzo, Esq.
                                   Office & P.O. Address
                                   28 East Main Street, 11th Floor
                                   Rochester, NY 14614
                                   Telephone:  (585) 325-5150
                                   Email: sschwarz@faraci.com
                                   Email: hmatarazzo@faraci.com

                                   SEEGER WEISS LLP
                                   James J. Bilsborrow, Esq.
                                   55 Challenger Road
                                   Ridgefield Park, NJ 07760
                                   Telephone:  (212) 584-0755
                                   Email:  jbilsborrow@seegerweiss.com

                                   WEITZ & LUXENBERG, P.C.
                                   Robin L. Greenwald, Esq.
                                   700 Broadway
                                   New York, NY 10003
                                   Telephone:  (212) 558-5500
                                   Email:  RGreenwald@weitzlux.com

*Attorneys for Plaintiffs and the Proposed*
*Settlement Classes*

**CERTIFICATE OF SERVICE**

I certify that on July 21, 2021, a true and accurate copy of the foregoing memorandum was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.


_/s/ Stephen G. Schwarz_____