**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHELE BAKER; CHARLES CARR; ANGELA CORBETT; PAMELA FORREST; MICHAEL HICKEY, individually and as parent and natural guardian of O.H., infant; KATHLEEN MAIN-LINGENER; KRISTIN MILLER, as parent and natural guardian of K.M., infant; JENNIFER PLOUFFE; SILVIA POTTER, individually and as parent and natural guardian of K.P, infant; and DANIEL SCHUTTIG, individually and on behalf of all others similarly situated,<br><br>                         Plaintiffs,<br><br>v.<br><br>SAINT-GOBAIN PERFORMANCE PLASTICS CORP., and HONEYWELL INTERNATIONAL INC. f/k/a ALLIED-SIGNAL INC. and/or ALLIEDSIGNAL LAMINATE SYSTEMS, INC., E.I. DUPONT DE NEMOURS AND COMPANY, INC., and 3M CO.,<br><br>                         Defendants. | Case No. 1:16-CV-00917-LEK-DJS |

**JOINT DECLARATION OF STEPHEN G. SCHWARZ, HADLEY
LUNDBACK MATARAZZO, JAMES J. BILSBORROW AND ROBIN
GREENWALD IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF CLASS SETTLEMENT,
PRELIMINARY CERTIFICATION OF SETTLEMENT CLASSES, AND
APPROVAL OF NOTICE PLAN**

We, Stephen G. Schwarz, Hadley Lundback Matarazzo, James J. Bilsborrow and Robin

Greenwald declare as follows:

        1.      Stephen G. Schwarz and Hadley Lundback. Matarazzo, attorneys of record for

Plaintiffs, are partners in Faraci Lange, LLP, appointed Co-Lead Interim Class Counsel by this

Court. Ms. Matarazzo and Mr. Schwarz submit this declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Settlement, Preliminary Certification of Settlement Classes, and Approval of Notice Plan.

2.      James J. Bilsborrow is a partner in Seeger Weiss LLP and is one of the attorneys of record for Plaintiffs. Mr. Bilsborrow submits this declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Settlement, Preliminary Certification of Settlement Classes, and Approval of Notice Plan.

3.      Robin Greenwald, is senior counsel and Environmental Department Manager at Weitz & Luxenberg, LLP, appointed Co-Lead Interim Class Counsel by this Court and is one of the attorneys of record for Plaintiffs. Ms. Greenwald submits this declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Settlement, Preliminary Certification of Settlement Classes, and Approval of Notice Plan.

## I.      THE LITIGATION

4.      This putative class action alleges negligence, nuisance, trespass and strict liability claims against four Defendants for allegedly contaminating the water supply of the Village of Hoosick Falls and numerous private drinking water wells in the Town of Hoosick with the chemical PFOA.  Defendants Saint-Gobain Performance Plastics Corp., ("SGPP") and Honeywell International, Inc. ("Honeywell") operated (or purchased companies that formerly operated) facilities in the Village of Hoosick Falls that utilized PFOA in manufacturing ("Processing Defendants").  Defendant 3M Co., (3M) manufactured APFO used at the Processor Defendants' facilities in Hoosick Falls, which when released into the environment became PFOA.  Defendant E.I. DuPont de Nemours Company, Inc. ("DuPont") manufactured aqueous fluoropolymer dispersions ("AFD") that were used by the Processor

Defendants to coat fabrics and other substrates and at times contained APFO manufactured by Defendant 3M that when heated was released as PFOA into the environment. DuPont and 3M are referred to collectively as the "Manufacturing Defendants".

5.      Four separate class actions were filed in this Court in 2016 all seeking similar relief against Honeywell and SGPP. On July 27, 2016 the Hon. Daniel J. Stewart granted a motion to consolidate the four actions and appointed Weitz & Luxenberg, P.C. and Faraci Lange, LLP as Co- Lead Interim Class Counsel. (Dkt. 1). Thereafter, on August 26, 2016, a Master Consolidated Class Action Complaint was filed against SGPP and Honeywell on behalf of Michelle Baker, Charles Carr, Angela Corbett, Pamela Forrest, Michael Hickey, individually and as parent and natural guardian of O.H., Kathleen Main-Lingener, Kristin Miller, as parent and natural guardian of K.M., James Morier, Jennefer Plouffe, Silvia Potter, individually and as parent and natural guardian of K.Pl and Daniel Schuttig, all individually and on behalf of others similarly situated. (Dkt. 9).

6.      On September 26, 2016, Defendants Saint-Gobain and Honeywell filed a Motion to Dismiss Plaintiffs' Master Consolidated Class Action Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), which the Parties fully briefed. (Dkt. 13.) On February 6, 2017, the Court entered a Memorandum-Decision and Order granting in part and denying in part the Motion to Dismiss. In particular, the Court denied Defendants' motion to dismiss Plaintiffs' claims for negligence and trespass, as well as nuisance claims brought by Plaintiffs who obtain drinking water from a private well, but granted the motion to dismiss nuisance claims alleged by Plaintiffs who obtain drinking water from the Village Municipal Water System. The Court also certified its order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). (Dkt. 33.) On February 16, 2017, Saint-Gobain and Honeywell petitioned the Second

3

Circuit Court of Appeals for permission to appeal pursuant to 28 U.S.C. § 1292(b) and to temporarily stay proceedings in the District Court pending determination of the petition for leave to appeal. Separately, Saint-Gobain and Honeywell each filed an Answer and Affirmative Defenses to the Master Consolidated Class Action Complaint on February 28, 2017.

7.      On March 1, 2017, the Second Circuit granted a temporary stay of proceedings in the District Court pending disposition of the motion to stay by the Court. On December 8, 2017, the Second Circuit denied the motion to stay proceedings in the District Court but granted the petition to appeal this Court's motion to dismiss order pursuant to 28 U.S.C. § 1292(b).

8.      On December 10, 2018 Plaintiffs filed a First Amended Master Consolidated Class Action Complaint adding 3M and DuPont as Defendants and removing Plaintiff James Morier as a class representative.

9.      On February 23, 2018, Saint-Gobain and Honeywell filed an opening brief in the Second Circuit. This was followed by full briefing as well as multiple amicus briefs and oral argument. The Second Circuit ultimately affirmed this Court's motion to dismiss order on May 18, 2020.

**A. Discovery**

10.     Following denial of Defendants' motion to stay proceedings, discovery commenced before this Court.

11.     The parties thereafter engaged in significant discovery efforts, involving several sets of written discovery served by and on each party including interrogatories and requests for document production.  Interrogatories were answered, voluminous document productions and the parties frequently met and conferred in an attempt to avoid discovery disputes requiring court intervention.   Quarterly conferences with Magistrate Judge Stewart were held to discuss

progress as well as any unresolved discovery issues.

12.     Depositions of each Plaintiff as well as 11 depositions of current or former employees of Saint-Gobain and/or Honeywell, Rule 30(b)(6) deponents for each company, and one third-party witness were held beginning in December of 2018.

13.     After Answers were served by 3M and DuPont, Plaintiffs propounded document requests and interrogatories these Defendants and engaged in motion practice with DuPont on the scope of discovery before Magistrate Judge Stewart. In response to Plaintiffs' document requests, both 3M and DuPont made extensive document productions.

14.     Several million pages of documents were produced collectively by Defendants and reviewed and analyzed by Plaintiffs' counsel through the use of a digital document review platform and third-party host system that allowed multiple counsel access from different locations.  Documents were also subpoenaed from the New York State Department of Environmental Conservation and the New York State Health Department relevant to the litigation.  These were also reviewed and analyzed by Plaintiffs' counsel and experts retained by Plaintiffs' Counsel.

15.     Between June 23, 2020 and September 2, 2020, Plaintiffs deposed seven former DuPont employees. Each of these depositions occurred via Zoom because of the limitations imposed by the COVID-19 pandemic.

16.     The depositions of witnesses lasted between 7 and 9 hours each and for most defense witnesses spanned more than one day.

**B.  Motion for Class Certification**

17.     On April 6, 2020, Plaintiffs filed a Notice of Motion for Class Certification. In their motion, Plaintiffs sought to certify four classes, as follows: (i) a class of property owners

who obtain drinking water from the Village Municipal Water System; (ii) a class of property owners who obtain drinking water from privately owned wells; (iii) a class of property owners and renters who obtain drinking water from a privately owned well upon which a point-of-entry treatment (POET) system was installed; and (iv) a class of individuals exposed to PFOA in their drinking water who subsequently received blood tests demonstrating the presence of PFOA in their blood serum. On April 9, 2020, Plaintiffs filed their Second Amended Master Consolidated Class Action Complaint. All Defendants filed an Answer and Affirmative Defenses to this pleading on July 23, 2020.

18.     Defendants filed a joint opposition to Plaintiffs' Motion for Class Certification on January 14, 2021. Defendants 3M and DuPont filed a separate opposition to class certification raising additional, distinct arguments on the same date.  Plaintiffs filed replies in support of their Motion for Class Certification to each opposition brief on February 18, 2021.

### C. Experts and Expert Depositions

19.     Plaintiffs' counsel retained eight different experts and produced reports from these experts at the time the Class Certification motion was filed on April 6, 2020.  These experts spanned the following disciplines:  environmental engineering and fate and transport of PFOA in the environment; hydrogeology; environmental medicine; epidemiology; pollution control and industrial standard of care, real estate economics; particulate air modeling; and medical monitoring program design and administration.

20.     On July 30, 2020, Defendants served eight responsive expert reports. The parties thereafter commenced expert deposition discovery, during which sixteen expert depositions were conducted between October 2020 and December 2020, all via Zoom.

**D.** *Daubert* **Motions**

21.     Following completion of expert depositions, on January 14, 2021 Defendants filed a joint Motion to Exclude Plaintiffs' Expert Testimony against all of Plaintiffs' experts. Plaintiffs filed an opposition to Defendants' motion to exclude expert testimony on February 18, 2021. Defendants filed a reply in support of their Motion to Exclude Plaintiffs' Expert Testimony on March 11, 2021.

22.     On May 7, 2021 this Court issued a Decision and Order denying Defendants' motions to exclude Plaintiffs' experts under *Daubert*. (Dkt. 265.)

## II.     MEDIATION AND SETTLEMENT NEGOTIATIONS

23.     After submission of all supporting and opposition papers on Plaintiffs' Motion for Class Certification and Defendants' Motion to Exclude Expert Testimony, the Parties mutually agreed to attempt to mediate a resolution of this matter and each side proposed a list of three mediators to select from.  The Parties mutually agreed to select Professor Eric Green of Resolutions, LLC as mediator.  After an initial joint conference call with Prof. Green, the parties were directed to submit Mediation Summaries of no more than twenty-five (25) double-spaced pages to the mediator, with copies to all parties by April 2, 2021.  The parties also were directed, at their discretion, to submit an ex parte memo to the mediator.  After the summaries and ex parte memos were submitted, Prof. Green spoke to the Plaintiffs' counsel and counsel for each of the four Defendants independently in advance of the first scheduled day of mediation.

24.     On April 12, 2021, the Parties engaged in a full-day mediation before Prof. Green. When the session ended on April 2 the Plaintiffs and the Settling Defendants agreed to schedule two additional dates to continue the mediation, April 30, 2021 and May 5, 2021.

Plaintiffs and the Settling Defendants negotiated for another full day on April 30, 2021 but again did not reach an agreement, although progress was made.  At the end of the third day of mediation on May 5, 2021, Plaintiffs and the Settling Defendants believed they reached an agreement in principle. In multiple sessions between May 5 and the date the Settlement was executed, the Parties negotiated the detailed Settlement.  During this process it became apparent that the parties had not reached agreement as to the geographical scope of the Private Well Water Settlement Class, the Nuisance Settlement Class and the Medical Monitoring Settlement class.  This led to further negotiations between the three Settling Defendants and Plaintiffs and eventually another session with Professor Green on June 29, 2021.  During this final session, the parties reached agreement on all outstanding terms of the Settlement that is being presented to the Court for preliminary approval.  However, several other sessions were required to work out the final language for the Settlement Agreement and related documents.

## III.    THE PROPOSED SETTLEMENT

25.    The terms of the settlement are set forth in the executed Settlement Agreement ("Settlement") attached as Exhibit 1 to this Declaration including Exhibits A-F to that Agreement which are identified in Appendix B to the Agreement.  The Settlement before this Court is between Plaintiffs and Defendants SGPP, Honeywell and 3M ("Settling Defendants).  The Settlement seeks approval of four settlement classes:

### A.    Municipal Water Property Settlement Class:

All Persons who are or were owners of Residential Property that was supplied with drinking water from the Village Municipal Water System, and who purchased that property on or before December 16, 2015 and owned that property as of December 16, 2015;

### B.    Private Well Water Settlement Class

All Persons who are or were owners of Residential Property located in the Village of Hoosick Falls or the Town of Hoosick that was supplied with drinking water from a

private well in which PFOA was detected, and who owned that property at the time PFOA in the property's private well was discovered through a water test on or after December 16, 2015;

**C.    Nuisance Settlement Class**

All Persons who are or were owners or renters of Residential Property located in the Village of Hoosick Falls or the Town of Hoosick that was supplied with drinking water from a privately owned well in which PFOA was detected, had a point-of-entry treatment (POET) system installed to filter water from that well, and who either (i) owned and occupied that property at the time PFOA in the property's private well was discovered through a water test on or after December 16, 2015; or (ii) rented and occupied the property at the time PFOA in the property's private well was discovered through a water test on or after December 16, 2015

**D.    Medical Monitoring Settlement Class:**

All Persons who, for a period of at least six months between 1996 and 2016, have (a) ingested water supplied by the Village Municipal Water System or from a private well in the Village of Hoosick Falls or Town of Hoosick in which PFOA has been detected, and (b) underwent blood serum tests that detected a PFOA level in their blood above 1.86 µg/L; or any natural child (i) who was born to a female who meets and/or met the above the above criteria at the time of the child's birth and (ii) whose blood serum was tested after birth and detected a PFOA level above 1.86 µg/L;

26.    Excluded from the Settlement Classes will be the following:

i.    any Person who has timely and validly excluded himself, herself or itself from the Settlement Classes, in accordance with Section 12 of the Settlement,

ii.    any Person who has previously filed a lawsuit alleging a PFOA-related injury or illness, including without limitation a spousal derivative claim, or seeking medical monitoring or property damages, related to the presence of PFOA in the Village Municipal Water System, in private wells in the Village or Town, on or at their property, and/or in their blood, except for the Action, that has not been dismissed and/or in which a request to dismiss pursuant to Fed. R. Civ. P. 41(a)(2) is not pending as of thirty (30) days prior to the Fairness Hearing,

iii.    the Settling Defendants, any entity or division in which the Settling Defendants

have a controlling interest, their legal representatives in this Action, and their

officers, directors, assigns and successors;

iv.    the judge to whom this Action is assigned, any member of the judge's immediate

family and the judge's staff, or any other judicial officer or judicial staff member

assigned to this case, (vi) any Class Counsel, including their partners, members,

and shareholders, and any immediate family members of Class Counsel,

v.    any State, including without limitation the United States, or any of its agencies,

and (viii) the Village of Hoosick Falls and the Town of Hoosick.

27.    The Settling Defendants have agreed to pay the sum of $65.25 Million Dollars

into a common Settlement Fund to fund all of the Settlement Classes, attorneys' fees and case

expenses, as well as Administrative Expenses associated with notice, opt outs and objectors.

(Exhibit 1, Settlement at §2(b).) The Settling Defendants will pay $10 million dollars within

twenty (20) days of preliminary approval.  This Fund will be used to pay administration

expenses for providing notice to potential class members and processing claims, opt-outs and

objections.  This fund will also earn interest that accrues to the benefit of the Nuisance

Settlement Classes. (*Id.*) In the event that the Settlement is not ultimately approved, the

remainder of this fund will be returned to the Settling Defendants.  (*Id.* at §18(e)(ii).)  Under

no other circumstances will any of this fund revert to the Settling Defendants.  The remaining

$55.25 million dollars will be paid into the common Settlement Fund by the Settling

Defendants within twenty (20) days of this Court granting final approval of the Settlement. (*Id.*

at §2(b)(ii).)

28.    The Parties propose that the Settlement Fund be allocated as follows between

the four Settlement Classes, Attorneys' Fees, Costs, Administrative Expenses and Class

Representative Service Awards:

      A.  <u>Property Settlement Classes</u>

The sum of TWENTY MILLION, SIX HUNDRED NINETY-FIVE THOUSAND, DOLLARS ($20,700,000) shall be allocated from the Settlement Fund for distribution to Property Settlement Class Members who demonstrate eligibility for either the Municipal Water Property Settlement Class or the Private Well Water Property Settlement Class.

      B.  <u>Nuisance Settlement Class</u>

The sum of SEVEN MILLION, SEVEN HUNDRED SIXTY-ONE THOUSAND, SIX HUNDRED EIGHTY-THREE DOLLARS ($7,761,683) plus the interest earned on the Settlement Fund prior to final approval shall be allocated from the Settlement Fund for distribution to Nuisance Settlement Class Members who demonstrate eligibility.

      C.  <u>Medical Monitoring Settlement Class</u>

The sum of TWENTY-TWO MILLION, EIGHT HUNDRED THOUSAND, DOLLARS ($22,800,000) plus any other remaining portion of the Settlement Fund that is not utilized or allocated for other purposes shall be allocated to the Medical Monitoring Program from the Settlement Fund.

      D.  <u>Attorneys' Fees</u>

Class Counsel will request at final approval that attorneys' fees of TWELVE MILLION THREE HUNDRED NINETY-SEVEN THOUSAND FIVE HUNDRED DOLLARS ($12,397,500), be awarded to Class Counsel for their efforts in bringing about the Settlement. This amounts to 19% of the total Settlement Fund.  The Settling Defendants have agreed not to oppose the application for attorneys' fees in this amount.

      E.  <u>Case Expenses</u>

Class Counsel will request reimbursement of case expenses in the amount of $1,040,817.

    F.   <u>Service Awards</u>

Class Counsel will request that each of the ten class representatives receive awards of $25,000 each for their service in responding to discovery and interrogatories served on them by Defendants, appearing for full day depositions in this matter and serving as representatives of class members to assist counsel throughout this case and during settlement negotiations. The total of these proposed service awards will be $250,000. The Settling Defendants have agreed not to oppose this application.

    G.   <u>General Settlement Administration Costs</u>

The General Settlement Administration Costs shall be paid from the Settlement Fund and shall not exceed $300,000. (Exhibit 1, Settlement, §5(c).) An additional $200,000 may be paid for these expenses in exceptional circumstances. (*Id.*) These costs shall include, but shall not be limited to, the costs incurred for the performance by the General Administrator of duties related to dissemination of Class Notice, administration of the Escrow Account, processing claims, opt-outs and objections and administration of the Settlement Fund in accordance with the Agreement.

    H.   <u>Excess Funds</u>

To the extent that any amounts remain in the Settlement Fund after all payments have been made to fund all of the Settlement Classes, Attorneys' Fees and Case Expenses approved by the Court at Final Approval and General Settlement Administrative Costs as well as, any tax-related expenses, and any Court-approved Service Awards, those remaining amounts shall be added to the Medical Monitoring Settlement Class Allocation. (*Id.* at §4(d).)

12

29.     Although the class definitions for the Private Well Property Damage Class, the Nuisance Class and the Medical Monitoring Class proposed in Plaintiffs' motion for class certification designated a class area of less than the entire Town of Hoosick, the parties have negotiated a settlement that includes the entire Town of Hoosick for these three proposed Settlement Classes.

30.     The proposed claims process and determination of what each eligible class member will receive is as follows:

    A.  Property Damage Settlement Classes – The Town of Hoosick has publically available tax rolls for each year in which the full market value as determined by the Town Assessor is listed for each property.  It is proposed that the tax year 2015 be selected for use in the property damage allocation process because this was the most recent year full market values of properties in the Town were determined prior to the discovery of the drinking water contamination.  The Settlement provides that a fraction be created for each eligible property in the Property Settlement Classes with the numerator of this fraction being the full market value of the property as set forth on the Town of Hoosick Tax Roll for 2015 and the denominator of the fraction being the total full market value of all eligible properties.  This fraction will then be multiplied by the total amount allocated to the Property Settlement Classes ($20,700,000) to determine the amount the owner(s) of each eligible property will receive.  The claims process will require the property owners to complete a simple Claim Form and provide proof of ownership, unless ownership can be determined by the General Administrator through public records, and proof of contamination, in the case

of a private well, or proof that the property is serviced by the Village of Hoosick

Falls municipal water system.  (*Id.* at §4(a).)

B.  <u>Nuisance Settlement Class</u> – Each eligible member of the Nuisance Settlement

Class will receive a pro-rata share of the total amount allocated to this class

($7,761,683).  To be eligible, a class member must submit a declaration that

establishes they resided at a property serviced by a private well at the time it

was discovered to be contaminated with PFOA and proof of either an ownership

or leasehold interest in such property at such time.  (*Id.* at §4(b).).

C.  <u>Medical Monitoring Settlement Class</u> – All members of the Medical Monitoring

Settlement Class will be eligible to receive the same testing and clinical services

except those that are specific to gender.  (*Id.*, Appendix A).

## IV.     ADEQUACY OF THE SETTLEMENT

### A.     Property Damage Settlement Classes

31.     As stated above, the Settlement is with three of the four Defendants in this case.

Plaintiffs' counsel will continue to pursue the fourth Defendant, DuPont, through trial unless

a resolution with this defendant is reached sooner.  As a result, the amount being offered by

the Settling Defendants must be viewed as only a partial recovery on all property damage and

medical monitoring claims and further recovery for these classes is probable.

32.     To assist in evaluating the reasonableness of the amount apportioned to the

Property Damage Settlement Classes, Plaintiffs utilized information and opinions developed

by their retained expert, Dr. Jeffrey Zabel.  Dr. Zabel is an expert in real estate economics and

is well-qualified and has extensive experience analyzing the environmental impacts on real

estate markets using econometric models. He is a professor of economics at Tufts University

and co-director of its Masters' Program in Data Analytics. (Dkt. 168, Zabel Rpt. at 1.) Dr.

Zabel has published over 35 articles in peer-reviewed economics journals, as well as several book chapters, a number of which analyze the impacts of Superfund designations or other environmental pollution on real estate markets. (*Id.*) To isolate and measure the average percent diminution in value attributable to the market's perception of PFOA contamination in Hoosick Falls, Dr. Zabel designed and applied a hedonic regression model.  A hedonic regression model is a statistical tool used to measure the price impact associated with a particular attribute by isolating that attribute from other variables that may affect value.

33.     Dr. Zabel collected data on all single-family home sales in Rensselaer and Washington Counties from 1998 through September 2019. (Dkt. 168, Zabel Rpt. at 3.) He removed "outlier" properties from this data set—those for which certain data was missing, homes outside the 1st and 99th percentile in square footage, parcels in excess of 10 acres, and foreclosure sales. (*Id.* at 3-4.) Dr. Zabel then designed a hedonic model, "which explains variations in sales price as a function of property characteristics, location (jurisdiction) attributes, and changes over time." (*Id.* at 4.) The model specifically includes several property characteristics that typically influence value, such as the age of the home, lot size, the number of bedrooms and bathrooms, and square footage. (*Id.* at 4-5.)

34.     Dr. Zabel defined the Town of Hoosick as the relevant market after reviewing state and federal communications, advisories, and media reports that described PFOA contamination throughout both the Village and Town. (Dkt. 168, Zabel Rpt. at 3.) He then identified five "control towns"—nearby communities with real estate markets comparable to Hoosick Falls—and compared sales prices in the Town of Hoosick to those in the controls.[1] Prior to 2016, before information regarding PFOA contamination in Hoosick Falls was widely

---

[1] The "control towns" consist of Jackson, Easton, Schaghticoke, Brunswick, and Poestenkill. (Dkt. 168, Zabel Rpt. at 5.)

available to the market, property values in Hoosick and the control towns were comparable. (*Id.* at 7-8) Beginning in 2016, however, property values in Hoosick deviated sharply from the control towns, a trend that continue through the end of September 2019. (Dkt. 168, Zabel Rpt. at 7-9.) "The results indicate that properties in Hoosick have been depressed by at least 8.75 percent, and as much as 20 percent or more" as a result of the market's perception of PFOA contamination. (*Id.* at 1.) The exact diminution in value depends on how such diminution is defined: whether one considers the price impact only in 2016 (24%); whether one considers the price impact since the discovery of PFOA (2016-2019) (21%); or whether one determines price impact by considering a period both before and after discovery of PFOA (2012-2019) (8.75%). (*Id.* at 8-9.) Each output shows that the widespread contamination in Hoosick diminished property values, results that are statistically significant. (*Id.* at 8-9.)

35.　　From the data analyzed, Dr. Zabel was also able to calculate the average sale price of a home in Town of Hoosick (which includes the Village of Hoosick Falls) since the contamination was discovered (2016-2019), which was $121,739.  Using Dr. Zabel's hedonic model valuation at 8.75% diminution estimate, this translates to an average loss per home of $10,652.16.  Using the 21% diminution estimate, this translates to an average loss of $25,565.19 per home.   The midpoint between these two estimates, is $18,108.68 per home.

36.　　It is estimated that there are approximately 1,300 homes serviced by the Hoosick Falls Village water system and an additional 500 homes with contaminated private wells in the Town of Hoosick with POET systems installed.  If the total amount allocated to the Property Damage Settlement Classes ($20,700,000) is divided by 1800 it yields an average recovery of $11,500 per home.  This represents 63% of the average loss per home at the midpoint between the 21% diminution estimate and the 8.75% diminution estimate.  These are

estimates based upon currently available data, and the methodology outlined above.  But each property owner will in all cases receive a share of the recovery based upon the full market value of her property prior to the contamination being discovered as compared to the full market value of all eligible properties.  In this way each property owner will be treated fairly with owners of more valuable properties receiving a higher dollar amount but each class member will receive an equal percentage of full market value.

37.     Accordingly, in this partial settlement it is projected that the Property Damage Settlement Class members will recover 63% of the midpoint estimate by Dr. Zabel of damages for diminution of property values.

### B.     Nuisance Settlement Class

38.     As mentioned above, it is estimated that there are approximately 500 residential homes with private contaminated wells.   Owners who resided in these homes at the time the contamination was discovered and lessors of such homes who occupied the homes at that time would be eligible for the Nuisance Damage Settlement Class.  It is unknown how many owners/lessors would qualify per property.  Assuming that there is an average of 1.5 eligible nuisance class members per home, each nuisance class member would receive $10,348 per class member.[2]

39.     Damages recoverable in nuisance are for annoyance and inconvenience experienced by class members as a result of the nuisance allegedly created by defendants SGPP and Honeywell by releasing PFOA into the community. These damages are intended to compensate for the loss of use of their usual source of drinking water for several months between the time the contamination was discovered and the time the Village water system and

---

[2] New York law restricts nuisance claims to individuals with a property interest in the affected property.  *See Swearingen v. Long*, 889 F.Supp. 587, 592-593 (N.D.N.Y. 1995).

the private wells were provided with filtration systems.   This period varied between three and six months for all class members.   Accordingly, $10,348 per class member is a reasonable recovery based upon past reported nuisance jury awards.  Because there is no claim in nuisance alleged against DuPont, this would be the entire recovery for each nuisance class member. Nevertheless, this is a reasonable recovery based upon the damages suffered.

### C.   Medical Monitoring Settlement Class

40.     Plaintiffs' expert, Dr. Alan Ducatman, has proposed a medical monitoring program for those exposed to PFOA through contaminated drinking water in the class area who are measured to have over 1.86 ug/L of PFOA in their blood.  It is believed that approximately 2,000 people from the Town of Hoosick area tested with greater than 1.86 ug/L in testing performed in 2016 and 2018.

41.     Plaintiffs have also retained experts on health economics to estimate the cost of a 30 year medical monitoring program.   Based upon these cost estimates, the amount allocated to the Medical Monitoring Settlement Class of $22,800,000 will be sufficient to pay for a medical monitoring program lasting at least ten years assuming 2000 participants.

42.     The Settlement provides that any funds left over after the ten year program ends will be distributed pro-rata to the participants in the program based upon their level of participation over the ten year duration.  In other words, someone who participated in all benefits of the program for ten years would receive a full pro-rata share, but someone who participated in only 50% of the services offered would receive a ½ pro-rata share.  This additional cash distribution to class members, if it occurs, may be used to continue their monitoring beyond ten years or for other purposes at the participant's discretion. Based upon participation rates in other similar programs, it is unlikely that 100% of those eligible will participate in the entire program, so those that do participate are likely to receive significant

18

cash payments at the end of ten years that will fund additional monitoring and provide further benefit.  Moreover, it is expected that the opportunity for a cash payment at the end of ten years will encourage participation, which will benefit more eligible class members.

43.    Additionally, as mentioned above, this is only a partial settlement and further recovery is anticipated.

44.    The Settlement further provides that in the event the amount left over in the fund from this Settlement after the ten year program ends exceeds the amount that was expended from that fund during this ten year period, the amount of this differential would be paid to a health oriented charitable organization selected by the parties with a mission consistent with the goals of the program.

45.    Based upon all of the above, the proposed settlement is reasonable and adequate for the Medical Monitoring Settlement Class.

## V.    SIDE AGREEMENTS

46.    The Settlement incorporates a Supplemental Agreement that will not be publically disclosed. This agreement establishes a threshold for opt outs that if exceeded provides the Settling Defendants option to void the settlement.  It was jointly agreed that making this specific threshold number public could potentially encourage an organized effort to solicit opt outs to try to gain additional benefits for a small group of class members to the detriment of the majority of class members.  The Settling Defendants have also entered into a confidential agreement specifying the relative share of the Settlement Fund that will be contributed by each Settling Defendant and when.  The existence of such agreement has been disclosed to Plaintiffs' counsel but not its terms.

## VI.   CLASS NOTICE

47.     The Settlement provides that KCC Class Action Services LLC will serve as the General Administrator. (Exhibit A, Settlement at §1(x)). Before selecting KCC, Class Counsel contacted and discussed proposals from leading class action settlement notice and administration firms, including KCC. Class Counsel then compared proposals for any inconsistency in services delivered and price, and selected KCC as the best candidate. KCC is a leading class action notice and claims administrator comprised of seasoned class action practitioners. KCC has administered more than 7,000 settlements and has the largest domestic infrastructure in the industry with a large call center that can evaluate thousands of claims per day. (*Id.*, Exhibit D). The Settling Defendants have consented to the appointment of KCC.

48.     The Medical Monitoring Administrator will be Edgar C. Gentle, Esq. Mr. Gentle submitted an expert report in this case outlining his experience and skill in administering medical monitoring programs. (*See* Dkt. 163.) In particular, Mr. Gentle has been appointed administrator of four settlements that provide medical testing or access to medical clinics. (*Id.*) He also provided expert testimony for the plaintiffs in *Sullivan v. Saint-Gobain Performance Plastics Corp.*, No. 16-cv-125 (D. Vt.), a factually similar PFOA class action pending in the District of Vermont. The Settling Defendants have consented to Mr. Gentle serving in this capacity. (*See also, Id.*, Exhibit E for Mr. Gentle's qualifications.)

49.     The Parties respectfully request that the Court approve the proposed Notice form attached as Exhibit 1, Settlement, Exhibit B. The Settling Defendants will provide the General Administrator with (i) confidential private well testing data provided by the NYSDEC and/or New York State Department of Health, including property addresses, from testing performed on properties within the Town of Hoosick and Village of Hoosick Falls since

December 2015, and (ii) confidential records provided by the NYSDEC and/or New York State Department of Health of all properties within the Town of Hoosick and Village of Hoosick Falls at which POETs have been installed since December 2015. The General Administrator shall use this information solely for the purposes of providing Notice and administering the Settlement, including making eligibility determinations, as described in Section 3.

50.     Within twenty (20) days of Preliminary Approval, or by the time specified by the Court, the General Administrator shall commence the Notice Program, including by mailing the Notice Form in such form as is approved by the Court.  The General Administrator shall transmit the Notice Form via direct mail to all owners of Residential Properties that obtain drinking water from the Village Municipal Water System and owners of Residential Properties in the Contamination Zone that obtain drinking water from private wells in which PFOA was detected on or after December 2015.

51.     Commencing on the Notice Date, the General Administrator will implement the Notice Program. As set forth in more detail in Exhibit F to the Settlement (Exhibit 1 to this Declaration), the Notice Program shall consist of direct mail; internet, national and social media impressions; a national press release; and a community outreach effort.  The General Administrator will also maintain a Settlement Website containing the Second Amended Complaint, this Agreement, the Notice Form, Plaintiffs' motion seeking Preliminary Approval, the Preliminary Approval Order, Plaintiffs' motion seeking Final Approval, the Final Approval Order, the Claim Form, and such other documents as the Parties agree to post or that the Court orders posted.  These documents shall remain on the Settlement Website for at least six months after Final Approval.     The Settlement Website's URL will be www.hoosickfallspfoasettlement.com.

52.     The Parties also respectfully request that the Court establish the following schedule after Preliminary Approval:  (1) deadline for sending Class Notice (the Notice Date): twenty (20) days from Preliminary Approval; (2) Opt-Out Deadline: one hundred and five (105) days from the Notice Date; (3) Objection Deadline: one hundred and five (105) days prior to the Fairness Hearing; (4) deadline for filing motions for approval of Plaintiffs' Service Awards and attorneys' fees and costs awards: one-hundred twenty (120) days from Preliminary Approval; (5) Fairness Hearing: one-hundred fifty (150) days from Preliminary Approval, or as soon thereafter as is mutually convenient.

## VII.   OPT OUT PROCEDURES

53.     A Settlement Class Member may opt-out of the Settlement Class at any time prior to the Opt-Out Deadline, which is 105 calendar days from the Notice Date (or other date as ordered by the Court), provided the opt-out notice that must be sent to the Settlement Administrator is postmarked no later than the Opt-Out Deadline. (Exhibit 1, Settlement at §12.) If a Property that qualifies for either Property Damage Settlement Class has more than one owner, and if one owner of such property  excludes himself or herself from either Property Damage Settlement Class, then all owners of such property shall be deemed to have opted out of the Settlement with respect to that property. (*Id.* at §12(d).)

## VIII.  OBJECTION PROCEDURES

54.     The Settlement also provides a procedure for Settlement Class Members to object to the Settlement, to the application for attorneys' fees and costs, and/or to the Service Awards. (*Id*. at §13). Objections must be submitted no later than the Objection Deadline, as specified in the notice, which is 105 days prior to the Fairness Hearing (or other date as ordered by the Court). (*Id*.) If submitted by mail, an objection shall be deemed to have been submitted

when posted if received with a postmark date indicated on the envelope if mailed first-class postage prepaid and addressed in accordance with the Settlement's instructions. (*Id*.) If submitted by private courier (*e.g.*, Federal Express), an objection shall be deemed to have been submitted on the shipping date reflected on the shipping label. (*Id*.)

## IX.    INFANTS, INCOMPETENTS AND DECEDENTS

55.    Each of the Plaintiffs who filed this Action as parent and natural guardian of a Minor will apply to the Court individually or jointly for approval of the settlement on behalf of the Minor class representatives and all absent Minor Settlement Class Members.  It is anticipated by the parties that an Order from this Court approving the Settlement for all named Minor Plaintiffs and absent Minor Settlement Class Members will provide authority under Local Rules of Civil Practice, Rule 17.1 and N.Y. C.P.L.R. § 1201 for parents and guardians of all named Minor Plaintiffs and absent Settlement Class Members to sign Claim Forms and releases on behalf of their Minor children and wards shall effectuate a settlement under Local Rules of Civil Practice, Rule 17.1 and N.Y. C.P.L.R. § 1207 for all named Minor Plaintiffs and absent Minor Settlement Class Members. Proposed Declarations by the Plaintiff parents of the infant representative Plaintiffs and by Interim Class Counsel supporting approval of the Settlement on behalf of all infant Plaintiffs and absent infant class members are attached as Exhibits 2 & 3.   Executed versions of these declarations will be filed separately after Preliminary Approval is granted.

56.    The legal representatives of deceased or incompetent absent Settlement Class Members shall have authority to sign Claims Forms and releases on behalf of the absent Settlement Class Members they represent.  Where a legal representative of a deceased or incompetent absent Settlement Class Member submits a Claim Form on that Settlement Class

Member's behalf, that legal representative shall attest to their authority to act for the deceased or incompetent absent Settlement Class Member.  With respect to any incompetent Settlement Class Members identified during the claims process, Interim Settlement Class Counsel shall apply for an Order from this Court providing authority for such legal representative to sign the Claim Form and release on behalf of the incompetent Settlement Class Member he or she represents.  It is anticipated by the parties that an Order from the Court finally approving the Settlement shall effectuate a settlement under Local Rules of Civil Practice, Rule 17.1 and N.Y. C.P.L.R. § 1207 for all absent incompetent Settlement Class Members.

## X.    CLASS COUNSEL

57.    The Settlement in this action provides meaningful relief to Settlement Class Members and was made possible only by Interim Class Counsel's extensive experience in class action litigation in general and in litigation involving environmental contamination in particular.

58.    Class Counsel have emerged as leaders in environmental and class litigation. As detailed in Class Counsel's firm resumes, attached hereto as Exhibits 4-6, Interim Class Counsel also have extensive experience in a wide range of class and environmental litigation.

59.    As recognized by Hon. Daniel J. Stewart in his order appointing Weitz & Luxenberg P.C. and Faraci Lange, LLP as interim counsel, both firms, individually and together, have had extensive experience in class action and environmental litigation and this experience has only increased since the time of that order in 2016.  (Doc. No. 20).  The recent experience is detailed further in Exhibits 4 & 5.

60.    James Bilsborrow was with Weitz & Luxenberg until March of 2021 when he became a partner at Seeger Weiss, LLP another highly experienced firm in the field of class

actions.  See Exhibit D.  Mr. Bilsborrow has worked extensively on this case and it is requested that his new firm in addition to Weitz & Luxenberg, PC and Faraci Lange, LLP, be appointed Class Counsel for the four settlement classes. See Exhibit 6.

## XI.    INTERIM CLASS COUNSEL'S EFFORTS IN THIS ACTION

61.    Interim Class Counsel's combined expertise allowed them to build a strong case of both liability and damages against all four Defendants in this action. The skill, knowledge and innovation on the part of Interim Class Counsel and the extensive effort and investment made by these firms were instrumental in the result achieved.

62.    Interim Class Counsel not only successfully defeated Defendants' motion to dismiss in this Court but were successful in the Second Circuit on the appeal of that motion. Interim Class counsel briefed and argued the consolidated appeal of this Court's ruling in this case and its similar ruling in *Benoit v. Saint-Gobain.*   The Second Circuit issued its main opinion in the consolidated appeals in the Benoit case with that opinion incorporated by reference into its decision in this case.  The Second Circuit's decision has established important precedent for environmental contamination actions and particularly those seeking medical monitoring consequential damages.  Interim Class Counsel's novel argument establishing exposure to PFOA as an injury under New York law sufficient to support a negligence claim was a landmark ruling that directly impacted the settlement of this case.

63.    As mentioned above, Interim Class Counsel has spent years and thousands of hours pursuing discovery in this case, including organizing and reviewing hundreds of thousands of documents, conducting over two dozen fact witness depositions, over a dozen expert witness depositions, filing an extensive and detailed motion for class certification and successfully defending Defendants' multiple motions to exclude the testimony of Plaintiffs'

experts on *Daubert* grounds.

64.    Interim Class Counsel also skillfully negotiated the Settlement in this case.  This successful negotiation required extensive experience and unique skills as the Settling Defendants are represented by some of the most experienced and skilled firms and attorneys in the nation. Interim Class Counsel have obtained a resolution that provides a certain recovery of a significant percentage of the best-case recovery against three of the four Defendants in this case with the opportunity for further recovery against Defendant DuPont.

65.    Over the five years, Interim Class Counsel have devoted substantial attorney and staff time and over $1,000,000 of out-of-pocket expenses to develop and prosecute this litigation to a successful conclusion against three major corporations with virtually unlimited resources. Interim Class Counsel have at all times represented Plaintiffs and the Settlement Class on a contingent basis and thus took an enormous risk in investing substantial resources on a highly complex action where the outcome was uncertain.

66.    The litigation tasks that Class Counsel performed include:

A.    Researching and preparing the complaints and other pleadings;

B.    Briefing and arguing the opposition to the motion to dismiss;

C.    Briefing and arguing the appeal of the denial of the motion to dismiss in the Second Circuit;

D.    Developing discovery plans, a protective order, and a protocol for the identification and production of highly relevant ESI;

E.    Substantial offensive and defensive party and nonparty discovery, including reviewing millions of pages of documents;

F.    Working with experts to establish liability, causation and damages;

G.    Preparing for and defending dozens of fact and expert depositions;

H.   Preparing for and attending three full-day mediations in addition to one supplemental mediation session after an initial agreement had been reached; and

I.   Negotiating and preparing documentation for the settlement.

67.   In addition to the time already spent on this case over the five years of its existence, Interim Class Counsel estimate that collectively they will spend at least an additional 200-400 hours on this case administering the Settlement and seeking final approval of the Settlement.

## XII.   CONCLUSION AND RECOMMENDATION

68.   As set forth in more detail above and in Exhibit 4-6, Interim Class Counsel in this case have more than fifty (50) years of combined experience representing plaintiffs in environmental contamination mass tort cases and class actions.  It is our combined judgment, based upon this experience and our extensive knowledge of the facts of this case that the Settlement with the Settling Defendants is in the best interests of all members of the four proposed settlement classes and preliminary approval should be granted.  If approved, this settlement will provide immediate cash payments to class members for their property diminution due to the contamination and their nuisance damages and will also provide ten years of medical monitoring for medical monitoring class members, which will allow for early diagnosis and treatment of diseases and conditions related to PFOA exposure.  If Preliminary Approval is not granted, it is likely this litigation will continue for at least two more years and potentially longer delaying any recovery for diminution of property value and nuisance, and delaying the commencement of medical monitoring, which could delay diagnosis and treatment of serious illnesses including cancers.  This settlement also avoids the risks of an adverse jury verdict, even though this is not highly likely, it is certainly possible for a jury to

award damages of less than the amount offered and even for a jury to find no liability for one or more of these defendants. Moreover, Interim Class Counsel will continue to litigate this case against Defendant DuPont with the expectation of further recovery for the Property Damage Class Members and the Medical Monitoring Class Members. For all of these reasons, it is respectfully requested that the Court grant Preliminary Approval of this Settlement.

We declare under the penalty of perjury that the foregoing is true and correct.

Dated: July 21, 2021

STEPHEN G. SCHWARZ

Dated: July 21, 2021

HADLEY LUNDBACK MATTARAZZO

Dated: July 21 2021

ROBIN GREENWALD

Dated: July 21, 2021

JAMES J. BILSBORROW